E98AADELF                    Jury Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4             v.                          12 CR 802 (KBF)

5   DAVID DELVA,

6                 Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         September  8, 2014
9                                        9:30 a.m.

10

    Before:
11
                      HON. KATHERINE B. FORREST,
12
                                         District Judge
13

14                         APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    JUSTINA GERACI
17  RYAN POSCABLO
         Assistant United States Attorney
18
    JEFFREY PITTELL
19       Attorney for Defendant Delva

20

21  ALSO PRESENT:  JOHN REYNOLDS, Special Agent FBI
    ANNIE CHEN, Paralegal Specialist, U.S. Attorney's Office
22

23

24

25

E98AADELF                     Jury Trial

1           THE COURT:  Good morning, everyone.  Please be seated.

2           (Case called)

3           MS. GERACI:  Good morning, your Honor.

4           Justina Geraci and Ryan Poscablo for the government.

5    We're joined at counsel table by Paralegal Specialist Darcy

6    Brady and by FBI Special Agent John Reynolds.

7           THE COURT:  Good morning, all of you.

8           MR. PITTELL:  Good morning.

9           Jeffrey Pittell, appearing for Mr. Delva

10          THE COURT:  Good morning, Mr. Pittell.

11          And good morning, Mr. Delva.

12          THE DEFENDANT:  Good morning.

13          THE COURT:  We have several matters to go over this

14   morning before we get our jury panel.  I'm hopeful that we'll

15   be among the first of the scheduled trials today to get our

16   jury panel.  So I am hopeful that that would put the panel

17   coming in around 10:30.  That's my hope.  We'll let you know as

18   we get updates from the folks downstairs.

19          I guess I have four matters on my agenda.  I've got

20   the two letters from John Philippe which are Government

21   Exhibits 50 and 51 that we'll go over.  We've got Government

22   Exhibit 800 which we had said we would deal with this morning.

23   We have Mr. Delva's letter to the Court which the government

24   responded to as a pro se motion and we'll find out if the

25   defendant wants in fact to have that as a pro se motion and if

1    so we'll deal with it this morning, and then just making sure

2    we all understand the jury selection process.

3            So with that said, we'll go through those items.  Do

4    you folks have additional items that we should note right now

5    for this morning's agenda?

6            MR. POSCABLO:  The government has like one or two

7    issues.  Just to front for the Court, there's a witness that

8    the defense may call who is currently in the courtroom and we

9    have had conversations with the defense.  I don't know if that

10   witness is actually on the witness list.

11           MR. PITTELL:  Rose Thomas.

12           MR. POSCABLO:  Rose Thomas.  I believe she is on the

13   witness list.  I've spoken with Mr. Pittell about what the

14   witness is going to testify about.  He has indicated that it

15   might be about Mr. Accilien who is expected to testify.  I've

16   asked Mr. Pittell to have her step out during Mr. Accilien's

17   testimony if she is going to testify about Mr. Accilien which

18   we would also contest.

19           THE COURT:  All right.  So the application -- and I am

20   not sure if it's on consent yet -- we'll figure out from

21   Mr. Pittell to have Ms. Thomas should she be in the courtroom

22   when Mr. Accilien is called to the stand, to step outside

23   during the period of time when he's on the stand but not

24   otherwise; is that right?

25           MR. POSCABLO:  That's correct.

E98AADELF                    Jury Trial

1          THE COURT:  Mr. Pittell, do you have any objections?

2          MR. PITTELL:  No.  That's what I had actually

3    proposed.  I have no objection.

4          THE COURT:  All right.  That's on consent.

5          MR. POSCABLO:  One other thing, your Honor.  My

6    understanding is that at a prior proceeding your Honor

7    allocuted the defendant as to offers that were made to

8    defendant prior to trial, that he rejected those offers and

9    that his desire was to go to trial.  Subsequent to when your

10   Honor allocuted defendant as to that another offer was made and

11   it was rejected by the defendant.  So I just respectfully ask

12   that your Honor ask him again about his desire to go to trial

13   and his refusal of the plea offer.

14         THE COURT:  Let me make sure I understand though

15   before we proceed.  There's two ways of doing this.  One is to

16   determine whether or not the defendant had an offer conveyed to

17   him which he at that time turned down.  The other is something

18   which is worded differently which is, does he understand that

19   there were offers made to him which he turned down?  Does he

20   understand that going to trial could lead to both acquittal or

21   also could lead to potentially higher penalties?  Is there an

22   offer still open?

23         MR. POSCABLO:  There is not.

24         THE COURT:  So the purpose of the Court's allocution

25   is really just to determine whether or not an offer was

E98AADELF                          Jury Trial

1    subsequently was made and had been turned down by the

2    defendant.

3              MR. POSCABLO:  That's correct, your Honor.

4              THE COURT:  All right.  So Mr. Pittell, are you aware

5    of an offer that was made subsequent to the time that DNA

6    evidence in this matter was received in July of 2014?

7              MR. PITTELL:  There was a verbal offer made by the

8    government which I conveyed to Mr. Delva.  I have no objection

9    if the Court wants me to go into at least the general specifics

10   of the offer.

11             THE COURT:  I don't need to so long as it was conveyed

12   to Mr. Delva and did Mr. Delva instruct you that he was turning

13   it down?

14             MR. PITTELL:  Yes.

15             THE COURT:  Mr. Delva, was there a plea offer,

16   extended to you at least orally through your counsel that you

17   understood was coming from the government in July of 2014?

18             THE DEFENDANT:  Yes.

19             THE COURT:  And did you think about that offer and

20   then make a decision to turn that down?

21             THE DEFENDANT:  Yes.

22             THE COURT:  All right.  Thank you.

23             MR. POSCABLO:  Thank you, your Honor.

24             THE COURT:  All right.  Let's go into the matters that

25   we have.

E98AADELF                    Jury Trial

1          MR. PITTELL:  Judge, I am sorry to interrupt.  We

2    actually have one matter that we want to put on the list.

3          THE COURT:  Yes.

4          MR. PITTELL:  There is a disagreement between

5    Mr. Delva and I on a certain line of inquiry which pertains to

6    his defense in this case.  He wishes to make a record of our

7    disagreement.  I realize the letter motion is not going to be

8    ex parte and after getting the letter agreement I agree it

9    shouldn't be, the discussion on that should be ex parte.

10          THE COURT:  You do agree or don't agree?

11          MR. PITTELL:  I do agree.  But this disagreement about

12    defense strategy that should be done, I would request at this

13    point ex parte and then sealed just for purposes that it's

14    placed on the record so that in the event there is an appeal

15    that it's preserved.

16          THE COURT:  All right.  I do think that given what

17    you've said at the moment it should be done ex parte and it

18    could certainly be done so that it could be preserve for

19    Mr. Delva for the future.  If you wanted we can do that.

20          MR. POSCABLO:  Judge, we can step out.

21          THE COURT:  Let's not do it right now.  Do we have to

22    do it right now?  Is it the kind of thing --

23          MR. PITTELL:  No.  I would think we could do it at any

24    time before we open.

25          THE COURT:  All right.  So we'll take it up at a

E98AADELF                    Jury Trial

1    particular time.  Make sure you remind me if I forget but let's

2    certainly do that.

3            All right.  Now, you folks got word from my deputy

4    that I do allow coffee and water or whatever beverage you folks

5    could find making your time here most comfortable because I

6    will also tell the jury that they can have coffee and beverages

7    as well.  I don't mind that it tends to make people feel more

8    comfortable here in the courtroom.

9            In terms of the two letters which are Government

10   Exhibits 50 and 51 --

11           Let me ask you, Mr. Delva, is there some reason why he

12   can't have water or coffee?  Does the marshal have any

13   objection to him having water or coffee?

14           THE MARSHAL:  No, your Honor.

15           THE COURT:  So if Mr. Delva I just want to make sure

16   that to the extent that that would make him comfortable as well

17   that he is able to have that.  So everything is what's good for

18   the goose is good for the gander.

19           THE DEFENDANT:  Thank you.

20           THE COURT:  Now, the two letters that we have are

21   Government Exhibits 50 and 51.  They're letters from Jean

22   Philippe to Mr. Accilien.  Mr. Accilien is a cooperating

23   witness in this matter.  Mr. Jean-Philippe previously pled

24   guilty to the conspiracy that's been charged here and the Court

25   relies upon that guilty plea in part for its determinations on

E98AADELF                         Jury Trial

this motion.  The motion is to preclude both letters on the

basis of hearsay.  The Court also relies upon Mr. Accilien's

own guilty plea with respect to his participation.  The Court

also relies on the testimony of the male and female victims

during the Fatico hearing held in the Trevor Cole/Dominique

Jean-Philippe case in terms of participation beyond those two.

The Court also relies upon the proffer of the government by the

government of Mr. Accilien's testimony.  And finally, the Court

relies upon the content of the letter itself, one of the

letters which refers to the, in particular, to David among

others.

        So the question for this Court is whether these two

letters are admissible or should be precluded as the defendant

has requested and the defendant asserts that they're hearsay

and not subject to exception and in particular, the

co-conspirator exception under 801D2(e).

        The Court notes that Mr. Pittell in his letter which

carefully set out the legal standard and went through why he

did not think the legal standard had been met and also went

through the interpretations that the government had proffered.

The defendant asserts that the co-conspirator exception is not

met and that these statements are therefore hearsay and that

the interpretations are inaccurate.

        The Court disagrees and the motion is denied for the

following reasons:

E98AADELF                    Jury Trial

1            I find in letters are either not hearsay where they're

2     not offered for the truth of the matters asserted or to the

3     extent that they can be considered hearsay then they do meet

4     the co-conspirator exception.  In that regard I do apply, as

5     Mr. Pittell noted, the factors in the Borjelay case that there

6     was a conspiracy.  Here, we have three guilty pleas, noting

7     that there was a conspiracy that the members included the

8     declarant which here is Jean Philippe and then the other person

9     who was the recipient which is Mr. Accilien, they are members

10    of that conspiracy pursuant to their own pleas and also

11    pursuant to the proffer that it involved Mr. Delva and that the

12    statement was of course during the course of and in furtherance

13    of the conspiracy.

14            And in that regard I would note as Mr. Pittell

15    appropriately points out that this statement, the statements

16    were necessarily made after the events in question because they

17    occurred in a time when Jean Philippe was incarcerated

18    following an arrest for his participation in this conspiracy.

19    Nevertheless, under the Beachnut case 871 F.2d 1181 in pin

20    note, pin cite 1199 or the Airington case 867 F.2d 122 in 130

21    or the Rahme case, R-A-H-M-E, in 813 F.2d 31 in 35.  There, of

22    course, are instances where even following the termination of

23    the particular events in question an attempt to maintain

24    secrecy and prevent disclosure of the actions of the

25    conspiracies can, nonetheless, be considered to be in

E98AADELF                      Jury Trial

1    furtherance of.

2           I do find having reviewed the letters carefully now

3    more than once and trying to decipher what they might mean

4    because they are handwritten and they are written in a kind of

5    lingo that is necessarily open to some in interpretation.  I do

6    find that they appear to be suggesting in several different

7    places that there be secrecy maintained and that the secrecy

8    and/or the lack of disclosure of criminal participation by

9    others is something which should be appreciated.  Those things

10   I find go beyond idle chatter maintaining secrecy is far beyond

11   idle chatter.  It goes to the heart of maintaining the heart of

12   the conspiracy itself and, therefore, I find that they are in

13   furtherance of.

14          In terms of the interpretation to the extent that the

15   Court needs the government's interpretations in all, I don't

16   need them as a matter of law to make this determination.  I do

17   final that the interpretations lend themselves to

18   cross-examination.  It maybe that if Mr. Accilien is going to

19   interpret these letters in a manner that Mr. Pittell believes

20   is vulnerable to being considered inaccurate that he can take

21   that up on cross-examination, I would expect him to do so and

22   to go hard at it.  But, nevertheless, the Court's review of the

23   content of the letters itself does suggest that they are in

24   furtherance of.  So that is the resolution of that motion.  The

25   motion as to Exhibits 50 and 51 then is denied.

E98AADELF                          Jury Trial

1              In terms of pro se motion, Mr. Pittell, I am prepared

2       to state the Court's views but I don't know whether or not your

3       client and/or you would like to maintain that motion.

4              MR. PITTELL:  Judge, I haven't read the government's

5       response on speaking without knowing what they said and I saw

6       they filed it on ECF last night but I didn't get a chance to

7       pull it up and read it.  But, yes, Mr. Delva wants to maintain

8       the motion.  I think his letter is written well enough to

9       understand the points that he's trying to make.  That's why

10      when I filed it on ECF I styled it as raising two issues.  One,

11      is in essence reconsideration of your Honor's ruling on the

12      suppression of the cellphones.  And then the other one is the

13      dismissal of the indictment based upon the complainant, Patrick

14      James, using Eugene Brown which is known as a false alias which

15      will come out in the trial as a false alias on the complaints.

16      So I mean, I'll stand by the representations in the letter.

17             THE COURT:  All right.  I do find that the letters

18      themselves, the letter itself from Mr. Delva was quite clear as

19      to what it was seeking and I didn't have any doubt that it made

20      the points that you had suggested, Mr. Pittell, or that the

21      government had responded to.  So we don't have ships passing in

22      the night.  The ships have clearly met here.  I do find however

23      that the portion of the motion which refers to the cellphones

24      is in effect a motion for a reconsideration of the Court's

25      prior ruling and/or to the extent that it's relates to a

E98AADELF                        Jury Trial

1    confusion of which cellphone was taken when that the Court

2    didn't deal with during a prior motion.  There was a third

3    phone that was obtained at the time of the defendant's own

4    arrest in the federal matter.  That is the third cellphone.  So

5    there weren't three that were obtained as part of the search.

6    So the portion of the motion which is a denial of an untimely

7    motion for reconsideration relates to two of the cellphones.

8    The third piece relates to a cellphone which was obtained at

9    the time of arrest.  And in that regard the Court finds in any

10   event in motion does not change the Court's view that the

11   evidence is properly before the Court as the evidence was

12   obtained pursuant to a proper seizure in the ordinary and in

13   the appropriate manner.

14        Now, with that said of course, the issue is preserved

15   for appeal including the renewal of the motion that was made by

16   Mr. Delva as well as the piece relating to the third phone.

17        Mr. Pittell.

18        MR. PITTELL:  Yes, your Honor.  Actually regarding the

19   third phone, what he's referring to is it's our understanding

20   that when the agents seized cellphones in the apartment they

21   initially seized three cellphones, the two phones that without

22   make any concessions we'll call the Delva phones which the

23   government still has and which one of them was opened up and

24   examined subject to search warrant.

25        The third phone belonged to one of the residents of

E98AADELF                        Jury Trial

1    the apartment, McKenzie Bruno.  He was one of the persons

2    that -- I want counsel at the time -- testified in the

3    suppression hearing.  It is my understanding that phone was

4    initially taken.  From the paperwork it does not look like was

5    vouchered and it was given back to Mr. Bruno in some point.

6    But that's what Mr. Delva's referring to see in third phone in

7    his letter, not the iPhone which was seized from him two months

8    later when he is arrested on the charges.

9             THE COURT:  All right.  That's helpful.  So what I

10   would ask the government -- let me just back up.  I understand

11   the point of the third phone is a concern that the information

12   on that third phone was been mixed in with the other two.  Is

13   that right?  That's what I understood in the letter.

14            MR. PITTELL:  Actually, I guess I am going to have to

15   ask Mr. Delva but it is my understanding that regarding the

16   mix-in argument, what Mr. Delva is contending in his letter is

17   that the two Delva phones are seized.  There was a search

18   warrant obtained only for one of the phones.  The second phone

19   was never searched.  He's contending though that the

20   information on the memory card of that phone is mixed in with

21   the other items which were searched.

22            THE COURT:  All right.  So what I would like to know

23   from the government is -- and if we can't do it this right now

24   can you take some time to make sure -- is whether or not any of

25   the information that the government seeks to introduce in this

E98AADELF                        Jury Trial

1    trial relates to any of the information that Mr. Pittell in

2    particular suggests or argues was taken from Phone Number Two

3    and is mixed in with Phone Number One.  It you folks need to

4    confer during a break and then put clearly on the record what

5    the information is that is claimed to be mixed in, then you

6    folks should do so.  But what I want to know is particular is a

7    phone number or contact is it something that otherwise couldn't

8    go into government exhibits that relate to the charts for

9    example or something elsewhere we can tell quite specifically

10   what is the information mixed in.  Because if it's not mixed in

11   a manner that's coming in in trial then ultimately we don't

12   have an issue here for the trial.  If it's coming in because

13   it's been mixed together in least arguably I'll find out from

14   the government why they think it's not mixed in and why they

15   think additional review of the contents of the individual

16   phones done.

17            MR. PITTELL:  I'll discuss that with the government.

18            MS. GERACI:  Your Honor, I could just represent on the

19   record right now that's just factually incarcerate.  There was

20   not a second phone seized from Mr. Delva the day of that

21   arrest.  There was only one phone and we produced the contents

22   of that phone because it was pursuant to a search warrant.

23   There was no other phone taken or seized or even found from

24   Mr. Delva that day.

25            THE COURT:  All right.  Then how about there were two

1    phones obtained in the apartment on the day of Mr. Accilien's,

2    the initial sort of attempt to arrest Mr. Accilien which led

3    eventually to a larger arrest.  Whose phone was the second

4    phone that day?

5              MS. GERACI:  That day my understanding is that is

6    McKenzie Bruno's phone.  The two phones that were seized that

7    day were Mr. Delva's one phone and McKenzie Bruno's phone.

8    McKenzie Bruno's phone was given back to McKenzie Bruno.  It

9    was never searched.  It was returned to him.

10             THE COURT:  I was confusing this.  Then the third

11   phone --

12             MS. GERACI:  -- later arrested federally and in that

13   point an iPhone was seized from him.

14             THE COURT:  What we need to figure out is whether or

15   not any information Mr. Pittell contends is from Mr. Bruno's

16   phone that is part of the evidence the government seeks to

17   introduce in trial.  So is there a contention that the evidence

18   which you folks are contending is from Mr. Delva's phone in

19   fact is from Mr. Bruno's phone.  If there is such information

20   which you folks, Mr. Pittell claims has been mixed, then we

21   will sort out the next step.  If it turns out that this is a

22   principled argument, a theoretical argument about what could

23   occur should the government want to present additional evidence

24   but not evidence on the exhibit list, then it's something else,

25   all right.  So we'll take it one step in a time.  Is there

1    anything on the exhibit list which has mixed, allegedly mixed

2    information in it.  So we'll take that up in break.

3              MS. GERACI:  We never searched McKenzie Bruno's phone.

4    So the government's position is no.

5              THE COURT:  You never searched the phone?

6              MS. GERACI:  McKenzie Bruno, your Honor, we never

7    searched it.

8              THE COURT:  So with that information Mr. Pittell can

9    see if there's anything that he can identify in particular that

10   he contends is from the Bruno phone.

11             All right.  That is the first of the two issues.

12             The second issue relates to the issue of the inclusion

13   of the name "Eugene Brown" on, quote, complaint.  As I

14   understand it and as has been stated in the government's

15   response which, Mr. Pittell, I will tell you about since it's

16   only a paragraph, Eugene Brown, that name was only put on the

17   NYPD complaint.  It's not contained on any of the filings of

18   the indictments in this matter except as an a/k/a I think or

19   also in some of the motions as an a/k/a.  So I don't think

20   there's anything for the Court to do.

21             So there's a difference between, for instance, the

22   complaint in this action which would be often but not always,

23   it would accompany the indictment as a separate document or the

24   indictment itself or/and the NYPD complaint.  So the NYPD

25   complaint is of no particularly legal force in court in terms

1     of a charging instrument, all right.  So that motion then is

2     denied as well.

3           The other matter that the Court had relates to a

4     couple of the exhibits and that is Government Exhibit 808

5     first.  Now this exhibit, I am just going through now some of

6     Mr. Pittell's noted objections on the government's exhibit

7     list.  This exhibit Mr. Pittell argues is several different

8     things but it's hearsay and it's irrelevant and also makes a

9     reference to a right to counsel in another case.  I am not sure

10    if he was asserting attorney/client privilege because it

11    wouldn't be attorney/client privilege.  He's making that

12    statement to a third party.  But I am trying to figure out what

13    the use of this call is having reviewed it, what's the use of

14    the call?  And how much of this call are you even planning on

15    putting in?  Because it goes on for a couple of pages but it

16    doesn't seem to be all of it relevant.

17          MS. GERACI:  Yes, your Honor, that's absolutely

18    correct.  The government's intention was really only to direct

19    the witness, who would be Gregory Accilien, to pages four and

20    five of the call which as your Honor can tell talk about the

21    defendant and Dominique Jean-Philippe, a co-conspirator,

22    talking about how Mr. Accilien and others shouldn't say

23    anything.  This call --

24          THE COURT:  Why don't you just show me exactly where

25    you are in the page because there's lot of lingo.

1              MS. GERACI:  Of course, judge.  I'm looking

2      specifically in the very last lines of page four into the early

3      line of page five and then perhaps five lines down.  You'll

4      start seeing repetition of the theme.

5              THE COURT:  So this is DJP shit crazy, like, then goes

6      on?

7              MS. GERACI:  Exactly, judge.  And then the next line

8      from Mr. Delva says, that's why when we came up to me I talked

9      about speaking to his lawyer and the response is hopefully

10     Dreko which is the nickname for the coconspirator.

11     Mr. Accilien would do the same.  And then later down that page

12     about five or six lines down Mr. Delva then notes that before

13     Mr. Accilien got locked he told him not to say anything or not

14     to sign anything.  Then later down there about to or three

15     lines Dominique Jean-Philippe says also not to talk to the

16     authorities.  That's really the only segment the government

17     intends to introduce.

18             THE COURT:  Why don't you make a proffer about its

19     relevance.

20             MS. GERACI:  It's essentially the same argument that

21     we have made in respect to Government Exhibit 50 and 51.  It's

22     coconspirator statements in attempts to cover-up the

23     conspiracy.  Actually, the situation is very similar because in

24     this case Dominique Jean-Philippe is the only one with Trevor

25     Cole who has been arrested in this point.  Mr. Accilien has

1    been arrested and Mr. Delva is not arrested at this time.  So

2    the idea is some of the coconspirators are arrested, some are

3    not and they're having discussions about how to cover-up the

4    conspiracy.

5         THE COURT:  All right.  Mr. Pittell, why don't you

6    tell me a little bit more about your objection.

