E99Qdel1                          Jury Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                         12 CR 802 (KBF)

DAVID DELVA,

              Defendant.

------------------------------x

                              New York, N.Y.
                              September 9, 2014
                              9:20 a.m.

Before:

               HON. KATHERINE B. FORREST,

                              District Judge

                      APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JUSTINA GERACI
RYAN POSCABLO
    Assistant United States Attorney

JEFFREY PITTELL
    Attorney for Defendant Delva

ALSO PRESENT:  JOHN REYNOLDS, Special Agent FBI
ANNIE CHEN, Paralegal Specialist, U.S. Attorney's Office

E99Qdel1                          Jury Trial

1              (In open court; jury not present)

2              THE DEPUTY CLERK:  Continuation of the matter now on

3    trial, United States of America v. David Delva, 12 CR 802.

4              Counsel, please state your names for the record.

5              MS. GERACI:  Good morning, your Honor.  Justina Geraci

6    and Ryan Poscablo for the government.

7              We are joined at counsel table by paralegal specialist

8    Annie Chen and by FBI Special Agent John Reynolds.

9              THE COURT:  Good morning all.

10             MR. POSCABLO:  Good morning.

11             MR. PITTELL:  Good morning, your Honor.  Jeffrey

12   Pittell appearing with Mr. Delva.

13             THE COURT:  Good morning, Mr. Pittell.  And the Court

14   notes Mr. Delva's presence here in court this morning.  Good

15   morning, sir.

16             THE DEFENDANT:  Good morning.

17             THE COURT:  We've got to -- I note that it is 9:20.  I

18   know it took some time to get the defendant up here.  We've got

19   to start on time because I promised the jury we would start on

20   time, and it would be, I think, not great to start the first

21   full day of trial not on time.

22             So, let me start our housekeeping matters by asking

23   you folks what in particular you think we need to go over this

24   morning that might come up today so we can address those

25   matters first before we circle back over other things.

E99Qdel1                          Jury Trial

1              MR. POSCABLO:  Judge, there are two other issues, if I

2      may address them.  The first is that as I was walking out of

3      the courtroom this morning to rush to the restroom, I opened a

4      door and was shocked to find a juror there.  Not recognizing

5      the lady as -- I think it was Juror No. 1 -- as a juror, I

6      said, "Excuse me" and "hello" then I realized it was a juror,

7      and I put my head down and ran to the bathroom the way we were

8      taught to.  But I told Mr. Pittell about it and I wanted to let

9      the Court know.

10             THE COURT:  All right.  Thank you.

11             MR. POSCABLO:  Judge, the second thing is that upon

12     receipt of the transcript last night, the government realized

13     that the entire portion of the ex-parte conversation that the

14     Court had with both Mr. Delva and his counsel were on the

15     official transcript.  AUSA Geraci was the one who was reading

16     the transcript late at night.  When she realized that's what

17     she was reading, she stopped, scanned until she could continue

18     reading again, and read where it was appropriate.  So I guess

19     there would be an application from Mr. Pittell, but I will just

20     make it for him, unless he disagrees, that that portion of the

21     transcript be sealed and that --

22             THE COURT:  It should be sealed.  It should have been

23     sealed.  I'm sure it was just an error.  Unfortunate.  I thank

24     you folks for doing the right thing, which is not proceeding

25     with it, and it will be removed from the publicly available

E99Qdel1                        Jury Trial

1    portion of the transcript.

2              MR. POSCABLO:  With that, Judge we, have an official

3    copy that we will just give back to the court reporter.

4              THE COURT:  Thank you.

5              MR. POSCABLO:  Can I just have one second to confer

6    with counsel about any issues that may come up?

7              THE COURT:  Let me ask Mr. Pittell if he's got

8    anything that he's got first.  Mr. Pittell, anything you would

9    like to raise this morning?

10             MR. PITTELL:  No.

11             THE COURT:  Thank you.  We're back to you, Mr.

12   Poscablo, whether you have anything else.

13             MR. POSCABLO:  Judge, we are going to continue with

14   Mr. Accilien today.  I think all of the issues with regards to

15   Mr. Accilien have been vetted with the Court, and we will

16   proceed accordingly.  One of the things that -- one of the

17   things that I want to just make sure we understand what the

18   Court's ruling is is with regards to the prison call between

19   Mr. Delva and Mr. Jean-Philippe.  Our intention is --

20             THE COURT:  Just so the record is clear, you're

21   talking about Government Exhibit 800?

22             MR. POSCABLO:  That's right, your Honor, and 800-T,

23   which is the transcript, which the government's acknowledges it

24   would not go back into evidence but is being offered as an aid

25   to the jury.  I think our intention is to play only a portion

E99Qdel1                          Jury Trial

1    of the call.

2              THE COURT:  As I understood from yesterday when we had

3    the discussion about this motion, the in limine issue that had

4    been brought forward or -- actually it was part of the

5    objections on the exhibit list -- was the only portion that was

6    going to be really referenced was the bottom of page 4 on to

7    page 5.  In that regard, we discussed it yesterday.

8              MR. POSCABLO:  That's right.  Just so that the Court

9    knows what we are intending to do, we are going to start the

10   tape right at that portion and then only show the portion of

11   the transcript that references that part, pages 4 and 5, and

12   that's it.

13             THE COURT:  Mr. Pittell had raised the potential

14   issue, but he can deal with this on cross if he wants,

15   depending on how it comes out or if you want to make an

16   application, Mr. Pittell, to have more of the call in, you can

17   do so.  I know you've had some concerns about the balancing of

18   various considerations in that regard, but that I think was the

19   nature of some of the back and forth.

20             In addition to your objection, you believed that or

21   you were stating yesterday that the portion of the call that

22   was going to be played might be taken out of context from other

23   portions of the call that might tell a broader story.  So I

24   invited you to play more of the call if you want to.  I think

25   that's going to be useful to do.

1              So I don't know if you want Mr. Poscablo to play more

2       of the call or whether or not you would prefer to do that if

3       you choose to do so on cross.

4              MR. PITTELL:  If I choose to do so, it will probably

5       be on cross.  At this point I just plan to register my

6       objection to the extent I need to register it again to preserve

7       it, and then they'll put it in, and we'll proceed from there.

8              THE COURT:  Thank you.

9              MR. POSCABLO:  After that, we expect to call Special

10      Agent Perry or Mr. Patrick James.  The reason I say "or" is

11      because Mr. Perry is also scheduled to testify in another trial

12      in this courthouse.  We are trying to manage the time.

13             If Agent Perry testifies, we will introduce first,

14      prior to his testimony we will read a stipulation between the

15      parties which concerns cell records, cell site records.  Then

16      we are going to introduce his report.  We are going to offer

17      his entire report.  I don't think there is any objection from

18      Mr. Pittell with regards to the entire report going in.

19             I do want to note for the Court that Special Agent

20      Perry will testify as to two telephone numbers.  Those are the

21      telephone numbers for Jean-Philippe and Trevor Cole that I

22      think there's been testimony with regard to Trevor Cole and his

23      telephone number -- I'm sorry -- Jean-Philippe and

24      Jean-Philippe's telephone number.  There has not yet been any

25      testimony with regards to Trevor Cole and his telephone number,

E99Qdel1                    Jury Trial

1    but there will be a stipulation that we expect, that's already

2    been signed by the parties, that a particular number is Trevor

3    Cole's number and we just won't read it until -- our

4    expectation was to read it later.  So we will offer that

5    portion of the testimony subject to connection.

6              MR. PITTELL:  You could put the stip in.  I don't have

7    any objection.

8              THE COURT:  Why don't you just put the stip in?

9              MR. POSCABLO:  Because it's a long stip.  Just put

10   that portion in?  I can do that.

11             THE COURT:  You can put that piece in.

12             MR. POSCABLO:  We can do that.  Perfect.

13             THE COURT:  And you'll connect it up later.

14             MR. POSCABLO:  We'll do that.

15             THE COURT:  You do that.  I'll tell the jury, I will

16   give them the instruction on stips in terms of accepting these

17   agreed-upon facts.

18             How much longer do you expect Mr. Accilien's direct to

19   last?

20             MS. GERACI:  Judge, approximately a half hour or so.

21             THE COURT:  Anything else from you, Mr. Poscablo?

22             MR. POSCABLO:  No, your Honor.  After that, we will

23   have Patrick James and then the next witness after that, if we

24   get to it, will be the female victim, Jeanette Adams.

25             THE COURT:  Mr. Pittell, nothing else from you?

E99Qdel1                        Jury Trial

1              MR. PITTELL:  No.

2              THE COURT:  Let's go back over a few things.

3              Mr. Pittell, are there any more specifics that you

4    have on particular government exhibits which the defendant

5    contends contain merged cell phone records from cell phones one

6    and two, shall we say, from the initial seizure, which is the

7    cell phone of Mr. Delva and then the second is of a roommate

8    which was, according to the defendant, returned.  Any more

9    specifics?

10             MR. PITTELL:  No.

11             THE COURT:  All right.  I see Mr. Delva has a binder

12   in front of him.  If upon looking through the materials or

13   looking through the Government Exhibits you note something, you

14   can raise it with me, but at this point in time, I will deem

15   that issue resolved unless you raise it again.  All right?

16   That was one of the pro se motions.  So it would be denied

17   subject to being renewed, should there be any specifics which

18   you folks later want to bring to my attention.

19             At this point in time, Mr. Pittell, do you have any

20   view as to whether or not the defendant will testify?  And,

21   again, the defendant -- it's Mr. Delva's right to make that

22   determination.  I am not asking you for a commitment one way or

23   the other.  This can be fluid.  It's really about figuring out

24   how the trial is going to be proceeding.

25             MR. PITTELL:  I don't, Judge, quite frankly.

E99Qdel1                      Jury Trial

 1            THE COURT:  So we will play that by ear.  This leads

 2       into the next point, which is, I will be giving you folks, I

 3       believe today or tomorrow, the jury instructions, a draft of

 4       the jury instructions.  It will have in there as a placeholder

 5       right now that the defendant chose not to testify and the

 6       particular instruction that goes with that.  That's easily

 7       changed.  It's only just as a draft.  It will be in brackets

 8       for the moment.

 9            If you get it today, we'll talk at the end of the day

10       about the time frame for review and coming back for being

11       prepared for the charging conference or the beginning of the

12       charging conference.  If it's tomorrow morning, then it

13       wouldn't be before Thursday morning that we would do that.  But

14       by Thursday morning, I would expect that we're going over the

15       charge.

16            The only other item I had, but then decided I would

17       wait for you folks to raise it, so let me state it, but I'm

18       just going to let it go unless somebody wants to say something

19       about it now has to do with the hospital records.  I think we

20       talked about some of the issue with the hospital records in the

21       past and what could be done without particular types of

22       witnesses and what can't be done or shouldn't be done without a

23       further evidentiary record.  But sufficient unto the day, you

24       folks have heard me.  I don't keep need to following up on

25       those evidentiary matters.

1          Anything else?

2          MR. POSCABLO:  Judge, we've prepared a stipulation

3    that should address all those issues, and we handed it to

4    Mr. Pittell.  If we can't resolve it, then we'll raise the

5    issue.

6          THE COURT:  Thank you.

7          Mr. Pecorino.

8          THE DEPUTY CLERK:  We're waiting on three more.

9          THE COURT:  We're waiting on three.  Is there anything

10   else that folks would like to raise?  Mr. Pittell, anything we

11   need to talk about up here at the sidebar?

12         MR. PITTELL:  No.

13         THE COURT:  Thank you.

14         MR. POSCABLO:  And nothing from the government, Judge.

15         THE COURT:  All right.

16         MR. PITTELL:  I mean, Judge, since you brought up the

17   hospital records, since we have time, I can just give you a

18   little more detail about where we're going with that.

19         As I indicated before, I kind of pulled back on my

20   consent because the government was objecting to my hospital

21   records.  I think we all know that hospital records, a

22   significant portion of hospital records, are admissible under

23   the hearsay exception.  The major portion which is not

24   admissible is the diagnosis portion because that is an opinion

25   of a doctor which is often hotly disputed in criminal and civil

E99Qdel1                        Jury Trial

1    cases.

2            In this particular case, I don't know if we're really

3    disputing that so much.  I would imagine the government has

4    concerns about me putting in the entire universe of Mr.

5    Accilien's records because it's quite voluminous.  That's not

6    my intention.

7            What I propose to do is just take selected excerpts.

8    When I get a chance, I'll provide those excerpts to the

9    government.  If we can work it out, we'll work it out amongst

10   ourselves and we'll put it in by stipulation.  If not, then

11   we'll present it to the Court, really I guess just for review

12   and ruling as to what the Court determines is not hearsay.  We

13   will obviously try having to avoid doing that, but

14           THE COURT:  The only concern I have is that I think

15   this fellow is going to be on cross by 10:15.  So unless you've

16   got enough cross to keep it going to a big break, we may not

17   have the witness, at least, for anything that comes up if you

18   want to use the witness with those records.

19           MR. PITTELL:  I would not be using the witness with

20   the records with the records being in evidence.  If I do put it

21   in, it would be as a defense exhibit at some point.

22           THE COURT:  That's fine.

23           MR. PITTELL:  If it's to refresh a recollection, you

24   know, it would be marked, but I wouldn't move it in at that

25   point.

E99Qdel1                          Jury Trial

1              THE COURT:  All right.  I think we're on the same

2     page.

3              MR. PITTELL:  That's it, basically.

4              THE COURT:  Mr. Poscablo?

5              MR. POSCABLO:  Judge, as soon as the jury is here, you

6     can cut me off but I think we can have this conversation; I

7     think it's a longer conversation.  Let me state for the record

8     the concern the government has to this line of defense.

9              Mr. Accilien, as expected, is and has testified that

10    he suffers from schizophrenia and anxiety.  He's testified to

11    it.  There is no -- I'm not sure whether he's ever seen these

12    medical records.  The government's position is that the

13    introduction of these medical records, and, indeed, any

14    testimony by any other witness, is extrinsic evidence on a

15    collateral matter and is not relevant and shouldn't be

16    permitted.

17             THE COURT:  Well, it depends on what his symptoms are.

18    If he is a fellow with schizophrenia who has experienced

19    hallucinatory symptoms, it's not irrelevant to the extent it

20    could be he hallucinated Mr. Delva's presence.  I don't know

21    where this will lead, but it's not as extrinsic, I think, as

22    some flat statement that it's, you know, depression or

23    something.  This is in the nature of something different.

24             MR. POSCABLO:  And, Judge, I acknowledge that.  I

25    think it's one of these wait-and-see things.  We have to wait

E99Qdel1                        Jury Trial

1   and see what Mr. Accilien will testify to on cross-examination

2   when he's asked.

3         But here is my concern both with regards to that

4   medical records and with regards to the expert witness that the

5   defense has noticed.

6         First, the expert witness has not examined

7   Mr. Accilien.

8         THE COURT:  Nor is she going to testify about his

9   particular condition in terms of how he exhibits the symptoms,

10  as I understand it.  She is not going to be giving a medical

11  opinion.

12        MR. POSCABLO:  As to his -- as to how a particular --

13  what that means for him.

14        THE COURT:  Yes.  As I understand it, she is going to

15  be saying effectively "here is a term.  Here is what as a

16  medical matter that term can mean."

17        Mr. Pittell, am I right?  That's how I understood her

18  testimony.

19        MR. PITTELL:  It's what I put in my notice.  It's

20  going to be the medical terms.  It's about explaining what the

21  illness is and about the medications.

22        THE COURT:  So the only -- and you folks can then

23  cross her.  If you want -- you folks should talk because for

24  medical opinions if it's going to be "here is what the

25  condition is" and the condition varies from a textbook

E99Qdel1                        Jury Trial

1    condition by focusing on one thing and not the other, if there

2    is wiggle room in terms of what the condition is that you folks

3    think is where the Mack truck is being driven, you should talk

4    about that view, that opinion, and if we need, raise it with

5    me; but I need something specific because right now the proffer

6    appears to be that she is going to be very limited.  It does

7    strike me as something which the jury should be aware of in

8    terms of assessing the overall -- they can determine

9    Mr. Accilien's credibility for themselves, but this is a fact

10   for them to take into consideration.

11              MR. POSCABLO:  Right.  Just so I lay it out there --

12   and we'll put it as an issue before the Court when it's

13   appropriate -- my concern is that she is going to testify that

14   a particular condition means certain things, and by inference

15   then she is essentially testifying as to what this, the

16   witness, Mr. Accilien, is suffering from.

17              THE COURT:  But then you would cross-examine her on

18   "Isn't it true that there are 12 ways in which this condition

19   can exhibit itself?  Isn't there a spectrum?"

20              MR. POSCABLO:  That's right.

21              THE COURT:  "Do you know where he falls?"

22              MR. POSCABLO:  Right.

23              THE COURT:  "Have you assessed him in the last --

24   ever."  I mean, there is -- I could come up with 15 minutes of

25   cross on exactly that point.

E99Qdel1                          Jury Trial

1          MR. POSCABLO:  Agreed.

2          THE COURT:  I'm sure you could too.

3          MR. POSCABLO:  And we will.  I just -- because she

4    hasn't prepared a report, because we have no 3500 for her,

5    because the --

6          THE COURT:  There's no 3500, as I understand it,

7    because it doesn't exist.  Is that right?

8          MR. PITTELL:  As to Dr. Rosenbaum, no, there is none.

9          THE COURT:  And we've gotten a proffer on the opinions

10   a couple of times.  So I don't think -- the purpose of a

11   report, I want to make sure the record is clear, is so that

12   nobody's surprised.  It's not the formality of a piece of

13   paper.  Here, the Court did obtain the motion in limine to

14   preclude her, got an additional proffer from Mr. Pittell on her

15   testimony.  So you folks have known about it since July.

16         MR. POSCABLO:  Right.  And we'll be prepared, Judge.

17   I just wanted to front it for the Court that it's an issue.

18         THE COURT:  You need to make your record.  I just want

19   to make sure my position on this is clear.  To the extent that

20   you folks believe that there is going to be testimony which

21   talks about what the condition is -- I'm just repeating myself

22   from what I said before -- that you think has got too much

23   wiggle room; that it is leaving out certain things or adding in

24   certain things, then you should raise it with me, and we'll

25   figure out whether it's straying into kind of opinion testimony

E99Qdel1                         Jury Trial

```
 1   that we are not anticipating.  But if it's simply, look,
 2   "schizophrenia is" and it's something like be Wikipedia put
 3   into lay person's terminology, that I'm not particularly
 4   concerned about so long as Wikipedia, assuming it's
 5   scientifically accurate -- I don't mean to suggest that it
 6   would ever be Wikipedia.
 7              MR. POSCABLO:  I get it.
 8              THE COURT:  What I mean is some medically -- Wikipedia
 9   is not, but some medically accepted definition.
10              MR. POSCABLO:  Right.
11              THE COURT:  Mr. Pittell, does any of that give you any
12   pause or do you want to clarify anything?
13              MR. PITTELL:  No.  Like I said, we'll try and work it
14   out amongst ourselves.
15              THE COURT:  Thank you.
16              Mr. Pecorino?
17              THE DEPUTY CLERK:  Still one.
18              THE COURT:  What number?
19              THE DEPUTY CLERK:  Number two.
20              THE COURT:  Number two.
21              MR. PITTELL:  Number two is not here?
22              THE COURT:  Number two is not here yet.  It's still
23   early.  It's only 9:38.  What I would suggest is we'll wait
24   some appropriate length of time.  I believe he will show up.
25   He hasn't called.  I have no reason to believe he is sick or
```

E99Qdel1                          Jury Trial

1    anything like that.  So we'll figure it out.  Anything else?

2    All right I'll come back when my deputy tells me that we have a

3    full complement of jurors.

4              (Recess)

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E99Qdel1                          Jury Trial

1              (Jury present)

2              THE COURT:  All right, ladies and gentlemen, let's all

3       be seated.  Thank you.

4              Ms. Geraci, you may continue.

5        GREGORY ACCILIEN, resumed.

6       DIRECT EXAMINATION CONTINUED

7       BY MS. GERACI:

8       Q.  Good morning, Mr. Accilien.

9       A.  Good morning.

10      Q.  Mr. Accilien, you testified yesterday that one of the

11      things that was taken from the drug dealer that you and the

12      group robbed was marijuana.  Do you remember that?

13      A.  Yes.

14      Q.  What was your understanding as to what was going to happen

15      with the marijuana that was taken?

16              MR. PITTELL:  Objection.

17              THE COURT:  Hold on one second.

18      A.  Can you rephrase that?

19              THE COURT:  Yes.  The objection is sustained.  Why

20      don't you just rephrase that?

21      Q.  Do you know what was going to happen with the marijuana

22      that was taken?

23      A.  I know they were supposed to share it amongst each other.

24              MR. PITTELL:  Objection.

25              THE COURT:  You can ask him the basis for his

E99Qdel1                         Accilien - Direct

1   understanding.  Overruled.

2   BY MS. GERACI:

3   Q.  How do you know what was going to happen?

4   A.  How do I know?

5   Q.  Yes.

6   A.  Because David got his piece of it.

7            MR. PITTELL:  Objection.  Move to strike.

8            THE COURT:  Overruled.

9   Q.  Do you know what David or anyone else was going to do with

10  the marijuana?

11  A.  They was going to eventually sell it.

12  Q.  You testified yesterday that after David Delva beat the

13  male victim, that you left and went home.  Do you remember

14  that?

15  A.  Yes.

16  Q.  When you returned home, did you make or receive any phone

17  calls from any of the participants in the robbery?

18  A.  I probably did, but I don't remember.

19  Q.  Do you recall if you received calls or if you made calls?

20  A.  Umm, I don't remember if I made calls.

21  Q.  Mr. Accilien, you testified yesterday that you dealt drugs

22  with David Delva.  Do you remember that?

23  A.  Yes.

24  Q.  And you also testified that you dealt drugs with Dominique

25  Jean-Philippe?

E99Qdel1                        Accilien – Direct

1    A.  Yes.

2    Q.  Do you know the names of any of the customers of David

3    Delva?

4    A.  Big Brother.

5    Q.  Anyone else?

6    A.  Ed.

7    Q.  How do you know Ed?

8    A.  I know Ed through –– through Dominique.

9    Q.  Can you explain how you know Ed through Dominique?

10   A.  I used to –– I used to –– I know he was Dominique's

11   customer.

12   Q.  By that you mean Dominique's drug customer?

13   A.  Yes.

14   Q.  What kind of drugs?

15   A.  Marijuana and I believe coke.

16   Q.  And what did Ed purchase from David Delva?

17            MR. PITTELL:  Objection.

18            THE COURT:  You need to establish a foundation for

19   that question, so sustained.

20            MS. GERACI:  Yes, your Honor.

21   Q.  Due know if Ed purchased any narcotics from David Delva?

22   A.  Yes.

23   Q.  How do you know?

24   A.  Because I had –– I had steered Ed to buy from David.

25   Q.  What kinds of narcotics did Ed purchase from David Delva?

E99Qdel1                          Accilien - Direct

```
 1    A.  Cocaine.
 2    Q.  Do you know when David Delva began selling narcotics?
 3            MR. PITTELL:  Objection.
 4            THE COURT:  Sustained.  You can ask him when he was
 5    first aware of it, but you can't ask sort of something as
 6    open-ended as what you've asked.
 7    Q.  You testified yesterday that you sold drugs with David
 8    Delva.  Is that correct?
 9    A.  Yes.
10    Q.  And you also testified yesterday that one of the drugs was
11    crack cocaine.  Is that correct?
12    A.  Yes.
13    Q.  When did you begin working with David Delva to sell crack
14    cocaine?
15    A.  I don't know the exact date, but I know it was a little
16    bit -- a few months after Dominique was in jail.
17    Q.  And you testified yesterday that David Delva -- that you
18    worked with David Delva to sell marijuana.  Do you remember
19    that?
20    A.  Yes.
21    Q.  When did you begin doing that?
22            MR. PITTELL:  Objection.  Judge, I'm objecting to the
23    form of some of these questions.
24            THE COURT:  Overruled.
25    Q.  Mr. Accilien, when did you begin to sell marijuana with
```

E99Qdel1                        Accilien - Direct

1    David Delva?

2    A.  Right after the robbery.

3    Q.  Do you know any customers who purchased marijuana from

4    David Delva?

5    A.  Do I know?  Not really.  Because, see, David had his

6    customers and I had my customers.

7           MR. PITTELL:  Objection, Judge.  I don't think there's

8    a question.

9           THE COURT:  That's right.  There is no question

10   pending.  So we'll strike that testimony.  You may proceed.

11   BY MS. GERACI:

12   Q.  Mr. Accilien, irrespective of the names of customers, do

13   you know whether he had marijuana customers?

14   A.  Yes, he did.

15   Q.  Do you know how frequently he sold marijuana?

16          MR. PITTELL:  Objection.

17          THE COURT:  Sustained.

18   A.  No.

19   Q.  Mr. Accilien, you testified yesterday that you pled guilty

20   to the crime of perjury.  Do you remember that?

21   A.  Yes.

22   Q.  What did you lie about?

23   A.  I lied about dealing drugs with David.

24   Q.  Can you tell us why you lied about that?

25   A.  Because I was trying to, umm -- I was trying to cover up my

E99Qdel1                        Accilien - Direct

1    nephew.

2    Q.  Did you also plead guilty to dealing drugs?

3    A.  Excuse me?

4    Q.  Did you ultimately plead guilty to being a drug dealer?

5    A.  Yes.

6    Q.  Let me direct your attention to June 4 of 2013.  And you

7    testified yesterday that's the date of your arrest.  Is that

8    correct?

9    A.  Will you rephrase that?

10   Q.  When were you arrested federally in this case?

11   A.  June 4, 2013.

12   Q.  Where were you arrested?

13   A.  I was arrested at 832 South Oak Drive.

14   Q.  Is that where you lived at the time?

15   A.  Yes.

16   Q.  That's in the Bronx?

17   A.  Yes.

18   Q.  For how long have you lived there?

19   A.  I lived there for three to four years.

20   Q.  At the time of your arrest, were you alone at that

21   apartment or were other people with you?

22   A.  There was other people with me.

23   Q.  Who else was there?

24   A.  David Delva, Zaleka Witter and Bruno Mackenzie and Cut,

25   C-U-T.

E99Qdel1                          Accilien - Direct

1   Q.  Do you know whether there were any weapons in your

2   apartment at the time?

3   A.  Did I know?

4   Q.  Yes.

5   A.  Yes, I did.

6   Q.  How do you know?

7   A.  Because David had showed me.

8   Q.  What did David show you?

9   A.  He showed me the gun.

10   Q.  Can you describe the gun he showed you?

11   A.  It was a black smaller gun.

12   Q.  Whose gun was that?

13   A.  It was Dave's gun.

14   Q.  Do you know where he kept it?

15   A.  Umm, I did, it was on the closet.

16   Q.  Did you ever speak with him about this gun?

17   A.  Yes.

18   Q.  Did you have any understanding as to why he had the gun?

19             MR. PITTELL:  Objection.

20             THE COURT:  Sustained.

21   Q.  You mentioned -- did he ever tell you why he had the gun?

22   A.  He said he was selling drugs; he needed protection.

23   Q.  Mr. Accilien, do you know whether there was any ammunition

24   in the apartment at the time?

25   A.  Yes.

```
 1   Q.  How do you know?

 2   A.  Because he had showed me.

 3   Q.  Who had shown you?

 4   A.  David.

 5   Q.  Do you know where it was?

 6   A.  No.

 7   Q.  Do you know whether there were any drugs in the apartment

 8   at the time?

 9   A.  Yes.

10   Q.  How do you know?

11   A.  He had showed -- Dave showed me.

12   Q.  What did he show you?

13   A.  He showed me that he had crack.

14   Q.  When the police arrived at your apartment to arrest you,

15   did you tell them about the gun or the ammunition or the crack?

16   A.  Initially?

17   Q.  Initially, yes.

18   A.  No.

19   Q.  At some point were you placed under arrest?

20   A.  Yes.

21   Q.  Do you know whether David Delva was placed under arrest?

22   A.  Yes.

23   Q.  How do you know?

24   A.  Because he was cuffed up and brought to a different car.

25   Q.  Did you speak with David Delva at the apartment after you
```

E99Qdel1                        Accilien - Direct

```
 1    were both under arrest?

 2    A.  Excuse me?

 3    Q.  Did you speak with David Delva at your apartment after you

 4    were both under arrest?

 5    A.  Yes.

 6    Q.  And what did you say to him; what did he say to you?

 7    A.  He told me not to talk and to not to sign anything.

 8    Q.  Do you have any understanding as to what he meant by that?

 9            MR. PITTELL:  Objection.

10            THE COURT:  Why don't you rephrase it?

11    Q.  Did he explain to you what he meant by that?

12    A.  He said basically not to cooperate and to -- not to -- not

13    to sign any papers at the precinct.

14    Q.  After you were arrested, did you remain in custody?

15    A.  Excuse me?

16    Q.  After you were arrested, did you remain in custody or were

17    you released?

18    A.  No, I -- after I was arrested, I was locked up.

19    Q.  Did you speak with David Delva after you were arrested?

20    A.  Yes.

21    Q.  How did you speak with him?

22    A.  I spoke to him through the phone.

23    Q.  Did you call him or did he call you?

24    A.  No, I called him.

25    Q.  Where were you calling from?
```

E99Qdel1                    Accilien - Direct

1   A.  I was calling from MCC.

2   Q.  Where were you calling him?

3   A.  Where I was calling him?  Can you rephrase that?

4   Q.  Sure.  Was he -- do you know where he was when you were

5   calling him?

6   A.  I believe he was in -- in his -- in his room.

7   Q.  During the call you were talking about, what did you say to

8   him and what did he say to you?

9   A.  I don't -- I don't specifically remember everything that --

10  that -- that I spoke to him about in that conversation, but I

11  only remember that he told me to hold it down in that

12  conversation.

13  Q.  What do you -- I'm sorry -- do you have an understanding --

14  what did that mean to you?

15          MR. PITTELL:  Objection.

16          THE COURT:  I'll allow it in the form, the last form.

17  Go ahead.  Why don't you rephrase it, that last form, the one

18  question.

19  Q.  What did -- I'm sorry, I forgot what I said.  What did that

20  mean to you?

21  A.  Basically, not -- to hold it down; not to cooperate.

22  Q.  After you were arrested, did you speak with law enforcement

23  agents?

24  A.  Yes.

25  Q.  When you first spoke with law enforcement after you were

1   arrested, did you mention David Delva's involvement in the

2   robbery that we talked about yesterday?

3   A.   Yes.

4   Q.   Let me direct your attention to late June of 2013.  Where

5   were you at that time -- excuse me -- late June of 2014?

6   A.   Late June?

7   Q.   Just a few months ago, do you recall where you were at that

8   time?

9   A.   Yeah, I was in MCC.

10  Q.   Can you describe what, if anything, was happening in your

11  unit at MCC at that time?

12  A.   Yes.  There was a rumor going around that I was supposed to

13  be --

14          MR. PITTELL:  Objection.

15          THE COURT:  Sustained.

16          MS. GERACI:  Just a moment, your Honor.

17          (Pause)

18  Q.   Mr. Acclien, did anyone at MCC have a conversation with

19  you about you being a cooperator?

20  A.   Yes.

21  Q.   Do you know who that was?

22  A.   I don't know the name of this guy, but I know he was an old

23  man that -- that was in my unit.

24  Q.   What did you say to him; what did he say to you?

25  A.   Well, he told me that he -- he spoke to -- he didn't know

```
 1    if he was my nephew; he thought it was my cousin.  He said that
 2    he spoke to my cousin, and my cousin told me not to take the
 3    stand on him.
 4    Q.  Do you know who he was referring to?
 5    A.  He was referring to David Delva.
 6              MS. GERACI:  Your Honor, at this time the government
 7    would like to read a stipulation between the parties.
 8              THE COURT:  All right.  Ladies and gentlemen, let me
 9    just tell you what a stipulation is.
10              A stipulation is an agreement between the government
11    and the defendant as to certain facts.  So you can accept these
12    facts as true because they're both agreeing to these facts.
13              All right.  You may proceed.
14              MS. GERACI:  Thank you, your Honor.
15              The stipulation, which is Government Exhibit 3003
16    states:  It is hereby stipulated, and agreed, by and among the
17    United States of America, by Preet Bharara, United States
18    Attorney for the Southern District of New York, Timothy Sini
19    and Justina Geraci, United States Attorneys of counsel, David
20    Delva, the defendant, by and with the consent of his attorney,
21    Jeffrey Pittell that:
22              (1) The DVD marked as Government Exhibit 200 contains
23    video recordings from surveillance cameras located at 801 Neill
24    Avenue, Bronx, New York.  The recordings were made on
25    September 4, 2014 at the times indicated on the time stamps on
```

1    the recordings.

2              (2) The recordings fairly and accurately depict what

3    was captured by surveillance cameras at 801 Neill Avenue,

4    Bronx, New York.

5              (3) The photographs marked as Government Exhibits 201

6    through 205 are still images taken from the video recordings

7    contained on Government Exhibit 200.

8              It is further stipulated and agreed that this

9    stipulation and Government Exhibits 200, 201, 202, 203, 204 and

10   205 may be received in evidence as Government Exhibits at

11   trial.  It is dated July 10, 2014 and signed by both parties.

