E9AAADEL1                    Jury Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        12 CR 802 (KBF)

DAVID DELVA,

                Defendant.

------------------------------x

                                          New York, N.Y.
                                          September 10, 2014
                                          9:00 a.m.

Before:

                    HON. KATHERINE B. FORREST,

                                          District Judge

                         APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JUSTINA GERACI
RYAN POSCABLO
    Assistant United States Attorney

JEFFREY PITTELL
    Attorney for Defendant Delva


ALSO PRESENT:  JOHN REYNOLDS, Special Agent FBI
ANNIE CHEN, Paralegal Specialist, U.S. Attorney's Office

E9AAADEL1                    Jury Trial

1              (Trial resumed; jury not present )

2              THE COURT:  Good morning, everyone.  Please, be

3    seated.

4              (Case called)

5              MS. GERACI:  Good morning, your Honor.

6              Justina Geraci for the government and I am joined at

7    counsel table by Paralegal Specialist Annie Chen

8              THE COURT:  All right.  Good morning, both of you.

9              MS. GERACI:  It feels a little lonely up here at

10   counsel table because AUSA Poscablo is with a witness.

11             MR. PITTELL:  Good morning, judge.

12             Jeffrey Pittell appearing for Mr. Delva.

13             THE COURT:  The Court notes that Mr. Delva is here.

14             We have got a couple of housekeeping issues to go over

15   today before we start.  I've also got the jury charges which

16   will be hand to you at a break.  As indicated, we'll start with

17   those tomorrow morning and I've got a couple things that if we

18   have time I'll mention about the charges before we have the

19   jury come in if we have time.

20             Today, I understand that Mr. James is going

21   potentially to testify; is that right?

22             MS. GERACI:  Yes, your Honor.

23             THE COURT:  And that there was a question about

24   whether or not in terms of immunity how we should handle it.

25   Here is what I would propose we do.  The requirement is that he

1    say under oath that he would take the Fifth unless he was

2    provided immunity. I don't see any particular reason to have

3    to have him do that outside the presence of the jury since I'll

4    have signed an immunity agreement beforehand if I haven't

5    already. I know I signed one for him. I can't remember if it

6    was only for the Fatico hearing or two for him. But what I

7    would propose when you are calling him as you are going to have

8    to explain the immunity agreement and simply ask him, is it the

9    case, are you testifying here or however you are going to

10   approach it in a non leading way. Agreement, yes, this

11   immunity thing was it would you testify without being granted

12   immunity? No, I take the fifth. Or some other way. I don't

13   care how word the question. That was not very artful. I have

14   to have my coffee which is right here but do you understand

15   what I am saying?

16          MS. GERACI: I do, your Honor.

17          THE COURT: Does anybody think that I need to take him

18   outside of the presence of the jury given that we know he is

19   going to take it, he would take the Fifth unless he had

20   immunity given his background?

21          MS. GERACI: I think it's sounds fine, your Honor.

22   I'll just confer with Mr. Poscablo when he comes in but I see

23   your Honor's proposal and I don't think that would be a

24   problem.

25          THE COURT: Mr. Pittell, do you want me to do more?

E9AAADEL1                    Jury Trial

1              MR. PITTELL:  Judge, this is my perspective.  Having

2       represented people like Mr. James in the past they've always

3       followed my advice to assert the Fifth, I would say based on my

4       experience there is no need to do anything further.  However,

5       there is one little quirk in this case.  During

6       cross-examination at the, I guess it was the Fatico hearing,

7       one of the attorneys questioned him about his immunity and his

8       answer was, he was asking him whether or not he was coming up

9       here on his own or whether or not he needed immunity and I

10      think the answer was more along the lines, I would have been

11      willing to do it on my own.  Then the attorney at that point

12      made an oral application to revoke his immunity.  I mean, I

13      would just suggest so the record is clear that he at least

14      state on the witness stand what I expect he's going to state

15      that he's been advised and will follow that advice.

16             THE COURT:  Let's just do that unless it comes

17      conveniently at s break if we are going to call him just as the

18      next witness and it's going to happen so there's not a logical

19      break.  I am going to have you, Ms. Geraci, just do that

20      through your questioning of the witness.  I don't perceive any

21      particular reason why that creates any dilemma that needs to be

22      taken outside of the presence of jury, nor do I think it's

23      particularly long and therefore will unduly delay things in

24      front of the jury.  But if you disagree let me know.

25             MS. GERACI:  That sounds reasonable, your Honor.

E9AAADEL1                    Jury Trial

1          THE COURT:  What else is going to happen today?  How
2     much time, Mr. Pittell, do you think you've got left?
3          MR. PITTELL:  Very brief.
4          THE COURT:  All right.  So a little bit from you and
5     then how much on redirect, Ms. Geraci?
6          MS. GERACI:  Your Honor, I would say about 10, 15
7     minutes.
8          THE COURT:  All right.  So somewhere ten-ish ten, 15
9     or so maybe sooner, we'll be into the next witness.  Is that
10    Mr. James?
11         MS. GERACI:  It will be someone else, your Honor.  It
12    will be either Eric Perry who will testify as to the cell sites
13    in this case or Diana Cooke who is the DNA expert.  The only
14    reason I say it will be either of them is because Special Agent
15    Perry is testifying before another judge this morning.  If he
16    available and free he will come here.  If not we intend to call
17    Diana Cooke.
18         THE COURT:  All right.  My guess is it's going to be
19    Cooke because if he's testifying before another judge, are they
20    starting at ten?
21         MS. GERACI:  I think they're starting the ten.
22         THE COURT:  So I bet he'll just be on the stand in
23    that other proceeding.  So either of Cooke or Perry, then
24    Mr. James or someone else.
25         MS. GERACI:  It'll be either Cooke or Perry and then

E9AAADEL1                        Jury Trial

1   the other.  So one of the two and then after that we intend to

2   call Jeanette Adams and then Patrick James.

3              THE COURT:  I see.  So that's the order for today.

4              All right.  In terms of other open items we had the

5   open item relating to the information, that document which,

6   Mr. Pittell, you had offered yesterday so that you could have a

7   relatively straightforward way of referring to what

8   Mr. Accilien had pled guilty to the first time and what he had

9   pled guilty to the second time.  I had asked you folks to go

10  off and think about if there is some way to do that other than

11  having the information introduced.  I don't feel particularly

12  strongly about this because I do think now having reflected

13  upon it that I can talk about how the information here can be

14  taken as true is what I would do.  In order to distinguish it

15  from the indictment I think I need to do something like this

16  because he pled guilty to the information twice.  But I would

17  want to if we're going introduce it make sure that I give a

18  distinction between the information that he pled guilty to and

19  the indictment which is simply a charge against the defendant.

20             So have you folks reflected as to how you want to

21  proceed with that?

22             MR. PITTELL:  I've reflected but we haven't discussed.

23             THE COURT:  All right.  So I am not going to raise it

24  again sua sponte.  You folks can raise it with me.

25             Next, I just wanted to make sure I didn't have an open

E9AAADEL1                    Jury Trial

1    item that I --

2              MR. PITTELL:  Can I just take a moment to confer?

3              THE COURT:  Sure.

4              (Pause)

5              THE COURT:  It sounds like you have a solution.  I

6    assume you'll be able to work that out.  Seeing you folks it

7    sounds like you are starting to work out language.  If you are,

8    then I assume you are going to get there.  So you folks will

9    work that out and then present a stipulation if and when you

10   see fit.

11             In terms of other things, I wanted to encourage you

12   folks when you were reviewing the transcript in this matter to

13   raise with me anything which you think we need to revisit

14   either we've left it as an open item and you were going to take

15   on the responsibility of bringing it back to me or if I had

16   said I'll think about X, Y or Z and I haven't gotten back to

17   you and you still want a determination on whatever the open

18   question is, I am now lobbing the tennis ball back over the net

19   into your court because I have completed all the open items

20   that I know that I have which means if there are any, it is an

21   oversight.

22             And the next item is in terms of jury instructions, I

23   have put in an alibi instruction.  I think that there is, it's

24   an appropriate defense instruction, although I've changed the

25   wording and you'll see that, Mr. Pittell, just slightly sort of

1  tightening it up a little bit and not have in that instruction

2  anything that really talks specifically about the type of proof

3  in this case because we don't do that elsewhere but we'll talk

4  about there was evidence of and you'll see the charge.  But the

5  government should look at that because it was not, they had not

6  edited that charge in the version that I got.

7          In terms of investigative techniques not required,

8  that's not currently in because it hasn't come up but if you

9  folks need that, let me know and remind me and we'll put it

10 back in.

11         We do have the use of evidence pursuant to a search

12 and also improper considerations based upon race, religion,

13 etc.  But how about similar act evidence?  Do we need similar

14 act evidence?  Is that likely?

15         MR. POSCABLO:  Judge, I was looking at our motions in

16 limine and your Honor's draft opinion and truly the only one

17 that we were seeking to introduce was a statement by

18 Mr. Accilien that he attributes to the defendant where he says

19 two things.  One, he was chosen for this robbery because he had

20 done robberies in the past and that statement if you recall

21 where he says, this is not the kind of robbery I do.

22         THE COURT:  One instance of which was in and a second

23 version of it which was precluded in the nature of the second

24 version.

25         MR. POSCABLO:  Other than that, we're not going to be

1    offering any other 404(b) evidence.  We are not going to call

2    any witnesses to testify about the other incident.

3          THE COURT:  All right.  So, Mr. Pittell, if you think

4    that we need a Similar Acts charge, I will include one, but I

5    think there's a call as to whether or not given what the state

6    of the record is right now, whether or not it draws undue

7    attention to these issues we're not -- let me know.  When you

8    see the charges let me know.

9          MR. PITTELL:  Yes, judge.

10         THE COURT:  But you folks will get those charges this

11   morning and that will be that.

12         Anything you folks want to raise with me?

13         MR. POSCABLO:  Your Honor, after Mr. Accilien's

14   completed with his testimony we plan on calling former

15   Criminalist Diane Cooke.  We are going to be producing four of

16   her expert reports which are labeled 1000 through 1003.

17         THE COURT:  Let me ask you in terms of introducing the

18   report, why would you introduce the report which is itself -- I

19   have not seen the report but most reports are hearsay.  It's

20   simply a recitation of her opinions and it is for disclosure

21   purposes to the defendant.  I don't know that there's a reason

22   why you need to introduce them.  If there are exhibits, charts,

23   data that she needs to refer to in there, that's fine.  If it's

24   simply for her to be able to review on the stand, that's fine.

25   But does it need to come in as evidence?

E9AAADEL1                    Jury Trial

1            MR. POSCABLO:  Judge, from my experience with DNA

2     experts and their reports, nine times out of ten they will look

3     at that report throughout their entire testimony.

4            THE COURT:  That's OK.

5            MR. POSCABLO:  But they are business records and

6     that's the hearsay exception to why they're admissible.

7     They're kept in the ordinary course --

8            THE COURT:  So she would have created this report?

9            MR. POSCABLO:  That's correct.

10            THE COURT:  So it's not much of a report -- well, it's

11     a report but it's not a report created for purposes of this

12     matter; is that correct?

13            MR. POSCABLO:  That's correct.

14            THE COURT:  This trial proceeding?

15            MR. POSCABLO:  That's right.  In fact, those reports

16     are created before any case is brought.

17            THE COURT:  All right.  Why don't you lay then a

18     foundation for it --

19            MR. POSCABLO:  OK.

20            THE COURT:  -- and proceed that way.  We'll see what

21     kind of foundation we get.  But I hear what you are saying that

22     this is different from just an expert report created for

23     purposes of walking in here to testify.

24            MR. POSCABLO:  So your Honor's clear and I think

25     Mr. Pittell knows this, the expert report is actually her

1    analysis is really just one or two pages.  The rest of it is

2    really the data and charts that she analyzed in order to come

3    up with the conclusions that are on the first two pages.  But

4    really I raised it because we have a demonstrative which is up

5    there.  It is a chart that was prepared and it's within one of

6    her reports.  I think it's within 1003.  I think it's like the

7    third or fourth page.  And it is a chart that she will be

8    referring to a lot so we decided it is the one that we are

9    going to blow-up and essentially it shows --

10             THE COURT:  They won't, of course, be able to see it

11   back there.

12             MR. POSCABLO:  No.  We will move it up.  But it is

13   reflected in the government exhibits.  We can put it up on the

14   screen as well but I was going to ask the Court that she be

15   able to step down and write on it with a marker to explain how

16   she drew the conclusion that Mr. Delva's DNA is on that.

17             THE COURT:  That's fine.  If she's writing on it with

18   a permanent marker then you'll want to reintroduce the second

19   version with the permanent marker as an exhibit lest we have

20   describe every place that she's made the mark so we need to

21   have it in the record.

22             MR. POSCABLO:  Sure.

23             THE COURT:  Mr. Pittell, have you seen those reports?

24   Do we anticipate any evidentiary issues that we need to explore

25   right now?

1              MR. PITTELL:  Yes, your Honor.  Exhibit 1003 is really
2    the entire file from the medical examiner's office.  It
3    includes documents which are not prepared by them such as
4    police reports.  It also includes --
5              THE COURT:  I didn't see an objection on your list.  I
6    saw pending under chart for call and pending under Delva DNA
7    report.
8              MR. PITTELL:  There should be a 103 objection for
9    that.
10             THE COURT:  All right.  I'll take your word for it
11   that you've got a more recent objection I don't have but my
12   version doesn't have any objections for most of them, but go
13   ahead.
14             MR. PITTELL:  Also, the report after the second page
15   has an appendix which is several pages which is the medical
16   examiner's definition and terms of items.  I don't think that
17   that should be included.
18             THE COURT:  Why shouldn't it be included?
19             MR. PITTELL:  Well, because it's --
20             THE COURT:  If there are terms which are utilized in
21   the interpretation of report --
22             MR. PITTELL:  Yes.
23             THE COURT:  -- then I would it would -- why would we
24   want to excise them?  What theory?
25             MR. PITTELL:  Because this is the opinion of the

E9AAADEL1                          Jury Trial

1    officer of the medical examiner's office as to what these words

2    mean.  There may not necessarily be a universal agreed upon

3    definition of these terms.

4              THE COURT:  Well, you can cross-examine her on that.

5    Presumably, we are going to have her -- does she need to be

6    qualified as an expert?

7              MR. POSCABLO:  Yes, your Honor.

8              THE COURT:  I'll by the way just throw it in now, give

9    the jury sort of an instruction as to how to consider the

10   testimony of an expert but also that they should weigh it as

11   they would the testimony of any other witness.  But if she's

12   going to be -- if she agrees that those terms are terms that

13   she uses and she uses them according to those definitions and

14   otherwise qualified as an expert and they're otherwise useful

15   to the jury in terms of understanding her opinion, they do seem

16   to fit within the boundaries of what would be in 702.  Indeed,

17   under 701 if she were considered to be not a pure expert but a

18   layperson expert, so either way.

19             MR. PITTELL:  My concern is it just appears to have

20   the appearance of learned treatise and there is no source of

21   authority for this information in here.

22             THE COURT:  You can certainly cross-examine her on

23   that whether she knows whether these are standard and accepted

24   definitions, etc.

25             MR. PITTELL:  Another objection I have is that as

E9AAADEL1                        Jury Trial

1    Mr. Poscablo indicated that the file includes analysis and

2    testing but some of this analysis and testing was done by

3    people other than her.

4              THE COURT:  Well, he'll need to lay a foundation for

5    that as being under her supervision and control but otherwise

6    it wouldn't be unusual if she supervised them controlled them,

7    knew their methodology and you know depends on the nature --

8              MR. PITTELL:  I don't think she supervised them.  I

9    don't think she was present or supervised every analyst who

10   participated in every step of the analysis.  I think it's

11   several analysts that it was kind of passed along with one

12   analyst to the other, back to another one.  And so you have one

13   analyst doing one part of the analysis.  She's not present in

14   the room.  She doesn't supervise.  We have no way of knowing

15   whether or not that analyst followed all protocols, did

16   everything properly.

17             THE COURT:  Let me ask you, I want to separate out

18   right now what would have been an in limine Daubert motion to

19   preclude the witness and issues relating to Daubert whether her

20   methodology is an adequate methodology from a current issue

21   over the admissibility of the reports.  That last statement

22   sounded more like a Daubert type motion to preclude certain

23   testimony.  At this point I'll let Mr. Poscablo lay a

24   foundation but I am not going to if he lays an appropriate

25   foundation right now on the fly do a separate Daubert analysis

1    but is this a report driven --

2            MR. PITTELL:  Judge, I mean I don't know if it's a

3    Daubert issue because I am not necessarily contesting the

4    science.  It's just the actual testing itself.  And in the

5    disclosure the government disclosed CVs of other analysts and I

6    was begin the impression that whatever other analysts were

7    involved were going to verify their results in their findings.

8            THE COURT:  Mr. Poscablo, not having read these

9    reports I don't know what the language is but tell me how this

10   medical person is going to testify.

11           MR. POSCABLO:  Yes, your Honor.  First, let's be clear

12   about something.  Diana Cooke we've provided Diana Cooke's

13   curriculum vitae.  Her CV was part of her 3500.  Mr. Pittell

14   asked for additional Rule 16 discovery with regard to the

15   accreditation process of the OCME and we provided him with that

16   information with contained and CCs of several of her

17   supervisors.  The testimony will show that once a case is

18   assigned to a particular criminologist, that criminologist has

19   her hand in almost every step of the process.  She's not doing

20   every testing.  She will do one particular part.  But after a

21   particular, for example your Honor, there's several steps.

22   First, there's extraction, then quantitation, then several

23   other steps after that.  She won't do every step but after the

24   extraction step is done she will review what was done so it

25   becomes her case.

1      THE COURT:  Is there a consistent methodology used

2  there for those steps?

3      MR. POSCABLO:  Absolutely.  And she can testify to

4  that.

5      THE COURT:  She should.

6      MR. POSCABLO:  And he she will.  So I don't actually

7  understand Mr. Pittell's objection with regard to the report.

8      THE COURT:  Let me see an exemplar so that we can

9  eliminate any issues with respect to the report.  I will allow

10  the witness to testify and to testify as to her opinions.

11  Certainly, her testimony is directly relevant.  She appears to

12  have the necessary qualifications but I'll let you develop that

13  on direct-examination with her.  And based upon that proffer as

14  to how this is done then I think she will have an adequate

15  basis.  However, the report's another matter, at least portions

16  of the report which may have text let me just see those or at

17  least one exemplar and we'll take it from there.

18      Joe, do we have a jury?

19      COURTROOM DEPUTY:  We're waiting on two more.

20      THE COURT:  What numbers?

21      COURTROOM DEPUTY:  Four an 12.

22      MR. POSCABLO:  Just before I hand this to your deputy,

23  Mr. Pittell is correct about one thing and I've removed those.

24  The full file is what we were offering as 1003 included the

25  certification, our letter requesting certified copy and there

E9AAADEL1                      Jury Trial

1   are some police reports and property invoices in here.  I've

2   removed those and I will hand them separately to your deputy in

3   order to show the Court which we intend to offer and what we

4   are willing to take out.

5              THE COURT:  All right.  Mr. Pittell knows what you are

6   willing to take out?

7              MR. POSCABLO:  I will show him, yes.

8              (Pause)

9              THE COURT:  Is this document, this laboratory report,

10  is that what you are calling her expert report?

11             MR. POSCABLO:  Yes, your Honor.

12             THE COURT:  And it's your proffer, Mr. Poscablo, that

13  this document would be created once the Office of the Chief

14  Medical Examiner is asked to perform the kind of testing that

15  was requested and irrespective of whether or not that

16  individual doing the testing was going to be testifying at

17  trial?

18             MR. POSCABLO:  Yes, your Honor.

19             THE COURT:  As the morning goes on my sentences won't

20  be as poorly constructed as they are right now.

21             MR. POSCABLO:  And neither will my answers.

22             THE COURT:  Your answers are fine.

23             All right.  This document which has been handed to me

24  to review which is Government Exhibit 1003 and it does not have

25  the pages which Mr. Poscablo had indicated as materials he's

E9AAADEL1                          Jury Trial

```
 1    willing to take out, do appear to be business records of the
 2    Office of the Chief Medical Examiner.  I will let Mr. Poscablo
 3    lay a foundation for those.  You need to do it.  I am not going
 4    to admit them now.  You need to do it with the witness on the
 5    stand and we'll see if she says anything surprising but
 6    otherwise I would expect that these would come in
 7              MR. POSCABLO:  Thank you, your Honor.
 8              THE COURT:  All right.  I'll hand this back to you,
 9    both the materials you said you were taking out and also the
10    exhibit itself.
11              Anything further we should go over this morning?
12              All right.  OK.  We're ready.  Let's get Mr. Accilien
13    out on the stand.
14              (Witness present)
15              THE COURT:  All right.  Joe, bring out the jury.
16              (Jury present)
17              THE COURT:  All right.  Ladies and gentlemen, let's
18    all be seated.  I see from at lease some of cups in your hands
19    the coffee arrived.  Were there not tops?  No tops.  Let's see
20    if we can get tops from the cafeteria.
21              Mr. Pittell, you may proceed.
22    CONTINUED CROSS-EXAMINATION
23    BY MR. PITTELL:
24    Q.  Good morning, Mr. Accilien.
25    A.  Good morning.
```

E9AAADEL1                    Accilien - Cross

1   Q.  Mr. Accilien, I just want to ask you a couple follow-up

2   questions about the day you were arrested on June 14, 2013.

3   A.  Yes.

4   Q.  When you were arrested, was there a woman and some children

5   living in your apartment on South Oak Drive?

6   A.  Yes.

7   Q.  And what was the name of the woman that was there?

8   A.  Zaleka Witter.

9   Q.  Does she have a nickname?

10  A.  Leka.

11  Q.  That the same Leka whose name was in the handwritten

12  letters that we were looking at up on the screen yesterday?

13  A.  Yes.

14  Q.  The Leka who is the mother of the children of, with her and

15  Dominique Jean-Philippe?

16  A.  Yes.

17  Q.  And were how many children were in the apartment?

18  A.  Two children.

19  Q.  And were they children of her and Dominique?

20  A.  Yes.

21  Q.  And they were -- so Zaleka and two children were sleeping

22  in the living room?

23  A.  Yes.

24  Q.  And now, when the police came and arrested you they did, at

25  some point they ask for permission from you to search the

E9AAADEL1                    Accilien - Cross

1    apartment?

2                MS. GERACI:  Objection, your Honor.

3                THE COURT:  Sustained.

4    Q.  Did you give the police permission to search the apartment?

5                MS. GERACI:  Objection, your Honor.

6                THE COURT:  Yeah, I don't know why this is relevant.

7    The search is -- ladies and gentlemen, the search, the

8    obtaining of evidence in this matter ahs been deemed legal so I

9    don't think there's --

10               MR. PITTELL:  Laying the issue --

11               THE COURT:  It's not relating to that.  All right.

12   Try a few more.  We understand each over in terms of what's

13   already resolved but you can go ahead if you've got something

14   else.

15               MR. PITTELL:  You can answer the question.

16               THE COURT:  Why don't we have the court reporter read

17   that back because I interrupted it.

18               (Read back)

19   A.  No.

20               THE COURT:  Let me just say that just because of that

21   answer I just want, ladies and gentlemen, for you folks to

22   understand that the law of searches is very complicated and the

23   law of searches that are incident to an arrest is very

24   complicated and we have analyzed inn this particular case and

25   searches here were perfectly legal and that's already been

E9AAADEL1                    Accilien - Cross

1   determined.  So the answer's being offered for another purpose

2   and you must assume that the search was perfectly legal and all

3   evidence obtained pursuant to that search.  Thank you.

4           You may proceed.

5   BY MR. PITTELL:

6   Q.  But at some point you gave permission to search the

7   bedroom?

8   A.  No, I never did.

9   Q.  And the bedroom you shared with David Delva?

10  A.  I wasn't -- I was living in the living room at one point

11  but I decided to move in David's room the night before I got

12  arrested.

13  Q.  Right.  So as of the day that you got arrested you were

14  sharing a bedroom with David Delva?

15  A.  Yes.

16  Q.  Now, you had indicated that at some point in sometime you

17  sold drugs with your brother, Dominique; is that correct?

18  A.  Yes.

19  Q.  That is at some point in time while you were living in your

20  residence at South Oak Drive; is that correct?

21  A.  Yes.

22  Q.  And sometimes your brother would bring drugs over to your

23  house?

24  A.  Yes.

25  Q.  And sometimes he would break up and put them on a scale and

```
 1    break them up and put them in little packages in your house?
 2    A.  Yes.
 3              MR. PITTELL:  Judge, I have no further questions of
 4    this witness.
 5              THE COURT:  All right.  Ms. Geraci.
 6              MS. GERACI:  Thank you, your Honor.
 7    REDIRECT EXAMINATION
 8    BY MS. GERACI:
 9    Q.  Mr. Accilien you were examined at length yesterday about
10    your schizophrenia; do you remember that?
11    A.  Repeat that again.
12              THE COURT:  I am going to ask you to slow down so the
13    court reporter can get a clear record.
14              MS. GERACI:  Sorry.
15    Q.  You were examined at length yesterday about your
16    schizophrenia; do you remember that?
17    A.  Yes.
18    Q.  You were examined at length yesterday about the medical
19    attention and the treatment you received for your
20    schizophrenia; do you remember that?
21    A.  Yes.
22    Q.  You have been living with this mental illness for many
23    years; is that right?
24    A.  Yes.
25    Q.  Yesterday you were asked about auditory hallucinations; do
```

1    you remember that?

2    A.  Yes.

3    Q.  Do you know what auditory hallucinations are?

4    A.  Voices.

5    Q.  Can you tell when someone is actually speaking versus when

6    you hear voices in your head?

7    A.  Yes, I could tell the difference.

8    Q.  Can you tell the difference if a voice in your head is

9    telling you to do something versus when a real person is

10   telling you to do something?

11                MR. PITTELL:  Objection.

12   A.  Yes.

13                THE COURT:  Overruled.

14   Q.  Can you tell the difference if a voice in your head is

15   yelling or cursing at you versus when a real person is yelling

16   or cursing at you?

17   A.  Yes, I could tell the difference.

18   Q.  You were also asked about visual hallucinations; do you

19   remember?

20   A.  Yes.

21   Q.  Can you tell the difference when you see something real

22   versus when you are hallucinating?

23   A.  Yes.

24   Q.  Mr. Accilien, you testified that you were asked by your

25   brother, Dominique, to bring David Delva to the crime scene; do

1    you remember the testimony?

2    A.   Excuse me.

3    Q.   Do you remember that you testified that you were asked by

4    your brother, Dominique, to bring David Delva to the crime

5    scene?

6    A.   Yes.

7    Q.   Do you have an understanding as to why you were asked to do

8    that?

9              MR. PITTELL:  Objection.

10             THE COURT:  Sustained.  You'd have to rephrase.

11   Q.   What was your belief --

12             MR. PITTELL:  Objection.

13             THE COURT:  Sustained.

14   Q.   Why did you bring David Delva to the crime scene?

15             MR. PITTELL:  Objection.

16             THE COURT:  Overruled.

17   A.   Because David had more experience than me --

18   Q.   What does that mean?

19             MR. PITTELL:  Judge, note the objection to the beyond

20   the scope.

21             THE COURT:  Overruled.  I'm sorry.  I missed the last

22   question.  Do you want that reread?

23             MS. GERACI:  Yes, your Honor, please.

24             THE COURT:  So, why don't we have the court reporter

25   read back the prior question and answer and the answer to the

1    last question.

2            (Testimony read back)

3    Q.  What do you mean when you say he had more experience than

4    you?

5    A.  That's what he was doing before and I guess they was more

6    comfortable --

7            MR. PITTELL:  Objection.

8            THE COURT:  Overruled.

9            Ladies and gentlemen, I want you to understand that

10   the defendant here is not on trial for any of his past history

11   or any assumptions about past history.  We don't have any proof

12   or evidence in this case as to what his past history is or was

13   and that's not what this trial about.  This trial is about the

14   charges in the indictment.  The testimony of the witness is

15   simply offered for his state of mind.  So it's offered for a

16   purpose other than to show some sort of propensity to do

17   something.

18           You may proceed.

19           MS. GERACI:  Could I just get the last answer read

20   back?

21           THE COURT:  All right.  Yes.

22           (Testimony read back)

23   Q.  Mr. Accilien, what was he doing before that you thought he

24   was more comfortable?

25   A.  He was doing robberies before.

```
 1   Q.  Mr. Accilien, you were questioned excessively by

 2   Mr. Pittell about lies you told the government; do you recall

 3   that?

 4   A.  Yes.

 5   Q.  And when you got arrested the very first time you got

 6   arrested you didn't tell the FBI right away about David Delva's

 7   involvement in the robbery and kidnapping; is that right?

 8   A.  Yes.

 9   Q.  But when you met with the government you still minimized

10   both your conduct and his; is that right?

11   A.  Yes.

12   Q.  But at some point you got the story straight, didn't you?

13   A.  Yes.

14   Q.  That means you told the truth about your involvement and

15   his; is that right?

16           MR. PITTELL:  Objection.

17   A.  Yes.

18           THE COURT:  Hold on.  Let me just also read that.

19   I'll allow it.  Overruled.  No, it was answered.

20           MR. PITTELL:  Objection is also to form.

21   BY MS. GERACI:

22   Q.  Mr. Accilien, when you first pled guilty you pled guilty to

23   a number of crimes, right?

24   A.  Yes.

25   Q.  You pled guilty to conspiracy to rob, to robbery,
```

1  kidnapping, conspiracy to kidnap and the use of a firearm; is

2  that right?

3  A.  Yes.

4  Q.  And then you had to plead guilty again; is that right?

5  A.  Yes.

6  Q.  And the additional crimes to which you pled guilty were a

7  narcotics conspiracy for drugs and also to lying; is that

8  right?

9  A.  Yes.

10  Q.  Did you suffer the consequences for that?

11  A.  I sure did.

12  Q.  Did your mandatory minimum sentence go up because of your

13  second plea?

14  A.  Yes.

15  Q.  Did you lie at any point during your testimony in court on

16  Monday?

17  A.  Repeat that again, please.

18  Q.  Did you lie at any point during your testimony to this

19  court on Monday?

20  A.  No.

21  Q.  Did you lie at any point during your testimony on Monday?

22  A.  No.

23  Q.  Are you lying today?

24  A.  No.

25  Q.  Mr. Accilien, you were shown a series of phone contacts

E9AAADEL1                    Accilien - Redirect

1   yesterday that were from the defendant's cellphone; do you

2   remember that?

3   A.   Repeat that again.

4   Q.   Sure.  You were shown a series of phone contacts yesterday?

5   A.   Yes.

6   Q.   Do you remember that?

7   A.   Yes.

8   Q.   OK.  And your testimony was that the phone, the one with

9   the 305 area code is David Delva's phone; is that right?

10  A.   Yes.

11  Q.   During the time of the robbery in September of 2012, did

12  you testify that the only time you used this phone was when you

13  were with the defendant at the crime scene?

14  A.   Yes.

15  Q.   You would call David Delva on this phone, right?

16  A.   Would I call him?  Yes.

17  Q.   On the 305 phone, would you call him on that number?

18  A.   Yes, I called him.

19  Q.   You in fact called him on that phone while you were at home

20  and he was at the crime scene; is that right?

21           MR. PITTELL:  Objection.

22  A.   Yes.

23           THE COURT:  Overruled.

24           MS. GERACI:  With the Court's permission can I ask

25  Ms. Chen to put up Government Exhibit 2000-Z.  It's already in

1    evidence.  And focus on entry 71 and 72 which should be on page

2    nine.

3              (Pause)

4    Q.  Mr. Accilien, are those both you --

5    A.  Yes.

6    Q.  And would David Delva call you from this phone,

7    Mr. Accilien?

8    A.  Yes.

9              MS. GERACI:  Judge, just for the record you are

10   looking at phone contact 71 and 72 and it's indicates that it's

11   Greg from 917 number and Greg house, the 347 number.

12             THE COURT:  All right.  Thank you.

13   Q.  Mr. Accilien, did you ever take pictures with David's

14   cellphone?

15   A.  No.

16   Q.  Did some of your friends also know David Delva?

17   A.  Yes.

18   Q.  In fact, you introduced people to David Delva, right?

19   A.  Yes.

20   Q.  You testified yesterday that you sold crack to a person

21   listed in that phone as "Harris"; is that right?

22   A.  Yes.

23   Q.  Where did you get the crack you sold to Harris?

24   A.  From David.

25   Q.  Do you recall a contact "Wayne" that you testified about

1   yesterday as your next door neighbor?

2   A.  Yes.

3   Q.  He's David's next door neighbor too, right?

4   A.  Yes.

5   Q.  Mr. Accilien, you testified previously that Trevor Cole and

6   Dominique Jean-Philippe were arrested for the September 2012

7   robbery and kidnapping, right?

8   A.  Yes.

9   Q.  And that you were arrested after them for the same crimes;

10  is that right?

11  A.  Yes.

12  Q.  And do you know whether Lisa Hylton was arrested before or

13  after you or at all?

14  A.  Yes.  She was arrested before me.

15  Q.  You began to proffer with the government about a month

16  after you were arrested; is that right?

17  A.  Yes.

18  Q.  At the time you began to cooperate do you know whether

19  Trevor Cole, Dominique Jean-Philippe or Lisa Hylton were

20  prepared to go to trial?

21          MR. PITTELL:  Objection.

22          THE COURT:  Hold on.  Let me just read this.  I'll

23  allow it.  You may answer.

24  A.  Can you rephrase that?

25  Q.  Sure.  At the time you began to cooperate do you know

1   whether Trevor Cole Dominique, Jean-Philippe or Lisa Hylton

2   were prepared to go to trial?

3   A.  Did I know?

4   Q.  Did you know?

5   A.  No.

6   Q.  In fact, you met with the government a lot during that

7   period; do you remember that?

8   A.  Yes.

9   Q.  Mr. Accilien, you were asked a series of questions

10  yesterday about the West Indian Day parade; do you remember

11  that?

12  A.  Yes.

13  Q.  I'm going to direct your attention to September of 2012,

14  were you at that parade in September of 2012?

15  A.  No.

16  Q.  Was Trevor Cole at that parade in September of 2012?

17  A.  No.

18  Q.  Was Dominique Jean-Philippe in September of 2012?

19  A.  No.

20  Q.  Was David Delva at that parade in September of 2012?

21  A.  No.

22  Q.  Why?

23  A.  Because they were at the robbery scene.

24  Q.  Mr. Accilien, you can tell the difference between a reality

25  and delusion; is that correct?

E9AAADEL1                          Accilien - Redirect

1    A.  Yes.

2    Q.  Do you have any doubt in your mind as you sit here today

3    that the robbery and kidnapping actually happened in September

4    of 2012; do you have any doubt?

5    A.  Yes.

6    Q.  You have a doubt or you don't have a doubt?

7    A.  No, no, I don't have a doubt.

8    Q.  Do you have any doubt in your mind that you saw guns during

9    that robbery and kidnapping?

10   A.  No, I don't have any doubt.

11   Q.  Do you have any doubt that you saw a female tied up on the

12   floor during that robbery and kidnapping?

13   A.  No, I don't have any doubt.

14   Q.  Do you have any doubt that Trevor Cole participated in that

15   robbery and kidnapping?

16   A.  I don't have any doubt.

17   Q.  Do you have any doubt that Dominique Jean-Philippe

18   participated in that robbery and kidnapping?

19   A.  No.

20   Q.  Do you have any doubt that David Delva participated in that

21   robbery and kidnapping?