7         MR. PITTELL:  My objection is Mr. Delva had been

8    arrested at that time.  He had been arrested on a gun charge

9    and a drug possession charge at the same time Mr. Accilien was

10   arrested and that case was taken over to the Bronx district

11   attorney.  They filed a complaint and he was being prosecuted

12   on that.  He was in custody in some point.  The charges may

13   have been refused or may have been released on bail.  I don't

14   recall offhand but that's some of the earlier references in

15   there.  The reference to the lawyer and not talking, I mean

16   this is him talking about exercising his constitutional rights.

17   And I think that there needs to be a distinction between

18   telling somebody that you are exercising your right to remain

19   silent and not speak to the police and telling someone to

20   cover-up a conspiracy.  So my objections are similar to the

21   objections I raised.  I realize these aren't actually his

22   statements but they're still similar in objections I made

23   regarding the Jean-Philippe letters.

24        THE COURT:  Can you just point me specifically so the

25   record is absolutely clear what you think the language is that

1   refers to the exercise of his constitutional rights.  Let's get
2   a real precise location for that.
3            MR. PITTELL:  Page four and five of the last line.
4            THE COURT:  OK.  So after that's why when they came up
5   to me I was all, um, let me speak to my lawyer?
6            MR. PITTELL:  Yes.
7            THE COURT:  All right.  So, Ms. Geraci, why don't you
8   tell me what your response is to that line in particular.
9   We've talked about some of the other matters.
10           MS. GERACI:  Your Honor, the government would submit
11  if you would look in the prior line from Dominique
12  Jean-Philippe what he's talking about there is that law
13  enforcement will essentially sort of get in your head.  You'll
14  see the language before the Court.  And the response is from
15  Mr. Delva the government argued this as showed consciousness of
16  guilt.  He's saying I know.  I already know.  That is why I
17  didn't talk to them.  Then it goes on as I've described, the
18  whole page five goes on to describe what he told Mr. Accilien
19  as far as not speaking to the authorities as well.
20           THE COURT:  Here is what I suggest because I do find
21  that this is open, this particular segment is open to varying
22  interpretations.  I find that it is certainly open to
23  interpretation which makes it directly relevant to the matters
24  currently before this Court.  But I hear your point,
25  Mr. Pittell, and what I suggest I do is give the jury a

1   particular instruction at the time that this is played that the

2   reference to a lawyer the jury should understand that all

3   defendants have a constitutional right to a lawyer.  They have

4   a constitutional right to remain silent.  But I don't think

5   that a defendant if he chooses to talk about that right in the

6   context of what might otherwise be potentially incriminating

7   statements somehow absolves those statements or protects them

8   from coming in because of that fact.  So I think that we can

9   have a cautionary instruction to the jury that ought to resolve

10  that.  I'll come up with one of my own but if you folks want to

11  propose something can you do so in break.

12          MR. PITTELL:  Judge, also I realized that in my

13  notation of objections I'd actually had wanted to or I thought

14  afterwards that I wanted to in least make an objection on 403

15  grounds.  I don't know if the entire recording is going to be

16  played to the jury.

17          THE COURT:  I think Ms. Geraci said it would not be.

18  That's it's just going to be essentially the portion starting

19  down there in DJP on page four, the last, the second to last

20  paragraph through page five.

21          MR. PITTELL:  Right.  Well, if that's the case then I

22  think there probably isn't a 403 objection.  I feel that when

23  you listen to the entire recording some of the language that is

24  used over and over again may be offensive to some of the

25  jurors.  That was primarily my concern.

E98AADELF                          Jury Trial

1          It's still though, I just want to make it clear that

2     though that even if it's excised and basically just the last

3     page is put in and there's a cautionary instruction I still

4     object because the references to not talking and even on the

5     second page -- well, on the last page was I told him don't sign

6     anything, when you look in it in context there's earlier

7     discussion about his legal case and his rights being

8     disrespected and --

9          THE COURT:  Well, if he wants other portions in -- and

10    you folks can make a determination based upon how it comes out

11    and how you are feeling at the time, I'll certainly take an

12    application.  If it's a matter of putting things into

13    appropriate context and you think this call has been unduly

14    truncated then we can certainly entertain that, all right.

15    Then the Court will take the 403 objection as withdrawn.

16         In terms of other objections let's just go back and go

17    through a couple of them and I'll make sure that we've got an

18    understanding as to where the defendant, what his objections

19    are.  We've talked about 50 and 51.  For the 52 and others

20    going up to 70, Government Exhibit 70, those are all the

21    standing objections.  And so the Court has ruled as its ruled

22    in the past and those objections will be preserved if they're

23    made at the time of introduction.

24         In terms of several objections which occur starting at

25    500, Government Exhibit 50, Mr. Pittell objects that he doesn't

1    want to have the phones given to the jury in a manner in which

2    the phones are operable.

3          Ms. Geraci, would you just let me know, can you

4    proffer right now whether or not they will be operable.

5          MS. GERACI:  Judge, they will be turned off.  And

6    we'll, perhaps, your Honor could instruct the jury not to play

7    with the buttons or turn them on.  That's no problem with the

8    government.

9          THE COURT:  All right.  So the Court will do that

10   otherwise if there are any additional objections, Mr. Pittell,

11   at the time that the government seeks to introduce them, let

12   the Court know.  If I forget to tell the jury to not fiddle

13   with them -- they don't typically fiddle with them.  They have

14   them all the time and they don't have it them long enough to

15   fiddle with them.

16         MR. POSCABLO:  We'll just remember not to hand them to

17   them.  We'll just show it to them.

18         THE COURT:  All right.  That takes care of several of

19   them.  There are a couple relating to the Exhibits 651 to 633.

20   Did Mr. Pittell get the photographs?

21         MS. GERACI:  I believe he did, your Honor.  Let me

22   check.

23         (Pause)

24         THE COURT:  You folks will raise that with me in a

25   break.  It's really a place holder objection because

E98AADELF                          Jury Trial

1    Mr. Pittell as I understand it hadn't seen them.  But had a

2    potential 403 objection, so I would need to look in them.

3            Now, 702-A which continues, 704-A and then also the

4    objections between 704-C and 707 are objections to the

5    inclusion as I understand it of a photograph really of the

6    contents of a contact onto the chart.  So it's a cut and paste

7    of the contact, a contact item from the phone onto a chart.

8    That doesn't surprise me as a particular problem.  It does

9    strike me as still a chart.  And I think it's useful to have

10   the jury instruction that we have for charts as a result.  But

11   I don't think an appropriate foundation is otherwise laid for

12   the names and an appropriate foundation is laid for the phone

13   and the phones in and all they're doing is extracting what's an

14   already admitted piece of evidence into a chart.  That strikes

15   me as not problematic.  But am I misunderstanding the issue?

16           MR. PITTELL:  Judge, I think when I wrote that

17   objection I was actually -- I might have been looking in a

18   different exhibit because is this 702-A that I have now is a

19   chart.

20           THE COURT:  A chart with a sort of a photo, if you

21   will.

22           MR. PITTELL:  Yeah, there are photographs of the

23   contacts in there but either I was looking in a different

24   exhibit or maybe -- I mean, I was looking at something

25   different when I wrote what is on there.

E98AADELF                    Jury Trial

1              THE COURT:  That objection is withdrawn if the

2    appropriate foundations are laid.  Why don't we do this?  Why

3    don't you see how the evidence comes in and if you object, you

4    object.  If you don't, you don't, all right?  But your

5    potential for objecting is preserved because you have noted it

6    on the pretrial order so you don't have to waive your objection

7    right now.  You can see how things come in.

8              So those are the exhibits we already had gone over, GX

9    800.  I had one other thing which is jury selection I wanted to

10   make sure --

11             MR. PITTELL:  Are we done with the exhibits?

12             THE COURT:  Yes.

13             MR. PITTELL:  I had informed the government last night

14   or yesterday I wanted to raise an objection on the

15   admissibility grounds of the medical records of Ms. Adams.  It

16   may have been on a stipulation.

17             THE COURT:  This is Government Exhibit 31?

18             MR. PITTELL:  Yes.

19             THE COURT:  Is that coming in through a stip?

20             MR. PITTELL:  I am objecting.  I told the government I

21   am objecting on the admissibility rounds.  If the Court rules

22   it's admissible I am not going to object that there's no

23   custodian or that they are not properly certified.  I am not

24   going to require that but I want to raise an objection

25   regarding admissibility of -- actually, for Eugene Brown's

E98AADELF                    Jury Trial

1   hospital records, Exhibits 30 and 31.  I note that in a letter

2   the government had submitted to the Court last week which dealt

3   with some of the outstanding motions in limine regarding the

4   admissibility of my psychiatrist, the government took the

5   position that medical records are rank hearsay.  If the -- of

6   course they are referring to Mr. Accilien's medical records.  I

7   think if the government was going to take the position that

8   medical records are not admissible because they're hearsay then

9   it's incumbent upon me to in least raise the same objection to

10   the medical records of Mr. Brown or Mr. James and Ms. Adams.

11           THE COURT:  All right.  Now, of course, there's a

12   rule.

13           MR. PITTELL:  I disagree with the government's

14   position but --

15           THE COURT:  Right.  Let me just take a look in one

16   thing if I could.  All right. I am looking in 8034 which only

17   takes care of part of it.  I don't really know exactly what the

18   content of the records are going to be but why don't you,

19   Mr. Poscablo, give me a proffer.

20           MR. POSCABLO:  Judge, medical records for Mr. James

21   and Ms. Adams are very different than the medical records that

22   defense will seek to introduce for Mr. Accilien.

23           THE COURT:  Well, I think --

24           MR. POSCABLO:  There's a relevancy argument that we

25   can set aside first.

1          THE COURT:  All right.  But let me just sort of -- It

2     may be helpful if you showed me the records that you are going

3     to seek to introduce from male victim and female victim so that

4     I can figure out if it's simply a recitation of what they're

5     telling the hospital for purposes of medical diagnosis or if

6     there is going to be a diagnosis and those are two different

7     things.

8          MR. POSCABLO:  Judge, all the government seeks to

9     introduce from Government Exhibit 30 and 31 are, one, the fact

10    that each of these victims were admitted to Jacobi Medical

11    Center on a particular day at a particular time.  We will seek

12    to elicit from these records what the initial diagnosis was for

13    each victim what they informed the hospital.

14         THE COURT:  What the initial diagnosis was?  That's

15    where I think you run into issues because under 8034 the

16    statement of the witness can come in for purpose of medical

17    diagnosis.  I don't know how you get the diagnosis in without

18    calling the health professional or otherwise having a stip.

19         MR. POSCABLO:  100 percent agreed, your Honor.  And

20    that's where I think Mr. Pittell has already signed a

21    stipulation saying to your Honor, saying to the Court he will

22    not -- he is not arguing that it's lack of -- it's not

23    admissible under the business records.  I think that's what he

24    is saying.

25         THE COURT:  No, I think it's different.  He is not

1   giving you a hearsay exception what he is saying he is not

2   going to contest that you could lay a proper foundation for it

3   as a foundational matter that it is what it purports to be.

4   These are hospital records.  But whether or not the content has

5   indicia of reliability or whether it's some fly by night

6   medical organizations that the doctors just write down any old

7   thing, he is not going to say one way or another where it falls

8   on that.  You've got this potential and if you don't have to

9   call a custodian of records but you've got to somehow get a

10  stip or call the treating physician.

11          MR. POSCABLO:  Well, right.  Well, we'll talk to

12  Mr. Pittell about it, judge, because usually the statements

13  made -- the point of contention usually in these issues is the

14  statements made by the victim not the diagnosis or the

15  treatment but I am happy to talk to Mr. Pittell.

16          THE COURT:  Well, the statement made by the victim

17  would fall under 8034, but that would fall without seeing the

18  particular language I can't tell you where it would start or

19  stop.  I also believe that's simply the date that it was a

20  medical record generated, that would probably fall under since

21  there's a stipulation as to admissibility the Court believed

22  the date and the fact of it being on the letterhead of the

23  hospital to the extent that these are, quote, declarations

24  under the hearsay rule would come in under the hearsay general

25  catchall exception as being generally indicative of having

E98AADELF                         Jury Trial

1    indicia of reliability.  So the date and fact that it has in

2    patient being male victim or female victim on the letterhead of

3    a hospital, those can come in.  If you want diagnosis in, you

4    are going to have to do something else.

5              MR. POSCABLO:  OK.  Yes, your Honor, understood.

6              THE COURT:  All right.  What else did we have?

7              Now, jury selection, I was saying you'll have 14

8    jurors in total, 12 plus two.  That will be for peremptories,

9    ten for the defendant, six for the defendant for the 12.  One

10   each against the alternates in the end separate and apart from

11   the tenant six, all right.  So there'll be a separate set of

12   strikes against the alternates.  So when you are striking it'll

13   be against the panel of 12.  You can strike against anybody

14   sitting in any of 12 seats, one through 12 at any time.  So in

15   other words, if you struck number one you can strike number one

16   ten times if you want.  You can always strike whoever is

17   sitting in the box.

18             MR. POSCABLO:  And if you don't exercise your

19   challenge you lose it?

20             THE COURT:  Use it or lose it.  If you don't exercise

21   a challenge, you'll loose it.  So the defendant gets two, two,

22   two, two, one, one that's ten in total.  And the government

23   gets one each round.  Hand a post it or slip of paper to my

24   deputy each round irrespective of whether you use a strike or

25   not so that the jury does not know who is striking.  That way

1    if you are going to waive as to a particular round hand a blank

2    Post-it to my deputy.  So he'll check two Post-Its.  He'll go

3    back and read off the numbers and that way the jury doesn't

4    have any sense as to who's striking, OK.

5         I will give the jury the typical sort of cautionary

6    instruction they shouldn't care or think about why they're

7    struck.  It's just the right of counsel to strike.  And

8    otherwise after somebody's been struck we'll fill-in from the

9    back.  I'll ask that individual did they have any "yes" answers

10   to any of the questions I asked.  If they did we'll go through

11   them.  If they didn't I'll ask them for their 30 seconds bio

12   information, just to stand up and recite it.  That person then

13   is in the 12 and we'll then do another round of peremptories

14   against them.

15        In the very end of everything I am going to ask you

16   are there any issues?  Is the jury acceptable to the

17   government?  Is the jury acceptable to the defense counsel?  If

18   you folks want to raise anything you think that there's

19   something that really has gone awry and just your objection has

20   not otherwise been reserved that will be the time to say

21   something like, your Honor, can we approach?  And I am not

22   going to have you take it up then in front of the jury but

23   we'll approach and then that will be one more question or

24   something else if you believe that somehow I've miscounted on

25   peremptories or something else.  But once you've said the jury

1    is acceptable, any objections you have to reserve are gone.

2              All right.  What else should we do right now?

3              MR. PITTELL:  Just a couple things on jury selection.

4    I was giving some thought to your voir dire this morning and I

5    thought in light of the fact about what Mr. Accilien is going

6    to testify it may be worthwhile to ask the jurors if they've

7    ever suffered from any mental illness or anybody in their

8    family has ever suffered or been treated for mental illness.

9              THE COURT:  Well, mental illness is such a broad

10   category.  It could cover depression.  It could cover I think

11   in a civil case I have had right now there is an argument that

12   ADD is covered within the category of whether or not it's a

13   DDSM.  I don't know.  But I wouldn't want to do anything that

14   broad.

15             MR. PITTELL:  Schizophrenia?  I mean that's the mental

16   illness that's going to be in issue.

17             THE COURT:  Let me hear from the government on this.

18   You can confer for a second, Mr. Poscablo.

19             MR. POSCABLO:  Thank you, your Honor.

20             (Pause)

21             THE COURT:  The request would be have you or someone

22   close to you been diagnosed with schizophrenia?

23             MR. POSCABLO:  Judge, we don't have a problem with

24   that.

25             THE COURT:  All right.  So I will then add that to the

1  voir dire.

2           MR. PITTELL:  Thank you.  Judge, on the alternate

3  rounds is it two rounds on alternates?

4           THE COURT:  No, one round simultaneous.  So both of

5  them may go.  Bear in mind if both go then you'll get two folks

6  from the audience who you've never seen before.  If there's no

7  cause they are in alternates.

8           MR. PITTELL:  We each get one?

9           THE COURT:  Right.  So if you don't mind the

10  alternates there's some benefits to standing down but that's

11  for you folks to decide in terms of your own tactics.

12           Anything further?

13           MR. POSCABLO:  I don't know if your Honor's practice

14  is to hand back the indictment but there is a redaction that

15  we'd like to make to the indictment.

16           THE COURT:  Why don't you talk with Mr. Pittell about

17  it.  If you folks agree then I would take that redaction.  If

18  you don't I'll rule on it.  It is my practice to send into the

19  back the indictment.  Let me tell you so that you keep track of

20  this also, Mr. Poscablo, it's a good thing to do, to have this

21  sort of -- we'll do this right now -- have our rules in mind.

22  Any admitted exhibits with the exception of certain physical

23  exhibits, if there were weapons and things of that nature would

24  go into the back room.  What does in go into the back room are

25  transcripts of phone calls English to English, all right.  Now,

1    if it's a foreign language to English then the transcript

2    becomes evidence.  If it's English to English therefore

3    assistance to assist the jury, they are not themselves evidence

4    and the evidence is in fact the audio.  And so the

5    transcription would not go back but we would instruct the jury

6    they certainly can have it replayed etc.

7              in the end conclusion of arguments and when the jury

8    has been instructed and they're ready to go in the jury room

9    and begin deliberations in that moment, all right, and in

10   particular let me just make sure right here I am talking in

11   particular now to Ms. Brady and to Mr. Pittell and to my

12   deputy.  You are the folks who are most important for this as

13   well as government lawyers.  The moment deliberations begin the

14   chart with the introduced evidence will go into the back room

15   with them.  So it will not take around an hour or two hours or

16   three hours to figure out what goes back there.  We've had a

17   couple of ludicrous situations where people have taken for ever

18   what goes back and what doesn't go back and I have had to keep

19   my head from exploding.  So it will be wheeled into the back

20   room.  So decide and talk in advance.  Make sure you've got

21   agreement and I'll talk to you as well about what's really been

22   admitted, what should be taken out of the cart.

23        Mr. Pittell, you should feel free to take check the

24   cart to make sure things are in.  The government's exhibits are

25   usually bigger than the defendant's exhibits in terms of number

E98AADELF                        Jury Trial

 1     but it will go back right then.

 2              Mr. Poscablo.

 3              MR. POSCABLO:  Judge, one item are the numerous phone

 4     charts listed in the exhibits.

 5              THE COURT:  Yes.

 6              MR. POSCABLO:  We anticipate that the way this will

 7     play out in trial is Special Agent Reynolds who subpoenaed all

 8     of those phone records will be handed disks which contain all

 9     of the records, several disks for each, a disk for each phone

10     record.  They are voluminous, trying to print one out, each one

11     is almost 1500 pages.  So what we did was just put it on the

12     disk usually initialing the disk.  Not as an aid to the jury

13     but as a summary chart which we believe will be admissible and

14     sent, back we have prepared those charts.

15              THE COURT:  Yes.  When the charts are admitted that

16     we've talked about which are the ones which there have been an

17     objection, those would go back to the jury room.

18              MR. POSCABLO:  The charts which pull out specific

19     calls.

20              THE COURT:  Correct.  They would go back.  So long as

21     you have laid the appropriate foundation I am assuming that if

22     they are admitted subject to connection, I am all assuming all

23     the connections are made but otherwise they would come in as a

24     summary chart and they would be instruction to the jury as to

25     how to understand and grapple with that evidence.

E98AADELF                    Jury Trial

1            MR. POSCABLO:  Greet.

2            THE COURT:  And to weigh as they would other evidence.

3            MR. POSCABLO:  Thank you, your Honor.

4            MR. PITTELL:  So we're talking there are certain

5    charts that have Mr. Delva's name on it that I have an

6    objection to the use of his name on those charts.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E98Qdel2

1          THE COURT:  Well, why don't we see how it comes in and

2     whether there is an appropriate foundation laid because if the

3     foundation is not appropriate as to some or all of the

4     information, then we need to modify the charts or how they come

5     in, if at all.  All right?

6          For the charts, let's be specific.  I'm talking about

7     702-A, and there are a number of them up through 707.  Those

8     are exhibits I was referring to.  If those come in after an

9     appropriate foundation, they would go into the back room.  If

10    they don't come in and there are issues, we'll deal with it.

11    If I overrule an objection, then obviously they would still go

12    in because the objection would be overruled.  If I don't

13    overrule the objection, then we would have to deal with it at

14    the time.

15         Any word, Joe?  15 minutes.

16         I don't know where this jury is hailing from, if they

17    are coming from way Upstate.  I don't know if, you know, coming

18    from some of the outer counties that we draw from, how many of

19    them, therefore, may have hardship issues, things like that.  I

20    don't know how long it is going to take us to pick the jury.

21    It tends to go not overly long.  I think that we will certainly

22    get to openings today; there is no doubt about that.  I would

23    expect if we don't run into any bumps in the road that are

24    unexpected, we ought to get to at least the first witness.

25         We will, however, take a break after jury selection.

E98Qdel2

1    I would assume that would either be at lunchtime or if we are

2    still doing jury selection, then we come back from lunch,

3    finish up jury selection and take a short break so that you can

4    get everything positioned appropriately.  So there will be a

5    short break at least before we go into openings.

6            MR. POSCABLO:  Judge, just to give the Court a

7    heads-up and defense counsel who we intend to call today.  We

8    had intended to call Police Officer Donald Ford, a first

9    responder to the scene.  We learned yesterday that Officer Ford

10   had an accident.  He cut up his hand and had surgery last

11   night.  So he is not available today, and we don't even know if

12   he is going to be available to us the rest of the week.

13           Our first witness is going to be an individual by the

14   name of Officer Morel.  She is an ECT technician.  She has to

15   testify today.  She is currently on vacation, and she is coming

16   in on a vacation day.  If we can have her today, she is a very

17   short witness.

18           THE COURT:  I hear you, and I certainly hope to be

19   able to accommodate that.  I will tell you that one thing we

20   won't do in terms of taking things out of order is letting her

21   come in before openings have occurred.  We're hamstrung a

22   little by that.  We have to pick a jury first, have openings,

23   and then we can get her right on to the stand, but I can't

24   guarantee it.

25           MR. POSCABLO:  I know, your Honor.  I was only

E98Qdel2

1   indicating that because if it's 5:00 and she is only on cross,

2   I don't anticipate her testimony to be long.  If we can go a

3   little past five.  It's probably the only time I will ask your

4   Honor to do that.

5          THE COURT:  Actually, I appreciate that, your warning

6   me of that because otherwise I would tell the jury, and I will

7   tell them that but for today, we will end promptly at five, but

8   today we will go a little later but not much.