12             Your Honor, at this time the government offers

13   Government Exhibits 200 through 205 and Government Exhibit

14   3003, which is the stipulation.

15             THE COURT:  Mr. Pittell, are those stipulated to?

16             MR. PITTELL:  Yes, they are.

17             THE COURT:  All right.  Received.

18             (Government's Exhibits 200 through 205 and 3003

19   received in evidence)

20             MS. GERACI:  Thank you.

21   Q.  Mr. Accilien, have you had an opportunity to review a video

22   in connection with this case?

23   A.  Yes.

24             MS. GERACI:  May I approach, your Honor?

25             THE COURT:  You may.

E99AADEL2                    Accilien - Direct

1    BY MS. GERACI:

2    Q.  Mr. Accilien, I've handed you what's been admitted in

3    evidence as Government Exhibits 201 and 205.  Do you recognize

4    these images?

5    A.  Yes.

6    Q.  Did you have an opportunity to review these prior to your

7    testimony today?

8    A.  Excuse me?

9    Q.  Did you have an opportunity to review these prior to today?

10   A.  Yes.

11   Q.  What are you looking at?

12   A.  Dominique and Trevor Cole.

13   Q.  Are those the people depicted in the images?

14   A.  Yes.

15          MS. GERACI:  Let's go through them one by one with the

16   Court's permission I'll ask Ms. Chen to publish 201 to the

17   jury?

18          THE COURT:  Yes.

19          (Pause)

20   Q.  Mr. Accilien, you just a moment ago said that these are

21   Dominique and Trevor.  Can you explain who is who?

22   A.  Dominique in the white shirt.  Trevor in the black shirt.

23   Q.  The person in the white is Dominique, your brother?

24   A.  Yes.

25   Q.  And this other person in the darker shirt is Trevor?

```
 1    A.  Yes.

 2              MS. GERACI:  202, please, Ms. Chen.

 3    Q.  Can you see who is in this image as well?

 4    A.  Yes.

 5    Q.  Who are the people in this image?

 6    A.  The same people.

 7    Q.  Wearing the same clothing?

 8    A.  Yes.

 9    Q.  Can you tell me who is who?

10    A.  The one in the white shirt is Dominique and the one in the

11    black shirt is Trevor.

12              MS. GERACI:  Let's look at 203, please.

13              (Pause)

14    Q.  Mr. Accilien, could you see who we're looking at here?

15    A.  Dominique in the white shirt.  Trevor in the black shirt.

16              MS. GERACI:  204, please.

17              (Pause)

18    Q.  Who are we looking at here?

19    A.  Dominique in the white shirt.  Trevor in the black shirt.

20              MS. GERACI:  And lastly 205.

21              (Pause)

22    Q.  Who are we looking at here?

23    A.  Dominique in the white shirt.  Trevor in the black shirt.

24              MS. GERACI:  May I approach, your Honor?

25              THE COURT:  You may.
```

1    Q.  Mr. Accilien, I've handed you what's been introduced in

2    evidence as Government Exhibit 200.  Have you had an

3    opportunity to review that disk prior to your testimony today?

4    A.  Yes.

5    Q.  And are those your initials and date on the disk?

6    A.  Yes.

7    Q.  Did you initial and date this after you watched the video

8    you spoke about?

9    A.  Yes.

10           MS. GERACI:  Your Honor, at this time the government

11   would like to read another stipulation between the parties.

12           THE COURT:  All right.

13           MS. GERACI:  This is Government Exhibit 3006, same

14   caption as I've read above.  And it says that we stipulate to

15   the following:

16           One, if called to testify, an employee of the

17   Metropolitan Detention Center or the jail would testify as

18   follows:

19           A, he or she is familiar with the system through which

20   inmates can make telephone calls from the jail.

21           B, inmates are permitted to make telephone calls from

22   the jail and are informed that their telephone calls are

23   subject to monitoring.  The jail maintains a daily recording

24   system that automatically records telephone calls made by

25   inmates.  Each digitally recorded call is stored as an

E99AADEL2                          Accilien - Direct

1    electronic file.  The file name for each call includes the date

2    and time the call commenced and the phone number that was

3    called.

4           C, in order to place that telephone call from the jail

5    an inmate is required to enter into the telephone system his

6    are her unique identification number.  This number is used to

7    track an inmate's telephone calls and recordings of those

8    calls.

9           D, Government Exhibit 800 is a compact disk containing

10   a true and accurate copy of the recording of a telephone call

11   made by Dominique Jean-Philippe from the jail on June 12, 2013,

12   at approximately 6:38 p.m.

13          Two, Government Exhibit 800-T is a true and accurate

14   transcription of the telephone call contained on Government

15   Exhibit 80.  The header on the first page of Government Exhibit

16   800-T accurately reflects the approximate date and time of the

17   recording.

18          It is further stipulated and agreed that this

19   stipulation and Government Exhibits 800 and 800-T may be

20   received in evidence as Government Exhibits at trial.

21          This stipulation is dated July 10, 2014, and signed by

22   both parties.

23          At this time, your Honor, the government offers

24   Government Exhibit 800, 800-T as an aid to the jury and 3006.

25          THE COURT:  Mr. Pittell, is that a stipulation between

E99AADEL2                        Accilien - Direct

1   you and government?

2          MR. PITTELL:  3006 is but I have an objection to 800

3   and 800-T.

4          THE COURT:  All right.  So in the nature of what was

5   previously stated so the stipulation of Government Exhibit 3006

6   is received.  Government Exhibit 800 which is the recorded

7   telephone call is received.  800-T which is a transcript is

8   received not as evidence but as an aid to the jury.

9          (Government's Exhibits 800, 800-T and 3006 received in

10  evidence)

11         THE COURT:  Are you going to play the call now?

12         MS. GERACI:  Yes, your Honor, just a portion of it.

13         THE COURT:  Let me just describe for the jury how you

14  use transcripts.

15         When you hear a recorded telephone call it is the

16  recording which is in fact the evidence.  The transcript is

17  simply there to follow along.  If you think you hear something

18  different, then it's what you believe you hear that controls.

19  The transcript as a result is not evidence.  It's just to

20  assist you.  Here, the transcript, the wording in the

21  transcript is agreed to.  Am I right?

22         MS. GERACI:  Yes, your Honor.

23         THE COURT:  All right.  You may proceed then.

24         MS. GERACI:  Thank you, judge.

25         May I approach, your Honor?

E99AADEL2                        Accilien - Direct

 1              THE COURT:  You may.

 2   BY MS. GERACI:

 3   Q.  Mr. Accilien, I am showing you what has been entered into

 4   evidence as Government Exhibit 800 and 800-T.  Have you had an

 5   opportunity to review these materials prior to your testimony

 6   today?

 7   A.  Yes.

 8   Q.  Are those your initials and the date on Government Exhibit

 9   800 which is the disk?

10   A.  Yes.

11   Q.  And are those your initials and date on Government Exhibit

12   800-T which is the document I handed to you?

13   A.  Yes.

14   Q.  Did you have an occasion to listen to a call, a prison call

15   before today?

16   A.  Yes.

17   Q.  And when you listened to the call did you review the

18   transcript?

19   A.  Yes.

20   Q.  And did you -- were you able to recognize the voices on the

21   call?

22   A.  Yes.

23   Q.  Who is on the call?

24   A.  David Delva and Dominique Jean-Philippe.

25   Q.  On the transcript's in front of you as Government Exhibit

E99AADEL2                         Accilien - Direct

1   800-T is David Delva indicated by the "DD"?

2   A.  Yes.

3   Q.  And on the transcript in front of you that's Government

4   Exhibit 800-T is Dominique indicated by DJP?

5   A.  Yes.

6            MS. GERACI:  At this time I will ask Ms. Chen to play

7   the call at 3 minutes, 43 seconds.

8            THE COURT:  All right.  So how are you going to --

9   you'll put up the transcript?

10            MS. GERACI:  Yes, your Honor.  I was also going to ask

11   Ms. Chen to put up pages four through five of the transcript.

12            And you can do it right next to each other.

13            THE COURT:  All right.  So don't turn it on yet.  No,

14   go ahead and put it up there but don't turn the recording on.

15   I just want to make sure we're in the right place.

16            (Pause)

17            THE COURT:  All right.  Can you get it onto the main

18   screen as well?

19            (Pause)

20            THE COURT:  All right.  I had thought we were going to

21   start not quite way up there.  Is this where you folks had

22   believed you were going to start?

23            MS. GERACI:  Yes, your Honor.  I actually mentioned

24   this to Mr. Pittell the other day that we would be starting

25   basically one line after the "UI".

 1                THE COURT:  Let me just make sure that -- give me one

 2     moment.  I want to make sure there is no determination that

 3     would be different based on where you are going to start.

 4                (Pause)

 5                THE COURT:  All right.  You can proceed.

 6                MS. GERACI:  Thank you, your Honor.

 7                THE COURT:  So, ladies and gentlemen, you can follow

 8     along on your screens.  Does everybody's screen work?  All

 9     right.  Terrific.  Thank you.

10                (Audio Recording Playing)

11                MS. GERACI:  Your Honor, the government is all set

12     with the call and no further questions for Mr. Accilien.

13                THE COURT:  All right.  Thank you.

14                Mr. Pittell.

15                MR. PITTELL:  May I proceed?

16                THE COURT:  You may.  I was just waiting for

17     Ms. Geraci to gather her things.

18     CROSS-EXAMINATION

19     BY MR. PITTELL:

20     Q.  Good morning, Mr. Accilien.

21     A.  Good morning.

22     Q.  Mr. Accilien, my name is Jeffrey Pittell.  I am the

23     attorney for your nephew, David Delva.  It's correct, we've

24     never met before?

25     A.  No.

E99AADEL2                    Accilien - Cross

1    Q.   We've never spoken before?

2    A.   Never.

3    Q.   Mr. Accilien, I'd like to start by going over the

4    description of what you told this jury about the robbery during

5    the Labor Day weekend, September 12?

6    A.   Yes.

7    Q.   You said that on Sunday night you first called your

8    brother, Dominique Jean-Philippe?

9    A.   Yes.

10   Q.   And you called him because you were looking for money?

11   A.   Yes.

12   Q.   Cause you didn't have any money?

13   A.   I had money but I just needed more.

14   Q.   And then so when you called him it turned out he was in the

15   neighborhood nearby and in an apartment?

16   A.   Yes.

17   Q.   And he said go to Rite Aid, get some gloves and some tape?

18   A.   Yes.

19   Q.   And then it was your testimony that you then went to Rite

20   Aid, got some gloves and some tape and brought it over to the

21   apartment?

22   A.   Yes.

23   Q.   And then it's your testimony that you went into the

24   apartment and you saw the woman who was tied up.  You saw

25   Trevor Cole and you saw your brother in the apartment?

E99AADEL2                    Accilien - Cross

1    A.  Yes.

2    Q.  And at that point it was just the three of you in the

3    apartment?

4    A.  Yes.

5    Q.  And then you testified that Trevor Cole and your brother

6    said that they were planning a robbery of the woman's

7    boyfriend?

8    A.  Yes.

9    Q.  And then at some point you went home; is that your

10   testimony?

11   A.  Yes.

12   Q.  And now, is it your testimony that it's still nighttime

13   that you went home?

14   A.  It was still nighttime.

15   Q.  So it was either Sunday night or early in the morning on

16   Monday morning when you went home?

17   A.  I don't remember the date but it was late night.

18   Q.  All right.  So let me put it -- you think was after

19   midnight when you went back home after going into the

20   apartment?

21   A.  I don't remember the timeframe.

22   Q.  OK.  So that night you went back home and then when I say

23   "back home" you went to your house on Oak Drive?

24   A.  Repeat that again, sir.

25   Q.  When you went back home you went to your home on Oak Drive?

1     A.  Yes.

2     Q.  And that's -- you live there with David Delva and other

3     people?

4     A.  Yes.

5     Q.  And it's your testimony that when you came home that night

6     David Delva was there?

7     A.  Yes.

8     Q.  And then at some point it's your testimony that you went

9     from your home that you lived with David Delva on Oak Drive and

10    went back to the apartment where the crime scene was; is that

11    correct?

12    A.  Yes.

13    Q.  Now, is it your testimony that when you went back with

14    David Delva it was still dark out?

15    A.  Was it still dark out?  Yes, it was.

16    Q.  So was still Sunday night or early into Monday morning?

17    A.  Yes.

18    Q.  And then it's your testimony that you stayed at the

19    apartment, the crime scene apartment with David Delva, your

20    brother and Trevor Cole until around sunrise?

21    A.  Yes.

22    Q.  And then at sunrise you and David Delva went back to your

23    home on Oak Drive?

24    A.  Yes.

25    Q.  And so I take it at that point if it's sunrise it's now

E99AADEL2                        Accilien - Cross

1   Monday?

2   A.   Yes.

3   Q.   And that Monday is Labor Day?

4   A.   Not that I remember.  I don't think it was Labor Day that

5   day.

6   Q.   You don't think the crime occurred on Labor Day weekend?

7   A.   It happened on Labor Day weekend but it wasn't the day that

8   we went back to the apartment.  It wasn't Labor Day that day.

9   Q.   Do you know what day of the week Labor Day falls on?

10  A.   What day of the week?

11  Q.   Yes.

12  A.   It should be on a Monday, I believe.

13  Q.   Do you know that Labor Day is always on a Monday?

14  A.   Do I know if it's always on a Monday?

15  Q.   Yes.

16  A.   I believe so.

17  Q.   And do you know that September 3, 2012, was Labor Day?

18  A.   September the 3rd?

19  Q.   Yes.

20  A.   Was Labor Day?  So was that Wednesday?

21  Q.   That Monday?

22  A.   That Monday?

23  Q.   Mr. Accilien, I'll withdraw the question.  I'll move on.

24  So when you -- I am just reviewing the description you gave to

25  the jury yesterday on your direct-examination just to make sure

1   I understand it.  So when you and David -- it's your testimony

2   that when you and David left the crime scene apartment to go

3   back to Oak Drive it was now sunrise?

4   A.  Yes.

5   Q.  It was daylight out?

6   A.  Yes.

7   Q.  And then it's your testimony that you went back to your

8   home and stayed at your home that day with David Delva?

9   A.  Yes.

10  Q.  And then at some point later that day you testified that

11  your brother, Dominique, came over to your house on Oak Drive?

12  A.  Yes.

13  Q.  And I believe you said that was on a Monday afternoon?

14  A.  Yes.

15  Q.  And that's when he brought over the hot wings?

16  A.  Yes.

17  Q.  And "hot wings" that means chicken wings?

18  A.  Yes.

19  Q.  And then you testified the next day, Tuesday, David Delva

20  left your home on Oak Drive and went back to the apartment, the

21  crime scene apartment?

22  A.  Excuse me?

23  Q.  It's your testimony that on the next day, the day after

24  your brother brought the hot wings, David Delva left your home

25  and went over the crime scene apartment?

E99AADEL2                      Accilien - Cross

1    A.  I thought I heard you say "Tuesday".

2    Q.  Yes.

3    A.  No, it wasn't on Tuesday.

4    Q.  It was on which day?

5    A.  I don't remember the day.

6    Q.  Sir, was it the day after your brother brought the hot

7    wings over?

8    A.  It was the day after my brother brought the hot wings.

9    Q.  OK.  And so if the day that your brother brought the hot

10   wings was a Monday, then the next day would have been Tuesday?

11   A.  I don't believe my brother brought the hot wings on a

12   Monday.  It could have been on a Sunday.

13   Q.  You think it was Sunday that your brother brought the hot

14   wings?

15   A.  All I remember, I remember that the day, the day that the

16   guy came in and got tied up in the house what I believe was the

17   day of Labor Day.

18   Q.  And so -- but let's go back to the day your brother brought

19   the hot wings over to your house.  It was the next day you

20   testified that David Delva went back to the crime scene?

21   A.  Rephrase that again, sir.

22   Q.  You testified that your brother brought hot wings over to

23   your house and that was the day after the night that you

24   brought the tape and gloves over?

25   A.  Yes.

E99AADEL2                    Accilien - Cross

1    Q.  All right.  And then the day after the hot wings day was

2    the next time that David Delva went back to the crime scene

3    apartment?

4    A.  Yes.

5    Q.  And you had indicated that when David Delva went back to

6    the crime scene apartment was the middle of the day?

7    A.  Yeah, like midday.

8    Q.  And then you said later at some point you went back over to

9    the crime scene apartment?

10   A.  Yes.

11   Q.  And that's when you said you saw the two victims tied up?

12   A.  Yes.

13   Q.  So that's the version of events that you gave on

14   direct-examination; is that correct?

15   A.  Yes, without the dates though.

16   Q.  Without the dates, just the order of the way things

17   happened?

18   A.  Um-hmm.

19           THE COURT:  When you say "um-hmm" do you mean "yes"?

20           THE WITNESS:  Yes.

21           THE COURT:  All right.  Thank you.

22   Q.  You were arrested on June 4, 2013; is that correct?

23   A.  June 4.

24   Q.  June 4, do you remember the year?

25   A.  2013.

1  Q.  Now, after you were arrested -- in fact, you were arrested

2  by the FBI agent sitting at the table over there; is that

3  correct?

4  A.  Yes, sir.

5  Q.  And after you were arrested you spoke with Agent Reynolds

6  and other law enforcement agents; is that correct?

7  A.  Yes.

8  Q.  And when you spoke with them that day you lied to them,

9  didn't you?

10 A.  I told the truth and I am only here to tell the truth, sir.

11 Q.  I am not talking about whether you are here to tell the

12 truth.  I am talking about the day you were arrested when you

13 spoke with Agent Reynolds you lied to him, didn't you?

14 A.  No.  I told the truth, sir.

15 Q.  Isn't it true, sir, that when you were first arrested and

16 you spoke with Agent Reynolds you told him that your brother

17 called him multiple times, asked to bring gloves and duct tape

18 but you did not get the gloves and duct tape and you never went

19 to the apartment.  Isn't it true that that was the first thing

20 that you told Agent Reynolds?

21 A.  Was that -- did I --

22 Q.  Well, I am asking you as you sit here now do you remember

23 telling that lie to Agent Reynolds?

24 A.  I don't remember me saying that.

25        MR. PITTELL:  You don't recall.

1           May I approach the witness, your Honor?

2           THE COURT:  You may.

3           MR. PITTELL:  Is it OK if I question him from right

4    here just to direct his attention?

5           THE COURT:  Yes.  Make sure you keep your voice up so

6    that the jury can hear.

7    BY MR. PITTELL:

8    Q.  Mr. Accilien, can you just put this down here.  I am

9    showing you a document, just for the record it's 3514-0.  I'd

10   ask you to read the paragraph I am pointing my finger to that's

11   highlighted in yellow.  Just read it to yourself and then I'll

12   ask you some questions.

13   A.  Yes.

14   Q.  Are you finished reading it?

15   A.  Yes.

16   Q.  All right.  Mr. Accilien, after showing you this document

17   and reading this document does it refresh your recollection

18   that when you spoke to Agent Reynolds you lied to him and you

19   told him that when your brother called and asked you to bring

20   duct tape you refused to do it and never went over to the

21   apartment?

22   A.  If it's written then I believe it happened but that wasn't

23   the time that I agreed to cooperate with the government.

24   Q.  That's not my question, sir.  My question is, did you tell

25   that lie to the agent on the day you got arrested?

E99AADEL2                    Accilien - Cross

1    A.  Yes.

2    Q.  So the first version of the events that you gave to him was

3    that your brother called and told you he was committing the

4    robbery, asked you to get duct tape and gloves, but you refused

5    to get the tape and you refused to go over.  That's the first

6    version of what happened that you gave to them; is that

7    correct?

8    A.  Yes.

9    Q.  And you told that to him while you were in a car being

10   transported to the FBI office?

11   A.  Yes.

12   Q.  All right.  Then after you got to the FBI office you spoke

13   with them again; is that correct?

14   A.  I believe so.

15   Q.  And at that point you told them that you admitted that you

16   had lied to them when you spoke to them in the car?

17   A.  Yes.

18   Q.  And you told them that you wanted to keep it real and tell

19   them the truth about what happened?

20   A.  Yes.

21   Q.  So then when you gave them this version you said that you

22   got a call from Trevor Cole who asked you to buy gloves and

23   tape.  You went and got gloves and tape.  You brought it to the

24   building.  You gave it to Trevor Cole outside the building but

25   never went inside; is that correct?

E99AADEL2                      Accilien - Cross

1   A.  Yeah, that's correct.

2   Q.  So that is the second version that you gave to him?

3   A.  But I still haven't agreed to cooperate with the government

4   yet.

5   Q.  I am not asking whether you cooperated or not.  I am just

6   asking is that the second version that you told the FBI after

7   you got arrested?

8   A.  Yes.

9   Q.  So in the second version of this story you were called by

10  Trevor Cole you go get the gloves and tape but you never go

11  inside?

12  A.  Yes.

13  Q.  Then at some point you were taken from the FBI office to a

14  hospital; is that correct?

15  A.  Yes.

16  Q.  And you were taken to the VA Hospital?

17  A.  Yes.

18  Q.  And that was because you needed some medication?

19  A.  Yes.

20  Q.  And then while you were being taken -- and the agents were

21  the ones who took you to the hospital; is that correct?

22  A.  Yes.

23  Q.  And then the agents took you from the hospital then to the

24  courthouse?

25  A.  Rephrase that again.

E99AADEL2                         Accilien - Cross

1    Q.   After you were finished being treated at the hospital the

2    agents then took you from the hospital to the courthouse?

3    A.   Yes.

4    Q.   And the reason why you had to go to the hospital was it was

5    treatment, to receive treatment relating to your schizophrenia;

6    is that correct?

7    A.   Yes.

8    Q.   So then while you were going from the hospital to the

9    courthouses, to the courthouse with the agents you discussed

10   the robbery again; is that correct?

11   A.   Excuse me?

12   Q.   While you were going from the courthouse -- I'm sorry.

13   When you were going from the hospital to the courthouse you

14   discussed the robbery with the agents?

15   A.   I don't remember.

16   Q.   While you were being taken from the hospital to the

17   courthouse did you tell the agents a third version of what

18   happened the night of the robbery?

19   A.   Did I?

20   Q.   Yes.

21   A.   Not that I remember.

22   Q.   OK.  Do you recall telling them -- withdrawn.

23        While you were going from the hospital to the

24   courthouse do you recall telling the agents that after you got

25   the call you brought the tape, you met Trevor Cole but this

E99AADEL2                    Accilien - Cross

1    time you met him in a stairwell outside the apartment and you

2    heard voices but you did not go inside the apartment?

3    A.  I don't remember saying that.

4              MR. PITTELL:  May I approach again, your Honor?

5              THE COURT:  You may.

6              (Pause)

7    Q.  Mr. Accilien, I am going to point to two highlighted

8    portions.  I'll just ask you to read them and then just look up

9    after you've read them.

10             (Pause)

11   Q.  Mr. Accilien, after reading this document does it refresh

12   your recollection as to whether or not when you were taken from

13   the hospital to the courthouse that you told the agents a third

14   version of what happened the night of the robbery?

15   A.  Yes.

16   Q.  And in this version you actually went inside the building

17   but you met Mr. Cole in the hallway outside the apartment?

18   A.  Yes.

19   Q.  And you told the agents that when you were there in this

20   version you saw Trevor Cole, Dominique Jean Philippe and Lisa

21   Hylton was there?

22   A.  No, I don't remember saying that.

23   Q.  Do you remember when you were speaking with the agents on

24   the night you were arrested that Trevor Cole was involved in

25   the robbery?

1    A.  Did I say Trevor Cole was in the robbery?

2    Q.  On the night you were arrested you told the agents Trevor

3    Cole was involved in the robbery?

4    A.  I believe so, yes.

5    Q.  And you told them that Dominique Jean-Philippe was involved

6    in the robbery?

7    A.  Yes.

8    Q.  And at some point you told them that Lisa Hylton was

9    involved in the robbery?

10   A.  I never mentioned Lisa Hylton.

11   Q.  You didn't mention Lisa Hylton on the night you were

12   arrested?

13   A.  No.

14          MR. PITTELL:  May I approach the witness again, your

15   Honor?

16          THE COURT:  Yes.

17   Q.  If could you just read the last paragraph and look up when

18   you are done.

19          (Pause)

20   Q.  Mr. Accilien, after reading that document, does that

21   refresh your memory as to whether or not you told the FBI that

22   Lisa was also involved in the robbery?

23   A.  It refreshed my memory but around that time I didn't know

24   if her name is Lisa.  I referred to her as "Sour", Sour's moms.

25   That's her daughter that used to date my brother.

1   Q.  All right.  So, but you did mention there was another

2   person or woman that was involved; is that correct?

3   A.  Yes.

4   Q.  And those were the only people you mentioned to the FBI

5   when you first got arrested?

6   A.  Yes.

7   Q.  So you did not mention David Delva when you first got

8   arrested?

9   A.  Yes.

10  Q.  Now, you indicated that you said earlier on you decided to

11  cooperate and go meet with the prosecutors; is that correct?

12  A.  Yes.

13  Q.  And approximately a month after you were arrested on

14  July 12, 2013, you met with the prosecutors and Agent Reynolds,

15  your lawyer, was there and maybe there were other people there,

16  as well?

17  A.  Yes.

18  Q.  Do you recall that meeting, the first meeting that you had

19  with them?

20  A.  Do I recall?

21  Q.  Yes.

22  A.  I mean it's been like 15 months, 14 months right now.  I

23  mean, I don't know if I remember everything but I think I

24  remember mostly everything.

25  Q.  I take it that you at least recall the first time that you

1    met, not necessarily everything about what happened but you

2    have an image in your mind of the first time that you sat down

3    and spoke with them?

4    A.  Yes.

5    Q.  And I take it that you subsequently learned that these

6    meetings with the prosecutors and agents they're called proffer

7    meetings; is that correct?

8    A.  Yes.

9    Q.  And you indicated that you had about ten to 12 of these

10   proffer meetings?

11   A.  Yes.

12   Q.  And before you actually started discussing what happened at

13   the robbery with the agents you signed a document between you

14   and your lawyer and the agents and the prosecutors; is that

15   correct?

16   A.  Yes.

17   Q.  And that document is called a proffer agreement?

18   A.  Yes.

19   Q.  And I am not going to ask you what was in it but I take it

20   your lawyer explained to you what was in the document?

21   A.  Yes.

22   Q.  And then before you got into -- well, actually, withdrawn.

23          So then at the meeting you met with the prosecutors

24   and you told them a version of what happened during the

25   robbery; is that correct?

E99AADEL2                    Accilien - Cross

1    A.  Yes.

2    Q.  And this version was different than the three versions that

3    you gave to the FBI on the night you got arrested; is that

4    correct?

5    A.  Yes, because around that time I believed that --

6    Q.  I am just asking you if the version was different.

7    A.  Excuse me.

8    Q.  I am just asking you if it was a different version from the

9    three versions you gave?

10   A.  Yes.

11   Q.  And under this version you said that your brother called

12   and asked you to get some duct tape and gloves?

13   A.  Yes.

14   Q.  And then you bought them at Rite Aid.  You went over to the

15   crime scene building.  You met Trevor Cole in the lobby and

16   then you went inside the building?

17   A.  Yes.

18   Q.  OK.  Again, I am just going over -- I am just asking you if

19   this is what you told the prosecutors and the agents during

20   this first meeting.

21   A.  Not that I remember.

22   Q.  And do you remember telling them that then you actually

23   went inside the apartment and saw a woman all tied up?

24   A.  Yes.

25   Q.  And do you remember telling them that you stayed until

E99AADEL2                    Accilien - Cross

1    midnight or around one a.m. and then you went back home to your

2    apartment on oak Drive?

3    A.  Yes.

4    Q.  And then you told them that when you went home you saw

5    David Delva and Cut at your home?

6    A.  I don't remember saying that.

7    Q.  And when I say "Cut".  Is "Cut" a nickname?

8    A.  Yeah, it's a nickname.

9    Q.  It's a nickname for a person that was living in your home

10   on Oak Drive at that time?

11   A.  Excuse me?

12   Q.  Was Cut living with you on Oak Drive during September?

13   A.  He used to stop by but he wasn't like directly living with

14   me.

15   Q.  So he was just hanging out that night?

16   A.  Yes.

17   Q.  So, did you tell them that you went home and told Cut and

18   David Delva about the robbery?

19   A.  No.  I only spoke to David about it.

20   Q.  OK.  And then -- so then at some point while you were home

21   you told them that your brother called?

22   A.  While I was home?

23   Q.  After you went back home?

24   A.  Um-hmm.

25   Q.  You told the agents and the prosecutors that your brother

1    called and you went back to the crime scene apartment?

2    A.  Yeah, I went back to the crime scene apartment with David.

3    Q.  Well, at that meeting isn't true that you told them you

4    went back to the crime scene apartment alone?

5    A.  In the meeting?

6    Q.  In the first meeting that you had with the prosecutors and

7    the agents at the first proffer meeting?

8    A.  Yes.

9    Q.  Isn't it true that you told them that you went back to the

10   crime scene apartment alone?

11   A.  The second time?

12   Q.  Yes.

13   A.  I don't remember saying that.

14          MR. PITTELL:  Approach again, your Honor?

15          THE COURT:  Yes.

16          MR. PITTELL:  Is it time to take a break?

17          THE COURT:  We're close to it.

18          MR. PITTELL:  The reason why I suggested, that's a

19   long portion for him to read.  It may take a while.

20          THE COURT:  All right. well, why don't we then, ladies

21   and gentlemen, why don't we take our mid morning break now.

22   We'll take about ten to 12 minutes and then we'll come back and

23   continue.  I want to remind you not to talk to each other or

24   anybody else about this case.  All right.  Thank you.

25          (Jury not present)

1          THE COURT:  Here is what I suggest because we'll want

2     to take our own break is that Mr. Delva take a break now for

3     about five minutes and then come back out to read that document

4     which ever portion you want to put in front of him or the whole

5     thing whatever you're turning his attention to in the meantime

6     for the first five minutes we can all deal with whatever

7     matters we want to --

8          MS. GERACI:  "Mr. Accilien".

9          THE COURT:  Mr. Accilien, step down and take a five

10    minute break.

11          (Witness not present)

12          THE COURT:  All right.  Let's all be seated.  First, I

13    want to apologize to Mr. Delva for having twice now misapplied

14    your name to the witness.  It's entirely unintentional.  I am

15    dealing with a lot of names and trying to keep a lot of things

16    in my head.  I know exactly who you are.  I know exactly who

17    you are not.  Same thing with the witness on the stand.  So I

18    apologize, sir.  It was unintentional.

19          THE DEFENDANT:  No harm done.

20          THE COURT:  Now, I have a couple things that I wanted

21    to just mention.  Are there things which you folks would like

22    to raise yourself?

23          MS. GERACI:  Not from the government, judge.

24          THE COURT:  All right.  So very quickly I just want to

25    make sure that I understand certain objections and the basis.

1    Mr. Accilien was asked, what did you understand was going to be
2    done with the marijuana?  Then he said -- then he is asked,
3    well, how did you know the marijuana was distributed?  He said,
4    well, David got his piece of it.  You then, Mr. Pittell,
5    objected and moved to strike.  Tell me the basis of your
6    objection because it struck me that when Ms. Geraci was asking
7    what was the basis he said what he said.  I mean she could have
8    continued and asked for more information but that was gone
9    through in his direct.  I want to make sure I understand.
10            MR. PITTELL:  It was just because the answer wasn't
11   responsive to the question.
12            THE COURT:  Oh, all right.  I actually thought that
13   the answer was because the way I interpreted it based on
14   yesterday's testimony is that he saw that there was a transfer
15   of marijuana to Mr. Delva and that that was how he understood
16   the marijuana had been, why he understood the marijuana had
17   been split up.  I was connecting yesterday with today.
18            MR. PITTELL:  Actually, I don't recall that portion
19   from yesterday's testimony.
20            THE COURT:  All right.
21            MR. PITTELL:  I'd like the objection to still stand.
22            THE COURT:  The objection can stand but so will the
23   basis for my ruling but it's fine.  I just want to make sure if
24   we're ships passing in the night that I understand.
25            MR. PITTELL:  I appreciate it.

1              THE COURT:  It's something that I do during

2     particularly at the beginning of trial so that people

3     understand where I am coming from and I get a sense of where

4     you are coming from.

5              The other objection that you made was the witness

6     testified to the phrase "hold it down".  And he was told the

7     phrase "hold it down" in a communication and Ms. Geraci said

8     what did that mean to you?  And you objected.  That question I

9     thought as phrased was proper.  What was the basis of your

10    objection so I overruled the objection.

11             MR. PITTELL:  I just thought it was calling for

12    speculation.

13             THE COURT:  All right.  It was just asking him what it

14    meant to him whether or not it's true or not true.  She wasn't

15    asking about the state of mind of somebody else.

16             Then there was a series of questions about do you know

17    how frequently Mr. Delva sold marijuana?

18             Ms. Geraci, this is for you.

19             It needed more foundation and did you ever see him

20    sell marijuana?  On how many occasions did you see him sell

21    marijuana?  Was he otherwise aware of the frequency?  Something

22    like that.