22   A.  I don't have any doubt.

23   Q.  Do you have any doubt that David Delva hit the male victim?

24   A.  I don't have any doubt.

25          MS. GERACI:  Thank you, your Honor.

1            THE COURT:  All right.  Thank you.

2            Mr. Pittell, anything further?

3            MR. PITTELL:  No, your Honor.

4            THE COURT:  All right.  Thank you.

5            Mr. Accilien, you may step down, sir.

6            All right.  Would the government call its next

7    witness.

8            MR. POSCABLO:  Yes, your Honor.  The government calls

9    Diana Cooke.

10           THE COURT:  All right.  Ms. Cooke to the stand,

11   please.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

E9a1del2                    Cooke – direct

1    DIANA COOKE,

2        called as a witness by the Government,

3        having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. POSCABLO:

6    Q.   Good morning again, Ms. Cooke.

7    A.   Good morning.

8    Q.   Where do you currently work?

9    A.   The Orentreich Foundation for the Advancement of Science.

10   Q.   How long have you worked there?

11   A.   About a week and a half.

12   Q.   And where did you work prior to that?

13   A.   The New York City Office of the Chief Medical Examiner.

14   Q.   And how long did you work at the OCME prior to leaving

15   there?

16   A.   Seven and a half years.

17   Q.   Is that a New York City agency?

18   A.   Yes, it is.

19   Q.   And is the OCME a part of the New York City Police

20   Department?

21   A.   No, it is not.

22   Q.   Now can you tell the jury generally what the Office of the

23   Chief Medical Examiner does, generally.

24   A.   They do autopsies, toxicology, anthropology, and the

25   forensic biology unit does testing on criminal evidence for the

E9a1del2                         Cooke - direct

1    presence of biological fluids.

2    Q.   Now were you in a particular department in the OCME?

3    A.   Yes, I was.

4    Q.   What department was that?

5    A.   The department of forensic biology.

6    Q.   Can you tell the jury a little bit about what the

7    department of forensic biology does.

8    A.   We receive physical evidence from criminal cases in New

9    York City, we examine this evidence for the presence of

10   biological fluids, such as blood, semen, saliva, or the

11   presence of skin cells, we submit these samples for further

12   testing, analyze the results, write reports, and testify when

13   necessary in court.

14   Q.   Now what position did you have right before you left?  What

15   was your position?

16   A.   I was a criminalist level 2.

17   Q.   And how long had you been a criminalist level 2 at the

18   OCME?

19   A.   About five years.

20   Q.   What was your title before that?

21   A.   I was a criminalist level 1B.

22   Q.   Now I want to ask a few questions about your background, in

23   particular about your educational background as it relates to

24   forensic science.  Did you go to college?

25   A.   Yes, I did.

461

E9a1del2                        Cooke - direct

1   Q.   Where did you go?

2   A.   I went to the University of Binghamton and got my

3   bachelor's of science in cell molecular biology, and I went to

4   the University of Albany and got my master's of science in

5   forensic molecular biology.

6   Q.   And after graduating from Albany where did you go?

7   A.   I went to the Office of the Chief Medical Examiner.

8   Q.   And you were there for seven and a half years, before you

9   left.

10  A.   That's correct.

11  Q.   Why did you change jobs?

12  A.   The commute was much shorter.

13  Q.   Now can you describe for the jury some of the training that

14  you received specific to the DNA testing that you did about a

15  week and a half ago.

16  A.   When I first started at the Office of the Chief Medical

17  Examiner, or OCME, we went through a six-month intensive

18  training program in which each test that we performed in the

19  lab, we first watched a trained analyst perform this test, a

20  trained analyst then watches us perform the test.  We then

21  perform the test independently.  Lastly, we do a competency

22  test in which the results are unknown to us but known to a

23  supervisor, and we must pass all these competency tests to

24  perform this testing in the lab.

25  Q.   And did you participate in ongoing education throughout

E9a1del2                      Cooke - direct

1    your time at the OCME?

2    A.  That's correct.

3    Q.  What sort?

4    A.  We attend lectures that are at the OCME in continuing

5    education, we can go to conferences, and we also read current

6    journal articles in forensic science.

7    Q.  Now speaking more generally, does the Office of the Chief

8    Medical Examiner have to undergo any special accreditation?

9    A.  Yes, we do.

10   Q.  Can you describe what that means.  What is accreditation

11   and what's the process for getting accredited?

12   A.  Accreditation means that we meet or exceed the national

13   standards put forth for DNA testing, so we perform quality work

14   on a day-to-day basis.  In order to be accredited, we must

15   go -- undergo an inspection, which is done by the accrediting

16   agency, so they look at our office from top to bottom, so all

17   our procedures, the personnel, everything that -- our security,

18   everything that we do in the lab, and they must meet or exceed

19   the standards put forth by this testing.  Our lab is accredited

20   by ASCLD/LAB, which stands for American Society of Crime

21   Laboratory Directors/Lab Accreditation Board, and it's the

22   international accreditation.  And we're also accredited by the

23   New York State Commission on Forensic Science.

24   Q.  Now after you're accredited, is there any auditing that

25   takes place of the OCME?

E9a1del2                      Cooke - direct

1   A.   Yes.  Every year our office is audited, and every five

2   years we must undergo an inspection again to maintain our

3   accreditation.

4   Q.   And at the time that you left was the OCME in compliance

5   with all accrediting agencies?

6   A.   Yes, we were.

7   Q.   What about with all audits?

8   A.   Yes, we were.

9   Q.   Now in addition to the general audits and examinations of

10  the lab, did you personally undergo evaluations during your

11  time there?

12  A.   Yes, I did.

13  Q.   How often?

14  A.   Every six months analysts must undergo a proficiency test

15  in which an external agency provides a proficiency test, and

16  every test that we perform in the lab, we must perform on this

17  proficiency test, and then we must write up the results and

18  submit it to the external agency and then they would deem us if

19  we passed or failed the proficiency test.

20  Q.   Now at the time that you left, were you in compliance with

21  all of your professional obligations?

22  A.   Yes, I was.

23  Q.   And you testified earlier that you were a level 2

24  criminalist before you left the OCME, is that correct?

25  A.   That's correct.

E9a1del2                    Cooke - direct

1   Q.  What does it mean to be a level 2?

2   A.  As a level 2 criminalist, I would examine the evidence,

3   submit -- for biological fluids, submit these samples for

4   further testing, perform all the tests done in the lab, I would

5   then write up -- analyze the results, write reports, and

6   testify when necessary in court.

7   Q.  Those are all your responsibilities as a level 2.

8   A.  That's correct.

9   Q.  Now while you were there did the OCME lab use a rotation

10  system?

11  A.  Yes, we did.

12  Q.  What does that mean?  Can you explain that to the jury.

13  A.  The OCME lab deals with about 7,000 plus cases a year, so

14  in order to examine all these cases and perform the DNA testing

15  on these cases, we have a rotation system in which all the

16  analysts in the lab would be on a rotation and might handle

17  some or part of these cases.

18  Q.  And for the DNA reports that you prepared, do you review

19  all of the work that underlies those reports?

20  A.  Yes, I do.

21  Q.  Let's talk about how many DNA case the lab handles.  Do you

22  know approximately how many DNA cases the OCME handles each

23  year?

24  A.  Approximately 7,000 plus cases a year.

25  Q.  And in your seven and a half years at the OCME, how many

E9a1del2                        Cooke - direct

1    DNA tests have you performed?

2    A.   Thousands.

3    Q.   And have you testified before in matters involving DNA?

4    A.   Yes, I have.

5    Q.   How many times?

6    A.   About six or seven jury trials and about 30 or plus grand

7    juries.

8    Q.   And in all of those times you were designated as an expert

9    witness?

10   A.   Yes, I was.

11          MR. POSCABLO:   Your Honor, the government offers

12   Ms. Cooke as an expert witness in the area of forensic DNA

13   analysis.

14          THE COURT:   Mr. Pittell?

15          MR. PITTELL:   No objection.

16          THE COURT:   All right.  The court does find that

17   Ms. Cooke is qualified as an expert witness in the area that

18   counsel have indicated in terms of forensic DNA analysis.

19          Ladies and gentlemen, we're now going to hear

20   testimony that Mr. Poscablo will work with Ms. Cooke on, and I

21   just want to give you a few instructions before you listen to

22   that testimony about expert witnesses.

23          Expert witnesses, which Ms. Cooke is qualified to be,

24   are qualified based upon their experience and knowledge in a

25   particular field.  They have a particular kind of expertise.

1    They're a little bit different from fact witnesses, or they're

2    a lot different because they don't have to have firsthand

3    knowledge of something.  They have to have firsthand knowledge

4    if they're doing a test of something in particular, but it's

5    their expertise and knowledge that you're relying upon.  So

6    they can give opinions.  That's the big difference.  They can

7    give an opinion, and a fact witness is there to testify only

8    about what he or she experienced directly.  Now an expert

9    witness, as with any other witness, it's up to you to determine

10   what you believe and what you don't believe, and as with any

11   other witness, it is up to you to determine and assess

12   credibility.

13              All right.  Mr. Poscablo, you may proceed.

14              MR. POSCABLO:  Thank you, your Honor.

15   BY MR. POSCABLO:

16   Q.  Ms. Cooke, what is DNA?

17   A.  DNA is genetic material that contains information that

18   makes us human and also makes us unique.  We receive half of

19   our DNA from our mom and half from our dad.  About 99 percent

20   of our DNA is the same between you and me, so it's what makes

21   us human and gives us two eyes, a nose, and a mouth.  About

22   1 percent of our DNA is unique, and this is the portion we look

23   at in our lab.

24   Q.  Now what are some of the sources of DNA on the human body?

25   A.  Our cells in our body, so skin cells, our white blood cells

E9a1del2                        Cooke - direct

1    of our blood, sperm cells in semen.

2    Q.   And what is the goal of DNA testing?

3    A.   The goal of DNA testing is to determine, to -- once you

4    find DNA on criminal evidence, an attempt to identify from whom

5    these samples came from.

6    Q.   And are you familiar with the term "locus" or "loci"?

7    A.   Yes, I am.

8    Q.   So let's spell "locus" first for the court reporter.

9    A.   L-O-C-U-S.

10   Q.   And "loci"?

11   A.   L-O-C-I.

12   Q.   And what is that?  What are they?

13   A.   These are locations that we test on the DNA.

14   Q.   And what is an allele?  And you can spell that too.

15   A.   A-L-L-E-L-E.  And this is a varied form of DNA at a

16   location, so for example, if you have blue eyes, you'll have

17   alleles for blue eyes.

18   Q.   And what is a DNA profile?

19   A.   A DNA profile is a result that we receive in our lab and

20   it's simply a string of numbers that's unique to an individual.

21   So we test 15 locations in our lab and a sex determining

22   location, and at each location an allele is represented by a

23   number.  So we receive half of our DNA from our moms and half

24   from our dad, so we'll receive two numbers at each location.

25   So the result would be the string of numbers at all 15

1   locations.

2   Q.   And our DNA profile, is that unique for a particular

3   individual?

4   A.   Yes, except for identical twins, who would have the same.

5   Q.   If I had a twin, that person would have the same alleles in

6   the same loci as me.

7   A.   An identical twin, yes.

8   Q.   Identical twin, right.   Now I'd like to talk about how the

9   lab goes about DNA testing generally.   What types of materials

10  does the lab receive for testing?

11  A.   So we receive physical evidence from a criminal case, so we

12  could receive a sexual assault kit, so those would be swabs or

13  underwear from a sexual assault; we'd receive evidence that's

14  left behind at a crime scene, so bottles, gloves, clothing, or

15  we could receive a swab that was taken of an item left behind

16  at a crime scene, and a swab is a -- looks like one end of a

17  Q-tip, and it's used to swab an item.

18  Q.   Generally speaking, who performs the swab?

19  A.   Evidence collection officer at the crime scene.

20  Q.   Do you ever perform the swab?

21  A.   If we receive evidence in a case, sometimes we'll swab that

22  evidence ourselves, but we don't swab -- normally swab items at

23  a crime scene.

24  Q.   Ms. Cooke, can you explain to the jury what touch DNA is.

25  What is touch DNA?

E9a1del2                    Cooke - direct

1    A.  So there's something known as Locard's principle, and it

2    simply states that you --

3    Q.  You need to spell that for the court reporter.

4    A.  Locard, L-O-C-A-R-D.  And it's a principle that states that

5    if a person comes into contact with a item, object, or a

6    person, that you're going to leave something behind on the

7    object and potentially take something back or -- that object,

8    or you're going to take something back from that object.  So if

9    you touch an object, you can potentially leave behind skin

10   cells from your hand on that object.

11   Q.  Is blood considered touch DNA?

12   A.  It is not.

13   Q.  Why?

14   A.  Blood I guess is considered blood.  Touch DNA is simply

15   from touching an object and leaving skin cells behind.

16   Q.  So for blood, is semen considered touch DNA?

17   A.  It is not.

18   Q.  Okay.  Now as an aside, can someone be present at the scene

19   of a crime and not leave behind DNA?

20   A.  Yes, they can.

21   Q.  What are some of the reasons a person may or may not leave

22   DNA on an object that he or she touches?

23   A.  For example, you may be wearing gloves and not leave behind

24   your DNA, or sometimes when you touch an object, you may not

25   leave DNA behind.  Touch DNA, leaving DNA behind on an object

E9a1del2                    Cooke - direct

1  through touching, it could depend on many factors, such as some

2  people shed more DNA that than others, so they're called good

3  shedders.  It depends how long you hold on object for.  It

4  depends how long since you touched that object.  Also, if you

5  wash your hands before you touch an item, you may not leave any

6  DNA behind.

7  Q.  Now relatedly, what, if any, effect does bleach have on the

8  presence of DNA?

9  A.  Bleach can degrade the DNA, and therefore when we do our

10  DNA testing, we may not find DNA, or we can't perform the DNA

11  testing because no DNA is left suitable for testing.

12  Q.  So let's lead the jury through a typical process for you.

13  You receive an item, right?  That's what you testified to?

14  A.  Correct.

15  Q.  And after examining and receiving the item, what's the

16  step?  What's the step that you do next?

17  A.  After examining an item, first we'll visually examine the

18  item, and then we'll look for the presence of DNA.

19  Q.  And what's that called?  Is that extraction?

20  A.  The next step would be extraction.  So after we submit a

21  sample for further testing, the next step would be extraction.

22  Extraction is where we add chemicals to a tube and to separate

23  the DNA from the rest of the sample.

24  Q.  And what is done after DNA is extracted from a physical

25  item or a swab?  What happens next?

E9a1del2                          Cooke - direct

1    A.  The next step is called quantitation, and in this step

2    we're determining how much DNA is in the sample and if there's

3    enough DNA to go on with testing.

4    Q.  And to go on with further DNA testing with the OCME, how

5    much DNA is needed?

6    A.  20 picograms per microliter, which is a very, very small

7    amount.

8    Q.  That's not visible to the naked eye, is it?

9    A.  No, it's not.

10   Q.  Can you describe to the jury the process after

11   quantitation?

12   A.  The next step is called amplification, and in this step

13   we're making many copies of the DNA in the locations that we're

14   testing.

15   Q.  And what is capillary?

16   A.  The next step would be capillary electrophoresis, and in

17   this step we're separating the copies of DNA that we make out

18   on a machine and we're visualizing the results and analyzing

19   it.

20   Q.  And what's the next step after that?

21   A.  Analyzing the results and writing the report.

22   Q.  Now can you explain to the jury how a DNA sample is matched

23   or compared with another sample.

24   A.  So if an item of evidence, we're able to determine a DNA

25   profile, we can -- if we have a reference sample, we can

E9a1del2                      Cooke - direct

1   compare that person's DNA profile to the item of evidence, and

2   in order to determine if it's a match, they have to match --

3   every allele has to match at every single location to deem it a

4   match.

5   Q.  100 percent match.

6   A.  Yes, that's correct.

7   Q.  Now what happens if you don't have a known sample?  Can you

8   still create a profile?

9   A.  Yes, we can.

10  Q.  And are DNA profiles prepared if a sample is a mixture?

11  A.  If a sample is a mixture, it means that more than one

12  person is contributing DNA to that sample.  If we're able to

13  determine who's contributing the most DNA to that sample, we

14  can have -- we can -- the major donor to that sample, so

15  whoever's contributing the most DNA, we can get a profile from

16  that.

17  Q.  Let's say you had an item and from that item you were able

18  to pull DNA and there was a mixture, which you testified is at

19  least two people.  Two people touched that item.  You may or

20  may not be able to create a profile is your testimony, correct?

21  A.  That's correct.  So sometimes if we have a mixture and more

22  than one person is contributing DNA, let's say if they're

23  contributing the same amount of DNA, then we're not going to be

24  able to determine a DNA profile because we're not going to be

25  able to determine who contributed the most DNA from that

E9a1del2                        Cooke - direct

1   sample.

2   Q.   From the item that was touched.

3   A.   Correct.

4   Q.   And what happens if you have a representative sample from a

5   particular individual, what do you do next?  So if you had the

6   item that is touched, you testified that it could be multiple

7   people who touched it, so you have more than one person, and

8   you're not able to prepare a profile right away, correct?

9   A.   Mm-hmm.

10   Q.   What happens next?  If you're provided a sample from a

11   particular individual, like blood, or a swab from the cheek,

12   what do you do next?

13   A.   Okay.  So if we have a sample with a mixture on it and

14   we're not able to determine a profile, then we deem that sample

15   to be -- comparison to be done to that sample if we're able to

16   get a reference sample from a certain individual.  So if we get

17   a sample, or a reference sample from an individual at a later

18   date, then we can make a comparison to that profile, or to that

19   mixture to determine if they're either in the mixture or

20   excluded from the mixture.

21   Q.   Let's talk about the DNA testing in this case, okay?  What

22   was your role in the DNA analysis in this case?

23   A.   In this case I wrote the reports and analyzed all the

24   testing in the case.

25   Q.   And when do you write your reports, after all the testing

474

1    is done?

2    A.   Correct.

3    Q.   Do other individuals participate in different parts of the

4    testing?

5    A.   Yes, they do.

6    Q.   And that's the rotation system that you were talking about

7    before.

8    A.   That's correct.

9    Q.   Now what role do you play when they're testing these

10   materials?

11   A.   I analyze the results of the testing and then I will write

12   my conclusions in the report from my analysis of the tests.

13   Q.   Now are there particular testing methodologies that are

14   mandated by specific protocols?

15   A.   That's correct.  So our lab has standard operating

16   procedures for every test that's done in the lab, and each

17   analyst who performs these tests has to follow these standard

18   operating procedures.

19   Q.   And where are those reports?  After you prepare them, where

20   are the reports stored?

21   A.   In the case file.

22            MR. POSCABLO:  May I approach, your Honor?

23            THE COURT:  You may.

24   Q.   Ms. Cooke, I'm handing you what's been marked for

25   identification as Government Exhibits 1000, 1001, 1002, 1003,

E9a1del2                          Cooke - direct

1    and 1000-A.  I'd like you to take a look at them --

2    A.  Okay.

3    Q.  -- very quickly.  Did you have an opportunity to review

4    these reports prior to your testimony today?

5    A.  I did.

6    Q.  And generally speaking, what do you recognize these to be?

7    A.  Certified copies of the reports that I wrote for these case

8    files.

9    Q.  Who prepared these reports, you did?

10   A.  I did.

11   Q.  And are these reports made and kept in the regular course

12   of the OCME's business?

13   A.  Yes, they are.

14   Q.  And is it the OCME's regular practice to create these

15   reports and the underlying documents?

16   A.  Yes, it is.

17   Q.  And you testified that you prepared them, so you have

18   personal knowledge of these reports, correct?

19   A.  I do.

20   Q.  And were these reports prepared after the analysis

21   underlying the particular report was completed?

22   A.  They were.

23           MR. POSCABLO:  Your Honor, the government offers

24   Government Exhibits 1000, 1001, 1002, 1003, as well as 1000-A,

25   your Honor, which is a chart from 1003.  We might as well also

E9a1del2                        Cooke - direct

1    offer the demonstrative, 1003-A, which is a blowup of 1000-A.

2            THE COURT:  All right.  Mr. Pittell?

3            MR. PITTELL:  Other than my prior noted objections --

4    well, I'll just note my prior objections.

5            THE COURT:  All right.  Those documents and the

6    demonstrative are received.

7            (Government's Exhibits 1000, 1001, 1002, 1003, 1000-A,

8    1003-A received in evidence)

9            MR. POSCABLO:  Judge, Ms. Chen correctly and

10   appropriately corrected me that 1000-A is actually a

11   demonstrative from 1000 and 1003-A is a demonstrative from

12   1003.  I just wanted to correct the record.

13           THE COURT:  All right.  And I don't know exactly what

14   1000-A looks like or 1003-A looks like, although I've seen it

15   there.  If it's simply a blowup, then it will be received as

16   evidence.  If it's something else and there's added pieces that

17   make it a demonstrative, then it will be received for

18   identification.

19           You may proceed.

20   BY MR. POSCABLO:

21   Q.  Now, Ms. Cooke, I want to direct your attention --

22           MR. POSCABLO:  And Ms. Chen, can you please put up,

23   with the court's permission, Government Exhibit 1000, and in

24   particular let's turn to I think the third page of -- oh,

25   that's it.

477

E9a1del2                    Cooke - direct

1  Q.  You can look up on the chart or on the screen.  Whichever's

2  easier.

3            MR. POSCABLO:  Ms. Chen, can you please highlight the

4  part that says, "Testing indicates the presence of human

5  blood."

6  Q.  Turning your attention to Government Exhibit 1000, which is

7  on the screen, Ms. Cooke, what is this report?

8  A.  This was the report that I wrote for the case file for the

9  evidence that we examined in this case.

10  Q.  Okay.  Now just as an aside, prior to submitting this

11  report and finalizing the report, is it reviewed by anyone

12  else?

13  A.  Yes, it is.

14  Q.  By who?

15  A.  It is reviewed by my supervisor at the time.

16  Q.  Now what does this report show?  You testified it's about

17  the evidence, correct?

18  A.  That's correct.

19  Q.  So let's go through what it says.  The portion that

20  Ms. Chen highlighted, can you read that part?

21  A.  "Testing indicates the presence of human blood on the

22  following items."

23  Q.  Now that's not touch DNA.

24  A.  That's correct.  It's not touch DNA.

25  Q.  And what were the items that human blood was found on?

1    A.  A tie, a scarf, and a piece of duct tape.

2    Q.  Okay.  Now very quickly, what are those numbers after the

3    word "Voucher"?  What do those numbers indicate?

4    A.  So each item of evidence comes in a particular voucher

5    that's submitted by the New York State Police Department in

6    this case, and this is just a number that represents the

7    voucher that it came in on.

8    Q.  And then the item?

9    A.  And then the item number.  Some vouchers had more than one

10   item, so the item number states which item it was.

11   Q.  So it's your expert opinion that DNA in the form of human

12   blood was found on the tie, the scarf, and the duct tape, is

13   that correct?

14   A.  That's correct.

15   Q.  Now let's turn to the second line, with starts with

16   "Human."  Can you read that to the jury.

17   A.  "Human DNA sufficient for PCR DNA testing was found on the

18   following samples."

19   Q.  Okay.  And what does that mean?

20   A.  It means that DNA that's not blood or semen was found on

21   the samples listed below.

22   Q.  And just for the record, it reflects cigarette butts,

23   correct?

24   A.  Some are cigarette butts, some are swabs that we did of

25   duct tape, swabs of a glove, and then more cigarette butts, and

E9a1del2                          Cooke - direct

1   a swab of gum that was found on -- a piece of gum was found on

2   a cigarette butt.

3   Q.  And each of these items has a corresponding voucher number?

4   A.  That's correct.

5   Q.  And an item number.

6   A.  That's correct.

7           MR. POSCABLO:  Next page, Ms. Chen.  Actually, let me

8   go back one second.  You don't have to go back, Ms. Chen.

9   Q.  But what does PCR DNA testing mean?

10  A.  PCR stands for polymerase chain reaction, and one of the

11  steps that I had mentioned before, which is amplification, in

12  which we make many copies of the DNA at certain locations,

13  that's what PCR is.

14          MR. POSCABLO:  Next paragraph, Ms. Chen.  That's

15  great.

16  Q.  That first paragraph that starts, "PCR DNA typing," can you

17  just explain to the jury what that means, what that paragraph

18  is.  You don't have to read it.

19  A.  Okay.  So we found a single source, so coming from one

20  person, DNA profile on the following items, so two cigarette

21  butts and the swab of gum, and it was unknown because it didn't

22  match any of the reference samples of the victims in the case,

23  or elimination sample.

24  Q.  What is an elimination sample?  Can you explain to the jury

25  what that is.

E9a1del2                          Cooke - direct

1    A.  Any victim or anyone who's present at the crime scene, we

2    can eliminate them or compare them to the items of evidence,

3    and so it's a swab that comes from their mouth and we just use

4    it as a reference sample and compare it to the items of

5    evidence in the case.

6              MR. POSCABLO:  Ms. Chen, could you highlight that

7    second sentence in that first paragraph that says, "This DNA

8    profile is not the same."

9    Q.  Are those the elimination samples you're talking about?

10   A.  That's correct.

11   Q.  Can you tell us who were the elimination samples taken

12   from, according to your report?

13   A.  Eugene Brown, Jeanette Adams, Aisha Grahm and Brenda Luke.

14   Q.  So the finding in this first paragraph is that none of them

15   contributed to the cigarette butt, the cigarette butt, or the

16   swab of gum, is that correct?

17   A.  That's correct.  We found an unknown male DNA profile.

18   Q.  And that's what's reflect in the next line?

19   A.  Yes, so we deemed it male donor A and we did a statistic to

20   it.  And the statistic states that we expect to see this DNA

21   profile in 1 in greater than 6.8 trillion people.

22   Q.  What does that mean?

23   A.  So simply, there's about 6.8 trillion -- or 6.8 billion

24   people on planet Earth, so we expect to see this DNA profile

25   once in greater than 6.8 -- sorry -- so we expect to see this

E9a1del2                         Cooke - direct

1    DNA profile once in about a thousand planet Earths, each

2    containing 6.8 billion people.

3    Q.  So this is one person.  Unless they're twins, there's one

4    person who contributed this male donor A?

5    A.  Yes.

6    Q.  Let's turn to the highlighted, what looks like bolded, "The

7    DNA profile."  Can you read that out loud and just tell us what

8    that means.

9    A.  "The DNA profile of male donor A is suitable for entry into

10   the State DNA Index System (SDIS)/National DNA Index System

11   (NDIS), and the OCME local DNA databank."

12   Q.  What does that mean?

13   A.  So there's a database that's called CODIS, Combined DNA

14   Index System, and it's maintained at three levels -- local,

15   state, and national -- and this database -- these databases

16   house samples from evidence such as this or known individuals.

17   Q.  Okay.  So before we turn to the next line, regarding male

18   donor A, is it your expert opinion that male donor A

19   contributed to both the cigarette butt listed as item 3 in

20   voucher number ending in 4209, the cigarette butt in voucher

21   number ending in 7168, item 4, and the swab of gum from voucher

22   number ending in 7168, item 4?

23   A.  That's correct.

24   Q.  And let's go to female donor A.  What's the conclusion

25   here?

E9a1del2                    Cooke - direct

1   A.   So in the cigarette butt we also determined that there was

2   a single source DNA profile and it came from a female, so it

3   was unknown.   It did not match Eugene Brown, Jeanette Adams,

4   Aisha Grahm, or Brenda Luke, so we deemed it female donor A.

5   Q.   And the same statistic, 6.8 trillion people, 1 in

6   6.8 trillion, 1 in greater than 6.8 trillion people.

7   A.   That's correct.

8   Q.   And that was found on a different cigarette butt, the

9   cigarette butt that's vouchered as voucher number ending in

10  7168, item 5, is that correct?

11  A.   That's correct.

12  Q.   Now, Ms. Cooke, at the time you prepared this report, other

13  than the elimination samples, did you have any other samples to

14  compare the DNA to?

15  A.   No, we did not.

16  Q.   Not at the time of this report.

17  A.   That's correct.

18          MR. POSCABLO:   Okay.   The next page, Ms. Chen.

19  Q.   Now the first paragraph on -- I think it's page 3,

20  identifies the female donor B, is that correct?

21  A.   That's correct.

22  Q.   Can you tell the jury what your findings are, or were, with

23  regards to female donor B.

24  A.   So on the cigarette butt we -- on this cigarette butt, we

25  determined another female donor -- female DNA profile that

1    wasn't the same as Eugene Brown, Jeanette Adams, Aisha Grahm,

2    Brenda Luke, male donor A, or female donor A, so we deemed it

3    female donor B.

4               MR. POSCABLO:  Now, Ms. Chen, can you highlight the

5    section going down all the way to PCR DNA typing.  Right there.

6    Q.  Was the glove tested?

7    A.  Yes, it was.

8    Q.  Was the actual glove tested or swabs?

9    A.  We tested the actual glove.

10   Q.  And what was the conclusion from testing the glove?

11   A.  We found a mixture of DNA from at least three people on the

12   glove.  We weren't able to determine a major donor who

13   contributed the most DNA so we just deemed that the D -- the

14   DNA profiles of individual contributors to the mixture could

15   not be determined but the mixture of DNA was suitable for

16   comparison.

17   Q.  What does that mean, suitable for comparison?

18   A.  It means that we can do a comparison of -- once we get in a

19   reference sample, we can compare that person's DNA profile to

20   see if they're a possible contributor to the mixture.

21   Q.  Okay.  Now let's just quickly go through the bottom part of

22   this.

23              MR. POSCABLO:  The very last paragraph, Ms. Chen.

24   Q.  What was the conclusion here?

25   A.  The swabs from the duct tape, item 4 and item 7, the DNA

                    E9a1del2                    Cooke - direct

1    profile was the same as the DNA profile of Jeanette Adams;

2    therefore, she is the source of the DNA.

3              MR. POSCABLO:   Okay.  Ms. Chen, the next page, please.

4              The top part.  Thank you.

5    Q.  And the conclusion in the top of page 4?

6    A.  So on the swabs of the duct tape and then the bloodstains

7    found on the duct tape, tie, and scarf, the DNA profile was the

8    same as that of Eugene Brown; therefore, he is the source of

9    the DNA on these items.

10   Q.  And then the next line that starts with human DNA was found

11   on the following samples?

12   A.  The following samples, the swab of the bottle, a swab from

13   a possible chicken bone, and swabs from a different glove,

14   which was item 2, human DNA was found, but it was insufficient

15   to go on with further DNA testing, so as I said before, when we

16   determine how much DNA is in a sample and we need a certain

17   amount to go on for further testing, which is 20 picograms per

18   microliter, these samples each had less than, and we couldn't

19   go on with further testing.

20   Q.  Now you testified earlier about CODIS.  Was there a CODIS

21   hit for any of the items that you tested?

22   A.  Yes, there was.

23   Q.  And did a name come back for that CODIS hit?

24   A.  Yes.

25   Q.  What was that name?

E9a1del2                          Cooke - direct

1    A.  Trevor Cole.

2    Q.  Okay.

3           THE COURT:  Can you remind me what CODIS is.

4           THE WITNESS:  CODIS, which stands for Combined DNA

5    Index System, it is a database maintained on three levels --

6    local, state, and national -- and they house profiles from

7    known individuals and profiles from other evidence cases,

8    either local, state, or national level.

9           THE COURT:  All right.  Thank you.

10   Q.  And was there a female that was identified by CODIS?

11   A.  Yes, there was.

12   Q.  And do you remember the name?

13   A.  I believe it was Lisa Hilton.

14   Q.  Lisa Hilton?  Okay.  Now let's turn to Government Exhibit

15   which is in evidence, 1001.  Now generally speaking, before we

16   highlight this, what was the purpose of this report?

17   A.  So this report, we received DNA swabs from Trevor Cole.  We

18   cut the swab, examined it, and obtained his DNA profile and

19   compared it to the samples, evidence samples in the case.

20          MR. POSCABLO:  So Ms. Chen, can you highlight that

21   portion.  Thank you.

22   Q.  Can you tell us exactly what Trevor Cole's DNA sample was

23   tested against, or compared to.

24   A.  It was compared to all the evidence items that comparisons

25   could be made, so in this case we found that he is the source

E9a1del2                    Cooke - direct

1    of the DNA from the following samples, so that means his DNA

2    profile was the same as the DNA profile found on these items,

3    and that was the cigarette butt on voucher ending in 4209,

4    item 3, cigarette butt in voucher 7168, item 4, and the swab of

5    gum on voucher ending in 7168, item 4.

6    Q.  Was there anything that he was not the source of?

7    A.  Yes.  We found that he was not the source of the cigarette

8    butt on the voucher ending in 7168, item 5, and the cigarette

9    butt on voucher ending in 4209, item 1.

10   Q.  And was there something that he was excluded from?

11   A.  So I said that we found a mixture of DNA on the swabs of

12   the glove and there was at least three contributors.  We

13   compared Trevor Cole's DNA profile to that mixture and we found

14   that he was excluded as a contributor to that mixture.

15   Q.  And I want to highlight something for the jury here.

16   What's the difference between saying Trevor Cole is not the

17   source of the DNA and saying that he is excluded as a

18   contributor to the DNA?  What's the difference?

19   A.  So if it's a single source DNA profile, so one person

20   contributed DNA to that item, then we can say he's not the

21   source because we're comparing his DNA profile to the DNA

22   profile found on that item.  If it's a mixture, so more than

23   one person is contributing DNA, and we don't have a DNA profile

24   from that mixture, then we can either say that it could be

25   possibly a contributor or they can be excluded as a

E9a1del2                    Cooke - direct

1    contributor, because we don't see their DNA profile in this

2    mixture.

3            MR. POSCABLO:  Ms. Chen, just the bottom part.  Could

4    you highlight that bottom part.

5    Q.  And what does that show?

6    A.  This shows that the following items were consistent with

7    the DNA profile of Jeanette Adams so we didn't compare Trevor

8    Cole's DNA profile to these items.

9            MR. POSCABLO:  And the next page, Ms. Chen, page 2.

10   Q.  Directing your attention to the top of page 2, Ms. Cooke,

11   what does that show?  What was your conclusion there?

12   A.  That these items were consistent with the DNA profile of

13   Eugene Brown, so we didn't compare Trevor Cole's DNA profile to

14   the following items.

15   Q.  And the next -- and finally, the last line?

16   A.  The last line states that the following items were

17   insufficient, so again, these -- we found DNA on these items

18   but it wasn't enough to go on further testing, so we could not

19   compare Trevor Cole's DNA profile to these items.

20           MR. POSCABLO:  Now one thing I want to do, Ms. Chen,

21   can you just put up GX 1000 again, to the area that says Date.

22   Q.  What was the date that this report was prepared?

23   A.  April 22, 2013.

24   Q.  And let's go back to GX 1001.  What was the date that this

25   was prepared?

E9a1del2                         Cooke - direct

1   A.  April 22, 2013.

2   Q.  Let's go to 1002.  Now generally speaking, what is

3   GX/Government Exhibit 1002 analyzing?  What's the conclusion

4   there?

5   A.  So we received a swab that came from Dominique

6   Jean-Philippe.  We submitted this swab for DNA testing and we

7   obtained the profile of Dominique Jean-Philippe.

8           MR. POSCABLO:  Okay.  Ms. Chen, can you highlight

9   that.

10  Q.  And the same date, April 22, 2013, correct?

11  A.  Correct.

12  Q.  Okay.  So what was the conclusion here with regards to

13  Mr. Jean-Philippe?

14  A.  We compared Dominique Jean-Philippe's profile to the

15  evidence items and we found that he's not the source of the DNA

16  found on the following items, which were the cigarette butts

17  and the swab of the gum.

18  Q.  What about the next line?

19  A.  Dominique Jean-Philippe was excluded as a contributor to

20  the mixture of DNA found on the swabs of the glove.