9          Is there anything else?

10          MR. POSCABLO:  Thank you, your Honor.

11          MR. PITTELL:  If we have a few minutes, do you want to

12   deal with the ex-parte issue with Mr. Delva--

13          THE COURT:  Why don't we do this?  I would ask the

14   government and the government's representatives to at least go

15   into the back of the courtroom.  Mr. Pittell and Mr. Delva,

16   Mr. Marshal can come up over here.  Have Mr. Delva come up too.

17   I know it's unusual.  That way we can deal with this issue, I

18   am going to ask the government and its representatives to go

19   into the back so they can't hear.

20          (Pages 39-50 sealed ex parte discussion)

21

22

23

24

25

E98Qdel2

1          (Prospective jury panel sworn; jury selection follows)

2          (A jury of 12 and 2 alternates was impaneled and

3    sworn)

4                      AFTERNOON SESSION

5                         2:00 p.m.

6          (In open court; jury not present)

7          THE COURT:  I understand there was one matter relating

8    to exhibits somebody wanted to raise.

9          MS. GERACI:  Yes, your Honor, just the addition of

10   some physical exhibits which the government just marked 120-A

11   through 120-G.  These relate to the testimony of Officer Smith.

12   We've shown them to defense counsel, but we just marked them a

13   moment ago.

14         THE COURT:  Mr. Pittell, have you had a chance to

15   consider whether you have objections or do you want to take it

16   up at another time?

17         MR. PITTELL:  I don't think I have any objections, but

18   I would just like to reserve my option to object at another

19   time.

20         THE COURT:  Yes.  So 120-A through G, am I right?

21         MS. GERACI:  Yes, your Honor.

22         THE COURT:  I think we have the jury here ready.

23   Anything anybody else wanted to raise now?

24         MS. GERACI:  Not from the government.

25         THE COURT:  My plan is to go over the last of the

E98Qdel2a

1    instructions and then we'll go right into openings.

2              (Jury present)

3              THE COURT:  Ladies and gentlemen, I am going to give

4    you just a couple of instructions, then we are going to go

5    right into opening statements.  I see my deputy has given you

6    each a pad and a writing implement if you wanted it.  That does

7    not mean that you need to take notes.

8              People have different practices in that regard.  Any

9    notes that you do take will be always for you, and you only.

10   The notes are really just to assist you in your own sort of

11   exercise of noting down what may be important to you in any

12   manner that you see as useful to you, but the notes should

13   never be shown during deliberations, for instance, to another

14   juror saying, "Here, you see it happened; I wrote it down"

15   because people write things down for different reasons and make

16   notes of things for different reasons.

17             Again, it will be your personal recollection that will

18   control or you can have, we'll talk about it, testimony and

19   things like that read back.  Feel free to take notes if you

20   want to take notes, but they will be for you and you alone.

21             You are going to hear a lot from many different

22   witnesses during the course of this trial.  There are going to

23   be several hours, a number of hours of testimony.  There is a

24   question that actually arises, which is:  How do you decide who

25   to believe and what to believe and who not to believe and what

not to believe?  My answer to you is use your own plain common

sense.  The biggest asset that you folks have when you come to

be a juror is your plain common sense.

        You are selected because you are citizens that are

drawn from our communities.  It's your common sense.  We don't

expect to you come here with particular training.  We expect

you to come here to apply plain common sense.  You ask yourself

every single day in dealing with people every single day:  "Do

I believe this person?  Do I not believe them?  Are they acting

in a way that makes me not trust them and not trust what

they're saying?"

        You take those same skills that you apply in your

everyday life and you apply them to people who are testifying

in front of you, and you ask yourself:  Were they candid,

honest, open and truthful?  Do they have a reason to falsify,

exaggerate, distort their testimony?  Use your common sense and

good judgment to evaluate their testimony.

        Now, I told you that the burden of proof in this case

is beyond a reasonable doubt.  I instruct you again that even

though there is an indictment which contains charges against

the defendant, that's why we're here, he has put in a plea of

not guilty as to each and every one of those charges, and he is

presumed innocent unless and until the government has carried

its burden of proof at this trial.  The burden of proof is

beyond a reasonable doubt, and it is different from the burden

of proof that is imposed on a plaintiff in a civil case, and
it's on the government here until the very end of the case.  I
am going to tell you more about the burden of proof at the very
end of the case before you go into the jury room to deliberate
at the end and the close of all the evidence.

But, again, I want to remind you that this means that
the defendant and his lawyer, they don't have any obligation to
present any evidence in this case if they choose not to do so.
They could sit in silence throughout all of these proceedings
without ever saying a word, and you can draw no inference
against the defendant.  The question is whether or not the
government has carried its burden of proof.

It is very important that you keep an open mind
throughout this case.  Don't form any judgments until the
evidence is in.  Evidence in a trial comes in in pieces.  You
don't usually have one person who tells you the whole story and
everything there is to know.  You have different people who
tell different parts of the story.  And it may not be in
chronological order.  So, you hear some pieces; then you get to
hear other testimony and have to put them together.  Sometimes
you get the direct, then you get the cross, the
cross-examination, you've got to put it together.  So you want
to keep an open mind because it comes in in pieces.

The way it works is the government calls a witness in
its case.  The government has a chance to examine that witness

first.  Then the defense counsel has an opportunity to do so.
And then sometimes, depending upon the witness and the
questions and things of that nature, how long it's gone on for,
we allow a little bit of redirect, meaning direct again and
recross.  So sometimes it goes on a little bit, but I will
control that process for you.  Remember, there are two sides to
any story.  It is important for you to hear both sides before
you form judgments.

Now, there maybe circumstances when there is a friend
or relative of yours in the courtroom.  If that ever happens
let us know beforehand.  The reason for that is, again, I don't
want you to be exposed to things for you, the jurors, that you
shouldn't be exposed to.  There are things that go on when
you're not here about the evidence and about arguments that we
have on procedural matters that are for very particular reasons
that you need not concern yourself with done outside of the
jury's presence.  If one of your relatives or friends is
sitting in the courtroom, we don't want them telling you about
it either.  So it is useful for us to know about that if you've
got somebody here because we don't want them inadvertently
blurting something out to you.

Now, I said to you before, don't discuss the case with
each other.  I also want to make sure it's clear don't discuss
the case with anybody until you're done, until this whole thing
is done.  Don't research the case.  Don't go online and Google

E98Qdel2a

1    Map certain areas.  Don't do your own independent research on

2    any thing.  People do all kinds of things.  They want to become

3    investigators.  You're not investigators.  You're jurors in

4    this case, and you're here to listen to the evidence we want

5    you to hear and see just what's puts in as evidence in this

6    case.

7            Now, the lawyers here and everybody, in fact, at both

8    tables have been instructed, the lawyers, all the folks, not to

9    say hello to you, not to acknowledge your presence, not to

10   really do anything other than avert their eyes when they see

11   you in an elevator, in the hallway, passing, everything else.

12   The reason for that is it comes from the long experience of

13   sometimes people say, "Oh, well so-and-so smiled at me, they

14   must mean X" or "They said hello in some meaningful way."  No.

15   All right?  To avoid any misunderstandings about any kind of

16   inference that could be drawn from an interaction, we just put

17   an across-the-board rule which is nobody over here in this

18   courtroom on our side should be talking to the jury, OK, at

19   all.  So don't think that they're being rude.  They're

20   following my instruction.  All right?  And so if they run into

21   you, that's why they are averting their eyes and otherwise not

22   talking to you in the elevator.

23           Now, we are going to have in a moment opening

24   statements.  Opening statements are the opportunity of each

25   side to give you their view as to what the evidence in the case

E98Qdel2a

1   they believe is likely to show.  It will be for you ultimately

2   to determine what you think the evidence in fact shows once you

3   have heard and seen the evidence.  But the lawyers have the

4   opportunity to put a framework around it to give you their view

5   as to what they think the evidence will show.

6          You should remember now, and have in your mind always,

7   that what the lawyers say in this case is never evidence.  What

8   I say is never evidence.  The evidence is the testimony you

9   hear from the witnesses and it's the exhibits that you will

10  hear admitted.  I am going to say "received."  That means a

11  document or piece of evidence has been admitted.  That's the

12  evidence.  So a question from a lawyer, for instance, is never

13  evidence.  All right?

14         Similarly, opening statements, that's not evidence.

15  That is the lawyer's description about what they think the

16  evidence will be.  It will be up to you to determine what you

17  believe the evidence in fact shows.

18         A couple of other miscellaneous things:  I'm going to

19  tell you a schedule.  We take a break in the afternoon, you'll

20  be happy to know.  We take a break at about 3:30-ish. it

21  depends where we are on things in terms of when I break.  If

22  you are uncomfortable for any reason you, and need to take a

23  break sooner, catch Joe's eye and indicate to him -- he is an

24  expert in reading body language -- you can sort of indicate to

25  him like (indicating), and then he'll tell me we need to take a

break, and we'll take a break sooner if we have to.  We will

take one break.  Otherwise, we will go until 5:00.  We expect

to be prompt today, but there is a possibility, I said this

morning, that we can run a few minutes over.  In general, we

will generally try to end promptly at 5:00, so you can count on

that.

         In the mornings we will start in the courtroom at

9:30, which is why you need to be in the jury room by 9:15,

9:20, get yourselves organized and lined up.

         Two last things:  I have a computer here that is

hooked into the court reporter to something called Live Note.

I get a realtime transcript of what is going on.  So you will

see me -- like right now where my home screen is, I have to

sort of fiddle and unlock the screen -- not home screen, my

lock screen because I haven't touched it recently enough.  I'm

not web surfing.  I'm not doing my email.  I don't do that when

I'm on the bench.  I just want you to know when I'm looking

over there, it's usually I am trying to sort of see what

happened with -- I just wanted to re-read a little bit of

testimony or see a question.

         Lastly, I will have, and you folks can have, any kind

of drinks if you want to have like water in the jury box with

you or you want to bring a cup of coffee in in the afternoon or

the morning, feel free to do so.  I don't not allow you to do

so in my courtroom.  The only concern is if you have a spill,

1    please own up to it.  All right?  There is no problem with

2    having a spill.  The bigger issue is if you don't own up to it,

3    so we can clean it because things otherwise get out of hand.

4    That's it.  All right?

5            So, without anything further, we are going to go

6    straight into the opening statements.

7            Ms. Geraci.

8            MS. GERACI:  Thank you, your Honor.

9            Ladies and gentlemen, we are here today because that

10   man, David Delva, the defendant, was part of a four-man crew of

11   armed robbers who kidnapped, tortured and robbed a couple in

12   the Bronx for marijuana and money.

13           Two summers ago on the evening of September 2, 2012,

14   Labor Day weekend that year, a woman named Jeanette Adams

15   returned home alone to her apartment, an apartment she shared

16   with her long time boyfriend, Patrick James.  That night

17   Jeanette found two men waiting for her in the stairwell armed

18   with guns.  These two men forced Jeanette into her apartment

19   and they ransacked the place.  They knew that Jeanette's

20   boyfriend, Patrick, sold marijuana, and they were there to

21   steal his drugs and money.  Jeanette told them that there was

22   nothing in the apartment.  So they demanded that Jeanette call

23   Patrick and get him to come over.  Jeanette tried to protect

24   Patrick by calling a wrong number for him.

25           One of the two robbers then called his brother to come

1    over to the apartment with the defendant.  The plan was for the

2    four of them to rob Patrick when he got home and force him to

3    reveal the location of his stash house.  In the meantime, they

4    were going to hold Jeanette hostage.

5           The robbers put on latex gloves and they tied up

6    Jeanette and they wrapped her in duct tape.  They duct taped

7    her arms and legs, her entire head and over her eyes.  They put

8    a sock in her mouth and they taped it shut.  They left her like

9    that:  Blind, gagged and bound for hours on the floor of her

10   bedroom waiting for Patrick to come home.

11          Over the course of the next two days, the four

12   robbers, including the defendant, came and went from the

13   apartment waiting for Patrick's return.  They took over

14   Jeanette and Patrick's apartment and they made themselves at

15   home, eating, drinking, smoking, watching TV, while Jeanette

16   remained bound and gagged on the floor.  They beat her.  They

17   sexually assaulted her.  They urinated on her.  Thinking that

18   the robbers were going to kill her, she made the call to

19   Patrick's real cell phone number.  The robbers had to hold the

20   phone to her ear and she asked him to come to the apartment.

21          Finally, at some point on September 4, Patrick

22   arrived.  When he opened the door, three of the robbers were

23   there waiting for him.  One of them was the defendant.  They

24   jumped Patrick, beat him, stabbed him repeatedly and threatened

25   him with guns pointed at his head.  They hogtied him with duct

1    tape, duct taped his eyes shut and put a sock in his mouth and

2    taped his mouth shut.

3           Patrick caught a glimpse of Jeanette lying there

4    covered in duct tape and not moving.  Believing she was dead

5    and that he was next, Patrick told them the location of the

6    stash house where he kept his drugs and his money.  Two of the

7    robbers decided to head to the stash house and left the

8    defendant and another robber to watch Jeanette and Patrick.

9    They left a gun for them too.  And you will hear that at one

10   point the defendant brutally beat and pistol whipped Patrick

11   saying that he was going to kill Patrick if he didn't stay

12   still.  Meanwhile, the other two robbers raided Patrick's stash

13   house.  They took money, marijuana, jewelry and clothing.

14          Finally, on the evening of September 4 after they'd

15   gotten what they came for, it was over.  The robbers doused the

16   apartment and their two victims in bleach and they left.  When

17   Jeanette was finally able to free herself, the duct tape had

18   been on her wrists for so long that her skin came off of it.

19          Ultimately, the defendant and the other three robbers

20   were all arrested.  During the defendant's arrest, law

21   enforcement agents found crack cocaine in his pocket, and

22   cocaine and a loaded gun in his bedroom.  You will learn that

23   the defendant isn't just a robber of drug dealers.  He's also a

24   drug dealer himself and a convicted felon.  The defendant

25   operated his drug business off of his cell phone and from his

E98Qdel2                         Opening - Ms. Geraci

1    apartment, and he armed himself with a gun for protection.

2           So, we are here today, ladies and gentlemen, because

3    David Delva, the defendant, is charged with participating in

4    the kidnapping and armed robbery of Jeanette and Patrick over

5    Labor Day weekend 2012 and with being a drug dealer who used a

6    gun to protect his business.  Throughout this trial, you are

7    going to hear evidence that will prove that the defendant is

8    guilty of all of these crimes.

9           What will that evidence be?  You are going to hear

10   from the two victims themselves -- Jeanette Adams and Patrick

11   James.  They will tell you everything that they could see and

12   hear during that horrific Labor Day weekend.  Jeanette and

13   Patrick will also describe to you the various items that were

14   stolen from them, including jewelry, luggage, money, marijuana,

15   and even Jeanette's car.

16          You're going to hear from police officers who

17   investigated these crimes.  They will tell you about how they

18   gathered evidence from the apartment where Jeanette and Patrick

19   were held hostage, evidence like cigarette butts, latex gloves

20   and pieces of duct tape.

21          You will learn that some of the robbers, including the

22   defendant, left DNA on the physical evidence at that apartment.

23   A DNA expert who examined this evidence is going to testify in

24   this trial.  You will learn that although the robbers tried to

25   cover their tracks by wearing latex gloves, taking out their

1    trash and dousing the apartment with bleach, some of them still

2    left their DNA behind.

3          You're going to see phone records for phones belonging

4    to the robbers.  These phone records will show the frequent

5    contact among the defendant and his co-conspirators during the

6    time of the robbery.  You will hear the testimony of an FBI

7    special agent who will tell you that the cell phones belonging

8    to some of these men were at or near Jeanette and Patrick's

9    apartment throughout that Labor Day weekend.

10         You are even going to hear from one of the defendant's

11   co-conspirators, a man named Gregory Accilien.  Accilien has

12   already pled guilty to these crimes and to others.  He has

13   admitted to being a robber, kidnapper, drug dealer, and he will

14   tell you how this heinous crime was committed and about the

15   defendant's role in it.  Gregory Accilien is a criminal, just

16   like the defendant, and he participated with the defendant in

17   this crime.  You may be horrified by what he's done.  But the

18   question for you, ladies and gentlemen, when you evaluate his

19   testimony, is whether Accilien is telling you the truth and

20   whether his testimony is corroborated by all the other evidence

21   in this case.

22         Lastly, you are going to see physical evidence that

23   was seized from the defendant and from the other robbers.  You

24   will see various cell phones and text messages.  You will see

25   the drugs and the gun that were seized from the defendant.  And

E98Qdel2                        Opening - Ms. Geraci

1   you will see many of the items that were stolen from Patrick

2   and Jeanette.  We submit that all of this evidence will prove

3   to you that this defendant is guilty of all the crimes he's

4   charged with.

5          I am about to sit down, but before I do, I would like

6   to ask you to do three things:  First, pay close attention to

7   the evidence.  There will be a number of witnesses all week.

8   Please listen carefully to all their testimony and review the

9   physical exhibits.  Keep in mind the evidence will not

10  necessarily come in chronological order.  It will come at you

11  in bits and pieces over the course of this trial.

12         Second, please follow Judge Forrest's instructions on

13  the law.  Her Honor will explain to you how to apply the law to

14  this case.

15         And, third, just as Judge Forrest told you a moment

16  ago, just use your common sense, the same common sense you use

17  in your everyday lives outside of this courtroom.

18         If you pay close attention to the evidence, follow

19  Judge Forrest's instructions on the law and use your common

20  sense, we submit that you will return the only verdict that is

21  consistent with the law and the evidence:  That David Delva,

22  the defendant, is guilty on all counts.

23         THE COURT:  Mr. Pittell.

24         MR. PITTELL:  Good afternoon, ladies and gentlemen.

25         The American dream.  Now, we probably all heard that

E98Qdel2                          Opening - Mr. Pittell

1   phrase and if you give it some thought, you'll see that for

2   different people it has different meanings.  If you look out

3   the windows in this courthouse, you'll see New York City, a

4   city filled with skyscrapers, each one filled with people

5   pursuing their version of the American dream.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. PITTELL:  Some of these buildings housed some of

2     largest most well-known companies in America, American Express,

3     Chase Manhattan bank, Pfizer pharmaceuticals.  If you take any

4     of these companies, any really large company and you look

5     closely at the people who work there, who work hard there

6     everyday, you'll see there's different versions of the American

7     dream.  Take for example the chairman or the chairperson of

8     company or the CEO.  His or her dream might be to be a

9     multimillionaire or a billionaire or live on the upper east

10    side in a 25 million dollar townhouse, own a private plane.

11    That might be his or her dream.  Take someone who's a midlevel

12    manager.  His or her dream might be more modest.  It might be

13    just to have a house in Westchester or Long Island, take the

14    train into the city everyday, pay your mortgage, save for your

15    kid's college tuition, maybe take a family vacation every

16    summer.  That's their dream which comes out of hard work.  Take

17    someone who is, perhaps, a night custodian in a building,

18    someone who maybe is a recent immigrant to this country from

19    Central America or Mexico, his or her dream might be simply to

20    have a job and make ten bucks an hour, make minimum wage,

21    mopping floors, taking out the trash, his or here dream might

22    be just simply to earn enough money to send to family back

23    home.  Now all these dreams are different, but they all do have

24    one common thread.  They're all an honest version of the

25    American dream.  They're based upon hard work.

1           Now in this case over the next couple days you are

2     going to learn that there's also a dishonest version of the

3     American dream, one not based on a hard honest days' work.

4     This dream is held by people who come to this country who view

5     this country as a place where they can get rich by committing

6     crime after crime after crime.  Soon you are going to meet

7     Patrick James and he is a victim in this case.  I don't dispute

8     that he was robbed pretty much in the manner the government

9     says.  But you are also going to see that he is living the

10    dishonest version of the American dream.  He immigrated to this

11    country from Jamaica.  He understood a long time ago the rules

12    of American society don't apply to him.  He decided a long time

13    ago to reject the concept of working hard and he became a drug

14    dealer.  He's been selling drugs his entire adult life.  He's

15    been selling drugs for well over two decades, earning hundreds

16    of thousands if not millions of dollars.

17          In fact, you'll hear back in 1998 he was arrested and

18    charged with being a leader of a very large scale drug

19    trafficking enterprise in Arizona and he is convicted in

20    federal court just like this building out in Arizona.  Due to

21    his conviction he was deported and sent back home to Jamaica.

22    But what did he do?  He came back here.  He came back here

23    illegally, spent thousands of dollars to get a fake ID, a fake

24    passport, a fake identity.  And why did he do that?  So he

25    could come back here, come to New York and pick up right where

1    he left off making tens and thousands of dollars selling drugs.

2    Even after he got robbed in this case he continued to sell

3    drugs and commit other crimes.

4            So as you heard in the government's openings, by

5    telling you this horrific crime which happened to him and his

6    girlfriend, living the dishonest version of the American dream

7    has its risks.  In this case you will learn, put it in more

8    diplomatic terms, being a drug dealer, being in the profession

9    of drug dealing has its occupational hazards.  In reality if

10   you are a drug dealer other criminals are going to try and

11   steal your money.

12           Now, let me just interrupt here for one moment.  Don't

13   interrupt this as me saying it's appropriate or that's the

14   right thing to do or our law permits that.  I am just telling

15   you what is a reality, what happens to people that sell drugs

16   because Patrick James is going to tell you he'd been robbed

17   several times before the robbery in this case.  In fact, all

18   these jobs were inside jobs that they were done by people who

19   were associated with his girlfriend, Ms. Adams, who is also the

20   victim in this case.

21           Now, tragically in this case because of his drug

22   dealing it caused Ms. Adams in this particular case to become a

23   victim herself and to be tied up and to be beaten and to be

24   raped and nobody deserve that whether your boyfriend's a drug

25   dealer or a CEO of a company, nobody deserves that.  And you

1    know what?  I don't dispute that that happened, that this whole

2    horrific story you heard happened.  But what we do dispute is

3    the claim that Mr. Delva was there because Mr. Delva was not

4    there and Mr. Delva did not participate in this crime at all.

5            In addition to learning about the different versions

6    of the American dream in this case you are also going to learn

7    some things about the American Criminal Justice System.  One

8    thing you are going to learn is how the system works.  You are

9    going to learn that if a person is caught committing a serious

10   crime that one way a person can get a reduced sentence or to

11   get out of jail is to get up in that witness stand and point

12   the finger at somebody else.  Now, the problem with that and

13   the problem with having a system like that as you might

14   imagine, it gives a person an enormous incentive to lie because

15   let's say someone is the last person caught here.  The

16   government says there were four people involved.  So let's say

17   three of them are already caught and the fourth person is the

18   last one that's caught.  Let's say he's caught at a different

19   time.