23             In terms of stipulations Mr. Pittell did not object,

24    though he could have.  It was a minor point and therefore I

25    appreciated him not making a bigger deal out of it which is

```
 1   it's useful not to lead the witness when he's authenticating
 2   the disks.  And so typically it's did you have an occasion to
 3   review the disks before coming to court today?  Yes.  How do
 4   you know that?  Because my initials are on the disks.  As
 5   opposed to you feeding him the testimony and him just agreeing
 6   with you.  So they're technically leading.  It saves time so
 7   there was no substantive reason to have made an objection.  So
 8   I appreciated Mr. Pittell not making a dig deal out of if.  So
 9   I just tell you that for your information you may not agree
10   with that way of doing it but I think it's a better way of
11   doing it.
12           Anything else?
13           MR. PITTELL:  Just in terms of scheduling, I mean my
14   sense is it's going to be a long time with Mr. Accilien.  I
15   mean, I don't want to rush it.  I don't want to try and force
16   words into his mouth.  I recognize that it's got to be a slow
17   process.  I just let the Court and parties know that it could
18   take up the entire afternoon.
19           THE COURT:  I don't perceive you at this point in time
20   as wasting any time.  This appears to be directly responsive to
21   the detective testimony.  Let's take it piece by piece.  If at
22   some point in time we think that it's straining the areas that
23   are just unduly wasting time, I appreciate your giving us a
24   sense of where you are but proceed to do what you need to do,
25   Mr. Pittell.
```

E99AADEL2                    Accilien - Cross

1          MR. PITTELL:  I am just saying because it's always

2     hard to tell.  I know what I want to ask and go over but it's

3     hard to gauge how long it's going to take but now I have a

4     sense.

5          THE COURT:  I understand.  Let's all take our own very

6     brief break but then what we are going to do is let's get

7     Mr. Accilien back on the stand so that he can start reviewing

8     the document that Mr. Pittell had suggested he should review so

9     that we don't have to take up the jury's time with that.

10          (Recess)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E99Qdel3                          Accilien - cross

1              (In open court; jury not present)

2              MR. POSCABLO:  Judge, one thing I've spoken to

3   Mr. Pittell about, he is going to be asking questions of

4   Mr. Accilien, but I believe we may have an oral stipulation

5   between the parties with regards to the notes I wanted to --

6              THE COURT:  With regards to?

7              MR. POSCABLO:  The notes that Mr. Pittell is

8   attempting to impeach Mr. Accilien on.

9              THE COURT:  All right.  You can go ahead and bring out

10  the jury.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Mr. Pittell, you may proceed, sir.

3     BY MR. PITTELL:

4     Q.  Mr. Accilien, during the break, did you get an opportunity

5     to read a document that I put in front of you?

6     A.  Yes.

7     Q.  Does that document refresh your recollection that on

8     July 12, 2013 you met with the prosecutors and the case agents?

9     A.  Yes.

10    Q.  Does it refresh your recollection that at that meeting at

11    that time you told them that the robbery occurred as follows:

12    On Sunday night, your brother, Dominique Jean-Philippe, called

13    you and asked you to go get some duct tape and gloves?

14    A.  Yes.

15    Q.  And that you bought it at Rite Aid, went over to the crime

16    scene building, met Trevor Cole in the lobby and then went

17    inside the building with Trevor Cole?

18    A.  Yes.

19    Q.  Then you told them you actually went inside the apartment

20    of the crime scene?

21    A.  Yes.

22    Q.  And you told them that inside the building you saw a woman

23    who was all tied up?

24    A.  Yes.

25    Q.  And you told them that you stayed until around midnight or

E99Qdel3                         Accilien - cross

1    1:00 a.m. and then you went home?

2    A.  Yes.

3    Q.  And when you went home, you told them that you saw David

4    Delva and Cut at your home?

5    A.  Yes.

6    Q.  And when you saw David Delva and Cut at your home, you told

7    them that you told David Delva and Cut about the robbery?

8    A.  I was talking to David.

9    Q.  All right.  And then you told them that Dominique

10   Jean-Philippe, your brother, called you while you were at home?

11   A.  Yes.

12   Q.  And that you went back to the crime -- you told them that

13   you went back to the crime scene apartment alone?

14   A.  Yes.

15   Q.  And that when you went back there alone, you saw that the

16   woman was still tied up?

17   A.  Excuse me?

18   Q.  That when you went back to the apartment -- when you went

19   back to the crime scene apartment, you told them that the woman

20   was still tied up?

21   A.  Yes.

22   Q.  And in the apartment was your brother and Trevor Cole?

23   A.  Yes.

24   Q.  And you told them that you hung out in the apartment for

25   two to three hours with your brother and Trevor Cole?

E99Qdel3                        Accilien - cross

1    A.  Yes.

2    Q.  And you told them while you hung out in the apartment,

3    Trevor Cole showed you a money counting machine?

4    A.  Yes.

5    Q.  And that while you were hanging out in the apartment with

6    your brother and Trevor Cole, you smoked weed with them?

7    A.  Yes.

8    Q.  And at that point you told them that Trevor Cole at one

9    point was alone in the bedroom with the woman who was tied up.

10   Is that correct?

11   A.  Yes.

12   Q.  And you also told them that at one point you went into the

13   bedroom and you saw the woman tied up there?

14   A.  Yes.

15   Q.  And so after staying for about two, three hours hanging out

16   with Trevor Cole and Dominique Jean-Philippe in the apartment,

17   then you went back home?

18   A.  Yes.

19   Q.  And you told them that when you went back home, it was

20   still dark out?

21   A.  Yes.

22   Q.  You told them after you got back home, that at some point

23   later on you went back to the crime scene apartment with David

24   Delva?

25   A.  With David Delva.

E99Qdel3                         Acilien - cross

1    Q.   Yes.  I'm just asking you if that's what you told them,

2    told the prosecutors at that meeting?

3    A.   Yes, that's all on paper.

4    Q.   OK.  And you told them that it was now sunrise when you

5    were going back to the apartment?

6    A.   It was before sunrise.

7    Q.   But do you recall telling them that it was sunrise when you

8    went back to the apartment?

9    A.   No.

10   Q.   Did reading the paper refresh your recollection as to that?

11   A.   It did.

12   Q.   And then you told them that you and David Delva stayed in

13   the apartment for 30 minutes?

14   A.   Not that I remember.

15   Q.   Did looking at the paper refresh your recollection as to

16   whether or not you told them that David Delva and you stayed in

17   the crime scene apartment for 30 minutes?

18   A.   No.

19   Q.   And then did you tell them that after staying in the

20   apartment with David Delva -- after staying at the crime scene

21   apartment with David, then you and David went back home?

22   A.   Yes.

23   Q.   And you told them that when you and David went back home,

24   it was daylight?

25   A.   Yes.  It was sunrise.

E99Qdel3                          Accilien - cross

1    Q.  It was sunrise when you went back home?

2    A.  Yes.

3    Q.  And then you told them that later that same day, both your

4    brother and Trevor Cole came over to your house with hot wings?

5    A.  Did I say that?

6    Q.  I'm asking you if you -- if we --

7    A.  Is that what you're asking me?

8    Q.  I'm sorry?

9    A.  You're asking me if I said that?

10   Q.  Right, I'm asking you if after reading the report, it

11   refreshes your recollection as to whether you told them that or

12   not.

13           THE COURT:  And let me -- go ahead and answer.

14   A.  Yes.

15   Q.  I'm sorry, the answer is yes?

16   A.  Mmm-hmm.

17   Q.  And then --

18           THE COURT:  Let's just be clear what refreshing

19   recollection means.  I want to be sure that refreshing

20   recollection doesn't just mean do you remember reading it on

21   the piece of paper.  It means does that piece of paper trigger

22   a memory where now you have a memory and say, "Oh, yeah, I

23   remember saying that."  So that's what he's asking; not just

24   was it written down on something you read, but do you remember

25   saying it?  All right?

E99Qdel3                          Accilien - cross

1           So proceeding with that, Mr. Pittell, you may go on.

2    BY MR. PITTELL:

3    Q.  So did reading the paper refresh your recollection that you

4    had told them that Trevor Cole and your brother, they both came

5    over to your house with hot wings and all of you ate hot wings

6    together?

7    A.  Yes.

8    Q.  And then you told them that all of you hung out for a few

9    hours, and at some point Trevor Cole went back to the crime

10   scene apartment?

11   A.  Rephrase that again?

12   Q.  You told the agents and the prosecutors at that meeting

13   that after you ate the hot wings with your brother and Trevor

14   Cole, Trevor Cole went back alone to the crime scene apartment

15   and your brother stayed at your house?

16   A.  Yes.

17   Q.  And you told them that your brother actually stayed over

18   your house that night?

19   A.  He didn't -- he didn't sleep all night.  He left around

20   nighttime.

21   Q.  At least he slept for awhile and then got up and left?

22   A.  Yes.  Was that the first --

23   Q.  I'm sorry, there's no question.

24   A.  OK.

25   Q.  And then after you met with the agents and the prosecutors

E99Qdel3                    Accilien - cross

1   the first time on July 12, 2013, about two weeks later you met

2   them again for a second proffer.  Is that correct?

3   A.  Yes.

4   Q.  And during this proffer, you discussed the sequence of

5   events on the night of the robbery.  Is that correct?

6   A.  Yes.

7   Q.  And during that meeting with them, isn't it true that you

8   told them that after you went to the crime scene apartment,

9   dropped off the gloves and duct tape, you went back home and

10  then you went back to the crime scene apartment alone?

11  A.  Do I remember saying that?

12  Q.  Yes.

13  A.  No.

14          MR. PITTELL:  Judge, I have another document that I

15  would like him to read, but I think what I would like to do is

16  perhaps go to another line of inquiry to save time.

17          THE COURT:  All right.  Yes.

18  Q.  Mr. Accilien, you indicated that you had about 10 to 12 of

19  these proffer meetings with the prosecutors and the agents.  Is

20  that correct?

21  A.  Yes.

22  Q.  And isn't it true that during the second meeting in July,

23  they asked you about prior crimes that you had committed?

24  A.  Yes.

25  Q.  And you --

E99Qdel3                          Accilien - cross

1    A.  On the first proffer session?

2    Q.  On the second one.

3    A.  Second one?  Was that the first proffer session that you

4    showed me before that --

5    Q.  I'm just asking you -- let me rephrase the question.  Do

6    you remember during one of these early meetings, the first or

7    the second or third one, the prosecutor asked you questions

8    about whether or not you committed prior crimes?

9    A.  Yes.

10   Q.  Do you remember that they asked you whether or not you had

11   ever committed a robbery before September 12?

12   A.  Yes.

13   Q.  And you lied to them and told them that you had never

14   committed a robbery?

15   A.  Have I ever -- no, I don't remember that.

16   Q.  Do you remember them asking you whether or not you had been

17   involved in a robbery before the September 12 Labor Day

18   robbery?

19   A.  Excuse me?

20   Q.  Do you recall the prosecutors or the agents asking you

21   whether or not you had ever been involved in a robbery before

22   the September 12 robbery?

23   A.  Had they?

24   Q.  Do you remember them asking you that question?

25   A.  Yeah, I remember them asking.

E99Qdel3                          Accilien - cross

1    Q.  And isn't it true that you told them you had never

2    committed a robbery before the September robbery?

3    A.  At first, but then -- but then I told them later on that --

4    Q.  OK, I'm talking about at first.  So at first you told them

5    you had never committed a robbery before the September 12 Labor

6    Day robbery.  Is that correct?

7    A.  Yes.

8    Q.  And that was a lie; you lied to them?

9    A.  Yes.

10            THE COURT:  I think you're saying September 12, and

11   you --

12            MR. PITTELL:  I'm sorry.  Thank you.

13   Q.  When I said September 12, I meant September 2012.

14   A.  Yes.

15   Q.  When I say September 2012, I mean the September 2012

16   robbery that we're talking about in this case, the one

17   involving your brother and Trevor Cole and the woman victim?

18   A.  Yes.

19   Q.  Just so we're clear, at that meeting, you had told them

20   before that robbery you had never been involved in any other

21   robberies at first?

22   A.  Yes.

23   Q.  And that was a lie?

24   A.  Yes.

25   Q.  Because, in fact, you had been involved in several

1    robberies before that robbery.  Is that correct?

2    A.  Only three.

3    Q.  OK.  And one of them involved stealing money from a crack

4    user with Trevor Cole.  Is that correct?

5    A.  Yes.

6    Q.  And another one involved robbing an ice cream truck with

7    your brother, Dominique Jean-Philippe?

8    A.  Yes.

9    Q.  During that robbery, you actually -- you had a gun and at

10   gunpoint stole the money from the guy selling ice cream?

11   A.  Yes.

12   Q.  And another time you were with your brother, Dominique

13   Jean-Philippe, and Trevor Cole in a subway station, and the

14   three of you stole a CD player from someone in the subway

15   station?

16   A.  Yes.

17   Q.  And the person was just an innocent person riding the

18   subway.  Isn't that correct?

19   A.  Yes.

20   Q.  You didn't tell them about all of these robberies at first.

21   Is that correct?

22   A.  No.

23   Q.  When you met with them for these proffer meetings, before

24   the prosecutor spoke to you, they told you that the most

25   important thing about these meetings is you have to tell the

E99Qdel3                           Accilien - cross

1   truth.  Is that correct?

2   A.  Yes.

3   Q.  They told that to you at every single meeting.  Is that

4   correct?

5   A.  Yes.

6   Q.  Before the meeting started, they said the most important

7   rule if we're going to work together here is that you tell us

8   the truth?

9   A.  Yes.

10  Q.  And during those meetings you lied to them?

11  A.  But I had suffered the consequence for lying, sir.

12  Q.  I understand you, sir, but you agree that during those

13  meetings you lied to the prosecutors?

14  A.  Yes.

15  Q.  At the time of your arrest, you were living in an apartment

16  on Oak Drive.  Is that actually South Oak Drive?

17  A.  Yes.

18  Q.  And is it a one-bedroom apartment?

19  A.  Yes.

20  Q.  It's a one-bedroom apartment in a two-family building?

21  A.  Yes.

22  Q.  And the rent on that apartment is paid for by the Section 8

23  program.  Is that correct?

24  A.  Yes.

25  Q.  And the Section 8 program is where a person's rent is

1    either subsidized or completely paid for by the City.  Is that

2    correct?

3    A.  Yes.

4    Q.  And in this case, was all of your rent being paid for by

5    the City?

6    A.  No.

7    Q.  How much were you paying?

8          MS. GERACI:  Objection, your Honor.

9          THE COURT:  Sustained --

10         MR. PITTELL:  Actually, I'll withdraw it.  The number

11   is not important.

12         THE COURT:  Sustained.

13   Q.  You were paying a portion and the City was paying a

14   portion.  Is that correct?

15   A.  Yes.

16   Q.  Now when you first moved into this apartment on South Oak

17   Drive, you moved into this one-bedroom apartment by yourself.

18   Is that correct?

19   A.  Yes.

20   Q.  And when you filled out the application for Section 8

21   assistance, you indicated on the apartment that you were

22   seeking a one-bedroom apartment for yourself.  Is that correct?

23   A.  Yes.

24   Q.  And the application actually has a section that inquires as

25   to whether or not an applicant is going to be living by himself

1  or with other people?

2  A.  Yes.

3  Q.  And if other people are going to be living there, the

4  application asks for the names and ages and the employment of

5  other people who are going to be living there?

6  A.  Yes.

7  Q.  But in this case, you were living by yourself, so the

8  application only had your name?

9  A.  Yes.

10 Q.  Now, you know that if someone applies for Section 8 housing

11 and they get a subsidy and then their income situation changes,

12 let's say they get a better job, you're required to notify the

13 Section 8 program about that.  Is that correct?

14         MS. GERACI:  Objection.  Your Honor --

15         THE COURT:  I'll allow this one.  I think I know where

16 it's going.  You can proceed.

17 A.  Yes.

18 Q.  And, likewise, if other people who have jobs move into the

19 apartment, you're required to notify that to the Section 8

20 program.  Is that correct?

21 A.  Yes.

22 Q.  And now at some point you turned the living room in that

23 apartment into a bedroom.  Is that correct?

24 A.  Yes.

25 Q.  And you ended up sleeping in the living room and renting

E99Qdel3                           Accilien - cross

1   out the bedroom?

2   A.  Yes.

3   Q.  And you rented it out to Cut.  Is that correct?

4   A.  To who?

5   Q.  To Cut.

6   A.  No, I -- David was sleeping in the room.

7   Q.  But before David moved in, you had rented it out to

8   somebody else.  Is that correct?

9   A.  They wasn't -- they wasn't living with me; they were just

10  staying in the house.

11  Q.  Before David moved in, isn't it true that you rented out

12  the bedroom?

13  A.  No.

14  Q.  While David was living there, isn't it true that David and

15  Cut were living there with you at the same time?

16  A.  Cut used to stop by.

17  Q.  Isn't it true that when Cut would stop by though, he would

18  pay you $400 a month for rent?

19  A.  No.

20  Q.  Isn't it true that you rented out the bedroom to David?

21  A.  Excuse me?

22  Q.  To David.

23  A.  Yes.

24  Q.  You charged him rent?

25  A.  Yes.

1    Q.  You charged him $400 a month?

2    A.  No.  It was only $200.

3    Q.  You charged him $200 a month?

4    A.  Yes.

5    Q.  And you kept that money yourself.  Is that correct?

6    A.  Excuse me?

7    Q.  You kept the $200?

8    A.  No.  No.  I paid the rent with it.

9    Q.  OK.  You used that to pay your portion of the rent?

10   A.  Yes.

11   Q.  But you never notified the Section 8 program that you were

12   renting out a portion of that apartment to David Delva, did

13   you?

14   A.  I never notified them, but --

15   Q.  That's all I'm asking.  You never notified them that you

16   were renting out the apartment.  Is that correct?

17   A.  Correct.

18   Q.  And you know that you are supposed to do that with the

19   Section 8 program; that if you sublease a portion of your

20   apartment, that you need to let them know that you did that.

21   Is that correct?

22   A.  Correct.

23   Q.  Now, during your meeting with the prosecutors, and they

24   were asking you about other crimes that you had committed, they

25   even asked you about Section 8 housing.  Is that correct?

1    A.  Yes.

2    Q.  And they asked you if you had been truthful in your

3    applications for Section 8 assistance.  Is that correct?

4    A.  Yes.

5    Q.  In fact, in your applications, you were not truthful

6    because you did not disclose the fact that you were subleasing

7    a portion of the apartment.  Is that correct?

8    A.  I -- no, I thought -- I thought when they said that that I

9    wasn't truthful in the application is when they -- I thought

10   they meant that if I was really homeless, if I really needed an

11   apartment around that time.  I thought that's what they meant

12   when they asked me if I was being truthful in the application

13   of getting Section 8.

14   Q.  But you did not tell the prosecutors that you had failed to

15   notify Section 8 about subleasing the apartment.  Is that

16   correct?

17   A.  No.

18   Q.  So, I take it you know now that subleasing a portion of an

19   apartment even if it is only for $200 a month constitutes

20   Section 8 fraud.  Is that correct?

21   A.  Yes, but I didn't lie on the application at first.

22   Q.  OK, but you do know that to subsequently rent it out after

23   you fill out an application is Section 8 fraud?

24   A.  Yes.

25   Q.  And you did not tell the prosecutors about that Section 8

1    fraud when they asked you about your prior crimes?

2    A.  Well, umm --

3    Q.  I'm just asking whether or not you told them about Section

4    8 --

5    A.  Hold on.  Hold on.  I was never given the opportunity to

6    fill out the application to let them know that I had a new --

7    new personnel inside my apartment.  The year haven't ended yet

8    and the application was given to me at the beginning of the

9    year, and David -- and I was arrested before that.

10   Q.  And --

11           THE COURT:  Let him answer.

12   A.  I was arrest -- I was arrested before this application came

13   to my apartment.

14   Q.  My question is though, you did not tell the prosecutors

15   about the Section 8 fraud.  Is that correct?

16   A.  How was it a Section 8 fraud?  I didn't have the

17   opportunity to fill out the application.

18   Q.  I take it that you did not tell the prosecutors --

19           THE COURT:  I think we've been over this.

20           MR. PITTELL:  I'll move on.

21   Q.  During the meetings with the prosecutors, they asked you

22   about your drug use.  Is that correct?

23   A.  Yes.

24   Q.  And you told them you used marijuana.  Is that correct?

25   A.  Yes.

E99Qdel3                        Accilien - cross

1    Q.  But you said you never used crack or heroin or powder

2    cocaine.  Is that correct?

3    A.  No.

4    Q.  Well, I'm asking is that what you told them?

5    A.  Yeah, that's what I told them.

6    Q.  But, in fact, you have used some of those drugs.  Is that

7    correct?

8    A.  No, never, never did.

9    Q.  Isn't it true that in 2008 you tested positive for cocaine?

10   A.  Where -- where's that?

11   Q.  In 2008, were you living in a men's shelter, a VA shelter?

12   A.  Yeah.

13   Q.  And when you were living there, they drug tested you.  Is

14   that correct?

15   A.  No.

16   Q.  When you've been hospitalized, have you been drug tested?

17   A.  Not that I remember.

18   Q.  You don't ever recall being drug tested while you've been

19   hospitalized?

20   A.  No.

21   Q.  Do you recall testing positive one time for the drug

22   methamphetamine?

23   A.  Yes.

24   Q.  Or, actually, it's just amphetamine, not methamphetamine.

25   A.  Excuse me?

E99Qdel3                        Accilien – cross

1    Q.  Do you recall that positive drug test?

2    A.  This happened in the VA Hospital?

3    Q.  Right.  You had a positive drug test for amphetamine?

4    A.  Yes.

5    Q.  So at least in the VA Hospital you've been drug tested?

6    A.  Yes.

7    Q.  And you drug tested positive for marijuana?

8    A.  Yes.

9    Q.  Now, after you were arrested, you've been incarcerated at

10   the Bureau of Prisons.  Is that correct?

11   A.  Yes.

12   Q.  At the MCC jail across the street?

13   A.  Yes.

14   Q.  And there you've met with doctors and psychiatrists.  Is

15   that correct?

16   A.  Yes.

17   Q.  During your meeting there, you told one of your doctors

18   that you're being falsely accused in this case.  Is that

19   correct?

20   A.  If I did, I don't remember.

21   Q.  But that statement to your psychiatrist that this is --

22   this case is a false accusation was a lie.  Is that correct?

23   A.  I don't remember saying that, sir.

24           MR. PITTELL:  Approach the witness, your Honor?

25           THE COURT:  You may.

1          (Pause)

2              MR. PITTELL:  May I approach, your Honor?

3              THE COURT:  You may.

4    Q.  If you could just read this portion and just read --

5              THE COURT:  You need to speak audibly if you're having

6    him review a particular portion of the document.

7              MR. PITTELL:  I'm just directing him to portions of

8    the document I would like him to read.

9              THE COURT:  All right.  Mr. Pittell, do you want to go

10   to another question and then circle back to this so we don't

11   take up too much time as the government reviews things?

12             Mr. Accilien, why don't you put that one to the side

13   for just a moment and then we may come back to that.  But go on

14   to something else --

15   Q.  Actually, did you finish reading the document,

16   Mr. Accilien?

17   A.  Yes.

18             THE COURT:  Is the government ready?

19             MR. POSCABLO:  We haven't seen the document.

20             THE COURT:  Go on to another question and then circle

21   back.

22   BY MR. PITTELL:

23   Q.  Mr. Accilien, after looking at that document, does it

24   refresh your recollection -- well, actually, Mr. Accilien, you

25   were arrested on June 3.  Is that correct?

E99Qdel3                          Accilien - cross

1    A.  Yes.

2    Q.  And then two days later on June 5, you met --

3    A.  June 4.

4    Q.  June 4, OK.  So, the next day you met a psychiatrist on

5    June 5.  Is that correct?

6    A.  Yes.

7    Q.  And that was sort of an initial intake screening by a

8    psychiatrist when you were at the Bureau of Prisons?

9    A.  Yes.

10   Q.  And you told the psychiatrist there that you were sad

11   because you'd been falsely accused and this has never happened

12   to you before?

13   A.  Yes.

14   Q.  And that, of course, is not true.  Is that correct?

15   A.  It's not true, but that -- that wasn't -- that's not when I

16   started my agreement to tell the truth, sir.

17   Q.  I understand that.  So, at the time you feel that you did

18   not have any agreement so that you didn't have to tell the

19   truth.  Is that correct?

20   A.  No, that -- I didn't -- I didn't say that.  I'm just saying

21   that, I mean --

22   Q.  All I'm asking you is, was that statement that you made to

23   your psychiatrist on that day; that was not true.  Is that

24   correct?

25   A.  It was not true.

E99Qdel3                         Accilien - cross

1    Q.  Mr. Accilien, you told us about three robberies that you

2    were involved in.  Is that correct?

3    A.  Yes.

4    Q.  And you were never arrested for any of those robberies.  Is

5    that correct?

6    A.  No.

7    Q.  But during the last ten years, you've been arrested and

8    convicted for a whole variety of offenses.  Is that correct?

9    A.  Yes.

10   Q.  And you've been convicted of at least ten different crimes.

11   Is that correct?

12   A.  Yes.

13   Q.  And you pleaded guilty in almost all -- you've been

14   arrested almost -- you've been arrested over 15 times.  Is that

15   correct?

16   A.  Yes.

17   Q.  In almost every case where you've been arrested, you

18   pleaded guilty.  Is that correct?

19   A.  Yes.

20   Q.  And you pleaded guilty to felony charges?

21   A.  No.

22   Q.  You've pleaded guilty to misdemeanor charges?

23   A.  Yes.

24   Q.  And you've gone to prison for some of these charges?

25   A.  Yes.

1   Q.  And these charges include selling illegal drugs?

2   A.  Yes.

3   Q.  And these convictions are for selling marijuana?

4   A.  Yes.

5   Q.  And these convictions are for selling cocaine?

6   A.  No.

7   Q.  You've never been convicted of selling cocaine?

8   A.  Never.

9   Q.  But you have sold cocaine.  Is that correct?

10  A.  I've sold cocaine before.

11  Q.  And you have been convicted of assault.  Is that correct?

12  A.  Yes.

13  Q.  In 2010, you were arrested for assault --

14  A.  Excuse me.  You're talking about my records, right?

15  Q.  Yes.

16  A.  OK.

17  Q.  In 2010, you were arrested for assaulting a man in Mount

18  Vernon.  Is that correct?

19  A.  Yes.

20  Q.  And you got in a fight with the man and you cut him in the

21  face with a knife.  Is that correct?

22  A.  Yes.

23  Q.  And you went to jail for that.  Is that correct?

24  A.  Yes.

25  Q.  You were convicted of assault in that case?

E99Qdel3                        Accilien - cross

1    A.  Yes.

2    Q.  Assault with a weapon?

3    A.  Yes.

4    Q.  In 2007, you were arrested for robbing someone in a subway

5    station in Queens?

6    A.  Yes.

7    Q.  In that case, you were charged with stealing a PSP from

8    somebody?

9    A.  Yes.

10   Q.  When I say PSP, do you know what a PSP is?

11   A.  Yes, a Play Station.

12   Q.  A Play Station Portable?

13   A.  Portable.

14   Q.  It's a hand-held video game toy?

15   A.  Mmm-hmm.

16           THE COURT:  When you say "mmm-hmm," do you mean yes?

17   A.  Yeah, that means yes.  But that case was dismissed.

18   Q.  OK, well, you were arrested by the police for that case.

19   Is that correct?

20   A.  Yes.

21   Q.  And when the police tried to arrest you, you assaulted the

22   police.  Is that correct?

23   A.  Yes.

24   Q.  And then after the police were actually able to arrest you

25   and took you to the police station, you arrested other police

E99Qdel3                          Accilien - cross

1   officers at the police station?

2   A.  I what?

3   Q.  You arrested more police officers at the police station?

4            THE COURT:  Do you mean to use the word arrested or

5   something else?

6   Q.  I'm sorry.  You assaulted -- you assaulted other police

7   officers at the station?

8   A.  Not that I remember.

9   Q.  But you were charged with assaulting three police officers?

10  A.  Hmm.  OK.

11  Q.  And you -- the reason why you were trying to rob the person

12  of the PSP was because you thought the PSP had a chip in it

13  which was recording your thoughts?

14  A.  I had a brain tumor, sir.

15  Q.  OK.  And the brain tumor caused you to think that the PSP

16  was recording your thoughts.  Is that correct?

17  A.  Yes, sir.

18  Q.  And after you were arrested, you were incarcerated on that

19  case?

20  A.  Yes.

21  Q.  And you were then found unfit to proceed to trial.  Is that

22  correct?

23  A.  Yes.

24  Q.  And you were sent to Mid-Hudson and then Creedmoor

25  Psychiatric Hospitals after you were found unfit to proceed in

1  that case?

2  A.  Yes.

3  Q.  Now, you've also been arrested and convicted of jumping the

4  turnstile in the subways.  Is that correct?

5  A.  Yes.

6  Q.  And you've been convicted of that crime approximately five

7  times.  Is that correct?

8  A.  Yes.

9  Q.  But, I take it you've done it many more than five times.

10  Is that correct?

11  A.  Yes.

12  Q.  And that's because you feel you don't have to pay for the

13  subway?

14  A.  No.  Sometimes I was unemployed at one point in my life,

15  and I was trying to get from one destination to another.  At

16  some point, I was looking for jobs when I was hopping the

17  train.

18  Q.  So, whenever you didn't have any money, you would hop the

19  train?

20  A.  Yes.

21  Q.  And then you've indicated that after you were arrested on

22  June 4, 2013 in this case, you've been in jail ever since and

23  you're currently in jail.  Is that correct?

24  A.  Can you rephrase that, sir?

25  Q.  You were arrested on June 4, 2013 in this case?

E99Qdel3                    Accilien - cross

1   A.  Yes.

2   Q.  And you've been in jail ever since then?

3   A.  Yes.

4   Q.  And while you were in jail, you've even committed a crime.

5   Is that correct?

6   A.  Excuse me?

7   Q.  While you've been in jail, you've committed a crime.  Is

8   that correct?

9   A.  No.

10  Q.  Isn't it true that when you met with the prosecutors, you

11  lied to them and committed what you called the crime of

12  perjury?

13  A.  Oh, OK.

14  Q.  And when you committed that crime of perjury, you were in

15  jail on this particular case?

16  A.  Yes.

17  Q.  Mr. Accilien, you told us on direct examination that you

18  suffer from paranoid schizophrenia?

19          MS. GERACI:  Objection, your Honor.

20          THE COURT:  Sustained.  I think it was slightly

21  different, but why don't you rephrase.

22  Q.  On direct examination, did you tell us that you suffer from

23  schizophrenia?

24  A.  Yes.

25  Q.  And you've had that for over ten years.  Is that correct?

E99Qdel3                        Accilien - cross

1    A.  Seven to eight years.

2    Q.  In 2003, you were in the Army.  Is that correct?

3    A.  Yes.

4    Q.  During that year, you were in Germany?

5    A.  Yes.

6    Q.  While you were there, you got in a fight in a bar and got

7    hit in the head with a pipe?

8    A.  Yes.

9    Q.  And that caused you to lose consciousness?

10   A.  Yes.

11   Q.  Now, at the time in 2003, were you suffering from

12   schizophrenia?

13   A.  Soon -- soon as I left -- soon as I left the Army, I -- I

14   start the having the symptoms.

15   Q.  So your symptoms started after you left the Army?

16   A.  Yes.

17   Q.  But when you got hit in the head with the pipe in 2003, it

18   caused you to lose some consciousness?

19   A.  Yes.

20   Q.  And caused you to suffer a brain injury?

21   A.  It was 2002 it happened.

22   Q.  OK.  In 2002, it caused you to suffer a brain injury.  Is

23   that correct?

24   A.  Yes.

25   Q.  Then what year did you get out of the Army?

E99Qdel3                          Accilien - cross

1    A.   2003.

2    Q.   And then at some point you came back to New York.  Is that

3    correct?

4    A.   Yes.

5    Q.   In 2005 through 2006, you were hospitalized for almost a

6    year?

7    A.   Excuse me?

8    Q.   I'll rephrase the question.  In 2005 and 2006, you were

9    hospitalized in Kings County Hospital for almost a year,

10   weren't you?

11   A.   No, only for three months, sir.

12   Q.   OK.  But that was at Kings County Hospital?

13   A.   Yes.

14   Q.   And that was because you were suffering from paranoid

15   schizophrenia.  Is that correct?

16   A.   Yes, from schizophrenia.

17   Q.   OK.  And then you told us -- at some point you were

18   released from Kings County Hospital?

19   A.   Yes.

20   Q.   And then you've already told us that in 2007 you were

21   arrested for that robbery in Queens?

22   A.   Yes.

23   Q.   In that case, you were sent to Mid-Hudson and then

24   Creedmoor Psychiatric Hospitals.  Is that correct?

25   A.   Yes.

E99Qdel3                          Accilien - cross

1    Q.  And you were in those hospitals for close to a year.  Is

2    that correct?

3    A.  Yes.

4    Q.  And then it was while you were in those hospitals it was

5    discovered that you had a brain tumor?

6    A.  Yes, when I was in Mid-Hudson.

7    Q.  And the brain tumor was removed by surgery.  Is that

8    correct?

9    A.  Yes.

10   Q.  And you have told your doctors that as a result of the

11   surgery to remove the tumor, you had various symptoms.  For

12   example, it caused you to be off balance when you walk

13   sometimes?

14   A.  I mean, I -- it's been awhile.  I don't remember having

15   this conversation, sir.

16   Q.  OK.  Well, is that in fact the case, that since you've had

17   the tumor, there are times when you're off balance?