21  Q.  And the last line?

22  A.  We didn't compare his DNA profile to the following items

23  because the items were consistent with the DNA profile of

24  Jeanette Adams.

25  Q.  So fair to say that Dominique Jean-Philippe's DNA was not

E9a1del2                    Cooke - direct

1   found on any of the items that you tested?

2   A.  That's correct.

3            MR. POSCABLO:  Let's go to 1003.  And we'll go to the

4   second page.  Thank you, Ms. Chen.  Or the first page of 1003.

5   Q.  At some point did you receive a sample of DNA from David

6   Delva?

7   A.  Yes, we did.

8   Q.  Okay.  And was a profile of Mr. Delva's DNA determined?

9   A.  Yes.

10  Q.  All right.  So let's talk about Government Exhibit 1003,

11  which is in evidence.

12           MR. POSCABLO:  Can you highlight that portion.

13  Q.  Can you tell the jury what your conclusions were with

14  regards to this report.

15  A.  So we compared David Delva's profile to the mixture of DNA

16  that was found on the swabs of the glove, and we could not rule

17  him out as a contributor, so we had -- there was a positive

18  association between David Delva's profile and the mixture of

19  DNA that was found on the glove.  So therefore, we did a

20  likelihood ratio.  And a likelihood ratio is -- basically

21  there's two scenarios -- one scenario in which a person

22  contributes DNA to the mixture, along with two unknown,

23  unrelated individuals, and the other scenario is that three

24  unknown, unrelated individuals contributed to the mixture and

25  not that person.  And then we do a ratio and get a statistic

490

1    from it.

2    Q.  Let's do that again.  Let's do that very slowly.

3    A.  Okay.

4    Q.  And let me see if I understand it.  Because I got an A in

5    Bio.  The comparison you're doing is three people who you don't

6    know, unknown, unrelated people, as compared to Mr. Delva and

7    two unknown, unrelated persons, and the conclusion is that it's

8    4.42 million times more probable that it contains Mr. Delva's

9    and two unrelated, unknown individuals than three unknown,

10   unrelated persons, is that correct?

11   A.  That's correct.

12   Q.  That A in Bio helped.

13        Okay.  The next line, "Therefore," can you just read

14   that out loud to the jury.

15   A.  "Therefore, there is very strong support that David Delva

16   and two unknown, unrelated persons contributed to this mixture,

17   rather than three unknown, unrelated persons."

18   Q.  Let's talk about something.  The term "unrelated" means

19   what?

20   A.  Means that you're not related to them so they're not your

21   family.

22   Q.  If a person who is related to Mr. Delva -- father, uncle, a

23   nontwin brother, a cousin -- was one of the individuals who

24   touched, or was one of the other individuals who may have

25   touched this glove, does that exclude Mr. Delva from your

E9a1del2                    Cooke - direct

1   analysis?

2   A.  No, it does not.

3   Q.  Okay.  Could it potentially affect something in your

4   conclusion?

5   A.  It can.  So when we did this statistic, we didn't use any

6   other known reference sample, so for example, if we tested and

7   know someone else touched an item and let's say they happen to

8   be someone who's related to Mr. Delva, then it could change the

9   statistic, but in this case we just strictly compared David

10  Delva's profile to the mixture of DNA and did the statistic

11  from that.

12  Q.  Let's be clear about something, though.  If you had a

13  sample from that relative and it's possible that the relative

14  also touched that glove, does the statistic necessarily go

15  down?

16  A.  No, it does not.

17  Q.  Can you explain.

18  A.  It depends on many different factors, so first, that if we

19  have a reference, another reference sample that we are

20  comparing to items, they have to be also positively associated

21  with the mixture, so a possible contributor to this mixture

22  before we include them in our statistic.  And then it depends

23  on which alleles that they share and how many alleles that they

24  share, and that's how the statistic will change.

25  Q.  So it's possible that the statistic could go higher.

1    A.  I wouldn't know until I did the calculations.

2    Q.  Okay.  Good.

3              THE COURT:  Let me ask, what are the chances that you

4    could have a mistake for David Delva because a brother was the

5    one who had touched the DNA?

6              THE WITNESS:  So we strictly looked at David Delva's

7    profile and his profile only and compared his DNA profile and

8    found that there was a positive association between his profile

9    and -- being in the mixture of DNA, or that we see his DNA

10   alleles in his profile in the mixture of DNA.  So if let's say

11   we have his brother's DNA profile.  They're not going to -- 

12             MR. POSCABLO:  Nontwin.

13             THE WITNESS:  Nontwin.  Will not share every location,

14   so they'll have a different DNA profile.  So they may or may

15   not have been a contributor, or a possible contributor to this

16   mixture, but they're not going to have the same DNA alleles, so

17   it's a separate comparison, so we could say they may or may not

18   be a contributor to this mixture.

19             THE COURT:  I see.

20             MR. POSCABLO:  Now I actually want to dig into that a

21   little bit, and it's a good segue.  Your Honor, may I approach?

22             THE COURT:  Yes.  Now let me just tell you, at

23   11:00-ish we're going to take a break, so I just want to give

24   you fair warning so you can find a logical place.

25             MR. POSCABLO:  Great.  Thanks, your Honor.

E9a1del2                    Cooke - direct

1    BY MR. POSCABLO:

2    Q.  Before we do that, can you explain to the jury how you

3    determined that at least -- I think you said three

4    individuals -- at least three individuals touched that glove.

5    What I mean is, what I want you to explain to the jury is, why

6    isn't it at least two?  Why isn't it at least four?  Can you

7    explain to the jury what that means.

8    A.   Okay.  So before I stated that you receive half of your DNA

9    from your mom and half from your dad.  So at each location

10   our -- the alleles are represented by numbers, so we'll see one

11   number from your mom and one number from your dad.  They can be

12   the same number, so in that case you'll only see one number.

13   If we start to see two or more numbers at each location, so if

14   we see three or four, then there is an indication that there's

15   a mixture.  If there's three or four, that means that we're

16   starting to see at least a two-person mixture.  If there's more

17   than four, then we'll start seeing at least a three-person

18   mixture.  So five or six.  So you receive two from your mom --

19   or one from your mom, one from your dad, so two would be one

20   person; three or four, it could be possibly two people; five or

21   six, there could be possibly three people; if it's over six,

22   then there's four or more contributors and then we don't do any

23   comparisons to that sample.

24   Q.  Let's go over that in even more detail.

25            MR. POSCABLO:  May I approach, your Honor?

E9a1del2                    Cooke - direct

1          THE COURT:  Yes.

2          MR. POSCABLO:  And Ms. Chen, can you put up what's

3    been entered into evidence as Government Exhibit 1003-A.

4          And with the court's permission, may I ask Ms. Cooke

5    to step down?

6          THE COURT:  Yes.

7          MR. POSCABLO:  And, Judge, we'll have it on the

8    screen, so anyone who can't see the chart here can also follow

9    along.

10         Just one moment, your Honor.

11   Q.  All right.  I've placed on the screen and also in the

12   demonstrative 1003-A.  Ms. Cooke, what is this document,

13   generally?

14   A.  It's a table that's in our case file, so in this case it

15   was in the case file with David Delva's DNA profile.

16   Q.  Turning your attention to where it actually says David

17   Delva, can you explain what these series of numbers represent.

18   A.  So this is David Delva's DNA profile.  I said that we have

19   15 locations and a sex determining location, so going across

20   the top here, these are the 16 locations we test.

21   Q.  So there are 15 locations listed.  So for the record, the

22   first location you tested, D for David, 8, S for Sam, 1179.

23   A.  That's correct.

24   Q.  And there are 15 going on, and then which one --

25   A.  Well, then there's one additional, and that's called Amel,

E9a1del2                      Cooke – direct

1    and that's the sex determining location.  So X,X would stand

2    for female, X,Y is male.

3    Q.  And Mr. Delva, we all agree, is a male, so it's X,Y.

4    A.  That's correct.

5    Q.  Explain to us what these numbers represent.

6    A.  So I said that we test 15 locations, so this is the locus

7    or all together it's the loci that we test, and at each

8    location we receive half from our mom, half from our dad, and

9    they're represented by numbers.  So in this case David Delva

10   received a 12 and a 15, one from his mom, one from his dad.  In

11   this case, he just has a 30 here, so he received a 30 from his

12   mom, and a 30 from his dad.  And so on and so forth across.

13   Q.  And on and on across.

14   A.  Yes.

15   Q.  And these are the numbers, these are the loci, right?

16   A.  That's correct.

17   Q.  And these are the alleles that you're talking about.  And

18   what I mean by "this," let me be clear for the record.  The

19   loci are the 15 places you're talking about.

20   A.  Mm-hmm.

21   Q.  And then the alleles are the numbers that represent a

22   person's unique DNA profile.

23   A.  That's correct.

24   Q.  Okay.  Let's talk about the line that says "swabs of

25   glove."  What does that mean?

1    A.  So these are the mixture of DNA.  This is the mixture of

2    DNA that we found on the swabs of the glove.  We do two

3    amplifications or making copies, we do a splice to make sure

4    that there's no sample mix-up, and it's to confirm the mixture

5    in the sample.

6    Q.  So dup stands for duplicate.

7    A.  Yes, that's correct.

8    Q.  You duplicated the swabs -- or the DNA from the glove and

9    you tested it against Mr. Delva twice.

10   A.  Well, that's correct.  So when we do the test, we take a

11   portion of the sample and we do the amplification, so making

12   the copies from that sample.  And then at a separate time we do

13   a separate -- take a separate sample from that same sample, or

14   take a sampling from that same sample and do the amplification.

15   Q.  Can you explain to the jury, pointing to specific spots,

16   how you're able to determine that they were not two or not four

17   but potentially three people who contributed to the mixture of

18   the DNA that you found on the glove.

19   A.  Okay.  So going across, we look at every single location to

20   determine how many people are contributing to this mixture.  So

21   going across, in the first location, there are four alleles

22   seen in the first amplification and there are seven seen in the

23   second amplification.

24   Q.  What does that mean?

25   A.  So here -- and then we see that the 10, 12, 14, and 15 are

1   duplicated here.  So that means, looking at the first one, we

2   can say maybe there's a possibility of two.  This one, maybe

3   there's more than three.  We don't know.  So we look at the

4   whole entire sample.  So going across, we look at every

5   location.

6   Q.  Are there locations where there are at least four?

7   A.  So -- yeah.  So going across the second location, there's

8   three; the third location, there's three; the fourth location,

9   there's three; the fifth location, there's four; sixth

10  location, there's four, if you look at both of them together.

11  Q.  Meaning there's 7, 8, 9, in the first swab of the glove, in

12  the duplicate, there's 6, 7, 9.

13  A.  Mm-hmm.  So we look at both and we take everything into

14  consideration.  The next one, there's four; the next one,

15  there's four; this one, the following one, there's five; the

16  next one, there's six; the next one, there's three; two; one;

17  this is the sex determining location; then two; and one.  So

18  taking everything into consideration, we said at least three

19  individuals.

20  Q.  Why?  What's the standard that you use to determine that?

21  A.  So because some locations have three or four, some have

22  five or six, and then one actually has seven, in our lab, in

23  order to call something at least a three-person mixture, we

24  need -- there should be two or more locations containing more

25  than four alleles.  If two or more locations contain more than

1    six alleles, then we deem the sample inconclusive and say that

2    it cannot -- no comparisons can be done.  So in this case, two

3    or more locations had more than four alleles but only one

4    location had seven, so we deemed that it was at least a

5    three-person mixture.

6    Q.  Now let's be clear about what you just said.  If there were

7    enough alleles in particular loci or locus in which you would

8    have to call four or more, the lab would deem it inconclusive

9    under its protocol, correct?

10   A.  If there's more than six --

11   Q.  If there's more than six?

12   A.  -- in two locations, under our protocol, we would deem it

13   inconclusive.

14   Q.  That's a standard.  That doesn't mean you weren't able to

15   pull DNA out of it, is that correct?

16   A.  That's correct.

17   Q.  And it doesn't mean that you wouldn't be able to compare

18   that to something else, correct?

19   A.  That's correct.

20   Q.  It just means that the lab has created a standard that says

21   if there are six or more alleles --

22   A.  I'm sorry.  Seven or more.  So more than six.

23   Q.  -- more than six alleles in a particular locus, or any

24   number of locus, the lab would not conduct any more testing;

25   you'd call it inconclusive.

E9a1del2                    Cooke - direct

1    A.  That's correct.

2    Q.  If you used a different lab, they would still test, or they

3    could test?

4    A.  It depends on that lab's policy.

5    Q.  Okay.  So in this situation, what was the most amount of

6    alleles that you could find in a particular -- in all of the

7    loci?

8    A.  So in the first location we saw seven.  It was not

9    duplicated.  So it could be that maybe more than three people

10   are contributing DNA or it can mean that there's something in

11   our amplification process that something -- one of the alleles

12   cannot be true DNA so it's something that's called an artifact,

13   and this is seen on -- in DNA testing, and it's well known and

14   documented, and it's not true DNA but it's something from

15   either the biology or technology that we use in the lab.  But

16   in this case we don't know if it's an artifact, it could be a

17   true DNA allele coming from an additional contributor, we don't

18   know, but because it wasn't replicated and we only see it in

19   one location, that's why we deemed it at least three

20   contributors.

21   Q.  And did you make that decision?

22   A.  Yes, I did.

23   Q.  Was that reviewed by anyone?

24   A.  Yes, it was reviewed by my supervisor in the case and then

25   when a separate -- two supervisors reviewed this file and again

1   agreed with that conclusion.

2   Q.  Why two, as opposed to, as the other ones, just one?

3   A.  When we do the statistic of the likelihood ratio, we need

4   two separate reviews by supervisors in order for the case to be

5   concluded.

6   Q.  So all that work -- the extraction, the amplification, the

7   capillary with another word that I don't remember -- it just

8   becomes a matching game, right?

9   A.  I guess you could say that.

10  Q.  So let's go over how you determined that David Delva

11  contributed to this swab of glove.  In the first locus, what

12  are the numbers?

13  A.  So David Delva is a 12, 15 in the first location, and then

14  we look --

15  Q.  Can you circle what you find.

16  A.  Sure.  So then we look in the sample of the glove and we

17  see his DNA alleles are in that location in the mixture in the

18  swab.  So we see the 12, 15, and we see the 12, 15.

19          MR. POSCABLO:  And for the record, I've handed

20  Ms. Cooke a blue Sharpie and she is circling the areas in the

21  rows "swabs of glove" and "swabs of glove dup" to indicate

22  where, if any, the numbers associated with Mr. Delva appear on

23  the swab of glove.

24  Q.  Let's go to the second locus.

25  A.  So in the second location, David Delva is a 30, and we see

E9a1del2                      Cooke - direct

1   the 30 in both the initial amplification and the duplicate

2   amplification of the glove.

3   Q.  Okay.  Third?

4   A.  Mr. Delva is at 8, 11, and we see the 8, 11 in the initial

5   and the duplicate amplification.

6   Q.  And the fourth?

7   A.  Mr. Delva is a 7, 12, and we see the 7, 12 in the initial

8   amplification and just the 12 in the duplicate amplification.

9   Q.  Can you explain to the jury why the 7 may not have shown

10  up?

11  A.  So in a sample such as the swabs of the glove, which is

12  touch DNA, there was not much DNA found on the swabs of the

13  glove.  I believe it was around 31 picograms per microliter.

14  Q.  But more than enough for you to create a --

15  A.  So if you remember, we need 20 picograms per microliter to

16  go on.  An ideal sample would have been 100 picograms per

17  microliter in the sample, so in this case we had 31.  So we're

18  still able to go on with additional testing, but sometimes, in

19  samples that have a lower amount of DNA, we see something

20  that's called allele -- something that's called allele dropout.

21  So sometimes some of the fragments of the DNA are smaller and

22  some are larger, and sometimes in the larger fragments of the

23  DNA in certain locations, we see allele dropout because it's a

24  smaller sampling of a DNA in that sample.  So sometimes we see

25  something called allele dropout.  Doesn't mean that the alleles

E9a1del2                      Cooke - direct

1    aren't there.  Sometimes the alleles are too low for our

2    software to call because we have a threshold or sometimes we --

3    we see it but it's too low to be called by the software or

4    sometimes it might drop out.

5    Q.  Can you explain the differences, or the results between the

6    swabs of the glove and the swabs of the duplicate?

7    A.  So sometimes when we do this amplification, two separate

8    tests, and sometimes they're not going to amplify exact same

9    way because it's two separate tests, so we want to make sure

10   that the -- when we do the initial and the dupe, we want to

11   make sure that the samples, the mixtures are concordant with

12   each other, but sometimes they're not going to be exactly the

13   same.  And we often see this in samples that are low, such as

14   the sample that's 31 picograms per microliter.

15   Q.  Let's go to number 5, the fifth locus.

16   A.  So Mr. Delva is 14, 16, and we see the 14, 16 in the

17   initial and then we see the 14, 16 in the dupe.

18   Q.  And the next locus, the sixth?

19   A.  So Mr. Delva is 7, and we see a 7 in the initial and a 7 in

20   the duplicate.

21   Q.  The seventh?

22   A.  Mr. Delva is a 10, 12, and we see the 10, 12 in the initial

23   and the 10, 12, in the dupe.

24              (Continued on next page)

25

E9AAADEL3                    Cooke - Direct

1    BY MR. POSCABLO:

2    Q.  And eight?

3    A.  Mr. Delva's a 12 and there's a 12 in the initial and a 12

4    down.

5    Q.  Nine?

6    A.  Mr. Delva's a 1922.  There's a 19 in the initial and then a

7    1922 in the duplicate.

8    Q.  The tenth?

9    A.  Mr. Delva is a 1213.2.  We see the 12 and 13.2 in the

10   initial and then a 12 and 13.2 duplicate.

11   Q.  The next one?

12   A.  Mr. Delva is a 16.  We see a 16 in the initial and 16

13   duplicate.

14   Q.  Next one?

15   A.  Mr. Delva's nine ten in the initial and a nine in the

16   duplicate.  The next one is Mr. Delva is a 416 and we only see

17   the 16.  So in this case Mr. Delva's a 14 not seen in the

18   initial and dupe and again the due to the allele dropout.  In

19   this particular case looking at the raw data we do see a small

20   peak which is our raw data in the place of a 14 but we can't

21   tell it for certain because it was too low to be called by our

22   computer software.  But again, we take everything into

23   consideration when we are doing a comparison of the sample.

24   Q.  What you are saying is you reviewed the raw data?

25   A.  Yes, I did.

1  Q.  And based on your standards you are now willing to call

2  that there was a 14 there?

3  A.  It is a standard set forth by our software.  So there's a

4  certain threshold and if it's below that the computer won't

5  call it but we can still look through the raw data and sill

6  still see a peak there and see it is in the location of a 14

7  but because it's too low to be called we can't say.

8  Q.  Next?

9  A.  The next one is Camille Jennings and this is where we have

10  the sex determining location.  The next one Mr. Delva's a 12

11  and we see a 12 in the initial dupe.  And the next one is

12  called FGA and Mr. Delva's 1824.  And one amplification we

13  don't see anything and this, we see little peaks but they were

14  to low to be called by the software.  And the next one we have

15  18 but no 24.

16        And I just want to state the D18 S51 where we don't

17  see the 14 and FGA where we don't see the 24 they are larger

18  fragments of DNA.  So this is why we're more likely to see

19  allelic dropout.  And notice how like in certain ones we see

20  maybe four or more alleles at each location and these you only

21  see one or none.  That's because they're larger fragments and

22  alleles are dropping out.

23        MR. POSCABLO:  OK.  All right.  Your Honor, the

24  government offers what was formally 1003-A now is 1003-R for

25  revised.

1              THE COURT:  Mr. Pittell.

2              MR. PITTELL:  Subject to my prior objections.

3              THE COURT:  All right.  1003-R is received.

4              (Government's Exhibit 1003-R received in evidence)

5              THE COURT:  And is now a good time, Mr. Poscablo, to

6      take our midmorning break?

7              MR. POSCABLO:  It's a great time, your Honor.

8              THE COURT:  Terrific.  Ladies and gentlemen, you may

9      go off and take a break and we are going to come back in about

10     12 or so minutes.  I want to remind you not to talk to anybody

11     about this case and not to try to become a DNA expert yourself,

12     not to research or in any way try to investigate anything that

13     you hear about this case on your own.  Thank you.

14             (Jury not present)

15             THE COURT:  All right.  Ms. Cooke, you can step down

16     and take a break for ten or 12 minutes.  Thank you.

17             Ladies and gentlemen, let's all be seated.

18             (Witness not present)

19             THE COURT:  All right.  I had two things that I wanted

20     to go over and just be clear about.  One was there is a line of

21     questioning from Ms. Geraci about the 305 phone and at one

22     point she asked whether or not Mr. Accilien had called

23     Mr. Delva and it was from Mr. Accilien's home to Mr. Delva

24     elsewhere and Mr. Pittell you objected to that.  The question

25     was formed.  There was no sort of form issue.  I took it as a

1    scope, potential scope issue and then deemed it within the

2    scope given the amount of time spent on where the phone could

3    be at various points in time and who had it at various points

4    in time.  So that was the basis for my ruling.  Did you have

5    any other objection that you can recall?

6                MR. PITTELL:  I don't recall offhand.  I'll take a

7    look at the transcript tonight.

8                THE COURT:  If there's something else then let me

9    know.

10               In terms of the testimony of Mr. Accilien which we had

11   anticipated and was raised in advance of trial in an in limine

12   motion relating to prior acts, that came in I would say

13   relatively as expected.  And there was a question put to

14   Mr. Accilien about why he had asked Mr. Delva to accompany him

15   to the crime scene.  That actually had been also addressed on

16   direct-examination.  I did allow the Prior Act answer for the

17   reasons that were set forth in my pretrial ruling which

18   included a 403 analysis and I just wanted in particular to

19   mention the 403 analysis and the Court specifically weighing

20   the probative value completing the story, state of mind, etc.

21   The probative value against any undue prejudicial effect and I

22   also provided a cautionary instruction for the jury.  In light

23   of that because it did come in differently the first round on

24   direct, Mr. Pittell, we were discussing the Similar Acts

25   instruction before.  So you'll just keep in mind whether or not

E9AAADEL3                      Cooke - Direct

1    you want to ask for that Similar Act instruction in light of

2    the new testimony that came in.

3            Those are the two things I had wanted to raise.

     Anybody want to raise anything else?

5            MS. GERACI:  No, your Honor.

6            THE COURT:  All right.  Let's take our own brief break

7    and then we'll come back.

8            (Recess)

9            THE COURT:  Let's bring out the jury.

10           (Jury present)

11           THE COURT:  All right.  Ladies and gentlemen, let's

12   all be seated.

13           All right.  Mr. Poscablo, you may proceed, sir.

14           MR. POSCABLO:  Thank you, your Honor.

15           Ms. Chen, will you, please, place on the screen

16   Government Exhibit 101.

17           (Pause)

18   Q.  Directing your attention, Ms. Cooke, to the paragraph that

19   starts "the results are the same".  Can you see that up there?

20   And you can refer to the document that's before you.  Am I

21   correct that this is the report regarding Trevor Cole?

22   A.  That's correct.

23   Q.  Am I correct and I'll read it, that the conclusion here is

24   that Trevor Cole is the source of the DNA found on the samples

25   listed below; is that right?

 1   A.  That's correct.

 2   Q.  What are the samples that were listed?

 3   A.  Cigarette butt from voucher ending in 4209 item three,

 4   cigarette butt from voucher 7168 item four and the swab of gum

 5   voucher ending in 7168 item four.

 6            MR. POSCABLO:  So Ms. Chen, can you, please, put on

 7   the screen Government Exhibit 1008 which is in evidence.

 8   Q.  Now this is another chart that you prepared; is that

 9   correct?

10   A.  That's correct.

11   Q.  And this is for Trevor Cole?

12   A.  That's correct.

13   Q.  OK.  Just want to quickly go over this chart.  Am I correct

14   that a review of this chart will show that not all of

15   Mr. Cole's alleles showed up in, I think it's in the swab of

16   gum; is that correct?

17   A.  That's correct.

18   Q.  So this happens?

19   A.  Yes.  Again, I think this sample when I went over my notes

20   the swab of the gum had about 21 picograms per microliter.  So

21   again sometimes we see allelic dropouts in samples of a low

22   amount of DNA to start.

23            MR. POSCABLO:  Ms. Chen, focus you on the top part.

24   Q.  Very quickly go over a few spots, for example, in the third

25   locus swab of gum duplicate, it's missing an 11?

1    A.  That's correct.

2    Q.  And in the fifth locus the swab of gum, not the duplicate

3    is missing a 17?

4    A.  That's correct.

5    Q.  And it happens a few times in Trevor Cole's, correct?

6    A.  In the swab of the gum?

7    Q.  Yes.

8    A.  That's correct.

9    Q.  Well, complete the record.  An eight locus, the swab of gum

10   is missing an 8?

11   A.  That's correct.

12   Q.  The ninth locus is missing a thirteen in the duplicate and

13   the 11 locus I have starts VWA, the swab of gum amount

14   duplicate are -- I'm sorry.  The -- yeah the swab of gum and

15   the duplicate are missing 15?

16   A.  That's correct.

17   Q.  And but here you were able to determine that this was, in

18   fact, Trevor Kohl's DNA on there.

19   A.  In this case it was a single source DNA sample, so it came

20   from one person and we determined that DNA profile and that

21   profile met a statistic in which we were able to determine that

22   and conclude that it is Trevor Cole.

23   Q.  And the difference between this and the one involving

24   Mr. Delva is that Mr. Delva, the item from which Mr. Delva's

25   DNA was found was a mixture?

E9AAADEL3                    Cooke - Direct

1  A.  Yes.  In that case it was a mixture.  Again, we saw allelic

2  dropout because it was low amount of DNA to start with.

3          MR. POSCABLO:  Ms. Chen, you can take that down.

4  Q.  You mentioned the term "likelihood ratio".  What does that

5  mean?

6  A.  Simply a likelihood ratio is a statistic in which we get

7  the probability between, of two different scenarios and one is

8  a scenario in which a person contributes DNA to the mixture

9  along with unknown or unrelated individuals compared to

10  scenario which an individual does not contribute DNA to this

11  mixture and we get the probability of both and get the ratio of

12  that.

13  Q.  That's the ratio that I was doing with my left hand and my

14  right hand.  One side had Mr. Delva and two unknown unrelated.

15  The other side had no Mr. Delva and three unknown unrelated?

16  A.  That's correct.

17  Q.  Now, what's the relationship between that, the likelihood

18  ratio and something called the forensic statistical tool?

19  A.  So, in our lab when we perform the likelihood ratio it's a

20  program that's called Forensic Statistical Tool.  This program

21  was created in-house by one of our statistician and one of our

22  other forensic biologists.  And it went through many

23  validations and testing and then was subsequently approved by

24  the DNA Commission on Forensic Science.  And I believe we

25  starting use the Forensic Statistical Tool in our lab in around

E9AAADEL3                         Cooke - Direct

1    July 2012.

2    Q.  So you used the FST plug-in the data and it spits out that

3    likelihood ratio that we just talked?

4    A.  That's correct.  However, the likelihood ratio is a

5    statistic that is used in paternity testing and it's also used

6    not with using the Forensics Statistical Tool but it's the

7    likelihood ratio is also used in other forensic labs across the

8    country and in other countries in fact.

9    Q.  Now, if you recall I asked you a few questions earlier and

10   you answered you were talking about the topic of your

11   determination that there were at least three contributors to

12   the mixture of DNA found on the glove and why it wasn't two or

13   why it wasn't four.  Do you recall that colloquy between you

14   and me?

15   A.  I do.

16   Q.  And tell us again, is that a decision made just by you?

17   A.  This is a decision I made but I used the standards put

18   forth by our laboratory in determining how many contributors

19   are in the mixture.

20   Q.  What, if any, effect would finding more there than three

21   contributors have to the use of FST?

22   A.  If I deem that this mixture had more than three

23   contributors I would have deemed them inconclusive and I would

24   have not performed the FST on the sample.

25   Q.  Based on the standard set forth by the OCM?

E9AAADEL3                    Cooke - Direct

1   A.  That's correct.

2   Q.  And that's what we were getting into earlier when I asked

3   you if there was another lab that could test it?

4   A.  They could but it depends on what their policies are.

5   Q.  Policies and protocols?

6   A.  That's correct.

7   Q.  Is that the situation here?  Are there more than three?

8   A.  I said at least three individuals.

9   Q.  OK.  That is your finding?

10  A.  That's correct.

11  Q.  OK.  Very quickly I want to talk about secondary touch or

12  secondary transfer.  Are you familiar with that term?

13  A.  Yes, I am.

14  Q.  What is -- are they the same?  Do they mean the same thing?

15  A.  So primary transfer of DNA means that you touched an item

16  and transferred your DNA to that item.  Secondary transfers is

17  when you don't touch that item.  So it's DNA is transferred

18  through an intermediate source.  So either you come in contact

19  with another person and then that person touches the item and

20  transfers your DNA to the item or you come in contact with the

21  object and that object comes in contact with another object.

22  Q.  OK.  So what would have had to happen if we were to find

23  this was secondary touch or secondary transfer what would have

24  had to happen in this case in order for Mr. Delva's DNA to

25  appear on that glove?

E9AAADEL3                        Cooke - Direct

1   A.  So, there could be many different scenarios that could

2   happen.  In my opinion secondary transfer of DNA even though

3   it's something that's possible you could possibly find another

4   person's DNA through secondary transfers, it's something that's

5   very unlikely.  So, for example, let's say you shake someone's

6   hand and then that person will touch an object and that's how

7   your DNA gets on the object, but there has to be different

8   circumstances in order for that to happen and this why that's

9   unlikely.  So, if you touch someone's hand that person most

10  likely would have to touch that object immediately or not touch

11  anything else in order to transfer your DNA.  But let's say

12  that person touches your hand and then rubs his pants, rubs his

13  face, ten minutes passes and then they touch the object.  It's

14  very, very unlikely that they would transfer your DNA to that

15  object.

16  Q.  Have you done any readings on this?

17  A.  I have briefly.  There's articles on secondary transfer but

18  a lot of these experiments requirements are done in controlled

19  laboratory setting in which maybe they would touch someone for

20  one minute and then let five minutes past and then touch the

21  item.  So this is done in a controlled laboratory setting where

22  someone is probably not likely touching themselves or another

23  item and just standing there.

24  Q.  So I would have to touch some part of your face or your

25  hand for more than a brief second.  I would have to hold your

1    hand and shake your hand for a good minute.  I'm not saying

2    minute is timing but not a touch like this.  It's a momentary

3    touch.  It's a, I am touching your face or I am touching your

4    hand in order to even get the DNA on our hands; is that what

5    you are saying?

6    A.  That's the most likely scenario.  I mean, you could touch

7    someone for a second and get DNA on it.  It's not likely.  It

8    is just like if you touch something for a second.  Most likely

9    we're not going to get enough DNA to go on with further DNA

10   testing.  The same is if you touch someone you probably would

11   have to make a good contact with them in order to transfer DNA

12   and then that person would have to pretty much either not

13   immediately but not touch anything else and then touch another

14   object to transfer your DNA.  So that's why secondary transfer

15   of DNA is something that's very highly unlikely.

16   Q.  Two other questions and then one question about your

17   conclusion.  Throughout this process that you are testing the,

18   all the DNA that you've talked about, do you yourselves -- do

19   you yourself wear gloves?

20   A.  When we examine evidence and do any testing in the

21   laboratory we wear personal protective equipment and this is to

22   prevent contamination by us onto an item of evidence and also

23   protect us from getting any, touching the evidence and getting

24   maybe any blood born pathogens that might be on the evidence.

25   So what we wear is a hairnet, a mask that covers our face, nose

1   and mouth.  We wear gloves.  Sometimes we double glove and we

2   wear a lab coat and sometimes booties.  And this is done for

3   every testing that we do in the lab.

4   Q.  The amount of DNA that was found here, would that make

5   secondary touch unlikely?

6   A.  I really couldn't say.  I can't tell if it's secondary

7   touch.  But again something that's secondary touch is something

8   that's highly unlikely compared to a primary touch.

9   Q.  Two other questions.  One, what kind of glove did you

10  examine.  I don't think we asked that you question?

11  A.  So the piece of evidence, the swabs of the glove, we

12  examined a latex glove.  And what we did to when we examined

13  the glove is we swab the glove with swabs that is made in our

14  lab and put in a solution and then we swab it.  So we hold the

15  swabs with the pair of tweezers and gently swab the glove.  And

16  in this case we used four swabs and we swabbed both sides of

17  the glove.

18          MR. POSCABLO:  OK.

19          THE COURT:  When you say "both sides" do you mean the

20  front and back or do you mean the inside and outside?

21          THE WITNESS:  Front, back, inside and outside.

22  Q.  OK.  So finally, turning your attention to Government

23  Exhibit 1003 with regards to the testing of that, Mr. Delva's,

24  the comparison of Mr. Delva's DNA versus the DNA that's found

25  on that glove, on that latex glove, what is your expert

1    opinion?  What is your finding?

2              THE WITNESS:  Your Honor, may I refer to the report?

3              THE COURT:  Yes.

4    A.  OK.  So based on the comparison of the DNA profile of David

5    Delva to the mixture found on the sample of the swabs of the

6    glove, he cannot be ruled out as a contributor.  Therefore, a

7    likelihood ratio was calculated.  The DNA mixture found on the

8    swabs of the glove is approximately 4.42 million times more

9    probable if the sample originated from David Delva and two

10   unknown, unrelated persons than if it was originated from three

11   unknown, unrelated person.  Therefore, there is very strong

12   support that David Delva and two unknown, unrelated persons

13   contributed to this mixture rather than three unknown unrelated

14   persons.

15             MR. POSCABLO:  One moment, your Honor?

16             THE COURT:  Yes.

17             MR. POSCABLO:  No further questions, your Honor.

18             THE COURT:  All right.  Thank you.

19             Mr. Pittell.

20   CROSS-EXAMINATION

21   BY MR. PITTELL:

22   Q.  Good morning, Ms. Cooke.

23   A.  Good morning.

24   Q.  My name is Jeffrey Pittell.  We've never met before; is

25   that correct?

E9AADEL3                         Cooke - Cross

1   A.   That is correct.

2   Q.   I'd actually like to pick up to some of the things that you

3   said at the end of your testimony.  You just told us that the

4   glove was swabbed four times; is that correct?

5   A.   We used four swabs total.  So probably one swab for the

6   front, one swab from the back and then we on the other side of

7   glove or inside or outside of the glove, one again, one side

8   for the front, one side for the back.  All four swabs were

9   placed in one tube.

10   Q.   I am just simply asking you a yes or no question.  Was the

11   glove swabbed four times?

12   A.   Yes, with four swab swabs.

13   Q.   Was it swabbed by you?

14   A.   No, it was not.

15   Q.   Were you present when it was swabbed?

16   A.   I was not.

17   Q.   Within your file there is there a documentation which

18   indicates that it was swabbed once on the outside and once on

19   the inside and once on the front and once in the back?

20   A.   No.  It just states that four swabs were used.

21   Q.   So you don't have any personal knowledge of the locations

22   from when those four swabs were taken; is that correct?

23   A.   It said in the notes that four swabs were used to swab both

24   the inside in quotations and the outside in quotations of the

25   glove.

1    Q.  So we don't -- so you are just assuming that when it says

2    "inside" that that's referring to inside the glove as opposed

3    to top and bottom of the glove?

4    A.  That's what I am inferring from the notes, yes.

5    Q.  And so then you don't know whether it was swabbed when it

6    was done on the outside whether or not it was done once on the

7    top and once on the bottom?

8    A.  I do not know for sure.

9    Q.  And then according to the notes, after those four swabs

10   were taken whatever was found from the swabs or lifted from the

11   swabs was all combined into one sample; is that correct?

12   A.  That's correct.

13   Q.  So the DNA that was in that sample because of the combining

14   process there's no way of knowing whether the DNA was all from

15   the inside or all from the outside; is that correct?