20           Well, this person's caught and this person is sitting

21   in jail and this person's going to come to realize all the real

22   perpetrator's already been caught.  There is no one left for me

23   to point the finger at, so that person is going to come to

24   realize the only way he is going to get himself out of jail is

25   to falsely accuse someone else so he can avoid spending the

1  rest of his life in jail.  And that's exactly what happened

2  here.  Because you are going to learn that after Ms. Adam and

3  Mr. James were kidnapped and robbed, both the New York City

4  Police Department and the FBI got involved.  They investigated

5  this case.  Within a month or two they rounded up the whole

6  crew.  Well, almost the whole crew.  They rounded up everybody

7  except for Mr. Accilien.  But one person who they did round up

8  was Mr. Accilien's brother, Dominique Jean-Philippe.  Dominique

9  Jean-Philippe has been convicted of this crime.  He's serving a

10  life sentence for his participation in this crime.

11          MS. GERACI:  Objection, your Honor.

12          THE COURT:  Sustained.

13          Ladies and gentlemen, you should understand that any

14  particular penalty imposed on a defendant can be imposed for a

15  variety of reasons for a variety of different crimes.  The fact

16  that an individual may be serving a particular sentence is

17  neither here nor there.  And it would be absolutely

18  inappropriate for you to consider that in your deliberations

19  here.  So we'll strike that reference to the term from the

20  record.

21          You may proceed, Mr. Pittell.

22          MR. PITTELL:  Now, by the time Mr. Accilien was

23  arrested in June of 2013 the whole crew including his brother

24  had been rounded up.  He was the last man standing.  So as you

25  can imagine robbery and kidnapping is a very serious crimes.

1    So to avoid the possibility of spending a long time or even

2    possibly his entire life in jail, Mr. Accilien cut a deal with

3    the prosecutors.  Now this deal has a name.  It's called a

4    cooperation agreement.  And under the terms of a cooperation

5    agreement Mr. Accilien had to plead guilty to participation in

6    the robbery, in the kidnapping and other crimes.  Now, if he

7    provides what's called substantial assistance then at his

8    sentencing for the crimes he's pleaded guilty to, the

9    prosecutors will ask the judge to give him a reduced sentence.

10        Now, what I submit to you is that in plain English

11   "substantial assistance" really means Mr. Accilien getting up

12   on that witness stand and pointing a finger at David Delva, his

13   own nephew.  And that's exactly what he's going to do.  Either

14   today or tomorrow or the next day when he testifies he's going

15   to get up on the witness stand.  He is going to look at every

16   one of you.  He is going to look at Mr. Delva and he's going to

17   lie.

18        During this trial you are you are going to learn that

19   Mr. Accilien has a history of lying.  From the moment he was

20   arrested the agents spoke to him and he lied and lied and lied.

21   Then a month or two later during July and August he went and

22   met with the prosecutors and the agents and the first thing the

23   prosecutors told him at this meeting was that if you want to

24   get a cooperation deal --

25        MS. GERACI:  Objection, judge.

1            THE COURT:  Sustained.

2            MR. PITTELL:  Mr. Accilien is going to tell you that

3   he was told at that meeting that the prosecutor said to him, if

4   you are going speak to us you have to tell us the truth and you

5   are going to learn that Mr. Accilien sat at the table with

6   those prosecutors, looked at them face-to-face and he lied to

7   them again and again.  However, he was believed and he got his

8   cooperation agreement.

9            Now you are going to learn there's a fundamental

10  understanding built into one of these cooperation agreements.

11  And a cooperation, under the terms of a cooperation agreement

12  the cooperator is supposed to tell the truth and the cooperator

13  represents to the prosecute that he has been telling the truth.

14  However, if it turns out the cooperator has lied, then the

15  prosecutor can tear up the cooperation agreement and doesn't

16  have to ask for this reduced sentence.

17            Now in this case the lies that Mr. Accilien told the

18  prosecutors during those meetings in July and August of 2013

19  they hung out there for an entire year.  He had signed the

20  cooperation agreement, cut a deal with them, didn't tell them

21  about his lies.  But at some point during this summer, during

22  this past July the lies came out.  And while the prosecutors

23  didn't tear up the cooperation agreement, they made

24  Mr. Accilien plead guilty to another crime, to the crime of

25  lying to a federal agent.  However, the fact that Mr. Accilien

1    has now plead guilty to yet another crime, the crime of lying

2    to them, to everybody sitting at this table does not somehow

3    erase his past, does not somehow mean that all of a sudden now

4    he's cleansed and he is now going to be telling the truth

5    because let me tell you something.  He's going to get up on the

6    witness stand and do you know what he's going to lie about?

7    The sexual assault of Ms. Adams.  Because you know what, he is

8    one of three people who gang raped here.  Now he is going to

9    deny it and that's a lie he is going to take to the grave.  But

10   I contend, he was one of the three men who assaulted her over

11   the Labor Day weekend two years ago.

12         Now, in addition to Mr. Accilien being a liar you are

13   going to hear that sadly he suffers from paranoid

14   schizophrenia.  His illness is so severe he's been in and out

15   of half a dozen hospitals in the past decade sometimes for

16   months at a time.  He hears voices.  He sees illusions.  He

17   engages in uncontrollable violent behavior.  He's assaulted

18   fellow patients.  He's assaulted hospital staff.  He's

19   assaulted people in homeless shelters.  He's assaulted police

20   officers.  He's assaulted innocent people in subway stations.

21   He's even assaulted his own nephew, Mr. Delva.

22         Now, as you may recall, I said that back in August in

23   July of 2013 Mr. Accilien met with the prosecutors and when he

24   met with them he lied to them.  After he lied to the

25   prosecutors in August of 2013 Mr. Delva was arrested and

1    Mr. Delva was taken to the courthouse.  He was taken to the

2    courthouse because he was falsely accused of participating in

3    the robbery by Mr. Accilien.  But when Mr. Delva was taken to

4    this courthouse he was given the indictment in this case that

5    Judge Forrest explained to you and he was informed of the

6    charges in this case and he said to the judge in the courtroom,

7    I am not guilty.  I am not guilty of everyone of those charges.

8              And as Judge Forrest told you earlier today, as he

9    sits here now he is presumed not guilty.  The prosecutors have

10   to prove their case beyond a reasonable doubt.  We don't have

11   to do anything.  I don't have to make an opening statement.  I

12   don't have to question a witness.  In fact, there may be some

13   witnesses that I don't ask any questions.  I could put my head

14   down and sleep through the entire trial.  And in addition to

15   that, Mr. Delva does not have to testify.  He does not have to

16   tell his side of the story.  It is his absolute right to remain

17   silent so we could sit here and do nothing.  The burden remains

18   upon the government to prove this case beyond a reasonable

19   doubt.  And if they can't prove their case beyond a reasonable

20   doubt the presumption of innocence does not change.  Mr. Delva

21   is not guilty and you must vote a not guilty verdict.

22             Now, in reality I am not going to sleep through this

23   trial.  I imagine when Mr. Accilien testifies I'll have some

24   questions that I want to ask him because when he gets up on the

25   witness stand and he looks at all of you and he looks across

1   the courtroom, we are going to be looking at one who is a

2   federally convicted liar, someone who has been the federal

3   crime of lying.  And no matter how he's dressed, no matter how

4   calm his demeanor, you are looking at somebody who has a

5   violent past and someone who is a liar.

6            Now, in addition to Mr. Accilien, I expect I'll have a

7   question or two about the DNA evidence that the government

8   mentioned and I'll deal with that when the time comes.

9            Now, as I just said, I am not required to make this

10  opening statement.  I am not required to speak with you.  And I

11  am not required to say anything.  However, one reason why I am

12  doing this is because as the judge told you, I can't speak to

13  you in the hallway.  And in fact, when you see me in the

14  hallway or you see any of us in the hallway we're going to look

15  away.  We are not going to get on the elevator and it's not

16  because we're being discourteous or impolite.  We're not

17  permitted to have any appearance of communication with you.

18  But the only time that I can speak with you is in an opening

19  and closing statement.  So that's why I am speaking with you

20  now.  And at the end of the trial I'll get to speak with you

21  again.  And at that time you will have heard the evidence.

22  You'll have seen it.  You'll have heard the testimony of the

23  witnesses.  And I'll have an opportunity to discuss with you

24  what I believe it means or what it doesn't mean and at that

25  point after you've heard arguments and you've had an

1   opportunity to deliver a case I submit that the only fair and

2   honest verdict in the case is a not guilty verdict on all the

3   charges.

4            Thank you very much.  Thank you.

5            THE COURT:  Thank you, Mr. Pittell.

6            All right.  Ladies and gentlemen, we're now going to

7   have our first witness.

8            Ms. Geraci, would you like to call the first witness,

9   please.

10           MS. GERACI:  Yes, your Honor.  The government calls

11  Police Officer Sean Smith.

12           THE COURT:  All right.  We'll get Officer Smith up

13  here.

14   SEAN SMITH,

15       called as a witness by the Government,

16       having been duly sworn, testified as follows:

17  DIRECT EXAMINATION

18  BY MS. GERACI:

19  Q.  Officer Smith, where do you work?

20  A.  I am presently assigned to Patrol Borough Bronx Evidence

21  Collection Unit.

22  Q.  Is that with the New York City Police Department?

23  A.  Yes, ma'am.

24  Q.  What is your title?

25  A.  Police Officer.

E98AADEL3                        Smith - Direct

1   Q.  How long have you been a police officer with the NYPD?

2   A.  Since 1998.

3   Q.  And how long have you worked with the Bronx Collection

4   Team?

5   A.  Bronx Evidence Collection Team, since 2004.

6   Q.  Could you describe your duties and responsibilities?

7   A.  Basically, exactly what the title states.  We go to various

8   crime scenes and collect evidence from those crime scenes.

9   Q.  Let me direct your attention to the evening of September 4,

10  2012, into the morning of September 5, 2012.  Were you on duty

11  those days?

12  A.  Yes.

13  Q.  Were you assigned on those days?

14  A.  Patrolling the Bronx.

15  Q.  Did you report to a police investigation at 830 Magenta

16  Street in the Bronx?

17  A.  Yes.

18  Q.  Do you recall who instructed you to go to that location?

19  A.  We were requested by the Bronx Robbery Team.

20  Q.  At approximately what time did you arrive?

21  A.  Approximately, about midnight.

22  Q.  When you arrived, who was present?

23  A.  Two securing officers at the scene.

24  Q.  What did you do when you arrived at the location?

25  A.  Well, basically, at any scene what we do is we evaluate the

1   scene, try to find out if there is any information that the

2   detectives may have left or they're giving us, to what they

3   want collected at that scene.

4   Q.  Can you describe for the jury the condition of the

5   apartment you went to that night?

6   A.  The apartment pretty much was turned upside down.  The two

7   officers were on the outside in the hallway and I curious why

8   they were outside and I found out why when I walked in.  There

9   was a very strong odor in the apartment along with the mess and

10  it was just in total disarray.

11  Q.  Can you describe the odor?

12  A.  Hard to describe, anywhere from an industrial cleaner to

13  severe body odor.

14  Q.  Officer Smith, did you take any photographs?

15  A.  Yes.

16  Q.  What, generally, did you take photographs of?

17  A.  Part of our procedure is to take photos of items that we

18  are going to collect.

19          MS. GERACI:  Your Honor, may I approach?

20          THE COURT:  You may.

21  Q.  Officer Smith, I've just handed you what's been marked as

22  Government Exhibits 100 through 111, 113, 114 and 116 through

23  118.  Have you had an opportunity to review these prior to

24  today?

25  A.  Yes.

1   Q.  And do you recognize them?

2   A.  Yes.

3   Q.  What will they?

4   A.  The photos that I took at the scene.

5            MS. GERACI:  Your Honor, the government offers

6   Exhibits 100 through 111, 113, 114, 116 through 118.

7            THE COURT:  Mr. Pittell.

8            MR. PITTELL:  I have no objection.

9            THE COURT:  Received.

10           (Government's Exhibits 100 –111, 113, 114, 116 through

11  received in evidence)

12  Q.  Let's talk about these photographs one at a time.

13           MS. GERACI:  With the Court's permission may I publish

14  them to the jury?

15           THE COURT:  You may.

16  Q.  Officer Smith, please, look at what's been marked as

17  Government Exhibit 100.

18           MS. GERACI:  I'll ask Ms. Chen to put it on the

19  screen.

20           (Pause)

21  Q.  Could you tell the jury what we are looking at?

22  A.  The front door of the apartment.

23           MS. GERACI:  Let's look at exhibit 101.

24           (Pause)

25  Q.  Can you describe what we're looking at here, Officer Smith?

1   A.   That is just as you walk inside the apartment.

2   Q.   What room of the apartment are we looking at?

3   A.   To your right is a kitchen which you can't see in this

4   photo and right in front of you is the living room.

5            MS. GERACI:  Let's take a look at exhibit 102.

6            (Pause)

7   Q.   What appears in this photo?

8   A.   A cigarette butt.

9   Q.   Did you do anything with that?

10  A.   It's one of the cigarette butts we collected.

11           MS. GERACI:  Could we look at Exhibit 103.

12           (Pause)

13  Q.   What are we looking at here, Officer Smith?

14  A.   Whole view of the living room.

15  Q.   Can you tell what's on the table in this photograph?

16  A.   There was leftover food there on the table.

17  Q.   Did you do anything with that?

18  A.   We were requested to swab the food.

19           MS. GERACI:  Let's take a look at exhibit 104.

20           (Pause)

21  Q.   What is that?

22  A.   That's the food.

23  Q.   Is that food you testified you swabbed?

24  A.   Yes.

25           MS. GERACI:  105, please.

1              (Pause)

2   Q.  What are we looking at here, Office Smith?

3   A.  It's a glass bottle or an empty drink.

4   Q.  Did you do anything about that?

5   A.  We also swabbed that.

6              MS. GERACI:  106, please.

7              (Pause)

8   Q.  What are we looking at here, Officer Smith?

9   A.  This is a hallway that leads to the -- well, the end of

10  hallway is the bathroom and there's a bedroom off to the right

11  there.

12  Q.  Can you tell what's on the floor?

13  A.  That was duct tape with material all connected to it.

14  Q.  I just want to back up one moment.  You mentioned a couple

15  times that you swabbed certain items.  Can you describe what

16  you mean by "swabbed"?

17  A.  Basically, it looks like a Q-tip.  We put a little drop of

18  water on it to actually moisten the Q-tip and then a surface

19  such as that glass bottle we would actually swab the rim of

20  that bottle.

21  Q.  Why would you do that?

22  A.  This is to collect any evidence that may be on that bottle

23  such as biological or DNA.

24              MS. GERACI:  Let's take a look at 107.

25              (Pause)

E98AADEL3                           Smith – Direct

1    Q.  What are we looking at here, Officer Smith?

2    A.  There's some duct tape on the floor there and another

3    cigarette butt.

4    Q.  Can you tell what room this is?

5    A.  That's still in the hallway.

6                MS. GERACI:  108, please.

7                (Pause)

8    Q.  What are we looking at here?

9    A.  Just a close-up of the cigarette butt.

10   Q.  Is that the one you mentioned earlier a moment ago?

11   A.  Yes.

12               MS. GERACI:  109.

13               (Pause)

14   Q.  Can you describe what we're looking at here?

15   A.  This was the bedroom.

16   Q.  Is this the way the bedroom looked when you got there?

17   A.  Yes.

18               MS. GERACI:  110, please.

19               (Pause)

20   Q.  That view?

21   A.  Another photo of the bedroom.

22   Q.  Is that you taking the photograph?

23   A.  Yes, ma'am.

24               MS. GERACI:  111, please.

25               (Pause)

1    A.   Just another photo of the bedroom.

2              MS. GERACI:   113, please.

3              (Pause)

4    Q.   What is this?

5    A.   That's a close-up of the duct tape and material that is on

6    the bed.

7    Q.   With respect to some of the duct tape and material that

8    you've mentioned, did you collect some of this material?

9    A.   Yes, ma'am.

10             MS. GERACI:   114, please.

11             (Pause)

12   Q.   What are we looking at here?

13   A.   It's a little hard to see but there's actually more

14   material and duct tape on the, in the center of that photo.

15             MS. GERACI:   116, please.

16             (Pause)

17   Q.   What area of the apartment is this and what are we looking

18   at?

19   A.   Blurred out photo there is going to be the floor of the

20   bathroom.

21   Q.   And can you tell what's on the floor?

22   A.   That also was duct taping material.

23             MS. GERACI:   117.

24             (Pause)

25   Q.   What is this, Officer Smith?

E98AADEL3                          Smith - Direct

1    A.  Same thing.

2    Q.  Is this a close-up of what we saw a moment ago?

3    A.  Yes, ma'am.

4            MS. GERACI:  Lastly, 118.

5            (Pause)

6    Q.  What is this?

7    A.  There I was trying to fix the camera at that point but the

8    same thing, close-up of the material and duct tape.

9    Q.  Officer Smith, did you check evidence of the Magenta Street

10   apartment?

11   A.  This is the evidence at Magenta Street, yes.

12   Q.  Additional physical evidence that's reflected in the photo?

13   A.  Well, that's all the evidence that I recall collecting,

14   yes.

15   Q.  So can you describe the sorts of evidence you collected.

16   A.  It would be the two cigarette butts and I would say had to

17   be a five bags -- no.  Four more bags of duct tape and that one

18   bottle.

19           MS. GERACI:  May I approach, your Honor?

20           THE COURT:  You may.

21   Q.  Officer Smith, I am showing you what's been marked as

22   Government Exhibits 120-A through 120-G.  Did you recognize

23   these items?

24   A.  Yes, ma'am.

25   Q.  How do you recognize them?

E98AADEL3                     Smith - Direct

1   A.  These are the bags of the evidence that I collected.  One

2   way I can ID is my initials and my tax numbers on the seals.

3          MS. GERACI:  Your Honor, the government offers

4   Exhibits 120-A through 120-G.

5          THE COURT:  Mr. Pittell.

6          MR. PITTELL:  No objection.

7          THE COURT:  Received.

8          (Government's Exhibits 120-A – 120-G received in

9   evidence)

10  Q.  Let's go through each one of those without opening them.

11  What is contained in Government Exhibit 120-A?

12  A.  120-A is a cigarette butt that was on the computer desk.

13         MS. GERACI:  Could we put up Exhibit 120, please.

14  Q.  Officer Smith, the cigarette back butt that you're talking

15  about?

16  A.  Yes.

17  Q.  What about Exhibit 120-B, what is contained there?

18  A.  This is the soda bottle that was on the living room table.

19         MS. GERACI:  Could we put Exhibit 105 on the screen?

20  Q.  Is this the soda bottle you are talking about?

21  A.  Yes, ma'am.

22  Q.  What about 120-C?

23  A.  120-C was also another cigarette butt.

24         MS. GERACI:  Put Exhibit 107 up, please.

25         (Pause)

1              MS. GERACI:  And 108 after that is that the cigarette

2    butt that you collected in Exhibit 120-C.

3    A.  Yes, ma'am.

4    Q.  What about 120-D?

5    A.  120-D was the duct tape with the material on this that was

6    on the hallway floor.

7              MS. GERACI:  Could we put up 106, please.

8    Q.  Is that the location of the duct tape you had collected in

9    that bag?

10   A.  Yes, ma'am.

11   Q.  What about 120-E, please?

12   A.  120-E is also duct tape with material from the bathroom

13   floor.

14             MS. GERACI:  Could we put up 116, please.

15             (Pause)

16   Q.  Is that the duct tape and material you just referenced?

17   A.  Yes.

18   Q.  120-F?

19   A.  120-F is also duct tape with material on it from the

20   bedroom floor.

21             MS. GERACI:  Could we put up Exhibit 114, please.

22             (Pause)

23   Q.  Is that the material you just referenced?

24   A.  Yes, ma'am.

25             MS. GERACI:  And lastly, 120-G.

1   A.  Duct tape that was on the bed in the bedroom.

2              MS. GERACI:  Could we put Exhibit 113 up, please.

3              (Pause)

4   Q.  Is that the duct tape that's contained in the bag you are

5   holding?

6   A.  Yes.

7   Q.  Why did you collect this evidence?

8   A.  Generally, we collect evidence to aid and assist the

9   detectives or the investigating officers in further

10  investigating their crime.

11  Q.  And what did you do with this evidence after you collected

12  it?

13  A.  As you can see we actually vouchered things and it's either

14  sent out to the property clerk which is a storage facility or

15  we send it out to the police lab for testing.

16  Q.  Did you perform any forensic examination of this evidence?

17  A.  No.

18  Q.  Why not?

19  A.  I am not a tech or a scientist to do that.

20  Q.  Officer Smith, did you check any DNA evidence in connection

21  with this case?

22  A.  The evidence before you, this is the only thing that I

23  collect.

24  Q.  Did you collect from the victims in this case?

25  A.  Yes, ma'am.

1    Q.  What did you collect from the victims?

2    A.  What we call two elimination swabs.

3    Q.  What does that mean?

4    A.  Basically, if their DNA is on this the lab requests us to

5    get an elimination so they can identify their DNA that's on

6    this material versus any other DNA.

7    Q.  And where did you collect the victims' DNA if you remember?

8    A.  I think they were at Jacobi Hospital.

9    Q.  As pare of this investigation did you also report to the

10   address 801 Neil Avenue?

11   A.  Yes.

12   Q.  Do you recall when that was?

13   A.  Approximately, one o' clock or so.

14   Q.  Did you take any photographs or collect any evidence from

15   the Neil Avenue location?

16   A.  We dusted the safe there but came up with negative results.

17          MS. GERACI:  May I have a moment, your Honor?

18          THE COURT:  You may.

19          MS. GERACI:  Thank you, your Honor.  No further

20   questions.

21          THE COURT:  All right.  Thank you.

22          Mr. Pittell.

23          MR. PITTELL:  Judge, I don't have any questions for

24   this witness.

25          THE COURT:  Thank you.  You may step down, sir.

E98AADEL3                          Smith - Direct

1          THE WITNESS:  Thank you, sir.

2          MR. POSCABLO:  Your Honor, the government calls Police

3     Officer Tara Morel.

4          THE COURT:  All right.  Police officer Morel to the

5     stand, please.