18            THE COURT:  Starting back then up to the present, or

19   back then?

20   Q.  Yes, any time from the brain tumor surgery to the present,

21   are there times when you've felt you have been off balance?

22   A.  Yes.

23   Q.  And are there times when you've had a lack of

24   concentration?

25   A.  Yes.

E99Qdel3                          Accilien - cross

1   Q.  And there's times when you've had impulse control problems?

2   A.  What was an impulse control?

3   Q.  Where you're unable to control your behavior.

4   A.  Not -- not when I'm medicated sir.

5   Q.  But when you're not medicated, you've had that problem,

6   haven't you?

7   A.  Yes.

8   Q.  And you've told that to your doctors.  Isn't that correct?

9   A.  Yes.

10  Q.  And at some point, you were released from Creedmoor

11  Psychiatric Hospital.  Is that correct?

12  A.  Yes.

13  Q.  And that was in either 2007 or 2008?

14  A.  Yes.

15  Q.  And then towards the end of 2008 in December, you were

16  admitted to New York Presbyterian Hospital.  Is that correct?

17  A.  Yes.

18  Q.  And you were in that hospital for two months?

19  A.  Yes.

20  Q.  And at that hospital you were treated for suffering from

21  paranoid schizophrenia?

22  A.  Schizophrenia, sir.

23  Q.  Just schizophrenia?

24  A.  Yes.

25  Q.  And how long were you in the hospital for that stay?

E99Qdel3                          Accilien - cross

1    A.  I think it was three months also.

2    Q.  And then so you were released at some point in January or

3    February of 2009?

4    A.  Mmm-hmm.

5    Q.  Then later that year during August 2009, you were again

6    admitted to a hospital?

7    A.  What's the name of the hospital?

8    Q.  Montefiore Hospital.

9    A.  Yes.

10   Q.  And how long were you at Montefiore Hospital?

11   A.  I think the whole summer, probably three months also.

12   Q.  While you were there, you were treated for schizophrenia?

13   A.  Yes.

14   Q.  Was it schizophrenia or paranoid schizophrenia?

15   A.  Schizophrenia.

16   Q.  At some point have you been treated for paranoid

17   schizophrenia?

18   A.  Have I been treated for it?

19   Q.  Yes.

20   A.  Not that I know of.

21   Q.  What about at the VA Hospital, are they treating you for

22   schizophrenia or paranoid schizophrenia?

23   A.  No, schizophrenia.

24   Q.  Getting back to Montefiore Hospital, so after you were

25   there for three months and you were released, then

269

E99Qdel3                         Accilien - cross

1    approximately a year later you were arrested on a case where

2    you cut someone with knife in Mount Vernon?

3    A.  Yes.

4    Q.  How long were you in jail on that case?

5    A.  Six months.

6    Q.  Were you in the Westchester County jail?

7    A.  Yes.

8    Q.  Did you get any treatment for schizophrenia while you were

9    in jail there?

10   A.  I don't know if it was for schizophrenia, but they was

11   giving me medication.

12   Q.  It was mental health medication?

13   A.  Yes.

14   Q.  Then after you got out -- in that case, then you got out in

15   April of 2011?

16   A.  Excuse me?

17   Q.  You got out of the Westchester County jail in April of

18   2011?

19   A.  Yes.

20   Q.  And then in April of 2011, you began being treated at the

21   VA Hospital in the Bronx?

22   A.  Yes.

23   Q.  And you were treated there on an outpatient basis?

24   A.  Yes.

25   Q.  And you were treated for schizophrenia there?

E99Qdel3                         Accilien - cross

1    A.  Yes.

2    Q.  And you were treated there starting April 2011 all the way

3    up until the time you were arrested in June of 2013?

4    A.  Yes.

5    Q.  Then since June of 2013, you've been treated by doctors at

6    the Bureau of Prisons?

7    A.  Yes.

8    Q.  And when I say Bureau of Prisons, I mean doctors at the MCC

9    jail.

10   A.  Yes.

11   Q.  And I believe you told us yesterday you were treated for

12   schizophrenia and anxiety?

13   A.  Yes.

14   Q.  And you indicated that you have anxiety because you're

15   worried that you could spend the rest of your life in jail?  Do

16   you recall giving that testimony yesterday?

17   A.  Who said that, sir?

18   Q.  I'm asking if you recall saying that yesterday.

19   A.  I said that I had anxiety.  I never said anything the

20   reason I was having it, sir.

21   Q.  Are you worried you could spend the rest of your life in

22   jail?

23   A.  Am I worried about that?

24   Q.  Yes.

25   A.  Yes, I am worried about it, but that wasn't --

E99Qdel3                        Accilien - cross

1    Q.  And is that a cause of your anxiety, that worry?

2    A.  No, it's not the cause of my anxiety.

3    Q.  So, there are other things besides that which are causing

4    anxiety?

5    A.  Yes.

6    Q.  One of the symptoms you've experienced from your

7    schizophrenia is that you have auditory hallucinations?

8    A.  Yes.

9    Q.  When I say auditory hallucinations, you understand that to

10   mean that you hear things that aren't really there?

11   A.  Yes.

12   Q.  And you have had these auditory hallucinations since --

13   well, did you have them while you were in the Army in 2002 and

14   2003?

15   A.  No.

16   Q.  So you began to have them when you were in Kings County

17   Hospital or right before then?

18   A.  Kings County.

19   Q.  So that would have been sometime in 2004, 2005

20   approximately?

21   A.  That started but after I got medicated, I was good; I

22   wasn't going through any problems.

23   Q.  Well, I'm talking about when you're not medicated.

24   A.  Yes.

25   Q.  So when you have auditory hallucinations, you hear voices.

E99Qdel3                          Accilien - cross

```
 1   Is that correct?

 2   A.  Yes.

 3   Q.  And these voices tell you to do things sometimes.  Isn't

 4   that correct?

 5   A.  I mean, they probably do, but I ignore them.

 6   Q.  But they do tell you to do things?

 7   A.  Yes.

 8   Q.  And sometimes these voices curse at you?

 9   A.  Yes.

10   Q.  And when I say curse, they use the F word or other

11   inappropriate language at you.  Is that correct?

12   A.  Yesterday.

13   Q.  Now, you indicated that you started going to the VA

14   Hospital in April of 2001 after you got out of the Westchester

15   County jail?

16   A.  Yes.

17           THE COURT:  2001?

18   Q.  I'm sorry, 2011.

19           THE COURT:  Why don't you restate the question.

20   Q.  So you indicated that after you got out of the Westchester

21   County jail in April of 2011, you started being treated at the

22   VA Hospital?

23   A.  Yes.

24   Q.  And you were treated by a psychiatrist at that hospital?

25   A.  Excuse me?
```

 1  Q.  You would meet with a psychiatrist at that hospital?

 2  A.  Yes.

 3  Q.  And you would talk to that psychiatrist?

 4  A.  No, I -- I don't think I met with a psychiatrist.  I spoke

 5  to a -- a mental health doctor.

 6  Q.  OK.  So when you spoke with that mental health doctor, do

 7  you recall telling that doctor during September of 2011 that

 8  you were hearing voices that month?

 9  A.  The month of -- which month?

10  Q.  September of 2011.

11  A.  No, I -- I don't -- I don't -- I don't remember saying that

12  to him.

13  Q.  During the entire time that you were seeing doctors or

14  mental health doctors at the VA Hospital, did you ever tell

15  them that you were hearing voices?

16  A.  At one point, yeah, but it -- not in September.

17  Q.  What about in January of 2012?  Did you tell them in

18  January 2012 that you were hearing voices calling your name?

19  A.  Not that I remember, sir.

20  Q.  What about in May of 2012, do you recall telling them that

21  you were hearing voices which were cursing at you and telling

22  you to run away?

23  A.  Not that I remember, sir.

24  Q.  So, I take it you don't remember these specific ones that

25  I've asked you about, but there are instances where you told

E99Qdel3                         Accilien - cross

1    people at the VA Hospital that you were hearing voices?

2    A.  Yes, but -- and --

3    Q.  That's all.  I'm just asking whether or not --

4    A.  They would just higher the dose of my medication, and I

5    would feel good afterwards.

6    Q.  But there was more than one instance when you told them

7    that you were hearing voices.  Is that correct?

8    A.  Yes, and they treated me for it each time.

9    Q.  Now, after you were arrested in this case, when you were at

10   the MCC, did you meet with a psychiatrist or a mental health

11   doctor there?

12   A.  Yes.

13   Q.  When you first arrived at the jail in June of 2013, you

14   told the psychiatrist that you're hearing voices?

15   A.  Yes.

16   Q.  And you told the psychiatrist that the voices are telling

17   you to hurt yourself?

18   A.  Yes.

19   Q.  And you told the psychiatrist that the voices are telling

20   you to actually hurt the prosecutors?

21   A.  Where you getting this document from, sir?

22   Q.  I will first ask you if you recall saying this?

23   A.  No, I never said that, sir.

24   Q.  We'll come back to that in a moment, Mr. Accilien.  Let me

25   ask you another question.  Do you recall recently during this

1    past May or June of 2013 that you told the psychiatrist or a

2    mental health doctor at the Bureau of Prisons that you're

3    hearing voices which are saying "fuck you guys" to you?

4    A.  Fuck you who?

5    Q.  Fuck you guys.

6          THE COURT:  Let me just get a clarification.  You've

7    given two different time frames in that question.  Why don't

8    you restate the question so we can get a single time frame.

9    Q.  Do you recall during May or June of 2014 that you told a

10   psychiatrist or mental health doctor that you're still

11   experiencing auditory hallucinations and that you heard a voice

12   saying "fuck you guys"?

13   A.  Yes.

14   Q.  So, now you indicated that a year earlier during June 2013

15   you do you recall telling a psychiatrist or mental health

16   doctor that voices are telling you to hurt yourself?

17   A.  Not that I remember, sir.

18   Q.  Now, another symptom of your schizophrenia is sometimes you

19   have visual hallucinations?

20   A.  Yes.

21   Q.  And you call those illusions.  Is that correct?

22   A.  Yes.

23   Q.  And that they are illusions because you see things which

24   are not there?

25   A.  Yes.

1    Q.  Another symptom of your schizophrenia is that it sometimes

2    causes you to become violent and you can't control the

3    violence?

4    A.  Is that one of my symptoms, sir?

5    Q.  I'm asking you, has your schizophrenia caused you to become

6    uncontrollably violent?

7    A.  No.

8    Q.  Has it ever caused you -- but you've indicated in the past

9    that you've assaulted people.  Is that correct?

10   A.  Excuse me?

11   Q.  You've indicated that you have assaulted people in the

12   past?

13   A.  Yes.

14   Q.  And there are times when you've assaulted people but you

15   did not mean to do it.  Is that correct?

16   A.  No.

17   Q.  So, all the times that you've assaulted people, you've

18   intended to assault them?

19   A.  Yes.

20   Q.  Have there ever been times when your schizophrenia has

21   caused you to lose your self-control and attack people?

22              MS. GERACI:  Objection, your Honor.

23              THE COURT:  Hold on.  Let me just read this.

24   A.  Rephrase that, sir?

25              THE COURT:  Why don't you rephrase?  I think you've

E99Qdel3                              Accilien - cross

1    got an extra word or two in there.

2    Q.  Has there ever been a time when your schizophrenia has

3    caused you to lose your self-control and attack people?

4    A.  Not -- not that I know of, sir.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. PITTELL:

2    Q.  Well, what about when you were arrested in 2007 on that

3    case in Queens.  I am talking about the case where you were

4    sent to Creedmoor and Mid Hudson?

5    A.  I had a brain tumor, sir.

6    Q.  Well, did your brain tumor cause you to assault the person

7    at the train station?

8    A.  Yes.

9    Q.  And it was your brain tumor that caused to you fight with

10   the police officers?

11   A.  Yes.

12   Q.  Now, we've just gone through a whole list of hospitals that

13   you have been in, Kings County Hospital, Montefiore Hospital,

14   New York Presbyterian Hospital.  Isn't it true that sometimes

15   when you have been in those hospitals you have assaulted fellow

16   patients?

17   A.  That I what?

18   Q.  What you've assaulted fellow patients?

19   A.  Yes.

20   Q.  And sometimes you've assaulted the staff who works at these

21   hospitals?

22   A.  No.

23   Q.  You never assaulted the staff?

24   A.  No.

25   Q.  You've only assaulted the patients?

E99AADEL4                    Accilien - Cross

1   A.  Yes.

2   Q.  Did you mean to attack these patients in the hospital?

3   A.  The patient was bothering me, sir.

4   Q.  So the patient was bothering you so that's why you fought

5   with the patient?

6   A.  Yes.

7   Q.  At times when have you not been in hospitals you lived in a

8   VA shelter; is that correct?

9   A.  Yes.

10  Q.  And sometimes when you've lived there you've assaulted the

11  residents at the VA shelter?

12  A.  No.

13  Q.  Have you ever gotten in a fight with the residents at the

14  VA shelter?

15  A.  Hold on.  Yeah, I did one time.

16  Q.  And have you ever gotten in a fight with the staff at the

17  VA shelter?

18  A.  No.

19  Q.  Now, you've told us a couple times about a fight that you

20  got in in Mount Vernon when you stabbed a man in the face.  You

21  did that because you were paranoid and that he was talking to

22  another woman about you; is that correct?

23  A.  No.

24  Q.  Was the fight over another woman?

25  A.  Yes, it was.

1    Q.  And did you intend to attack that man with a knife?

2    A.  Yes.

3    Q.  It was not based upon your schizophrenia?

4    A.  No.

5    Q.  Now, you indicated that you one time got in a fight with

6    someone at the VA shelter?

7    A.  Yes.

8    Q.  And the police were called?

9    A.  Yes.

10   Q.  And the police took you.  That's when you were taken to New

11   York Presbyterian hospital; is that correct?

12   A.  No.  I didn't get in a fight that time.  I got arrested for

13   fighting in the VA shelter because a white guy was calling me

14   "nigger" in the cafeteria.

15   Q.  So, but when you were taken to the Columbia Presbyterian

16   Hospital were you living at the VA shelter at that time?

17   A.  Yes.

18   Q.  And the police had to take you from the shelter to the

19   hospital?

20   A.  Yes.

21   Q.  And that's because somebody at the shelter called 911 on

22   you?

23   A.  Yes.

24   Q.  And they called 911 because you were acting violent towards

25   the residents there at the shelter?

E99AADEL4                          Accilien - Cross

1    A.  No.  I was about to get into a fight but the fight never

2    occurred.

3    Q.  So that's why they called 911 because you were about to get

4    into the fight?

5    A.  Yes.

6    Q.  And then after you were taken to Columbia or to New York

7    Presbyterian Hospital you told us that you were there for about

8    three months?

9    A.  Yes.

10   Q.  And you were treated for schizophrenia?

11   A.  Yes.

12   Q.  And while you were there isn't it true that you told your

13   doctors there that when you looked at the color yellow it

14   burned your eyes?

15   A.  Yes.

16   Q.  And you told them that you saw somebody one time that was

17   wearing a yellow hat which burned your eyes?

18   A.  Yes.

19   Q.  And you told them that one time you went to a Best Buy

20   store and the employees were wearing yellow shirts and those

21   yellow shirts burned your eyes?

22   A.  Yes.

23   Q.  And then while you were in the hospital you got in a fight

24   with a patient at the hospital, is that right?

25   A.  That's because the patient was bothering me, sir.

1   Q.  And this patient was wearing a yellow shirt with the

2   "University of Michigan" name written on it; is that correct?

3   A.  No.

4   Q.  Was he wearing a yellow shirt?

5   A.  Not that I remember, sir.

6   Q.  Do you remember if he was wearing a Michigan University

7   shirt?

8   A.  No.

9   Q.  But did you get in a fight with a patient that was

10  bothering you?

11  A.  Yes.

12  Q.  Now, while you were at New York Presbyterian Hospital you

13  told them that you take some pills which help you increase your

14  sexual performance?

15          MS. GERACI:  Objection, judge.

16          THE COURT:  Well, I'm just not really sure where it's

17  going, so I am trying to think of the various potential options

18  while I am waiting.  I'll allow one more question so you can

19  answer that "yes" or "no".

20          THE WITNESS:  Can you rephrase that question, sir?

21  Q.  When you were -- let me ask you it in a different way.

22  When you were at New York Presbyterian Hospital, isn't it true

23  that you told them that you used three different types of sex

24  pills?

25  A.  No.

1          MS. GERACI:  Objection, judge.

2   Q.  Did you tell them that you used sex pills?

3   A.  No.

4   Q.  After you got out of New York Presbyterian Hospital you

5   indicated that you were then taken to or later that year you

6   went to Montefiore Hospital for three months?

7   A.  Yes.

8   Q.  And you were brought there by your girlfriend, and you were

9   brought there because you were vomiting?

10  A.  Yes.

11  Q.  And you were brought there because you were acting violent?

12  A.  No.

13  Q.  And you were brought there because you ran out of

14  medication?

15  A.  Yes.

16  Q.  And the medication was the medication used to treat

17  schizophrenia?

18  A.  Yes.

19  Q.  And what is that medication?

20  A.  Excuse me?

21  Q.  What the name of the medication that you take to treat your

22  schizophrenia?

23          THE COURT:  Now or at that time?  I don't know if

24  there's a difference.  I am just trying to get a timeframe.

25          MR. PITTELL:  All right.

E99AADEL4                    Accilien - Cross

1   Q.  Well, at that time when you were being admitted to

2   Montefiore Hospital do you recall what kind of medication you

3   ran out of?

4   A.  Risperdal.

5   Q.  And you've taken Risperdal for many years; is that correct?

6   A.  Yes.

7   Q.  And one of the things that you don't like about -- well,

8   are there -- does the Risperdal have effects on you that you

9   don't like?

10  A.  Yes.  That's why I stopped taking it and I am taking Invega

11  now.

12  Q.  And the Invega, is that the drug that you take by injection

13  every month?

14  A.  Yes.

15  Q.  And the Risperdal was a pill that you to take everyday?

16  A.  Yes.

17  Q.  And one of the side effects of Risperdal was that you

18  indicated it decreases your ability to concentrate while you

19  were having sex?

20          MS. GERACI:  Objection, judge.

21  A.  No, I never said that.

22          THE COURT:  Overruled.  I am going to see where this

23  goes.

24  Q.  Did the Risperdal ever affect your sexual function?

25  A.  No.

E99AADEL4                    Accilien - Cross

1   Q.  You never said that to any of your doctors?

2   A.  Not that I remember, sir.

3           MS. GERACI:  Objection, judge.

4           THE COURT:  Let me just have a sidebar.

5           (Continued on next page)

1          (Sidebar)

2          THE COURT:  I assume that where you are going to is

3     that the witness as motivated to stop using Risperdal as a

4     result of the symptoms; is that what you are getting at?

5          MR. PITTELL:  The records are full of references to

6     him taking sex drugs and he was taking that because the

7     Risperdal affected his sexual function.

8          THE COURT:  So where is that going?

9          MR. PITTELL:  Well, I think it's a fair line of

10    inquiry and given that the victim is going to testify about a

11    sexual assault and then in my opening statement I accused him

12    of being a participant.

13         THE COURT:  How does the Risperdal decreasing his

14    sexual function have any logical relationship to the sexual

15    assault?

16         MR. PITTELL:  Because he was taking sex enhancement

17    medication then and up through the time of the incident.

18         THE COURT:  OK.  Well, then not taking -- so, OK.

19    There's not a connection right now between taking the sexual

20    enhancement drugs and increasing the -- for sex drive versus

21    your ability to perform shall we say and so I am not really

22    sure about the connection yet.

23         MR. PITTELL:  I'll move on to another line of inquiry.

24    I think maybe may become relevant and if so --

25         THE COURT:  So go back.

```
 1              (In Open Court)
 2    BY MR. PITTELL:
 3    Q.  Mr. Accilien, we were at the point where we were talking
 4    about when you were at Montefiore Hospital.  Just so we're
 5    clear, you were there for approximately three months; is that
 6    correct?
 7    A.  Yes.
 8    Q.  And when I say "there" you were an in-patient, you were
 9    admitted to the hospital for three months?
10    A.  Yes.
11    Q.  And isn't it true that while you were there you got in a
12    fight with a patient?
13    A.  Yes.
14    Q.  And in fact you got in a fight with more than one patient?
15    A.  Yes.
16    Q.  And you got in a fight with one patient who you thought
17    that patient was a cop?
18    A.  Yes.
19    Q.  And you got in a fight with another patient who was using a
20    PSP device?
21    A.  Yes.
22    Q.  And you got in a fight with that patient because you
23    thought the PSP device was recording your brain activity?
24              MS. GERACI:  Judge, asked and answered.
25              THE COURT:  I think it was a different moment in time.
```

1          MR. PITTELL:  This is a different moment.  I'll allow

2     it.

3     A.  Not that I remember, sir.

4     Q.  But the fight was because of a chip that you were concerned

5     about within the PSP; is that correct?

6     A.  No.

7     Q.  But the fight was related to PSP?

8     A.  No.

9     Q.  So the patient had the PSP and you got into in a fight with

10    the patient who had a PSP?

11    A.  I got into a fight with the patient because the patient was

12    bothering me, sir.

13    Q.  But the patient that was bothering you had a PSP?

14    A.  Yes.

15    Q.  And that was while you were in the hospital?

16    A.  Excuse me?

17    Q.  Those two fights that you just told us about occurred while

18    you were in the hospital?

19    A.  Yes.

20    Q.  And while you were in Montefiore Hospital were you still

21    taking the Risperdal or had you switched to the Invega

22    injections?

23    A.  No.  I was still taking it.

24    Q.  You were still taking which one?

25    A.  Risperdal.

1   Q.   OK.  So those fights occurred while you were in the

2   hospital taking Risperdal?

3   A.   Um-hmm, yep.

4   Q.   And is that a "yes"?

5   A.   Yes.

6   Q.   When did you start taking the Invega?

7   A.   I started taking the Invega after I came out of prison in

8   Westchester County.

9   Q.   When you were going to see the VA doctors?

10  A.   Yeah, the VA doctors.

11  Q.   But while you were in the Montefiore hospital you also in

12  addition to getting in fights with patients got into fights

13  with staff members; is that correct?

14  A.   Yes.

15  Q.   And at some point you even had to be isolated; is that

16  correct?

17  A.   Yes.

18  Q.   And in fact it wasn't just Montefiore where you were put in

19  isolation.  When you were at New York Presbyterian you had to

20  be put into isolation?

21  A.   Yes.

22  Q.   And the isolation was because of the fighting; is that

23  correct?

24  A.   Yes.

25  Q.   And while you were at Montefiore Hospital you discussed

1    this fighting with the mental healthcare doctors; is that

2    correct?

3    A.   Not really.

4    Q.   Well, do you recall telling the doctors that you don't know

5    why you were acting violent towards other patients?

6    A.   No.

7    Q.   Did the doctors -- do you recall the doctors asking you why

8    you were getting into these fights and had to be isolated?

9    A.   No, I don't remember.

10   Q.   Now, while you were at Montefiore Hospital you were -- when

11   you were at least initially admitted you were drug tested; is

12   that correct?

13   A.   Where?

14   Q.   Montefiore.

15   A.   Yes.

16   Q.   And you tested positive for marijuana?

17   A.   Yes.

18   Q.   And the doctor told you that you have to stop smoking

19   marijuana?

20   A.   Yes.

21   Q.   And he told you that because it can worsen your

22   schizophrenia?

23   A.   Yes.

24   Q.   And it's not just the doctors, other doctors besides the

25   doctors at Montefiore have told you that you can't smoke

1    marijuana with your condition; is that correct?

2    A.  Yes.

3    Q.  Your doctor at the VA Hospital who you've seen since 2011

4    has told you that; is that correct?

5    A.  Yes.

6    Q.  And the doctors at New York Presbyterian Hospital have told

7    you you can't smoke marijuana because it worsens your

8    condition?

9    A.  Yes.

10   Q.  And they've told you that with your schizophrenia by

11   smoking marijuana it can cause you to experience paranoia?

12   A.  Yes.

13   Q.  And even though the doctors have told you for years and

14   years that you can't smoke marijuana you still smoke marijuana;

15   is that correct?

16   A.  Once in a while, sir.

17   Q.  And on the night of the September robbery you smoked

18   marijuana on that night, didn't you?

19   A.  Excuse me?

20   Q.  The night of the September robbery, the one that you've

21   testified in this case --

22   A.  Yes.

23   Q.  I am sorry?

24   A.  Yes.

25   Q.  You smoked marijuana with your brother and Trevor Cole

E99AADEL4                     Accilien - Cross

1   while the three of you were in the apartment; is that correct?

2   A.   Yes.

3   Q.   And that was the time that the woman was tied up in the

4   bedroom; is that correct?

5   A.   Yes.

6   Q.   Now, while you were at Creedmoor Hospital you engaged in

7   sexually inappropriate behavior; is that correct?

8   A.   What?

9   Q.   While you were at Creedmoor Hospital did you engage in

10  sexually inappropriate behavior?

11  A.   No.

12  Q.   While you were at Creedmoor Hospital did you attempt to

13  pull the pants down of other patients?

14  A.   No.

15  Q.   While you were at Creedmoor Hospital did you take your

16  shirt off, pinch your nipples and point the finger at other

17  patients?

18  A.   No.

19  Q.   Do you recall doing that?

20  A.   No, I don't recall doing that.

21  Q.   And did you tell a therapist there that you wished to put

22  your foot up the therapist's ass?

23  A.   No, I never said that.

24  Q.   When you were taking your Risperdal there were times when

25  you stopped taking it; is that correct?

1   A.  Yes.

2   Q.  And you stopped taking it because you did not like the side

3   effects of that medication?

4   A.  Yes.

5   Q.  And because you stopped taking it that's why the doctors

6   switched over to giving you the injection of the Invega?

7   A.  Yes.  No.  I think the doctor kind of like thought that

8   Invega would be a better medication for me than the Risperdal.

9   Q.  Just in terms of the way it's administered to take it was

10  easier to get an injection once a month as opposed to taking

11  pills everyday?

12  A.  Yes.

13  Q.  But other than the convenience though, part of the reason

14  why you stopped taking the Risperdal was because you did not

15  like the side effects?

16  A.  I remember mostly the reason why I stopped the Risperdal

17  was because at times I would forget to take my medication and I

18  was better to have taking the once a month where I don't have

19  to worry about taking my medication everyday.

20  Q.  But the Risperdal did affect your sexual function; is that

21  correct?

22          MS. GERACI:  Objection, your Honor.

23          THE COURT:  Overruled.

24  A.  Not that I remember, sir.

25  Q.  And what about the Invega, does that -- did that affect

1   your sexual function?

2              MS. GERACI:  Same objection.

3              THE COURT:  Sustained.

4   Q.  When you were at the VA Hospital isn't it true that you

5   told your doctor that the Invega injections are reducing your

6   ability to have sex?

7   A.  Where was this?

8   Q.  While you were at the VA Hospital getting the Invega

9   injections.

10  A.  Yes, but they gave me medication for that.

11  Q.  They gave you Viagra?

12  A.  Yes.

13  Q.  And they started giving you Viagra during June of 2012?

14  A.  Yes.

15  Q.  And you continued to take the Viagra from June in 2012 all

16  the way up until your arrest in June of 2013?

17  A.  Yes.  But they only gave me two Viagras a month.

18  Q.  But they did give you the Viagra throughout that entire

19  period?

20  A.  Yes.

21  Q.  And the reason why you got the Viagra was because you felt

22  the Invega was causing you to have erectile dysfunction?

23  A.  Yes.

24  Q.  I just want to go back to what you indicated the doctors at

25  Montefiore had told you about not smoking marijuana.  Just so

1    we're clear, when you were going to the VA Hospital you were

2    being drug screened; is that correct?

3    A.  Yes.

4    Q.  And you repeatedly tested positive for marijuana there?

5    A.  Yes.

6    Q.  And your doctors there at the VA Hospital told you that you

7    must stop smoking marijuana?

8    A.  Yes.

9    Q.  And they told you that it could make you paranoid?

10   A.  I don't particularly remember if they said that but they

11   said that it wasn't a good mixture with medication.

12   Q.  But it's also not a good mixture with schizophrenia, they

13   told you that as well?

14   A.  Yes.

15           THE COURT:  Haven't we have been down this exact line

16   a few minutes ago?  Am I misremembering something?

17           MR. PITTELL:  I am just clarifying that this is what

18   doctors at the VA Hospital told him.

19           THE COURT:  I think you did both of them before but go

20   ahead, just a couple more.

21   Q.  Just so we're clear, you ignored their advice and continued

22   to smoke marijuana?

23   A.  Yes.

24   Q.  Now, along with marijuana you also sometimes tested

25   positive for drinking alcohol?

1    A.   No.

2    Q.   But did you drink alcohol?

3    A.   Yes.

4    Q.   And the doctors also told you not to drink alcohol?

5    A.   I had the doctor tell me I could drink a little bit

6    sometimes.

7    Q.   But they told you they were concerned that the alcohol

8    could also create problems with your medication?

9    A.   Yes.

10   Q.   And the mixture of alcohol and the schizophrenia could

11   cause problems?

12   A.   Yes.

13            THE COURT:  Ladies and gentlemen, while we're pausing

14   here I just want to let you have a sense of timing and

15   typically we'll take lunch at 12:45 and then you'll be off and

16   start up again at two.  Is that all right for people?  Can I

17   get some nods of the head?  Terrific.  Thank you.

18            So, Mr. Pittell, you've got about 16 or 17 minutes.

19            MR. PITTELL:  All right.

20   Q.   Mr. Accilien, the September robbery that you testified

21   about, just so we are clear, do you know whether it was on

22   Labor Day of 2012?

23   A.   Do I know?

24   Q.   Yes.  Do you recall whether or not it was Labor Day, that

25   weekend?

E99AADEL4                        Accilien – Cross

1    A.  Yes, I remember it was Labor Day.

2    Q.  It was September 2012 Labor Day weekend?

3    A.  Yes.

4    Q.  Mr. Accilien, are you originally from the United States?

5    A.  Yes.

6    Q.  What about your parents, are they originally from the

7    United States?

8    A.  No.

9    Q.  What country are they from?

10   A.  Haiti.

11   Q.  Is there a Haitian community in New York City?

12   A.  Yes.

13   Q.  And every year on Labor Day is there any event which is a

14   celebration that the Haitian community takes part in?

15   A.  Yeah, the Labor Day parade in Brooklyn.

16   Q.  Is that also sometimes called the West Indian Day parade?

17   A.  Yes.

18   Q.  And it's called the West Indian Day parade because many

19   West Indian countries participate in that parade?

20   A.  Yes.

21   Q.  Countries such as Jamaica, Haiti, Dominican Republic,

22   Trinidad?

23   A.  Yes.

24   Q.  And so on.  And that parade is held every year on Labor

25   Day?

E99AADEL4                    Accilien - Cross

```
 1   A.  Yes.

 2   Q.  And on the Monday which is Labor Day?

 3   A.  Yes.

 4   Q.  And you say it's in Brooklyn.  It is on Eastern Parkway in

 5   Brooklyn; is that correct?

 6   A.  Yes.

 7   Q.  In the Crown Heights neighborhood of Brooklyn?

 8   A.  It passes by a few neighborhoods.

 9   Q.  Is Crown Heights one of the neighborhoods, if you know?

10   A.  Not that I know.

11   Q.  But this is a -- I take it that this is a large -- this a

12   huge event; is that correct?

13   A.  Excuse me?  Yeah, it's a huge event.

14   Q.  It's a massive celebration for really the entire West

15   Indian community in New York City?

16   A.  Yeah.

17   Q.  And on the day of the parade the section of Eastern Parkway

18   where there is a parade route is shut down for almost the

19   entire day; is that correct?

20           MS. GERACI:  Objection, your Honor.

21           THE COURT:  Hold on.

22   A.  I am not sure, sir.

23           MR. PITTELL:  Actually, judge, I'll withdraw the

24   question.

25           THE COURT:  All right.
```

1    Q.  Have you ever attended the parade, Mr. Accilien?

2    A.  Yes.

3    Q.  How many times have you attended the parade?

4    A.  Just one time.

5    Q.  And at one time that you attended the parade did you --

6    were you on Eastern Parkway in Brooklyn?

7    A.  I was on Parkside Avenue.

8    Q.  Did the parade go down Parkside Avenue?

9    A.  Around that area, yeah.

10   Q.  Parkside Avenue, do you know what the cross street was?

11   A.  No.

12            THE COURT:  I need you to connect this up.

13            MR. PITTELL:  I can give you an offer of proof, your

14   Honor.

15            THE COURT:  Let's not do it right now.  Do you have

16   something else you can do?

17            MR. PITTELL:  I picked this line of inquiry because I

18   thought we could finish by the break.

19            THE COURT:  Why don't you go ahead and start the next

20   line.  I don't want to break now because I want to use the time

21   but I need to know more about that line before we continue.

22   Q.  Mr. Accilien, do you recall earlier today I was asking you

23   questions about all your prior arrests and all your prior

24   convictions?

25   A.  Yeah.

E99AADEL4                    Accilien - Cross

1    Q.  Isn't it true, Mr. Accilien, that there was actually one

2    time when you were arrested and you were falsely accused of

3    committing a crime?