16   A.  That's correct.  But we wouldn't know from the nature of

17   the item because there was a latex glove which side was the

18   inside and which side was the outside.

19   Q.  All right.  But you don't know whether or not it was from

20   the inside or from the outside because it's all been combined;

21   is that correct?

22   A.  That's correct.

23   Q.  So it all could have been on the outside?

24   A.  From where the DNA came from?

25   Q.  Yes?

1   A.  Yeah, that's correct, we do not know.

2   Q.  Or it could also have been from the, all from the inside?

3   A.  That's correct.

4   Q.  Or it could have been a combination of both, a mixture of

5   the inside and the outside?

6   A.  That's correct.

7   Q.  All right.  You told us some thing about secondary transfer

8   and you indicated that it is very unlikely in this particular

9   case; is that correct?

10  A.  That's very unlikely in general.  I couldn't tell by this

11  specific case.

12  Q.  So when you say that's very unlikely you are just giving

13  your general opinion on secondary transfer, not specifically

14  this case?

15  A.  That's correct.

16  Q.  And you indicated that what you know about it is just

17  things that you've briefly read about it; is that correct?

18  A.  That's correct in literature.

19  Q.  And you've mentioned some controlled studies but I take it

20  you've never been involved in any of those controlled studies?

21  A.  That's correct.

22  Q.  And you indicated that DNA occurs when one person comes in

23  contact with another person's DNA; is that correct?

24  A.  I am sorry?

25  Q.  Secondary transfers?

1    A.   Secondary transfer?

2    Q.   Yes.

3    A.   Secondary transfer is when you don't come into contact with

4    the item but on your own there is an intermediary so either a

5    person or object transfers your DNA to another item.

6    Q.   So, for example, if I shake someone's hand I could pick up

7    their DNA from my hand and then if I can pick up a knife I

8    could transfer their DNA to the knife?

9    A.   Yes, that's possible.

10   Q.   And in that instance the person whose hand I shook, their

11   DNA would be on the knife but they never touched the knife?

12   A.   That's correct.

13   Q.   And, in fact, I could shake a person's hand out in the

14   street, go to a crime scene, pick up a knife and put their DNA

15   on that knife in the crime scene?

16   A.   That's something that's possible but, again, unlikely.

17   Q.   OK.  Well, I am just -- all the questions I am asking at

18   this point whether or not it's possible or not.

19   A.   OK.

20   Q.   You would agree it's possible?

21   A.   Yes.

22   Q.   And you said that touch DNA comes from the human skin; is

23   that correct?

24   A.   That's correct.

25   Q.   And do people shed their skin cells naturally?

E9AAADEL3                    Cooke - Cross

1   A.  Yes, they do.

2   Q.  And how many skin cells, if you know, does the average

3   person shed everyday?

4   A.  It's a lot.  I couldn't tell you offhand.

5   Q.  Is it like hundreds of thousands, millions?

6   A.  I believe it's over a hundred thousand.

7   Q.  And when they shed their skin cell if they touch things

8   their skin cells will shed off onto those items; is that

9   correct?

10  A.  That's correct.

11  Q.  So like when I touch this podium my skin cells could be

12  shedding and going on this podium?

13  A.  Yes, it can.

14  Q.  And my skin cells could be all over this table here?

15  A.  That's correct.

16  Q.  And these notes?  And then if someone else, another

17  attorney comes up to this podium, puts their hand on this

18  podium after I've touched it they could pick up my skin cells?

19  A.  Again, that's something that's possible.

20  Q.  And then if they go somewhere else and let's say they go to

21  another courtroom and touch another podium they could plant my

22  skin cells on that podium in that other courtroom?

23  A.  That's something that's possible.

24  Q.  Now, in this particular case are you aware of the fact that

25  Mr. Delva lived a few blocks away from the apartment where the

1    crime occurred?

2    A.  I do not.

3    Q.  You were you aware that Mr. Delva lived a few blocks from

4    the apartment where the latex glove that you examined was

5    found?

6    A.  I did not.

7    Q.  Were you aware of the fact that Mr. Delva lived with a man

8    by the name of Gregory Accilien?

9            MR. POSCABLO:  Objection, your Honor.

10           THE COURT:  Overruled.

11   Q.  Were you aware that Mr. Delva lived with a man by the name

12   of Gregory Accilien together in the same apartment a few blocks

13   away from the crime scene?

14   A.  I did not.

15   Q.  Have you ever heard the name Gregory Accilien at all in

16   your analysis in this particular case?

17   A.  I have not.

18   Q.  Have you done a DNA profile of Gregory Accilien?

19   A.  I did not.

20   Q.  Have you compared Gregory Accilien's DNA to any of the

21   items in this case?

22   A.  I have not.

23   Q.  So you did not compare it to the mixture that was found on

24   the latex glove in this case?

25   A.  I did not.

1   Q.  And I take it you are not aware that Gregory Accilien is

2   the uncle of David Delva?

3   A.  I am not.

4   Q.  And you are not aware that they are blood related?

5   A.  I am not.

6   Q.  All right.  So, if David Delva is living in an apartment

7   which is a few blocks away from the crime scene or -- actually,

8   let me withdraw the question.  So you would agree that David

9   Delva in his day-to-day life in his apartment is shedding skin

10  cells all over the apartment?

11  A.  Yes.

12  Q.  His skin cells are going to be in the bed that he sleeps

13  in?

14  A.  That's correct.

15  Q.  His skin cells are going to be on chairs in the apartment?

16  A.  That's correct.

17  Q.  Assuming he touches or sits in the chairs?

18  A.  That's correct.

19  Q.  If he walks around barefoot his skin cells will be on

20  flooring of the apartment?

21  A.  These are all possible.

22  Q.  His skin cells could be on clothing in his closet?

23  A.  Yes, it could be.

24  Q.  Door handles?

25  A.  Yes.

1    Q.   Tables?

2    A.   That's correct.

3    Q.   Furniture?

4    A.   Yes.

5    Q.   So his skin cells could be pretty much every where in the

6    apartment?

7    A.   Yes.

8    Q.   And if Mr. Accilien is also living in that apartment

9    Mr. Accilien can touch let's say a doorknob and if he touches a

10   doorknob that had been touched by his nephew, Mr. Accilien can

11   pick up some of the skin cells of Mr. Delva?

12   A.   He can.  That's possible.

13   Q.   And if Mr. Accilien went from his apartment where he shared

14   with Mr. Delva to the crime scene, he could have very well

15   transferred some of Mr. Delva's DNA to the crime scene?

16   A.   Again, that's something that's possible but in my opinion

17   secondary transfers is unlikely.

18   Q.   OK.  Well, but I am talking about in this particular case.

19   You would agree that is possible that if Mr. Accilien one time

20   went from the apartment that he shared with Mr. Delva to the

21   crime scene a few blocks away that Mr. Accilien could have

22   transferred some of Mr. Delva's DNA to the crime scene?

23   A.   That is something that could be possible.

24   Q.   And when Mr. Accilien got to that crime scene, if he stuck

25   his hand in a box which contained latex gloves he could have

1   transferred Mr. Delva's DNA to the latex gloves which were in

2   that box?

3   A.   Again, that's something that's possible but I believe

4   that's highly unlikely.

5   Q.   And would you agree that -- I realize you say it's possible

6   but it's highly unlikely but would you agree that if

7   Mr. Accilien went in the course of one day went from his

8   apartment with Mr. Delva to the crime scene that there's some

9   possibility that he transferred DNA to the crime scene?

10  A.   There's some possibility but, again, something in my

11  opinion when you are going from one place to another you are

12  going to be touching many things in between.  So when you

13  finally touch that object the likelihood of transferring DNA to

14  that actual object would be unlikely.

15  Q.   I am just asking you you would agree though that if

16  Mr. Accilien made at least one trip from his apartment to a

17  crime scene a few blocks away that there is some possibility no

18  matter how many that he transferred some of Mr. Delva's DNA to

19  the crime scene?

20  A.   Yes.

21  Q.   And in a few hours later Mr. Accilien made a second trip

22  from the apartment that he shared with Mr. Delva to an

23  apartment to the crime scene that the possibility of the

24  transfer of Mr. Delva's DNA to the crime scene would have at

25  least increased a little bit, is that correct, because now we

1   have two trips instead of one?

2   A.  I guess that's possibility.

3   Q.  And then if Mr. Accilien made a third trip from an

4   apartment that he shared with Mr. Delva to the crime scene that

5   this possibility would increase a little bit more?

6   A.  I guess it depends on the circumstances.

7   Q.  Certainly.  Then if Mr. Accilien made a fourth trip from

8   the apartment that he shared with Mr. Delva to the crime scene

9   the possibility would increase a little bit more; is that

10  correct?

11  A.  I guess depending on the circumstances again.

12  Q.  And now, you indicated that or you indicated that you did

13  some analysis of DNA of someone by the name of Trevor Cole?

14  A.  That's correct.

15  Q.  Now, if Trevor Cole was in Mr. Delva's apartment and went

16  from that apartment to the crime scene there's a possibility

17  that Mr. Cole could have also transferred some of Mr. Delva's

18  DNA to the crime scene?

19  A.  Again, that's something that is possible.

20  Q.  And you also did a DNA analysis of someone by the name of

21  Dominique Philippe?

22  A.  That's correct.

23  Q.  And if Mr. Philippe also went from Mr. Delva's apartment to

24  the crime scene it's also possible that he could have

25  transferred some of Mr. Delva's DNA to the crime scene?

1    A.  Yes, that's a possibility.

2    Q.  Now, do substances at all affect or can substances affect

3    the secondary transfer of DNA?  Let me give you an example.  If

4    I have -- let's say I take a piece of tape and I put tape on

5    this podium and then pull it up is because this tape has the

6    stickiness or tackiness to it, is there a possibility that it

7    could pick up more DNA from this than if let's say I touch it

8    with my hand and my hand just picks up DNA?

9    A.  I wouldn't know.  I've never done testing like that but I

10   mean I think either way it would transfer that's possible that

11   the tape would pick up more cells.  I wouldn't know.

12   Q.  You would agree based upon your education, your formal

13   college education, the continuing training that you have had,

14   the seminars you've attended, that it's a fair opinion that

15   something that's sticky is going to pick up more DNA than

16   something that's not very sticky?

17   A.  Sure.

18   Q.  And likewise if somebody eats chicken wings and the wings

19   have a sticky sauce there's a possibility that with the sauce

20   in their hands if they touch things in an apartment they might

21   pick up more DNA than if their hands were clean and they had no

22   sticky sauce on them?

23   A.  I would agree with the tape.  I am not sure about the

24   sauce.  I don't know how that would affect picking up DNA and

25   testing DNA for something that was that sticky.

E9AAADEL3                    Cooke - Cross

1   Q.  All right.  You told us about the testing procedures which

2   are used in your laboratory.  I think they were called the

3   rotation.  Is that the proper term for the steps of DNA

4   analysis?

5   A.  The rotation system is what we use in our lab for how each

6   item of evidence is tested.  The steps in our lab is examining

7   evidence extraction.

8   Q.  It's what -- I want to go I just want to make sure I have

9   the term right.  So it's called a rotation system; is that

10  what?

11  A.  The rotation system isn't what the steps that we perform on

12  each item.  It's in general how evidence moves through our lab.

13  Q.  OK.  And that is first -- I just want to make sure that my

14  understanding is correct from what you told us earlier so to

15  the extent I am repeating anything, I apologize.  You indicated

16  that you, the lab first receives an item; is that correct?

17  A.  That's correct.

18              (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. PITTELL:

2    Q.  And then you said it was examined for DNA.

3    A.  Correct.  The next step after we receive an item of

4    evidence, it's locked in storage until an analyst picks it up

5    to examine.

6    Q.  And is that examination, is that a visual examination?

7    A.  The first step is a visual examination.  We want to examine

8    the item, see if there's any staining on it, see where we want

9    to test it.  It depends on the nature of the item.

10   Q.  All right.  So it's just basically looking at it.  Some

11   things may be obvious.  If it's a bloody piece of tissue, it

12   would be obvious that there was blood on the tissue, I take it?

13   A.  Correct.  If we see a reddish-brown stain, then we do

14   further testing to test if it's possibly blood.

15   Q.  And then, but something like a glove, which if it only has

16   touch DNA, whatever's there is not necessarily going to be

17   visible to the naked eye.

18   A.  That's correct.

19   Q.  And so is the next step in the process extraction?

20   A.  That's correct.

21   Q.  Is that the swabbing, in this case, the swabbing of the

22   glove the extraction process?

23   A.  No.  When we're examining the item, that's when we swab the

24   glove.  So in our policy, if we don't -- if it's touch DNA, we

25   don't know where the DNA is, we would swab the entire item that

E9a1de14                    Cooke - cross

1    would be touched.  And then we would submit those swabs for

2    further testing.  And that is -- the next step is extraction.

3    Q.  Okay.  So the swabbing was a part of the examination step.

4    A.  That's correct.

5    Q.  Then the next step is extraction?

6    A.  Yes.

7    Q.  And then after that, it's quantification?

8    A.  Quantitation, yes.

9    Q.  Oh, sorry.  Quantitation.  And that's where you determine

10   the amount of DNA which is available.

11   A.  That's correct, in the sample.

12   Q.  All right.  And then we have amplification?

13   A.  Yes.  So if a sample has enough DNA to go on with further

14   testing, the next step would be amplification.

15   Q.  And then after amplification, what's the name of the next

16   step after that?

17   A.  We do something that's called capillary electrophoresis,

18   and in this step is where we separate out the many copies we

19   need.

20   Q.  I'm sorry, I don't mean to cut you off, but I'm just asking

21   you the name of the step.

22   A.  Okay.

23   Q.  So that one's called capillary.  And then the final step is

24   the analyzing of the results and writing the report.

25   A.  That's correct.

1   Q.  Now in this particular case did you receive the items?

2   A.  Did I?

3   Q.  Yes.

4   A.  Myself?

5   Q.  Yes.

6   A.  In this particular case, in our rotation system, another

7   analyst picked up the case and examined the evidence, and then

8   it was submitted for the next step and another person would do

9   an extraction.

10  Q.  Okay.  So I just want to go through these step by step and

11  find out who did what.

12  A.  Okay.

13  Q.  Do you know who received the item?

14  A.  The person who did the examination and all the evidence,

15  excluding the elimination samples, was Helen Wong.

16  Q.  I'm sorry.  Could you say the name again, please?

17  A.  Her name is Helen Wong.

18          MR. POSCABLO:  Judge, could we just get clarification

19  about which item or items Mr. Pittell is talking about.

20          THE COURT:  Yes.

21          MR. PITTELL:  Very good point.  I'm referring to the

22  latex glove.

23  A.  In this case it was Helen Wong.

24  Q.  So Helen Wong did the examination.  Who did the extraction?

25  A.  I would need to look and refer to my notes to --

E9a1de14                    Cooke - cross

1   Q.  Do you have them in front of you?

2   A.  I do not.

3   Q.  Oh.  Do you know if they're in the courtroom or if they're

4   in any of the trial exhibits?

5   A.  I know I have a certified copy in my bag.

6            MR. POSCABLO:  We have no objection to her looking,

7   Judge.

8            THE COURT:  All right.  Do we have her bag?

9            MR. POSCABLO:  May I approach, your Honor?

10           THE COURT:  Yes, you may.

11           (Pause)

12           THE WITNESS:  May I refer to my notes?

13           THE COURT:  Yes, you may.

14           MR. POSCABLO:  Judge, may I just approach and grab our

15   exhibits so that they don't get mixed up?

16           THE COURT:  Sure.

17           (Pause)

18           THE COURT:  While you're doing that, ladies and

19   gentlemen, I'll just give you a sense of our timing.  We will

20   break again at 12:45 for lunch, unless something comes up as it

21   did yesterday and we broke a little early, but normally it

22   would be 12:45.

23           MR. PITTELL:  Judge, while she's looking at her notes,

24   could we just have a brief sidebar, do two things at once?

25           THE COURT:  All right.  We'll make it brief.

1          (At the sidebar)

2          MR. PITTELL:  I don't think this is an issue that's

3   going to be a bone of contention, but the file that she's

4   looking at, that she's referring to as her case notes, that's

5   like the glove file.  The one that's in evidence is the Delva

6   file.  There will be some documents in that that I think my

7   expert may rely upon.  I don't want to bother to start putting

8   them in evidence through her, her certified copy.  I just want

9   to make sure that there's not going to be any problem with me

10  trying to put them in through my expert.  I mean, just --

11         THE COURT:  Why don't you ask her, are these the notes

12  that you were referring to, can you identify them, yes, they

13  were, are these the certified copy, yes, they were.  If you do

14  that, you've got the foundation for authentication at that

15  point and later, if you want to refer back to them, we'll deal

16  with it then, but --

17         MR. PITTELL:  The thing is, the file that's the glove,

18  or that's the glove file, it's a large file.  I don't even have

19  a marked copy file.  That's how I know it's probably what she's

20  looking at because it's several hundred pages thick because it

21  includes all the evidence, all the evidence in this case.

22         THE COURT:  You can ask her to authenticate it and

23  we'll deal with it at a break.

24         MR. PITTELL:  That's fine.

25

```
 1                (In open court)

 2                THE COURT:  All right.  Mr. Pittell, we're ready for

 3     you.

 4     BY MR. PITTELL:

 5     Q.  So, Ms. Cooke, do you know who did the extraction?

 6     A.  Yes.  Karen Bodden, B-O-D-D-E-N.

 7     Q.  Then do you know who did the quantitation?

 8     A.  Yes.  His name was Michael Kuhn, K-U-H-N.

 9     Q.  Do you know who did amplification?

10     A.  The first amplification was done by Helen Wong, and the

11     duplicate amplification was done by Patrick Carney,

12     C-A-R-N-E-Y.

13     Q.  And just so we're clear, I'm going to hold up Government

14     Exhibit 1000-A, or 1003-A and 1003-R.

15                MR. PITTELL:  I don't know if everybody can see.

16     Q.  So is this line that I'm pointing to, the fifth line on the

17     chart, the first one that has circles.  Is that the first

18     amplification?

19     A.  That's correct.

20     Q.  And then the one below it, that also has some blue circles,

21     that's the duplicate amplification?

22     A.  That's correct.

23     Q.  Now moving on to the next step, capillary, do you know who

24     performed that step?

25     A.  The first capillary electrophoresis was done by Kendra
```

1  Hardy, H-A-R-D-Y.

2  Q.  And the second one?

3  A.  Louie Vele, V-E-L-E.

4  Q.  And was there another one after that?

5  A.  There was analysis done.  The first analysis was done by

6  Kendra Hardy and reviewed by Beatrice Noel, N-O-E-L.  And the

7  second one was done by Louie Vele and was reviewed by Samantha

8  Rappa-Giovagnoli, R-A-P-P-A - G-I-O-V-A-G-N-O-L-I.

9  Q.  And then what's the next step after the analysis?  Is that

10  when you wrote the report?

11  A.  For that particular sample, then I analyzed all -- I went

12  over all these tests, analyzed it, and then wrote the report.

13  Q.  Now in order to give me all those names, you were looking

14  at a file and some documents that you have in front of you, is

15  that correct?

16  A.  That's correct.

17  Q.  And so going back to the first step, examination, did Helen

18  Wong prepare some kind of report or paperwork documenting her

19  examination?

20  A.  That's correct.

21  Q.  And then I'm just going to say the last names because I

22  don't remember all the first names.  I only have an initial.

23  A.  Okay.

24  Q.  Then when Bodden did the extractions, did Bodden also

25  prepare some kind of paperwork?

1    A.  Yes, she did.

2    Q.  And when Kuhn did a quantification, did Kuhn prepare

3    paperwork?

4    A.  Yes.

5    Q.  And then on the amplification by Wong, I take it there was

6    paperwork for that?

7    A.  That's correct.

8    Q.  And then for the duplicate amplification by Carney, there

9    was other paperwork.

10   A.  That's correct.

11   Q.  Same thing for capillary, which there were two different

12   persons, Hardy and Vele, doing it.  Did each one prepare their

13   own paperwork?

14   A.  That's correct.

15   Q.  Then we get to the analysis.  First there was one done by

16   Hardy, which was reviewed by somebody.  There was paperwork for

17   that?

18   A.  That's correct.

19   Q.  And then again the analysis was done by Hardy but reviewed

20   by somebody else.

21   A.  I think it was Vele and then reviewed by someone else, the

22   second one.

23   Q.  All right.  And so all of these items involved some actual

24   testing of the object or item removed from the object or the

25   DNA itself, is that correct?

1    A.  That's correct.

2    Q.  Now when it came to you, the physical testing part was

3    finished.

4    A.  That's correct.

5    Q.  And what you did was you looked at all of this paperwork

6    that we just went over, and based upon the paperwork, you wrote

7    your report?

8    A.  That's correct.  So I went over all the paperwork, I had to

9    agree with the findings, and then I made my analysis and wrote

10   the report.

11   Q.  You had mentioned there was a computer program, FST

12   program.  Was that something you did or did somebody else do

13   the FST?

14   A.  This is in a different file.  This was in the file in which

15   we created David Delva's profile, but I created -- or I did the

16   FST on my own.

17   Q.  So all these steps that I went through, the examination,

18   extraction, quantitation, amplification, and duplicate

19   amplification, capillary, analysis one and two, you were not

20   present for any of those, is that correct?

21   A.  For the sample for the swab of the glove, that's correct.

22   I believe I did do some of the analysis on some of the other

23   items in this case.

24   Q.  But as far as the glove that we've been talking about and

25   that's the subject of the comparison with Mr. Delva, you were

E9a1del4                    Cooke - cross

1   not present for any of the scientific testing of the glove or

2   what was extracted off the glove.

3   A.  That's correct.

4   Q.  So I take it that you did not watch or supervise all these

5   names that I went through, all these people conducting their

6   tests.

7   A.  That's correct.  But we all follow the same standard

8   operating procedures in the lab for each of these tests and we

9   all go through the same training for these procedures.

10  Q.  All right.  But you would agree that no matter how much

11  training people have, people can make mistakes?

12  A.  People can make mistakes, but in the nature of how many, in

13  our rotation system, I have to believe that there were no

14  mistakes made and that I trust my coworkers.

15  Q.  But that is only your belief and your assumption, is that

16  correct?

17  A.  That's correct.  But again, all these people go through the

18  same training and pass the same proficiency test in order to do

19  these tests in the lab.

20  Q.  But in any field of science, no matter how much training

21  people have, no matter how many proficiency tests they pass,

22  there is something called human error and people can make

23  mistakes, wouldn't you agree with that?

24  A.  That's correct, but that's why, in these tests, we do run

25  controls and that's why we run the duplicate amplifications to

E9a1dela4                    Cooke - cross

1    catch any of these mistakes.

2    Q.  But there was no duplicate testing -- there was no

3    duplication done in the extraction phase, was there?  It was

4    only done one time.

5    A.  There can't be any duplicate testing in the extraction

6    phase because we have one sample and we can't do it twice.

7    Q.  So there was only one taking of a sample from the glove, is

8    that correct?

9    A.  That's correct, and it was consumed.

10   Q.  And when you say consumed, you mean it no longer exists.

11   A.  So when we swab the glove, and we use all those swabs and

12   put it into the sample, we're saying that all those swabs were

13   consumed, and potentially we took all the DNA off of the glove

14   because we swabbed the entire glove.

15   Q.  So when you say consumed, those swabs being consumed, that

16   means that there's no way I could take those swabs and do my

17   own testing of those swabs because they've been consumed.

18   A.  Well, we have the original extract of the DNA in our lab

19   from the glove, so if you wanted to do DNA testing, you could

20   do it from that extract.

21   Q.  Okay.  But getting back to your being present for all this

22   testing, so you do not have any personal knowledge whether or

23   not any of these people along the steps of the way of the

24   testing made any errors.

25   A.  I was not present, no.

1    Q.  So you can only assume that no errors were made.

2    A.  That's correct.  But again, that's why we have controls and

3    duplicate samples, so we can catch any -- potentially catch any

4    sample -- or errors that are made.

5    Q.  Well, are you saying that your lab is perfect and that all

6    errors always get caught and your lab could never be wrong?

7    A.  I am not saying that.

8    Q.  Okay.  Ms. Cooke, you had said 20 picograms per microliter

9    is a threshold, is that correct?

10   A.  That's correct.  So our lab is validated, so during a

11   validation, we determine how much DNA to go on with further

12   testing and we want to choose an amount that we know is more

13   robust and reliable than, so our lab determined that anything

14   less than 20 picograms, the results may not be as robust and

15   reliable if it's 20 picograms or over.

16   Q.  Okay.  So let me just ask a couple follow-up questions on

17   that.  So in the steps of the process that I've gone through

18   with you, at which step is the determination of the number of

19   picograms there would be in an extracted DNA sample?

20   A.  That would be quantitation.

21   Q.  So in this particular case, after the DNA was extracted

22   from the swabs on the glove, then there was some quantitation

23   done from those extractions.

24   A.  From that extraction, yes.

25   Q.  And in any case, you're saying when the DNA sample is

1   analyzed by your lab, the first step is to determine quantity,

2   and under your lab standards, it has to be at least 20

3   picograms to be suitable for analysis.

4   A.   Suitable for it to go on with further testing.

5   Q.   But I believe you had said that the ideal amount is a

6   hundred or more, is that correct?

7   A.   That's correct.   In the literature, the ideal amount to go

8   on for testing is a hundred, but our lab validated that

9   anything over 20 is suitable to go on.

10  Q.   So I take it if there is an ideal threshold being a

11  hundred, then the range between 20 and a hundred is suitable

12  but less than ideal.

13  A.   I mean, I guess -- it's suitable, but the -- for the

14  testing, for the reagents, the kits state that a hundred

15  picograms is the target you want to shoot for.

16  Q.   But you had used the term a hundred or more is ideal.   So

17  if it's less than a hundred, you would agree that it's not a

18  hundred percent ideal; it's still suitable but it's not fully

19  ideal?

20  A.   I mean, I guess you could say that, but our lab determined

21  that anything over 20 will be something that could be repeated

22  and reliable, and that's what we use in our lab.

23  Q.   Also, sometimes, instead of being measured in picograms, is

24  DNA also measured in nanograms?

25  A.   Yes.   It's just the scientific factor how much it is.   I

E9a1del4                          Cooke - cross

1   think it's a thousand picograms per nanogram.

2   Q.  And so what would the ideal amount of nanograms be?  If a

3   hundred is the ideal picograms, then is a nanogram a thousand

4   times a hundred?

5   A.  Well, it would be .1 nanograms, I believe, if I'm doing the

6   math right.

7   Q.  All right.  Now in this particular case, you indicated that

8   I believe it was approximately 31 picograms on the glove, is

9   that correct?

10  A.  That's correct.  I could check my notes if you would like.

11  Q.  Okay.  If you could check, I'll check mine too.

12  A.  (Witness complies.)  It was exactly 31.35 picograms per

13  microliter.

14  Q.  31-point -- I'm sorry?

15  A.  35.

16  Q.  Okay.  So it's over the 20 threshold but it's closer to 20

17  than it is to 100, obviously.

18  A.  That's correct.

19  Q.  Now do you know by any chance if -- well, if we have a

20  hundred picograms of skin source DNA, do you know how many skin

21  cells that actually is?

22  A.  So if there's about 7 picograms of DNA -- I think it's just

23  over 7 per cell of DNA -- so you're going per microliter in the

24  sample.  So there's 31.35 picograms per microliter.  I believe

25  in this test there is about 20 microliters total, so there is

1    just under 5 cells per microliter, so 5 times 20 is about a

2    hundred cells, maybe, per sample, give or take.

3    Q.  And so it would be 5 times 20, which is a hundred, then

4    times 31, to determine the number of cells?

5    A.  Well, no.  So there is 31.35 picograms per microliter in

6    the sample.  There's about 20 microliters in the sample.  So if

7    there's 7 picograms per cell, so 7 divided by 31 is just under

8    5 cells of DNA in the sample.  No, sorry.  Wait.  So there's

9    just under 5 cells of DNA per microliter, so if there's 20

10   microliters, 5 times 20 is about a hundred.

11   Q.  So there's about a hundred, about a hundred actual cells?

12   A.  In the entire sample.

13   Q.  The entire sample.  And in this case you were able to

14   determine that these were skin cells, is that correct?

15   A.  We were not able to determine it was skin cells.

16   Q.  Were you able to determine whether or not they were blood

17   cells?

18   A.  There was no reddish-brown staining seen on the glove, so

19   when the analyst examined the glove, they did not do any

20   blood -- testing for possible presence of blood.

21   Q.  So in your opinion at least it's most likely that it was

22   skin cells.

23   A.  That's correct.

24   Q.  And the glove contained a mixture of at least three

25   persons.

E9a1del4                    Cooke - cross

1   A.   Three people, yes.

2   Q.   So the hundred skin cells is the total amount of skin cells

3   contributed by however many people contributed to the mixture,

4   is that correct?

5   A.   That's correct.

6   Q.   Not a hundred from each person who contributed.

7   A.   That's correct.  Hundred total.

8   Q.   And just to do the math easy, let's say there's two people

9   in a mixture and there's a hundred skin cells in the mixture.

10  That doesn't necessarily mean that it's 50 cells from one

11  person and 50 from another person, does it?

12  A.   That's correct.

13  Q.   In fact, it could be 99 to 1.

14  A.   That's correct, but most likely if it was 99 to 1, we

15  wouldn't see that 1, that person in the mixture.

16  Q.   Okay.  Well, all right.  So then adjusting a little, it

17  could be like 80/20.

18  A.   Sure.

19  Q.   Okay.  So just because we have a number of cells in the

20  mixture and a number of people who contributed to the mixture,

21  that doesn't necessarily mean that each person proportionately

22  contributed the same number of cells to the mixture.

23  A.   That's correct.

24  Q.   And I take it that there was no testing in this particular

25  case to specify the number of cells contributed by each person

1    in the mixture.

2    A.   If we're able to determine who's -- let's say if it's a

3    two-person mixture and we're able to -- sometimes we're able to

4    determine a ratio of the amount one person contributes compared

5    to the other, but in this case, since there was at least three

6    people, it was a low amount, we were not able to determine a

7    ratio.

8    Q.   Now the target threshold you said of 20 picograms, is that

9    a standard set by your lab or is it a national standard?  Where

10   does that come from?

11   A.   It's set by our lab.  So any tests that we perform in our

12   lab, we do validation for that specific test before we can

13   perform the test in the lab, and these validations ensure that

14   the test we do is robust and reliable, and that's how we set

15   the 20 picograms per microliter standard.

16   Q.   And is that set forth somewhere in the policies of your lab

17   or the protocols and standards of your lab?

18   A.   That's correct.

19   Q.   And where it specifies that, does it specify that that is a

20   standard for a single-source DNA?

21   A.   At that point, at that point of testing we wouldn't know if

22   it's single source or not, so we strictly look at the sample,

23   and if it's over -- 20 or over, we go on with further testing.

24   If it's under 20, then we don't.

25   Q.   So the standard of 20 applies for single source as well as

E9a1de14                    Cooke - cross

1    mixtures.

2    A.   That's correct.  We don't know if it's a single source or

3    mixture.

4    Q.   However, if the mixture contains 20 and the mixture had two

5    or more people, then mathematically, neither person would be

6    contributing 20 to the mixture.

7    A.   That's correct.

8    Q.   And in this particular case, because we have 31 picograms

9    and we have at least three people contributing to the mixture,

10   and because you indicated that the extreme range mixtures of

11   like 99 to 1 are not realistic, that in this particular case,

12   it's most likely that no one person contributed 20 or more

13   picograms to the mixture.

14   A.   We wouldn't know because we can't test that, but this is

15   why, in samples that are mixtures and that are small amounts of

16   DNA, why we see something called allele dropout that I talked

17   about before.

18   Q.   But it would be, at least in this case, safe to assume that

19   given that there are at least -- withdrawn.

20        When you say there's at least three contributors to

21   the mixture, is there a possibility that there could be four

22   contributors to the mixture?

23   A.   There is a possibility.  I wouldn't know.

24   Q.   Well, you've used the term at least three.  Do you mean to

25   say that it's no more than three or that it's three and could

1    possibly be more?

2    A.   That's correct.

3    Q.   So it could possibly be more than three.

4    A.   That's correct.

5    Q.   So in this particular case, would you agree that if there

6    are at least three and possibly more people contributing to the

7    mixture, that realistically, no one person has contributed 20

8    or more to the mixture?

9    A.   Yes, that's a possibility.

10   Q.   And I think you just said it, but I just want to make sure

11   we're clear.  So when we have samples where there is a low

12   amount of DNA, under a hundred but more than 20, because there

13   is a low amount, that's where you'll get things which you

14   showed on the chart, allele dropouts, is that correct?

15   A.   That's correct.  That's one of the reasons you could have

16   allele dropouts.

17   Q.   But like for example here -- I don't know if everybody can

18   see it -- like in the fourth row, we have 12 in each one but we

19   don't have 7 in the bottom row.  That's an allele dropout.

20   A.   Yes, that's a possible allele dropout.

21   Q.   And that could be because of the fact that it's a

22   relatively small amount of DNA.

23   A.   Yes.  That's one -- relatively small amounts of DNA is one

24   reason why you could have allele dropouts.

25   Q.   And what is a partial profile?

E9a1del4                         Cooke - cross

1    A.   A partial profile is when we don't have the entire profile.

2    So we have 15 locations.  Sometimes we -- one location might

3    not -- the alleles from that person or from the evidence might

4    not show up, so then they'll become a partial profile.

5    Q.   And partial profiles can sometimes exist in cases where the

6    amount of picos of DNA are low, under a hundred but more than

7    20.

8    A.   That's correct.

9             MR. PITTELL:  I want to put an exhibit up on the

10   screen.

11   Q.   Ms. Cooke, this is one of your reports in this case, is

12   that correct?

13   A.   That's correct.

14   Q.   And if you could look at the portion at the bottom where it

15   says, "Dominique Jean-Philippe is excluded as a contributor to

16   the mixture of DNA found in the sample listed below."  And

17   again, it says "swabs of glove," there's a voucher number, and

18   item number 3.  Is that the same glove that you contend you

19   found Mr. Delva's DNA on?

20   A.   That's the same glove, yes.

21   Q.   And that's actually the same swab -- or no.  That's the

22   same glove that was done with the comparison, I should say.

23   A.   So the evidence -- the mixture we found is in the evidence

24   file, and then we compared both Dominique Jean-Philippe and

25   then later David Delva to that mixture.

1  Q.  All right.  Now the exclusion, in order to exclude

2  Dominique Jean-Philippe from the glove, did you use the FST

3  program to compare his profile to the glove mixture?

4  A.  I did not.

5  Q.  Was a program used?

6  A.  No, I did it visually.  If I don't see Dominique

7  Jean-Philippe's alleles in multiple locations in the sample,

8  then I will exclude him.  When you exclude someone, you don't

9  do FST to that sample.

10 Q.  So it was done, for lack of a better term, manually by you,

11 is that correct?

12 A.  Yes, visually.

13 Q.  Now during the course of your working on this case, were

14 you ever informed that Dominique Jean-Philippe was a blood

15 relative of Mr. Delva?

16 A.  I was not.  I'm sorry.  I might have, in talking to the US

17 attorneys.

18 Q.  But because it was a visual examination done by you, you

19 would agree that there is some element of subjectivity that

20 goes into it.

21 A.  Well, I compared --

22         MR. POSCABLO:  Objection.  Just clarifying.

23         THE COURT:  I think she can answer.  Go ahead.

24         MR. POSCABLO:  Okay.

25 A.  Well, I compared Dominique Jean-Philippe's profile before I

1    received David Delva's, so I made this conclusion beforehand.