6      TARA MOREL,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. POSCABLO:

11    Q.  Good afternoon, Officer Morel.

12    A.  How are you?

13    Q.  What organization do you work for?

14    A.  The NYPD.

15    Q.  What is your rank with the NYPD?

16    A.  Police officer.

17    Q.  Ma'am, are you assigned to a particular unit?

18    A.  The Evidence Collection Unit.

19    Q.  Is that known as the ECT?

20    A.  Yes.

21    Q.  What borough?

22    A.  In the Bronx.

23    Q.  How long have you been with the NYPD?

24    A.  16 years.

25    Q.  How long have you been ECT?

1   A.  About nine years.

2   Q.  What was your position with the NYPD prior to joining ECT?

3   A.  I did patrol in the Four-Seven precinct in the Bronx.

4   Q.  What part of the Bronx is that?

5   A.  Northeast Bronx.

6   Q.  Generally speaking, what are the duties and

7   responsibilities as an officer with ECT?

8   A.  We respond to crime scenes and check any evidence or

9   fingerprints that may have been left behind.

10  Q.  How do you know what evidence to collect when you go to a

11  scene?

12  A.  Usually directed to by the detective at the scene.

13  Q.  Direct your attention to the dates September 13, 2012.

14  Were you on duty that night?

15  A.  Yes.

16  Q.  Or that day?  And did you respond to a particular crime

17  scene?

18  A.  Yes, I did.

19  Q.  How are you notified to respond?

20  A.  Detective notified our office.

21  Q.  Do you recall the detective's name?

22  A.  Detective Deloren.

23  Q.  Do you recall the location you responded to?

24  A.  Yes.

25  Q.  What was that location?

1   A.   830 Magenta Avenue, 5E, in the Bronx.

2   Q.   Avenue or street?

3   A.   Avenue.

4   Q.   OK.   What happened when you responded there to Magenta?

5   A.   I learned of some evidence that needed to be collected.

6   Q.   How did you learn that?

7   A.   Through the detective notifying my office.

8   Q.   Tell the jury what happened when you got there.

9   A.   I got to the apartment and I was directed to a black bag in

10  the living room on the table.

11  Q.   Who directed you to that black bag?

12  A.   People in the apartment.

13  Q.   Anybody in particular?

14  A.   There was a couple women and a man.  I don't recall exactly

15  which one.

16  Q.   Where did they direct you to -- where the black bag was?

17  A.   It was on a glass table in the living room.

18  Q.   Was that the original?  Where it was?

19  A.   No.

20  Q.   Where was it originally?

21  A.   It was collected from on top of the bed, mattress in the

22  bedroom.

23  Q.   How do you know that?

24  A.   I was explained that by the detective notifying our unit.

25          MR. PITTELL:   Objection.

1          THE COURT:  Sustained.  Let me ask a clarifying

2     question.  Maybe I am just confused.  You had asked,

3     Mr. Poscablo, if Officer Morel was called on September 13.  Is

4     it the 13th?

5          MR. POSCABLO:  It is.

6          THE COURT:  Why don't you rephrase that question.

7     Q.  So it was September 13, correct?

8     A.  Yes.

9     Q.  I'm going to put up on the screen with the Court's

10    permission what's been entered into evidence as Government

11    Exhibit 109.  Do you recognize this photograph?

12    A.  Yes.

13    Q.  You didn't take it, did you?

14    A.  No, I did not.

15    Q.  OK.  Did you have an opportunity to review this photograph

16    prior to your testimony today?

17    A.  Yes.

18         MR. POSCABLO:  Ms. Chen, can you highlight the portion

19    on the bed.

20         (Pause)

21    Q.  It's going to be too dark to see on the screen but can you

22    see it on your screen?

23    A.  Yes.

24         MR. POSCABLO:  I ask the Court to instruct the jury to

25    look on their screen.

E98AADEL3                          Morel - Direct

1   Q.  Do you see little what appears to be a black spot right

2   there?

3   A.  Yes, I do.

4   Q.  What do you recognize that to be?

5   A.  It looks to be the black plastic bag that I recovered.

6   Q.  OK.  Let's put on the screen at what's been entered into

7   evidence as Government Exhibit 103 with the Court's permission.

8           (Pause)

9   Q.  What is that a photograph of?

10  A.  The living room at 830 Magenta.

11  Q.  He's where the black plastic bag was when you collected it?

12  A.  Yes.

13  Q.  Did you look inside the bag?

14  A.  I did.

15  Q.  What, if anything, did you see?

16  A.  There was two latex gloves and two cigarette butts inside

17  the bag.

18  Q.  Can you explain to the jury how you checked that evidence?

19  A.  I myself put on latex gloves.  I opened a plastic bag and I

20  individually package each item inside their own paper bag and

21  sealed them.

22  Q.  What did you do next?

23  A.  I then vouchered them to the police lab for DNA analysis.

24  Q.  You do anything else in the apartment?

25  A.  I don't believe so.  Oh, there was two women who said they

1   touched the bag so they provided DNA elimination just to

2   eliminate themselves.

3   Q.   OK.  How did you do that?

4   A.   Again, it was sterile gloves and sterile swabs and I

5   individually swabbed each person with a swab and sealed it in a

6   brown paper bag as well.

7   Q.   Where did you swab them?

8   A.   Inside of their cheek.

9   Q.   What did you do with that evidence?

10  A.   Each swab as individually packaged in a brown paper bag and

11  sealed as well.

12  Q.   What happened to the evidence that you collected at this

13  apartment?

14  A.   It was submitted to the police lab.

15  Q.   OK.  Officer, have you had any other involvement in the

16  case?

17  A.   No, I have not.

18          MR. POSCABLO:  One moment, your Honor?

19          THE COURT:  Yes.

20          MR. POSCABLO:  No further questions, your Honor.

21          THE COURT:  Thank you.

22          Mr. Pittell.

23  CROSS-EXAMINATION

24  BY MR. PITTELL:

25  Q.   Good afternoon, Officer Morel.

E98AADEL3                    Morel - Cross

1   A.  Hi.

2   Q.  So you responded to that apartment on September 13, 2012;

3   is that correct?

4   A.  Yes.

5   Q.  And had you been there before then?

6   A.  No.

7   Q.  Do you know if other police officers had been there before

8   that date?

9   A.  Yes.

10  Q.  And when you arrived there was the door of the apartment

11  sealed?

12  A.  I don't remember.  I don't believe so.

13  Q.  Do you remember if there was yellow police tape across the

14  door?

15  A.  I don't remember anything like that.

16  Q.  So I take it that for you to get inside the apartment you

17  didn't have to break any seal to get in?

18  A.  No.

19  Q.  And you said that there were some women inside the

20  apartment?

21  A.  Yes.

22  Q.  How many women?

23  A.  Maybe three.

24  Q.  And were there any other people inside the apartment?

25  A.  I believe there was one other man.

E98AADEL3                    Morel - Cross

1   Q.  And these three women, were they police officers?

2   A.  No.

3   Q.  And this one man, was he a police officer?

4   A.  No.

5   Q.  They were -- for lack of a better term -- civilians?

6   A.  Yes.

7   Q.  And did they hand you this bag?

8   A.  No.

9   Q.  And you said that the bag was in the living room?

10  A.  Yes.

11  Q.  And did they point the bag out to you?

12  A.  I believe so, yes.

13  Q.  And did you go into -- you had looked at the picture, the

14  bedroom with a dresser.  Did you go into the bedroom where that

15  dresser was?

16  A.  I don't believe that I did.

17  Q.  All that you did was you went to the apartment, some people

18  pointed out a bag to you, you took the bag and then you left?

19  A.  I processed the evidence at the scene and then I left.

20  Q.  Did you leave the bag at the scene?

21  A.  No.

22  Q.  So when you say "processed" you mean you bagged up the bag

23  and its contents?

24  A.  Yes.

25  Q.  And then you also said you took some swabs, was it from all

1   four of the people that were in the apartment?

2   A.  It was two people in the apartment.

3            MR. PITTELL:  I have no further questions.

4            THE COURT:  Thank you.

5            MR. POSCABLO:  No redirect, your Honor.

6            THE COURT:  Thank you.  You may step down.

7            MR. POSCABLO:  Your Honor, the government calls

8   Gregory Accilien.

9            THE COURT:  All right.  Let's get Mr. Accilien.

10           MR. PITTELL:  Can I take 30 seconds before he comes?

11           THE COURT:  Well, all right.  Well, why don't we just

12   take an early break then.

13           Ladies and gentlemen, we'll take an early afternoon

14   break and then when we come back we'll hear from our next

15   witness.  I want to remind you not to talk to anybody about

16   this case.  I'll see you in about ten minutes.

17           (Jury not present)

18           THE COURT:  All right.  We are going to take a break.

19   But before we do so I just want to mention one thing because it

20   may come up with Mr. Accilien if you wouldn't mind before we

21   continue, which is there was an objection during your opening,

22   Mr. Pittell, to the references to "punishment".  And I

23   sustained the objection.  It did come up again and so it came

24   up twice.  And I just wanted to make sure and to caution you

25   not to raise punishment because, obviously, it invites the jury

1    to jury nullification.

2           There's an additional invitation additional through

3    the reference to the American dream in terms of the possibility

4    that they would then use their view of the legitimacy of

5    something as a way of discounting the witness versus

6    credibility issues so obviously you'll focus on bias and all of

7    those issues with Mr. James and everything else that you want

8    to go into but with Mr. Accilien if you could just not go into,

9    he could be looking at a lifetime of punishment.  You could do

10   ranges but the fact that his brother's in for life shouldn't

11   come up again.

12          MR. PITTELL:  Judge, the reason why I brought it up is

13   I was not bringing it up to invite the jury to nullify thinking

14   that Mr. Delva could get life if they convict him.  In this

15   particular case because Mr. Philippe is his brother and he

16   knows that his brother's doing life, that gives us him an

17   incentive to lie.  That's the argument behind the reason why I

18   am bringing it up.  I understand the issue that the Court is

19   concerned about but that's not why I bring it up.  I think it's

20   a powerful motive to lie if he knows his brother who

21   participated in this crime is serving a life sentence.

22          THE COURT:  Ms. Geraci.

23          MS. GERACI:  Judge, frankly, it is no different than

24   any other co-conspirator situation where some co-conspirators

25   who have relationships whether it's family or friends have not

E98AADEL3                        Morel – Cross

1    been sentenced yet and others have.  The fact of his life

2    sentence, the government submits is impermissible and will

3    cause issues that your Honor raised.

4              THE COURT:  I do believe that it's potentially

5    relevant and important to a witness' bias if they were looking

6    at three years versus a very substantial in excess of a decade

7    or more of punishment.  Obviously, a short versus very long

8    punishment could make a big difference.  I do find however that

9    there is a level at which given the fact they're not at least I

10   don't know yet if there's going to be a real distinction

11   between Mr. Delva made and some of other defendants, the jury

12   at least at this point may be confused as to whether he will

13   stand separately from them and whether or not in their minds

14   what he's looking at is a life sentence.  And so let's stay

15   away from the word life and talk about it.  You are certainly

16   welcome to talk about it if terms of very significant.

17             All right.  Anything further that anybody would like

18   to raise?

19             MR. POSCABLO:  No, your Honor.

20             THE COURT:  All right.  Let's take a short break and

21   then we'll come back.

22             MR. PITTELL:  I actually have one comment that I would

23   like to make.  When you were giving your opening instructions

24   to the jury and you were talking about direct examination,

25   cross-examination and then you talked about some redirect and

E98AADEL3                          Morel - Cross

1    recross and subject to your control, you did say after that

2    there's two sides to any stories and it's important that you

3    hear both sides before you form any judgment.  My only concern

4    with that is that in a criminal trial there are two sides to

5    the story.  A lot of times there is in direct and

6    cross-examination.  I believe that your instruction was

7    relating to the back and forth that occurs when there's direct

8    an redirect and so on.  If, perhaps, you could take a look at

9    what you said and --

10             THE COURT:  I am happy to.

11             MR. PITTELL:  -- a clarifying instruction would be

12   fine.

13             THE COURT:  I am happy to offer a clarifying

14   instruction.  I do think that it's crystal clear since I

15   particularly focused on burden of proof.  The defendant is

16   presumed innocent.  I actually do that, usually, two to three

17   times and I've done it two to three times and I actually

18   usually offer during my preliminary instructions as I did today

19   that the defendant need not put on a case and I affirmatively

20   said that.  But to avoid any potential confusion on the jury's

21   part, and you also obviously raised it in your opening

22   statement, I'm make sure I clarify it again, particularly, in

23   light of the fact that they've now seen some back and forth.

24   So at the end of the day I'll give them some final instructions

25   and say now you've seen some back and forth and I just want to

1  remind you that the defendant doesn't have any burden here.

2         MR. PITTELL:  That's fine.

3         THE COURT:  All right.  I hope that will take care of

4  it.

5         MS. GERACI:  Judge, lastly, Tara Morel has already

6  testified, so there is no need to hold the jury past five.

7         THE COURT:  Then people should plan on that promptly

8  at five.  So where ever we are going to be ending at five, so I

9  don't do sort of, can you give me five more minutes?

10         MS. GERACI:  Understood, your Honor.

11         MR. PITTELL:  Thank you very much, your Honor.

12         (Recess)

13         MS. GERACI:  Judge, with respect to this witness the

14  government intends to introduce Exhibit 800 that we discussed

15  earlier today.  I know defense counsel has an objection and we

16  were trying to resolve it but I don't know if we're quite

17  there.  Judge, the government intends to introduce the exhibit.

18         THE COURT:  Let's see how it comes in and we'll take

19  it on the fly.  So Mr. Pittell will object or not object as he

20  deems appropriate and we'll figure out the need to take up

21  additional matters.

22         MS. GERACI:  Thank you, your Honor.

23         THE COURT:  Let's bring out the jury.

24         (Jury present)

25         THE COURT:  OK.  Ladies and gentlemen, let's all be

1    seated.

2     GREGORY ACCILIEN,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MS. GERACI:

7    Q.  Good afternoon, Mr. Accilien.

8    A.  Good afternoon.

9    Q.  Mr. Accilien, do you have a street name?

10   A.  Yes.

11   Q.  What is it?

12   A.  "Dreko".

13   Q.  How old are you?

14   A.  32.

15   Q.  And where were you born?

16   A.  I was born in New Rochelle, New York.

17   Q.  Where do you currently live?

18   A.  I currently live in MCI.

19   Q.  Is that the Metropolitan Correctional Center?

20   A.  Yes.

21   Q.  When were you arrested?

22   A.  I was arrested June 4, 2013.

23   Q.  What were you arrested for?

24   A.  I was arrested for robbery, conspiracy to rob, kidnapping,

25   conspiracy to kidnapping and use of a firearm.

E98AADEL3                    GREGORY ACCILIEN

1   Q.  When did those crimes occur?

2   A.  This happened in 2012 around August/September.

3   Q.  August/September of 2012?

4   A.  Yes.

5   Q.  Did you commit this crime alone or did you commit it with

6   other people?

7   A.  I committed it with other people.

8   Q.  Who else committed this crime with you?

9   A.  Dominique Jean-Philippe, David Delva, Trevor Cole and Lisa

10  Hylton.

11  Q.  Do you see any of those people in the courtroom today?

12  A.  Yes.

13  Q.  Who do you see?

14  A.  David Delva.

15  Q.  Could you identify him, please?

16  A.  Right there.

17  Q.  Could you describe what he is wearing?

18  A.  Wearing a black suit and braids.

19        MS. GERACI:  May the rerecord reflect the witness has

20  identified defendant?

21        THE COURT:  So reflected.

22  Q.  How do you know David Delva?

23  A.  He is my nephew.

24  Q.  For how long have you known him?

25  A.  All his life.

E98AADEL3                         GREGORY ACCILIEN

1    Q.  Let's talk about the other people you just mentioned.  How

2    do you know Dominique Jean-Philippe?

3    A.  He's my brother.

4    Q.  For how long have you known him?

5    A.  All my life.

6    Q.  Does he have a street name?

7    A.  Yes.

8    Q.  What is it?

9    A.  "S-Dot".

10            MS. GERACI:  May I approach, your Honor?

11            THE COURT:  You may.

12            (Continued on next page)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

E98Qdel4                       Accilien - direct

1    Q.  Mr. Accilien, I am showing you what's been marked as

2    Government Exhibit 11.  Do you recognize the individual in that

3    photograph?

4    A.  Yes.

5    Q.  Who is it?

6    A.  Dominique Jean-Philippe.

7         MS. GERACI:  Your Honor, the government offers

8    Government Exhibit 11 into evidence.

9         THE COURT:  Any objection?

10         MR. PITTELL:  No.

11         THE COURT:  Received.

12         (Government's Exhibit 11 received in evidence)

13         MS. GERACI:  Permission to publish it to the jury,

14    Judge?

15         THE COURT:  You may.

16    Q.  Do you know what your brother did for a living?

17    A.  Yes.

18    Q.  What did he do -- how do you know?  I'm sorry.  How do you

19    know, Mr. Accilien?

20    A.  Because I used to help him; I used to help him sell drugs.

21    Q.  So he sold drugs for a living?

22    A.  Yes.

23    Q.  Do you know what kinds of drugs he sold?

24    A.  Crack cocaine.

25    Q.  Anything else?

E98Qdel4                          Accilien - direct

1   A.   Marijuana.

2   Q.   Anything else?  If that's all you remember, that's fine.

3   A.   That's all I remember.

4             MR. PITTELL:  Objection.

5             MS. GERACI:  The record will show that he just said

6   crack cocaine and marijuana is fine, Judge.

7             THE COURT:  You may continue.

8             MS. GERACI:  Thank you, Judge.

9   Q.   And you testified that you did this with him?

10  A.   Yes.

11  Q.   Do you know where your brother lived in 2012?

12  A.   Yes.

13  Q.   Where?

14  A.   In Mount Vernon.

15  Q.   Let's talk about another person you mentioned a moment ago.

16  How do you know Trevor Cole?

17  A.   I know Trevor Cole from the neighborhood of Dyre Avenue.

18  Q.   For how long have you known him?

19  A.   I've known him for like ten to 11 years right now.

20  Q.   Does he have any street names?

21  A.   Yes.

22  Q.   What are they?

23  A.   D-1.

24  Q.   Anything else?

25  A.   That's it.

1    Q.  Does he go by Blizz?

2    A.  Oh, yeah, he go by Blizz also.  I'm sorry.

3            MS. GERACI:  May I approach, Judge?

4            THE COURT:  You may.

5    Q.  Mr. Accilien, I'm showing you what's marked as Government

6    Exhibit 10.  Do you recognize the individual in that

7    photograph?

8    A.  Yes.

9    Q.  Who is that?

10   A.  That's D-1, Trevor Cole.

11           MS. GERACI:  The government offers Exhibit 10 into

12   evidence, Judge.

13           THE COURT:  Mr. Pittell?

14           MR. PITTELL:  No objection.

15           THE COURT:  Received.

16           (Government's Exhibit 10 received in evidence)

17           MS. GERACI:  Permission to publish, Judge?

18           THE COURT:  You may.

19   Q.  Is this the individual you were just talking about, Trevor

20   Cole?

21   A.  Yes.

22   Q.  Let's talk about the last -- another person you mentioned

23   Lisa Hylton.  How do you know her?

24   A.  I know Lisa Hylton through Dominique.

25   Q.  How do you know her through Dominique?

1   A.  Because Dominique used to date her -- her -- her daughter.

2   Q.  For how long have you known her?

3   A.  I knew her for like maybe one or two months.

4           MS. GERACI:  Permission to approach, Judge?

5           THE COURT:  Yes.

6   Q.  Mr. Accilien, I'm showing you what's marked as Government

7   Exhibit 16.  Do you recognized individual in that photograph?

8   A.  The one that's right here?  Yes, I recognize.

9   Q.  Who is that?

10  A.  That's Lisa Hylton.

11          MS. GERACI:  The government offers Exhibit 16.

12          MR. PITTELL:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 16 received in evidence)

15          MS. GERACI:  Permission to publish to the jury?

16          THE COURT:  Yes.

17  Q.  Is that the individual Lisa Hylton you were just talking

18  about?

19  A.  Yes.

20          MS. GERACI:  One moment, your Honor?

21          THE COURT:  Yes.

22  Q.  With respect to Lisa Hylton, you mentioned that you knew

23  her one or two months.  One or two months before what?

24  A.  The robbery.

25          MS. GERACI:  May I approach, Judge?

1          THE COURT:  Yes.

2   Q.  I'm showing you what's been marked as Government Exhibit

3   12.  Do you recognize the individual in that photograph?

4   A.  Yes.

5   Q.  Who is that?

6   A.  That's David Delva.

7          MS. GERACI:  The government offers Exhibit 12.

8          THE COURT:  Mr. Pittell?

9          MR. PITTELL:  No objection.

10         THE COURT:  Received.

11         (Government's Exhibit 12 received in evidence)

12         MS. GERACI:  Permission to publish?

13         THE COURT:  Yes.

14  Q.  Mr. Accilien, do you know what David Delva did for a

15  living?

16  A.  He worked in Iona College, and he sold drugs.

17  Q.  How do you know that he sold drugs?

18  A.  Because I -- I used to steer customers from Dominique's

19  customers to David Delva.

20  Q.  So you did this with David Delva also?

21  A.  Yes.

22  Q.  What kinds of drugs did David Delva sell?

23  A.  Crack cocaine.

24  Q.  Any other drugs?

25  A.  No.  Marijuana at times too.

E98Qdel4                              Accilien - direct

1           MS. GERACI:  Permission to approach?

2           THE COURT:  Yes.

3    Q.  Mr. Accilien, I'm showing you what's marked as Government

4    Exhibit 13.  Who is that?

5    A.  This is -- that's me, Gregory Accilien.

6           MS. GERACI:  The government offers Exhibit 13.

7           MR. PITTELL:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibit 13 received in evidence)

10          MS. GERACI:  Permission to publish, Judge?

11          THE COURT:  Yes.

12          MS. GERACI:  May I approach, your Honor?

13          THE COURT:  You may.

14   Q.  Mr. Accilien, I'm showing you what's been marked as

15   Government Exhibit 15.  Do you recognize the individual in that

16   photograph?

17   A.  Yes.

18   Q.  Who is that?

19   A.  The female victim.

20   Q.  Do you know her name?

21   A.  No.

22   Q.  Is this what she looked like in September of 2012?

23   A.  Not all the way but somewhat.

24   Q.  Can you describe what's different?

25   A.  She -- she had a -- she had a -- a -- she had a --

E98Qdel4                          Accilien - direct

1    something tying up her head.

2              MS. GERACI:  The government offers Exhibit 15 into

3    evidence.

4              MR. PITTELL:  Judge, I'm sorry.  Can we have the last

5    portion of the answer read back?

6              THE COURT:  Could the reporter read back the answer?

7    A.  She had like -- like a --

8              THE COURT:  It's OK.  We can have the court reporter

9    read it back.