4    A.  Not that I remember, sir.

5    Q.  Well, were you arrested during October of 2012?

6    A.  Oh, yeah, yes.

7    Q.  And that was just a month after the Labor Day robbery that

8    you testified about in this case; is that correct?

9    A.  Yes.

10   Q.  And in that case you were arrested and charged with bank

11   robbery?

12   A.  Bank robbery?

13   Q.  Bank robbery?

14   A.  No.

15   Q.  Well, you were arrested and charged with robbery; is that

16   correct?

17   A.  Yes.

18   Q.  And after you got arrested you were actually in jail for a

19   while; is that correct?

20   A.  Yes.

21   Q.  And you had a lawyer in that case and you had to go to

22   court; is that correct?

23   A.  Yes.

24   Q.  And at some point you learned that you were arrested

25   because someone picked you out of a photo lineup?

1    A.   Yes.

2    Q.   And, apparently, that person was a witness or a victim of

3    the robbery?

4              MS. GERACI:   Objection, your Honor.

5              THE COURT:   Sustained.   We'll have to take this up

6    again at 1:45.   Are you out of things?   Why don't we break

7    early if you need to make a proffer on that as well.   So I am

8    convinced.   I don't want to waste your time if we are going to

9    be going -- I don't want to make you folks wait, ladies and

10   gentlemen of the jury, while we go over some matters and I

11   don't want to keep on interrupting counsel's line of inquiry

12   that he wants to pursue.   So I want to figure you out with him

13   what the situation is.

14             So I am going to let you folks go to lunch a little

15   earlier.   So let's start at ten minutes to two.   Is that all

16   right or do you people have appointments?   Is that OK?

17   Terrific.   So we'll start again at ten minutes to two.   Thank

18   you.   Remember not to talk about this case with anybody

19   including to each other.   Thank you.

20             (Jury not present)

21             THE COURT:   All right.   Mr. Accilien, why don't you

22   step down, sir.   Take your lunch break.

23             We are going to start, Mr. Marshal, at ten minutes to

24   two, so if he could be on the witness stand by about a quarter

25   of or a minute or two before that.

1          (Witness not present)

2          THE COURT:  Let's all the rest of us be seated.

3          That last line of inquiry I just want to know when we

4    start there where are we going there because without having a

5    proffer on it it could be dangerous or not but I don't know

6    where it's going.

7          MR. PITTELL:  Where I am going with that is I plan to

8    establish that Mr. Accilien was arrested and falsely accused of

9    a robbery case and from that experience he learned that by

10   making a false accusation can cause someone to go to jail.

11         THE COURT:  I will preclude that line of inquiry.

12   There had been an objection.  That line of inquiry treads on a

13   variety of issues, one of which is obviously it's inviting

14   juror nullification through the potential for a false

15   accusation here.  There's no indication there.  I mean that

16   there's a necessary connection between the two.  So I am going

17   to preclude that line.

18         Also, I think that you had gone into a victim

19   suggesting that Mr. Accilien had been, that she wrongly or he

20   wrongly identified Mr. Accilien from a photo array.  That also

21   treads.  I think it's confusing and misleading to the jury in

22   terms of ways in which it could bleed over into inappropriate

23   areas in this case.

24         Does the government want to add anything because I

25   should articulate this better but I'll think about it at the

1    break.

2            MS. GERACI:  The government would just move to strike

3    the portions of the record that include these lines of

4    questions.

5            THE COURT:  On what basis?

6            MS. GERACI:  The government echoes what your Honor

7    just said.

8            THE COURT:  Do you have any additional ideas?

9            MS. GERACI:  There's really no relevance.  That's the

10   main objection.

11           THE COURT:  How about responsive to what Mr. Pittell

12   is saying?  Mr. Pittell is suggesting that the concept of false

13   accusation could be useful and that that was learned in that

14   prior situation.

15           Is that, Mr. Pittell, essentially --

16           MR. PITTELL:  Yeah.  And I think the timing is

17   significant too because it was after the robbery and it was

18   before he was arrested and this is something he came to

19   realize.  Obviously, my defense is that he is making a false

20   accusation.

21           THE COURT:  I understand.  The concept of making a

22   false accusation is not something that you need to have been

23   arrested in order to understand.  So you can make a point by

24   the way without going into this.  The line of inquiry doesn't

25   go to a propensity or willingness to himself lie or testify

1   falsely.  It doesn't go to his bias.  It doesn't go to his

2   credibility.  So you are trying to use it almost as a quasi

3   expert psychological line of questioning in terms of what could

4   motivate somebody.  And in that regard it's inappropriate.  I

5   think that's a better articulation of the Court's view.

6        I am going to ask the government -- we're going to go

7   over some other matters -- whether or not at the conclusion

8   since this line of inquiry has not really been developed

9   whether you really want me to go back on the record and draw

10  attention to it.  That will be up to you.  You can tell me

11  either now or you can tell me at the end of lunch.

12        MS. GERACI:  Your Honor, I've just conferred and it

13  seems we don't want to go back.

14        THE COURT:  So we'll just leave at no time.  The way I

15  left it with the jury is I want to inquiry further into it.

16        Other issue that I wanted to figure out is Eastern

17  Parkway and Labor Day, tell me about that.  I was allowing some

18  because I thought you had a timeframe relating to Labor Day or

19  something el else.  What I don't want you to do is use

20  Mr. Accilien to lay the foundation for somebody else's

21  testimony insofar as it's outside the scope of direct.  If it's

22  inside the scope of the direct, it's free game.  But if it's

23  outside you can't just use him for his knowledge of the Haitian

24  Day Parade.

25        MR. PITTELL:  It's obviously outside the scope of the

1    direct.  And I mean basically I'm using him as my witness to

2    lay a brief foundation about, to corroborate the fact that he

3    knows about the parade and that Mr. Delva has gone to the

4    parade in the past.  I guess you I could call him if I put on

5    my defense case maybe I'll reserve the right to call him as my

6    own witness.

7              THE COURT:  Then the question will be relevance as to

8    this case as to versus the possibility of the fact that he

9    happens to know generally speaking that somebody had gone to X,

10   Y or Z.  What we don't want to do is inadvertently make

11   Mr. Accilien into a.witness who will be giving testimony as to

12   where Mr. Delva was or was not on a particular day unless he

13   has particular information in that regard, so let's just say

14   sufficient unto the day.

15             Unless you have information that Mr. Accilien went to

16   the parade with Mr. Delva on the weekend in question, had plans

17   to go to the parade that were interrupted by the events in

18   question something in that nature, you need to tie it into the

19   September 2012 parade.

20             MR. PITTELL:  Well, I was going to ask questions that

21   did tie it into that, the actual parade.  I mean, look, so the

22   questions I was originally asking were foundation questions

23   laying the foundation for my inquiry about things he said

24   relating to Mr. Delva and the parade or September 2012.  So it

25   is relevant.  I guess --

1          THE COURT:  Give me a little bit more because now you

2    are suggesting -- I mean, obviously, the whereabouts of

3    Mr. Delva are directly relevant in this case and insofar as the

4    witness has testimony that would suggest that he could not have

5    been in two places at once, it's relevant.  But if it's

6    something other than that, then I don't know why we would go

7    into it with this particular witness.

8          MR. PITTELL:  The 3500 material there's a note where

9    Mr. Accilien said David usually goes every year and he's

10   thinking about going to the parade on the weekend of the

11   robbery.

12         THE COURT:  All right.  Well, that's I don't think

13   something that you should be asking.  Well you can ask him was

14   Mr. Delva, did he go to the parade that day?  What hours are

15   the parade?  That's the way to approach it.  Typically, when

16   does it start?  Typically, how long does it go for?  And did

17   Mr. Delva go to the best of your knowledge?  And I think that's

18   the way to get it at directly.  And then we'll see where it

19   goes.  And if he says yes, maybe, no or he was saying he was

20   going to go but couldn't go --

21         MR. PITTELL:  I do acknowledge by Mr. Accilien that

22   David was thinking about going to the parade that day.

23         THE COURT:  Well, you would never allow that question

24   in to the state of mind of another witness.  He can't talk

25   about what Mr. Delva was or was not thinking or contemplating.

1    Whether it shows up in 3500 material would be an entirely

2    different question.

3              MR. PITTELL:  But if he had said the Mr. Delva said he

4    was thinking of going to the state of mind.

5              THE COURT:  That's not an admission.  I don't know how

6    you get that in.  What you want it in is for the truth.  It is

7    not a co-conspirator statement that is going to fall in terms

8    of in furtherance of the conspiracy.  So what's the basis for

9    getting that hearsay statement in?

10             MR. PITTELL:  Well, I think to a certain extent it

11   corroborates the alibi defense that Mr. Delva was there.

12             THE COURT:  Well, no.  I think undoubtedly if

13   Mr. Delva has people who were at the parade who can testify

14   that Mr. Delva was present at the parade, that's absolutely the

15   kind of thing that we can be hearing, but not a witness who is

16   going to say that Mr. Delva told him that he was maybe thinking

17   about maybe going.  You need something closer.

18             MR. PITTELL:  All right, well --

19             THE COURT:  Let's go.  I've got a couple other things.

20             MR. PITTELL:  OK.

21             THE COURT:  We went through Government Exhibit 800.

22   The government did that.  Now I had mentioned before when we

23   were discussing that exhibit pretrial this is, of course, the

24   taped phone call that I was intending to and willing to give a

25   cautionary instruction regarding the portion of that that

1   related to "I am going to talk to my lawyer" or "let me speak

2   to my lawyer".  However, I did not do so and I want to explain

3   why and I will do so if Mr. Pittell or anyone else would like

4   me to do so.

5            Or, Mr. Pittell, it's really I think a situation where

6   it's up to you.  The reason why I did not is it went by so

7   quickly that I thought drawing attention to that particular

8   phrase and saying you know, of course, it's not whatever the

9   phrasing that I would use that would say you've got a right to

10  talk to your lawyer if you are accused of a crime you've got a

11  Constitutional right, that seemed to me to dwell on the

12  possibility of some sort of connection to a state of mind of

13  guilt.  And I as a result given the speed with which it went by

14  did not think I should draw attention to it.  If however you

15  would like me to go back to it, I will do so.  You can tell me

16  now or you can think about it during the lunch break.

17           MR. PITTELL:  I'll give it some thought.

18           THE COURT:  All right.  The other question to be

19  thinking about is whether or not given the -- I now see by the

20  way, where you are going with the sex pills and with the

21  medication.  And if there's anything further that you need to

22  inquire into you can do so because I'll say for the record that

23  the ability to actually perform sexually has now been raised.

24  It could be raised by the government as suggestive as to why

25  the witness could not, in fact, have been a member of the group

1    that sexually assaulted the victim.  Therefore, taking pills or

2    otherwise taking to get Viagra or whatever it is that would

3    allow him to perform session sexually then enabled him to be a

4    participant in a sexual assault.  Therefore, I now see where

5    you are going and will not interrupt any further line of

6    questioning.  You've gotten out that he was on Viagra.  He said

7    he had two pills.  I don't know if he took his September pills

8    by that time or not but you'll be able to raise whatever

9    inferences you want with the jury.  But if you want to go back

10   to any of that I'm not going to preclude you from doing so.

11            MR. PITTELL:  Here is the thing.  I asked him.  He

12   denied it.  I could pull out the page in the medical record,

13   have him read it.

14            THE COURT:  It's up to you.

15            MR. PITTELL:  Refresh his recollection.

16            THE COURT:  You've got him on the Viagra.

17            MR. PITTELL:  I may not need it.  I may not use it.  I

18   think a better use of the time is that if it's very critical to

19   me and I decide I want to use it.  I have a medical record.

20   It's a statement made by him in the course of treatment to his

21   doctors.  I think it's admissible.  I think it's relevant.  I

22   would propose if I want to go there just to offer that page

23   from the New York Presbyterian medical record.

24            THE COURT:  Let me ask because my basis for my ruling

25   is the connection between his ability to perform sexually at

E99AADEL4                    Accilien - Cross

1   the time of the kidnapping.  And so what we need to establish

2   is whether or not those pills were in addition to Viagra he's

3   got one pill that addresses sexual dysfunction on the record,

4   that would be at the right point in time, if you will, being

5   the point in time most relevant to the kidnapping.  If you want

6   to ask him a question about whether or not he in addition to

7   Viagra also took other sex related pills -- and that's what we

8   have been calling it.  I don't have a better praise for it at

9   the moment.  You can do so.  If you've got a medical record

10  that then suggests that he did we can then talk about that

11  medical record but it needs to be a September 2012 point in

12  time.

13          MR. PITTELL:  Well, I have both.  But he's admitted to

14  the September 2012 point in time of Viagra.

15          THE COURT:  That's fine.

16          MR. PITTELL:  The other one that I am talking about

17  where he made a statement regarding taking those pills was from

18  many years earlier which is why for my purposes it's not all

19  that significant.

20          THE COURT:  I am not trying to talk you into anything.

21  We don't have to talk about it any further.  I just wanted to

22  make it clear what my ruling was and the freedom with which you

23  had to roam in that area.  I think we understand each other.

24          The other thing for us to think about is the only

25  phrase that's come up that seems to be a medical phrase which

1     the jury would need any additional elucidation on but I don't

2     think they, in fact, need any additional elucidation, auditory

3     hallucinations.  In fact, that testimony came out quite clear

4     in terms of visual hallucinations and auditory hallucinations.

5     So I don't know what else Dr. Rosenblum would do with his medal

6     history.  We've just gone over it ad nauseam now but you'll be

7     thinking about that because it seems like you've explored and

8     can draw whatever connect the dots through inferences and

9     whatever way you deem appropriate in terms of timeframes and

10    symptoms.  I don't know if you need more in order to go after

11    credibility.  So I'll want you to address what additional

12    impact on potential credibility issues that testimony would go

13    to.

14              MR. PITTELL:  I agree.  I've actually given that some

15    thought as answers have come out.

16              THE COURT:  He's testified to it at some length.  All

17    right.  Anything that you folks would like to raise right now?

18              MS. GERACI:  No, your Honor.

19              MR. PITTELL:  No.

20              THE COURT:  All right.  We're going to come back and

21    start at ten minutes to two if the jury is all here.  I do have

22    a matter here at one o'clock.

23              (Luncheon Recess)

24              (Continued on next page)

25

E99Qdel5

                          AFTERNOON SESSION

                              2:00 p.m.

1           (In open court)

2           THE COURT:  We've got a full complement of jurors

3    here, so we'll bring in the jury.

4           (Jury present)

5           THE COURT:  Let's all be seated.  I need two cups of

6    coffee in the afternoon.  I see about half, three-quarters of

7    the jury has coffee.

8           Mr. Pittell, you may proceed, sir.

9           MR. PITTELL:  Thank you.

10   BY MR. PITTELL:

11   Q.  Good afternoon, Mr. Accilien.

12   A.  Good afternoon.

13   Q.  Mr. Accilien, Dominique Jean-Philippe, you've testified

14   he's your brother.  How is he related to you?

15   A.  He's my brother.

16   Q.  You both have the same mother and father?

17   A.  Yes.

18   Q.  So your direct blood brothers?

19   A.  Yes.

20   Q.  Prior to the September robbery, did the two of you speak on

21   a regular basis?

22   A.  Yes.

23   Q.  Would you speak every week?

1    A.  Yes, every week.

2    Q.  How about every day, would you speak almost every day?

3    A.  Almost every day.

4    Q.  And you would speak on the telephone?

5    A.  Yes.

6    Q.  And you would call him, and he would call you?

7    A.  Yes.

8    Q.  And you would call him from your house phone sometimes?

9    A.  Excuse me?  Yes.

10   Q.  The phone that you used to call him, sometimes you used to

11   call him from the phone in your house?

12   A.  Yes.

13   Q.  Or other times you would call him from your cell phone.  Is

14   that correct?

15   A.  I would call him from my house.  I didn't have a cell phone

16   for awhile.

17   Q.  But at some point you did have a cell phone.  Is that

18   correct?

19   A.  Yes.

20   Q.  That was the cell phone, the number was (917) 688-0330?

21   A.  Yes.

22   Q.  That was a phone that you -- that was your cell phone.  Is

23   that correct?

24   A.  Yes.

25   Q.  But at some point about four to five months before the

E99Qdel5

```
1    September robbery, so we're talking around April or May of

2    2012, that phone was stolen.  Is that correct?

3    A.  Excuse me?

4    Q.  Was that phone stolen from you at some point?

5    A.  Was it still on?

6    Q.  No.  Was it stolen?

7    A.  Yeah, it was stolen.

8    Q.  That was about four to five months before the September

9    robbery?

10   A.  Yes.

11   Q.  So it was stolen either April or May of 2012.  Is that

12   correct?

13   A.  I -- I don't know the exact -- the exact like time frame,

14   but it was around that time.

15   Q.  And after that time, you did not get another cell phone?

16   A.  No.

17   Q.  So, at the time of the September 2012 robbery, you did not

18   have your own cell phone?

19   A.  No.

20   Q.  Now, you said David came to visit with you during August of

21   2012?

22   A.  Excuse me?

23   Q.  David came to live with you during August of 2012?

24   A.  Yes.

25   Q.  And David brought a cell phone with him?
```

1    A.  Yes.

2    Q.  And his telephone phone had the number (305) 709-8402?

3    A.  Yes.

4    Q.  Because you did not have your own cell phone at that time,

5    there were times when David would let you use that cell phone.

6    Is that correct?

7    A.  Yes.

8    Q.  Isn't it true that David had another cell phone besides the

9    one with the 305 area code?

10   A.  Not at the time of the robbery.

11   Q.  OK.  But at some point, did he have a phone which was a HTC

12   brand phone?

13   A.  Yes, this was -- was like months after the robbery.

14   Q.  But at the time of the robbery, do you recall him having

15   that phone?

16   A.  No.

17   Q.  When you were arrested, did he have that phone?

18   A.  Excuse me?

19   Q.  When you were arrested in June of 2013, did he have that

20   phone?

21   A.  Yes.

22   Q.  That phone was in your bedroom when you were arrested?

23   A.  Which phone?

24   Q.  The HTC phone.

25   A.  Yes.

E99Qdel5

1    Q.  In fact, both of David's cell phones were in the bedroom

2    when he was arrested.  Is that correct?

3    A.  Yes.

4    Q.  But you indicated that David let you use -- going back to

5    the time of the robbery, and before, you said that David would

6    let you use the telephone that had the 305 area code.  Is that

7    correct?

8    A.  There was only one phone around that time.  It was 305

9    number.

10   Q.  So, I'm going to just refer to that as the 305 phone.

11   A.  Around the robbery, there was only one phone around that

12   time.

13   Q.  And the second phone I'll refer to as the HTC phone.  OK?

14   A.  OK.

15   Q.  So, during the time of the robbery, before the robbery and

16   a little bit after before he got the HTC phone --

17   A.  Yes.

18   Q.  -- David let you use the 305 phone.  Is that correct?

19   A.  Yes.

20   Q.  And he let you use it to send text messages?

21   A.  Yes, and also phone calls.

22   Q.  OK.  In fact, do you recall yesterday you even told us that

23   on the night of the robbery, you used that phone to send a text

24   message to your brother?

25   A.  Yes.

E99Qdel5

1    Q.   Where were you when you sent that text message?  Were you
2    out on the street?
3    A.   Where was I?
4    Q.   Yes.
5    A.   When I made that text message?
6    Q.   Yes.
7    A.   I was -- I was in the apartment of the robbery with David.
8    Q.   Now, the phone, you also testified that you had a phone in
9    your house?
10   A.   Yes.
11   Q.   And that was a landline phone?
12   A.   Yes.
13   Q.   Was that phone number (347) 346-8013?
14   A.   Yes.
15   Q.   And the service provider of that telephone, was it
16   Cablevision?
17   A.   Yes.
18   Q.   Did you also have Cablevision television or internet in the
19   house?
20   A.   Yes.
21   Q.   You had told us when I was asking you questions about your
22   medical records and your medical treatment --
23   A.   Yes.
24   Q.   -- that you now get injections of Invega?
25   A.   Yes.

E99Qdel5

```
1    Q.  And you had indicated that you get that once a month.  Is
2    that correct?
3    A.  Correct.
4    Q.  And the way that's given to you is a nurse comes or you
5    meet the nurse, and the nurse sometimes gives you the
6    injection?
7    A.  Excuse me?
8    Q.  Is there a visiting nurse service that you use to give you
9    that injection?
10   A.  A visiting nurse --
11           THE COURT:  Wait.
12   A.  Wait.  No.  No.  Yeah.  Yeah.  The visiting nurse makes
13   sure I take medication when I was -- when I was -- before I
14   came to prison.
15   Q.  Was the visiting nurse a woman by the name of
16   Ms. Sellie(ph)?
17   A.  Yes.
18   Q.  And her phone number is (917) 846-5166?
19   A.  Yes.
20   Q.  There are times when you would call Ms. Sellie or
21   Ms. Sellie would call you.  Is that correct?
22   A.  Yes.
23   Q.  And sometimes when you would call Ms. Sellie, you would
24   call her on the 305 phone.  Is that correct?
25   A.  Yeah, I believe so.
```

E99Qdel5

```
1   Q.  Sometimes she would even call you on that phone.  Is that
2   correct?
3   A.  Not that I remember.
4   Q.  But at some point, you even put her contact phone number in
5   the phone, in the 305 phone.  Is that correct?
6   A.  Not that I remember.
7   Q.  All right.
8             MR. PITTELL:  Judge, at this point I would like to
9   offer an exhibit in evidence.  It's actually Government Exhibit
10  2000-Z.  I have no objection leaving it as that number.  If you
11  want to put it in as Defense A, we can do that.
12            THE COURT:  Let's just have one number.  So you want
13  it as 2000-Z.
14            MR. PITTELL:  It's already marked as that number, so
15  I'm fine with that.
16            THE COURT:  All right.  Are you going to lay the
17  foundation for this witness?
18            MR. PITTELL:  Well, I will offer it.  If there is any
19  objection --
20            THE COURT:  Well, let me see this exhibit.
21            MR. PITTELL:  Your Honor, can I just speak with the
22  government briefly?
23            THE COURT:  Yes.
24            (Pause)
25            MR. POSCABLO:  Judge, we'll stipulate to it.  There's
```

E99Qdel5

1    going to be evidence in a stipulation that the government was

2    intending to offer later.

3            THE COURT:  So Government Exhibit 2000-Z is received.

4            (Government's Exhibit 2000-Z received in evidence)

5            MR. PITTELL:  If possible, could Ms. Chen put it up on

6    the screen?

7    Q.  Mr. Accilien, can you see the page in front of you.

8    Mr. Accilien, is there a document on the screen in front of

9    you?

10   A.  I see the names is recorded in David's cell phone, but he

11   must have recorded her name.

12   Q.  Do you see that entry number 125?

13           THE COURT:  Can you hold on a second?  There is a

14   juror that has some glasses that they need in the jury room.

15           Thank you, Mr. Pittell.  You may proceed.  Sorry.

16   Q.  You see that entry there number 125 on the phone?

17   A.  Mmm-hmm.

18   Q.  Is that the nurse Ms. Selifa that you used to speak with

19   and that she used to call you?

20   A.  Yes.  I think David recorded --

21   Q.  Mr. Accilien, there is no question before you.

22   A.  All right.

23   Q.  Mr. Accilien, did you ever have a girlfriend by the name of

24   Nina?

25   A.  Yes.

E99Qdel5

1    Q.  If we could look at entry number 128.  That's the Nina that

2    was your girlfriend.  Is that correct?

3    A.  Yeah she was my associate.

4    Q.  OK.  And you used to sometimes call Nina on this 305 phone.

5    Is that correct?

6    A.  Yes.

7    Q.  And she would sometimes call you.  Is that correct?

8    A.  Yes.

9    Q.  You had indicated a few moments ago that Cablevision was

10   the provider for your television and landline phone service.

11   Is that correct?

12   A.  Yes.

13   Q.  If we could go to number 24.  Do you see in there where

14   there is an entry of Cablevision?

15   A.  Yes.

16   Q.  You put that in there because sometimes you would call

17   Cablevision if you had problems with your landline and your

18   television service.  Is that correct?

19   A.  Yes.

20   Q.  Do you remember yesterday when you were looking at some

21   letters that were written to you by your brother and sent to

22   you from the Westchester County jail?

23   A.  Yes.

24   Q.  In those letters, do you recall that there's a reference in

25   there to a woman by the name of Sour?

1   A.  Yes.

2   Q.  And Sour is one of your brother's former girlfriends.  Is

3   that correct?

4   A.  Yes.

5   Q.  If we could look at entry 158.  That's Sour's phone number.

6   Is that correct?

7   A.  Yes.

8   Q.  At the time when your brother was arrested, she was

9   pregnant with actually twins from him.  Is that correct?

10  A.  Yes.

11  Q.  In those letters he actually is asking you to contact her.

12  Is that correct?

13  A.  I didn't really -- I haven't read the letter for awhile.  I

14  didn't read the whole letter for awhile, so I can't tell you if

15  he did --

16  Q.  Fair enough.  We'll get to that later on then.

17  A.  All right.

18  Q.  If we could look at entry number 12.  Do you see an entry

19  there for Big Brother?

20  A.  Yes.

21  Q.  Is that a friend or associate of yours?

22  A.  Umm, yeah, I know him.

23  Q.  If we could go down to number 13, actually 13 and 14.  We

24  see there's two entries for Black.  One is Black and the other

25  is Blackny.  Are those friends and associates of yours?

E99Qdel5

1    A.  I know Blackny, that's it.

2    Q.  And then if we could go down to 16 and 17, you see British

3    and Bronco up there?

4    A.  Yeah.

5    Q.  Those are also friends and associates of yours?

6    A.  I know British, that's it.

7    Q.  If we could go down to 23, you see where it says Bx Custy?

8    A.  Yes.

9    Q.  Is that a friend or an associate of yours?

10   A.  That's an associate of David Delva.

11   Q.  You don't know that one?

12   A.  No.

13   Q.  If you go down to 48 and 49, you indicated that on direct

14   that you sold drugs to someone by the name of Ed?

15   A.  Yes.

16   Q.  And is that the Ed who you sold drugs to, either of those

17   entries?

18   A.  I can't tell you because I don't remember his phone number,

19   but it could be.  There's a lot of Eds.

20   Q.  OK.  What about number 50?  You see where it says Ednew.

21   Could that be the Ed that you were selling drugs to?

22            THE COURT:  Let's not do the "could be."  Let's do it

23   a little bit different.

24   Q.  Take a look at the Ednew.  Do you know that phone number?

25   A.  I don't remember the phone numbers.  I don't remember that

1   phone number right there.

2   Q.  But I take it when you did sell the drugs to Ed from time

3   to time, you would talk on the phone with him?

4   A.  Excuse me?

5   Q.  You had indicated earlier that you sometimes sell drugs to

6   someone named Ed?

7   A.  Yes.

8   Q.  And were there times when you would make arrangements to

9   sell the drugs to Ed that you would speak with him over a

10  phone?

11  A.  Yeah, I mean, sometimes he would call me before he comes to

12  the house.

13  Q.  Right, he would call you or maybe you would call him.  Is

14  that correct?

15  A.  No, he would call me.

16  Q.  Well, if he called you and you didn't pick up, would you

17  call him back?

18  A.  Excuse me?

19  Q.  If he called you, and you didn't pick up the phone, would

20  you call him back?

21  A.  Yeah.

22  Q.  So you would call each other from time to time?

23  A.  Mmm-hmm.

24          THE COURT:  Is that a yes?

25          THE WITNESS:  Yes.  That's a yes.

1              THE COURT:  Thank you.

2    Q.  And sometimes you would use the 305 phone when you did

3    that?

4    A.  Umm, not that I remember.

5    Q.  Now, if we could just go down to 68.  Janet Gonzalez, that

6    was a girlfriend of yours?

7    A.  She's a friend.

8    Q.  If we can go to 73.  Harris.  That's a friend?

9    A.  Yes.  That's a -- that's one of the customers that I

10   steered to David.

11   Q.  But I take it you knew Harris before you steered him to

12   David?

13   A.  Yes.

14   Q.  So if Harris wanted drugs, Harris would, at least initially

15   in the beginning, call you.  Is that correct?

16   A.  Excuse me?

17   Q.  Before you steered Harris to David, he would call you

18   looking for drugs?

19   A.  Yes.

20   Q.  If we could go to 126 and 127.  You see Ness and Newmorgan.

21   Are those friends of yours?

22   A.  Yes.

23   Q.  If we could go down to 132.  You see Oodi?

24   A.  Yes.

25   Q.  Is that a former girlfriend of yours?

E99Qdel5

1   A.  Yes.

2   Q.  That's a girlfriend who lives in New Jersey?

3   A.  Yes.

4   Q.  If we go 163.  We have Summer up there.  That's a friend of

5   yours also?

6   A.  Yes.

7   Q.  Then if we could go down to, we could do 169 to 171.  You

8   see Taz, Taznew and Tiffany Dotg, those are all friends of

9   yours?

10  A.  Yes.

11  Q.  In fact, the Taznew may be the same Taz, just a new phone

12  number?

13  A.  Yes.

14  Q.  179 and 180.  You see the first one 179 is W-A-R-R-E-Y-E-R?

15  A.  No, I know Wayne that's it.

16  Q.  Wayne is your next door neighbor?

17  A.  Yes.

18  Q.  Your former next door neighbor?  So, I take it you put

19  these contacts into the 305 phone.  Is that correct?

20  A.  Yes.

21  Q.  And you used the 305 phone to call these people or for them

22  to call you from time to time?

23  A.  Yes.

24  Q.  I take it that's why the contacts were put into the phone,

25  to make it easier to call them?

1    A.  Yes.

2    Q.  And from time to time, you would even use the 305 phone to

3    send text messages to some of the people in the contacts?

4    A.  Yes.

5    Q.  On the night of the robbery -- I realize I'd asked you

6    about different versions of how it happened, but you told us

7    that at some point you went to Rite Aid, got gloves and some

8    tape and then went to the crime scene apartment.  Is that

9    correct?

10   A.  Yes.

11   Q.  After you bought the gloves and the tape, isn't it true

12   that you called your brother to let him know that you got the

13   gloves and the tape and that you were coming over?

14   A.  Have I called him?

15   Q.  Yes.

16   A.  No.

17   Q.  Did you call him in advance to let him know that you were

18   coming over?

19   A.  He already knew that I was coming over because he sent me

20   to the store to come see him.

21   Q.  So you just showed up without calling?

22   A.  I -- on the same phone call, he told me what bell to buzz,

23   so I buzzed the bell and he buzzed me in the apartment

24   building.

25   Q.  During that night, did you speak with your brother on the

E99Qdel5

1    phone?  Actually, withdrawn.  During the course of the robbery

2    from start to finish, were there times when you spoke with your

3    brother on the phone?

4    A.  Yes.

5    Q.  And there were times when you spoke with Trevor Cole on the

6    phone?

7    A.  Yes.

8    Q.  And you spoke with them on the landline phone?

9    A.  Yes, I believe so.

10   Q.  And you also spoke with them on the 305 phone?

11   A.  I'm not sure how many times I spoke to Trevor, but I think

12   I called him like once or twice.

13   Q.  I'm not asking number of times.  I'm just asking if you

14   spoke with both your brother and with Trevor.

15   A.  Yes.

16   Q.  So, you spoke with your brother?  It's a yes for each.  Is

17   that correct?

18   A.  Mmm-hmm.

19   Q.  And you already said you spoke with them sometimes with the

20   landline phone?

21   A.  Yes, with the landline phone.

22   Q.  And there are times when you spoke to them on the 305

23   phone?

24   A.  The cell phone was under David's custody when I --

25   Q.  But you said there was a point in time when you sent a text

E99Qdel5

1    message with the cell phone.  Is that correct?

2    A.  Yes, that's when me and David was in the apartment

3    together.

4    Q.  So at least there was sometime when the cell phone was in

5    your custody?

6    A.  Yes.

7    Q.  Even if it was for that time when you sent the text

8    message?

9    A.  Yes.

10   Q.  And so is it possible that you then maybe used it for other

11   phone calls but you don't recall as you sit here now?

12   A.  Can you -- can you repeat that again?

13   Q.  Is it possible that you also used it at other times to make

14   phone calls?

15           MS. GERACI:  Objection, your Honor.

16           THE COURT:  Sustained.  You need to rephrase if you're

17   going to ask that.

18   A.  Rephrase that?

19   Q.  Did you --

20           THE COURT:  Do you recall.

21   Q.  Did you use it to make phone calls that night?

22   A.  The night of the robbery?

23   Q.  Yes.

24   A.  I -- I used it to make phone calls not the first night but

25   the -- the third day that we was in the apartment building.

E99Qdel5

1   Q.  So, you did use it during the -- at least at some point

2   during the time period of the entire robbery from the beginning

3   to the very end, there was a point in time when your used that

4   cell phone?

5   A.  Yes.

6          THE COURT:  I'm sorry.  What date was it?

7          MR. PITTELL:  I didn't say a date.  I said from the

8   very beginning to the very end of the robbery.

9   A.  On the third day on that morning.

10   Q.  Oh.  But you said that you also used it to send a text

11   message on a different day.  Is that correct?

12   A.  On a different day?

13   Q.  Yes.

14   A.  Which day you talking about, sir?

15   Q.  Was it the first or second day that you sent the text

16   message?

17   A.  No.

18   Q.  Which day was it?

19   A.  On -- on the third day, sir.  The third morning.

20          THE COURT:  So the third day was the day when you sent

21   both the text message and used the 305 phone for a voice call?