2    So I never compared Dominique Jean-Philippe's profile to David

3    Delva's so I don't know how similar they are.

4            THE COURT:  Can I ask you a question.  In that chart,

5    which is 1003-A and B, government exhibit, that big chart

6    that's got all of the various columns going across --

7            THE WITNESS:  Yes.

8            THE COURT:  -- and then you've got the numbers inside

9    those columns --

10           THE WITNESS:  Yes.

11           THE COURT:  -- are those columns standard for every

12   DNA analysis that do you?  In other words, are you looking at

13   the same -- I guess we call them alleles, which is

14   characteristic?

15           THE WITNESS:  Okay.  So when we do our amplification,

16   we do the same locations, which are standard in our lab and

17   across the country.  These are the locations that were tested

18   to be highly variable between individuals.

19           THE COURT:  Okay.  So I just want to -- I'm sorry.

20           THE WITNESS:  Okay.

21           THE COURT:  Let me just see if Mr. Poscablo would be

22   kind enough to just put up the -- you can just hold it up.  It

23   doesn't matter.  You don't have to get it on the screen.  So

24   hold it up so I can see it.

25           So you see the columns going across, not where the

1   name is but -- Mr. Poscablo, right there, those.

2          THE WITNESS:  Yes.

3          THE COURT:  Ladies and gentlemen of the jury, can you

4   folks see that?

5          JURORS:  Yes.

6          THE COURT:  Those columns are standard columns.

7          THE WITNESS:  Yes, those are the standard locations

8   that we always test, and it's also tested across the country

9   and also in Europe.

10          THE COURT:  Okay.  So when you're testing the DNA

11   sample, because you don't know the name of the person yet,

12   you're looking at whether or not the particular number, like

13   12, appears in the allele.

14          THE WITNESS:  So how we get the number 12, so the

15   sample that --

16          THE COURT:  Not how you get the number, because the 12

17   I understand.  It comes from either the mother or the father.

18   Let's just call that an identifier, okay, just for current

19   purposes.

20          THE WITNESS:  Okay.

21          THE COURT:  So the number 12, so if that appears in a

22   column, right, that came from somebody, right?

23          THE WITNESS:  So for David Delva or let's say the

24   evidence?

25          THE COURT:  It can come from --

1              THE WITNESS:  Yes, it comes from someone, yeah.

2              THE COURT:  It comes from someone.  So I just want to

3      get to your visual examination.  When you're doing your visual

4      examination, you're looking to see, whoever you're testing it

5      against, whether or not their numbers are showing up enough

6      times.  So it's 12, 1, 14, 16?

7              THE WITNESS:  Okay.  So we compare -- so let's say we

8      have the DNA profile of David Delva and then when we do the

9      comparison, is that what you're talking about, and seeing if

10     the numbers are --

11             THE COURT:  I'm actually back at the cigarette butt,

12     back at the elimination.  I'm trying to figure out whether or

13     not, with the elimination, when you're doing it visually, I'm

14     trying to figure out if it's really subjective at all or

15     whether or not you're looking at actual numbers in standard

16     columns.  Are the columns going across the top standard?  Yes?

17             THE WITNESS:  Yes.

18             THE COURT:  And the numbers that are paired in each

19     column, those are individual.  Every individual's got their own

20     DNA, right?

21             THE WITNESS:  Yes, yes.

22             THE COURT:  None of us in this courtroom have the same

23     DNA, right?

24             THE WITNESS:  That's correct.

25             THE COURT:  And even people don't have the same DNA as

1    their mother and father or sister and brother.

2              THE WITNESS:  Unless you're an identical twin.

3              THE COURT:  Right.  Unless you're an identical twin.

4    So the DNA of the person in column 1 is 12, 14, 12, 14.

5              THE WITNESS:  Okay.

6              THE COURT:  What you're doing when you're doing your

7    visual elimination is trying to see if a particular

8    individual's profile shows up in that column.

9              THE WITNESS:  Yes.  So if an individual is 12, 14, and

10   then I look in that same column for the evidence and see if the

11   12, 14 is in the evidence --

12             THE COURT:  And it's nowhere there.

13             THE WITNESS:  Let's say it's nowhere there.  Then I

14   would probably look at the next column, and nowhere there, and

15   then I might go to the third and see.  If it's nowhere there,

16   then I would say exclusion.

17             THE COURT:  That's what you're calling your visual

18   elimination.

19             THE WITNESS:  That's correct.

20             THE COURT:  Thank you.  Okay.

21   BY MR. PITTELL:

22   Q.  But after looking at all of the data and comparing all of

23   the numbers, the ultimate determination as to whether or not

24   someone should or should not be excluded is a subjective

25   determination.

1   A.  That's correct.  And when we do those, that's why they're

2   reviewed by a supervisor, and I believe exclusions are -- there

3   would be a second time.

4   Q.  But it is possible that other medical examiners offices

5   could look at the same data and come up with a different

6   conclusion?

7   A.  I guess that's possible.

8            MR. PITTELL:  I'm about ready to go into another line

9   of inquiry, your Honor.

10           THE COURT:  All right.  Ladies and gentlemen, let's

11  take our lunch break.  We will resume promptly at 2.  So try to

12  be back and be ready by 2:00.  We're going to have a second

13  service of coffee and tea in there for you folks, hopefully

14  with tops this time.

15           I'm going to remind you not to talk to each other or

16  anybody else about this case.  Don't do any internet research

17  during the break, in case you have access to a phone or

18  internet device.  Don't do any internet research on anything

19  having to do with this case at any point in time until the

20  absolute conclusion.

21           Thank you.  We'll see you at 2.

22           THE DEPUTY CLERK:  All rise as the jury leaves.

23           (Jury excused)

24           (Continued on next page)

25

```
 1                  (Jury not present)
 2                  THE COURT:  Mr. Pittell, you had something you were
 3      about to say?
 4                  MR. PITTELL:  Me?
 5                  THE COURT:  Yes.  I thought you were about to.  Maybe
 6      it was to Mr. Poscablo.  Okay.
 7                  MR. PITTELL:  Oh, no.  Just in terms of telling
 8      Mr. Poscablo like how much more I have.
 9                  THE COURT:  I was going to ask you the same question.
10      How much more do you have?
11                  MR. PITTELL:  I don't really have much more, and in
12      fact, during the break, I'm going to cut out some of the fluff.
13      Not that I would ever put fluff in a cross-examination.  But
14      I'm going to try and make it briefer.  So I was going to let
15      the government and let the court know that they should just get
16      ready for the next witness.
17                  THE COURT:  All right.  Mr. Poscablo, at this point
18      how much redirect do you think you have, if any?
19                  MR. POSCABLO:  Judge, like five, ten minutes, tops.
20                  THE COURT:  All right.  So we'll get to the next
21      witness relatively soon.  Is that going to be FBI Special Agent
22      Perry or somebody else?
23                  MR. POSCABLO:  I think it is.  That's our aspirational
24      hope, and I think he's outside, so I think that's going to be
25      our -- he's finished with his testimony in the other case.
```

E9a1de14

```
 1                 THE COURT:  All right.  And then after that, the
 2      thought was to go to Ms. Adams?
 3                 MR. POSCABLO:  That's correct, your Honor.
 4                 THE COURT:  All right.  We ought to get there then
 5      this afternoon, is that right?
 6                 MR. POSCABLO:  Absolutely.
 7                 THE COURT:  Terrific.  Now there was one objection
 8      earlier that was:  "You knew that the defendant lived two
 9      blocks away, or a few blocks away from the crime scene."  I
10      think there was a series of questions like that.  Why did the
11      government object?  I overruled it, but I'm just wondering,
12      because I couldn't see any basis for an objection.
13                 MR. POSCABLO:  Judge, here's my thinking, that an
14      instruction was necessary at that point -- and I should have
15      been more clear about what I was trying to point to the
16      court -- that a lawyer's question isn't evidence, because it
17      appeared to me that Mr. Pittell was getting in a lot of facts
18      that this witness would not know anything about.
19                 THE COURT:  But I don't think these are facts which
20      are contested, right?  I mean, you folks brought out on direct
21      a number of occasions now how close the two apartment buildings
22      were, etc., etc.
23                 MR. POSCABLO:  That's correct.  No, it's not.  So I
24      probably should have withdrawn my objection, but I think your
25      Honor appropriately overruled it.
```

E9a1de14

1          THE COURT:  All right.  And, you know, I gave an

2    instruction at the beginning that lawyers' questions are never

3    evidence and nor is anything that I say ever evidence.  And

4    I'll be giving that same instruction as part of the jury

5    instructions.

6          Speaking of, you all have received a copy of the big

7    long phone book of jury instructions.  Because there are so

8    many counts, they're really quite long.  You'll see that I

9    break every page.  That's my practice is to do that per

10   instruction.  So the bulk really overstates the volume of

11   instructions.  Nevertheless, it's long, and it will take some

12   time to deliver.  So we'll have to bear that in mind as we

13   proceed.  I don't think we're yet at a point where we'll be

14   talking about timing for those.  But we'll start going over

15   them tomorrow morning.  If you give me some track changes, that

16   would be terrific, but the way that I work is, we'll start off

17   in the morning and I'll ask you, okay, counsel, if I haven't

18   gotten track changes, where's your first proposed change?  And

19   if it's on page 32, we'll go right to 32.  Time permitting, we

20   would circle back, and I would then return the draft and you

21   would have a second opportunity to review things.  But that

22   doesn't always happen.  So you ought to review it as if it's

23   your only chance and make any objections that you believe are

24   appropriate.  Okay?

25          Anything else that you folks want to raise?

E9a1de14

1              MR. POSCABLO:  No, Judge.  Thank you.

2              THE COURT:  Okay.  I do have another criminal matter,

3    it's a multidefendant case, in here at 1:00, so I'll need you

4    folks to just move some things around.

5              MR. POSCABLO:  What time did you want us back?

6              THE COURT:  Unless you need me, I don't need you back

7    until a few minutes before 2 to get everybody in place.

8              MR. POSCABLO:  Yes, your Honor.  Thank you.

9              THE COURT:  Thank you.

10             THE DEPUTY CLERK:  All rise.

11             (Luncheon recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                               2:00 p.m.

3              THE COURT:  Let's get the jurors out here.

4              (Jury present)

5              THE COURT:  All right.  Ladies and gentlemen, let's

6     all be seated.

7              All right.  Mr. Pittell, you may proceed, sir.

8              MR. PITTELL:  Thank you.

9     Q.  Good afternoon, Ms. Cooke.

10    A.  Good afternoon.

11    Q.  Ms. Cooke, I'd like to go back to the chart that's on the

12    easel in front of the jury.  It's also up on the screen.  It's

13    Exhibit 1003-A.  On your direct testimony you pointed out some

14    instances where there were some dropouts on the different loci;

15    is that correct?

16    A.  Yes.

17    Q.  Could you just come down and show us which loci there's

18    either dropouts or I think what you called it an artifact

19    discrepancy?

20    A.  OK.  An artifact is different than a dropout.  When I

21    brought up artifact I said that there are seven alleles seen in

22    this duplicate here in the first location.  And I said that one

23    of the alleles might be an artifact which isn't true DNA coming

24    from one of true individuals or possibly a fourth.  In this

25    instance I said it was an artifact because it's not repeated in

1   the first -- and we don't see any indication of a fourth

2   contributor in any other location.  So that's why I said it was

3   a possibility.

4   Q.  In loci number two are there allele dropouts on this one?

5   A.  It would be possible.  We do see possible peaks that aren't

6   called by the software in multiple locations.  I would have to

7   look at my raw data to see which one.  And it's more likely to

8   come from a larger loci where the DNA is larger.  So this would

9   be this one which is CSF1P0.

10  Q.  So when you view this there's allele dropouts because

11  there's a seven here but no seven here?

12  A.  I view it, when I say allele dropouts it's because we see a

13  possible allele present.  It's just too low to be called by our

14  software.  So that's why I say there might be allele dropout.

15  Q.  Is at least the ones where you know that there are or --

16  can you just mark them by drawing a circle above the loci item

17  number?

18  A.  It would be easier for me to look at my raw data than to

19  look at the chart.

20          MR. POSCABLO:  Can we clarify what the question is,

21  your Honor?

22          THE COURT:  Why don't you -- is there a pending

23  question right now?

24          MR. PITTELL:  Well, what I want to ask the witness to

25  do is to identify each loci where there is a discrepancy either

```
 1    by an artifact stutter or an allele dropout.  I thought on

 2    direct it could be done by looking at the chart but she's

 3    indicated that she needs to look at her data, which is fine.

 4    But that's what I am trying to do.

 5              THE COURT:  All right.  So the pending question is can

 6    you point out which of the instances where there's a missing

 7    allele, if you will, whether it's a likely dropout or a likely

 8    artifact; is that the question?

 9              MR. PITTELL:  Well, just where there is one.

10              THE COURT:  All right.  So the first thing is, is

11    there a place where there is an allele missing?

12              THE WITNESS:  Do you want me do it in respect to David

13    Delva's profile or in respect to where there's dropout, where I

14    see dropout from the data?

15    Q.  David Delva's profile from the data.

16    A.  OK.  I could do that.

17    Q.  OK.

18    A.  If I am preparing David Delva's profile the data I can do

19    it without looking at my --

20    Q.  So if could you just draw a circle around the full loci

21    number.

22              (Pause)

23    Q.  You had also indicated that comparing the amplification and

24    the duplicate amplification of the swab of the gloves there's

25    also can be discrepancies between the two?
```

1    A.   That's correct.   They are not always going to amplify

2    exactly the same especially with something that has low amount

3    of DNA to start.

4    Q.   Right.   Those are all the questions I have on that.   I

5    guess you can go sit back up there.

6            (Pause)

7    Q.   But when you do this.   You can look at one on the screen

8    when you do this visual comparison between the David Delva.

9    Actually, let me withdraw the question.   You had earlier

10   indicated that when you compared Dominique Jean-Philippe with

11   the glove you did a visual comparison?

12   A.   That's correct.

13   Q.   Now, is this doing a visual comparison by just looking at

14   David Delva, the top column and then looking at the two -- I

15   should state two rows of the swabs of gloves?

16   A.   That's correct.   So when I first did a visual comparison

17   from David Delva to the gloves and if I note that there is a

18   positive association between David Delva and the mixture of DNA

19   found in the glove.   That's when I'll do the statistical

20   calculation.

21   Q.   And the statistical calculation is using computer program

22   which has been referred to as FST?

23   A.   That's correct.

24   Q.   And that program is used to prepare what's called the

25   likely ratio?

1    A.   That program uses a likelihood ratio in its comparison,
2    that's correct.
3    Q.   Now, does FST take into account blood relationship between
4    people?
5    A.   If we had a sample that we compared and there was a
6    positive association I could use both as a comparison.  But
7    when we do it it's just David Delva's profile then it does -- I
8    am sorry -- it does not take in account blood relation if I am
9    just comparing David Delva's blood profile.  But if you did
10   have a blood relative and used that along with David Delva to
11   do a comparison and entered both their profiles, then it would
12   take that into account.
13   Q.   But in this case the FST was used on David Delva alone; is
14   that correct?
15   A.   That's correct.
16   Q.   And it was not used on Dominique Jean-Philippe?
17   A.   It was not because I noted --
18   Q.   I am just asking whether or not it was.
19   A.   OK.
20   Q.   And there was no analysis done of the DNA of Gregory
21   Accilien; is that correct?
22   A.   That's correct.
23   Q.   So presumptively FST was not used to compare Mr. Accilien
24   to the glove?
25   A.   That's correct.  We did not have his DNA.

1   Q.   Now, if, for example, a person related to David Delva came

2   in contact with the glove would that person possibly share some

3   DNA with Mr. Delva?

4   A.   If they are blood relatives, then yes.

5   Q.   And it would be more likely that they would share let's say

6   there's a mixture in the glove with Mr. Delva and a related

7   person, is there more likely to be more of the same DNA between

8   Mr. Delva and the related person or comparing to Mr. Delva and

9   the unrelated person?

10  A.   I'm sorry.  I don't understand your question.

11  Q.   Let me rephrase the question.  If a person related to

12  Mr. Delva had come in contact with the latex glove would that

13  relate person be more likely to share DNA with Mr. Delva than

14  an unrelated person?

15  A.   Yes.

16  Q.   Now, FST reports are for unrelated individuals; is that

17  correct?

18  A.   Yes.  So my report states that the scenarios between David

19  Delva and two unknown, unrelated persons compared to the other

20  scenario which is three unknown, unrelated persons.

21  Q.   So it's all based upon the premise that David Delva and --

22  well, it's based on the premise that your conclusion that it's

23  David Delva's in the mixture with two unrelated persons; is

24  that correct?

25  A.   That's correct.

1    Q.  And if it turns out there it was a related person within

2    that mixture that could affect the likelihood ratio?

3    A.  Yes, it would.  The likelihood ratio would either go up or

4    go down.

5    Q.  And how much DNA average with would an uncle and a nephew

6    share?

7    A.  I don't know offhand.  You share half of your DNA from your

8    mom and half from your dad.  I am not sure offhand how much you

9    would share with your uncle or --

10   Q.  If we do on average would it be like 25 percent?

11   A.  I can't say offhand.  I am sorry.

12   Q.  Now, if you had done an analysis of a sample of

13   Mr. Accilien's DNA and you included it in your comparisons --

14   well, let me withdraw the question.  If you did an analysis of

15   an uncle of Mr. Delva and you included in your comparison then

16   would you agree that the FST analysis in this case could be

17   different?

18   A.  First that uncle would have to be positively associated

19   with the mixture in order for me to include them in the FST and

20   if they're positively associated then the FST number would

21   differ.

22   Q.  So if you prepared a similar chart like this but instead of

23   having David Delva here, you have the uncle and -- but all this

24   information is the same regarding the swabs of the glove and

25   the comparison is similar, then you would not use FST; is that

1    correct?

2    A.  I am sorry.  Can you ask the question again.

3    Q.  If you took a swab from David Delva's uncle and you did a

4    sample and you prepared a line similar to the way you have the

5    line for David Delva here on this chart -- and I realize the

6    numbers will not be exactly the same because each person's

7    unique but, certainly, it's possible that you could have a

8    similar match where you have comparisons similar to all these

9    blue circles and only about five circles at the top; is that

10   correct?

11   A.  So if we did a comparison between David Delva's uncle and

12   we saw David Delva's uncle either a possible contributor or

13   cannot be excluded from the mixture, then we would use his DNA

14   profile in our FST calculation.  I am not sure --

15   Q.  Let me ask you this way.  If you did a -- if you took a

16   sample from David Delva's uncle and did a comparison with the

17   mixture and glove, it's possible that you would not be able to

18   exclude him; is that correct?

19   A.  That's correct.

20   Q.  And that's what happened with David Delva.  You felt it was

21   not possible to exclude him?

22   A.  That's correct.

23   Q.  And because you could not exclude David Delva, then you

24   went on to do the FST analysis?

25   A.  That's correct.

E9AAADEL5                         Cooke - Cross

1   Q.   Now, if you had done the, taken a sample from the uncle and

2   done a comparison and you couldn't exclude him as well, then

3   you wouldn't have done the FST analysis; is that correct?

4   A.   We would.  We could do different scenarios with our FST

5   analysis.  So if we could the same scenario we did before or we

6   could do another where we have David Delva and David Delva's

7   uncle and one unknown unrelated person compared to David

8   Delva's uncle and two unknown, unrelated persons.

9   Q.   If you do those comparisons though the results regarding

10  David Delva may be different than what's in your report in

11  evidence?

12  A.   That's correct.

13  Q.   And since a sample was not been taken from Mr. Accilien and

14  since a comparison of Mr. Accilien's DNA has not been done on

15  the glove there's no way to speculate how your results may have

16  been different; is that correct?

17  A.   That's correct.

18  Q.   And, in fact, the results could have shown that it was even

19  more likely that the DNA belonged to Mr. Accilien as opposed to

20  Delva because they are related?

21  A.   That would be a different statistic.  When we compare -- if

22  I included Mr. Accilien's DNA profile and let's say that he

23  could not be excluded and we used him in the FST calculation

24  we're still only calculating the ratio between Mr. Delva,

25  Mr. Accilien and one unknown, unrelated individual versus

1    Mr. Accilien and two unknown, unrelated individuals.  We're not

2    seeing the likelihood of Mr. Accilien being in the mixture.

3    Q.  But it's certainly possible that Mr. Accilien had been

4    thrown into the mix, so to speak.  Given the fact they're

5    related it's a possibility that there's a greater likelihood

6    that it was Mr. Accilien's DNA on the glove and not

7    Mr. Delva's?

8    A.  That's not what the statistic is going to be calculating.

9    Q.  Statistics cannot give you an opinion one way or another on

10   that?

11   A.  That's correct.

12   Q.  Now, you did not use -- I think I already asked you this

13   but if I did, I am sorry.  You did not use the FST program to

14   compare Dominique Jean-Philippe's DNA to the mixture on the

15   glove; is that correct?

16   A.  That's correct because I excluded him we did not do FST.

17   Q.  That is when we were talking about right before the lunch

18   break that is when you did the visual comparison?

19   A.  That's right.  If I visually exclude someone then we do not

20   do FST on that sample.

21   Q.  Did you -- when did you that comparison did you prepare a

22   chart similar to that one for Mr. Dominique Jean-Philippe and

23   the two amplified swabs in the glove?

24   A.  When we exclude someone from any sample in the case we do

25   not do a table.  That's part of our policy.  So the only time

1    we do a table is when there's a positive association.

2    Q.  So when you did the exclusion it was -- you did have at

3    least not necessarily the same exact numbers but similar

4    numbers, allele numbers for Mr. Jean-Philippe and your allele

5    numbers for the glove and you looked at some kind of charts or

6    data that you compared the two side-by-side; is that correct?

7    A.  That's correct.  I would compare the raw Dominique

8    Jean-Philippe's profile to the raw data from the glove.

9    Q.  Now, if you had used FST to compare Dominique Jean-Philippe

10   with the swabs of glove and it turned out that it was not

11   Dominique Jean-Philippe's DNA in the mixture what would the

12   likelihood of ratio be in that instance?

13   A.  The likelihood ratio would state, I will just throw a

14   number out there.  So maybe let's say it's a thousand times

15   more likely that the DNA -- I am sorry.  I would need to look

16   at how the statement is but that the DNA found mixture on the

17   swabs of the glove originated from three unknown unrelated

18   individuals versus Dominique Jean-Philippe and two unknown

19   unrelated individuals.

20   Q.  So it would be in essence a negative likelihood ratio?

21   A.  You never get a negative value.  The way you do it is you

22   get a statistic and then if it is less than one then you do one

23   over that number and that's how you get the thousand.

24   Q.  And then on the opposite if it turned out it was Dominique

25   Jean-Philippe's DNA in the mixture you would come up with a

1    likelihood ratio, not necessarily the same number but similar

2    to the way we have it on your report of Mr. Delva.  Mr. Delva's

3    report is four million some odd to one or but it would be some

4    type of ratio number; is that correct?

5    A.  So, if there's a positive association it would mean that

6    the scenario that that person is included it would be more

7    likely.  So it would be whatever, a thousand times whatever it

8    is.

9    Q.  So, right before the break I was asking you questions about

10   whether or not there's any subjectivity.  Let me ask it to you

11   this way.  You looked at the allele data for Mr. Delva swab's

12   on the glove.  You did your comparisons and then -- so you in

13   your opinion in your, based upon your training and expertise

14   you determined that it should then go to the FST program?

15   A.  That's correct.

16   Q.  And then with Mr. Jean-Philippe you looked at the allele

17   data of his sample and compared it with the allele data on the

18   gloves and based upon your training and expertise and

19   experience it was your determination that he should be excluded

20   manually and not, there was no need to send it to the FST

21   program; is that correct?

22   A.  That's correct.

23   Q.  And would you agree that between experts at least as far as

24   those determinations as to whether or not a comparison should

25   be excluded or got FST that reasonable experts could differ on

1   whether or not it should go to FST?

2   A.   That's correct.  But that's why we have review processes in

3   our lab.  So that before my report gets reported out someone

4   views my work and agrees with what I wrote up in the report.

5   Q.   But you would agree that there is no one universal protocol

6   and that somebody else that has training and experience and is

7   from a different lab in a different part of the country may

8   reach a different conclusion as to whether something should or

9   should not go through the FST?

10  A.   Yes, that's possible.

11  Q.   You had indicated that on your direct-examination if there

12  are six or more alleles, two times or six or more alleles in

13  two or more locis then it's not used; is that correct?

14  A.   If there is more than six -- I am sorry.  If there's more

15  than six two or more times then we deem the sample inconclusive

16  that means that there are four or more contributors and we

17  don't use it to do any comparisons.

18  Q.   So in this particular case I am pointing to the first

19  column with the first loci column where it ends in number 79?

20  A.   OK.

21  Q.   Do you see in the second amplification there are seven

22  numbers?

23  A.   Yes.

24  Q.   So does that mean that there is more than six alleles in

25  this loci?

1    A.   That's correct.

2    Q.   And so if let's say in the second column there's in the

3    same row the duplicate one, there's only three in this one but

4    if there had been seven in that one, then at that point the

5    sample could not be used; is that correct?

6    A.   That's correct.

7    Q.   And as we go through all of this you'll see in the same row

8    the second row, the duplicate row, the one ending in 33 there

9    are six alleles; is that correct?

10   A.   That's correct.

11   Q.   And now, the determination of the number of alleles in

12   these amplifications that is done during one of the steps in

13   the rotational system; is that correct?

14   A.   Well, one of the steps during the rotation system we

15   analyze the raw data normally with mixtures.  They leave

16   everything alone and they don't make any edits to that mixture

17   and we make edits if something is an artifact which is not true

18   DNA.

19   Q.   But so let me ask you a question this way.  These allele

20   numbers in these rows that say swabs of gloves the allele

21   numbers were not determined by you; is this correct?

22   A.   They're determined by the software.

23   Q.   OK.  And, but the software gets it based upon analysis done

24   by the analysts in that step in the rotational process?

25   A.   That's correct.  But then I would review their work and if

1    I don't agree then I would go back and change what they had

2    done if they did any edits.

3    Q.  And so but if -- I know you've told us that there's reviews

4    and there's checks in place but if one of those analysis did

5    make a mistake along the rotational process it's possible that

6    these numbers could be different?

7    A.  I am not sure what you are asking.  Like what mistake you

8    are talking about?

9    Q.  For example, there's seven in the first column and there's

10   three in the second column pointing to the second row, is it

11   possible that if someone made a mistake there could be four in

12   the second column of the second row instead of three alleles

13   there?

14   A.  Well, when they made the analysis nothing was edited out so

15   this is what it is.  This is how the DNA for that sample

16   amplified on each occasion.  So I don't understand what mistake

17   you are talking about.

18   Q.  Well, if one made a mistake during the amplification

19   process then these allele numbers could be different?

20             THE COURT:  You mean like a 16 could be a 15 or a 22

21   could be a 23?

22             MR. PITTELL:  Right.

23   Q.  A 16 could be a 15 or there could be an additional number

24   or one other number could be dropped out?

25   A.  It wouldn't be a mistake.  I mean the only mistake you

1    could is maybe a sample mix up.  But in my opinion these

2    mixtures on the first amplification and mixture on the second

3    are confirmed because they're basically the same alleles.  The

4    reason why they are not exactly the same is because it is a

5    small amount of DNA to start out with.  There's three

6    contributors, so you are not going to see the exact same

7    alleles at every location here.

8    Q.  Now, in the column ending 33 is the last two numbers in the

9    swabs of glove duplicate row where there's six digits, had

10   there been a seven, the number in that row then this whole

11   sample would have been inconclusive; is that correct?

12   A.  If there was possibly a seventh one and it depends on the

13   sample.  It's up to the interpretation of that analyst who is

14   writing the case and I could have deemed it inconclusive.

15   Q.  So you would agree at least this one we were close to being

16   inconclusive because we had seven in one and six in another?

17   A.  I mean you would have to look at the whole sample again.

18   The possible seventh allele that's called in the duplicate I

19   think is more likely coming from an artifact which is not a

20   true allele because you don't see any indication of more than

21   three contributors anywhere else on the other location.  So in

22   my opinion the seven, the allele in the first one is possibly

23   an artifact compared to being a true allele.

24   Q.  But you would at least agree the fact that there's seven

25   here and that there's six here that we're getting close to the

1   exclusion point; is that correct?

2              MR. POSCABLO:  Objection, your Honor, to the term

3   "exclusion".

4              THE COURT:  I understand.  Why don't you rephrase?

5   Q.  Had you indicated that if there are six or more two times

6   that the samples excluded and can't be used; is that correct?

7   A.  More than six.

8   Q.  Right.  OK.  And so the fact that we have, if we had seven

9   and two of them it's possible that the sample would have been

10  excluded based upon that?

11             MR. POSCABLO:  Objection again, your Honor.

12             THE COURT:  I think it's the wording of the way in

13  which the excluded is changing between the two questions.

14             You can answer if you can understand it.

15  A.  If there was more than six alleles at two locations then I

16  would possibly deem the sample inconclusive and then I would

17  not make any comparison to the sample.

18  Q.  So if there had been a seventh allele in this column where

19  the number ends in 33, it's possible that you might have then

20  at that point considered this inconclusive?

21  A.  Yes.

22  Q.  And you had indicated that the reason why it would be

23  inconclusive is at that point there would be a possibility that

24  there would be two more persons in the mixture?

25  A.  That's correct.

1    Q.  Because if there's three people in the mixture then the

2    number of alleles is going to be -- well, if I guess it can't

3    be a mixture if it's only one person but for one person there's

4    either one or two alleles; is that correct?

5    A.  That's correct.

6    Q.  So if it's three people, then the minimum is going to be

7    three and maximum is going to be six?

8    A.  I wouldn't say that there's a minimum but the maximum would

9    be six.

10   Q.  Okay.  So the maximum would be six.  So that's why the

11   number six or more is so critical because if there's more than

12   six then there's going to be more than three people in the

13   mixture?

14   A.  Possibly, yes.

15   Q.  Ms. Cooke, I am showing you a document from one of the

16   exhibits.  It's Exhibit 1000.  I believe it's page five.  Can

17   you see that on your screen?

18   A.  Yes.

19   Q.  What is this or do you -- actually, do you recognize this

20   document?

21   A.  Yes, I do.

22   Q.  What is this document?

23   A.  It's part of it's page five of my report of my, for the

24   evidence file and this particular is the evidence that we

25   received in the case.  The item numbers, voucher numbers, the

1   date that we received it and then a description of what the

2   evidence was.

3   Q.   And the latex glove that you compared with Mr. Delva's DNA

4   that's on that list; is that correct?

5   A.   That's correct.

6   Q.   And is it gonna be in about the middle where it says latex

7   glove from IO plastic bag it actually says it twice but it

8   would be the second time it says that?

9   A.   I believe it's Item Three, so of the second time.

10  Q.   Right, item three all the way on the left column?

11  A.   That's correct.

12  Q.   Now, starting at the top do you see where it says

13  "cigarette butt from computer desk"?

14  A.   Yes.

15  Q.   Was Mr. Delva's DNA found on that?

16  A.   No, it was not.

17  Q.   Do you see where it says "bottle from living room table"?

18  A.   Yes.

19  Q.   Was there Delva's DNA on that?

20  A.   No.  I believe the bottle was insufficient for DNA.

21  Q.   Do you see where it says "cigarette butt from hallway on

22  floor"?

23  A.   Yes.

24  Q.   Was Mr. Delva's DNA on that?

25  A.   No, it was not.

1    Q.  In fact, if I go through every item on this list isn't it

2    true that Mr. Delva's DNA is not according to your lab, it's

3    not on any of these items except for Item Number Three

4    corresponding to the latex glove?

5    A.  That's correct.

6            MR. PITTELL:  If we could just show your report up on

7    the screen.

8            (Pause)

9    Q.  All right.  Ms. Cooke, I am showing you the first page of

10   Exhibit 1003.  This is your report; is that correct?

11   A.  That's correct.

12           MR. PITTELL:  And if we could just zoom in on the

13   portion where it says the DNA mixture found on the swab is 4.4

14   two million times more probable.

15           (Pause)

16   Q.  Now, in some of your other reports the numbers you had were

17   in the trillions like when you had a DNA profile of somebody

18   was in the trillions and you had indicated that when the number

19   is that high there can only be one person in the world that

20   match that; is that correct?

21   A.  There are two different statistics.  The statistics where

22   it's in the trillions and which we did on the evidence that's

23   called Random Match Probability and that's determining how that

24   DNA profile found on the evidence is in the world population.

25   This is the likelihood ratio, so it's two different statistics.

1    Q.  So this is just a statistical ratio of the probability

2    about some of the DNA being in the mixture coming from David

3    Delva and to two unknown unrelated persons compared to the

4    possibility of the sample just having three unknown unrelated

5    persons?

6    A.  So likelihood ratio puts a wait until into which of two

7    scenarios is more likely.

8    Q.  So the two scenarios you are comparing is scenario of David

9    Delva and two unknown persons versus scenario of three -- let

10   me withdraw and rephrase that again.  So the two scenarios that

11   you are comparing is David Delva and two unknown unrelated

12   persons versus three unrelated persons.

13   A.  That's correct.

14   Q.  But this whole scenario is premised on the assumption that

15   Mr. Accilien is not in the mix; is that correct?

16   A.  That's correct.

17   Q.  And when I say "Mr. Accilien" I mean a related person?

18   A.  That's correct.

19   Q.  And so if a related person is in the mix then the number's

20   going to be different; is that right?

21   A.  If the possibility that a related person's in the mix then,

22   yes, the number would be different.

23          MR. PITTELL:  Judge, I am now just going to check to

24   see if I have another question.

25          THE COURT:  All right.

1          MR. PITTELL:  That's it.  Thank you very much,

2     Ms. Cooke.

3          THE COURT:  Thank you.

4          Mr. Poscablo.

5          MR. POSCABLO:  Yes, judge.

6     REDIRECT EXAMINATION

7     BY MR. POSCABLO:

8     Q.  Hi, Ms. Cooke.

9     A.  Hi.

10    Q.  Ms. Cooke, do you remember on cross-examination you were

11    asked several questions about the four different swabs that

12    were taken of the glove; do you remember that?

13    A.  Yes.

14    Q.  And testified that you actually didn't take those swabs,

15    correct?

16    A.  That's correct.

17    Q.  You testified that one of your colleagues did, correct?

18    A.  That's correct.

19    Q.  If you had swabbed that glove how would you have done it?

20    A.  I would have swabbed each side of the glove probably using

21    one side per side, back and front and then turned it inside out

22    and then swabbed with one swab back and forth with one swab

23    each and then combined it the same way.  This is how we're

24    taught to examine the evidence for a touched item.

25    Q.  Just exactly the same way your colleague did?

1          MR. PITTELL:  Objection.

2          THE COURT:  Sustained.  Rephrase.

3   Q.  So you would have taken the same number of swabs that

4   actually would have taken?

5   A.  Yes.

6   Q.  In the manner that they were taken?

7          MR. PITTELL:  Objection.

8          THE COURT:  I think you need to word it differently.

9   Sustained.

10         MR. POSCABLO:  I'll just move on, your Honor.

11  Q.  Want to go over this chart real quick because the term, the

12  artifact and stutter and dropout got a little mixed up.

13         What is an artifact?

14  A.  An artifact is an allele that might have been called in the

15  mixture that isn't a true allele coming from an individual who

16  contributed DNA in the case.

17  Q.  In the world of DNA what a stutter?

18  A.  A type of artifact.  So a stutter can happen when DNA is

19  being copied.  That enzyme copies the DNA sometimes slips off

20  the DNA and DNA instead of being a 12 would sometimes come up

21  as an 11.  So this is seen in DNA and it's literature and so

22  it's a single source DNA profile and sometimes maybe at one

23  location we see it's an 11, 12, 15 but it's actually a 12.  We

24  could take an edit the 11 out.  In cases of mixture we don't

25  make any edits because we can't tell if the DNA is actually an

1    artifact or true allele.