10             (Read back)

11             THE COURT:  You may continue.  I'm sorry, Mr. Pittell?

12             MR. PITTELL:  I have no objection.

13             THE COURT:  Received.

14             (Government's Exhibit 15 received in evidence)

15             MS. GERACI:  Permission to publish, Judge?

16             THE COURT:  Yes.

17   Q.  Other than having something tying up her head, is this what

18   she looked like?

19   A.  Yes.

20   Q.  Mr. Accilien, you testified a moment ago that you were

21   arrested in June of 2013 in connection with a robbery and

22   kidnapping.  When did you decide to cooperate with the

23   government?

24   A.  Right away.

25   Q.  Do you recall when your first meeting with the government

E98Qdel4                         Accilien – direct

```
 1   was?
 2   A.  I don't remember.
 3   Q.  Do you recall if it was one month or more after you were
 4   arrested?
 5   A.  I think it was one month.
 6   Q.  Did you discuss the robbery and the kidnapping the first
 7   time you met with the government?
 8   A.  Yes.
 9   Q.  Did you discuss being involved in it with Trevor Cole,
10   Dominique Jean-Philippe, Lisa Hylton and David Delva in this
11   robbery during your first meeting with the government?
12   A.  Yes.
13            MR. PITTELL:  Objection to form.
14            THE COURT:  Sustained.  I need you to try not to lead.
15            MS. GERACI:  Yes, your Honor.
16   Q.  You testified you discussed the robbery with the
17   government.  Do you recall telling the government who else
18   aside from you was involved in that robbery?
19   A.  Yes.  I told them that David Delva, Dominique
20   Jean-Philippe, Trevor Cole and Lisa Hylton was involved in the
21   robbery.
22   Q.  In connection with your efforts to cooperate with the
23   government, did you agree to meet with law enforcement and
24   prosecutors on other occasions?
25   A.  Yes.
```

1    Q.  Did you agree to provide information during the meetings?

2    A.  Yes.

3    Q.  What types of information did you provide to law

4    enforcement and prosecutors during the meetings?

5    A.  I, umm, explained about the robbery and the stuff -- the

6    stuff that Dominique and David do for -- as a -- as, I mean,

7    what they do as -- when they work and stuff like that.

8    Q.  Did you provide information about your own crimes?

9    A.  Excuse me?

10   Q.  Did you provide information about your own crimes?

11   A.  Yes, I provided information about my crimes too.

12   Q.  Were these meetings sometimes referred to as proffer

13   sessions?

14   A.  Yes.

15   Q.  Can you estimate how many proffer sessions you had with the

16   government?

17   A.  I don't remember, but it could be like around ten, ten,

18   eleven, proffer sessions.

19   Q.  As part of your cooperation, were you required to disclose

20   all of your crimes to the government during these meetings?

21   A.  Yes.

22   Q.  Did you?

23   A.  Yes.

24   Q.  Did you do it right away?

25   A.  Yes.

E98Qdel4                          Accilien - direct

1    Q.  At some point did you plead guilty to additional crimes?

2    A.  Yes.

3    Q.  As you sit here today, have you now disclosed all of your

4    crimes to the government?

5    A.  Yes.

6    Q.  Does that include the robbery and kidnapping that we've

7    been talking about?

8    A.  Yes.

9    Q.  Did you eventually plead guilty to all of these crimes?

10   A.  Yes.

11   Q.  What did you plead guilty to?

12   A.  Robbery, conspiracy to rob, kidnapping, conspiracy to

13   kidnapping and use of firearm.

14   Q.  What else did you plead guilty to?

15   A.  Also perjury and also, umm -- and also drugs.

16   Q.  What is your understanding of the maximum sentence you face

17   as a result of that guilty plea?

18   A.  Excuse me?

19   Q.  What is your understanding of the maximum sentence you face

20   as a result of that guilty plea?

21   A.  Life.

22   Q.  What's your understanding of the mandatory minimum sentence

23   you face as a result of that guilty plea?

24   A.  42.

25   Q.  Is that 42 years?

1    A.  42 years.

2    Q.  Did you plead guilty pursuant to a cooperation agreement?

3    A.  Yes.

4    Q.  What is your understanding of your obligations under that

5    cooperation agreement?

6    A.  It's to attend meetings, tell the truth, report -- testify

7    and also to don't do any additional trouble.

8    Q.  What's your understanding of what you will receive from the

9    government in return if you do all of the things you just

10   mentioned?

11   A.  The government will give a five two -- five -- five two --

12   5K letter to the judge.

13   Q.  And who writes that letter as -- what is your understanding

14   as to who writes that letter?

15   A.  The prosecutors write the letter.

16   Q.  What's your understanding of what types of information go

17   into that letter?

18   A.  The stuff that I did bad and also the good stuff.

19   Q.  Who receives that letter?

20   A.  The judge.

21   Q.  And what's your understanding of the effect that that kind

22   of letter has on your possible sentence?

23   A.  I may -- I'll get lower than my mandatory minimum.

24   Q.  Is that a possibility or is it guaranteed?

25   A.  It's a possibility.

E98Qdel4                        Accilien - direct

1    Q.  So with that letter, what is your understanding of your

2    possible sentence?

3    A.  Can you rephrase that again?

4    Q.  Sure.  With that letter, what is your understanding of what

5    your possible sentence could be?

6    A.  It's depending on the judge.

7              MS. GERACI:  One moment, your Honor?

8              THE COURT:  Yes.

9              (Pause)

10             MS. GERACI:  Your Honor, may I approach?

11             THE COURT:  Yes.

12   Q.  Mr. Accilien, I'm handing you what's been marked for

13   identification as Government Exhibit 3514-JJ.  Do you recognize

14   this?

15   A.  Yes.  It was -- it was translated by my -- by my lawyer.

16   Q.  It was explained to you by --

17   A.  Yes, it was explained to me by my lawyer.

18   Q.  Could you look at the very last page.  If you just flip it

19   over, you will see it.  Did you sign that last page?

20   A.  Yes.

21   Q.  Is this your cooperation agreement?

22   A.  Yes.

23             MS. GERACI:  Your Honor the government offers 3514-JJ.

24             THE COURT:  Mr. Pittell?

25             MR. PITTELL:  Yes.  I have no objection, Judge.

1          THE COURT:  Received.

2          (Government's Exhibit 3514-JJ received in evidence)

3    Q.  Mr. Accilien, how long have you been in federal jail so

4    far?

5          MR. PITTELL:  Just -- I'm sorry, are we going to keep

6    it as that number are or we going to give it a separate number?

7          THE COURT:  I think we will keep it as that number, so

8    3514-JJ.

9          MS. GERACI:  May I proceed, your Honor?

10          THE COURT:  You may.

11   Q.  Mr. Accilien, how long have you been in federal jail so

12   far?

13   A.  15 months.

14   Q.  Do you have any idea what your sentence will be?

15   A.  No.

16   Q.  Were you promised any particular sentence or any range of

17   sentence?

18   A.  None at all.

19   Q.  What do you hope your sentence will be?

20   A.  Hopefully time served.

21   Q.  What's your understanding of what happens if you don't tell

22   the truth today?

23   A.  That the 5K letter will be ripped up.

24   Q.  Do you mean your cooperation agreement?

25   A.  Yes.

1   Q.  Do you have an understanding of if you don't tell the truth

2   whether you'll get a 5K letter?

3   A.  Repeat that again, ma'am?

4   Q.  If you don't tell the truth, will you get a 5K letter?

5   A.  No, I won't get it.

6   Q.  What's your understanding of whether the outcome of this

7   trial has any effect on whether you actually receive a 5K

8   letter?

9   A.  Excuse me?

10  Q.  What is your understanding of whether the outcome of this

11  trial has any effect on whether you receive a 5K letter?

12  A.  Rephrase that again?

13  Q.  Does it matter what happens at this trial for you to

14  receive a 5K letter?

15  A.  Yes.

16  Q.  It matters?

17  A.  Yes, it matters.

18          MS. GERACI:  One moment, your Honor?

19                    (Pause)

20  Q.  Mr. Accilien, if the defendant is found not guilty at this

21  trial but you tell the truth, do you still get a 5K letter?

22          MR. PITTELL:  Objection to the form.

23          THE COURT:  I will allow it.

24  A.  Rephrase that again?

25  Q.  If the defendant is found not guilty at the trial but you

1   tell the truth, do you still get a 5K letter?

2   A.  Yes.

3   Q.  If the defendant is convicted at this trial but you lied,

4   do you get a 5K letter?

5   A.  No.

6   Q.  Mr. Accilien, you said you were arrested in June of 2013.

7   Was that the first time you were ever arrested?

8   A.  No.

9   Q.  What other crimes have you been arrested for in the past?

10  A.  Trespassing, selling drugs and robbery.

11  Q.  Other things as well?

12  A.  Assault battery.

13  Q.  Have you ever been convicted of or pled guilty to other

14  crimes, to any of these -- the crimes you just mentioned?

15  A.  Yes, I pled guilty to most of them -- most of them.

16  Q.  The robbery and the assault you mentioned, what happened

17  with that case?

18  A.  Well, the robbery case I -- I had a brain tumor, I wasn't

19  mentally fit for trial; and the assault I pleaded guilty to it.

20  Q.  Putting aside the crimes you've been arrested for, have you

21  committed crimes that you were never arrested for?

22  A.  Can you rephrase that again?

23  Q.  Sure.  Have you committed crimes that you never got

24  arrested for?

25  A.  Yes.

E98Qdel4                        Accilien - direct

```
 1   Q.   What?

 2   A.   Robbery, armed robbery.

 3   Q.   Did you commit that crime alone or with anyone else?

 4   A.   No, with -- with other people.

 5   Q.   Who did you commit the armed robbery with?

 6   A.   With Dominique Jean-Philippe and Trevor Cole.

 7   Q.   Were any of you armed in that robbery?

 8   A.   Yes, I was.

 9   Q.   Have you ever kidnapped anyone before?

10   A.   No.

11   Q.   Have you dealt drugs in the past?

12   A.   Yes.

13   Q.   What kinds of drugs?

14   A.   Crack cocaine, marijuana.

15   Q.   Who did you work with in dealing those kinds of drugs?

16   A.   I worked with Dominique, and I also worked with David.

17   Q.   What was your role?

18   A.   To look for customers -- to provide the drugs to their

19   customers.

20   Q.   Prior to your most recent arrest, were you employed?

21   A.   Excuse me?

22   Q.   Did you have a job prior to your arrest?

23   A.   No, not at that time.

24   Q.   Do you suffer from any mental health problems?

25   A.   Yes.
```

E98Qdel4                          Accilien - direct

1   Q.  What do you suffer from?

2   A.  Schizophrenia and anxiety.

3   Q.  When were you diagnosed with schizophrenia?

4   A.  I was diagnosed seven years ago.

5   Q.  How about anxiety, when were you diagnosed with anxiety?

6   A.  A few months after I entered the MCC.

7   Q.  Have you been prescribed medication for these?

8   A.  Yes.

9   Q.  Have you been taking your medication since you were

10  diagnosed?

11  A.  Yes.

12  Q.  Were there times that you did not take your medication?

13  A.  Yes.

14  Q.  Are you taking medication now?

15  A.  Yes.

16  Q.  At the time that you participated in the robbery and the

17  kidnapping in 2012, were you taking medication then?

18  A.  Yes.

19  Q.  Do you feel OK today?

20  A.  Yes.

21  Q.  Have you ever had any surgery?

22  A.  Yes.

23  Q.  What did you have surgery for?

24  A.  I had a brain tumor.

25  Q.  Has that surgery had any effect on you?

1    A.  At times I have loss of words and it -- where I had to --

2    the surgery is where my vocabulary is controlled by my brain,

3    so at times I can't cons -- concentrate while I'm talking.

4    Q.  And when was that surgery?

5    A.  This was -- this was in -- this could have been seven,

6    seven years ago, seven, eight.

7    Q.  Have you ever served in the armed forces?

8    A.  Yes.

9    Q.  Where did you serve?

10   A.  Regular Army.

11   Q.  What was your rank?

12   A.  Specialist.

13   Q.  Were you released honorably or dishonorably?

14   A.  Honorably.

15           THE COURT:  Was that before or after the brain tumor?

16           THE WITNESS:  This was before the brain tumor.

17           THE COURT:  You may proceed.

18   Q.  Mr. Accilien, let me direct your attention to September of

19   2012.  At that time where did you live?

20   A.  Excuse me?

21   Q.  In September of 2012, where did you live?

22   A.  832 South Oak Drive.

23   Q.  Is that in the Bronx?

24   A.  Yes.

25   Q.  Did you live there alone or did other people live there

1    were?

2    A.  Yes, David Delva lived with me.

3    Q.  When did Dave Delva move in with you?

4    A.  August 2012.

5    Q.  Do you know where he lived prior to moving in with you?

6    A.  Yes.

7    Q.  How do you know that?

8    A.  Well, he's my nephew, he would have told me where he came

9    from.

10   Q.  Where did he come from?

11   A.  Miami.

12   Q.  Do you know why he moved in with you?

13   A.  To -- to basically to -- to start a fresh start.

14   Q.  Do you know what that means?  Can you explain that?

15   A.  He basically wanted to start a fresh start from the

16   robberies he was doing in Miami.

17            MR. PITTELL:  Objection.

18            THE COURT:  Sustained.

19            The jury will disregard that last answer.

20   Q.  Mr. Accilien, you testified that you committed a robbery

21   with other people during this time.  Can you explain how you

22   personally became involved in that robbery?

23   A.  I was called -- I mean, no.  I gave a call to my brother,

24   Dominique Jean-Philippe, and I asked him -- I was going to ask

25   him to borrow some money, so he told me to meet him in this

1    building and to go get some duct tape and gloves from the Rite

2    Aid that was right near the building.

3    Q.  Let me back up.  Do you recall when you made that call to

4    your brother?

5    A.  No, I don't recall what time, but it was late night.

6    Q.  Was that around September 2 of 2012, the date?

7    A.  I don't remember the date.

8    Q.  Where were you when you called your brother Dominique for

9    money?

10   A.  I was -- I was in my apartment, 832 South Oak Drive.

11   Q.  What was the phone number you called him from?

12   A.  (347) 346-8013.

13   Q.  Is that a land line or a cell phone?

14   A.  A land line.

15   Q.  Is that your land line?

16   A.  Yes.

17   Q.  What number did you dial to reach Dominique?

18   A.  347 -- no, (917) 714-3787.

19   Q.  Is that Dominique's cell phone or a land line?

20   A.  That's his cell phone.

21   Q.  During the phone call you had with Dominique, can you

22   explain what you said to him and what he said to you?

23   A.  He -- I had asked him for some cash, and then he told me to

24   meet him at the hotel -- I mean, not the hotel, I'm sorry -- at

25   the apartment building to -- to go to the Rite Aid and get some

E98Qdel4                        Accilien - direct

1   gloves and some duct tape.

2   Q.  Do you recall the address of the apartment?

3   A.  No, I don't -- I don't remember the address.

4   Q.  Do you remember how long it took you to get from your

5   apartment to that apartment?

6   A.  About five minutes.

7   Q.  And do you recall where the Rite Aid was?

8   A.  The Rite Aid was right across the -- across the street from

9   the house.

10  Q.  I'm sorry, from your house?

11  A.  No, no, it was across the street from the school.

12  Q.  What school?

13  A.  That was next to her house.

14  Q.  Do you know the school that's next to the apartment you're

15  talking about?

16  A.  It was across the street from Evander High School.

17          MS. GERACI:  May I approach, your Honor?

18          THE COURT:  You may.

19  Q.  Mr. Accilien, I'm showing you what's been marked as

20  Government Exhibit 41 and 43.  Take a look at the first one,

21  Exhibit 41.  Can you tell me if you see the high school that

22  you were telling --

23          MR. PITTELL:  Objection.

24          THE COURT:  Sustained.

25  Q.  Please take a look at Exhibit 41 and tell me if that map

1   looks familiar to you?

2   A.  Yes.

3   Q.  Can you tell me what you recognize on that?

4   A.  Evander High School.

5   Q.  What is the map generally showing?

6           MR. PITTELL:  Objection.

7   A.  It's showing --

8           THE COURT:  I'll allow it.

9   A.  It's showing Evander High School and also the address to --

10  to -- where the crime scene was done.

11          MS. GERACI:  The government offers Exhibit 41.

12          MR. PITTELL:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 41 received in evidence)

15          MS. GERACI:  Permission to publish, Judge?

16          THE COURT:  Yes.

17  Q.  Mr. Accilien, would you please take a look at what's now

18  been marked Exhibit 43.  It's just under the photograph I

19  showed you.

20  A.  Could you repeat that?

21  Q.  Could you look at the paper in front of you, the second

22  page there is Exhibit 43?

23  A.  Yes.

24  Q.  Does that look familiar to you?

25  A.  Yes.

E98Qdel4                          Accilien - direct

1    Q.   What is that?

2    A.   That was the Rite Aid Pharmacy.

3    Q.   Is that a particular Rite Aid Pharmacy you recognize or

4    just any?  You just testified -- let me rephrase --

5              MR. PITTELL:  Objection.

6              THE COURT:  Sustained.

7    Q.   Mr. Accilien, you just testified that you went to a Rite

8    Aid --

9              MR. PITTELL:  Objection.

10   A.   Yes, this --

11             THE COURT:  Try a different way.  What do you see in

12   that photo?

13             THE WITNESS:  This is the Rite Aid that's -- that's --

14   that I went to before I went to 830 Magenta.

15             MS. GERACI:  The government offers Exhibit 43.

16             MR. PITTELL:  No objection.

17             THE COURT:  Received.

18             (Government's Exhibit 43 received in evidence)

19             MS. GERACI:  Permission to publish, Judge.

20             THE COURT:  Yes.

21   Q.   Mr. Accilien, did you in fact go to this Rite Aid?

22   A.   Yes.

23   Q.   What did you get there, if anything?

24   A.   Duct tape and gloves.

25   Q.   What did you do with the duct tape and gloves?

1   A.  I brought them to Dominique and -- at the crime scene.

2   Q.  Do you know why he asked you to buy these things for him?

3   A.  At first I didn't -- I didn't know.  I thought he was going

4   to cut up drugs with it, but then when I went to the -- went to

5   the apartment building, I scene that there was a woman tied up

6   in the right side of the bed.

7   Q.  When you arrived at that apartment building, how did you

8   get in?

9   A.  The door -- I was buzzed in through the bell and Trevor and

10  Dominique opened the door for me, and they -- and they, umm --

11  punched in the alarm in the ADT alarm system.

12  Q.  Was that in the building or in the actual apartment?

13  A.  In the actual apartment.

14  Q.  Can you describe when you walked into the apartment what it

15  looked like?

16  A.  Soon as you come in, you see a kitchen on the right side,

17  and there's a -- there was a barrel that was on the left side,

18  and there's a living room as soon as you come in.  After you --

19  after you pass the kitchen, there's a living room.

20  Q.  Were there any bathrooms?

21  A.  There was a bathroom on the left side.

22          MS. GERACI:  Permission to publish Exhibit 101 which

23  has already been admitted?

24          THE COURT:  Yes.

25  Q.  Mr. Accilien, do you recognize the scene depicted there?

```
1    A.  Yes.

2    Q.  What is that?

3    A.  That was the living room.

4    Q.  Is that the barrel you mentioned?

5    A.  Yes.

6            MS. GERACI:  Permission to publish 103 already

7    admitted?

8            THE COURT:  Yes.

9    Q.  Mr. Accilien, what is pictured here?

10   A.  The living room.

11           MS. GERACI:  Permission to publish 106 already

12   admitted?

13           THE COURT:  Yes.

14   Q.  Mr. Accilien, what are we looking at here?

15   A.  That was the duct tape that was on -- on top of the guy's

16   head.

17   Q.  Is this inside the apartment that you're talking about?

18   A.  Yes.

19           MS. GERACI:  Permission to publish 109 also admitted

20   into evidence?

21           THE COURT:  Yes.

22   Q.  Mr. Accilien, what are we looking at here?

23   A.  There's the room.

24   Q.  What room are we looking at?

25   A.  The room that the lady was tied up in.  Oh, no, she was on
```

1   the right side of the bed.

2   Q.  So this is the bed?

3   A.  On the floor, on the floor on the right side of the bed.

4          MS. GERACI:  Permission to publish 111 already

5   admitted?

6          THE COURT:  Yes.

7   Q.  Mr. Accilien, what are we looking at here?

8   A.  This is the room.

9   Q.  Can you specify, is it what particular room in the

10  apartment?

11  A.  It's the bedroom.

12  Q.  When you got to the apartment, who was there?

13  A.  It was Trevor Cole, Dominique Jean-Philippe and also the

14  female victim; she was tied up with like some type of scarf to

15  the back of her hands in the room.

16  Q.  Do you have any understanding as to who that female was?

17  A.  She was the female victim.

18  Q.  Do you know her name?

19  A.  Do I know her name?  No, I don't know her name.

20  Q.  Do you know if anyone in the apartment was armed?

21  A.  Yes.

22  Q.  How do you know?

23  A.  It was -- it was on the table of the living room.

24  Q.  What exactly was on the table in the living room?

25  A.  A .38.

1    Q.  Can you describe the gun what color was it?

2    A.  It was a silver gun.

3    Q.  Did you ever see that gun before?

4    A.  No -- I mean, yes, I've seen it before.

5    Q.  Where have you seen it before?

6    A.  Dominique had it.

7    Q.  So what did you do when you first got to the apartment?

8    A.  I first -- the first thing I did was bring the duct tape

9    and gloves to Dominique, and then I walked around and I seen

10   the female tied up in her room.

11   Q.  Did you speak with Dominique or Trevor Cole?

12   A.  Yes.

13   Q.  Can you tell me what you said to them and they said to you?

14   A.  Yes, I asked them what was going on, and then Dominique was

15   like, "Yeah, I got this come up."

16   Q.  What does that mean?

17   A.  A robbery, and basically he was looking for the -- for the

18   drug dealer to come inside his apartment and the girl was

19   supposed to be his girlfriend.

20   Q.  The girl was the girlfriend of?

21   A.  Of the drug dealer.  And then I -- I started acting

22   paranoid, so he asked me to bring David into the picture.

23   Q.  Why were you acting paranoid?

24   A.  Because I wasn't used to kidnapping.

25   Q.  What did you do after he asked you to bring David into the

E98Qdel4                            Accilien – direct

 1    picture?