22          THE WITNESS:  Yes.  That phone -- I remember that I

23   used the phone.

24   Q.  Mr. Accilien, you indicated on direct examination that

25   you've sold drugs before.  Is that correct?

1    A.   Yes.

2    Q.   During the period between 2009 up through 2012, you sold

3    cocaine.  Is that correct?

4    A.   Excuse me?

5    Q.   During the period from 2009 up to 2012, you sold cocaine at

6    some point during that time period.  Is that correct?

7    A.   Yes.

8    Q.   And you also sold marijuana --

9    A.   Yes.

10   Q.   -- during that time period?

11   A.   Yes.

12   Q.   And would you sell drugs every day during that time period?

13   A.   No, it wasn't an everyday thing.

14   Q.   But it was -- was it at least once a week?

15   A.   Yeah, I could say so.

16   Q.   In 2009, you were arrested for selling marijuana.  Is that

17   correct?

18   A.   2009?

19   Q.   Yes.

20   A.   Yes.

21   Q.   And you pleaded guilty and you did a brief time in jail.

22   Is that correct?

23   A.   Yes.

24   Q.   And then after you were released from jail, you continued

25   to sell drugs.  Is that correct?

1    A.   Yes.

2    Q.   In February of 2010, you were again arrested for selling

3    drugs?

4    A.   February 2010?

5    Q.   Yes.

6    A.   Can I see that document, sir?

7    Q.   OK.  To save time, I'll come back to that.  Let me ask you

8    something.

9         Do you recall being arrested in 2010 for selling

10   drugs?

11   A.   No.

12   Q.   Do you recall being arrested twice in the month of May of

13   2010 for selling drugs?

14   A.   No.  2012?

15   Q.   I haven't gotten there yet.  I'm still in 2010.

16   A.   Twice selling drugs?

17   Q.   Yes.

18   A.   No.  I don't remember that at all.

19        MR. PITTELL:  May I approach the witness, your Honor?

20        THE COURT:  Yes.

21   Q.   Mr. Accilien, I'm showing you a document.  I've directed

22   the portion for you to look at.  I would ask you just to take a

23   look at it and let us know when you've looked at it.

24   A.   It says I've been arrested on February 17, 2010, but that's

25   the only date.  It's not twice.  It's not twice.

E99Qdel5

1   Q.  Do you recall being arrested for selling marijuana in

2   February of 2010?

3   A.  I believe -- I believe so, but I -- I only remember getting

4   caught selling drugs twice.

5   Q.  When you say "drugs," do you mean marijuana or do you mean

6   cocaine?

7   A.  Marijuana only.  That's the only drug I ever got caught

8   selling.

9   Q.  Well, if you look at that document, does it refresh your

10  recollection as to whether or not you were arrested and

11  convicted for selling marijuana during February of 2010?

12  A.  Rephrase that, sir?

13  Q.  Have you had a chance to look at that document?

14  A.  Uh-huh.

15  Q.  Does it refresh your memory -- here, let me take it back.

16  Have you had enough time to look at it?

17  A.  But it's only one time.  It's not twice, sir.

18  Q.  Mr. Accilien, after looking at that document, does it

19  refresh your memory as to whether or not you were arrested and

20  pleaded guilty to selling marijuana during February of 2010?

21  A.  Yes.

22  Q.  Now, do you recall after that happened in February being

23  arrested in May of 2010 for the same charge?

24  A.  No.  I don't remember -- I don't remember that.

25  Q.  Mr. Accilien, I've marked a portion of the document that's

E99Qdel5

```
 1   in front of you again.  I asked you before just to take a look
 2   at it.  After you've had enough time to look at it, let us
 3   know, and then I'll ask you a question.
 4   A.   I'm looking at May 10 -- no, I'm looking at July 13, 2010,
 5   and I'm also looking at May 4, 2010.
 6            MS. GERACI:  Your Honor, objection to reading --
 7            THE COURT:  Well, why don't we do this:  Does the
 8   government want to stipulate that he was arrested in May of
 9   2010?
10            MS. GERACI:  One moment, your Honor.
11            THE WITNESS:  And it's possession of marijuana; it's
12   not for selling drugs.
13            THE COURT:  Hold on.
14            MR. PITTELL:  Mr. Accilien, there is no question.
15            MS. GERACI:  The government will stipulate that he was
16   arrested on or about May 19, 2010 for criminal possession of
17   marijuana in the fifth degree in a public place.
18            THE COURT:  Is that sufficient, Mr. Pittell, so we
19   don't spar on it?
20            MR. PITTELL:  Yes.  If we could just go on, if we
21   could have a similar stipulation for the next two convictions.
22            MS. GERACI:  Arrests?
23            MR. PITTELL:  For the second arrest in May of 2010.
24            MS. GERACI:  The government will stipulate that on or
25   about May 4, 2010, he was arrested again for criminal
```

E99Qdel5

```
1    possession of marijuana in the fifth degree in a public place.
2             I did that one.
3             The government will further stipulate that on or about
4    May 6, 2012, he was convicted of criminal sale of marijuana in
5    the fourth degree.
6             THE WITNESS:  What date was that?
7             MS. GERACI:  I'm sorry, and it appears it was after a
8    plea of guilty.
9             THE COURT:  So, do we know, just so the record is
10   clear, whether or not that particular conviction related to one
11   of the earlier arrests that we're talking about or is it a
12   separate arrest?
13            MS. GERACI:  It's a different arrest, your Honor.
14            THE COURT:  Thank you.
15   Q.  Mr. Accilien, can I get that document back from you?
16   A.  What was that first date that you said that I sold
17   marijuana?
18   Q.  Mr. Accilien --
19   A.  Because I don't even remember -- I only remember getting
20   caught selling drugs twice.
21   Q.  Mr. Accilien, do you recall being arrested for selling
22   marijuana in May of 2012?
23   A.  May -- May of 2012?  Yes.
24   Q.  And you pleaded guilty in that case, and you were in jail
25   for five days.  Is that correct?
```

E99Qdel5

```
 1   A.  Yes.
 2   Q.  And then after you got out of jail, you continued selling
 3   drugs up until June of 2013 when you were arrested in this
 4   case?
 5   A.  Umm, on and off.
 6   Q.  On and off?
 7   A.  Yes.
 8   Q.  In fact, you sold crack cocaine during that period.  Is
 9   that correct?
10   A.  Yes.
11   Q.  Between April 2013 when you got out of jail and June of
12   2013 when you were arrested for this case.  Is that correct?
13   A.  Yes.
14   Q.  When you sold the crack cocaine, the deals that you did
15   with the people, it was not inside your house.  Is that
16   correct?
17   A.  No.
18   Q.  It was -- you would meet them somewhere out on the street
19   or in a public place.  Is that correct?
20   A.  Yes.
21   Q.  When you would arrange to meet with them, I take it you
22   would speak with them over the telephone first.  Is that
23   correct?
24   A.  Yes.
25   Q.  You would talk or sometimes it would be by voice call.  Is
```

1    that correct?

2    A.  Yes.

3    Q.  But sometimes you would communicate with them by text

4    messages.  Is that correct?

5    A.  No.

6    Q.  It was only voice calls?

7    A.  Yes.

8    Q.  When you would speak with them, you would arrange -- when

9    you would go meet with them, you would speak to each other on

10   the phone before you actually met with each other.  Is that

11   correct?

12   A.  Yes.

13   Q.  You would sometimes speak with them on a cell phone while

14   you were out on the street.  Is that correct?

15   A.  Sometimes.

16   Q.  At that time between April and June of 2013, you didn't

17   have your earlier phone, the 917 phone.  Is that correct?

18   A.  When was this?

19   Q.  Between April and June of 2013.

20   A.  No.

21   Q.  Your 917 phone had been stolen a long time ago.  Is that

22   correct?

23   A.  Yes.

24   Q.  So when you would use a cell phone to communicate with

25   people on those drug deals, you would use the 305 phone.  Is

E99Qdel5

1    that correct?

2    A.  Not -- not around -- not around that time.

3    Q.  But if you were to use a cell phone, that was the only cell

4    phone you had to use.  Is that correct?

5    A.  Yes.

6    Q.  And you sold crack cocaine to over ten different people.

7    Is that correct?

8    A.  No.  Negative.

9    Q.  Did you ever sell to someone named Ed?

10   A.  Yes -- no, not Ed.

11   Q.  What about Big Booty?

12   A.  Only -- I only sold it to two people.

13   Q.  That was Ed and Big Booty?

14   A.  No.  To --

15   Q.  Big Brother?

16   A.  No, the other guy, I forgot his name.  Harris.  Yeah,

17   Harris and this girl named Maria.

18   Q.  The Harris is the Harris that was in the contacts that we

19   looked at?

20   A.  Yes.

21   Q.  So, at least sometimes you would use that 305 cell phone to

22   do drug deals?

23   A.  Excuse me?

24   Q.  You would use -- there were times when you used the 305

25   cell phone to facilitate a drug deal?

E99Qdel5

1   A.  Yeah -- no, they would call me in -- in my -- in my home

2   phone -- phone number.

3   Q.  But the Harris whose phone number was in that list of

4   contacts I showed you was someone whom you conducted drug deals

5   with.  Is that correct?

6   A.  Yes.  But at times they would call David too, but --

7   Q.  But if you wanted to have a drug deal with Harris, you

8   would use the 305 cell phone.  Is that correct?

9   A.  Excuse me?

10  Q.  Did you ever use the 305 cell phone to do a drug deal with

11  Harris?

12          MS. GERACI:  Judge, objection.

13          THE COURT:  Overruled.

14  A.  If Harris called my phone and he doesn't find me, he calls

15  David.

16  Q.  But sometimes you would call him on the 305 phone?

17  A.  No.

18  Q.  So at least as of the date you were arrested in June 2013,

19  at that time you were selling drugs.  Is that correct --

20  withdrawn.  Not necessarily that day but around that time

21  period you were selling drugs.  Is that correct?

22  A.  When was this?

23  Q.  Around the time of your arrest in June of 2013.

24  A.  Not really.  I wasn't really selling drugs around that

25  time.

E99Qde15

1    Q.  But at some point during that month, you were still selling

2    drugs.  Is that correct?

3    A.  No.

4    Q.  What about during May of 2013?

5    A.  I don't remember the -- I don't remember making any sales

6    that May either.

7    Q.  But do you remember when I asked you earlier as to whether

8    or not you were selling crack cocaine during the period of

9    April and June of 2013?

10   A.  April and June?

11   Q.  Yes.

12   A.  Yeah, but -- I probably made sales like around April, not

13   around June.

14   Q.  All right.  So sometime during the time period of April and

15   June of 2013, you were selling crack at least during that time

16   period.  Is that correct?

17   A.  Yes.

18   Q.  And --

19   A.  You said around April and June?

20   Q.  From April up to June 2013.

21   A.  It wasn't up to June because I remember I stopped selling

22   drugs for David like before -- before the winter was over.

23   Q.  When you say you stopped selling them before the winter was

24   over, are you saying that you weren't selling drugs between

25   April and June of 2013?

E99Qdel5

1    A.   I probably stopped selling like around April, like around

2    the time of April.

3    Q.   But during that April of 2013, you were at least during

4    that month selling crack cocaine?

5    A.   Yes.

6    Q.   Were you selling regular cocaine as well?

7    A.   Yes.

8    Q.   Now, in the business of selling --

9    A.   I was only helping.  That's all I was doing.

10   Q.   But you were still selling.  Is that correct?

11   A.   Yes.

12   Q.   And in the drug business, sometimes people that sell drugs

13   use electronic scales to weigh out drugs.  Is that correct?

14        MS. GERACI:  Objection, Judge.

15        THE COURT:  Sustained.

16   Q.   Do you know if scales are used to weigh drugs?

17   A.   Yes.

18   Q.   In fact, when the police raided your house when you were

19   arrested during June of 2013, they recovered an electronic

20   scale.  Is that correct?

21   A.   Yes.

22   Q.   And that scale was in the kitchen?

23   A.   Yes.

24   Q.   And it's the kitchen of your house on South Oak Drive?

25   A.   Yes.

E99Qdel5

1    Q.  Also, sometimes in the drug dealing business, small baggies

2    are used to package drugs.  Is that correct?

3             MS. GERACI:  Objection, your Honor.

4             THE COURT:  Sustained.  You can ask him what he did or

5    what he knows someone else did but not just general,

6    generality.

7    Q.  Mr. Accilien, when you were arrested in June 2013, were any

8    drug recovered from your bedroom, if you know?

9    A.  Was any drug --

10   Q.  Recovered from your bedroom, if you know?

11   A.  No.

12   Q.  You don't know?

13   A.  No.  I said no.

14   Q.  Do you know if a gun was recovered from your bedroom when

15   you were arrested?

16   A.  No.  It was David that --

17   Q.  There is no question before you, sir.  I'm just asking

18   whether or not if you know a gun was recovered from your

19   bedroom on the day you were arrested.

20   A.  OK.

21   Q.  Actually, you can leave it right there.

22            Mr. Accilien--

23   A.  Mmm-hmm.

24   Q.  -- do you remember looking at this envelope and letter

25   yesterday?

1    A.  Yeah.

2    Q.  I'd like to direct your attention to -- do you see where

3    it's addressed to Dreko at 832 South Oak Drive?

4    A.  Yeah.

5    Q.  That name Dreko, that's your nickname.  Is that correct?

6    A.  Yes.

7    Q.  And that's the only person that that's addressed to on the

8    envelope.  Is that correct?

9    A.  Yes.

10   Q.  All the other writing on there doesn't refer to another

11   person or another name.  Is that correct?

12   A.  No.

13   Q.  Then if we could go to page 1 of the letter.  If you could

14   take a look at the very first line of that.  You see the very

15   first line?

16   A.  Mmm-hmm.

17   Q.  Can you read that?

18   A.  "Whatshup bitch ass."

19   Q.  When someone uses the expression "whatshup bitch ass,"

20   we're speaking to one person.  Is that correct?

21   A.  Yeah.

22   Q.  And then on the second line you see where it says, "First

23   of all, I would like to remind you"?

24   A.  OK.

25   Q.  You see the word "you" on the second line, on the end of

1    the second line?

2    A.  Right.

3    Q.  That's referring to you, correct?

4    A.  OK.

5    Q.  I'm asking you.

6    A.  Yes.  Yes.

7    Q.  Because this letter is addressed too you?

8    A.  Yes.

9    Q.  And we could look at the side where it's written in the

10   margin.  Can you read that?

11   A.  Excuse me?

12   Q.  Actually, can the document be flipped sideways?  Do we have

13   the original document as an exhibit.

14          Mr. Accilien, I realize it may be hard to read, but

15   can you read what's written in the margin all the way on the

16   left side there?

17   A.  "Enjoy your freedom, cherish it cuz this shit sucks."

18   Q.  Now, your brother's -- he's writing this to you while he's

19   in jail.  Is that correct?

20   A.  Yes.

21   Q.  So, his reference to "this shit sucks," that means being in

22   jail sucks?

23   A.  Right.

24   Q.  I take it you would agree with that?

25   A.  Yes, I do.

E99Qdel5

1    Q.  If we could go back to the body of the letter.

2    Mr. Accilien, if you look on the -- starting at the top, if you

3    count down five lines, you see there's a word it's spelled

4    L-E-K-A?  You see that word?

5    A.  Yeah.

6    Q.  That's the name of a woman her name is Leka.  Is that

7    correct?

8    A.  Yes.

9    Q.  And Leka is a former girlfriend of your brother?

10   A.  Yes.

11   Q.  And she actually has a child with your brother?

12   A.  Yes.

13   Q.  And the two of them were living together at the time of his

14   arrest?

15   A.  Excuse me?

16   Q.  Were the two of them living together when your brother was

17   arrested?

18   A.  Yes.

19   Q.  And because he got arrested, she and her child had to move

20   out, and they moved in with you in the house at South Oak

21   Drive?

22   A.  Yes.

23   Q.  There was a point in time when your brother was angry at

24   you because you would not let her and the child sleep in the

25   bedroom and you had them sleep on the couch in the living room?

E99Qdel5

1   A.   There's two beds.   There's one in the living room and

2   there's one in the bedroom.

3         (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E99AADEL6                     Accilien – Cross

```
 1   BY MR. PITTELL:
 2   Q.  Right.  But she was sleeping in the living room?
 3   A.  OK.
 4   Q.  I am asking, was she sleeping in the living room?
 5   A.  Yes.
 6   Q.  And your brother was angry because you didn't let her sleep
 7   in the bedroom?
 8              MS. GERACI:  Objection, your Honor.
 9              THE COURT:  Why don't you ask it differently.
10   Rephrase.
11   Q.  Did you have discussions with your brother about her
12   sleeping in the living room?
13   A.  Yes.
14   Q.  And there was a point in time when you spoke with him over
15   the telephone while he was in jail?
16   A.  Excuse me?
17   Q.  There was a point in time when you spoke about the subject
18   of Aleka sleeping in the living room with him while he is
19   calling you from the jail?
20   A.  Yes.
21   Q.  And he told you he was angry with you for having her sleep
22   in the living room and not in the bedroom?
23              MS. GERACI:  Objection, your Honor.
24              THE COURT:  Hold on one second.
25              (Pause)
```

1             THE COURT:  Give me one more word.

2             MS. GERACI:  Hearsay.

3             THE COURT:  Overruled.

4             MR. PITTELL:  Can the question be read back?

5             THE COURT:  Yes.  The court reporter can read the

6    question back.

7             (Testimony read back)

8             THE COURT:  You can answer.

9    A.  Repeat that again.

10            (Testimony read back)

11   A.  Yes, correct.

12   Q.  All right.  Now, if we could go to the letter and if we

13   could see the whole letter again and I'd like to start on line

14   seven where it actually starts with the word but and then all

15   the way down to where it says "loyalty", all right.

16            Mr. Accilien, can you read this document starting with

17   but and ending where it says "loyalty" with an exclamation

18   mark, can you read that to us?

19   A.  But I don't want no money from y'all niggas.  You and David

20   I knew you both bad at money management but that is the last

21   thing I expect from y'all.  But what I do expect is some

22   fucking family loyalty.  Both of you guys should be kissing my

23   ass.

24   Q.  Actually, "loyalty" is just fine.  So that reference in the

25   letter, that's referring to your brother being angry at you for

```
 1   having Aleka sleep in the living room and not giving her and
 2   their child the bedroom?
 3   A.  That was --
 4            THE COURT:  Hold on a second.  You need to put a
 5   question on the end of that.
 6   Q.  That -- is it correct that that paragraph or that portion
 7   of the letter which you just read refers to your brother being
 8   angry at you for not letting Aleka sleep in the living room?  I
 9   am sorry.  Not letting her sleep in the bedroom with her child?
10   A.  Around the time that I received this letter Aleka was not
11   even living in my house.
12   Q.  But she had been living there before?
13   A.  No, she wasn't.  She hadn't moved to my house yet around
14   the time I receive this letter.
15   Q.  So was there -- was Aleka still living in her apartment
16   where she had been living with your brother?
17   A.  Excuse me?
18   Q.  Was she still living in the same place?
19   A.  Yes, she was still living at the same place.
20   Q.  Now, at some point everything got stolen from that
21   apartment; is that correct?
22   A.  Which apartment is this?
23   Q.  The one that your brother had.
24   A.  Are you talking about the one Aleka was living in or the
25   one that he was living in?
```

E99AADEL6                          Accilien - Cross

1   Q.  The one that he was living in.

2   A.  No -- yes, stuff was stolen out of his room.

3   Q.  A lot of his personal property was stolen?

4   A.  Yes.

5   Q.  His TV; is that correct?

6   A.  Yes.

7   Q.  And he was angry at you for not doing anything about that;

8   is that correct?

9   A.  Yes.

10  Q.  And so when he makes reference to "family loyalty" in his

11  letters it's not because he's angry at you because you are not

12  giving him money.  It's because you are not doing things for

13  the family?

14  A.  When he means "loyal" he was talking about being not

15  cooperating, sir.

16  Q.  Well, isn't loyalty just referring to doing things for

17  family like getting in touch with Aleka or his other

18  girlfriend, Sour?

19  A.  No.

20  Q.  He did have another girlfriend, Sour; is that correct?

21  A.  Yes.

22  Q.  And at that time Sour was pregnant?  At the time that you

23  received this letter Sour was pregnant?

24  A.  I believe so.

25  Q.  She was pregnant with twins?

1   A.  Yes.

2   Q.  And the twins were -- he was the father of those twins?

3   A.  Yes.

4   Q.  And there were people who were telling her that she should

5   get an abortion because your brother may spend the rest of his

6   life in jail?

7           THE COURT:  Sustained.  And that will be struck.  The

8   jury will disregard that question and answer.

9   Q.  There were people that were --

10          THE COURT:  No.  Let's not go there.  We'll take it up

11  at a break but let's not go to that question.  Go to something

12  else.

13          MR. PITTELL:  If we could refer to page --

14          THE COURT:  While you are doing that, ladies and

15  gentlemen, when I strike testimony it is stricken from the

16  record.  It means you must disregard that testimony.  It may

17  not enter into your deliberations in any way.  It is like it

18  never happened, all right.

19  Q.  All right.  I want to direct your attention to starting at

20  the first line in the letter, not the portion that's in the

21  margin but the first line where it says, the first word is

22  "simple" going down six lines where it ends in the middle where

23  it says right where it says "her" between the word "her" and

24  "if".

25          Do you see that on your screen, Mr. Accilien?

1    A.   Where in the letter are you talking about?

2    Q.   If you look at the top, you see where it says the word

3    "simple"?

4    A.   Yes.

5    Q.   Could you start -- read from there.  Read all the way down

6    until you get to the middle of the last line and then you can

7    stop at the word "her"?

8    A.   It says simple shit I asked y'all to do.  Y'all act like

9    it's asking for too much.  I haven't heard from Sour and her.

10   But he is referring to two people now, you know that, right?

11   Q.   I do know that but let's talk about Sour.

12   A.   All right.

13   Q.   In here he's saying he just wants you to do a simple thing

14   to go look for Sour because her phone is off and he hasn't

15   heard from her; is that correct?

16   A.   Yes.

17   Q.   He's angry because you haven't even done that, correct?

18   A.   It wasn't my fault that I couldn't get in contact with

19   Sour.

20   Q.   I am not asking whose fault it was.  I am just asking if

21   your brother is angry with you because you haven't been able to

22   get in touch with Sour on his behalf, that's what that section

23   means?

24   A.   OK.

25   Q.   Is that correct?

1    A.   I would have to read the, a few more sentences before

2    "stand tall".

3              (Pause)

4    Q.   Do you agree that you need in order to give an

5    interpretation from the letter you need to read the whole

6    letter or just other portions?

7              MS. GERACI:   Objection, judge.

8    A.   Excuse me?

9              THE COURT:   Hold on.   Why don't you ask him

10   specifically about the piece that he is referring to.

11             MR. PITTELL:   Right.

12   Q.   You can actually if you want to read other portions before

13   you can answer my question by all means go ahead.

14             THE COURT:   And just so that we're clear, let's get

15   the pending question in front of us so he can have that in mind

16   so when he's getting it in context he can remember.

17             So what's the question?

18             MR. PITTELL:   Well, my question is the portion that

19   you read, Mr. Accilien, where it starts with "simple shit"

20   means that your brother is angry with you because you have not

21   gone out and gotten in touch with Sour for him because he can't

22   because her phone is disconnected.

23             THE COURT:   Is that how he interpreted it; that what

24   you want to know?

25             MR. PITTELL:   No.

1    A.   I guess he was mad but I am not completely sure.

2              MR. PITTELL:  Right.  But that's the kind of thing

3    he's referring to in the prior section where he uses the word

4    "family loyalty" is that he's angry with you for not doing

5    something like that going out and getting in touch with the

6    mother of his children.

7              MS. GERACI:  Objection, your Honor.

8              THE COURT:  Sustained.

9    BY MR. PITTELL:

10   Q.   If we could move on to the next section, it's a little

11   below the middle of the letter where it says "I told mom" and

12   then it goes onto the next page six lines ending with "kids".

13   I guess, if you could just read this portion right here

14   starting with "I told".

15   A.   I told mom already to give you whatever the little change

16   she got every week 40, 50 bucks to give to Sour and don't you

17   dare take a penny from it.  I don't know what's up with Sour

18   she's been very frustrated with being broke and pregnant.  She

19   is young and if shit hit the fan for me I doubt she's going to

20   be there but right now she is pregnant with my twins and I need

21   to make sure she's good.  There's a lot of people in her ear

22   trying to get her to get rid of my kids.  You and David both

23   supposed to be the positive.

24   Q.   If we could just stop right there.  So the portion that you

25   read on the earlier page where it says "I told mom" that's

1   referring to both you, your and Mr. Jean-Philippe's mother; is
2   that correct?
3   A.  Um-hmm, yes.
4   Q.  And he's saying that he told your mother to give whatever
5   spare change she has to Sour?
6   A.  Um-hmm.
7   Q.  Is that what your understanding of what the letter says?
8   A.  Yes.
9   Q.  And then the second part where it says Sour's been very
10  frustrated because she's been broke it's because she doesn't
11  have very much money; is that correct?
12  A.  Yes.
13              THE COURT:  Is that what it says?
14              MR. PITTELL:  Your understanding of what it means.
15              THE COURT:  Why don't you rephrase that.  If you are
16  asking him -- are you asking him for an interpretation or to
17  tell you that that's what the words say on the page?
18              MR. PITTELL:  Actually, I'll just withdraw the
19  question.
20              THE COURT:  All right.
21  Q.  And then the portion you just read starting on the third
22  line up to make sure where it says "theirs" on the third line
23  from the bottom, the third word in it says that a lot of people
24  are trying to get her to get rid of my kids.  You and David
25  need to be positive.  What do you understand that to refer to?

1          THE COURT:  We're not -- go to your next question.

2     We'll come back to this.  I'll get a proffer on relevance.

3          MR. PITTELL:  All right.  If we could go to page four.

4          (Pause)

5          MR. PITTELL:  Starting on eight line from the bottom,

6     last word on the line that says the word "you".  And then it

7     goes onto the second word on the next page -- Well, let's start

8     with this.  I am sorry.  The sixth line from the bottom, do you

9     see where it says "you"?  Can you read this from the word

10    "you".  Onto the first line in the upper right-hand corner all

11    the way to the bottom and then on.  Well, read that and then

12    we'll go to the next page?

13    A.  You and David already disappointed me.  Got niggas

14    violating me.  None of y'all said or did anything.  Niggas like

15    Horace who sole my flat screen TV, Play Station, radio, bed,

16    none of y'all said or did shit.

17    Q.  OK.  Remember I asked you some questions earlier about

18    things being stolen from your brother's apartment?

19    A.  Yes.

20    Q.  Is that what it's referring to where it says Horace who

21    stole my flat screen TV, Play Station --

22    A.  Yes.

23    Q.  -- radio and so on?

24    A.  Yes.

25    Q.  And it's referring to someone named Horace as the one who

1    stole these things from him?

2    A.  Yes.

3    Q.  And further up where it said violating me that is his

4    reference to the term violating me means his property being

5    stolen?

6    A.  Um-hmm.

7    Q.  And after that it says and none of y'all said or did

8    nothing.  That refers to neither you nor David doing anything

9    about Horace stealing your brother's property; is that correct?

10   A.  Yes.

11   Q.  And so when your brother makes references to the term

12   "family loyalty" in this letter he's referring to things like

13   that where neither you nor David did anything about Horace

14   stealing his property?

15            MS. GERACI:  Objection, your Honor.

16            THE COURT:  Overruled.  He can answer it.

17   A.  I don't think so.

18            THE COURT:  Tell me when you are going to go onto your

19   next exhibit because we'll take our afternoon break.

20            MR. PITTELL:  I think I only have a few more questions

21   on this letter and then should I continue.

22            THE COURT:  No.  Go ahead.  Let me just make sure -- I

23   know it's gotten warm in here, ladies and gentlemen, and we're

24   trying to get the AC on.  I think some of you back there, I saw

25   you fanning yourselves.  So we're trying to get that fix.  It's

1    usually too cold in the jury box and right now it's too warm.

2    Why it can just be a steady temperature, I know not, but we're

3    trying to get it fixed.

4             You may proceed.

5             MR. PITTELL:  I'd like to actually go back to page

6    three and if we could read what's written in the left margin.

7             (Pause)

8             MR. PITTELL:  Your Honor, can I approach the witness

9    and show him a hard copy?

10            THE COURT:  Yes.

11   Q.  Mr. Accilien, I am showing you the same document which is

12   up on the screen.  Are you able to read what's in the margin?

13   It might actually be coming up on your screen now.  Here, I'll

14   take this back from you.  Can you read it now?

15   A.  Throw this letter away or rip it cause you know knowing you

16   probably leave it around for Aleka to find it on your retarded

17   shift.

18   Q.  Your brother's telling you to throw -- this after you get

19   this letter he's telling you to rip it up, right?

20   A.  Yeah.

21   Q.  That's because he doesn't want Aleka to find the letter?

22   A.  Yes.

23   Q.  Because it has reference to him getting Sour pregnant and

24   is Sour is pregnant with their twins; is that correct?

25   A.  That's correct.

```
1    Q.  And he wanted you to rip it up because Aleka was actually
2    living with you at the time and he was concerned she might find
3    the letter and see it?
4    A.  Yes.
5              MS. GERACI:  Objection.
6              THE COURT:  Overruled.
7              MR. PITTELL:  OK.  If we could go to page five.
8              (Pause)
9    Q.  And if we could start on the second line, do you see where
10   it says "shit" and then there's three dots and then there's a
11   word after that?
12   A.  Um-hmm.
13   Q.  Can you read starting with that word and then stop on the
14   third line where it says the word "me"?
15   A.  Little bitch made niggas like porky gave you the run around
16   on playing me.
17   Q.  On "paying" or "playing"?
18   A.  On "paying".  I am sorry.
19   Q.  And that's a reference to someone named "Porky" who owes
20   your brother some money?
21   A.  Yes.
22   Q.  And the reference to you giving you the run-around means
23   that your brother's actually to collect the debt from Porky but
24   he is giving you the run-around?
25   A.  Yes.
```

E99AADEL6                    Accilien - Cross

1   Q.  And then if we could go to the next line, see where it says

2   after me it starts with "y'all"?

3   A.  Y'all niggas looking real soft out there and if my family

4   look soft then I look soft.  I mean --

5   Q.  You can stop right there?

6   A.  Yes.

7   Q.  So that refers to the fact that him and your family's going

8   to look soft if Porky's allowed to give you the run-around and

9   not pay the debt; is that correct?

10  A.  Excuse me.

11  Q.  The reference to "looking soft" and the "family looking

12  soft" refers to the perception that your family's going to have

13  on the street if porky's allowed to skip on the debt that he

14  owes your brother.

15  A.  Yeah.  He also means about Horace taking his stuff too.

16          MR. PITTELL:  OK.  Judge, other than the inquiry that

17  we're going to take up, I am finished with this letter.

18          THE COURT:  All right.  Let's take our midafternoon

19  break.

20          Ladies and gentlemen, we'll come back in 12 minutes.

21  We'll try to keep it as close to 12 as we can.  I want to

22  remind you not to talk to each other about this case or anybody

23  else.

24          (Jury not present)

25          THE COURT:  All right.  Mr. Accilien, you can step

 1    down, sir, and take a short break and everybody else, let's be

 2    seated.

 3              (Witness not present)

 4              THE COURT:  Couple of things.  First, can we move the

 5    screen in front of Mr. Delva?  Is it possible to move it to the

 6    right so I can see his face?  I like to see people's faces

 7    generally in the courtroom.

 8              (Pause)

 9              THE COURT:  Thanks.  In terms of the letters, I

10    suspect these will be used maybe several times.  I don't know.

11    Got another letter coming up.  When the letters are used again

12    can you folks freeze the Jpegs into however you've got the

13    image filed into some manner so we don't have to spend the 30

14    seconds waiting to rotate.

15              MR. POSCABLO:  We can use the Elmo.

16              THE COURT:  Whatever you folks want to do, let's try

17    to avoid the 30 second delays with rotation.

18              The other thing I wanted to mention and to go over was

19    why I sua sponte cut Mr. Pittell off and then struck his

20    testimony on the abortion and spending life in jail because you

21    were referring to life in jail which we talked about yesterday

22    for those very same reasons.  You didn't need to go there to

23    make a point.  The abortion -- it's the kind of thing by the

24    way I like to hear about in advance it we are going to get to

25    something like somebody's trying to have somebody else abort

E99AADEL6                    Accilien – Cross

1    twins, that falls in the bucket of things I don't like to be

2    surprised about, particularly, if there's a proffer as to why

3    it's relevant because it, obviously, raises hot button issues

4    for the jury.  Getting rid of kids can mean a variety of

5    things.  So the language in the letter doesn't necessarily lend

6    itself automatically to an abortion.  In any event, if that's

7    what it's being talked about, I need to know why we're ever

8    going there and why it's not redacted from the letter because

9    it is distracting to the jury in terms of the issues.

10          Now, the points that you were making more broadly

11   about what could family loyalty mean, all fair game.  And

12   taking care of Sour and taking care of Aleka, the other woman,

13   all fair game.  The Horace and flat screen TV, all fair game to

14   go after family loyalty, to go after soft is exactly within the

15   heartland of what you can do and have done.  But I just wanted

16   to tell you why I had cut you off.