2    Q.  What is a dropout?

3    A.  Dropout happens when we start out with a low amount of DNA

4    in a sample and sometimes the larger fragments or locations

5    have larger fragments of DNA sometimes are too small to be

6    detected by our software so it's not called by software.

7              MR. POSCABLO:  With the Court's permission may I ask

8    Ms. Cooke to just step down quickly?

9              THE COURT:  Yes.

10   Q.  Ms. Cooke, on Government Exhibit 1003-A and then 1003-R you

11   used a black marker to circle certain loci to either a stutter,

12   a dropout or --

13   A.  I only circled the ones that there's a possible dropout.

14   Q.  OK.  So in these situations where there is a dropout you

15   mean there's an allele that possibly dropped out?

16   A.  That's correct.  So when DFS the 17 probably dropped out

17   from the second amplification but we do see it in the first.

18   Q.  What about the second one?

19   A.  In this one the 22 possibly dropped out in the first

20   amplification but we see it in the second.

21   Q.  And what about in the one that's TPOX?

22   A.  In this one the 10 possibly dropped out in the second

23   amplification but we do see it in the first.

24   Q.  14 dropped out in S51, correct?

25   A.  Yes.

1    Q.   24 dropped out in FGA?

2    A.   So that 1824 possibly dropped out in the first

3    amplification and 24 in the second.  But again, in cases of

4    dropout it's, we could still sometimes see a peak in that

5    location but it's just not high enough to be called by

6    software.  But when you visually look at it you could tell that

7    it's possibly the 24 or in this case possibly the 14.

8    Q.   You could go back to the stand.  But could you explain what

9    you mean by peak what you are talking about?

10   A.   OK.  So in our raw data comes out and it looks like a graph

11   so it has an X and Y axes.  And at each location the alleles

12   that you see looks like peaks, like mountains or upside-down

13   Vs.  So the higher the peak the more DNA for that allele that's

14   seen in the sample.  So that's how if it's a mixture sometimes

15   we are able to determine who contributed the most DNA to a

16   mixture because their peaks would be higher.  In this case

17   we're able to determine who contributed the most DNA to the

18   mixture.  But in the cases of dropouts sometimes the peaks

19   could be very small and they are not called by our software but

20   you do still see them visible.

21   Q.   You used a term "positive association".  What does that

22   mean?

23   A.   Positive association would be possibly a contributor to the

24   case.  So therefore we see every single one of his alleles in

25   the mixture of DNA.  So that would be possibly a contributor.

1    We could also positively associate someone that cannot be

2    excluded.  And this is the case of Mr. Delva where we see most

3    of his DNA alleles in the mixture except for a few alleles

4    which can be reasonably explained and by "reasonably explained"

5    I mean allelic dropout.

6    Q.  So let's just be clear about something.  You are saying

7    that he cannot be excluded from the DNA sample taken from the

8    glove?

9    A.  That's correct.

10   Q.  If you were to learn that his uncle also touched that glove

11   could you exclude him, Mr. Delva?

12   A.  Can I exclude Mr. Delva?  I would still make the same

13   exclusion that he cannot be excluded from the glove and still

14   do the FST on it.

15   Q.  In fact, the only time you couldn't do with a new piece of

16   information is if I told you the Mr. Delva had a twin?

17   A.  If he had an identical twin then I could say that it could

18   be possibly that identical twin or Mr. Delva.

19   Q.  But absent that even a family member that touched that

20   glove there would still be a positive identification for

21   Mr. Delva on this glove?

22   A.  That's correct.

23   Q.  Just explain to the jury a little more because I think it

24   got a little complicated.  The FST and the ratio all that stuff

25   you testified about that just talks about the number at the end

1   of the day, right, the number that you can say 1.42 million,

2   five million, 18 trillion a gazillion, that calculates the

3   number, right, of the association?

4   A.  It calculates a weight to which scenario is more likely.

5       MR. POSCABLO:  Ms. Chen, can you put up Government

6   Exhibit, I believe, it's 1002.

7       (Pause)

8   Q.  So this Dominique Jean-Philippe's report, right?

9   A.  Yes.

10  Q.  In your expertise with two brothers who had the same mom

11  and dad, share similar alleles?

12  A.  Yes, they would.

13  Q.  OK.  Now, take the brother and the brother and these number

14  of alleles that they may potentially share and now you take a

15  nephew and an uncle, who would share more alleles?

16  A.  A blood brother, a full blood brother compared to an uncle

17  would share more alleles.

18  Q.  So, if I were to tell you that Mr. Accilien and Dominique

19  Jean-Philippe were brothers, blood brothers, same mom, same dad

20  and then I told that you Mr. Accilien and Mr. Delva had a

21  nephew and uncle relationship, who would share more alleles,

22  Mr. Accilien and Mr. Delva or Mr. Accilien and his brother

23  Dominique Jean?

24  A.  Most likely Mr. Accilien and Dominique Jean Philippe.

25  Q.  How many times did you find Dominique Jean-Philippe's DNA

1    in any of the evidence that you reviewed?

2    A.   Dominique Jean-Philippe was excluded from all items of

3    evidence in this case.

4    Q.   OK.   One more thing I am going to ask you cause you were

5    asked about it several times and I'm going to ask you to turn

6    to your note if you don't already know the answer.   In two

7    sections here --

8              MR. POSCABLO:   And Ms. Chen, can you put up 1003-A.

9              (Pause)

10   Q.   Two areas here of this chart, and specifically, I am

11   speaking about the first locus D8S1179 and the swabs of the

12   glove duplicate, there are seven numbers?

13   A.   That's correct.

14   Q.   And in D19S433 there are five alleles, OK.   In both the --

15   if you compare -- if you both do the glove and the glove

16   duplicate --

17   A.   There are five, yes.

18   Q.   But if you just do the duplicate it's four?

19   A.   OK.   So if you are just looking at the duplicate it's four.

20             (Continued on next page)

21

22

23

24

25

E9a1del6                          Cooke - redirect

1    BY MR. POSCABLO:

2    Q.   Right.   Can you tell from looking at your raw data whether

3    there are any other potential alleles that you decided

4    shouldn't be included in this chart?

5    A.   So looking at the raw data, again, there could be possible

6    allele dropout, where you would see a peak but it wasn't called

7    by our software, but we take everything into consideration, so

8    if there were many locations where I see between both the

9    called alleles and the peaks that were not called, we might

10   take those into consideration also, but the only -- the only

11   location that showed any more than six peaks at a location was

12   that duplicate of the D8S1179.

13   Q.   The first one, locus?

14   A.   Yes.

15   Q.   And just to be clear again, if you were to find that there

16   were two or more loci where there was greater than six alleles,

17   as per the protocols and standards of the New York City OCME,

18   you would deem it inconclusive, is that correct?

19   A.   That's correct.

20   Q.   Separate and apart from whether you could find that

21   Mr. Delva is positively associated with the glove, you would

22   technically deem it inconclusive.

23   A.   We would deem it inconclusive before we compared it to any

24   suspect or reference sample in the case.

25   Q.   But that's not what happened here, right?

1    A.  I did not deem it inconclusive.

2              THE COURT:  Let me ask, though, if you deem it

3    inconclusive, you stop doing your analysis.

4              THE WITNESS:  For that sample, yes.

5              THE COURT:  Okay.  So let's say you've already

6    completed your analysis and you've got what you've got.  All

7    right?

8              THE WITNESS:  Okay.

9              THE COURT:  And then you go back and you say, ah, I

10   could have called this other allele and now I've got the two

11   that are 7, or whatever.  Assume for the moment that you've got

12   two loci, locations that have got 7, all right?

13             THE WITNESS:  Yes.

14             THE COURT:  Does that change your determination as to

15   Mr. Delva?

16             THE WITNESS:  Okay.  So we probably wouldn't somehow

17   get a 7 one later that we --

18             THE COURT:  Assume you do.

19             THE WITNESS:  So assume maybe I made a mistake and

20   maybe miscounted and there's two locations with 7.

21             THE COURT:  Or there's an FST thing with the peaks and

22   valleys and suddenly you're going to call an extra one, say,

23   oops, my eyesight was off that day, I now call an extra one.

24             THE WITNESS:  So then I would -- if I later determined

25   that maybe I would deem the sample inconclusive because I think

1    there might be four or more people in there, then I could go

2    back, amend my report, and state that the sample is

3    inconclusive and I would not do that FST on David Delva, I

4    wouldn't do any comparisons to that sample.

5              THE COURT:  But assume for the moment you've already

6    done your FST and assume for the moment you've already got -- I

7    mean, my point is, does it change the fact that David Delva's

8    DNA was found on the glove?

9              THE WITNESS:  No.  We still made that positive

10   association.

11             THE COURT:  So you've made the positive association no

12   matter what.

13             THE WITNESS:  No matter what.  But if I felt that the

14   sample was in fact four or more people or let's say my

15   supervisor reviewing it did, then we would just deem it

16   inconclusive and we would do -- take out any associations with

17   it.

18             THE COURT:  All right.

19             THE WITNESS:  If later, like -- later, let's say, my

20   supervisor was reviewing the case and said, looking at that, I

21   would think that this is not a three-person mixture, at least a

22   three-person mixture, I think it's four or more people, I would

23   not do this FST on it.  Then I would -- we would go back and

24   amend the report.  If I agreed with her.  We would have a

25   discussion about it.  If, let's say, I ended up agreeing with

1   her, we would probably go back, amend the report, stating that

2   that sample is indeed inconclusive and we would take out the

3   FST and not do it.

4            THE COURT:  All right.  Mr. Poscablo.

5   BY MR. POSCABLO:

6   Q.  And all that would do is you would take out the FST, you

7   wouldn't even calculate a ratio, right?

8   A.  We wouldn't -- we wouldn't do any comparison --

9   Q.  That's right.

10  A.  -- if we found it inconclusive at a later date.

11  Q.  But the proverbial cat's out of the bag because you already

12  did, so would that change your expert opinion that Mr. Delva's

13  positively associated with this glove?

14  A.  No, it wouldn't, and I still stand by that.  I believe that

15  it's at least three people and not four or more.

16  Q.  Okay.  Now I just want to end on one topic, because you

17  were asked several cross-examination questions about it, okay,

18  and that's secondary transfer of DNA, okay?

19  A.  Okay.

20  Q.  So let me give you a hypothetical.  Let's say Mr. Pittell

21  is a heavy shedder and I shook his hand and I touched my bottle

22  of water and I handed you the bottle of water so the lab could

23  do a DNA test.  Is it possible that Mr. Pittell's DNA would be

24  on that bottle of water when you tested the outside of the

25  bottle?

1    A.  Yes, it's possible.

2    Q.  Is it likely?

3              MR. PITTELL:  Objection.

4              THE COURT:  Overruled.

5    A.  I mean, I wouldn't be able to tell till I tested it, but it

6    depends on many factors.  If he was a heavy shedder and you

7    shook his hand for let's say a good minute, two minutes --

8    Q.  Let's say I rubbed his face.  I just kept rubbing the man,

9    because he's a handsome man.  And he's a heavy shedder.  And I

10   touched my bottle, I wiggled it around, and I handed it to you.

11   A.   Immediately touched the bottle and gave it a good hold?

12   Q.  Gave it a great hold.

13   A.   Then there's a possibility, yeah, that your DNA -- his DNA

14   would be on it.

15   Q.   Certainly a possibility.  My question was, is it likely?

16   A.   That I wouldn't know.  I mean, I would say it was a greater

17   likelihood than if, you know, you touched many other things and

18   then touched the bottle.

19   Q.   So let's go there.  Let's say I did the same thing, I just

20   played with his cheeks because he's so handsome, and then I

21   opened that door with the same hand, I pressed the elevator, I

22   went downstairs, I went and bought Cracker Jacks from the

23   downstairs lobby area, came back upstairs, I saw another lawyer

24   that I knew, I shook his hand, came back upstairs, touched the

25   bottle, gave it to you.  Is it possible that his DNA would be

1    on that bottle?

2              THE COURT:  Would still be on the bottle.

3    Q.  Would still be on the bottle.

4    A.  Would still -- that's when you touched the bottle, after

5    you came back upstairs?

6    Q.  Is it possible?

7    A.  It's possible.

8    Q.  Of course it's possible.  Is it likely?

9    A.  In that case it's more unlikely than the first scenario.

10   Q.  Okay.  Now let me give you one final scenario.  Let's say

11   we shared a room, and he's a heavy shedder.  He's shedding all

12   over the room.  And then I walk out and I go to Rite Aid and I

13   buy some gloves, and then I take those gloves and I walk for

14   another four or five minutes and I go into an apartment

15   building, I ring a bell, I go into an apartment building.  I

16   then drop off the gloves.  I sit around, I eat, I watch some

17   TV, using a remote control.  I shake the hands of a couple of

18   buddies who are in that apartment.  Maybe I have some sticky

19   chicken wings, hot wings, with sticky sauce on them.  And then

20   I touch that glove.  It's possible, right, that Mr. Pittell's

21   DNA would be on that glove?

22   A.  Is guess it's possible.

23   Q.  Is it likely?

24   A.  I would say no.

25             MR. POSCABLO:  Okay.  No further questions, your

E9a1del6

1    Honor.

2              THE COURT:  All right.  Thank you.

3              Mr. Pittell, are we all set?

4              MR. PITTELL:  Yes, we are, Judge.

5              THE COURT:  All right.  Thank you.  You may step down,

6    Ms. Cooke.

7              THE WITNESS:  Thank you.

8              (Witness excused)

9              THE COURT:  All right.  You know, we're close to

10   having our break.  Let's go ahead and have our break.  Do you

11   think our coffee is going to be there?

12             THE DEPUTY CLERK:  I think it is.

13             THE COURT:  All right.  Ladies and gentlemen, we'll

14   take our midafternoon break, and I'll see you in a few minutes.

15   Thank you.

16             THE DEPUTY CLERK:  All rise as the jury leaves.

17             (Jury excused)

18             (Recess)

19             (In open court; jury present)

20             THE COURT:  Mr. Poscablo.

21             MR. POSCABLO:  Your Honor, the government calls

22   Special Agent Eric Perry.

23             (Witness sworn)

24             MR. POSCABLO:  Your Honor, with the court's

25   permission, prior to examining Special Agent Perry, the parties

1    have a stipulation, two stipulations they'd like to read, one

2    in full and one in part.

3              THE COURT:  Yes.  You may proceed.

4              MR. POSCABLO:  Thank you, Judge.

5              It is hereby stipulated between the parties, with the

6    same header as before, that, if called to testify, a custodian

7    of records of Sprint would testify as follows:

8              He or she is familiar with the recordkeeping practices

9    of Sprint.

10             Government Exhibit 705 includes true and correct

11   telephone records, including toll records and cellular site

12   tower location information for the cellular telephone assigned

13   telephone number 347-734-2142.

14             Government Exhibit 705 includes dates and times

15   corresponding to each toll reflected in those records.  Those

16   dates and times are recorded in Eastern Standard Time.

17             Paragraph C reads:  Government Exhibit 701 includes

18   true and correct telephone records, including toll records, for

19   the cellular telephone assigned telephone number 917-574-2074.

20             Government Exhibit 701 includes dates and times

21   corresponding to each toll reflected in those records, and

22   those dates and times are recorded in Eastern Standard Time.

23             Paragraph 2.  If called to testify, a custodian of

24   records of AT&T and Cingular Wireless would testify as follows:

25             He or she is familiar with the recordkeeping practices

1   of AT&T and Cingular Wireless.

2            Government Exhibit 702 includes true and correct

3   telephone records, including toll records, for the cellular

4   telephone assigned telephone number 201-916-0824.

5            Government Exhibit 702 includes dates and times

6   corresponding to each toll reflected in those records.  Those

7   dates and times are recorded in Eastern Standard Time.

8            Paragraph 3.  If called to testify, a custodian of

9   records of T-Mobile would testify as follows:

10           He or she is familiar with the recordkeeping practices

11  of T-Mobile.

12           Government Exhibit 704 includes true and correct

13  telephone records for the toll records, cellular site tower

14  location information for the cellular telephone assigned

15  telephone number 917-714-3787.

16           Government Exhibit 704 includes dates and times

17  corresponding to each toll reflected in those records.  Those

18  dates and times are recorded in Eastern Standard Time.

19           The records contained in Government Exhibit 704

20  pertain to the cellular telephone marked as Government

21  Exhibit 600.

22           And finally, if called to testify, a custodian of

23  records of Cablevision would testify as follows:

24           He or she is familiar with the recordkeeping practices

25  of Cablevision.

1           Government Exhibit 707 includes true and correct

2    telephone records, including toll records, for the land line

3    telephone assigned telephone number 347-346-8013.

4           Government Exhibit 707 includes dates and times

5    corresponding to each toll reflected in those records, and

6    those dates and times are recorded in Eastern Standard Time.

7           Government Exhibit 707 is true and correct subscriber

8    information for the land line telephone assigned telephone

9    number 347-346-8013.

10          It is further stipulated and agreed that this

11   stipulation and Government Exhibits 701, 702, 704, 705, 707,

12   and 707-B may be received in evidence as government exhibits at

13   trial.  Signed by all the parties.

14          Your Honor, the government offers the stipulation,

15   which is marked Government Exhibit 3004, as well as all of the

16   foregoing exhibits.

17          THE COURT:  All right.  Mr. Pittell, that is the

18   stipulation?

19          MR. PITTELL:  Yes.

20          THE COURT:  All right.  Then those are all received.

21          (Government's Exhibits 701, 702, 704, 705, 707, and

22   707-B, and 3004 received in evidence)

23          MR. POSCABLO:  And the next stipulation, I'm only

24   going to read a portion of this one.

25          It is hereby stipulated and agreed by all of the

E9a1de16                          Perry - direct

1    parties that:

2            Paragraph 6.  In or about August 2012 through October

3    2012, and specifically during the period September 2 through

4    September 5, 2012, the telephone number 347-734-2142 was

5    assigned to a cellular phone used by Trevor Cole.

6            Your Honor, we can offer the exhibit, the stipulation

7    now, and then we'll reoffer it again when we read the entire

8    stipulation to the parties, but we can offer it now.

9            THE COURT:  What's the number of that stipulation?

10           MR. POSCABLO:  3005.

11           THE COURT:  All right.  Mr. Pittell?

12           MR. PITTELL:  Yes, no objection.  We're agreed upon

13   it.

14           THE COURT:  Okay.  3005 is received.

15           (Government's Exhibit 3005 received in evidence)

16           MR. POSCABLO:  Thank you, your Honor.  Your Honor, may

17   I proceed?

18           THE COURT:  You may.

19    ERIC PERRY,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. POSCABLO:

24   Q.  Good afternoon, Special Agent Perry.  How are you?

25   A.  Good.  Thanks.

1    Q.  What do you do for a living, sir?

2    A.  I'm a special agent with the Federal Bureau of

3    Investigations.

4    Q.  What type of work do you do for the FBI?

5    A.  I'm a full-time member assigned to the FBI's Cellular

6    Analysis Survey Team.  We use the acronym of CAST, C-A-S-T.

7    Q.  And where are you located?  Where is your field office?

8    A.  My position is based out of our FBI headquarters office in

9    Washington, DC, but I am detailed to the New York field office

10   across the street.

11   Q.  Do you cover a particular location or area in the United

12   States?

13   A.  My work predominantly deals with the northeast region.

14   However, I do have cases on the West Coast, pretty much in the

15   LA area, in Colorado, several other states in the midwest.

16   Q.  How long have you worked for the FBI?

17   A.  A little over five years.

18   Q.  Can you briefly tell the jury about your educational

19   background.

20   A.  I have a bachelor's degree in recreation law enforcement

21   from the University of Maine up in Presque Isle.

22   Q.  Can you explain what historical cell site analysis is.

23   A.  Yes, I can.  Any time that a phone connects to the network,

24   whether it be for a voice call or text message or to connect to

25   the internet or data connection, those records are collected

E9a1del6                          Perry - direct

1    and maintained by the cellphone provider, such as AT&T,

2    T-Mobile, Verizon, and Sprint.

3    Q.  What kind of training have you had regarding historical

4    cell site analysis?

5    A.  To date I have over 400 hours of specialized training.

6    Q.  Is that through the FBI?

7    A.  It's actually -- majority of the training is actually

8    provided to us by a contractor by the name of Emerging

9    Technology Solutions, which is out of Morrisville, North

10   Carolina, and it's in conjunction with several hours of

11   training from the providers themselves, from their members of

12   their law enforcement subpoena compliance group as well as

13   their RF engineers.

14   Q.  Now in addition to you actually attending and participating

15   in 400 hours of training, do you yourself conduct training?

16   A.  Yes, I do.

17   Q.  Can you tell the jury a little bit about that.

18   A.  Actually just last week I was in the Boston, Massachusetts

19   area conducting two two-day classes into introduction --

20   introduction to basic cellular analysis to the Boston Police

21   Department, the Maine State Police, Massachusetts State Police,

22   as well as some other prosecutors from the attorney general's

23   office in Maine.  We also -- in the last couple months I've

24   taught classes in New Mexico as well as Salt Lake City.

25   Q.  Special Agent Perry, throughout your career with the FBI,

E9a1del6                          Perry - direct

1    if you can approximate for me the number of call detail records

2    that you have analyzed.

3    A.  That would be close to a thousand, sir.

4    Q.  Okay.  And approximately how many cell site reports have

5    you prepared as a member of CAST?

6    A.  It would be close to 500.

7    Q.  And how many times have you testified as an expert in the

8    area of historical cell site analysis?

9    A.  I've testified -- this will be my 17th time.  I would say

10   I was deemed qualified an expert in seven of those.

11   Q.  What you mean by that is not that you were not deemed an

12   expert in the others.

13   A.  My testimony was, you know, rose to the level of an expert

14   and therefore I was qualified as that, as an expert.

15            MR. POSCABLO:  Your Honor, at this point the

16   government offers Special Agent Perry as an expert in

17   historical cell site analysis.

18            THE COURT:  Mr. Pittell?

19            MR. PITTELL:  I have no objection, Judge.

20            THE COURT:  The court does find that Special Agent

21   Perry is an expert in historical cell site analysis and will be

22   allowed to testify in that capacity.

23            Ladies and gentlemen, you recall my instruction on

24   expert testimony.  They can give opinions as well as fact

25   testimony.

1              You may proceed.

2              MR. POSCABLO:  Thank you, Judge.

3    BY MR. POSCABLO:

4    Q.  Special Agent Perry, can you explain to the jury generally

5    how a cellphone works.

6    A.  A cellphone, in essence, is a two-way radio.  It

7    communicates with cell towers through radio frequencies.

8    Q.  And what is a cell tower?

9    A.  A cell tower can come in different sizes and shapes.  In

10   essence, it's a structure.  A typical cell tower would be a

11   metal pole, such as like a flagpole or a metal tower that you

12   may see if you're driving along the New Jersey Turnpike.

13   Affixed to the cell tower is -- are the antennas, and that's

14   actually what -- the antennas are where your phones will

15   transmit and receive signals to and from.

16   Q.  If you're standing by a particular tower and you make a

17   call, what happens to your call?

18   A.  Actually, your phone is constantly stacking and racking is

19   the term that we use.  It is constantly looking for the

20   strongest and clearest signal to provide you, as the customer,

21   the best quality of service.

22   Q.  In the middle of a call?

23   A.  Actually, that's a constant process.  It's constantly -- if

24   it appears that your call quality is -- this is really

25   indicative if you're moving.  As you move away from one tower

E9a1de16                        Perry - direct

1    towards another, the signal will be weaker and then it will go

2    stronger towards the tower that you're driving towards.

3    Q.   What happens?  Does it kick you to the next tower?

4    A.   What we call it is a handoff.  They'll hand you off to the

5    next strongest, clearest signal, tower.

6    Q.   And using that information, can you determine the location

7    of a cellphone at a certain point in time by cell tower sites?

8    A.   We can determine the general vicinity, yes.

9    Q.   Okay.  And can you explain to the jury very quickly how a

10   tower hands over a call to another tower.

11   A.   Again, once a phone is connected to a cell tower, to the

12   network, there's a constant evaluation between the phone and

13   the towers.  It's constantly evaluating your receive signal

14   strength or the clarity of your call, and when it deems to

15   be -- as you move closer to another tower, there's a tower that

16   becomes more attractive or a stronger, clearer signal, it will

17   then switch your phone; the call will then just hand off to the

18   next closest tower.

19              MR. POSCABLO:  Your Honor, may I approach?

20              THE COURT:  Yes.

21   Q.   Special Agent Perry, I'm handing you what's been marked for

22   identification as Government Exhibits 704 and 705.  Do you

23   recognize these?

24   A.   Yes, I do.

25   Q.   So let's talk about 704.  How do you recognize 704?

1    A.  This is actually a CD-ROM or a DVD with my initials on it.

2    These are the call detail records for the phone number ending

3    in 3787.

4    Q.  If you open the records contained in that disc, you said

5    that there are phone records, right?

6    A.  Yes.

7    Q.  If we printed them out, how many pages would we have?

8    A.  It would be quite voluminous.  It would be quite a stack of

9    paper.

10   Q.  And what is the telephone number associated with the call

11   detail records contained on Government Exhibit 704?

12   A.  The complete phone number is area code 917-714-3787.

13   Q.  Do you associate that with a particular person?

14   A.  Yes, I do.

15   Q.  Who is that?

16   A.  It's Dominique Jean-Philippe.

17            MR. POSCABLO:  Your Honor, the government offers

18   Government Exhibit 704.

19            THE DEPUTY CLERK:  It's in.

20            MR. POSCABLO:  Oh, sorry, Judge.

21            THE COURT:  That's all right.

22   Q.  Government Exhibit 705, do you recognize that?

23   A.  Yes, I do.  It has my initials as well.

24   Q.  Okay.  What's the telephone number associated with 705?

25   A.  That's going to be 3 -- I'm sorry -- area code

1   347-734-2142.

2   Q.  And do you associate that with a particular individual?

3   A.  Yes, I do.

4   Q.  And who is that?

5   A.  Trevor Cole.

6   Q.  Okay.  Did you analyze these records prior to your

7   testimony today?

8   A.  Yes, I did.

9   Q.  And what, if anything, did you do?

10  A.  I actually compared the phone numbers actually to a

11  particular -- two different addresses which I was provided to

12  determine the amount of call activity that occurred in

13  perspective -- in relation to these two addresses.

14  Q.  And after conducting that analysis, did you prepare

15  anything?

16  A.  Yes, I did.

17  Q.  Okay.  I've placed before you what's been marked for

18  identification as Government Exhibit 706.  Take a quick look at

19  that.  And look up at me when you're done.

20  A.  (Witness complies.)  Okay.  I'm familiar with these.

21  Q.  What is it?

22  A.  These are the exhibits that I created to reflect the

23  results of my analysis for these two phone numbers.

24          MR. POSCABLO:  Okay.  Your Honor, the government

25  offers Government Exhibit 706.

1          THE COURT:  I think that's also in.

2          THE DEPUTY CLERK:  No.

3          THE COURT:  No, 706 is not in.

4          MR. POSCABLO:  I don't think so, your Honor.

5          THE COURT:  Mr. Pittell, do you have an objection?

6          MR. PITTELL:  I have no objection, Judge.

7          THE COURT:  All right.  706 is received.

8          (Government's Exhibit 706 received in evidence)

9   BY MR. POSCABLO:

10  Q.  Okay.  Special Agent Perry, I'd like to go over a couple of

11  the slides from your report, okay?

12          MR. POSCABLO:  And with the court's permission, and

13  Ms. Chen's help, can we put on slide number 4.

14          Actually, let's start with slide number 2.

15  Q.  What is that a photograph of?

16  A.  This is actually two photographs of the same cell tower.

17  Q.  And that's the cell tower you were testifying about

18  earlier.

19  A.  It is, and this is actually an image of a cell tower that I

20  pulled from the internet.

21          MR. POSCABLO:  Page 3, Ms. Chen?

22  Q.  What is that?  What are these photographs of?

23  A.  Not all cell towers look like the previous one.  Cell

24  towers, especially here in Manhattan, will often be affixed to

25  structures, such as buildings and water towers, as well as

E9a1de16                        Perry - direct

1    bridges.  This is just a collage of photographs in which --

2    particular locations that cellphone towers could be concealed.

3    Q.  The rock on the bottom left-hand portion, there's a cell

4    tower in there?

5    A.  That's actually -- especially if they need to fill in a

6    dead area of a park, a lot of times they'll just put a small

7    antenna in.

8            MR. POSCABLO:  Slide 4, Ms. Chen, please.

9    Q.  What does this document show?

10   A.  This is actually an excerpt or a portion of the actual call

11   detail record for the phone number ending in 3787 that I

12   analyzed, and this is described -- this is explaining column

13   definition for the particular call detail record.

14   Q.  This is a snapshot of the record that you actually

15   reviewed?

16   A.  It's a portion, yes.

17           MR. POSCABLO:  Ms. Chen, could we just quickly go

18   through that.  And highlight just one portion of it and then we

19   can scroll to the right, if that's possible.  Perfect.  Thank

20   you.

21   Q.  The first column includes what?  Just lead me through the

22   columns.

23   A.  MISSDN is actually the customer target number in which

24   these records were pulled for.

25           The IMSI, which is the international mobile subscriber

1    identifier, that's just the SIM card.  That's the SIM card

2    that's placed inside of an actual -- your phone.  And that is

3    actually what these records are generated off from is the SIM

4    card.

5              The next column is IMEI.  That's called the

6    international mobile equipment identifier.  And that's actually

7    the serial number for the plastic part of your phone, the shell

8    of your phone.

9              The Event Type, most -- in this particular case, these

10   actually are -- it's going to either be voice, SMS, which is a

11   text message, or a data connection.

12             The Start Date and Time is the date and time that the

13   event occurred.

14   Q.  The Direction?

15   A.  Yeah, I'm sorry, yes.  The Direction, of course, that's

16   either outbound or inbound, depending on what number is calling

17   who.

18   Q.  Meaning outgoing is the person who has the phone is making

19   the call?

20   A.  Yeah.  In this case, if 3787 was making an outbound call,

21   it would say outgoing.

22             Then Connected To is which number that the phone

23   number 3787 is connected to.  The First LAC is -- LAC stands

24   for location area code.  If you think of this particular term

25   and this particular number as a zip code or an area code for

1    land line, such as 212, we know that to be the Manhattan area

2    code, or a zip code, it resides in one specific geographical

3    place on -- in the United States.  This, in terms of cellular

4    technology, a LAC is a group of cell towers that contain a

5    hundred different towers, and if you think of it almost like a

6    forest full of trees -- and this, again, is going to reside --

7    this particular, you know, LAC will reside in a specific

8    geographical area.

9           The next column is called First Cell ID.  This is a

10   combination of two different numbers.  With T-Mobile, the first

11   four numbers are going to represent the actual tower, so if I

12   take the top row here, there's a number of 2057.  That is

13   actually going to be your tower number.  The last number is

14   going to determine which sector or on what particular antenna

15   did that call occur on.  And T-Mobile is gracious enough to

16   provide the latitude and longitude of the cell tower that was

17   used at the beginning of the call and at the end of the call.

18   So as you see here, you have First LAC, First Cell ID, and you

19   have the First Tower Latitude and Longitude.  That's the GPS

20   coordinate in which that tower can be located and then you'll

21   see the additional columns saying LAC, Last LAC, Last Cell ID,

22   and then Last Tower Latitude and Last Tower Longitude.  That's

23   the particular cell tower that the call ended on.

24   Q.  Just a quick question about this.  You noted earlier that

25   the event type was voice.  Does that differentiate between a

1  voice mail or a conversation?

2  A.  You often want to look at this in conjunction with the

3  duration and a lot of cellphone providers will actually have

4  specific phone numbers that are their voice mail platforms.  I

5  believe T-Mobile starts with 805.  And/or you want to look at

6  your duration as well sometimes.

7  Q.  If there is a conversation, will a cell site record,

8  meaning a longitude and latitude, be captured?

9  A.  Yes, it will.

10  Q.  What about with text message?

11  A.  T-Mobile, they do not capture that under their norm -- you

12  know, the normal records.  They're in the process of updating

13  their system where they will capture that for future use.

14  Q.  What about voice mail?

15  A.  Voice mail, if it actually -- the last LAC times, there

16  will be no information of the towers.  It will say NA for not

17  applicable.

18  Q.  You said gracious earlier with regards to latitude and

19  longitude, because what do other cellphone companies do?

20  A.  I think there's close to 500,000 cellphone towers with all

21  the providers combined, and for a company such as Sprint and

22  Verizon, where they don't automatically incorporate the

23  latitude/longitude in the same record, you have to go to a

24  special key, a tower with -- and you have to go find the

25  individual tower that was used.  It can be a quite painstaking

E9a1de16                          Perry - direct

1    process.

2              MR. POSCABLO:  Let's go to slide 5.

3    Q.  And what does this show?

4    A.  This is actually a portion of the call detail records for

5    the Sprint phone number ending in 2142, which was Trevor Cole's

6    phone number, and again, this is a slide to provide the

7    definition of each call.

8    Q.  And it has very similar information as the T-Mobile slide

9    does, right?

10   A.  Yes, it does, minus that latitude and longitude.

11   Q.  Right.  Which column do you apply that code to?

12   A.  In this particular case I would need the cell tower key.

13   And with Sprint or Verizon they term the term Repoll that

14   describe that LAC, the group of cell towers, so this is Repoll

15   262, and then you have the First Cell and Last Cell.  Again,

16   that's the first tower and sector that the call started on and

17   the last tower and sector that the call ended on.  So taking

18   that first row, it was utilizing a group of towers in Repoll

19   262 -- I'm sorry.  Utilized, you know, towers located in Repoll

20   262 but specifically utilized -- and this is why Sprint

21   actually flip flopped it, and it's a little bit different than

22   T-Mobile and AT&T is where they put the sector number before

23   the tower number.  So in this case, the number, the complete

24   number is 30014, but that in essence means that's sector 3 on

25   tower 14.

1            MR. POSCABLO:  Let's go to slide 6, Ms. Chen.

2    Q.  What does this slide show?

3    A.  This is actually the surrounding cell towers for

4    T-Mobile -- or T-Mobile cell towers surrounding the address of

5    830 Magenta Street in the Bronx, New York.

6    Q.  And how were the cell towers depicted?

7    A.  With a biohazard sign.  It kind of shows up the three

8    sectors.

9    Q.  In the middle of that is an address, 830 Magenta Street, is

10   that right?

11   A.  Yes, sir.

12   Q.  And why is there other writing in sort of like a text box?

13   What do those represent?

14   A.  Those represent the LAC and the cell ID for those

15   particular towers.

16   Q.  And are those the towers that service that address?

17   A.  Yes.

18            MR. POSCABLO:  Okay.  Ms. Chen --

19            THE COURT:  So any one of the towers can service that

20   address?

21            THE WITNESS:  As you can see, the address of 830

22   Magenta Street, your Honor, is in the middle of all three

23   towers, so it's going to be specifically one sector on each of

24   the towers will provide service to that address that we'll see

25   here.

1              THE COURT:  Your call could go to any of them?

2              THE WITNESS:  That's -- yes, that's what we're going

3   to do here, your Honor.

4              THE COURT:  Oh, all right.

5              MR. POSCABLO:  I think actually the next slide would

6   really help.