 2    A.  I -- I left the apartment building.

 3    Q.  Where did you go?

 4    A.  I went to my apartment.

 5    Q.  What did you do when you got to your apartment?

 6    A.  I explained the story to David.

 7    Q.  Was David at the apartment when you got there?

 8    A.  Yes, he was.

 9    Q.  And what did you say to David and what did he say to you?

10    A.  I -- I explained to David what was going on, and he agreed

11    what was going on, and he said that he wanted to come too.

12    Q.  What did you do next?

13    A.  We both -- we both went back to the apartment.

14    Q.  When you say both, you mean you and David?

15    A.  Yeah, me and David.

16    Q.  When you arrived back at the apartment, was the female

17    victim still there?

18    A.  Yes, the female victim was still there.

19    Q.  Can you describe what she looked like and where she was?

20    A.  She was on the right side of the floor of the bed, and she

21    was tied up with some kind of black scarf -- no, but the second

22    time that I came to the house, she was tied up with the duct

23    tape.

24    Q.  What, if anything, did you do with the latex gloves?

25    A.  We put them on.

1    Q.   Do you know if everyone put them on?

2    A.   Everybody put them on.

3    Q.   What happened next after you and David got to the

4    apartment?

5    A.   The next thing -- the next thing that happened, Dominique

6    and Trevor had a long conversation with us.  He was telling us

7    that, I mean, that this guy wasn't even legally -- legally in

8    the country -- legally in the country; that he wouldn't call

9    the police officers if we did this robbery.  And he also showed

10   us a money counting machine, and he -- Trevor told us that this

11   guy have to have a lot of money because he got a money counting

12   machine.  He just have to show us where the money was at when

13   he comes over here.

14   Q.   What was your reaction to this?

15   A.   At first I kind of like agreed what was going on, so me and

16   David sat down in the living room.

17   Q.   Did you speak with David at all?

18   A.   After awhile, I did speak to David because we started

19   spending too long inside the apartment.

20   Q.   What did you say to David and what did he say to you?

21   A.   I told -- I told David that we're spending too long in the

22   apartment.  It seems like this guy is not going to come over

23   here.  And David started -- to the point where David started

24   talking too.  He said that this is not the type of robbery that

25   he's used to doing because he -- he never kidnapped nobody

E98Qdel4                          Accilien - direct

1    before and he also was more used to the in-and-out kind of

2    thing --

3              MR. PITTELL:  Objection.

4              THE COURT:  Overruled.

5    Q.  Continue, Mr. Accilien.

6    A.  So we decided that -- I mean, this guy was taking too long

7    to come into the apartment, and we wasn't comfortable with the

8    situation of a woman being tied up in the room, so we both

9    decided to leave the apartment.

10   Q.  Before you decided to leave the apartment, you said that

11   David was telling you he's not comfortable with this kind of

12   robbery.  What were you about to say what he's comfortable

13   with?

14   A.  He was more comfortable with the --

15             MR. PITTELL:  Objection.

16             THE COURT:  No.  No.  We'll sustain that.  Because

17   it's after the question.

18   Q.  You testified that you and David stayed in the apartment

19   for some amount of time.  Is that right?

20   A.  Excuse me?  State that again.

21   Q.  You and David stayed in the apartment for some amount of

22   time?

23   A.  Yes.  For some amount of time.  It was around sunrise at

24   the time when we left.

25   Q.  What were you doing in the apartment when you were waiting?

E98Qdel4                          Accilien - direct

1   A.   I was -- I was smoking marijuana and smoking cigarettes.

2   Q.   At some point did you decide to leave the apartment?

3   A.   Yes.

4   Q.   When was that, approximately?

5   A.   I don't know what time, but it was -- it was sunrise.

6   Q.   Why did you decide to leave?

7   A.   We did -- me and David decided that we was going to leave

8   the scenery because we wasn't -- we wasn't -- we wasn't

9   comfortable what was going on inside that apartment.

10  Q.   What do you mean by that?  What were you not comfortable

11  with?

12  A.   We wasn't comfortable with --

13            MR. PITTELL:  Objection.

14            THE COURT:  Sustained.  Just talk about what you were

15  thinking and felt.

16  A.   OK.  Well, I just felt like, like I didn't want to go

17  through this because I never kidnapped nobody before, and I --

18  I decided that I wanted to leave the apartment, and David

19  followed me.

20  Q.   Did you speak to David about how you were feeling?

21  A.   Yes.

22  Q.   Did you have a conversation with him about how you both

23  were feeling?

24  A.   I believe so.

25  Q.   Did he explain to you what he was feeling?

E98Qdel4                          Accilien - direct

```
1    A.  No.

2    Q.  At some point did you and David both leave the apartment?

3    A.  Yes.

4    Q.  Do you know what the reaction was from Dominique or Trevor

5    Cole to you leaving?

6    A.  Well, they -- they was acting like -- like we was acting

7    like punks because we was leaving the scenery.

8    Q.  Did they do anything in response to you leaving?

9    A.  They -- they tried to talk us into staying, but we decided

10   to leave anyway.

11   Q.  Do you know if they elicited help from anyone else because

12   you were leaving?

13   A.  Excuse me?

14   Q.  Do you know if they elicited help from anyone else because

15   you were leaving?

16   A.  Yeah.  Before we left the apartment, Trevor picked up the

17   cell phone and he called, he called Lisa Hylton and he

18   explained to Lisa Hylton that me and David was -- was going to

19   leave the apartment, and that he needed more help because --

20   because we both was going to leave the scenery.

21   Q.  After you and Dave left the apartment, where did you go?

22   A.  We both decided to -- no, I -- I -- I picked up some change

23   that was on top of the refrigerator, and we both decided to

24   leave the apartment, and then I went to the store, got some

25   cigarettes and beer and met David back in the apartment in 832
```

E98Qdel4                         Accilien - direct

1  South Oak Drive.

2  Q.  When you say you met David back in the apartment, do you

3  mean your home apartment?

4  A.  Yes, my home apartment.

5  Q.  At some point at your home apartment, did you receive a

6  visitor?

7  A.  Yes, later on -- later on in the afternoon I received a

8  visit from Dominique, and Dominique came upstairs to talk to me

9  and David.  He brought some hot wings, and then we heat up the

10  hot wings in the oven.  And that's when Dominique started

11  talking to me and David more and more intensively because he

12  started saying that stuff like, "Come on, David and Greg, you

13  guys are -- you acting like this ain't my family" and stuff

14  like that.  "How you going to act like this?  I'm saying, how

15  you going to leave the scenery and I need you -- you both for

16  to be there tomorrow."

17  Q.  Why did you need to be there tomorrow?

18  A.  Because the drug dealer was supposed to be coming to the

19  apartment around that time the next day.

20  Q.  What, if anything, did you do the next day?

21  A.  Excuse me?

22  Q.  What, if anything, did you do the next day?

23  A.  What did I do the next day?

24  Q.  (Indicating)

25  A.  The next day I -- I went to the apartment building after

1    David.

2    Q.  Do you know when David left to go to the apartment

3    building?

4    A.  He left like around -- I don't remember like the exact

5    time, but I know it was like around midday and he was putting

6    his sneakers on, and I asked him where he was going, and he

7    said he was going to go back to the crime scene, and I told him

8    it wouldn't be a good idea, but he left anyway.

9    Q.  Before you went over, as you just testified, did you do

10   anything else?

11   A.  Excuse me?

12   Q.  Before you went over to the apartment, did you do anything

13   else?

14   A.  Yes.  I tried to -- I called -- I called Dominique, and I

15   called David, and I also called Trevor to see what was going

16   on, to see if everything was all right, but they -- nobody

17   picked up, so that's when I decided that I was going to go back

18   to the apartment and see if everything was OK.

19   Q.  Do you recall the number that you called David on?

20   A.  Yes.

21   Q.  What's that number?

22   A.  (305) 80 -- (305) 709-8402.

23   Q.  Do you know if that was his cell phone at the time or was

24   that a land line?

25   A.  That was his cell phone at the time.

1   Q.  Did you call him from the land line you talked about

2   earlier?

3   A.  Yes.

4   Q.  Mr. Accilien, have you reviewed any phone records in this

5   case or are these just phone numbers you actually remember?

6   A.  These are actually phone numbers that I remember.

7   Q.  After no one answered their phones, what did you do?

8   A.  I -- I went to the apartment to see what was going on, to

9   see if everything was OK.

10  Q.  When you arrived back at that apartment, who was there?

11  A.  I seen Lisa Hylton with a box and a bag full of stuff and a

12  box full of exotic weed, and I seen Trevor, David and Dominique

13  inside the apartment.

14  Q.  Did you also see the female victim still?

15  A.  Excuse me?

16  Q.  Do know if the female victim that you testified --

17  A.  Yeah, the female victim was still tied up in the room, and

18  the male victim was also tied up on the front side of the bed

19  of the room.

20  Q.  Did you see the gun that you testified about earlier?

21  A.  Yes, the gun was on the table still.

22  Q.  Did you speak with anyone at the apartment?

23  A.  Not really, but Dominique asked me to stay to -- to leave

24  the apartment building to go to the hotel with Lisa Hylton and

25  make sure that she doesn't leave with the weed and stuff like

1      that.

2      Q.  Is that something you did?

3      A.  No, because before I decided to do that, Dominique changed

4      his mind and said that it's better off that I stay in the

5      apartment with David and he's giving me a chance to redeem

6      myself, so I could watch over -- watch over the guy to make

7      sure he doesn't untie himself and try to leave or something

8      like that.

9      Q.  At some point did Dominique, Trevor and Lisa leave the

10     apartment?

11     A.  Excuse me?

12     Q.  At some point did --

13     A.  Yeah, Dominique and Trevor and Lisa left right after they

14     told me what to do.

15     Q.  Do you know where the gun was at this time, the gun you

16     testified about earlier?

17     A.  It was on the table.

18     Q.  So they left it?

19     A.  They left it on the table.

20     Q.  Did you notice the state of the male victim?

21     A.  Excuse me?

22     Q.  Did you notice what the male victim -- where he was and

23     what he looked like?

24     A.  The male victim, I -- I don't -- I didn't see his face, but

25     I seen he was tied up from the back and his legs was tied up

1   and he had duct tape across his eyes.

2   Q.   What happened next with respect to the male victim as you

3   were able to observe it?

4   A.   Excuse me?

5   Q.   What did you observe happened with respect to the male

6   victim?

7   A.   OK, after awhile, the male victim was moving -- moving his

8   face around so he could get the duct tape off of his eyes and

9   then that's when he started looking at me because the duct tape

10  was being removed off his eyes, and I asked David -- I told

11  David, I said, "You guys didn't put the duct tape right over

12  his eyes.  He could see me."  And then that's when David came

13  in with a -- like some kind of mop stick and hit him over --

14  like a few, and I guess he put the duct tape back on his eyes

15  again.

16  Q.   Did anyone say anything at this point?

17  A.   No, nobody said anything, but I didn't feel comfortable.

18  So after that happened, I decided to leave the apartment.

19          MS. GERACI:  One moment, your Honor?

20          (Pause)

21  Q.   You mentioned that some people were looking to go to a

22  hotel room.  Could you explain what that means?

23  A.   Excuse me?

24  Q.   You mentioned a moment ago that some people were going to

25  go to a hotel room.  Can you explain what the plan was, what

1   that means?

2   A.  Some people supposed to go to the hotel room?

3   Q.  You mentioned that initially you and Lisa were going to go

4   to a hotel room?

5   A.  Yeah.

6   Q.  What was going to happen?

7   A.  I was supposed to be watching over to make sure that she

8   doesn't leave with the marijuana.  And I -- I want to rephrase

9   a part that you asked me that was he saying anything?

10            MR. PITTELL:  Objection.

11            THE COURT:  Why don't you pose a new question,

12   Ms. Geraci.

13   Q.  Mr. Accilien, what, if anything, did you hear David say to

14   the male victim?

15   A.  While he was hitting the male victim, he told the male

16   victim that you must not be worried about your life, and then

17   he was hitting him with the stick.

18   Q.  Mr. Accilien, did you wear latex gloves at this point?

19   A.  Yes.

20   Q.  Do you know whether David Delva was wearing latex gloves at

21   this point?

22   A.  He did too.

23   Q.  While you and David Delva were in the apartment, did you at

24   any point try to reach out to Dominique, Trevor or Lisa?

25   A.  Rephrase that.

1   Q.   While you were in the apartment with David Delva, did

2   anyone try to reach out to Dominique, Trevor or Lisa?

3   A.   Yes, I tried to reach out to Dominique.  I sent him a text

4   through David cell phone, and I was trying to tell him that

5   this guy is getting texts saying that they need him because

6   he's a drug dealer, and his customers was asking -- was asking

7   him, you know, where he's at and stuff like that.  And I was

8   basically telling Dominique that he needs to come back soon as

9   possible because there's people that are looking for the drug

10  dealer right now.

11  Q.   So, to be clear, you were texting Dominique through David

12  Delva's cell phone?

13  A.   Yes.

14  Q.   Who was getting calls or texts?  Who was reaching out?

15  A.   Excuse me?

16  Q.   Who was reaching out to the drug dealer?

17  A.   His customers.

18  Q.   At some point, did you decide to leave?

19  A.   Yes, I decided to leave.

20  Q.   Why?

21  A.   Because I wasn't comfortable with the situation of people

22  beating people down while they were tied up.

23  Q.   Did you try to stop David from doing that?

24  A.   No.

25  Q.   Why?

E98Qdel4                         Accilien - direct

1    A.  Because, I mean, they was already considered me being a

2    punk for not being around for this -- for the time when they

3    needed me the most, and that's when I decided to leave the

4    crime scene.

5    Q.  Were you surprised at this?

6    A.  At -- yeah, I was surprised.  I never seen David act like

7    that before.

8    Q.  When you decided to leave, what did David do?

9    A.  He didn't do anything.

10   Q.  Did he leave with you or did he stay?

11   A.  He stayed and I left.

12   Q.  Where did you go next?

13   A.  I went to my apartment building.

14   Q.  Did you see David Delva again at some point?

15   A.  Excuse me?

16   Q.  Did you ever see David Delva again at some point?

17   A.  Yes, it was around sunset David came to the apartment.

18   Q.  When David came to your apartment, did he have anything

19   with him?

20   A.  Yes, he had -- he had the .38, a Louis Vuitton hat and a

21   cologne.

22   Q.  When you say .38, was that the gun you were talking about

23   earlier?

24   A.  Yes.

25   Q.  When David Delva came home with these things, did you speak

1   with him?

2   A.   Yes.

3   Q.   What did you say to him and what did he say to you?

4   A.   I asked him -- I asked him what happened when he returned

5   the second time, and he said that, you know, D-1 stabbed the

6   guy in his hands and they hit him with a gun and they punched

7   him in the face.  And after that, they tied him up and stuff

8   like that.

9   Q.   Did he speak to you about any drugs?

10  A.   They speak to me about drugs?  I don't -- no they didn't

11  talk to me about drugs.

12  Q.   Did they speak to you about any money?

13  A.   He said that he was going to get some money the next day.

14  Q.   Did he speak to you about what they did before they left

15  the apartment?

16  A.   Oh, umm, they -- he explained -- I had asked him did they

17  clean the apartment at one point, and then he said that they --

18  they used Clorox to clean the apartment, the tables and

19  everything, and they even dumped Clorox on the guy while he was

20  on the floor.

21  Q.   And the guy, that was the male victim?

22  A.   Yes.

23  Q.   Did you ask David where he got the things that he brought

24  over to the apartment?

25           MR. PITTELL:  Objection.

1          THE COURT:  Overruled.

2    Q.  Mr. Accilien, did you ask David where he got the things

3    that he brought over?

4    A.  Yes.

5    Q.  And what did he tell you?

6    A.  He told me he got that from the apartment.

7    Q.  Did he ever tell you what happened to either the male or

8    female victim?

9    A.  He -- well, he explained that when they was all ready to

10   leave, they untied the female and the female basically tied

11   up -- untied the male victim afterwards.

12   Q.  The male victim -- I'm sorry.

13          Did he speak to you about a car?

14   A.  Excuse me?

15   Q.  Did he speak to you about a car?

16   A.  Yes, he -- he said that Dominique had -- was driving the

17   female's car.  It was a Nissan Jeep.

18   Q.  Do you know what happened with the gun that he came home

19   with?

20   A.  The next day Dominique picked it up.

21   Q.  Were you there when he picked it up?

22   A.  Yes.

23   Q.  Mr. Accilien, did you get anything for this robbery?

24   A.  No, I didn't get nothing from this robbery.

25   Q.  Did you ask for something from the robbery?

1    A.  Yes.

2    Q.  Who did you ask?

3    A.  I asked Dominique if I would get something.

4    Q.  What was the response?

5    A.  "Well, you punk ass didn't do anything, so you not getting

6    anything."

7    Q.  Do you know whether David got anything from the robbery?

8    A.  Yes, he -- yes.

9    Q.  How do you know?

10   A.  It was given to me -- I mean, no.  It was given to him in

11   front of me.

12   Q.  What was given to him in front of you?

13   A.  Like $800, 8, $900, something like that.

14   Q.  Anything else?

15   A.  And a quarter pound of marijuana -- quarter pound of

16   marijuana.

17   Q.  Do you know whether anyone else got anything from the

18   robbery?

19   A.  I know D-1 got his cut, and Lisa Hylton got his cut also.

20   Q.  When you say "cut," what does that mean?

21   A.  That means their portion of the robbery.

22   Q.  Do you know whether Dominique or Trevor were ever arrested

23   for the robbery you were talking about?

24   A.  Yes.

25   Q.  After they were arrested, did you speak with either of

1   them?

2   A.  Yes, I spoke to Dominique.

3   Q.  Where did you speak with Dominique?

4   A.  I spoke to Dominique in Valhalla.

5   Q.  Is that a prison?

6   A.  Yes.

7   Q.  What did he say to you and what did you say to him?

8   A.  At that point he told me that --

9          MR. PITTELL:  Objection.

10          THE COURT:  Why don't -- I think, first of all, it's

11   useful if you clarify who is physically where when this is

12   occurring.  And the objection is overruled.

13          MS. GERACI:  Thank you, your Honor.

14   Q.  Mr. Accilien, you said you were speaking to Dominique in

15   the prison.  Were you arrested at the time?

16   A.  No.

17          THE COURT:  No?  Physically so you were outside and

18   Dominique was in the prison.

19          THE WITNESS:  Yes.

20          THE COURT:  I see.  You may continue.

21   Q.  You were visiting?

22   A.  Yeah, I was visiting.

23   Q.  During this visit what did you say to him, and what did he

24   say to you?

25          MR. PITTELL:  Objection.

E98Qdel4                        Accilien - direct

1              THE COURT:  Overruled.

2    A.  At that point he told me that nobody knew anything about --

3    like nobody knows about me and David at this point, so we don't

4    have nothing to worry about.

5              MR. PITTELL:  Objection.

6              THE COURT:  Overruled.

7         (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. GERACI:

2    Q.  Did you ever speak to David about this?

3    A.  Yes.

4    Q.  What did you say to him and what did he say to you?

5    A.  I told him that, you know I told him that nobody knows

6    about us doing this robbery, so you don't have nothing to worry

7    about and that was it.  I don't recall what David said.

8    Q.  Did you have other communications with Dominique while

9    Dominique was in prison?

10   A.  I received a letter from in the mail.

11            MS. GERACI:  May I approach, your Honor?

12            THE COURT:  Yes.

13   Q.  Mr. Accilien, I've handed you what has been marked as

14   Government Exhibits 50 and 51.  Will you, please, take a look

15   at those and you are welcome to take them out and tell me if

16   you recognize them.

17   A.  Yeah, I recognize it.

18   Q.  Have you seen those before?

19   A.  Yes.

20   Q.  Have you opened them before?

21   A.  Yes.

22   Q.  What are they?

23   A.  Letters I received from my brother while he was locked up

24   in Valhalla.

25   Q.  I'm sorry.  I couldn't hear you.

1          THE COURT:  Turn the microphone down.

2     A.  Letters that I received from Dominique while he was locked

3     up in Valhalla.

4     Q.  Do you recognize the handwriting on those letters?

5     A.  Yes.

6     Q.  Whose handwriting is it?

7     A.  Dominique's handwriting.

8     Q.  Are these letters in essentially the same condition as when

9     you first received them?

10    A.  Only they are kind of wrinkled but you know they're not in

11    the same condition.

12         MS. GERACI:  The government offers 50 and 51?

13         MR. PITTELL:  Judge, I have an objection and can I

14    have a brief voir dire of the witness on the document?

15         THE COURT:  The objection is as it was before and that

16    objection will be overruled but you can have a brief voir dire.

17    Brief.

18         MR. PITTELL:  Can I approach and take a look --

19         THE COURT:  You may.

20         (Pause)

21    VOIR DIRE EXAMINATION

22    BY MR. PITTELL:

23    Q.  Mr. Accilien, you had indicated earlier that Dominique's

24    nickname is "S-Dot"?

25    A.  Yeah, that's his street name.

1   Q.  That's always been his street name?

2   A.  That's always been his street name.

3   Q.  Do you remember when you were arrested in June 2013?

4   A.  Um-hmm.

5   Q.  OK.  From June 2013 going forward has that always his

6   street name?

7   A.  No.

8   Q.  What other street name did he have?

9   A.  He used "Diddy" also.

10  Q.  When did he start using "Diddy"?

11  A.  It maybe a, a month before he got arrested.

12          MR. PITTELL:  May I approach the witness, your Honor?

13          THE COURT:  Yes.

14          MR. PITTELL:  Judge, I am going to renew my objection

15  in light of the witness' testimony relating to my earlier

16  objection.

17          THE COURT:  All right.  Let's not make the argument

18  now.

19          MR. PITTELL:  I don't know how much you want me to

20  say.

21          THE COURT:  That's fine.  The objection is overruled.

22  What we'll do is we'll take it up at the end of the today which

23  is only 25 minutes from now.

24          MR. PITTELL:  My concern is that if there's testimony

25  about the contents of the letter --

E98AADEL5                    Accilien - Direct

1              THE COURT:  I understand.  We'll deal with it.  Why

2      don't we do this.  Given that the testimony is about to be

3      right now why don't we just take brief sidebar over here.

4              I apologize, ladies and gentlemen of the jury.  We'll

5      keep it really short over here at sidebar.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar)

2          THE COURT:  Is there any dispute that these letters

3     were received by the witness?

4          MR. PITTELL:  No.

5          THE COURT:  Is there any dispute that these were

6     letters that were sent by Dominique Jean-Philippe while he is

7     in Valhalla to his brother?

8          MR. PITTELL:  No.

9          THE COURT:  That's really the foundation but go ahead

10    and put your objection.