17          Now, I didn't say anything and the government didn't

18   object knowing my prior instruction, when the letter itself,

19   when that reference came in through the written text the

20   government didn't object and so I let that go.  I don't know

21   it's relevant but the government didn't object.

22          In terms of a couple of things, Ms. Geraci, at one

23   point you had objected when Mr. Pittell had said did your

24   brother tell you he was angry with you for having her sleep in

25   the living room and you objected on hearsay grounds and I

1    overruled it one, because it's not necessarily for truth.  And

2    two, if it was it's state of mind.  It's clear not a

3    coconspirator issue and nor was it suggested that it was.  That

4    was the basis of my ruling.

5           Then a couple of times Mr. Pittell has and there's

6    been a lot of inconsistencies.  So Mr. Pittell and he has a

7    right to be inconsistent because you've got to take what you

8    can get so you want to push things, but he objected a lot with

9    you, Ms. Geraci, in terms of what did this mean.  And

10   rightfully so because you can't talk about what somebody else

11   meant in a letter.  But when Mr. Pittell's repeatedly asking

12   Mr. Accilien what did this mean and didn't this mean this, that

13   and the other thing and I am letting it go and I will let it go

14   unless you object.  He has thrown in a couple of times what was

15   your interpretation, what was your perception?  But if it's not

16   objected to, it's not objected to.

17          I just wanted to make sure that the record is clear on

18   the difference between how I am handling objections on both

19   sides, letting some things go and letting other things treated

20   differently.

21          MR. PITTELL:  Judge, regarding the life sentence, I

22   apologize.  That was really just a slip.  I was not trying to

23   slip it in.  I think regarding the abortion issue --

24          THE COURT:  You've made the point.

25          MR. PITTELL:  I am just going to leave it alone.  I

1    think it relates to the "family loyalty" theme and I think I've

2    covered it well enough.

3              THE COURT:  You've got a lot of fodder in that letter

4    to make the family loyalty point.  I think you pointed out --

5              MR. PITTELL:  I will say I do have questions on the

6    next letter but it's not nearly as many.  In fact, they're all

7    only on page one.  It's actually all on page one and the

8    envelope real quick.

9              THE COURT:  All right.

10             MR. PITTELL:  It won't have to be flipping and --

11             THE COURT:  All right.  Why don't we go ahead and take

12   our own break for just a few minutes and you folks, the

13   Mr. Marshal, you can bring Mr. Accilien back out into the

14   stand, it you want to bring Mr. Delva in the back for a few

15   minutes.  You can bring Mr. Accilien in if you want to do it

16   that way.

17             Anything else?

18             MS. GERACI:  No, your Honor.

19             THE COURT:  All right.  Mr. Pittell, we're OK for the

20   next segment.  Anything you need to go back to or want to

21   revisit?

22             MR. PITTELL:  No.  I am looking at the chapters I have

23   left.  I think I am going to take up the rest of the day with

24   him.

25             THE COURT:  Look, do you what you do.  It's been

1    relevant so far.  I am not going to cut you off, all right.

2              MR. POSCABLO:  Judge?

3              THE COURT:  If he is done 20 minutes earlier I am

4    going to have you call somebody else.

5              MR. POSCABLO:  Thank you, your Honor.

6              (Recess)

7              THE COURT:  All right.  Let's bring the jury out.

8              (Jury present)

9              THE COURT:  Ladies and gentlemen, it was a little cold

10   over here and so I told whoever was directly under vent that

11   they could shift at least for tonight until we're able to get

12   some vent issue taken care of.  I apologize for the up and down

13   temperature.

14             Let's all be seated.  Thank you.  So we have Juror No.

15   Seven now sitting down there.  Is anybody else uncomfortable

16   with the vent right now?  It would help you to move?  No.

17             All right.  Let's go ahead and proceed, Mr. Pittell.

18             MR. PITTELL:  Thank you.  If we could take a look at

19   Exhibit 51.

20   Q.  Mr. Accilien, could you see that on the screen?

21   A.  It's kind of light but I could see it though.

22   Q.  This is the second letter that was sent to you from your

23   brother?

24   A.  Yes.

25   Q.  Again, real quick, we're looking at the envelope.  Can you

1    see at the top line what it says there above the address?

2    A.  Can you make it a little darker?

3           THE COURT:  Do you have a hard copy you can just hand

4    to the witness?

5           MR. PITTELL:  I am going to show him this one.  If you

6    could put the other one up, just the one page.

7           (Pause)

8           THE COURT:  I don't think we need the Elmo because

9    they are not going to redate this one.

10   Q.  Mr. Accilien, I am showing you Exhibit 51, the envelope of

11   that.  If you could just take a look at that you see where

12   something is written above the address, what does that say

13   there?

14   A.  "Diddy".

15   Q.  Not the return address, the mailing address?

16   A.  Oh, "to Dreko".

17   Q.  That means that's to you, correct?

18   A.  Yes.

19   Q.  And it's just to you?

20   A.  Not really.

21   Q.  There's no -- but there's no other name written there; is

22   that correct?

23   A.  Yeah, but inside the letter it's going to talk about me and

24   David.

25   Q.  But the address itself is to you?

```
1    A.  Yes.

2           MR. PITTELL:  All right.  If we could go look at the

3    first page.

4           (Pause)

5    Q.  If you could read the first four lines up to the word "up"?

6    A.  Yo, you've got to be the dumbest motherfuckers in the

7    world.  How the fuck you let Aleka find the letter I sent you

8    when I told you to rip the shit up?

9    Q.  You can stop right there for a second.  Mr. Accilien, is it

10   correct Aleka found the other letter that you were looking at

11   before the break?

12   A.  Negative.  Negative.

13   Q.  No.  Did Aleka find any letter?

14   A.  No.

15   Q.  Then if could you read the next three lines right after

16   where it says "up" start with "even" and you could stop at

17   "closet".

18   A.  Even if you ain't ripped it up why you can't put that shit

19   away like in the closet or --

20   Q.  OK.  You could stop.  Actually, just stop right there.

21   That's fine.

22   A.  OK.

23   Q.  At the time that you received this letter you were living

24   in at 832 South Oak Drive; is that correct?

25   A.  Yes.
```

1   Q.  And at the time that you were received this letter you were

2   sleeping in the bedroom of that apartment; is that correct?

3   A.  No, I was sleeping in the living room too.

4   Q.  But were you also sleeping in the bedroom with David at

5   that time?

6   A.  No.

7   Q.  OK.  And how many closets were in the bedroom?

8   A.  There's a closet in each room.

9   Q.  There's a closet in the living room and there's a closet in

10  the bedroom?

11  A.  Yes.

12  Q.  Now, if we could look down at it's the tenth line starting

13  in the middle with "I'm thinking" and it ends up -- actually,

14  yeah, we could just -- All right.  If could you just read,

15  start with "I'm thinking" and end on the end of the third line.

16  A.  I am thinking how I used to travel all the way to -- I am

17  thinking how I used to travel all the way down to Manhattan to

18  bring you food at the hospital.  You were in Montefiore.

19  Q.  I don't mean to interrupt but you could stop right there

20  for a moment.  Do you recall earlier in the day I was asking

21  you questions about you being hospitalized at Montefiore

22  Hospital?

23  A.  Yes.

24  Q.  There were times during your hospitalization that your

25  brother, Dominique, came and visited you in the hospital; is

1    that correct?

2    A.  Yes.

3    Q.  And he brought you food?

4    A.  Yes.

5    Q.  Is that correct?  All right.  If you could read the second

6    to last line where it says "I got" and end on the next, on the

7    last line where it says "locked"?

8    A.  OK.  It says I got not going to put money on the phone to

9    you and when you was lock.

10   Q.  OK.  If you could stop right there?

11   A.  When he was locked down.  And I don't know the rest.

12   Q.  All right.  Do you recall earlier when I asked you

13   questions about the time period when you were in the

14   Westchester County Jail?

15   A.  Um-hmm.

16   Q.  And in order to make phone calls from the jail you have to

17   have money on your phone account; is that correct?

18   A.  Yes.

19   Q.  And there were times when you were in that jail that your

20   brother, Dominique, put money on your phone account so you

21   could make calls?

22   A.  Right.

23   Q.  And that's what that's referring to?

24   A.  Yes.

25   Q.  And the farther line which you read about bringing you food

1    to the hospital that's referring to him bringing you food while

2    you were at Montefiore?

3    A.  Yes.

4         MR. PITTELL:  I'm finished with this exhibit.

5    Q.  Mr. Accilien, during September of 2012, in fact, during the

6    Labor Day weekend of the robbery -- well, actually, during the

7    month of September 2012 and going into August of 2012, David

8    Delva was living in your house; is that correct?

9    A.  Right.

10   Q.  And David Delva was sleeping in the bedroom?

11   A.  Yes, he was sleeping in the bedroom.

12   Q.  And sometimes you slept in the bedroom with him?

13   A.  No.

14   Q.  Did you ever sleep on the same mattress as him?

15   A.  The last days before I got locked up I did.

16   Q.  All right.  And how many bathrooms are in that apartment?

17   A.  One bathroom.

18   Q.  And so I take it you and David Delva would sometimes use

19   the same bathroom?

20   A.  Yes.

21   Q.  And how many kitchens are in the apartment?

22   A.  One kitchen.

23   Q.  And so am I correct that you and David Delva would use the

24   same kitchen?

25   A.  Right.

1   Q.  You would use the same refrigerators or the same sink?

2   A.  Yes.

3   Q.  Was there a chair and table in the kitchen?

4   A.  Yes.  There's a chair and no tables.

5   Q.  OK.  So the two of you sometimes sit in that chair?

6   A.  Yes.

7   Q.  And so you said there was no table in the kitchen?

8   A.  No.

9   Q.  But you had indicated that at one point during the time of

10  the robbery Trevor called and Dominique came over with some hot

11  wings?

12  A.  Yes.

13  Q.  And hot wings you said they're chicken wings?

14  A.  Yes.

15  Q.  And do they have some kind of hot sauce on them; is that

16  why they are called "hot wings"?

17  A.  Yeah, they're hot wings.

18  Q.  Do they have like a sticky sauce on them?

19  A.  Yeah, I believe so.

20  Q.  All right.  So where did all of you eat the wings?

21  A.  We ate it in the living room and the bedroom.

22  Q.  All right.  And is there some kind of table in the living

23  room?

24  A.  No.

25  Q.  All right.  When you say you ate it in the bedroom that's

```
 1   the bedroom that David Delva was sleeping in at the time?
 2   A.   Yes.
 3   Q.   During the early part of September was David Delva sleeping
 4   in the living room or the bedroom?
 5   A.   I believe he was living in his own room around that time in
 6   the living room -- in the bedroom.
 7   Q.   And who else was living in the apartment at that time?
 8   A.   Just me.  It was just me and David.
 9   Q.   Was Cut staying there at that time?
10   A.   Yeah, he used to pass by.  That was it.
11   Q.   Now, you've told us a couple times that you bought the
12   latex gloves from Rite Aid?
13   A.   Yes.
14   Q.   Did you buy a whole box of gloves or a package?  What did
15   you buy?
16   A.   It was a whole box of gloves.
17   Q.   And did you bring that box over to the crime scene?
18   A.   Yes.
19   Q.   And you left the box at the crime scene?
20   A.   Yes, in the possession of Dominique.
21   Q.   Right.  So when you first went there and gave him the
22   gloves everybody opened up the box an took out the gloves; is
23   that correct?
24   A.   Yes.
25   Q.   And you put on a pair of gloves at that time?
```

1   A.  Yes.

2   Q.  And then when you left, before you left did you take off

3   the gloves and leave them there?

4   A.  No.  I took mine when I got outside.

5   Q.  OK.  Did you take the gloves back home?

6   A.  No.

7   Q.  So you took them outside and then you got rid of them at

8   some point?

9   A.  Excuse me?

10  Q.  When you were outside you got rid of them at some point on

11  your way home?

12  A.  Yes.

13          THE COURT:  What point in time are we at when he is

14  taking the gloves off?

15  Q.  This is when after you dropped off the gloves and then

16  after you left the crime scene apartment for the first time?

17  A.  Yes.

18          MR. PITTELL:  That's what I am talking about.

19          THE COURT:  All right.  Taking the gloves off, was

20  there a moment when the gloves went on in the apartment?

21          MR. PITTELL:  I believe I asked him that.

22          THE COURT:  No I -- fine.  Why don't we just clarify

23  that now that I've confused other people.

24  Q.  Mr. Accilien, when you brought the box of gloves to the

25  apartment did somebody open up the box of gloves?

1    A.   Yes.

2    Q.   And when the box was opened up you yourself put on a pair

3    of gloves?

4    A.   Yes.

5    Q.   And then when you left the apartment you were still wearing

6    the gloves?

7    A.   Yes.

8    Q.   But at some point when you were heading home to South Oak

9    Drive you took off the gloves and threw them out?

10   A.   Yes.

11   Q.   Now you've indicated that at some point you went back at

12   the crime scene apartment?

13   A.   Yes.

14   Q.   And when you went back to the crime scene apartment was

15   there still a box of gloves there?

16   A.   Yes.  I am not sure what happened to the box of gloves but

17   there were still gloves around.

18   Q.   All right.  So when you went back to the crime scene

19   apartment you put on a fresh pair of gloves?

20   A.   Yes.

21   Q.   And then when you left the crime scene apartment the second

22   time did you have the gloves on?

23   A.   Excuse me.

24   Q.   When you left the crime scene apartment the second time did

25   you still have the gloves on?

1   A.  Yes.

2   Q.  And the same thing as the first time, did you discard it at

3   some point when you were on your way home to South Oak Drive?

4   A.  Yes.

5   Q.  Then you indicated that you went to the crime scene

6   apartment a third time; is that correct?  I am not asking about

7   the time you went but there was at least a third time?

8   A.  Yes, there was.

9   Q.  There was a third time when you went from her home at South

10  Oak Drive back to the crime scene?

11  A.  Yes.

12  Q.  And when you went back to the crime scene the third time

13  you put on a pair of gloves that third time; is that correct?

14  A.  Yes.

15  Q.  And you wore the gloves while you were in the crime scene

16  apartment the third time and then at some point you left the

17  crime scene apartment?

18  A.  Yes.

19          THE COURT:  That was a compound question.  Why don't

20  you break that down so we get each question.

21  Q.  You wore the gloves while you were in the crime scene

22  apartment?

23          THE COURT:  This is the third time?

24          MR. PITTELL:  Right.

25  Q.  While you were in crime scene apartment for the third time

1    did you wear the gloves?

2    A.  Yes, the third time I wore gloves.

3    Q.  And when you left the crime scene apartment for the third

4    time did you -- were you still wearing the gloves, if you

5    recall?

6    A.  Yes.

7    Q.  And was it like the prior two times that before you got

8    home you took the gloves off and you discarded them at some

9    point?

10   A.  Yeah, it was the same thing.

11   Q.  And I just want to go back so I'm clear.  When you went to

12   the crime scene the second time you went from your house on

13   South Oak Drive right to the crime scene?

14   A.  The second time?

15   Q.  The second time you went to the crime scene.

16   A.  The second time I left my house with David and I went to

17   the crime scene.

18   Q.  Right.  So the first time you left your house you went to

19   Rite Aid, then you went to the crime scene?

20   A.  Yes.

21   Q.  The second time you went from your house to the crime

22   scene?

23   A.  Can you repeat that again, please.

24   Q.  The first time you went to the crime scene from your house

25   you went from your house to Rite Aid, then to the crime scene?

1   A.   Yes.

2   Q.   The second time you went right from your house to the crime

3   scene?

4   A.   Yes.

5   Q.   Third time you went right from your house to the crime

6   scene?

7   A.   Yes.

8   Q.   So other than the first time that you went to Rite Aid all

9   the other times that you went to the crime scene you went

10  directly from your house to the crime scene?

11  A.   Yes.

12  Q.   And every time that you were at the crime scene including

13  the first time you put gloves on?

14  A.   You talking about going to the crime scene, right?

15  Q.   I am talking about when you are in the crime scene.

16  A.   Oh, leaving the crime scene, you are talking about leaving

17  the crime scene?

18  Q.   I am talking when you are inside the crime scene, every

19  time you were inside the crime screen you were wearing gloves.

20  A.   Are you talking about leaving the crime scene, did I go;

21  directly to my house.

22  Q.   Nope.  I am asking you while you were inside the crime

23  scene itself, were you wearing gloves?

24  A.   Yes.

25  Q.   Every single time?

1    A.  Yes.

2    Q.  Now, one of these times while you were in the crime scene

3    you indicated that you saw Trevor Cole in the bedroom with a

4    woman; is that correct?

5    A.  That, that -- that proffer session wasn't accurate yet.  It

6    took me a while for me to get the story straight.

7    Q.  OK.  So you feel that you've now gotten your story

8    straight?

9    A.  Yes.

10   Q.  It took about ten or 11 meetings before you got your story

11   straight?

12   A.  Right around that.

13   Q.  OK.  But you feel the story is straight now?

14   A.  Excuse me?

15   Q.  But you feel your story is straight now?

16   A.  Yes, it is.

17   Q.  But while you were having all these meetings trying to get

18   your story straight you were giving them different stories?

19   A.  Just certain things was left out.  That was it.

20          MR. PITTELL:  I want to show the witness Exhibit 52-I.

21   It's not in evidence.  I expect it will be in evidence.  To

22   facilitate matters I am willing to offer it now in evidence.

23          THE COURT:  All right.  This is on the government's

24   list?

25          MR. PITTELL:  Yes.

1              THE COURT:  All right.

2              MR. PITTELL:  Oh, you are not putting it in?

3              MR. POSCABLO:  No.

4              MR. PITTELL:  All right.  Judge, I'd like to offer

5    Exhibit 52-I into evidence.  Actually, I'll show it to the

6    witness.

7              MR. POSCABLO:  Judge, no objection, your Honor.

8              THE COURT:  All right.  52-I is received.  There's no

9    objection to it.  I see the document.  Do you want to publish

10   it or do something else?

11             (Defendant's Exhibit 52-I received in evidence)

12             MR. PITTELL:  I'd like to publish it and show it the

13   witness.

14             THE COURT:  Publishing it, of course, ladies and

15   gentlemen of the jury, is just a legal term for showing it to

16   you once it's been admitted.

17   Q.  Do you see that photograph, Mr. Accilien?

18   A.  Yes.

19   Q.  Do you see the photograph is like looking into a room on

20   the right side of the photograph?

21   A.  Yes.

22   Q.  Is that the bedroom of your apartment on South Oak Drive?

23   A.  Right.

24             MR. PITTELL:  And can you -- is there any way we can

25   zoom into some dressers or some bottles?

E99AADEL6                    Accilien – Cross

1   Q.  Do you see right there where there's some bottles on top of

2   a white plastic –– do you see that?

3   A.  Yeah, the bottles?

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. PITTELL:   (Continued)

2    Q.   Yeah.

3    A.   Yeah, I see the bottles.

4    Q.   What is that?

5    A.   All those -- those were all -- all the bottles that Dave

6    finished drinking.

7    Q.   Did you -- the letters that I showed you earlier, Exhibit

8    50 and 51, the letters from your brother --

9    A.   Uh-huh.

10   Q.   -- did you put the letters on those bottles?

11   A.   No, they was -- they was inside of Dave's closet.

12            MR. PITTELL:   All right.   I'm done with the exhibit.

13   Q.   Mr. Accilien, I asked you about when you were arrested and

14   went to the Westchester County jail for assaulting someone with

15   a knife in October of 2010.

16   A.   Yes.

17   Q.   Besides this case, have you been involved in other assaults

18   of people for which you've never been arrested?

19   A.   Rephrase that, please, sir?

20   Q.   Well, actually, I asked you questions about that.   I asked

21   you questions about fights you got in with patients and

22   hospitals.   Do you remember me asking you those questions?

23   A.   Yes.

24   Q.   And I also asked you questions about fights that you got in

25   with residents at the VA shelter?

1    A.   Yes.

2    Q.   Other than the fight you got in at the bar in Mount Vernon,

3    other than the fights that you've had at the VA shelter, other

4    than fights that you've had in hospitals with patients, have

5    you been involved in other fights?

6    A.   Umm, I've been involved in other fights.

7    Q.   Do you have a cousin by the name of Stanley Noisette?

8    A.   Yes.

9    Q.   Isn't it true that you were involved --

10   A.   He's not my cousin.  He's my god brother.

11   Q.   Isn't it true that at one point in time you and Dominique

12   got in a fight with Stanley?

13   A.   No.

14   Q.   Isn't it true that there was a point in time when Stan --

15   where does Stanley live?

16   A.   I believe he lives with his -- I'm not sure where he lives.

17   I remember he used to stay with his mother in Yonkers, but I

18   don't know if he lives there now.

19   Q.   Was there a -- do you recall a point in time when he came

20   to visit you when you were living with your brother, Dominique?

21   A.   Yes.

22   Q.   And there was a point in time when you and Dominique were

23   living together.  Is that correct?

24   A.   Yes, that's right.

25   Q.   During that point in time when you were living with

1   Dominique, you and Dominique were selling drugs.  Is that

2   correct?

3   A.  Yes.

4   Q.  When Stanley came to visit you and Dominique, well, he

5   came -- you found out he came by your house and neither you nor

6   Dominique was home.  Is that correct?

7   A.  Do I recall that happening?

8   Q.  Yes, do you remember him coming by your house when neither

9   of you were home?

10  A.  No, I don't remember that, sir.

11  Q.  Do you recall a time when he went inside your house --

12          THE COURT:  Mr. Pittell, why don't you rephrase it

13  because the way you asked it would then itself have been an

14  impossibility.

15  Q.  OK.  Do you recall a time where your god brother Stanley

16  went by your house when nobody was home and left your front

17  door open?

18  A.  No, I don't remember.

19  Q.  Do you remember a time when the police came into that house

20  where you lived with your brother Dominique when nobody was

21  home and the police found drugs in that house?

22  A.  No, I don't recall that either.

23  Q.  You don't recall that happening?  Was there ever a time

24  when your brother Dominique beat up your cousin Stanley?

25  A.  No.

E99Qdel7                           Accilien - cross

1    Q.  What but, was there a point in time when you beat up your

2    cousin Stanley?

3    A.  No.  He was my god brother.

4    Q.  Have you ever got in a fight with David Delva?

5    A.  David Delva tried to beat me up, but I wasn't fighting him

6    back.

7    Q.  So the two of you have gotten in fights before?

8    A.  Yes.

9    Q.  You've had fights more than one time.  Is that correct?

10   A.  Umm, well -- yeah --

11   Q.  I'm not asking who started it or whose fault it was.  I'm

12   just asking if you had fights.

13   A.  Yeah, I had a fight with him like twice.  I mean -- I

14   mean--

15   Q.  When I say fights, I mean physical fights; not words.

16   A.  Yeah, about -- I had a fight with him twice.

17   Q.  Do you have a sister named Rose Thomas?

18   A.  Yes.

19   Q.  And did she ever talk to you and complain to you about you

20   beating up David?

21   A.  No.

22   Q.  Do you recall her ever asking you "how could you beat up

23   your own flesh and blood"?

24            MS. GERACI:  Objection, your Honor.

25   A.  No.

1              THE COURT:  Overruled.

2    Q.  Do you recall ever telling your sister that you beat up

3    David because he disrespected you?

4    A.  Excuse me?

5    Q.  Do you recall ever telling your sister that you beat up

6    David because he disrespected you?

7    A.  Not that I remember.

8    Q.  Did you ever get in a fight with David because he mouthed

9    off at you?

10   A.  I got in a fight with David the first time because he was

11   drunk and he was being obnoxious.

12   Q.  So, he was mouthing off because he was drunk and obnoxious?

13   A.  Yes.

14   Q.  And the second time you got in a fight with David was

15   during 2012 when he was living with you at South Oak Drive?

16   A.  Yes.

17   Q.  During that fight, you pushed David down a flight of

18   stairs?

19   A.  No.  No.  No, that's not -- that's not -- that's not right.

20   Q.  At some point during that -- the course of that fight,

21   David Delva was outside the house on the street somewhere and

22   you were inside the house?

23   A.  Excuse me?

24   Q.  At some point during the fight, were you inside the house

25   on South Oak Drive and David was outside of the house?

E99Qdel7                         Accilien - cross

1    A.  No.  David was inside the house, and he -- he initiated the

2    fight which -- by throwing blows.  I tried to fight him off,

3    but he -- this time around he wasn't drunk, so I couldn't

4    handle him, so he started punching -- punching -- throwing

5    punches at me, and then he broke the wall with his fist.

6    Q.  Mr. Accilien, I'm just asking you was there a point in time

7    during this fight when you were inside the house and David was

8    outside the house?

9    A.  Repeat that again?

10   Q.  At some point during this fight, didn't David go outside

11   the house?

12   A.  No.

13   Q.  And --

14        THE COURT:  When is this fight?  Like is this in --

15   Q.  During 2012 when Mr. Delva was living with you.

16        THE COURT:  All right.  Thank you.

17   Q.  Isn't it true that at some point you jumped through a

18   window to get outside to go after Mr. Delva?

19   A.  Oh, this didn't happen in 2012.

20   Q.  When was it that you jumped through the window to get at

21   Mr. Delva?

22   A.  This happened like two or three years ago.

23   Q.  So, two or three years ago you were involved in a fight

24   with Mr. Delva?

25   A.  From 2012, like two or three years ago before 2012.  And

E99Qdel7                        Accilien - cross

1    when I jumped out the window it was because David Delva broke

2    the lock of my door, and I -- I couldn't -- I couldn't step out

3    my door because the lock was broken, so I had to -- I had to

4    jump out the window to get out my house.

5    Q.  So, when you were jumping out window, David Delva was

6    outside?

7    A.  Yes.

8    Q.  Mr. Accilien, I want to go back to when you were arrested

9    on June 4, 2013.

10   A.  Yes.

11   Q.  On that same day -- well, on the day you were arrested, the

12   police came and raided your apartment?

13   A.  Right.

14   Q.  And it was a whole team of police?

15   A.  Yes.

16   Q.  You were actually arrested and handcuffed and taken out of

17   the apartment?

18   A.  Yes.

19   Q.  And you saw that David was arrested and handcuffed and

20   taken out of the apartment?

21   A.  Correct.

22   Q.  And you know that David was charged with possession of a

23   gun and drugs which were recovered from the bedroom?

24   A.  Yes.

25   Q.  And you know that David for that case was being prosecuted

1    in Bronx Supreme Court?

2              MS. GERACI:  Objection, your Honor.

3    A.  Yes.

4              THE COURT:  Hold on.

5    A.  Yes.

6              THE COURT:  All right.  I'll overrule it.  You can

7    proceed.

8    Q.  So you and David were taken away in separate cars?

9    A.  In separate cars?  Yeah.

10   Q.  After you were both arrested on that date in June.

11   A.  Yes.

12   Q.  And earlier this morning, you indicated that while you were

13   in the car to the FBI office, you even spoke with the agents in

14   the car.  Is that correct?

15   A.  Yes.

16   Q.  At that point you knew that your brother, Dominique, and

17   Trevor Cole had already been arrested for their participation

18   in the September robbery?

19   A.  Correct.

20   Q.  While you were in the car, the agents told you that you

21   should decide to cooperate in this case.  Is that correct?

22   A.  I don't remember the conversation I had that day.  It's

23   been 15 months from now.

24   Q.  Do you recall the agents telling you that you were facing a

25   long time in jail based upon what they were arresting you for?

1          MS. GERACI:  Objection, your Honor.

2          THE COURT:  Sustained.

3    A.   Do I remember them saying that?

4    Q.   Actually, there is no question before you.

5          THE COURT:  Mr. Pittell, I'll allow that.

6          MR. PITTELL:  Could I have it read back then, Judge?

7          THE COURT:  If you want it.

8          MR. PITTELL:  Yes, please.

9          THE COURT:  Could we have the question read back?

10         (Read back)

11         THE COURT:  This is during the initial arrest period

12   of time?

13         MR. PITTELL:  Right.

14         THE COURT:  You can answer.

15   A.   I don't remember them telling me that, but I knew from the

16   charges that a lot of time was going to be served because of

17   that.

18   Q.   Wasn't there a point where the agents said, "Look,

19   Mr. Accilien, come on, we got you dead to rights to robbery.

20   You're facing a lot of jail time.  The smart thing to do is

21   cooperate with us."  Isn't there something they said to you to

22   that effect?

23         MS. GERACI:  Objection, your Honor.

24         THE COURT:  Sustained.

25   Q.   You indicated that --

1           THE COURT:  You would have to call the agents to have

2     them say what they said so that it's not hearsay.

3     Q.  You indicated, I believe it was yesterday on your direct

4     examination, that you did decide to early on cooperate in this

5     case?

6     A.  Yes.

7     Q.  When you made that decision, you knew David had been

8     arrested on the Bronx charges.  Is that correct?

9     A.  Yes.

10    Q.  At some point, you and the prosecutors signed a cooperation

11    agreement?

12    A.  Me and who?

13    Q.  Well, actually, let me withdraw the question.

14          So, when you indicated you decided to cooperate, the

15    first thing you did was have that first proffer meeting with

16    the prosecutors?

17    A.  Repeat that again, sir?

18    Q.  After you decided to cooperate, you then had that first

19    proffer meeting with the prosecutors?

20    A.  I started -- I started cooperating in the first -- I

21    started cooperating in the first proffer meeting.

22    Q.  Right, but at some point in this case you had a whole

23    series of proffer meetings with the prosecutors?

24    A.  Yes.

25    Q.  After two or three or four of these meetings -- I'm not

E99Qdel7                          Accilien - cross

1    going to hold you to a number -- but after a series of these

2    meetings, the prosecutors eventually offered you a cooperation

3    agreement?

4    A.   No, they did not offer me any cooperation because -- hold

5    on.  Hold on.  Hold on.  Can you repeat that again?

6    Q.   Yes.  At some point did you sign a cooperation agreement in

7    this case?

8    A.   Yes.

9    Q.   In fact, you've signed two cooperation agreements?

10   A.   Yes.

11   Q.   So, let's talk about the first cooperation agreement.

12   A.   All right.

13   Q.   Before you signed the first cooperation agreement, you had

14   a whole series of meetings with the prosecutors?

15   A.   Yes.

16   Q.   Then after you had these meetings, the prosecutors sent a

17   cooperation agreement to your lawyer, and your lawyer brought

18   it to you and gave you a copy of the cooperation agreement?

19   A.   No, they didn't give me a copy of the cooperation

20   agreement.

21   Q.   Did your lawyer show it to you?

22   A.   Yeah, he showed it to me.

23   Q.   And then at some point you signed the cooperation

24   agreement?

25   A.   Yes.

1              MR. PITTELL:  Judge, to facilitate matters, I would

2     like to offer 3514-L in evidence.

3              MR. POSCABLO:  As a cooperation agreement between the

4     government dated September 5, 2013 and Mr. Accilien, we

5     stipulate to that.

6              THE COURT:  So, that's received.

7              MR. PITTELL:  So we will just keep it as that Exhibit

8     3514-L.

9              THE COURT:  Yes.

10             (Government's Exhibit 3514-L received in evidence)

11             MR. PITTELL:  Approach the witness, your Honor?

12             THE COURT:  Yes.  I thought 3514-JJ.

13             MS. GERACI:  That's the second cooperation agreement,

14    your Honor.  That is in evidence.

15             THE COURT:  All right.

16    Q.  Mr. Accilien, I'm showing you 3514-L.  Can we possibly

17    publish this?

18             Mr. Accilien, I ask you to take a look at the hard

19    copy of the document in front of you and look at the last page.

20    Is that your signature on the last page?

21    A.  Yes.

22    Q.  That this the first cooperation agreement that you signed?

23    A.  Yes.

24    Q.  If you could take a look at page -- under the terms of this

25    cooperation agreement, one thing that you were required to do

1    was to plead guilty to robbery conspiracy, robbery, kidnapping,

2    kidnapping conspiracy and a gun charge.  Is that correct?

3    A.  Yes.

4    Q.  If we could take a look at page 2, paragraph three, which

5    is just a one-sentence paragraph:  If you could look at page 2,

6    Mr. Accilien.  You can look on the screen.  Can you -- I will

7    come here and point to the section.  Can you read this line

8    right here?

9    A.  The maximum sentence of incarceration is life with

10   mandatory minimum of seven years.

11   Q.  What does that mean to you?

12   A.  The maximum sentence I could get is life.

13   Q.  It means that on the charges you pleaded guilty to, you're

14   facing a maximum of life and at least a minimum of seven years.

15   Is that correct?

16   A.  Yes.  No.  No.  No.  No -- yeah.  Yeah.  Yeah.  Correct.

17   That's right.

18   Q.  However, this cooperation agreement provides that if you

19   provide something which is called substantial assistance, you

20   might get a sentence which is less than life, which is even

21   less than seven years.  Is that correct?

22   A.  Repeat that again?

23   Q.  Under the terms of this cooperation agreement, if you

24   provide what's called substantial assistance to the

25   government--

1   A.  Yes.

2   Q.  -- you can get a sentence which is less than life?

3   A.  Yes.

4   Q.  In fact, you can get a sentence which is even less than the

5   mandatory minimum seven years.  Is that correct?

6   A.  That's correct.

7   Q.  You could even get a sentence of time served?

8   A.  Yes.

9   Q.  Time served means that your jail sentence would end on the

10  day of your sentence and you would walk out a free man, so to

11  speak?