7              THE WITNESS:  This will explain.

8              MR. POSCABLO:  Yes.

9   BY MR. POSCABLO:

10  Q.  So what does this slide show?

11  A.  I was fortunate enough to get out there in a reasonable

12  amount of time to conduct a drive test to determine the actual

13  cell towers that provide service to 830 Magenta Street in the

14  Bronx.

15  Q.  What does that show?  Tell us what you did.

16  A.   In essence what a drive test is, it's the same process that

17  a majority of the providers use to determine the actual

18  coverage area for their networks and their cell towers to

19  determine if they have dead spots or if they need to put in

20  additional towers.  However, we go into -- most often we have a

21  particular one tower, one sector that we need to focus on, so

22  we end up doing a lot more driving than the provider -- than

23  most of the providers do.  And the process is, the GPS is

24  capturing my location every second.  What you see here is you

25  see a series of dots and then different color codes.  Every

E9a1del6                         Perry - direct

1   time you see a dot, that is where I'm physically located based

2   on my GPS.  At the same time, in this instance, I'm utilizing a

3   T-Mobile phone and I'm utilizing my drive test software, which

4   is JDSU, and that allows me to capture the cell tower sector

5   that my phone is connected to.  So every second I have my

6   location and I capture what cell tower am I connected to.

7   That --

8   Q.   You're in the northeast corner, you're capturing through

9   one cell tower reflected in what color?

10  A.   Well, the northeast --

11  Q.   I'm sorry.

12  A.   I mean, northeast south would probably be the best on this.

13  If I'm doing north, the color code is actually green.  And that

14  would be tower -- sector 2 and tower 2109.  If I'm color coded

15  yellow, that's the coverage area for sector 3 on tower 2243.

16  The color red down on the south part of the map is sector 7 on

17  2059.  And the blue color will -- is the coverage area for

18  sector 2 on tower 2050.  And as you can see, they all tend to

19  overlap almost right in the vicinity of 830 Magenta Street.

20  Q.   Special Agent Perry, that portion of this chart, the

21  different colors on the map, that represents results from your

22  drive test, correct?

23  A.   That's my drive test, yes.

24  Q.   And is there anything on this that represents some analysis

25  that you did with regards to the calls?

E9a1del6                         Perry - direct

1    A.   Yes.   I conducted a call frequency to determine -- I had a

2    date range that I was advised to focus on from September 2nd

3    to September 4th, so I focused on the amount of call

4    frequencies in which the Philippe -- from Philippe's phone

5    utilizing these towers which have been color coded here for the

6    dates of September 2nd through the 4th, and then I compared

7    that to the amount of times that the Philippe phone used the

8    same towers outside of that, absent that time period.

9    Q.   You mean the Dominique Jean-Philippe phone?

10   A.   Yes.

11   Q.   And what was your finding?

12   A.   For the dates of September 2nd through September 4th, I

13   identified 105 phone calls in which the Dominique Philippe

14   phone utilized the cell towers that are represented here in the

15   sectors that are color coded here, the four sectors.  Outside

16   of that time frame, when I removed that time frame from

17   starting on August 18, 2012 through September 1st of 2012 and

18   then picking it back up after that, after the 4th, so

19   September 5, 2012 through October 19, 2012, I located 96 calls.

20           MR. POSCABLO:   Okay.  Ms. Chen, page 8, please.

21   Q.   What does that show?

22   A.   This is a call frequency between the Philippe phone number

23   and a phone number with the area code of 305.

24   Q.   What's the rest of the number?

25   A.   305-709-8402.

1    Q.   And what does this chart show?

2    A.   This is -- what I did here is I -- T-Mobile allows that

3    Connected To column, and I was able to go ahead and filter the

4    call detail records for the Dominique Philippe phone and

5    determined how many times was there contact between the

6    Philippe phone and the 305 number, and again, I broke it out by

7    specific date ranges.

8    Q.   Okay.  So how many calls from September 2, 2012 until

9    September 4, 2012?

10   A.   There was 78.  And this does include some text messages.

11   This was just communication, absent geography.

12            MR. POSCABLO:  Ms. Chen, number 9, please.

13   Q.   What does this chart show?

14   A.   I then isolated all the calls between the Philippe phone

15   and the phone number with 305 for the times that the Philippe

16   phone was communicating with those towers that provide service

17   to 830 Magenta Street, and the results here are the dates and

18   times for that call activity.

19   Q.   So we may be clear what you're saying, this chart reflects

20   calls made from the Philippe phone while it's in that zone, the

21   830 Magenta Street area?

22   A.   Yes.

23   Q.   And also calling this 305-709-8402 number?

24   A.   That's correct.  Where the Philippe phone was located in

25   the vicinity of 830 Magenta Street and in contact with the 305

E9a1del6                          Perry - direct

1    number.

2              MR. POSCABLO:  Number 18, Ms. Chen.

3    Q.  What does this show?  This is a new area, right?

4    A.  It is.  This is the vicinity of the second address I was

5    provided as 801 Neill Avenue in the Bronx, New York.

6              MR. POSCABLO:  And Ms. Chen, 19.

7    Q.  And what does this show?

8    A.  Again, this is the results of my drive test for the

9    particular cell towers that would provide service to the 801

10   Neill Avenue.

11   Q.  And similar to the analysis you gave for 830 Magenta, is

12   there any analysis made with regards to the calls relevant to

13   801 Neill Avenue?

14   A.  Yes, there is.

15   Q.  What is that?

16   A.  The Dominique Philippe phone made a total of 17 calls using

17   the sectors highlighted here in red and green, and all of these

18   calls actually occurred on one day, September 4, 2012.

19             MR. POSCABLO:  Ms. Chen, slide 24.

20   Q.  And you just testified that while the Dominique Philippe

21   phone was in the 801 Neill Avenue range, all of that occurred

22   on September 4th, correct?

23   A.  Yes.

24   Q.  So what does this chart show?

25   A.  This actually is -- again, this is all of the phone calls

E9a1del6                          Perry - direct

1    with the communication between the Dominique Philippe phone and

2    the phone number with area code 305, when the Philippe phone

3    was communicating with towers in and around 801 Neill Avenue in

4    the Bronx.

5    Q.   And that's the same number you were analyzing in earlier

6    charts.

7    A.   That is correct.

8             MR. POSCABLO:   The next one, Ms. Chen.   25.

9    Q.   This is a different phone, correct?

10   A.   Yes, this is the phone for Trevor Cole, Sprint phone.

11   Q.   And this is just to show where the Sprint towers are or

12   where the towers are?

13   A.   This is to show where the cell towers that were utilized --

14   actually, this is Sprint cell towers in and around 830 Magenta

15   Avenue.

16            MR. POSCABLO:   Okay.   The next slide, Ms. Chen, which

17   is 26.

18   Q.   Similar to your other charts.

19   A.   This is the result of my Sprint drive test.

20   Q.   Okay.   And you did analysis on this one as well, right?

21   A.   Yes, I did.

22   Q.   And can you explain to the jury what your findings were.

23   A.   The results for this, utilizing the same time frame that I

24   did for the Dominique Philippe phone, focusing on

25   September 2nd through September 4, 2012, there was 105 phone

E9a1del6                          Perry - direct

1    calls using the sectors here I indicated in the red and the

2    yellow.  Excluding that time frame from August 18, 2012 to

3    September 1, 2012, and then again starting on September 5, 2012

4    through November 10, 2012, there was a total of 57 calls.

5    Q.  Special Agent Perry, with your work, have you become

6    familiar with the term "retention policy" as it applies to

7    phone records?

8            MR. POSCABLO:  You can take it down, Ms. Chen.

9    A.  Yes, I am.

10   Q.  Okay.  What does "retention policy" mean?

11   A.  Certain providers will maintain their call detail records

12   for varying lengths of times.

13   Q.  And are you familiar with -- let me back up.

14           In your experience are the retention policies

15   different per company?

16   A.  Yes, they are.

17   Q.  And for a particular company, are the retention policies

18   different for different types of records?

19   A.  I'm sorry.  Could you repeat your question?

20   Q.  Sure.  Do some companies retain phone records longer or

21   shorter than they do cell site records?

22   A.  Yes, they do.

23   Q.  Give me some examples of that.

24   A.  There are certain providers who will maintain just the toll

25   records.  They can come in -- toll records, in our line of

1    work, is all of the call activity of the date and time the call

2    occurred and when, and the numbers that are called, absent the

3    cell site information.  So when we refer to often the call

4    detail records with cell sites, that information can be held up

5    to six months, all the way up to six, seven years, with some

6    providers.

7    Q.  Are you familiar with the retention policy of Metro PCS?

8    A.  Yes, I am.

9    Q.  What's their retention policy with regards to toll records?

10   A.  They can only go back six months.

11   Q.  What about with regards to cell site records?

12   A.  Six months.

13           MR. POSCABLO:  One moment, your Honor?

14           THE COURT:  Yes.

15           MR. POSCABLO:  No further questions, your Honor.

16           THE COURT:  All right.  Thank you.

17           Mr. Pittell?

18           MR. PITTELL:  I have a couple questions.

19           THE COURT:  All right.

20   CROSS-EXAMINATION

21   BY MR. PITTELL:

22   Q.  Good afternoon, Agent Perry.

23   A.  Good afternoon, counsel.

24   Q.  On the presentation you showed up there, I saw that there

25   was a 305 number up there?

E9a1de16                          Perry - cross

1   A.  That is correct, sir.

2   Q.  Am I correct, though, with all the documents and records

3   you've reviewed, you have no way of determining who was

4   actually speaking on the 305 phone when those calls were being

5   made with the Philippe phone, is that correct?

6   A.  Yes, sir, that is correct.

7   Q.  And there's no recording of either conversations or

8   messages that may have been left on a voice mail, is that

9   correct?

10  A.  I would be unaware.  I'm not -- I have no knowledge of that

11  in existence.

12          MR. PITTELL:  Thank you.

13          THE COURT:  All right.  Thank you.  You may step down.

14          THE WITNESS:  Thank you, your Honor.

15          (Witness excused)

16          THE COURT:  Would the government like to call its next

17  witness, please.

18          MS. GERACI:  Your Honor, the government calls Jeanette

19  Adams.

20          THE COURT:  All right.  Ms. Adams to the stand,

21  please.

22          (Continued on next page)

23

24

25

1    JEANETTE ADAMS,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. GERACI:

6    Q.  Good afternoon, Ms. Adams?

7    A.  Good.  Afternoon.

8    Q.  Where were you born?

9    A.  Jamaica.

10   Q.  Are you a United States citizen?

11   A.  Resident.

12   Q.  Permanent resident?

13   A.  Yes.

14   Q.  Could you speak you just a little bit louder?

15   A.  Yes.

16   Q.  How old are you, Ms. Adam?

17   A.  50.

18   Q.  Are you currently working?

19   A.  Yes.

20   Q.  Where do you work and what do you do?

21   A.  I am a home health aid.  I work in Dobbs Ferry.

22   Q.  I'd like to direct your attention to the early September of

23   2012.  On September 2, 2012 where did you live?

24   A.  830 Magenta.

25   Q.  Is that in the Bronx?

E9AAADEL7                         Adams - Direct

1    A.  Bronx, yes.

2    Q.  What was your apartment number?

3    A.  Apartment 5E.

4    Q.  How long did live in that apartment?

5    A.  Almost three years.

6    Q.  Did there come a time when you stopped living at the

7    apartment at 830 Magenta Street?

8    A.  Yes.

9    Q.  And approximately when?

10   A.  September -- after the robbery I left.

11   Q.  Is that what caused you to move?

12   A.  Yes.

13   Q.  In early September 201 did you live in the Magenta Street

14   apartment alone or did you live with other people?

15   A.  I lived with Patrick, my boyfriend.

16   Q.  Patrick James?

17   A.  Yes.

18   Q.  Does he go by any other names?

19   A.  Eugene Brown.

20   Q.  And you said he was your boyfriend at the time?

21   A.  Yes.

22   Q.  How long were you and Mr. James dating before September of

23   2012?

24   A.  Four years.

25   Q.  And for how long did he live with you at the Magenta Street

1    apartment?

2    A.   Two years, almost three years.

3         MS. GERACI:   Could I ask Ms. Chen and with the Court's

4    permission publish Exhibit 14 first?   I'm sorry, your Honor.

5    It's Exhibit 15 which is already in evidence.

6         THE COURT:   Yes.

7    Q.   Do you recognize that photo?

8    A.   Yes.   That's me.

9    Q.   Who is that?

10   A.   Me.

11        MS. GERACI:   May I approach, your Honor?

12        THE COURT:   You may.

13   Q.   Ms. Adams, I have shown you what's marked as Government

14   Exhibit 14.   Do you recognize the individual in that

15   photograph.

16   A.   Yes.

17   Q.   Who is that?

18   A.   Patrick James.

19        MS. GERACI:   Your Honor, the government offers Exhibit

20   14.

21        THE COURT:   I already have that as in but in any

22   event, any objection?

23        MR. PITTELL:   I have no objection the second tame,

24   judge.

25        THE COURT:   Received.

E9AAADEL7                         Adams - Direct

```
 1              (Government's Exhibit 14 received in evidence)
 2              MS. GERACI:  Apologize.  Permission to publish, your
 3   Honor?
 4              THE COURT:  You may.
 5              (Pause)
 6   Q.  Ms. Adams, who had a key to your apartment at Magenta
 7   Street?
 8   A.  Patrick James.
 9   Q.  You had the key as well?
10   A.  Yes.
11   Q.  Is that the Patrick James that we just saw in the photo?
12   A.  Yes.
13   Q.  And in addition to your apartment on Magenta Street did
14   Patrick James have any other apartments?
15   A.  Yes.
16   Q.  Where?
17   A.  On Neil Avenue.
18   Q.  Do you know the address?
19   A.  It's 801 Neil.
20   Q.  Is that also in the Bronx?
21   A.  Yes, it is.
22   Q.  Have you ever been to Mr. James' Neil Avenue apartment?
23   A.  Used to live there before we moved to Magenta.
24   Q.  What did Patrick James do for a living?
25   A.  Sell marijuana.
```

1    Q.  Do you know what kind of marijuana he sold?

2    A.  Cush.

3    Q.  How do you know that?

4    A.  Cause I see it.

5    Q.  Do you know where he got the marijuana that he sold?

6    A.  California.

7    Q.  How do you know that?

8    A.  Cause he goes there to get it.

9              MR. PITTELL:  I am sorry.  I couldn't hear that.

10             THE COURT:  The court reporter may read the answer

11   back.

12             (Read back)

13             MS. GERACI:  May I proceed, your Honor?

14             THE COURT:  You may.

15   Q.  Ms. Adams, did you assist in any way in Patrick James'

16   marijuana business?

17   A.  No.

18   Q.  Do you know where Patrick James stored marijuana he was

19   selling back in September 2012?

20   A.  Neil Avenue.

21   Q.  How do you know that?

22   A.  Cause it's the stash house.  That's where he kept the drugs

23   and the money.

24   Q.  Do you know where he stored -- sorry.  Withdrawn.

25             Before you were robbed when was the last time you saw

1  Patrick James at your Magenta Street apartment?

2  A.   Couple days.  Like I saw him like, I forgot.  Either

3  Wednesday or Thursday I saw him.

4  Q.   And just to be clear, what date did the robbery occur?

5  What day of the week?

6  A.   On a Sunday.

7  Q.   You saw him the Wednesday or Thursday?

8  A.   Yes.

9  Q.   Do you know where he went after you saw him?

10 A.   He went to his son graduation, something pertaining to his

11 son.  I think it's in Georgia or one of those somewhere he

12 went.

13 Q.   Do you know whether he came back to the Magenta Street

14 apartment at some point before the robbery?

15 A.   Well, the robbers they told me he came there because they

16 said they saw him.

17            MR. PITTELL:  Objection.

18            THE COURT:  Hold on.  Sustained.  Why don't you reask

19 the question.

20 BY MS. GERACI:

21 Q.   Why did you believe that Patrick James came back to the

22 apartment at some point?

23 A.   Because one of the robbers they told me that they saw

24 Patrick came and took clothes from the apartment and left in

25 his car.

1   Q.  Let me turn your attention to the evening of September 2,

2   2012.  What were you doing that evening?

3   A.  Well, that evening I went to bingo, me and my sister and a

4   friend.

5   Q.  Is that something you did regularly?

6   A.  Yes.

7   Q.  Who were you at bingo with, specifically?

8   A.  My sister and a friend of mine named Grace.

9   Q.  Who is Grace?

10  A.  Grace is Lisa Hylton mom.

11          MS. GERACI:  Permission to publish Exhibit 16, your

12  Honor?

13          THE COURT:  Yes.

14  Q.  Ms. Adams, do you recognize the individual in the photo?

15  A.  Yes.

16  Q.  Who is that?

17  A.  Lisa Hylton.

18  Q.  Is it your testimony this is Grace's daughter?

19  A.  Yes.

20  Q.  What did you do after bingo that night?

21  A.  Well, after bingo we left and stopped at a cookout.  And we

22  were there for like 20, 25 minutes cause I have to go to work

23  the next morning.  So I was there at the cookout and I take,

24  dropped my sister and Grace home, then I proceed home.

25  Q.  And when you say you proceed home --

1    A.   To Magenta, yeah.

2    Q.   Approximately, what time did you arrive home that evening?

3    A.   I can't remember.  I think it was after ten or around ten.

4    I can't remember but it was like after ten.

5    Q.   Let's talk for a moment about your apartment on Magenta

6    Street, what was your apartment number?

7    A.   5E.

8    Q.   What floor of the building is that?

9    A.   Fifth floor.

10   Q.   Are there other apartments in your building?

11   A.   Yes.

12   Q.   How do you get into the building from the ground floor?

13   A.   Through the -- they have two doors.  You have to go through

14   one and you have to use the key to go through the other one to

15   get into the building.

16   Q.   Is there an elevator in your building?

17   A.   Yes.

18   Q.   How many bedrooms did your apartment have?

19   A.   One.

20   Q.   How many bathrooms?

21   A.   One.

22   Q.   Can you briefly describe the layout of the space when you

23   walk right into your apartment?

24   A.   When you walk in you see the kitchen, the living room, the

25   dining room and the hallway.  That's where the bedroom and the

1   bathroom is at.

2              MS. GERACI:  Your Honor, I intend to show the witness

3   several exhibits that are already in evidence, so permission to

4   publish.

5              THE COURT:  Yes.

6              MS. GERACI:  May I ask Ms. Chen to show the jury

7   Exhibit 100.

8              (Pause)

9   Q.  Do you recognize this?

10  A.  Yes.

11  Q.  What are we looking at?

12  A.  Apartment door at Magenta.

13             MS. GERACI:  101, please.

14             (Pause)

15  Q.  What are we looking at here?

16  A.  Inside my apartment at Magenta.

17             MS. GERACI:  103, Ms. Chen.

18             (Pause)

19  Q.  What are we looking at here?

20  A.  The living area.

21  Q.  Of your apartment?

22  A.  Yes.

23             MS. GERACI:  105, please.

24             (Pause)

25  Q.  Is this a photo from your apartment?

1     A.  Yes.

2     Q.  Can you tell me if you can see the photo frame in the

3     picture, who is in that picture?

4     A.  Yeah, Patrick.

5             MS. GERACI:  106, please.

6             (Pause)

7     Q.  What are we looking at here?

8     A.  That's the bathroom and the bedroom.

9             MS. GERACI:  109, please.

10            (Pause)

11    Q.  What area of the apartment is this?

12    A.  The bedroom.

13            MS. GERACI:  110, please.

14            (Pause)

15    Q.  What is this?

16    A.  Bedroom.

17            MS. GERACI:  111, please.

18            (Pause).

19    Q.  Still the bedroom?

20    A.  Yes.

21            MS. GERACI:  And lastly, 116.

22            (Pause)

23    Q.  What area is this?

24    A.  The bathroom.

25    Q.  Ms. Adams, on the evening of September 2, 2012 when you

1   came home to Magenta Street after bingo and the cookout, how
2   did you get to your apartment on the fifth floor?
3   A.   Take the elevator.
4   Q.   When you get out of the elevator on the fifth floor which
5   way do you go to your apartment?
6   A.   I have to turn left.
7   Q.   And on the evening of September 2, 2012, what did you do
8   when you got off the elevator on the fifth floor?
9   A.   I got off the elevator, walk to my apartment but the exit
10   door was opened.  So I stuck my head through the exit cause
11   it's a habit of me if it's open I am going to look.  So when I
12   looked I saw two gentlemen standing on the step.
13   Q.   Could you tell -- could you see their faces?
14   A.   Yes.
15   Q.   Did you recognize either of them?
16   A.   No.
17   Q.   Could you tell their race or ethnicity?
18   A.   Black.
19   Q.   And what, if anything, were the two men holding or
20   carrying?
21   A.   They had two guns.
22   Q.   One each?
23   A.   Yes.
24   Q.   What color were the guns?
25   A.   Silver.

1    Q.   Are you at all familiar with guns?

2    A.   No.

3    Q.   So you have no idea what kind of guns?

4    A.   No.

5    Q.   Did either of the men say anything to you?

6    A.   Yes.   They asked me for the key to the apartment.

7    Q.   Did the men who said something to you have any kind of

8    accent?

9    A.   Jamaican accent.

10   Q.   What, if anything, do you do in response?

11   A.   Well, I gave him the bag, my pocketbook cause I told him

12   the key was in there.

13   Q.   And what happened next?

14   A.   Well, he went to the door and he tried to open the door but

15   I have an alarm, so the alarm went off.   So he came back and

16   get me and bring me into the apartment to disarm the alarm,

17   which I did.

18   Q.   And what happened after you were inside the apartment and

19   you disarmed the alarm?

20   A.   They told me that they're here to get the drugs and money.

21   Q.   Whose and money did you think they were looking for?

22   A.   Patrick.

23   Q.   Did you respond to them?

24   A.   I told them there was no drugs and money here.

25   Q.   What happened next?

1  A.  I can't quite remember.  I remember they put me in the

2  bedroom at one point.

3  Q.  What were they doing while you were in the bedroom?

4  A.  They were, cause I have stuff packed in the boxes I was

5  about to move.  I was moving.  So I have stuff pack up and they

6  were searching the boxes.  And you know they were on the phone.

7  They were on phone talking to whosoever they were talking to on

8  the phone and they were searching up the apartment cause they

9  were looking for the drugs and money which I told them there

10  was none here.

11  Q.  At some point did you try to resist them?

12  A.  Yes.  At one point I tried to lock them out.  But what

13  happened as I was standing there and I have a box where the fan

14  was standing on, so the box fell between the door so I couldn't

15  lock them out.

16  Q.  What door where you talking?

17  A.  My bedroom door.

18  Q.  You are in the bedroom and you tried to close the door?

19  A.  Yes.

20  Q.  And a lock stopped you?

21  A.  Yeah.

22  Q.  Did they do anything in response to that?

23  A.  Yes.  They -- cause I have some tape from the U-haul that I

24  used to tape up the box, they used it to tape my, both my arms

25  together and put a sock in my mouth cause I was talking a lot

1    so they put a sock in my mouth and tape up my mouth.

2    Q.  They taped you with packing tape?

3    A.  Yes.

4    Q.  What happened next?

5    A.  So I tried to pull -- I keep pulling the tape off cause it

6    wasn't strong enough, so I keep pulling it off.  And one of the

7    guys said to the other guy I must go to Rite Aid and get a duct

8    tape.

9    Q.  Do you know who he said that to?

10   A.  No, I don't know but he said to somebody go to Rite Aid and

11   get the duct tape.

12   Q.  What was the next thing you remember?

13   A.  They were -- remember, I know they were in and out.  I

14   don't know how much of them but they were in and out and

15   eventually the guy came back with the tape.

16   Q.  Someone came back the with the tape?

17   A.  Yes.

18   Q.  What did he do with the tape?

19   A.  Well, they taped both my arms, my two feet and my mouth.

20   They didn't -- they taped my arms, my feet, my mouth and they

21   taped my eyes.

22   Q.  Did they say anything to you?

23   A.  No.  Well, you know they wanted me to call Patrick to come

24   to the apartment.

25   Q.  And whose phone did they want you to use?

E9AAADEL7                      Adams - Direct

1   A.  Well, they took my phone cause they had my phone.  They

2   took my cellphone, so they wanted me was to call him.

3   Q.  And do you recall your cellphone number at that time?

4   A.  Yes.

5   Q.  What was it?

6   A.  (917)574-2074.

7   Q.  Could that cellphone make long distance, out-of-state or

8   international calls?

9   A.  Canada.

10  Q.  And did you, in fact, use your phone to call Patrick?

11  A.  No.

12  Q.  What did you do?

13  A.  Well, they wanted me was to give them, to tell them the

14  number but Patrick had a number there that he had before but

15  that number was it disconnected.  So I told them that was the

16  number.

17  Q.  How did you tell them that is the number?

18  A.  Because was under a name Pat Eye, so I told them that his

19  number is in the phone under Pat Eye.

20  Q.  And that is a contact in your phone?

21  A.  Yes.

22  Q.  And when you say "Pat Eye", P-A-T E-Y-E?

23  A.  Yes.

24  Q.  Did they dial that number?

25  A.  But it was disconnected.

1    Q.  What's the next thing you remember?

2    A.  The next thing I remember they had put me on the floor to

3    lay down and they were there whispering.  And the guy said to

4    me, mommy, you need to get Patrick upstairs cause they need to

5    get money and they wanted to get the money from Patrick.  They

6    want $250,000 from Patrick and they wanted me was to -- they

7    had me on the floor there.  They raped me because they want me

8    was to get Patrick.

9    Q.  Do you know how many people raped you?

10   A.  Three of them raped me.  I don't know who it is but three

11   of them raped me and urinated on me.  One of them urinate on my

12   head, my face.

13   Q.  Did anyone give you anything to eat, Ms. Adams?

14   A.  Yeah.  One of them, the Jamaican one with the Jamaican

15   accent because he was the one that was corresponding with me

16   because he's telling me that his boss, his boss wanted the

17   money from Patrick and they want me to bring Patrick upstairs

18   and --

19   Q.  Did any of them say anything to you when they were raping

20   you?

21   A.  Yeah.  One of them asked me if Patrick do it better than

22   this, if Patrick do it better.

23   Q.  Could you see anything at this time?

24   A.  No.

25   Q.  Why?

1    A.  Because my eyes were duct taped.

2    Q.  How were your eyes duct taped?

3    A.  They wrapped it around like this.

4    Q.  After you were raped, what happened?

5    A.  I was lying there on the floor and one of them put my

6    underwear back on and I was laying there on the floor and at

7    one point they took me out the bedroom and take me to bathroom

8    into the tub.  And they turned the cold water on, poured the

9    Mr. Clean cause I was in the tub and they poured the Mr. Clean.

10   And at no time one point they had this, a girl was in my

11   bedroom and they were having sex on the bed.  And she was

12   making the sex sound.  And they were watching porno in the

13   room, smoking marijuana and cigarettes and having a good time.

14   Cause I don't know they were in and out the door cause each

15   time they go through the door the alarm it make the sound and

16   they were inside if there in and out and eventually because at

17   that point I didn't want to tell them because I figured they

18   was going to kill me when Patrick come they were going to kill

19   me if Patrick there.

20             MR. PITTELL:  Objection.

21             THE COURT:  Overruled.

22   Q.  Ms. Adams.

23   A.  Cause you know I thought they were going to kill me and

24   Patrick when they get the money and stuff like that.  So I am

25   there eventually, eventually you know I tell them, OK, his

1    number in the phone is Patrick James.

2    Q.  You gave them the real number?

3    A.  Yes.

4    Q.  What was the real number?  Do you remember it?

5    A.  Yeah.  201-916-0824 and so the guy told me to call him.

6    Q.  How were you able to call him?

7    A.  What?

8    Q.  How was the call made?

9    A.  They dialed the number cause I told them what the number

10   was and but I didn't told them the number.  I told them the

11   name.

12   Q.  The contact?

13   A.  Patrick, yes.

14   Q.  And were your hands still on bound?

15   A.  Yes, cause I was still in the tub.

16   Q.  Did they rebind your feet?

17   A.  Yes.  They tied my feet back after they raped me they duct

18   taped my feet back.

19   Q.  Do you have any idea how many people were in the apartment?

20   A.  No.

21   Q.  Could you hear any voices?

22   A.  They were whispering.  They were whispering.  I don't know

23   if it's 20, 30 but they're always whispering, whispering.  They

24   were in and out.

25   Q.  And you could hear female voice at some point?

1    A.   Yes.

2    Q.   And when you say they were in and out how could you tell

3    they were coming in and out, assume you meant?

4    A.   What?

5    Q.   Do you mean they were coming in and out of apartment?

6    A.   Yes.

7    Q.   You could tell how?

8    A.   Because by going through the door the alarm, each time you

9    go it make a sound.

10   Q.   Approximately, when did they make the call to Patrick with

11   your phone?

12   A.   Well, after they raped me and put me in the tub the guy he

13   came in there and I decide cause I am saying, listen, I am

14   going to die.  So ain't no use in my sitting here waiting any

15   longer so I told him Patrick James and then he went back

16   outside and they were whispering and then he came back and

17   dialed the number and I called Patrick.

18   Q.   And the phone was able to reach Patrick?  You could hear

19   him?

20   A.   Yes, cause they put it close to me cause they took the tape

21   off my mouth and I spoke to Patrick.

22   Q.   What did you say?

23   A.   I called him and I said to him that I need money to go pick

24   up my medication cause I to Rite Aid.  He came but he didn't

25   come upstairs.

1   Q.   How do you know he didn't come upstairs?

2   A.   Because he called me and he called the phone cause you

3   know, cause I keep getting calls but I don't if they were

4   answering but I was at the time getting calls.   And Patrick

5   called the phone and they told me, well, one of the guys, the

6   Jamaica guy say, mommy, Patrick calling and they put the phone

7   to my ears and I said I need money to go pick up my

8   prescription to Rite Aid.   So he told me that he left the money

9   in the windshield wiper downstairs.   It's my car.

10  Q.   What happened next?

11  A.   Well, they went down there and they took money from the car

12  from there and then.   But Patrick told me he was coming the

13  following day.   He was going down Manhattan and when he comes

14  back he would come there to see me.

15  Q.   Do you know what day it is at this point?

16  A.   No.

17          THE COURT:   How long a period of time has elapsed

18  between the time that you were confronted on the Sunday night

19  and the time that you were raped?

20          THE WITNESS:   Well, I don't know if it's the -- I

21  don't know if it's the next day or but I know it wasn't the

22  same night that they kidnapped me.   I think it was -- I don't

23  know if it's the following day or late in the night.   I don't

24  know what time it is cause you know my face was, you know I

25  don't know the time.

1          THE COURT:  And then how much -- do you have any sense

2    about how long it was after that you spoke with Patrick and

3    told him to drop off the money?

4          THE WITNESS:  It was like maybe the following day I

5    guess I spoke to him.

6          THE COURT:  All right.

7          THE WITNESS:  But he came -- when I called I think it

8    was the following day or late in the night but whatever time it

9    was I spoke to him he told me that.  I asked him to bring the

10   money but he didn't come upstairs.  He left it in the car so I

11   don't know if -- I don't really know.

12         THE COURT:  Just trying to get a sense of the elapsed

13   time.

14         MR. PITTELL:  Judge, her head was turned into the

15   microphone.

16         THE COURT:  Let me have the court reporter then read

17   back from the time that I began asking questions of up until

18   this page.  Thank you.

19         (read back)

20         MR. PITTELL:  Thank you.

21   Q.  Ms. Adams do you have any sense of, approximately, when you

22   were able to make the call to Patrick's actual cellphone

23   number?

24   A.  No, I don't know.

25   Q.  What's the next thing you remember after making the call

1   and asking him to come?

2   A.  Well, he brought the money, calls me, he called back and he

3   told -- well, he called me, he called back and they let me

4   speak to him on the phone.  He told me he left the money on the

5   windshield wiper downstairs.  He's not going to come upstairs

6   but because he already left but he was going to come and see me

7   the following day because he's going to Manhattan and after he

8   leave Manhattan he who would come up and see me.

9   Q.  Could you tell what the robbers were doing as you were

10  sitting there waiting?

11  A.  Well, they were -- I don't know.  They were up in the

12  apartment.  I don't know what they were in there doing.

13  Q.  Had you and Patrick been fighting at any point?

14  A.  Yes.  We, we -- yeah, we were fighting the week, the same

15  week we had the fight before he left to visit his son.

16  Q.  Did you recognize any of the voices you were hearing?

17  A.  No.

18  Q.  Do you know why you were moved from the bedroom to the

19  bathroom?

20  A.  Because they wanted to bring the girl in so because after

21  they removed me and put me in the bathroom that's when the girl

22  came.

23  Q.  At some point did you speak to Patrick again?

24  A.  Yes.  The next day I think it's morning or the afternoon

25  because they already know that he was coming to see me after he

1   left Manhattan so they keep telling me to call him to see

2   where's at.  And call him and eventually they told me that he

3   was on his way up to, I told him to bring me something to eat.

4   Q.  What did you tell him to bring you?

5   A.  Stewed chicken end rice.

6   Q.  Why did you ask him to bring that?

7   A.  Because I don't like that.  And to bring me soda, Pepsi.

8   Q.  Why did you ask that?

9   A.  I don't like Pepsi.

10  Q.  Why did you ask for that?

11  A.  Because I am trying to give him a clue that something is

12  wrong but he is so angry because we had a fight and stuff, so.

13  Q.  Did you notice if any of the robbers were wearing gloves?

14  A.  I couldn't tell if they were wearing gloves cause my eyes

15  were duct taped.

16  Q.  What's the next thing you remember happening?

17  A.  OK.  Cause I am still in the bathroom in the tub and this

18  is a waiting game.  They were back and forth.  I guess they

19  were looking through the window cause you could see through the

20  window I guess they probably was looking through the window

21  waiting to see --

22          MR. PITTELL:  Objection.

23          THE COURT:  Sustained.  So I'm going to ask you to not

24  to speculate.

25  A.  They were going back and forth.

E9AAADEL7                     Adams - Direct

 1            MR. PITTELL:  Could we just maybe move the microphone

 2     a little.

 3            THE COURT:  Maybe pull your chair up a little bit

 4     more.  Thank you.

 5     Q.  Ms. Adams, how could you tell what they were doing?

 6     A.  Cause they were walking.  I heard feet walking back and

 7     forth.  And the guy, one of the guys said to me, the Jamaican

 8     guy, the one that is corresponding with me said to me, he told

 9     me Patrick is coming.  He said to me, mommy, don't make no

10     sound.  Just relax.  That's what he told me.

11     Q.  Did he do anything after that?

12     A.  No.  They were there waiting.  So Patrick came through

13     cause I heard when the door opened and whatever they had he put

14     it on the floor.  And they were --

15     Q.  How do you know they put it on the floor?

16     A.  Whatever he had, the box he dropped it on floor and all of

17     them run to him and he scream out and he said to me, Jeanette,

18     you set me up.  That's what I heard he saying.  And they start,

19     they take him to the bedroom and they were beating him in

20     there.  And he was there crying out a lot of noise cause they

21     were beating him so bad in there.  And at one point one of the

22     guys came to me and said to me cause I guess they asked him for

23     money and he told them I don't remember if it was his cousin or

24     his brother and they came to me and they asked me, who is that

25     guy?  And I said, well, his cousin.

1    Q.   Just to be clear, somebody came to you and asked you --

2    A.   Who is that guy was because Patrick -- I guess Patrick told

3    him that's the guy who had the money.

4    Q.   And you said that that person was Patrick's cousin?

5    A.   Yeah.  I can't remember if it was I told them cousin or his

6    brother.  But I don't quite remember who I said it was but they

7    came and asked they wanted to know, if I know who it was?

8              THE COURT:  Ms. Geraci, you need to go back.  I don't

9    understand exactly but rather than me clarifying it, why don't

10   you clarify how the information arrived that there was another

11   person and then the question about the brother or the relative

12   whose talking to whom about what when.

13             MS. GERACI:  Yes, your Honor.

14   Q.   Let's just back up a little bit, Ms. Adams.  You, at some

15   point one of the robbers came to you and asked you a question?