11         MR. PITTELL:  I want to renew my motion to suppress.

12    When the letters were seized by Detective Deloren, Detective

13    Deloren testified that the name "Dominique Jean-Philippe" was

14    written on the letter and the name "Diddy" is written on the

15    letters.  That issue was never raised or explored.

16         THE COURT:  That issue that we've just established by

17    the record here is that it's one in the same person and so

18    whether or not, a couple of things that that has also been an

19    issue has been in the case since the day those letters were

20    discovered.  So you can't raise that right now when we are

21    about to sort of have this o on -- face and it is the same

22    letters.  So that objection is overruled.

23         Anything else?

24         MR. PITTELL:  No.

25         (Continued on next page)

1          (In Open Court)

2          THE COURT:  All right.  Ms. Geraci, you may proceed.

3     BY MS. GERACI:

4     Q.  Mr. Accilien, do you recall when you received these letters

5     from Dominique Jean-Philippe?

6     A.  I don't remember but I think it was not too long after he

7     was arrested.

8     Q.  Were you arrested at that time?

9     A.  No.

10    Q.  Do you know if Mr. Delva was arrested at that time?

11    A.  No he wasn't arrested either.

12          THE COURT:  Have you offered those two documents?

13          MS. GERACI:  I did offer them.

14          THE COURT:  They're received.  I don't know if I used

15    the word "received".  They're received over objection.

16          (Government's Exhibits 50 and 51 received in evidence)

17          MS. GERACI:  Thank you, your Honor.  Permission to

18    publish portions of them to the jury, your Honor?

19          THE COURT:  Government Exhibits 50 and 51 you may

20    publish.

21          MS. GERACI:  Thank you, judge.

22          May I direct Ms. Chen to Government Exhibit 50, page

23    one and two of the numbered pages.

24    Q.  Mr. Accilien, can you see that on the screen?

25    A.  Yes.

1  Q.  Could you, please, read that?

2  A.  But I don't want no money from y'all niggas.  You and

3  David, I know y'all both bad at money management so that's the

4  last thing I expect from y'all.  But what I do expect some

5  fucking family loyalty.  Both of y'all should be kissing my ass

6  no Frank Ocean right now for standing tall and keeping other

7  niggas standing tall.

8  Q.  Please, just continue until the words "too much".

9  A.  Simple shit.  I asked y'all to do y'all act like it's

10 asking for too much.  I haven't heard from Sour.

11 Q.  Mr. Accilien, can you explain to the jury what that portion

12 of the letter means to you?

13 A.  Basically, he was trying to tell me that he was not

14 cooperating, so he expect us not to do the same thing too.

15 Q.  When you say "us" who are you referring to?

16 A.  Me and David.

17 Q.  When you say "David" who specifically are you referring to

18 the defendant or someone else?

19 A.  The defendant.

20         MS. GERACI:  May I direct Ms. Chen to pages four

21 through five, the numbered pages.

22 Q.  Mr. Accilien, can you start reading with the word "you".

23 A.  You and David already disappointed me got niggas violating

24 me and none of y'all said or did nothing.  Niggas like Horace

25 who sold my flat scene TV, Play Station, radio, bed and none of

 1    y'all said or did shit.

 2              MS. GERACI:  And the next page is a section that

 3    begins with "y'all".

 4    Q.  Mr. Accilien, can you start reading from the highlighted

 5    portion, please?

 6    A.  OK.  Y'all niggas looking real soft out there and if my

 7    family looks soft then I look soft.  I mean, Dreko, I kind of

 8    took the credit that from you even though you be trying to act

 9    touch but I think you turned David soft to this niggas David

10    getting mad drunk just to go step to Ed.  That's --

11    Q.  Mr. Accilien, can you explain what that portion of the

12    letter means to you.

13    A.  He basically said that you know that me and David that he

14    basically said that he could expect it from me but after David

15    I am making him soft too because David got a whole lot -- he

16    got drunk a lot.

17              THE COURT:  What does the word "soft" mean to you?

18              THE WITNESS:  "Soft" basically means not being -- it's

19    a punk, being a punk or something like that.

20    Q.  Can I direct to you the section that says "looking real

21    soft" and there's is something above the word "soft".  Do you

22    see that?

23    A.  Looking real soft out there.

24    Q.  What does -- what's your understanding of what that means?

25    What does that mean to you?

1    A.  Basically, we're looking really bad on the outside of jail.

2    Q.  And it says look soft again just below there, what's

3    written above there?

4    A.  Looks soft, pussy.

5    Q.  What is your understanding of what all that means?

6    A.  Basically, just saying that I was acting pussy like.  I was

7    acting like a punk or something like that.

8    Q.  And what do you mean by "acting like a punk"?

9    A.  Not being aggressive.

10   Q.  In what sense are you not being aggressive?

11   A.  Referring to the guy named Horace.

12          MS. GERACI:  One moment, your Honor?

13          THE COURT:  All right.

14   Q.  Mr. Accilien, put aside the letter for a moment and look at

15   me and can you let me know what does it mean to be called soft?

16   What does that mean when Dominique was calling you soft?

17   A.  Basically trying to say that I am -- I am acting like a

18   punk or something like that.

19   Q.  And what does that mean?  Why is he saying what you just

20   read that he was disappointed you, he expect this from you but

21   not from some other people?

22          MR. PITTELL:  Sustained.

23          THE COURT:  You can't ask what does it mean.  You can

24   ask what he understands.

25   Q.  What is your understanding why he is disappointed in you?

1              MR. PITTELL:  Objection.

2              THE COURT:  I will allow it as phrased.  You may

3    answer.

4    A.  He's basically saying that he was disappointed in me

5    because I'm letting David become soft too and because I have

6    been acting soft lately.

7    Q.  And can you explain what you mean by "acting soft lately"?

8    A.  Acting like a punk lately.

9              MS. GERACI:  Can you direct his attention to Exhibit

10   50, the side portion of the page.

11             (Pause)

12   Q.  Mr. Accilien, are you able to read that portion of the page

13   even though it hasn't been redated?

14   A.  Yeah.

15   Q.  Can you read that allowed?

16   A.  Y'all niggas need to man up.  I'm always standing up.

17   Q.  I'm sorry, Ms. Accilien.

18   A.  Oh yeah.  I could read it like that though.

19   Q.  Can you read that?

20   A.  Y'all niggas need to man up.  I am always standing tall.

21   Y'all niggas need to show some appreciation.

22   Q.  What's your understanding as to what that means?

23   A.  He was basically saying that we need to appreciate that he

24   is standing tall, that we should man up also.

25   Q.  What does that mean to stand tall?

```
 1   A.  Not to cooperate.

 2   Q.  What does he mean by telling you to man up?

 3   A.  Do the same also.

 4   Q.  Can you explain what you mean by cooperate?

 5   A.  Excuse me?

 6   Q.  Can you ex -- you said that it means not to cooperate.  Can

 7   you explain what you mean by not cooperate?

 8   A.  Oh, but basically not to take the stand or anything like

 9   that.

10   Q.  Take the stand on anything like that for what?

11   A.  For the case that is going on right now.

12   Q.  You are talking about whose case?

13   A.  Dominique's case.

14   Q.  Is that in relation to the robbery you have been talking

15   about?

16   A.  Yes.

17             MS. GERACI:  May I direct Ms. Chen to Exhibit 50 at

18   the very end?

19             THE COURT:  Just for your planning purposes, counsel,

20   we'll in end in about 11 minutes.

21             MS. GERACI:  Thank you, your Honor.

22   Q.  Mr. Accilien, can you read that last sentence, please?

23   A.  Remember we family.  Stand tall and hold me down like I did

24   for y'all.

25   Q.  What's your understanding of what that means?
```

1   A.   Remember we as a family we should stand tall, basically,

2   not to cooperate and then you should hold me down like do the

3   same thing for me too like.

4   Q.   Can you explain what "hold me down" means?

5   A.   "Hold me down" is basically to make sure you -- to take

6   care of him also.

7   Q.   Let's talk about the second letter.

8         MS. GERACI:  If I can direct Ms. Chen to put up

9   Exhibit 51 at numbered page two.

10        (Pause)

11  Q.   The text containing music, magazine, socks.

12        THE COURT:  Mr. Accilien, can you read that section,

13  please.

14  Q.   Can you see that, Mr. Accilien?

15  A.   No.

16  Q.   Can you read that out loud, Mr. Accilien, if you can see

17  it?

18  A.   Out your bum ass check and sent me out a package every

19  three months that's music, magazine, socks boxers and white Ts.

20  Think I'm playing if you -- if you think I'm playing if you

21  want and gonna find yourself --

22  Q.   Continued on the next page.  What does that last phrase

23  mean that you just said to you?

24  A.   Going to be in the same hot water as I am.

25  Q.   What does that mean, the same hot water?

1    A.  The same hot water as I am.

2              MS. GERACI:  If I could direct Ms. Chen to highlight

3    page three.

4    Q.  Mr. Accilien, are you able to see what's written up the

5    side of page three?

6    A.  No, I can't.  It's not rotated yet.

7              MS. GERACI:  Might take a moment?

8              Your Honor, may I approach?

9              THE COURT:  You may.

10   Q.  Mr. Accilien, if you are able to see what's on the screen

11   or what's in front of you whatever you can read better, can

12   you, please, read that?

13   A.  I got your life in my fucking hand nigga and no where to

14   run unless you go to -- don't play with me.

15   Q.  What does that mean to you?

16   A.  That he has my life in his hands.

17   Q.  Can you explain that, why does -- why he has -- can you

18   explain that?

19   A.  Why is my life in his hands?

20   Q.  Yes.

21   A.  Because, basically, if he talk about me being inside the

22   robberies to the right people I'll be doing a lot of time.

23             MS. GERACI:  May I direct Ms. Chen to page four of

24   that exhibit.  It starts with "both of y'all" halfway through.

25   Right there.

1    Q.  Mr. Accilien, could you see that?

2    A.  Yes.

3    Q.  Can you read that, please?

4    A.  Both of y'all should be real nice to me if you got half of

5    the brain in y'all head.  Peace, you bitch ass nigga.  Oh,

6    yeah, happy birthday.  Hope you enjoy yourself because I don't

7    know.

8    Q.  What does that mean to you it?

9    A.  Can you put that screen back so I could read it?

10         (Pause)

11   A.  It's basically saying both of us should be nice to him

12   because he is standing tall.

13   Q.  When he says "both" who is he talking about?  Do you know?

14   A.  Me, David.

15   Q.  Do you know David Delva?

16   A.  Yeah.

17   Q.  The very last sentence of that document begins with

18   "cherish".  Mr. Accilien, can you read that sentence, please?

19   A.  Cherish the freedom you have, my guy.  Don't fucking play

20   me.  That's all I got to say.

21   Q.  What does that mean to you?

22   A.  Cherish the freedom that I had and don't play with him

23   cause that's all he has to say.

24   Q.  And when he says "cherish the freedom" what does he mean by

25   that?

 1              THE COURT:  Sustained.  You've got to rephrase it.

 2   Q.  What is your understanding of what cherish the freedom

 3   mean?

 4   A.  Enjoy being out of jail.

 5              MS. GERACI:  Judge, this might be a good time to stop.

 6              THE COURT:  All right.  Ladies and gentlemen of the

 7   jury, we'll break for the evening.  We'll pick up tomorrow at

 8   9:30 in the morning.  So if you folks can be here and be ready

 9   to come out by 9:15, that would be terrific.  That way we can

10   get you right out to the 9:30 and we can start.  So it takes a

11   little while as you folks probably know from today to get

12   through the security, so build that into your schedule.  We

13   can't start until each and everyone of you is here.  So, we'll

14   be waiting for you.  If you aren't able to be on time I am sure

15   my deputy has given you his number and make sure that we'll

16   still have to wait for you.

17              Don't speak to anybody including each other about this

18   case and try not to do any kind of internet research on people,

19   places or things when you are home this evening.  Remember to

20   keep an open mind.  Testimony comes in in pieces.  Now you've

21   seen some of the back and forth in terms of how it goes with

22   direct and with cross.  I want to remind you that as I've said

23   to you earlier today during some preliminary instructions, just

24   to remind yourself that the defendant, Mr. Delva, has bears no

25   burden of proof.  The government bears the burden of proof.  So

 1    he doesn't actually have to ask any questions.  He can sit

 2    there silently throughout the entire trial and it's up to the

 3    government to make the case.  So you shouldn't think twice

 4    about it if there are no questions from his counsel.  It

 5    doesn't matter in terms of Mr. Delva.  He has no burden of

 6    proof burden to do.  It's up to the government.  They bear the

 7    burden of proving their case at trial.

 8              All right?  I'll see you tomorrow morning.

 9              (Jury not present)

10              THE COURT:  Mr. Accilien can step down.

11              (Witness not present)

12              THE COURT:  All right counsel, let's all be seated.

13              I've got a couple of things and then you folks may

14    have some things.

15              Mr. Pittell, you had made a, you had looked at one

16    point -- this is now early in the Accilien testimony when

17    Ms. Geraci was eliciting what drugs Dominique Jean-Philippe had

18    sold and the answer was crack or marijuana.  And then you look

19    quizzically and I overruled it.  I couldn't figure out what the

20    objection was.

21              MR. PITTELL:  It wasn't actually the answer.  It was

22    the way he was being prompted, I think.

23              THE COURT:  I see.

24              MR. PITTELL:  I don't remember.  It was kind of like

25    it's OK.  You can say something.  It was more of a colloquy

1    type interaction but it was not the substance.

2              THE COURT:  All right.

3              MR. PITTELL:  Whatever came out afterwards I wasn't

4    objecting to that.

5              THE COURT:  All right.  And then there also was an

6    objection to the conversation in Valhalla, the in-person

7    conversation which we had not dealt with before.  And

8    Mr. Accilien was asked what Dominique Jean-Philippe said to him

9    and he said to Mr. Jean-Philippe.  You objected.  Was that in

10   the nature of the same types of objections that you had had to

11   the content of the letters?  In other words, that was hearsay

12   not coming within an exception or something else?

13             MR. PITTELL:  I actually didn't know what the answer

14   was going to be and so I was objecting because I mean it's

15   going to be hearsay and I don't know whether or not it was

16   subject to any exceptions.

17             THE COURT:  I predicted that the government was going

18   to have elicited it for a reason and was prepared to do a

19   strike it if it had been something else.  Let me remind you

20   folks because it's a good lesson for us not to have to take

21   chances that if there's going to be something that's going to

22   come out or be inquired into that might run into an issue and

23   if it was going to be surprising at all surface it in advance.

24   As it came out it was essentially the Court's view similar to

25   the content of what the letters were and therefore fits within

1    the hearsay exception if it's even offered for the truth.  He

2    said there was nothing to worry about because nobody knew about

3    his involvement.  That's the way exceptionally the witness

4    interpreted that.  That is again we spoke about the cases this

5    morning about maintaining the secrecy and integrity of the

6    conspiracy as one of those types of conversations that can fall

7    within a co-conspirator exception even postdating the criminal

8    activity itself.  And so the Court does find and found that

9    that is what was going on here and therefore it fits within

10    that exception.

11           There was one other objection that came in two pieces.

12    I sustained and struck a piece from the record and but also

13    allowed another piece and I just want to explain it and it was

14    when the witness was discussing a conversation that he with

15    Mr. Delva where Mr. Delva was stating that he was more

16    comfortable with a different kind of robbery than he was with

17    the type of robbery that was being undertaken.  And it was the

18    context of as the witness had testified he was not aware that

19    Mr. Delva had been involved in the kidnapping in the past.

20           When it was asked in the context of telling the end of

21    the context of the statement he had just said, I allowed it.

22    When it was just a question, Ms. Geraci, by you, what did you

23    think he meant by "more comfortable", so you asked him just a

24    blunt question where he would have had to have gone into

25    assumptions about a criminal past, that's when I sustained.  I

```
1  || just want to make it clear as to why I allowed one question and
2  || did not allow another.  Were there thing which you folks would
3  || like too raise with the Court?
4  ||          MS. GERACI:  Not with the government, your Honor.
5  ||          MR. PITTELL:  Judge, I just maybe want to flesh out a
6  || little bit what we were talking about at the sidebar.
7  ||          THE COURT:  Yes.
8  ||          MR. PITTELL:  I assumed that Detective Deloren was
9  || going to testify first and the letter was going to go in
10 || through them.  Once it was in Mr. Accilien would testify as to
11 || the contents.  I do have a slight concern because his testimony
12 || during the suppression hearing, at least from my reading of the
13 || transcript is pretty clear that Detective Deloren, the letter
14 || said the name "Dominique Jean-Philippe", Dominique
15 || Jean-Philippe on the address.  The letter says Diddy.  He
16 || testified it was a relatively recent nickname.  I guess I'll
17 || wait until Detective Deloren gets up on the witness stand.  If
18 || I have some questions about and I want to reraise the motion
19 || I'll reassert it at that time.
20 ||          THE COURT:  All right.  Why don't you see how things
21 || progress.  I would just note that this is an issue or an
22 || argument that could have been raised at any time and was not
23 || raised before.  The fact that the envelope says on its face the
24 || street name of Mr. Dominique Jean-Philippe has not been any
25 || mystery to anybody.  This has been exactly the letters that
```

 1    were talked about during the suppression hearing and the

 2    letters that have been the subject of motion practice here.

 3            But in any event, we're talking about somebody by the

 4    same name and the point for that one of the other issues that

 5    certainly would have come up had no argument been raised as

 6    part of the suppression hearing is that the letters are

 7    directed to the individual who was being arrested that day from

 8    the prison in Valhalla and so that to me there may have been

 9    some additional basis for seizure.  I don't know that we and

10    particularly if Deloren knew about Diddy being the street name

11    but let's see how Mr. Deloren testifies.

12            MR. PITTELL:  I am not disputing the fact that there

13    were less addressed to Mr. Accilien.  I am not now contending

14    their by somebody else other than Mr. Philippe.  In fact, my

15    argument as to why they should have been suppressed really went

16    to an issue of credibility and there were arguments based upon

17    that in my submissions.  This is just another potential issue

18    that would go along further support that argument.  So it's not

19    a new argument that I am raising.  It's additional evidence in

20    support of.

21            THE COURT:  Well, let me just say that you were not

22    counsel at the time of the supression hearing.  I believe it

23    was Mr. London who was counsel who I thought, the Court thought

24    did a terrific job at representing his client's interests at

25    that hearing.  He did not for whatever reason raise that

1    argument.  So the argument was not raised at the time

2    Mr. Deloren was testifying in the suppression hearing.  So when

3    I was referring to the issue having been litigated and having

4    been a full opportunity, certainly, the beginning of the

5    opportunity was then.  There was a subsequent opportunity that

6    would have been more recently in connection with a more recent

7    motion practice as to those same letters.  But in any event, I

8    think we understand each other and let's hear what Mr. Deloren

9    has to say and then you'll decide what to do at that point in

10   time.

11          Anything else that you or the government would like to

12   raise at this time?

13          MS. GERACI:  Judge, just with regard to the Government

14   Exhibit 800 which is a prison call transcripts, I've spoken to

15   counsel.  The government's intention is to only play a certain

16   portion of this call and to use a portion of the transcript as

17   a jury aid.  I've shown the sections to defense counsel and I

18   just wanted to apply that for the Court that will be the next

19   section of Mr. Accilien's testimony.

20          THE COURT:  All right.  Thank you.  And in addition,

21   have you folks had an opportunity to talk about the merged,

22   what I am calling the merged cellphone chart or I am sorry.

23   Not the chart.  The issue that was raised in the pro se motion

24   relating to the merged information from the cellphone, you were

25   going to figure out whether or not there was, Mr. Pittell, any

1   information in particular that you believe is in any of the

2   government exhibits that reflects this merger of information.

3   Because if there is then we can look very specifically at

4   whether or not the cellphones seized at the Accilien apartment

5   does or does not contain that information or whether or no it's

6   resident on that cellphone which the government's proffered

7   they have not searched at all.  If you haven't had an

8   opportunity to review that with your client, why don't you we

9   you do so.  We'll take it up on housekeeping tomorrow morning.

10          My issues for tomorrow morning are what we had spoken

11  about before trial began, the ex parte issue that was raised.

12  We'll continue that if anything needs to be continued as it was

13  discussed.

14          Mr. Pittell, tomorrow the Adam's hospital records we

15  need to -- I just want to know if there's any issue here we

16  need to address, you folks will tell me.  What I am calling the

17  merged cellphone whether there's any information that is

18  actually going to be introduced that combines any merger of

19  content.

20          I will be asking you whether or not the defendant

21  currently expects to testify.  Now you may not reach a decision

22  until we move along but if there is an expectation now as to

23  yes or no without reaching al final decision, that would be

24  helpful to know so we can start planning out some timing but I

25  won't get to that until tomorrow morning.  That's my list for

E98AADEL5                    Accilien - Direct

1    tomorrow.

2              Anything else you folks want to have on the agenda

3    tomorrow morning?

4              MS. GERACI:  No, your Honor.

5              MR. PITTELL:  No, but we might put something on in the

6    morning.

7              THE COURT:  All right.  That's fine.  A lot happens

8    overnight at trial.  We will pick up with each other at nine

9    o'clock.  Be prompt.  Be on time and we'll have the jury come

10   in at 9:30.  Thank you.

11             We are adjourned for the evening.

12             (Adjourned to Tuesday, September 9, 2014 at nine a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX OF EXAMINATION

2    Examination of:                              Page

3    SEAN SMITH

4    Direct By Ms. Geraci . . . . . . . . . . . . .76

5    TARA MOREL

6    Direct By Mr. Poscablo . . . . . . . . . . . .89

7    Cross By Mr. Pittell . . . . . . . . . . . . .94

8    GREGORY ACCILIEN

9    Direct By Ms. Geraci . . . . . . . . . . . . 102

10                        GOVERNMENT EXHIBITS

11   Exhibit No.                                Received

12   100 -111, 113, 114, 116 through   . . . . . . .79

13   120-A - 120-G  . . . . . . . . . . . . . . . .85

14   11   . . . . . . . . . . . . . . . . . . . 105

15   10   . . . . . . . . . . . . . . . . . . . 107

16   16   . . . . . . . . . . . . . . . . . . . 108

17   12   . . . . . . . . . . . . . . . . . . . 109

18   13   . . . . . . . . . . . . . . . . . . . 110

19   15   . . . . . . . . . . . . . . . . . . . 111

20   3514-JJ   . . . . . . . . . . . . . . . . . 117

21   41   . . . . . . . . . . . . . . . . . . . 126

22   43   . . . . . . . . . . . . . . . . . . . 127

23   50 and 51   . . . . . . . . . . . . . . . . 155

24

25
```