12  A.  Yes.

13  Q.  The way it works is that in order for you to get a

14  potential sentence of time served is that if you provide

15  substantial assistance to the government, the government will

16  file a motion before the Court.  Is that correct?

17  A.  It would file a letter for the judge.

18  Q.  OK.  And the letter, is this letter sometimes called a 5K

19  letter?

20  A.  Yes.

21  Q.  And what a 5K letter is, is it -- it's a letter to the

22  judge which explains all the substantial assistance that you

23  have provided?

24          MS. GERACI:  Objection, your Honor.

25          THE COURT:  I'll allow it.  It's your understanding.

1    It's not the legal definition of this, but --

2    A.  Repeat that again, sir?

3    Q.  A 5K letter is a letter written by the prosecutor which

4    explains to the judge the substantial assistance that you

5    provided?

6    A.  Yes.

7    Q.  In the provision of the agreement where it says there's a

8    mandatory minimum of seven years, unless the prosecutor writes

9    that 5K letter, there is no way that you can possibly get a

10   sentence of less than seven years.  Is that correct?

11   A.  Rephrase that again, sir?

12   Q.  Unless the prosecutor writes a 5K letter, you have to get a

13   sentence of at least seven years.  Is that correct?

14   A.  Repeat that again?

15   Q.  Do you remember the provision in the letter where it says

16   there's a mandatory minimum of seven years?

17   A.  Yes.

18   Q.  Do you understand that unless the prosecutor writes a 5K

19   letter--

20   A.  Uh-huh.

21   Q.  -- under the terms of this cooperation agreement, you are

22   stuck with a sentence of at least seven years?

23   A.  I believe so.

24   Q.  OK.  And that 5K letter cannot be written by you.  Is that

25   correct?

1   A.  Excuse me?

2   Q.  The 5K letter, it cannot be written by you?

3   A.  No, no, not at all.

4   Q.  And it cannot be written by your lawyer?

5   A.  No.

6   Q.  There's only one person who can write that 5K letter?

7   A.  Yes.

8   Q.  That's the prosecutors?

9   A.  Correct.

10  Q.  So, the letter has a special power because the letter will

11  permit the judge to give you a sentence of less than seven

12  years?

13  A.  Yes.

14  Q.  If they don't write that letter, you're going to do at

15  least seven years under this cooperation agreement?

16  A.  Yes.

17  Q.  Now, you just told us that the prosecutor's decision to

18  write the 5K letter depends on whether or not you provide

19  substantial assistance to the prosecutors?

20  A.  Correct.

21  Q.  And the decision as to whether or not you've provided

22  substantial assistance rests completely with the prosecutors?

23  A.  Yes.

24  Q.  So, even if you think you've provided substantial

25  assistance, if the prosecutors disagree, there's nothing you

E99Qdel7                          Accilien - cross

1   can do about that?

2   A.  That's correct.

3   Q.  And likewise, even if your lawyer thinks you provided

4   substantial assistance but the prosecutors don't think so,

5   there is nothing your lawyer can do about that?

6   A.  No.

7   Q.  Now, this letter is six pages long.  And in addition to

8   providing substantial assistance, it also requires you to do

9   other things.  Is that correct?

10  A.  Excuse me?

11  Q.  This letter requires you to do other things besides provide

12  substantial assistance?

13  A.  Correct.

14  Q.  One thing that it requires is that after you sign this

15  letter, after you sign this cooperation agreement, you are not

16  permitted to commit any other crimes?

17  A.  Correct.

18  Q.  And if you commit a crime, then the prosecutors could tear

19  up this agreement?

20  A.  Correct.

21  Q.  And by tearing up the agreement, that means that they

22  wouldn't give you that 5K letter?

23  A.  Correct.

24  Q.  So --

25  A.  As a matter of fact, I'm --

1   Q.  Sir, I'm just --

2   A.  OK.

3   Q.  I'm just trying to ask a simple yes-or-no question.

4   A.  OK.

5   Q.  So, if you commit a crime after you sign this letter, after

6   you sign the cooperation agreement, it would be within the

7   right of the prosecutors to tear it up?

8   A.  Yes.

9   Q.  And by tearing it up, that means you would not get the 5K

10  letter.  Is that correct?

11  A.  That's correct.

12  Q.  And you would be stuck doing at least seven years in jail?

13  A.  That's correct.

14  Q.  And possibly a maximum of life?

15  A.  Correct.

16  Q.  Now, after you signed this cooperation agreement on

17  September 5, 2013, you subsequently committed another crime,

18  didn't you?

19  A.  After September 5, 2013?

20  Q.  After you signed the cooperation agreement, you committed

21  another crime.  Is that correct?  After you signed the first

22  cooperation agreement, you committed another crime, didn't you?

23  A.  I told a lie, right?

24  Q.  You committed the crime of what you've called perjury.  Is

25  that correct?

1   A.   Yes.

2   Q.   And --

3   A.   Which I suffered the consequence.

4   Q.   There is no question for you right now.  You signed this

5   agreement on September 5, 2013?

6   A.   Yes.

7   Q.   Subsequently, after you signed that, on July of 2014, you

8   committed the crime of making a false statement to a federal

9   agent or federal prosecutor.  Is that correct?

10  A.   Yes.

11  Q.   You've sometimes referred --

12  A.   Hold on.  This was done in July?

13  Q.   No.  I'm asking you is that during July 2014, you made a

14  false statement to a federal agent or a federal prosecutor?

15  A.   July 2014?

16  Q.   Right.

17  A.   Can I -- can I see the document?

18  Q.   Let's try it this way, Mr. Accilien.  After you signed this

19  first cooperation agreement, after you signed it, you

20  subsequently committed the crime of what you call perjury.  Is

21  that correct?

22  A.   Yes.

23  Q.   And that's because during one of the meetings you had with

24  the prosecutors and the agents, after you had signed the

25  cooperation agreement, you lied to them.  Is that correct?

E99Qdel7                         Accilien - cross

1   A.  Yes.

2   Q.  In fact, during meetings you had before you signed the

3   cooperation agreement, you had also lied during some of those

4   meetings.  Is that correct?

5   A.  I was getting the story straight, sir.

6   Q.  Well, during July and August of 2013 you met with the

7   prosecutors during those months.  Is that correct?

8   A.  What month?

9   Q.  July and August of 2013.

10  A.  Not that I remember.

11  Q.  Were you arrested in June of 2013?

12  A.  Yes.

13  Q.  Do you remember that?

14  A.  Yes.

15  Q.  And the next month during July you met with the

16  prosecutors?

17  A.  I don't remember -- I don't remember how long it was.  I

18  don't remember the specific date.

19  Q.  I'm not asking you a specific date.  During the month of

20  July did you meet with the prosecutors at least once during the

21  month after you were arrested?

22  A.  I don't remember.

23          MR. PITTELL:  Approach the witness, your Honor?

24          THE COURT:  You may.

25          (Pause)

1          THE COURT:  What is it?

2          MR. PITTELL:  Judge, at this time I would offer

3     Exhibit 3514-KK into evidence.

4          THE COURT:  What is KK?  I can look it up.

5          MR. PITTELL:  Superseding information.  May I

6     approach?

7          THE COURT:  Yes.  Why don't we assume that this issue

8     will be somehow addressed in terms of a stipulation or a

9     document, but let -- there are other reasons why I don't think

10    it is appropriate to admit an information.

11         MR. PITTELL:  All right.  I'm just going to show it to

12    the witness then.

13         THE COURT:  All right.  Yes, you can stipulate to it.

14    Is that what you're saying?  Why don't you folks just arrive at

15    a quick stipulation, Mr. Pittell, unless you want to ask one

16    more question.  Otherwise, let's move on and get a stipulation.

17         MR. PITTELL:  All right.  Let me try to ask one more

18    question.

19         THE COURT:  You're trying to get a time frame, right?

20         MR. PITTELL:  Yes.

21    BY MR. PITTELL:

22    Q.  Mr. Accilien --

23    A.  Yes, I remember this.

24    Q.  So, Mr. Accilien, does this refresh your recollection that

25    after you were arrested in June of 2013, you met with the

1   prosecutors during July of 2013?

2   A.   Yes.

3   Q.   And during those meetings you lied?

4   A.   Yes.

5   Q.   And then the next month, August of 2013, you met with the

6   prosecutors and you lied?

7   A.   Yes, I was trying to cover up for my nephew.

8   Q.   But you still lied to them.  Is that correct?

9   A.   Yes.

10  Q.   And you had already given up your nephew at that point?

11  You had already implicated him in the robbery at that point?

12  A.   Yeah, but I -- I didn't want to talk about his drug-selling

13  business.

14  Q.   All right.  So, you lied during July and August of 2013,

15  and then in September of 2013 you signed a cooperation

16  agreement.  Is that correct?  The document that's in front of

17  you.

18  A.   When was this?

19  Q.   September of 2013.  That's when you signed the cooperation

20  agreement, the first cooperation agreement.

21  A.   Yeah, the first one.  Yes.

22  Q.   Right.  And those lies which you had told during July and

23  August of 2013 were still hanging out there.  Is that correct?

24  A.   Were they still hanging out there?

25  Q.   Yes, you hadn't come clean about that lying at the time you

E99Qdel7                     Accilien - cross

```
 1    signed the cooperation agreement?
 2    A.   Which -- which cooperation agreement are you talking about?
 3    Q.   The first cooperation agreement.
 4    A.   Did I come clean with -- with what I was lying about?
 5    Q.   Right.
 6    A.   Yes, I did come clean.
 7    Q.   I'm talking about during September of 2013 when you signed
 8    the first cooperation agreement, at that point you hadn't told
 9    the prosecutors, "I lied to you during the meetings of July and
10    August."  At that point you had not told that to the
11    prosecutors?
12    A.   But I fessed up.  I fessed up for what I was lying about.
13    Q.   Right, you fessed up later on.  Is that correct?
14    A.   Later on?  What do you mean later on?
15    Q.   When you fessed up about lying, it was a year later after
16    you signed the first cooperation agreement?
17    A.   I believe so.
18    Q.   Then after you signed the first cooperation agreement
19    during September of 2013, in a meeting you had with the
20    prosecutors in July of 2014, you lied to them during that
21    meeting?
22    A.   You talking about the --
23    Q.   After you signed the first cooperation agreement in
24    September of 2013 --
25    A.   Yes.
```

1    Q.  -- you had a meeting with the prosecutors during July of

2    2014?

3    A.  Yes.

4    Q.  And during that meeting with the prosecutors in July of

5    2014, you lied to them during that meeting?

6    A.  What was the lie, sir?

7    Q.  I'm asking you, did you lie?

8    A.  What was the lie?

9    Q.  I'm asking you, did you lie?

10   A.  I don't know unless you tell me what I said.

11   Q.  All right.  Did you plead guilty to lying, to a charge of

12   lying to the prosecutors during July and August of 2013 and

13   July of 2014?

14   A.  What was the lie about?

15   Q.  I'm asking you, did you plead guilty to the charge of lying

16   three times to the prosecutors?

17   A.  I don't know about three times, but you're not telling me

18   what I lied about.

19   Q.  Can you take a look at the document in front of you?

20            MR. POSCABLO:  Your Honor --

21            THE COURT:  Yes.

22            MR. POSCABLO:  -- the witness hasn't indicated that he

23   doesn't remember.  There's no refreshing of recollection.  He's

24   just asking for clarification of the question.

25            THE COURT:  Why don't you repeat the question?  See if

1  you can get an answer and then just move on to the next

2  question about refreshing if he doesn't recall.

3  Q.  Mr. Accilien, after looking at this document, does this

4  refresh your recollection as to whether or not you pleaded

5  guilty to the charge of lying to the prosecutors in July of

6  2014?

7  A.  Yes, it talks about my narcotic distribution activities.

8  Q.  So, after you lied to the prosecutor during July of 2014,

9  they tore up your first cooperation agreement.  Is that

10  correct?

11  A.  Yes, I believe so.

12  Q.  And at that point, you could have been facing a minimum of

13  seven years with a maximum of life?

14  A.  Yes.

15  Q.  And it was within their right to do that because you had

16  violated the cooperation agreement?

17  A.  Yes.

18  Q.  You had violated because you lied to them?

19  A.  Yes.

20  Q.  And you violated because after you signed it, you committed

21  the federal crime of perjury.  Is that correct?

22  A.  Yes.

23  Q.  You committed the perjury before you signed the first

24  agreement, and you committed the perjury after you signed the

25  second agreement -- I'm sorry -- and even after you signed the

E99Qdel7                         Accilien - cross

1    first agreement?

2    A.  Yes, it's just the first agreement.  Not the second one.

3    Q.  Right.  But you committed the perjury before and after your

4    signing of the first agreement?

5    A.  Can you -- can you refresh my memory what I -- with what --

6    Q.  You've told us that you --

7              THE COURT:  Why don't you just get a couple more

8    questions on this and then move on.

9    Q.  You've told us you committed perjury.

10   A.  Yes.

11   Q.  You committed perjury before you signed the first

12   agreement?

13   A.  In a proffer session?

14   Q.  The perjury that you told us you committed, that occurred

15   before you signed the first agreement?

16             THE COURT:  Why don't you phrase it as "lied."

17   Q.  You told us that you lied to the prosecutors?

18   A.  Yes.

19   Q.  Is that correct?

20   A.  Yes.

21   Q.  And you lied to them before you signed the first agreement?

22   A.  Was that at a proffer session --

23   Q.  Yes, during a proffer session, you lied to them?

24   A.  About distributing drugs.

25   Q.  Before you signed the first agreement?

E99Qdel7                          Accilien - cross

1   A.  I believe so.

2   Q.  And then after you signed the first agreement, you had

3   other proffer sessions with the prosecutors?

4   A.  Right.

5   Q.  And during those proffer sessions, you lied to them again?

6           MS. GERACI:  Objection, your Honor.

7           THE COURT:  Hold on.  Sustained.  Approach it a little

8   differently.  Why don't you rephrase?

9   Q.  After you signed the first cooperation agreement, didn't

10  you lie to the prosecutors during a proffer session which

11  occurred during July of 2014?

12  A.  I don't -- I was asked the question if I distributed drugs,

13  and I said no, and it was only one time.  I don't remember

14  repeating -- repeating the same question.

15  Q.  So, you lied at least one time to the prosecutors after you

16  had signed the first cooperation agreement?

17  A.  Correct.

18  Q.  And because of that, that's why they tore up the first

19  cooperation agreement?

20  A.  Correct.

21  Q.  And then you signed a second cooperation agreement?

22  A.  Yes.

23  Q.  And that's the one that you looked at yesterday.  Is that

24  correct?

25  A.  Yes.  Can I see it again?

E99Qdel7                        Accilien - cross

1    Q.  Well, let me ask you something.  That's the one where you

2    said that you thought that you were facing a minimum of 42

3    years on that one?

4    A.  Yes.

5    Q.  Can you see that in front of you, Mr. Accilien?

6    A.  Yes.

7    Q.  I am going to point you to a paragraph.  Can you just read

8    the first -- see where my pen is?  Can you just --

9    A.  Read that?

10   Q.  Read that, yes.

11   A.  The total maximum term of imprisonment of course (sic) one

12   through seven of the SI (sic) information is life imprisonment

13   with a mandatory minimum sentence of 17 years imprisonment,

14   seven years of which must be imposed to run consecutively to

15   any other sentence including the sentence imposed on the other

16   counts of the SI (sic) information.

17   Q.  Is it your understanding that now pleading guilty to the

18   second cooperation agreement, you're still facing a maximum

19   term of life.  Is that correct?

20   A.  Yes.

21   Q.  But there's a minimum sentence now of at least 17 years.

22   Is that correct?

23   A.  Yes.

24   Q.  And the same deal applies as in the first cooperation

25   agreement; that unless you get a 5K letter, you're going to be

E99Qdel7                        Accilien - cross

1    doing at least 17 years.  Is that correct?

2    A.  Correct.

3              THE COURT:  For your planning purposes, Mr. Pittell,

4    you have 20 minutes.  Then we will be ending for the afternoon.

5              MR. PITTELL:  All right.  Thank you.

6    Q.  Mr. Accilien, when you signed both of these cooperation

7    agreements, it was your fundamental understanding that you were

8    required to be truthful.  Is that correct?

9    A.  Yes.

10   Q.  And you broke that fundamental understanding by not being

11   truthful.  Is that correct?

12   A.  Yes, on the first agreement.

13   Q.  And on the second agreement are you now saying that you're

14   being truthful?

15   A.  Yes.

16   Q.  When you signed the first agreement, they asked you "are

17   you telling the truth," and you told them that you were.  Is

18   that correct?

19   A.  Yes.

20             MR. PITTELL:  Judge, could we have a 30 second side

21   bar?

22             THE COURT:  Yes.

23        (Continued on next page)

24

25

1                (At the side bar)

2                MR. PITTELL:  I'm just about done.  I'm trying to cut

3      it down and get it done at 5:00.  I know Mr. Delva is probably

4      going to have some questions that he wants me to ask.  What I

5      propose is soon as I finish my cross in 15 minutes, that we

6      don't start the redirect so that I can just go over whatever

7      questions he has.  If there is additional cross, it will be

8      brief, and we'll start tomorrow morning.

9                THE COURT:  We will start tomorrow morning with any

10     redirect.  Do you have redirect?

11               MS. GERACI:  Yes, your Honor.

12               THE COURT:  Let's do that so you can confer with your

13     client.  If you are unable to have time today to address his

14     issues, you could start with some additional cross tomorrow

15     morning, but I would assume you would be doing some just very

16     minor cleanup at that point.

17               MR. PITTELL:  Exactly.

18               I wasn't quite sure though, what was -- what I allowed

19     to inquire now regarding the over-the-counter sex medications.

20               THE COURT:  My ruling was that you can inquire so long

21     as you tie it into the September 2012 time frame because the

22     relevance of that is his ability to engage or not engage or

23     inability to engage in a sexual assault.  That's how I see the

24     relevance.

25               MR. PITTELL:  So questions about him using them in

E99Qdel7                           Accilien - cross

1    2009 or 2010 are off limits?

2              THE COURT:  There is no reason for them to be

3    relevant.  That's based upon my understanding of relevance

4    you've got to tie it into the time frame.

5              MR. PITTELL:  Well, I mean --

6              THE COURT:  August, September of 2012.

7              Thank you.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    Q.  Mr. Accilien, during that period between 2010 and 2013 when

3    you were going to the VA Hospital, you had indicated earlier

4    that sometimes you would get drug tested when you would have

5    those visits.  Is that correct?

6    A.  Yes.

7    Q.  And at one of those visits you were told that you tested

8    positive for amphetamines.  Is that correct?

9    A.  Yes.

10   Q.  And you told them that the reason why you tested positive

11   was that a girl put a pill in your drink at a bar so that you

12   could have sex with her.  Is that correct?

13   A.  Yes.  It wasn't at the bar.  It was at my house.

14   Q.  OK.  But you knew she was putting that pill in your drink?

15   A.  Yes.  No, no, I didn't at first.

16   Q.  But she told you that she put it in your drink?

17   A.  Later on.

18   Q.  What kind of pill was that?

19   A.  It was like some type of ecstasy pill.

20   Q.  The purpose of it was so that you could have sex with her?

21   A.  Yes.

22   Q.  And that was during May of 2012.  Is that correct?

23   A.  I don't remember the exact date.

24   Q.  But you had indicated earlier that when you were at the VA

25   Hospital, they also gave you a prescription for Viagra?

E99Qdel7                        Accilien - cross

1    A.  Yes.  Not Viagra.  Levitra.

2    Q.  Didn't you testify earlier that they also gave you a

3    prescription for Viagra?

4    A.  No.  It's a form of Viagra, but it's a little -- it's

5    called Levitra.

6    Q.  You got Levitra?

7    A.  Yeah.

8    Q.  OK.  But it serves the same purpose; it helps facilitate

9    sexual activity?

10   A.  Yes.

11   Q.  So, did you take the Levitra the same time that you took

12   this ecstasy pill that this girl put in your drink?

13   A.  No.

14   Q.  Were you taking the Levitra at that time?

15   A.  They only gave me like two pills a month, so I wasn't able

16   to have that much supply to -- to be used that day.

17   Q.  So you took that -- the ecstasy pill because you ran out of

18   Levitra?

19   A.  Somebody slipped it in my drink, sir.

20           MS. GERACI:  Objection.

21           THE COURT:  Sustained.

22   Q.  But you were receiving the Viagra prescription before the

23   September 12 robbery.  Is that correct?

24   A.  Excuse me?

25           MS. GERACI:  Objection, your Honor.

1       THE COURT:  Hold on.  I think it is just the name of

2   the drug.  Why don't you --

3   Q.  You were receiving the Levitra before the September 12

4   robbery.  Is that correct?

5   A.  Yes.

6   Q.  And --

7   A.  But I wasn't --

8   Q.  It's just a yes-or-no question.  You were receiving a

9   prescription?

10      MS. GERACI:  Your Honor --

11  A.  No.  No.  No, I wasn't -- they don't give prescriptions in

12  the VA.  They give you medication through the mail, and I got

13  to keep on coming to see the doctor every month to get a

14  refill, but I never -- I never went back to get a refill.  I

15  only got it like once or twice.

16  Q.  Well, you got it during June of 2012.  Is that correct?

17  A.  June?

18  Q.  Yes.

19  A.  Can I see a document that say that, sir?

20  Q.  Sure.

21      THE COURT:  When do you recall having the Levitra

22  medication?

23      THE WITNESS:  When I recall -- I don't recall what

24  date really.

25      THE COURT:  How about a month, approximately?  Do you

```
 1     know if you had any July, for instance, of 2012?

 2                 If you have a document that refreshes his

 3     recollection, you can proceed.

 4                 MR. PITTELL:  I have a document.

 5     BY MR. PITTELL:

 6     Q.  Mr. Accilien, I am showing you a document.  I would ask you

 7     just to take a look at the portions that I have marked on

 8     there.

 9     A.  That's my mental health doctor.  The doctor that prescribed

10     that to me is a mental -- is my primary doctor.

11     Q.  Mr. Accilien, after looking at the document, does that

12     refresh your recollection that on June 22, 2012 you went to go

13     see your mental health doctor and you got a prescription for

14     Levitra or Viagra?

15     A.  They don't give prescriptions in the VA.  They send you the

16     medication through mail.

17     Q.  So does it refresh your recollection that around the time

18     of June 22 when you went to go visit your doctor that you got a

19     prescription in the mail?

20     A.  I can't understand this -- this document because my -- my

21     primary doctor is the only doctor that could send me the

22     Levitra.

23                 THE COURT:  If it doesn't refresh your recollection,

24     it doesn't refresh your recollection.

25                 You can ask a new question.
```

E99Qdel7                        Accilien - cross

1   Q.  But you were getting this Levitra before the September 2012

2   robbery.  Is that correct?

3   A.  Yes.

4   Q.  And you were getting it after the September 2012 robbery?

5   A.  No.

6   Q.  Do you recall going to see your doctor on September 27,

7   2012, about two weeks after the Labor Day robbery?

8   A.  Do I remember going there?

9   Q.  Yes.

10  A.  I go there every month, so it's a possibility I went over

11  there.

12  Q.  But do you recall going there about two weeks after the

13  robbery?

14  A.  I usually go at the end of the month, like at the first --

15  like at the end of the month.

16  Q.  So, do you recall seeing your psychiatrist -- so at the end

17  of September, you went and saw your doctor at the VA Hospital.

18  Is that correct?

19  A.  In September?

20  Q.  Yes.

21  A.  Yes.

22  Q.  When I say the end of September, I mean the end of

23  September 2012.

24  A.  Yes.

25  Q.  Do you recall the doctor asking you how do you feel, and

E99Qdel7                    Accilien - cross

 1    you told him you feel really well; this has been the best

 2    summer in a long time.  Do you recall telling him that?

 3    A.  Yes.

 4    Q.  And you had indicated earlier that you did not feel

 5    comfortable about being at the crime scene of the robbery.  Is

 6    that correct?

 7    A.  Yes.

 8    Q.  And two weeks later you told your psychiatrist that this

 9    was the best summer you've had in a long time.  Is that

10    correct?

11    A.  I don't -- I don't -- I don't remember saying that.

12          MR. PITTELL:  I have no further questions for this

13    witness, Judge, subject to what I had mentioned at the side

14    bar.

15          THE COURT:  All right.  So there may be some matters

16    that we can take up first thing in the morning, but we'll stop

17    right now if we can, and we will pick up tomorrow morning,

18    ladies and gentlemen, at 9:30.

19          So, try to be on time.  I'd like to start right at

20    9:30 so we can get as much done during the day as possible.

21          I want to remind you -- and I told you, you'd get sick

22    of this -- but I do need to remind you not to talk to each

23    other or anybody else in your life about this case, and to keep

24    an open mind.  Just remember that evidence comes in in pieces

25    and there's still a fair amount of evidence to go.  I want to

E99Qdel7                          Accilien - cross

1    remind you not to do any research.  Don't look up any topics

2    which have come up.

3            There will be coffee and/or tea in the morning, but I

4    think the tea selection may be limited.  So if you're a tea

5    drinker, and you've got some specialty tea at home, you might

6    want to bring it along.  But we'll have some coffee and tea.

7    It's some regular sort of black tea I think is what it is and

8    decaf in the jury room tomorrow morning.  Then we are going to

9    do a second -- a refill after lunch.  So you will have them

10   both in the morning and the afternoon.

11           And, lastly, now that we all know that the heating

12   system here is unpredictable -- in part, perhaps it's because

13   the weather is sort of going up and down -- you might want to

14   bring a sweater.  I know it sounds a little crazy because it's

15   80 degrees outside half the time, but you might want to bring a

16   sweater in and/or wear layers, but I see Juror No. 8 -- there's

17   not much further you could go.  You're already in a

18   short-sleeve shirt.  That way if it's cold you could put the

19   sweater on, and if it's warm, you could take the sweater off.

20           All right, ladies and gentlemen, we'll see you

21   tomorrow morning.

22           (Jury recessed)

23           (Continued on next page)

24

25

1          THE COURT:  All right.  Mr. Accilien, you can step

2     down, sir, and we'll resume tomorrow at 9:30.

3          (Witness not present)

4          THE COURT:  Let's all be seated.

5          So, a couple of just brief housekeeping things and

6     I'll let you folks confer.  I'll give you folks the jury

7     instructions tomorrow morning.  You ought to have a set on your

8     chair when we start and also I'll send you the Word file.  If

9     you make changes overnight that'll be terrific.  I've got a few

10    things where we differed, your versions and mine in terms of

11    what I want and I'll just doublecheck to make sure I am

12    comfortable with my version.  But you folks will look closely

13    at that anyway.

14         A couple of things I wanted to go back to, there was

15    a -- Ms. Geraci, you had objected to when Mr. Delva was

16    arrested in the Bronx and was taken to the Bronx and prosecuted

17    in the Bronx Supreme Court.  I overruled that.  I didn't know

18    what your objection was.

19         MS. GERACI:  Your Honor, just for relevance.

20         THE COURT:  All right.  I think that there was some

21    relevance and then a broad sense of relevance.  I allowed it.

22         In terms of the agents telling Mr. Accilien that he

23    faced a lot of time, I allowed that because it did give you a

24    lot of time and it went to bias and motive to testify falsely

25    or come up with a false story.  In fact, at that time it was

1    just the beginning of a series of statements to law enforcement

2    but that was the reason for my allowing that to come in.  I did

3    get that ruling wrong and I don't believe there's any prejudice

4    from it and I'll just tell you why.  There was an objection.

5    It was a government objection to a defense question.  The

6    question was, Did your sister, Rose Thomas, ask you how could

7    you beat up your own flesh and blood?  I overruled the

8    objection and allowed it.  At the time it was a hearsay

9    objection as I understood it, just a flatout asking another

10   person a question.  And on the fly it didn't strike me as

11   necessarily in for the truth and it didn't because it's in the

12   nature of the question or it struck me as state of mind.

13          Upon reflection I, actually, think I was wrong.  I

14   think it has an embedded fact in it and the fact is coming in

15   for the truth which is that there had been a physical assault.

16   So, therefore, I don't think that my ruling was correct.  I

17   think was hearsay that was coming in for the truth.

18          I, however don't believe that there's any prejudice

19   for the following reasons:

20          There was subsequent testimony and in fact a little

21   before a physical altercation between the defendant and his

22   cousin, uncle, Mr. Accilien between Mr. Delva and Mr. Accilien.

23   And while it wasn't clear who the aggressor was and so you

24   could argue that him being the aggressor was somehow unusual,

25   in fact, there's other testimony where he has conceded he was

1    the aggressor.  So having him being placed in the position of

2    an aggressor in a physical assault, I don't think places him in

3    a particularly different position than he otherwise would have

4    been.  I would have preferred to have gotten that right but I

5    want to acknowledge that I think that that ruling was in error.

6               Anything that you folks would like to raise.

7               MS. GERACI:  No, your Honor.

8               THE COURT:  Mr. Pittell.

9               MR. PITTELL:  Judge, there was some discussion about

10   whether or not the superseding information and the information

11   should come in.

12              THE COURT:  It shouldn't come in for the evidence.

13   What I don't want you to do, what I think it would be confusing

14   the jury, here is my thinking.  If it's to put it in for you

15   made a statement on that date, we charge the jury all the time

16   and it's very important here with the indictment that the

17   charging instrument is not in and of itself evidence of

18   anything and so it's got to be something else.  So that was my

19   thinking.  I don't want to explain to the jury why it's in for

20   one purpose for the truth and for evidence as to what he did

21   and in another instance with the indictment more importantly

22   not in for that purpose.  That was my thinking.  But tell me

23   how you react to that rationale.

24              MR. PITTELL:  I actually was considering putting both

25   the original information and superseding information in,

1   actually, almost as demonstrative exhibits.  It's easier to

2   show what he originally pleaded guilty to and what the

3   additional charges are by just showing the document because

4   it's nicely laid out with Count One, Count Two, Count Three,

5   and Count Four.

6          THE COURT:  If you've got his guilty plea allocution

7   which is a sworn statement.  It's under oath.  It's got indicia

8   of liability and he allocutes to the crime.  If that's what you

9   want --

10          MR. PITTELL:  I was really more just kind of wanting

11  to show the before and the after weight what he originally

12  pleaded guilty to and what's been hatched on, so to speak.

13          THE COURT:  I think we've been through this ad

14  nauseam.

15          MR. PITTELL:  I'll look at the transcript.  I've kind

16  of got the feeling I was beating a dead horse to use a bad

17  analogy and I wasn't sure if it's clear.

18          THE COURT:  Well, I think the jury took away several

19  potential points from it but I think what they do understand

20  and what came across quite clearly I thought, what came across

21  quite clearly is that he had two different sets of charging

22  instruments.  They had -- there is an additional charge in the

23  second one.  The mandatory minimums went up.  I don't know that

24  you were crystal clear on there being a narcotics charge the

25  second time but it was raised in the direct.  In the direct

1    examination the narcotics charge came out.  You have been

2    crystal clear about the false statement, the 17 year mandatory

3    minimum is derived largely from the narcotics charge.  So

4    that's the only piece I think that there is a little lack of

5    clarity which is not only was he charged with false statement

6    but he was charged with the narcotics distribution.  Am I

7    getting it right in terms is of chronology?

8              MR. PITTELL:  Yeah.

9              THE COURT:  But I think we have been over this ground.

10   You've plowed it.  If upon reviewing the transcript you think

11   you've got a question or two I'll allow it but not much more

12   than that because it's painful.

13             MR. PITTELL:  It's really just if I wanted to have an

14   easy way to argue it to the jury it's easier to show a document

15   and say, here is Count One, Two, Three, Four and Five and

16   here's another document, here is Counts Five, Six and Seven.

17   It is in the cooperation agreement but it's -- visually, it's a

18   lot more difficult to work with the cooperation.

19             THE COURT:  All right.  The alternative is when you,

20   if you want it use it that way it may be that the government's

21   not going to object to its use that way.  He did plead guilty

22   to those charges.  So, in that sense it is different from the

23   S1 here and so I think the jury, I can draw the distinction in

24   terms of the here Mr. Accilien pled guilty to these.  You

25   folks, why don't you all think about this.  This is a solvable

E99AADEL8                    Accilien – Cross

1    problem and we'll take it up tomorrow morning with our

2    housekeeping.

3            Anything else, folks?

4            MR. PITTELL:  No, your Honor.

5            THE COURT:  I'll see you tomorrow morning at 9:00.

6    Thank you.

7            (Adjourned to Wednesday, September 10, 2014 at 9 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION
 2   Examination of:                          Page
 3   GREGORY ACCILIEN
 4   Direct By Ms. Geraci . . . . . .191
 5   Cross By Mr. Pittell . . . . . .211
 6                       GOVERNMENT EXHIBITS
 7   Exhibit No.                             Received
 8    200 through 205 and 3003  . . . . . . . . . . 203
 9    800, 800-T and 3006   . . . . . . . . . . . 208
10    2000-Z  . . . . . . . . . . . . . . . . . 320
11    3514-L  . . . . . . . . . . . . . . . . . 392
12                       DEFENDANT EXHIBITS
13   Exhibit No.                             Received
14    52-I   . . . . . . . . . . . . . . . . . 379
15
16
17
18
19
20
21
22
23
24
25
```