16   A.   Cause they, whatever Patrick told him who have the money.

17   So they come to ask me if I know that person who Patrick told

18   them have the money before whatever money he had asked Patrick

19   for, I guess he told them that that guy, his cousin or his

20   brother have the money so they came and they asked me.

21   Q.   Why did you think they were asking you that?

22   A.   Because Patrick told them that's the guy who have the money

23   to keep his money, I guess.

24   Q.   So --

25   A.   So they came and they asked me.  I told him, yes, Patrick.

1    MR. PITTELL:  Objection.

2    THE COURT:  Overruled.

3    MR. PITTELL:  Objection as to what Patrick said.

4    THE COURT:  Overruled.

5  Q.  So they came and asked you who this is and you said it is

6  either a cousin or something like that?

7  A.  Yeah.

8  Q.  What's the next thing you remember?

9  A.  The next thing they were in there beating him up so bad and

10  then after a while I know at one point I don't know but

11  somebody left through the door and somebody was left back in

12  the apartment cause they were still in the bedroom beating

13  Patrick from the time they left till they came back.

14  Q.  And that's what you could hear.

15  A.  Yes.

16  Q.  Where were you this whole time?

17  A.  In the tub.

18  Q.  At some point did you hear anyone come back into the

19  apartment?

20  A.  Yeah.  They came back in and they start cleaning up,

21  mopping, wiping down stuff.

22  Q.  How could you tell?

23  A.  Because they were in the bathroom washing the mop in the

24  sink.  I could hear and pouring Mr. Clean cause I could smell

25  the Mr. Clean.

1   Q.  And you could smell that in the bathroom as well?

2   A.  Yes.

3   Q.  Approximately, how long did it take -- did you think the

4   robbers took to clean?

5   A.  Couldn't tell.

6   Q.  What's the next thing you remember?

7   A.  OK.  The next thing I remember the, one of guys, one of the

8   robbers this one I was corresponding he came and he told me

9   that he didn't get all the money and he gave me the knife said

10  to me, I am going to leave the knife and you could free

11  yourself and if you want to you could also free Patrick.

12  Q.  Did anyone touch you in any other way?

13  A.  Yeah.  One of them when they were leaving, I remember one

14  of them punched me in the side of my face.  I don't know who it

15  was but somebody punched me in the side of the face.

16  Q.  Where did they leave?  Did you say they left you a knife?

17  A.  Yeah, the guy.

18  Q.  Where did they leave it?

19  A.  Well, I was in the tub and he gave it to me and he said to

20  me that.  He gave me the knife and he told me that I could free

21  myself.

22  Q.  Do you know who punched you?

23  A.  No.

24  Q.  Were you able to free yourself?

25  A.  Yes.

1  Q.  How were you able do that?

2  A.  Well, I put the knife in my mouth and I used it to cut the

3  tape from my arm and then I released, cut -- even now I still

4  have the tape burn around my ankle here.  And then I get out

5  the tub and I peep inside cause after at one point I didn't

6  hear Patrick any more.  So when I peeped in I saw him.  They

7  tied his hand behind his back.  He's naked and he's bleeding

8  and I free him, release the tape and I and then I said to him

9  that we weren't going to call the police.

10  Q.  Why did you say that?

11  A.  Because it was drugs and I know it was drug related.  So I

12  was afraid that I would get in trouble, you know.  And then I

13  called my sister cause I have the landline phone and I called

14  my sister and I said to her that I am here two and a half day,

15  three days.  They kidnapped me here and nobody came to see if I

16  am OK or not and then my sister came and she is the one who

17  called the cops.

18  Q.  Your sister called or someone else?

19  A.  Either my sister or my niece.

20  Q.  They called 911?

21  A.  Yes.

22  Q.  Let just back up really quickly.  Can you describe what you

23  saw Patrick and what you were thinking?

24  A.  I saw him there.  I thought they raped him also too and I

25  was going to left him there cause I am so mad because of him

1    it's why I am in this predicament and all of that and --

2    Q.  How was he tied up?

3    A.  With his arm and his feet together they tied.

4    Q.  Behind his back?

5    A.  Yeah.

6    Q.  Was he bleeding?

7    A.  Yes, he is bleeding in his head and his arm.

8    Q.  What did you think when you saw him?

9    A.  I felt so bad for him.  I was going to leave him there,

10   trust me.

11   Q.  Cause you were angry?

12   A.  Cause I was angry and raped they raped me.  They, you know

13   urinated on me cause of Patrick money, you know, the drugs and

14   the money.  I could have lose my life.  I am sitting there

15   wondering if I am going to die.  You know, it was terrible.

16          MS. GERACI:  Can with the Court's permission may I ask

17   Ms. Chen to publish Exhibit 113 which is already in evidence?

18          THE COURT:  Yes.

19   Q.  Ms. Adams, do you recognize that?

20   A.  Yes.

21   Q.  What is it?

22   A.  Duct tape and the duct tape.

23   Q.  Is it just duct tape or is there other stuff thee?

24   A.  Clothes, yes, clothes.

25          MS. GERACI:  Could we show 117, please.

```
 1              (Pause)
 2    Q.  Do you recognize that?
 3    A.  Yes.
 4    Q.  What is that?
 5    A.  Well, the black thing I know it was my tights that I had on
 6    and the rest I can't quite.
 7    Q.  It's a little blurry?
 8    A.  Yeah.
 9    Q.  Ms. Adams, at some point did the police come to your
10    apartment?
11    A.  Yes.
12    Q.  Do you have any idea when?
13    A.  The following day, I guess.
14    Q.  Was it night time or morning?
15    A.  Morning.
16    Q.  Did you speak to the police?
17    A.  Yeah.
18    Q.  Did you tell the police about the robbery?
19    A.  No.  I'm not one -- I wasn't the one who, Patrick told them
20    about the robbery.
21    Q.  Are there things you never told the police?
22    A.  I never told them about the rape.
23    Q.  Why didn't you do that?
24    A.  Because I was ashamed and I just didn't want nobody to know
25    that I got raped.
```

1    Q.  Did you ever take a shower?

2    A.  No, I didn't take a shower.

3    Q.  Not that fight?

4    A.  No.  I just took the clothes and just changed into a

5    different clothes.

6    Q.  Did you go to the hospital that night?

7    A.  Yes.

8    Q.  Do you know where Patrick went?  Did he also go to the

9    hospital?

10   A.  Both of us went to the hospital.

11   Q.  How did you get there?

12   A.  Ambulance.

13   Q.  Were you treated for injuries?

14   A.  Yes.

15   Q.  Did you tell the doctors everything that happened to you?

16   A.  I just didn't tell them about the rape.

17   Q.  Why not?

18   A.  Because I just didn't want.  I just didn't want nobody to

19   know I got raped.

20   Q.  Do you know how long you were at the hospital,

21   approximately?

22   A.  Couple hours like about five about four or five hours we

23   were there.

24   Q.  Did you go back to your Magenta Street apartment that

25   night?

1    A.  No.  We went to a motel and stayed.

2    Q.  At some point were you able to determine what, if anything,

3    the robbers stole from you?

4    A.  Yeah.  They took my car and my pocketbook.

5    Q.  Louie bag?

6    A.  Yeah.  And I had change in a big bottle of change,

7    quarters, nickels and dimes, they took it.

8    Q.  What kind of a car did you have?

9    A.  A Rolls.

10   Q.  What color was it?

11   A.  Gray.

12           MS. GERACI:  May I approach, your Honor?

13           THE COURT:  Yes.

14   Q.  Ms. Adams I'm showing you what's marked as Government

15   Exhibit 300.  Do you recognize this image?

16   A.  Yes.

17   Q.  What is that?

18   A.  My car again.

19   Q.  Is that the car you were talking about that the robbers

20   stole?

21   A.  Yes.

22           MS. GERACI:  The government offers Exhibit 300.

23           THE COURT:  Mr. Pittell.

24           MR. PITTELL:  Want to take a quick peak.  No

25   objection.

1          THE COURT:  Received.

2          (Government's Exhibit 30 received in evidence)

3          MS. GERACI:  Permission to publish, judge?

4          THE COURT:  Yes.

5          (Pause)

6   Q.  When did you notice that your car had been stolen?

7   A.  The following day.

8   Q.  At some point did you get it back?

9   A.  The police found it, yeah.

10  Q.  I want to just go back to injuries that you suffered.  Did

11  the duct tape cause you any injuries?

12  A.  Yeah.

13  Q.  What kind of injuries?

14  A.  Like burn on my wrists and around my ankle here.

15  Q.  Did you get any medication for that?

16  A.  Yeah antibiotic cream.

17  Q.  And what injuries were you treated for at the hospital?

18  A.  For the burn, the duct tape.

19  Q.  The duct tape burns?

20  A.  Yes.  Cause I didn't tell them about the rape so.

21  Q.  Did there come a time later when you went back to your

22  apartment on Magenta Street?

23  A.  Yes.

24  Q.  Approximately, when?

25  A.  Two days after, I guess.

E9AAADEL7                         Adams - Direct

1   Q.   And when you went back there what, if anything, did you

2   find?

3   A.   A bag with cigarette butts ad all that, cigarettes.  They

4   were smoking.

5   Q.   And what did the bag look like?

6   A.   It's black, one of those black plastic bags.

7   Q.   Do you know everything that was in the bag or just what you

8   just stated?

9   A.   Just cigarette.

10  Q.   Did you look through the bag?

11  A.   I just opened it and see the cigarette butt.

12  Q.   Did you recognize it as not being yours?

13  A.   Yes.

14  Q.   What did you do with the bag?

15  A.   I called the police.

16  Q.   I'm sorry?

17  A.   I called and told police that I found a bag with cigarette

18  butts.

19  Q.   What happened next?

20  A.   They sent somebody to get it.

21  Q.   You mentioned that some of the items that were stolen

22  included a Louis Vuitton bag.  Did you ever see that bag again?

23  A.   Yes.

24  Q.   Where did you see it?

25  A.   Facebook in a picture.  Lisa Hylton daughter was holding

1    it.

2    Q.  Ms. Adams, did there come a time when you were shown

3    photographs by the police in connection with this robbery?

4    A.  What.

5    Q.  Were you ever shown photographs by police in connection

6    with this robbery and kidnapping?

7    A.  Yeah.

8    Q.  Were you able to recognize anyone in the photographs?

9    A.  Just the two guys that was on the steps.  Nobody else.

10           MS. GERACI:  One moment, please?

11           THE COURT:  All right.

12           MS. GERACI:  Thank you, Ms. Adams.

13           THE COURT:  All right.  Thank you.

14           Mr. Pittell.

15           MR. PITTELL:  Thank you.

16   CROSS-EXAMINATION

17   BY MR. PITTELL:

18   Q.  Good afternoon, Ms. Adams.

19   A.  Yeah.

20   Q.  Ms. Adams, my name is Jeffrey Pittell.  I am the attorney

21   for the man sitting here to my left, David Delva.  We've never

22   met before; is that correct?

23   A.  Yes.

24   Q.  We've never spoken by the telephone; is that correct?

25   A.  Yeah.

E9AAADEL7                        Adams - Cross

1           THE COURT:  I'm going to actually ask for you to turn

2    the mic a little bit to the left and that way.

3    Q.  But I take it you understand that I am here to ask you some

4    questions about what happened?

5    A.  Yes.

6    Q.  I take it that this robbery and the rape was a traumatic

7    event in your life?

8    A.  Yes.

9    Q.  And so it occurred a little over two years ago during the

10   Labor Day weekend?

11   A.  Yes.

12   Q.  And you've indicated that it occurred more or less during a

13   three day period starting on Sunday night until Tuesday?

14   A.  Yes, Tuesday night.

15   Q.  Tuesday night.  And during most of this time you were

16   blindfolded?

17   A.  Yes.

18   Q.  And actually blindfolded by having tape put over your eyes?

19   A.  Yes.

20   Q.  And you were tied up?

21   A.  Yes.

22   Q.  And I guess you've indicated it was your wrists were taped

23   together?

24   A.  Yes.

25   Q.  And was it in front or behind?

E9AAADEL7                    Adams - Cross

1   A.  The front.

2   Q.  And your ankles were all taped up too?

3   A.  Yes.

4   Q.  And it was so tight that I guess it, you said it burned our

5   wrists or something at the hospital?

6   A.  Yes.

7   Q.  That was because of the tightness or the tape?

8   A.  Well, the tightness and trying to free my -- trying to pull

9   myself, so it rubbed my skin off.

10  Q.  So your skin was irritated at some point during this three

11  day period also?

12  A.  Yes.

13  Q.  And you were -- is my understanding correct you were

14  deprived of food during this time period?

15  A.  Yes.

16  Q.  In fact during a portion of this a sock was in your mouth

17  and tape?

18  A.  That was earlier.

19  Q.  So that eventually came off?

20  A.  Yes.

21  Q.  And am I understanding correctly that you were not given

22  opportunities to use the toilet?

23  A.  No.

24  Q.  And I am sorry to inquire but I take it you even had to

25  soil yourself?

1    A.  Right, on the floor because they wouldn't let me go to the

2    bathroom.

3    Q.  You indicated that at some point during this ordeal you

4    were beaten or hit by one of these men?

5    A.  Yes.

6    Q.  And you said they were whispering but were there times when

7    they were yelling and talking to you in loud vices?

8    A.  Just one guy, the Jamaican, with the Jamaican accent, he's

9    the only one who really corresponded.  They were all

10   whispering.  Whosoever was in the apartment I couldn't tell if

11   it's 20, 50, 30 I couldn't tell.  They were all whispering I

12   only spoke to that one guy.

13   Q.  Was he ever yelling to you or talking to you in a loud tone

14   of voice?

15   A.  Sometimes.

16   Q.  You've indicated that one of these men urinated on you?

17   A.  Yes.

18   Q.  And then you've indicated that you were raped by three men?

19   A.  Yes.

20   Q.  I apologize in advance, Ms. Adams, but I need to ask you

21   some questions about the rape.  You said it was by three men.

22   Was it three different men?

23   A.  Three mens, three different men but I couldn't see their

24   face but I know it was three of them raped me.  I don't want to

25   talk about the rape.  I don't want to talk about it.  This is

E9AAADEL7                      Adams - Cross

1   the main reason why I didn't report it because I don't want to

2   talk about it, please.

3           THE COURT:  Ms. Adams, I know it's hard but we're

4   going to have to talk about it at least to a certain extent.

5   So I am going to allow Mr. Pittell to ask this question, all

6   right.

7           Mr. Pittell, why don't you reask the question.

8   Q.  Were you raped by three different men?

9   A.  I -- yeah, I guess so, three men.

10  Q.  It was not the same men?

11  A.  I couldn't tell because I was blindfold and I couldn't tell

12  if it was the same guy that raped me three times but it's, I

13  know it was three different guys raped me, three of them.

14  Q.  Was it one right after the other?

15  A.  Yes.

16  Q.  And this occurred in your bedroom?

17  A.  In the bedroom on the floor.

18  Q.  And so when the rape started were you already on the floor

19  of the bedroom?

20  A.  I was on the floor at all time.

21  Q.  All right.  So at some point one of the men came into the

22  room and raped you?

23  A.  They came.  At one point the Jamaican guy came in and he

24  said to me, mommy, you need to tell me, get Patrick up here

25  cause him can't help me any more.  And I turned to him and said

1    to him you saw, you guys saw Patrick.  Why you didn't get

2    Patrick?  Why you waiting on me to get to Patrick.  You saw

3    Patrick.  Then he left and then somebody came in the room cause

4    they wasn't making -- just at one point one of them said to me

5    asking me if Patrick sex me better than him do.

6    Q.  Ms. Adams, I realize you don't want to answer these

7    questions but I need to ask you some questions just simply

8    about the sequence of events.  So while you were lying on the

9    floor I take it one man came in and raped you; is that correct?

10   A.  Yeah.

11   Q.  And then when that man was finished did that man leave the

12   room and another man came in and raped you?

13   A.  I don't know if the three of them were standing there

14   waiting one at the time.  But I know they raped me.  I don't

15   know if they leave or stand there but I know when one finish

16   one came and when the other one finish the other one came and

17   three of them raped me.  Three of them raped me.  Three of them

18   raped me.  I don't know if I am HIV because I didn't get

19   tested.  Come on.  You crazy?  They raped me.  They tried to

20   get to Patrick.  They saw Patrick.  They didn't take Patrick

21   because I don't sell drugs and I don't have money.  I work.

22   Even though I talk to a dealer, a drug dealer I don't have

23   any -- I told them they should have take Patrick.  They

24   shouldn't rape me to get to Patrick.  They should do what they

25   did to me because Patrick was there.  They saw Patrick and all

E9AAADEL7                         Adams - Cross

1   of them they are waiting on me, the weak link.  Why?

2   Q.  Ms. Adams, going back to my question, Ms. Adams, could you

3   tell whether or not the first man left the room when the second

4   and --

5   A.  I don't know if he left cause I was blindfolded.  They have

6   they fund and they get up and they leave.  They were having

7   fun, yeah.

8   Q.  So, Ms. Adams, is the answer you can't tell?

9   A.  I can't tell if they were in the room or when they finished

10  they left or whatever.

11  Q.  Then when the third man came --

12  A.  The third man came and he had his fun and he said to me oh,

13  did Patrick do it like this?  No.  Patrick did it better.

14  Q.  Other than the third man, did any of the other men speak to

15  you?

16  A.  No.

17  Q.  Now, I take it that well -- withdrawn.  You said this whole

18  incident started on a Sunday night; is that correct?

19  A.  Yes.

20  Q.  And so you had been up all day Sunday and played bingo

21  Sunday night and were then coming home late Sunday night; is

22  that correct?

23  A.  If I was what?  If I did what?

24  Q.  Were you up during the day on that Sunday?

25  A.  Yes.

E9AAADEL7                    Adams - Cross

1    Q.  OK.  And then you went out and played bingo?

2    A.  Yes.

3    Q.  And then so when you came home Sunday night it had been,

4    after being up during the day and then being out at night; is

5    that correct?

6    A.  Yes.

7    Q.  And then I take it you didn't get much sleep from the time

8    this incident started on Sunday?

9    A.  I never slept.  From they kidnapped me I never slept.

10   Q.  So you were awake, deprived of sleep during the entire

11   time?

12   A.  I was alert.  I wasn't deprived.  I know exactly what they

13   do because you know what?  I was thinking about I am going to

14   lose my night.  They are going to kill me.  They are going to

15   bring Patrick to kill me, so.

16   Q.  So you did not sleep from Sunday night until Tuesday?

17   A.  Yes.

18   Q.  Now, you indicated that you were blindfolded; is that

19   correct?

20   A.  Yes, I was.

21   Q.  And the blindfold was on the entire time?

22   A.  Yes.

23   Q.  And what was the blindfold made out of?

24   A.  Duct tape.

25   Q.  Like the silver?

1    A.  The silver duct tape.

2    Q.  So when that duct tape was over your eyes you couldn't see

3    anything?

4    A.  No.

5    Q.  So I take it you couldn't tell whether it was actually

6    daytime or night time?

7    A.  No.

8    Q.  And likewise if you had a watch on you wouldn't be able to

9    look at that watch and tell what time was?

10   A.  No.

11   Q.  And you wouldn't be able to look outside to see whether

12   it's daylight or nighttime out?

13   A.  No, I couldn't tell if it's day or night cause I was in

14   permanent darkness with the tape over my eyes.

15   Q.  So I take it that between you being blindfolded, not having

16   any sleep, not having food, it's pretty much impossible for you

17   to say at what time certain things occurred; is that correct?

18   A.  I don't know what time it occurred.  I don't know what time

19   it occurred cause I could not tell the time.  I was

20   blindfolded.  I didn't have a watch.  And if I even have a

21   watch I wouldn't worry about looking at the because I am

22   thinking I am going to lose my life at Patrick came in that

23   apartment.

24   Q.  So, for example, if I ask you do you know what time it was

25   when you were raped there's no way you could tell?

E9AAADEL7                         Adams - Cross

1    A.  No.

2    Q.  And if I asked you whether it was daylight outside you

3    wouldn't be able to tell us that?

4    A.  No.

5    Q.  And if I asked you if it was dark outside you wouldn't be

6    able to tell us that?

7    A.  No.

8    Q.  Now, but the rape occurred before you were moved from the

9    bedroom to the bathroom?

10   A.  No.  They raped me.  It's after they raped me they took me

11   to the bathroom.

12   Q.  And the rape occurred before Patrick came into the

13   apartment with the food?

14   A.  Yes.  The rape occurred before Patrick came upstairs.

15   Q.  And it occurred before you made that first call to Patrick?

16   A.  The first call I made to Patrick I came, gave them a wrong

17   number so I didn't get Patrick.  The second time is, it's after

18   they raped me that I called Patrick.

19   Q.  And that's when he came and left some money downstairs?

20   A.  Yes.

21   Q.  And then you spoke with him again after that?

22   A.  Well --

23   Q.  And had him come back?

24   A.  I spoke to him the same time he left the money and he told

25   me that he wasn't coming but he would come the following day

E9AAADEL7                        Adams - Cross

1    cause he's going down Manhattan and when he finished he's going

2    to come up there.  After that was I guess the next day.

3    Q.  So the rape occurred at least before those two

4    conversations with Patrick?

5    A.  The rape occurred after they raped me and that's when I

6    called Patrick because at that point I didn't want to call

7    Patrick cause I don't know what the plan was cause I thought

8    when he come they are going to kill me with Patrick but it's

9    after they raped me was when I gave them the right, tell them

10   the name the phone is at Patrick James and the number.  And

11   when they called Patrick and I told Patrick that I need the

12   money to go to Rite Aid to pick up my prescription which he

13   didn't come upstairs he left, he told me that he left it in the

14   windshield wiper.

15             THE COURT:  Mr. Pittell, we are going to end in about

16   three minutes just to give you a sense of timing.

17             MR. PITTELL:  OK.

18   Q.  You said that you had come home from playing bingo that

19   night?

20   A.  Yes.

21   Q.  And you were playing with the mother of a girl named Lisa

22   Hylton?

23   A.  Yes.

24   Q.  And is that the same Lisa Hylton who was involved in the

25   robbery in this case?

E9AAADEL7                    Adams - Cross

1    A.  Yes.

2    Q.  And you had indicated that Patrick was, he got his drugs

3    from California?

4    A.  Yes.

5    Q.  And did he shortly before that Labor Day weekend get a

6    shipment of drugs?

7    A.  I don't know.

8    Q.  So you stopped knowing about his drug shipments at some

9    point?

10   A.  I don't know about his drug shipments.  I know that he goes

11   to California.  I don't know when it comes or you know so cause

12   I am not involved in selling drugs.  I just deal with the drugs

13   dealer.  I don't sell it.

14   Q.  Now, the Patrick has been robbed before of drugs; is that

15   correct?

16   A.  Yes.

17   Q.  How many times is that?

18   A.  Couple times.

19   Q.  And were you living with him during any of those other

20   robberies?

21   A.  Yes.

22   Q.  And when you say a couple times, is it two or three?

23   A.  Like four.

24   Q.  Sorry?

25   A.  Like four times.

1    Q.  Four times?

2    A.  Yeah.

3    Q.  And one time occurred before you moved to the apartment on

4    Magenta Street; is that correct?

5    A.  Yes.

6    Q.  And it occurred while you were living in another apartment

7    in the Bronx?

8    A.  Yes.

9    Q.  And you were living with Patrick James?

10   A.  Yes.

11   Q.  And you have a daughter named Crystal?

12   A.  Yes.

13   Q.  And isn't it true that your daughter, Crystal, came over

14   with tow people and stole some drugs from the apartment?

15   A.  Yes.

16   Q.  And one of those who people was Lisa Hylton?

17   A.  Yes.

18   Q.  And were you home when that happened?

19   A.  Yes.

20   Q.  And your daughter and the two other people they had guns

21   and knives; is that correct?

22   A.  Not my daughter.  Lisa and the guy.

23   Q.  All right.  But your daughter was with Lisa an the guy?

24   A.  Yes.

25   Q.  All right.  And money and drugs were stolen; is that

E9AAADEL7                    Adams - Cross

1   correct?

2   A.   Yes.

3   Q.   Now, another time --

4            THE COURT:  Mr. Pittell, do you have much more of

5   this?  We're about --

6            MR. PITTELL:  This is a good time to stop.

7            THE COURT:  All right.  Let's do that.

8            Ladies and, gentlemen, we'll end for this afternoon.

9   We'll pick up tomorrow morning at 9:30 and I just want to

10  remind you not to talk to anybody at all about this case.

11  Thank you.

12           (Jury not present)

13           THE COURT:  All right.  Ms. Adams, you may step down

14  and we'll see tomorrow morning just a few minutes before 9:30.

15           Ladies and gentlemen, let's all be seated to see if

16  we've got any housekeeping.

17           (Witness not present)

18           THE COURT:  All right.  There were two objections that

19  I'll just briefly go over one.  There was a point when

20  Ms. Adams stated or testifying that she thought that they would

21  kill her.  Mr. Pittell, you objected.  I couldn't figure out

22  what an appropriate objection would be.  What was the nature of

23  your objection?

24           MR. PITTELL:  Judge, I couldn't hear what you said.

25           THE COURT:  She testified that she thought they were

1    going to kill her and you objected.  It's possible it was for

2    dramatic affect to interrupt testimony but I couldn't figure

3    out what an appropriate objection would have been right there.

4              MR. PITTELL:  I thought there may have been some

5    reference to people saying something.

6              THE COURT:  That's the next one.

7              MR. PITTELL:  I can't recall.

8              THE COURT:  OK.  The second one was at one point she

9    said somebody was -- she was talking about what Patrick had

10   said at one point and you objected and I thought that you were

11   making a hearsay objection but it wasn't for the truth.  It was

12   for the statement and the fact that he had said it.  That I

13   think it was that his cousin had the money or something like

14   that.  I mean it was a statement along those lines.  So it's

15   irrelevant whether or not the cousin, in fact, had the money or

16   he is just saying the cousin had the money was just for the

17   fact that it was said.  That's why I ruled as I did.

18             Is there anything that you folks would like to raise?

19             How much more do you have, Mr. Pittell?  Give me a

20   sense.

21             MR. PITTELL:  Probably 15 minutes, 20 minutes.

22             THE COURT:  Is it the government's intention still to

23   call Patrick James after that?

24             MR. POSCABLO:  It is, your Honor.

25             THE COURT:  All right, then.

1            MR. POSCABLO:  Then Andrew Brandt, Matthew Fleming,

2     Ellis Deloren.  We that will take us through the day and then

3     our last witness will be Special Agent John Reynolds.

4            THE COURT:  How about Donald Ford?

5            MR. POSCABLO:  Judge, we haven't heard from him and at

6     this point we may not call him.

7            THE COURT:  He is the fellow who got injured.

8            MR. POSCABLO:  He.  Is I think the facts are in the

9     record that we need.

10            THE COURT:  OK.  All right.  So that will take us

11     through the day on Thursday.  So either end Thursday or Monday.

12            MR. POSCABLO:  That's right, your Honor.

13            THE COURT:  All right.  So then that would be,

14     Mr. Pittell, you picking up on Monday and so you would proceed.

15     Do you have any sense as to the folks that you've got, if any

16     of them are particularly long witnesses?  You've got the three

17     Noisettes, Bell, Thomas Rosenbaum and Ryan, if you know of if

18     any of them are off right now, off the list?

19            MR. PITTELL:  No.  They're all on the list now.  If I

20     had to gauge which one would be the longest, probably, Ryan.

21            THE COURT:  Is that the DNA expert?

22            MR. PITTELL:  Yeah.  I imagine the government will

23     have a question or two for her.

24            THE COURT:  All right.  And, approximately, what do

25     you have any idea what order you are thinking of calling?

1          MR. PITTELL:  Well, I am going to have Ms. Ryan come

2     this weekend.  So I'll have her here on Monday.

3          THE COURT:  Well, sounds like you can get to her on

4     Monday it's very likely if you want to because it sounds like

5     the government's likely to rest on Monday.  If I've got the

6     timing mapped out.

7          MR. PITTELL:  Yeah.  One of Noisettes is from Florida.

8     The marshals are flying him up.  I am going to have to call him

9     after the other ones.

10         THE COURT:  All right.  So you'll work it out.  But

11    are the Noisettes are they short or long or I mean are they

12    half hour witnesses?  Are they 15 minutes witnesses?  Are they

13    hour witnesses?

14         MR. PITTELL:  I think one will be an hour direct.  The

15    other will be shorter.

16         THE COURT:  All right.  Let's see.  How about Bell?

17    How long is bell?

18         MR. PITTELL:  I am trying to map out.

19         THE COURT:  Raheem Bell.

20         MR. PITTELL:  He is one of the witnesses to be short

21    also.

22         THE COURT:  If these folks who are going to say he was

23    here with me at the following times I mean I can't tell this is

24    going to go on very long.

25         MR. PITTELL:  The first one I call is going to set the

E9AAADEL7                    Adams - Cross

1    stage.  I'm not going to redo it again.

2              THE COURT:  All right.

3              MR. PITTELL:  I mean unless it becomes a bone of

4    contention but --

5              THE COURT:  All right.  So I think there's some

6    possibility that you'd be done with the witnesses on your list

7    at the end of the day Tuesday.

8              MR. PITTELL:  Yeah, I would think so.

9              THE COURT:  All right now, so we will need to discuss

10   maybe end of the day tomorrow your current views on whether or

11   not you think you are likely to have Mr. Delva, whether he's

12   likely to choose to testify or not.

13             Mr. Delva, it's your decision.  You understand that?

14             THE DEFENDANT:  Yes.

15             THE COURT:  So I am not going to hold you to that.

16   But I do want to get a sense of timing because if we're at

17   Wednesday Thursday I need to know whether I've got a clear part

18   of Friday because right now I don't have us sitting on Friday

19   as you know but the charge itself is going to take over two

20   hours so that's a chunk of time right there.  And of course

21   there's closings which will take some time.  So we are going to

22   spend the better part of the day between closings and charge.

23   So if that's all Wednesday as one thing, then we're into

24   Thursday for deliberations.  But maybe that we don't get to

25   charge and closings until Thursday in which case I'd rather if

E9AAADEL7                    Adams – Cross

1    we have them charged and we close to have them deliberate.  I

2    don't want them to take the whole weekend and hence my desire

3    to.  I am not going to ask you right now and you can go back.

4              MR. PITTELL:  I don't mean to interrupt but I could

5    tell you right now my answer tomorrow at this time is going to

6    be the same that it is, I just don know.

7              THE COURT:  All right.  Look, I am only asking and I

8    know you are straight shooter.  So I am only asking for your

9    best view at this point in time.  If you don't have one I am

10   not asking you to commit to something you don't know.

11             MR. PITTELL:  If I do I'll let you know.

12             THE COURT:  All right.  So be it.  We'll just deal

13   with it as it comes.

14             Anything that you folks would like to raise?

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

E9a1del8

1          MS. GERACI:  Your Honor, just with respect to the

2     defendant's proposed medical expert, not the DNA person but

3     Dr. Rosenbaum, the government renews its objection to calling

4     her as a witness.

5          THE COURT:  Well, maybe we'll deal with this tomorrow,

6     where you folks can decide and Mr. Pittell can assess what the

7     medical records I think would be and what definitions at this

8     point she needs to give.  It seems like, from Mr. Accilien's

9     testimony, we had an awful lot on the schizophrenia, and I

10     think you've inquired a great deal into matters which may go to

11     the jury assessment of him as a witness in that regard.  But

12     why don't I get a proffer from you tomorrow, Mr. Pittell.  I

13     think that at least we can join issue on.  If there's nothing

14     for her to do, there's nothing for her to do.  If there is, we

15     should probably all start grappling with it in very specific

16     terms.

17          Anything else?

18          MR. POSCABLO:  Not from the government, your Honor.

19          THE COURT:  Mr. Pittell, from your side?

20          MR. PITTELL:  No.

21          THE COURT:  All right.  We've got jury instructions.

22     You folks have that.  You've got the Word file and we'll be

23     dealing with those tomorrow morning.  We'll start at 9 on

24     those.  I do have a matter -- hold on one second.

25          We're adjourned for the evening.

E9a1de18

```
 1              MR. POSCABLO:  Good evening, Judge.

 2              MR. PITTELL:  Actually, I just have one other thing

 3     about the jury instructions.  You had indicated that you had

 4     made some variations from the one we submitted.

 5              THE COURT:  Let's put it this way.  I started with

 6     Serrano and you folks did sort of and then you didn't, so you

 7     can't run a track change against that and Serrano.  Put it that

 8     way.  Nor can you run a track change against that and your

 9     version.  There's not going to be a substitute for reading it

10     all yourself.  Because, for reasons known only unto you folks,

11     you seem to vary from the Serrano charge for reasons that were

12     unclear to me.  It was more stylistic, and I sort of like my

13     own.  And because I've spent a lot of time wordsmithing these

14     down to be comprehensible to mere, you know, mortals, hence my

15     attachment to my wording.

16              MR. PITTELL:  So is this more akin to Serrano.

17              THE COURT:  That's more akin to Serrano than anything

18     else.  But there are some charges that Serrano didn't have.

19     There were several charges that were just not relevant to him.

20              MR. PITTELL:  Right.

21              THE COURT:  Kidnapping.

22              MR. PITTELL:  But just like the definition of

23     conspiracy.

24              THE COURT:  That's almost verbatim.

25              MR. PITTELL:  Okay.
```

E9a1de18

```
 1              THE COURT:  In fact, I think what we can do, and I
 2     don't mind doing this, is why don't we send them the version we
 3     have which has got the -- I always have two versions, of
 4     course, right?  You would expect that I would.  One is
 5     footnoted to where it's all coming from and the second is the
 6     version that you get.  We'll give you the version that's
 7     footnoted to where it's all coming from, but I caution you that
 8     you need to read it all yourself.  But that will be an aid to
 9     you.  So don't rely on it exclusively, but you can tell that
10     it's in good faith, and if it says Serrano verbatim, that's
11     where I believed I got it.  If this is you folks offered
12     something and I've taken it from you or from the following
13     Second Circuit case, that's all in the footnote.  So we'll give
14     you that version as well.
15              I should lastly say that my practice is to post to the
16     docket at the conclusion, after the jury's charged, I'll put in
17     an order with every version of the instructions that I have
18     given you so that it's clear for the record forever and ever
19     what pages we're talking about when we talk about changes
20     during the charge and exactly what language is on that page at
21     that time.  All right?
22              ALL COUNSEL:  Thank you, Judge.
23              THE COURT:  We're adjourned.
24              THE DEPUTY CLERK:  All rise.
25              (Adjourned to September 11, 2014, at 9:00 a.m.)
```

```
                         INDEX OF EXAMINATION

Examination of:                                    Page

Cross By Mr. Pittell . . . . . . . . . . . . . 444

Redirect By Ms. Geraci . . . . . . . . . . . 448

DIANA COOKE

Direct By Mr. Poscablo . . . . . . . . . . . 460

Cross By Mr. Pittell . . . . . . . . . . . . . 517

Redirect By Mr. Poscablo . . . . . . . . . . 581

ERIC PERRY

Direct By Mr. Poscablo . . . . . . . . . . . 598

Cross By Mr. Pittell . . . . . . . . . . . . . 620

JEANETTE ADAMS

Direct By Ms. Geraci . . . . . . . . . . . . 622

Cross By Mr. Pittell . . . . . . . . . . . . . 656

                        GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1000, 1001, 1002, 1003, 1000-A, 1003-A . . . 477

 1003-R   . . . . . . . . . . . . . . . . . . 506

 701, 702, 704, 705, 707, and 707-B, and . . . 597

          3004

 3005   . . . . . . . . . . . . . . . . . . . 598

 706   . . . . . . . . . . . . . . . . . . . 606

 14   . . . . . . . . . . . . . . . . . . . . 625

 30   . . . . . . . . . . . . . . . . . . . . 654
```