E9bQdel1                         Jury Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            12 CR 802 (KBF)

5    DAVID DELVA,

6                   Defendant.

7    ------------------------------x

8                                      New York, N.Y.
                                       September 11, 2014
9                                      9:30 a.m.

10
     Before:
11
                    HON. KATHERINE B. FORREST,
12
                                       District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     JUSTINA GERACI
17   RYAN POSCABLO
          Assistant United States Attorney
18
     JEFFREY PITTELL
19        Attorney for Defendant Delva

20

21   ALSO PRESENT:  JOHN REYNOLDS, Special Agent FBI
     ANNIE CHEN, Paralegal Specialist, U.S. Attorney's Office
22

23

24

25

1              (In open court; jury not present)

2              THE DEPUTY CLERK:  Continuation of the matter now on

3     trial.  United States v. David Delva, 12 CR 802.

4              Counsel, please state your names for the record.

5              MS. GERACI:  Good morning, your Honor.  Justina Geraci

6     and Ryan Poscablo for the government.  We are joined at counsel

7     table by Paralegal Specialist Annie Chen and by FBI Special

8     Agent John Reynolds.

9              THE COURT:  Good morning all of you.

10             MR. POSCABLO:  Good morning, your Honor.

11             MR. PITTELL:  Good morning.  Jeffrey Pittell is here

12    with Mr. Delva.

13             THE COURT:  Good morning to both of you.

14             THE DEFENDANT:  Good morning.

15             THE COURT:  I want to just mention my schedule to you

16    first and then see if you have anything to raise.  If not, we

17    will go straight into some jury instructions.

18             My schedule, I have a conference call with some folks

19    who are going to trial later this month.  So I am going to

20    speak with them at 11:00 a.m.  We will take our mid-morning

21    break about two minutes to that, to 11:00.  We can pretty much

22    count on it as a result unless something comes up unexpected

23    that requires us to take an earlier break, but that would be my

24    plan.

25             Do you folks have anything you'd like to raise before

1    we talk about the jury instructions?

2                MR. POSCABLO:  No.

3                MS. GERACI:  No, your Honor.

4                THE COURT:  Mr. Pittell?

5                MR. PITTELL:  No.

6                THE COURT:  Had either side sent a tracked change

7    version?

8                MS. GERACI:  We did not, your Honor.

9                MR. PITTELL:  No.

10               THE COURT:  It's all right.  I just wanted to make

11   sure I hadn't missed it.  I know that there wasn't a lot of

12   time.

13               So why don't you folks tell me where you've got your

14   first proposed change.  Let me just also tell you how I do

15   this.  We discussed a little bit of it yesterday, which is we

16   will go to the page, we can talk about general concepts, but I

17   far prefer to have specific language or edits, you know, "take

18   this out; we really preferred our version for the following

19   reason," something specific so we are not having endless

20   conversations about things that are superfluous.

21               Who has the first change?

22               MR. POSCABLO:  Judge, if we could, just in the areas

23   where we noted that there might be some language changes, I

24   don't have one prepared yet.  If I could have an opportunity

25   with Mr. Pittell, maybe we can work out the language; but if it

1   is OK with you, unless you don't want me to, I will highlight

2   you where we think there might be an issue.

3           THE COURT:  Tell me your first page and we'll find out

4   where Mr. Pittell's first page is.

5           MR. POSCABLO:  The government's first page is page 22

6   use of informant section.  I'm using the one your Honor sent

7   later that has source, source information.

8           THE COURT:  I'm not, but I don't think it should

9   change the pagination.

10          MR. POSCABLO:  Use of informants.  I don't know if any

11  testimony has come out about informants.

12          THE COURT:  Mr. Pittell, do you disagree?

13          MR. PITTELL:  No.  That was one of my comments.

14          THE COURT:  Page 22 is out.  Use of informants is out

15  on consent.

16          Mr. Pittell, what is your first page?

17          MR. PITTELL:  My first change is actually on page 20.

18          THE COURT:  Back up.

19          MR. PITTELL:  It's a modest change.  I would suggest

20  that starting in the fourth paragraph "you heard testimony

21  about an agreement."  The agreement here is a cooperation

22  agreement, or, actually, it should say cooperation agreements.

23  So I would just request that the word cooperation be inserted

24  before agreement and agreements be in the plural.

25          THE COURT:  Any objection to that?

1           MR. POSCABLO:  None.

2           THE COURT:  That change is made on page 20.

3           MR. POSCABLO:  Just so the change is clear: "You also

4    heard testimony about cooperation agreements between the

5    government and cooperating witness"?

6           THE COURT:  That's right.

7           MR. POSCABLO:  Thank you, your Honor.

8           THE COURT:  What is your next change, Mr. Pittell,

9    after 22, which is where I think you both had changes, or if

10   you had anything on 21, let me know.

11          MR. PITTELL:  I'll tell you my next page.  If the

12   government is before me, they can go first.  My next page is

13   29.

14          THE COURT:  Mr. Poscablo?

15          MR. POSCABLO:  Yes, we both have.

16          MR. PITTELL:  It's uncalled witnesses equally

17   available.  I don't know if that is really applicable or not.

18          THE COURT:  Let's put a placeholder here.  I will take

19   it out right now unless either of you request to have it put

20   in, in which case I'm happy to put it in.  Does that sound

21   reasonable?

22          MR. PITTELL:  That's fine.

23          MR. POSCABLO:  Yes, your Honor.

24          THE COURT:  So uncalled witnesses out on page 29, out

25   on consent, but we will put it back in if you folks decide it's

1    a charge you would like to have.

2                MR. POSCABLO:  Judge, you know the government's

3    position.  I think we'd rather have it in, but we'd be willing

4    to have it out.

5                THE COURT:  All right.  If you would rather have it

6    in, then let's put a placeholder here.  What I would like you

7    to do is tell me then in our next session who you think this

8    might be applicable to because I don't just want to have it in

9    to have it in.

10               MR. POSCABLO:  Right.

11               THE COURT:  If there is somebody who you think falls

12   in the category of an uncalled witness --

13               MR. POSCABLO:  Just so the record is clear, Judge, I

14   was thinking more along the line of the lab assistants; what

15   Mr. Pittell crossed Ms. Cook about, the several lab assistants.

16   The jury could infer from his cross-examination that he was

17   questioning the methodologies and consistency of the lab and,

18   in particular, the practices used by each of those lab

19   assistants.

20               THE COURT:  All right.  So why don't we think about

21   this and we'll make a determination about it at a later point.

22   Who has -- page 29, who's got something?

23               MR. POSCABLO:  Judge, we have something on page 45.

24               MR. PITTELL:  I beat you again.  Page 35.

25               THE COURT:  All right.  Page 30, Court change on page

E9bQdel1                         Jury Trial

 1    30 under Count Five, the firearms there is plural.  It should

 2    be "possessed" -- insert the word "a" take off the "S" from

 3    firearms and make it singular.  It would be "used, carried and

 4    possessed a firearm."  And the next line "possession of a

 5    firearm which" -- singular -- "was brandished."

 6              MR. PITTELL:  I'm sorry, which page?

 7              THE COURT:  Page 30.  It's under the summary of Count

 8    Five.  If there are other places where firearms is plural,

 9    we'll catch that and we'll also make that change.

10              Turning to page 35, Mr. Pittell?

11              MS. GERACI:  I'm sorry, your Honor.  I believe in

12    Count Five the plural of firearms is correct.  The allegation

13    is that several co-conspirators also possessed firearms.

14              THE COURT:  You're right.

15              MS. GERACI:  Thank you, your Honor.

16              THE COURT:  You're right.  Thank you.  Back to the way

17    it was.  Just testing you folks.  Page 30 is stet.

18              Page 35.

19              MR. PITTELL:  Judge, what I would like to do with this

20    is -- this might actually sound contradictory to some of my

21    prior comments because I know in prior charges -- I've

22    indicated that I've read the Court's charge in Serrano because

23    I was actually counsel in that case and I read the charge in

24    Borrero and Serrano and your conspiracy charge here is

25    basically the same, if not the verbatim in both of those.

E9bQdel1                    Jury Trial

 1          however, in prior cases as well, I know colleagues of

 2     mine have objected to use of language in this charge where it

 3     has language which says the government is not required to do

 4     this or it's not required to do that.  So, really, for

 5     preservation purposes, I would like to object to the language

 6     starting in paragraph three which says "to establish a

 7     conspiracy" the first two sentences simply on the ground that

 8     from my perspective, a jury charge should be what the

 9     government's obligation is, what the government's burden is,

10     what their affirmative acts are.

11          THE COURT:  You would agree with me that this is a

12     correct statement of the law?

13          MR. PITTELL:  A hundred percent.  I'm not objecting

14     that it is an improper representation or a misrepresentation or

15     anything like that.  I'm just simply -- I want to at least just

16     for the record, in the event somebody else looks at this charge

17     and wants to raise that issue, that it's been preserved.

18          THE COURT:  All right.  Ms. Geraci?

19          MS. GERACI:  The government has no problem with your

20     Honor's charge here as written.

21          THE COURT:  Let me give you my theory for this charge

22     which is, it explains to the jury in a very confusing -- what

23     might be a confusing area what they have to do, and part of

24     determining what you've got to find is it's useful to put into

25     context what you're not expected to have to have.  I understand

E9bQdel1                          Jury Trial

1      your point, which is that the government always bears an

2      affirmative burden of proof, not some negative burden of

3      elimination, but, nevertheless, for this point it's just about

4      context and the jury is told repeatedly about the relevant

5      burdens of proof.

6              With that said, if you believe that there is

7      particular language I should add in around that statement or

8      any others which you think go into the negative, then I would

9      certainly be willing to do that.

10              So, for instance, if there is something which -- these

11     charges are already so long that I hate to say everything four

12     or five times or 10 times or 15 times -- but if there is

13     something that you think indicates or reemphasizes a point that

14     you would like to have reemphasized on the burdens, why don't

15     you make a suggestion?  But your point is otherwise preserved.

16              MR. PITTELL:  Thank you.

17              THE COURT:  We are still waiting for my deputy to tell

18     me the jury is ready.

19              Let's go on to the next page.  Do you have anything

20     else on that page, Mr. Pittell?

21              MR. PITTELL:  No, not on that page, but there is one

22     other portion of the conspiracy charge where it's the exact

23     same situation where I don't disagree with the Court's

24     statement of the law; it's just really a preservation argument.

25     That's on the extent of participation.

E9bQdel1                        Jury Trial

```
 1                THE COURT:  That is --
 2                MR. PITTELL:  It's on page 40, I'm sorry.
 3                THE COURT:  Page 40.  We're waiting on four jurors.
 4      Which numbers?
 5                THE DEPUTY CLERK:  7, 12, and 4.  I'm not sure of the
 6      other one.  7, 12, 4 and one more; I'm not sure who.
 7                THE COURT:  All right.
 8                MR. PITTELL:  Actually, you know what, Judge?  I
 9      withdraw my statement because this is not really the same.
10      It's not the same burden of elimination argument that I'm
11      raising on the other one.
12                THE COURT:  What page, Ms. Geraci?  Is the government
13      also on 40?
14                MS. GERACI:  Yes, your Honor.
15                THE COURT:  What do you have on 40?
16                MS. GERACI:  I have nothing on 40, your Honor.
17                THE COURT:  What's our next proposed change?
18                MS. GERACI:  Your Honor, the government has something
19      on 45, but I don't know if Mr. Pittell has something before
20      that.
21                MR. PITTELL:  I'm on 44.
22                MS. GERACI:  There we go.
23                MR. PITTELL:  All right.  This is a really -- this is
24      proof that I read your charge.  On the last paragraph, you talk
25      about a book being sent -- made in California.  I would just
```

E9bQdel1                    Jury Trial

1    ask that you use any one of the other 49 states just because

2    the witness testified that the marijuana was from California.

3              THE COURT:  That's fine.  Why don't we say made in

4    Seattle or Oregon.  That's on page 44.  California in the last

5    paragraph is changed to Seattle.

6              Next change.  We're waiting on a couple of jurors.

7              Mr. Poscablo?

8              MR. POSCABLO:  Judge, an issue has come up that I

9    think will take a little bit of time that I want to discuss,

10   and I think if the Court is amenable, we can table the

11   discussion about jury instructions.

12             THE COURT:  We will put the jury instructions to the

13   side.  Joe, nevertheless, give me a sign when the jury is

14   assembled.

15             Mr. Poscablo.

16             MR. POSCABLO:  Judge, I'm sorry.  I ran out because

17   the issue did come up.  Special Agent Kim Markus, who works

18   with Special Agent John Reynolds, met with our victim, the

19   victim witness this morning, just to bring her up to the

20   courthouse, was instructed -- Special Agent Markus was

21   instructed not to talk to her because she is still on

22   cross-examination, and she did not.  But unsolicited, the

23   witness informed Special Agent Markus that she recognizes the

24   defendant as one of the individuals who was in the apartment on

25   the night of -- during the weekend of the robbery and

E9bQdel1                        Jury Trial

1    kidnapping.  Specifically, she said something along the lines

2    of "I recognize him.  He's gained a little wait.  He has hair

3    and he had a baseball cap on during the robbery.  I remember

4    him because when my duct tape came down a little bit, he was

5    lying in the bed watching TV one day when they picked me up and

6    put me in the bathroom."

7            I literally have had about three seconds to process

8    this, and I didn't even get a chance to front it with

9    Mr. Pittell, so I apologize for that.  But it is an issue I

10   wanted to alert the Court and Mr. Pittell because, one, I

11   didn't want him walking into it if he asked a question on

12   cross-examination and it came out.

13           But, second, we haven't had an opportunity yet to

14   decide whether we want to elicit it in redirect, and I wanted

15   to front it to the Court because the Court could also preclude

16   us from eliciting it on redirect.

17           THE COURT:  Let me ask you:  Did the agent who was

18   accompanying the witness -- let's just get rid of the

19   procedural issue first -- was there any response or other

20   conversation which occurred around that point, that

21   communication?

22           MR. POSCABLO:  There was not between Special Agent

23   Markus and the witness.  Special Agent Markus then told Special

24   Agent Reynolds.  Special Agent Reynolds did ask three follow-up

25   questions.  I think the follow-up questions by Special Agent

E9bQdel1                     Jury Trial

1    Reynolds were to clarify what exactly Ms. Adams had told

2    Special Agent Markus, which is, "You recognize the defendant?

3    How do you recognize him?  Where do you recognize him from,

4    and, what, if anything, did you say he -- you recognize him

5    doing, if anything?"  So it is essentially along the lines of

6    repeating what she said.  No new facts were elicited.

7                 THE COURT:  All right.  Mr. Pittell.

8                 MR. PITTELL:  Judge, I object to any testimony where

9    she is now identifying the defendant in the middle of the trial

10   right now.

11                THE COURT:  Well, that -- well, let's think about what

12   the nature of the objection would be because, of course, it

13   does happen that witnesses who see people at trial are asked

14   whether they recognize anybody.  I am not -- I don't recall --

15   well, this witness' testimony on direct so far has been that

16   she had duct tape across her eyes the entire time.  Now that's

17   not inconsistent with what she is now saying, but, as a result,

18   I don't believe she was asked whether or not she recognized

19   anybody in the courtroom specifically and directly.  So, I

20   don't think that recognition at the time of trial is in and of

21   itself preclusive.

22                I think it is a really a procedural issue, which is

23   what it comes down to, which is the witness is off direct.  She

24   is on cross-examination.  She remains on cross-examination at

25   the moment.  You have not concluded that.  The question is

1   whether or not the Court would allow the government to reopen

2   the direct for purposes of eliciting this testimony and then,

3   of course, allow you an opportunity to recross her on any

4   inconsistencies with any number of things that you might see or

5   deem appropriate to inquire into.  I think that is as I see the

6   issue, the nature of the issue.  But tell me if you folks

7   perceive there being a different issue.  I see it as an order

8   and inquiry of witnesses issue.

9           Mr. Poscablo?

10          MR. POSCABLO:  Judge, I do think there is another

11  issue, and I haven't done a research on the law.  The issue is

12  one of suggestiveness, meaning even -- I think your Honor

13  absolutely identified a correct issue, which is procedurally.

14  Although, we would like to look at the record to see if

15  Mr. Pittell's questions at all opened the door to allow this

16  just to be a redirect as opposed to a reopening of direct, but

17  setting that aside for a second, which I think your Honor

18  identified, I do recall some case law that suggests that this

19  could be suggestive in the sense that she hasn't -- just so the

20  record is clear -- she had not identified him previously.

21          A six-pack containing a photograph of the defendant,

22  who I think looked a little different at the time, was

23  presented to her, and she didn't identify the defendant from

24  that six-pack.  I think there is some case law that might show

25  that having her do an in court ID at this point could be unduly

  1    suggestive.  I haven't done the research into that, your Honor.

  2    Maybe one of the things we could do is we can take -- if we

  3    cannot ask her during her cross or redirect --

  4            THE COURT:  I don't think there is much left.  I think

  5    as Mr. Pittell had said, this is an issue which we would need

  6    to resolve right now before we start, unless we want to take

  7    another witness out of turn and indicate to the jury that we

  8    are going to take a witness out of turn -- we are going to

  9    resume Ms. Adams in a little bit, but we are in the meantime

 10    going to take a witness out of turn.  This occurs in trials,

 11    really, from time to time.  You shouldn't think about really

 12    why.

 13            Give us all the time to get the suggestiveness cases

 14    but not necessarily delay our ability to proceed today.  That

 15    is what I would suggest we do to buy yourselves a little bit of

 16    time but to use our trial time efficiently.  Because I would

 17    like to have the suggestiveness cases.  In terms of whether it

 18    could be arguably appropriate within the scope of a redirect, I

 19    suppose whether or not she could see anything is in the scope

 20    of redirect, but the bigger issue, I think, is this legal issue

 21    that you've now identified.

 22            Mr. Pittell, do you have additional legal issues?

 23            MR. PITTELL:  Judge, I mean, it's kind of hard to just

 24    rattle them all off.  Obviously, there's a whole host of

 25    issues, procedural issues, substantive issues --

1           THE COURT:  I know, but we are going to have to joint

2    issue on this given where we are, so I need to know what we can

3    look at specifically.

4           MR. PITTELL:  It also gets into the issue as to

5    whether or not -- I mean, look, she knows -- she's testified at

6    a prior sentencing proceeding.  So knows there's a prosecution

7    table.  She knows there's a defense table.  Based upon her

8    demeanor on the witness stand, she is obviously very angry

9    about what happened.  I think it is clear that she acknowledged

10   that she was blindfolded the entire time.

11          Factually, Trevor Cole and Dominique Jean-Philippe

12   have pleaded guilty and admitted they were the two men who

13   abducted her.  They were the only two men who she had an

14   opportunity to see.  That's a fact.  That's what she has

15   acknowledged.  That is the so-called truth of the matter.

16          And she has been shown an array of Mr. Delva where his

17   photo was different in the array.  I have the array.  So it

18   gives me great cause for concern that she is coming -- "he

19   looks different from then" as opposed to "he looks different

20   from the guy who I saw in that photograph."  And then I am

21   going to go after her very hard on cross-examination, and I

22   don't want to have to do that.  That's not been my approach to

23   this witness.  I am not attacking her credibility.  I may be

24   poking around at a few issues here and there, but I think that

25   at this point in the trial it's highly prejudicial.

1          And, I mean, obviously, I didn't know this was coming.

2     Obviously, the government didn't.  None of us knew this was

3     coming.  But if I had any inkling this was coming, I would

4     consider the possibility of having several people sitting at

5     the defense table or possibly Mr. Delva not being present in

6     the courtroom.

7          There could have been other steps I may have taken if

8     I had any idea this was coming.  Look, like you said, these

9     things happen.  OK.  Trials are not science and things happen,

10    but I just -- it's my position that in light of these factors

11    as well as possibly others -- if you give me time to think and

12    research, I could probably come up with other arguments too

13    that at this point in the trial where we are -- we've opened,

14    the parties have taken their positions, their cases are being

15    put in -- that for her to now come point him out is going to be

16    highly prejudicial.

17          MR. POSCABLO:  Judge, I don't disagree with

18    Mr. Pittell, and I think your Honor's suggestion that we take a

19    witness out of turn is appropriate.  The reason for that is I

20    think Ms. Geraci -- it's my witness next; it's Mr. James.  I

21    think Ms. Geraci can -- I literally spoke to a supervisor for

22    about three minutes after I heard.  Ms. Geraci can step outside

23    and speak to people at the office, and it may be the case we

24    have a non-issue because people who know the law back at the

25    office may tell us don't even go there, and we'll tell the

E9bQdel1                          Jury Trial

 1    Court we won't even go there.  I think at that point we will

 2    ask the Court for permission, with consent of Mr. Pittell, to

 3    instruct the witness not to say anything with regards to

 4    identifying the defendant, if we decide that that's correct.

 5              THE COURT:  All right.  So why don't we do this:  I

 6    think we all realize this will take a little bit of time and

 7    consideration to analyze.  The jury is here?

 8              THE DEPUTY CLERK:  Yes.

 9              THE COURT:  I will have the jury come out.  I am going

10    to say to them that we are going to actually call a witness out

11    of turn and then we will return to Ms. Adams just right

12    after -- I won't say right after -- you know, shortly.

13    Sometimes we call witnesses out of turn for a variety of

14    reasons, for schedule, which is a true, schedule.  Either that

15    or we could delay this and not have testimony until 1:00, but I

16    prefer not to do that.

17              In the meantime, Ms. Geraci, you will do what you can.

18    If you can print out any cases that would help us get to

19    quickly if the determination is that you folks are going to

20    pursue this line of inquiry.  If you are not, then you could

21    just let us know, and I don't need any cases.

22              Meanwhile, I will ask my clerk to pull up -- there

23    must be Supreme Court case law on suggestiveness.  I don't

24    recall the cases offhand and what the factors are, but I will

25    have my clerk -- Jamie, why don't you go ahead and pull those

E9bQdel1                        Jury Trial

1   up, print them out and bring them up to me while I'm on the

2   bench?

3           Does that seem a reasonable way to proceed?

4           MS. GERACI:  Yes.

5           MR. PITTELL:  Yes, Judge.

6           THE COURT:  I am going to wait for Mr. Poscablo.  I

7   know he is conferring with someone.

8           MR. POSCABLO:  One moment, your Honor?

9           THE COURT:  Yes.

10          (Pause)

11          MR. POSCABLO:  Judge, the issue I am discussing

12  dusting with Mr. Pittell now is the next witness, Patrick

13  James.

14          THE COURT:  Yes.

15          MR. POSCABLO:  Mr. James, likewise, did not identify

16  Mr. Delva in the six-pack previously.  He has, however, stated

17  that he remembers a number of people.  He can generally

18  describe some of the people.  And given Ms. Adams' information

19  this morning, I fronted with Mr. Pittell the possibility that I

20  am going to ask Mr. James to stand up in court and see if he

21  recognizes anyone --

22          THE COURT:  And this is done all the time.

23          MR. POSCABLO:  It is.

24          THE COURT:  I mean, we are not talking in that regard

25  about anything other than we're prior to the beginning of

E9bQdel1                    Jury Trial

 1    direct examination.  He may have a misidentification or a

 2    correct non-identification of the photo array.  That is the

 3    subject typically of cross-examination even vehement,

 4    vigorous -- I should say vigorous cross-examination.

 5            MR. POSCABLO:  But I wanted to front that issue for

 6    Mr. Pittell so he's prepared for it.

 7            THE COURT:  I don't know where that would go.

 8            MR. POSCABLO:  Neither do I.

 9            THE COURT:  Mr. Pittell, that is no greater risk than

10    you stand every time you have a witness who has an alibi

11    defense and you got people who've been asked whether they

12    recognize the defendant being a participant in the crime at the

13    time.

14            MR. PITTELL:  However, there is an issue in that the

15    witness has previously seen a photograph of Mr. Delva and has

16    stated he was not one of the participants.  And then --

17            THE COURT:  You mean during the photo array?

18            MR. PITTELL:  In the photo array.

19            THE COURT:  Are you aware of any instance other than

20    the photo array when he was shown a picture of the defendant

21    and failed to identify him?

22            MR. PITTELL:  No.

23            THE COURT:  All right.  Here is what I think we need

24    to do in light of this:  What we need to do in light of this is

25    I need to take a 20 minute break.

1          Joe, can you tell the jury that sometimes things --

2     no, don't tell them anything other than we're going to start in

3     about 20 minutes.  Just tell them that.

4          I need to go down and look at some Supreme Court cases

5     on suggestiveness because I don't want to walk into something

6     with Mr. James.  It strikes me analytically that this should

7     not be that kind of situation with Mr. James, but let me just

8     assure myself of that.  Let's not take more than 20 minutes

9     right now.  I'm not suggesting people will have answers to

10    Ms. Adams within 20 minutes.  I will expect in 20 minutes to be

11    picking up with Mr. James, but let's take 20 minutes to sort of

12    learn what we can learn.  Let's resume in like 18, and that

13    would give me at least a chance to look at a few things.  OK?

14    Does that sound reasonable?

15         MR. POSCABLO:  That's fantastic, Judge.

16         THE COURT:  We will reach a determination as to how to

17    proceed with Mr. James in the next 20 minutes.

18         MR. POSCABLO:  Your Honor, within the next 20 minutes,

19    if we've learned we probably shouldn't go there with Ms. Adams,

20    we can just continue.

21         THE COURT:  Tell Mr. Pittell and tell my deputy.  He

22    can let me know.  At that point, you may decide not to proceed

23    with Mr. James in that manner.

24         MR. POSCABLO:  That's right.

25         (Recess)

E9BAADEL2                        Adams - Cross

1            THE COURT:  All right.  Let's all be seated just for a

2       moment.  My review of the law and discussions with other judges

3       indicates that this would be, certainly, legally permissible.

4       Although, something would be subject to cross-examination.

5            Where is Mr. Pittell?  Oh, there you are.  You are on

6       the other side the table.

7            Suggestiveness is a pretrial lineup issue.  Show up is

8       more trial show up occurs.  The due process requirements are

9       met through effective cross-examination and it is certainly the

10      case that there are ample instances in which witnesses don't

11      identify an individual pretrial and do identify them at trial.

12      That is an issue for the jury to weigh and determine.  They may

13      as a result discount the in-trial identification procedure,

14      etc.  So this does occur.  This does come up.

15           Why don't you folks tell me whether you have arrived

16      at a different legal conclusion and where we stand as to both

17      of the witnesses.  It strikes me that Mr. James is an easier

18      situation.  If you want I'll ask him if he can identify

19      anybody.  He may or he may not.  And them we have got the

20      separate issue of Ms. Adams.

21           MR. POSCABLO:  Judge, as I informed Mr. Pittell and

22      informed your deputy, the government does not intend to elicit

23      any in court identification from Ms. Adams.  Although, in

24      response to your Honor's question the government did have an

25      opportunity to do some research and we believe your Honor's

1    absolutely right on the -- your Honor, you are right.  It is

2    show up.  It's not suggestiveness and we agree with your Honor

3    but we for other reason we're not --

4            THE COURT:  That's fine.  You can certainly make

5    whatever trial choices you deem appropriate, all right.  So

6    that's not an issue for Ms. Adams.  It is an issue for

7    Mr. James.

8            Mr. Poscablo, in light of that, are you intending,

9    then you should not intend, you should not I don't think

10   instruct Ms. Adams not to say anything.

11           MR. POSCABLO:  We haven't instructed Ms. Adams at all.

12           THE COURT:  Here is the issue because there is -- and

13   this is a, I want to hear people on this -- but potentially one

14   of the tactical reasons you could decide not to do this is

15   because it could impact her credibility.  And having had her

16   testify that she was blindfolded and therefore if she blurts it

17   out with Mr. Pittell he may take the opportunity to undermine

18   her credibility.  As a result, I can see it going both ways and

19   I wouldn't want the government then to instruct her in a way

20   that could impair the ability of the defendant to attack a

21   particular line of credibility.

22           MR. POSCABLO:  Understood, your Honor.  We haven't

23   spoken to her since the conversation that I already outlined

24   for the Court and we will not instruct her.

25           THE COURT:  You would need to proceed as carefully as

1    you would proceed with any line of inquiry you prefer not to go

2    down.

3            MR. POSCABLO:  With regard to Mr. James, I think there

4    will be potentially two questions for him.

5            THE COURT:  I don't need to know the questions.  You

6    are going do an in-court identification process.

7            MR. POSCABLO:  We'll see if he goes there, not going

8    to avoid it.

9            THE COURT:  Mr. Pittell, it you would like to be heard

10   on either issue which is, should the government now be

11   instructed not to instruct Ms. Adams not to say something, I am

12   suggesting that that would be inappropriate given the possible

13   credibility issues that may arise.  I don't want the government

14   doing anything that they wouldn't normally do during

15   cross-examination which is stand down.  But I want to hear from

16   you on that.  The second thing is as to Mr. James.

17           MR. PITTELL:  I'll start with Mr. James.  I mean, I

18   agree that a witness can get up on the witness stand and point

19   out somebody.  There is another quirk in here in that

20   Mr. James, it is my understanding, has been shown four photo

21   arrays -- he identified three of them -- of people who were

22   arrested, not Mr. Delva.  The one with Mr. Delva there was no

23   identification.  I don't have the photograph with me but the

24   reports from the 3500, I have seen the photograph where he was

25   shown a booking photograph of a suspect whose last name was

1    Evan.

2           Do you have the 3500 binders?

3           THE COURT:  I do.

4           MR. PITTELL:  It's 3507-WW.

5           THE COURT:  Tell me why this is not --

6           MR. PITTELL:  I think it's probably a matter of cross

7    because the booking photo the guy has dreads and --

8           THE COURT:  3507-WW.

9           MR. PITTELL:  Right.

10          THE COURT:  All right.  Well, if this is a matter for

11   cross it's a matter for cross.  And then he may not go there.

12   Mr. Poscablo has indicated that he is going to see what he

13   wants to do as he proceeds which is certainly reasonable.  All

14   right.  I don't have the attachment which is the photograph.  I

15   only have the report from the 5/13/13 302.

16          MR. PITTELL:  I don't have the attachment either.  I

17   would just ask that if this becomes an issue I know there's a

18   copy in my office, so I tried to bring everything that I

19   think's relevant and I didn't foresee this happening and I

20   would just ask that I be given an opportunity to at least

21   reserve the right to potentially recall Mr. James for cross on

22   this specific photograph if it becomes an issue.

23          THE COURT:  So you are saying that the fact that a

24   witness might do an in-court identification can't be a

25   surprising thing and so, therefore, if you had information that

1   you would use to cross-examine that witness on a potential

2   in-court identification then that's the kind of thing that you

3   know you do.  If he's got dreads I don't know if that's helpful

4   or harmful to you given that at the time of the incident the

5   defendant didn't have dreads but does now.

6          So whether you -- why don't we do this?  I think that

7   we've arrived at -- do you want to circle back to Ms. Adams.

8   I've got an 11 o'clock call that will take me out for 15

9   minutes.  In fact, what I am going to do is move the 11 o'clock

10  call to some other time.  I'll move it to the 3:30 break.  I'm

11  going to move that because I don't want to be taking this big

12  long break and then have to break right away.  Circle back to

13  Ms. Adams because I want to get people in here.

14         Mr. Pittell, the question is I just want to elicit now

15  whether or not you believe -- and I think you should said no --

16  there should be no particular instruction by the government one

17  way or another to interfere with the testimony of the witness.

18         Let's bring the jury out.

19         Let's get Ms. Adams out.

20         (Witness present)

21         (Jury present)

22         THE COURT:  All right.  Ladies and gentlemen, let's

23  all be seated.

24         It looks like we have tops for the coffee cups.

25  Unless you brought your own, perhaps, they provided them.  I

E9BAADEL2                         Adams - Cross

```
1    want to apologize first for starting a little bit late.

2    Sometimes things do come up unexpectedly and we have to address

3    them before we have you folks out here and so I apologize.

4              All right.  We are continuing with Ms. Adams.

5              Mr. Pittell, you may proceed, sir.

6     JEANETTE ADAMS, resumed.

7    CONTINUED CROSS-EXAMINATION

8    BY MR. PITTELL:

9    Q.  All right.  Good morning, Ms. Adams.

10   A.  Good morning.

11   Q.  Ms. Adams, yesterday on direct-examination you said you

12   work as a home health aid?

13   A.  Yes.

14   Q.  How long have you been doing that?

15   A.  Over 20 odd years, like about 24, 25 years.

16   Q.  Has it been 20 years consistently?

17   A.  On and off.

18   Q.  There have been times when you've been unemployed?

19   A.  Yes.

20   Q.  You indicated that you went out with Mr. Patrick James for

21   four years?

22   A.  Yes.

23   Q.  But you stopped going out with him after the September

24   robbery?

25   A.  Yes.
```

E9BAADEL2                    Adams - Cross

1    Q.  And during that four-year period you lived with him for,

2    approximately, two years?

3    A.  Before what?

4    Q.  During that four-year period you lived with him for two

5    years?

6    A.  Yes.

7    Q.  And during that period was he paying the rent?

8    A.  Yes.

9    Q.  And was he paying the bills?

10   A.  He was paying bills, yeah.

11   Q.  And buying the food and things like that?

12   A.  He was paying the bills.

13   Q.  All right.  What about the car, did he buy the car?

14   A.  I financed the car.

15   Q.  Is he from Jamaica?

16   A.  Yes, he is.

17   Q.  Did you ever travel there with him?

18   A.  No.

19   Q.  You also indicated on direct-examination that he is a

20   marijuana dealer?

21   A.  Yes.

22   Q.  And he was doing that during the entire four-year period

23   that you were going out?

24   A.  When I met him he wasn't selling drugs.

25   Q.  What's that?

1    A.  When I met him he wasn't selling marijuana.

2    Q.  So at some point after you met him he started selling

3    marijuana?

4    A.  Yes.

5    Q.  You said that the type of marijuana he sold was Kush?

6    A.  Yes.

7    Q.  What is Kush?

8    A.  High grade.

9    Q.  High grade marijuana?

10   A.  Yes.

11   Q.  And I take it it's expensive marijuana?

12   A.  I don't know cause I never bought it.  I don't know how

13   much it cost.

14   Q.  But it's more expensive than low grade marijuana, I take

15   it?

16   A.  Yes.

17   Q.  Now, I was just a little unclear.  At the time of the

18   September 12 robbery were the two of you living together in

19   that apartment on Magenta Street or were you separated?

20   A.  We were living together.

21   Q.  But he kept his drugs and his money at a different

22   apartment that you called the "stash house"?

23   A.  Yes.

24   Q.  You had indicated that he used to go to California to get

25   his marijuana?

1    A.  Yes.

2    Q.  But when he started keeping the marijuana at the stash

3    house did you know about the comings and goings of his drug

4    business?

5    A.  No.

6    Q.  So the marijuana that was at the stash -- do you know if at

7    the time of the September 12 robbery there was any marijuana at

8    the stash house?

9    A.  No, I don't know.

10   Q.  And do you know at least as of the time of the September 12

11   robbery where he was getting his marijuana from?

12   A.  California.

13   Q.  He was still getting it from California then?

14   A.  Yes.

15   Q.  Now, you had indicated that during this incident you heard

16   a lot of voices coming and going in your apartment?

17   A.  Hear a lot of whispering, hear a lot of people going and

18   coming.

19   Q.  And I take it because you were blindfolded you couldn't see

20   them but could you hear them?

21   A.  Yes.

22   Q.  And you also indicated that you could tell people were

23   coming and going because you heard the alarm go off or at least

24   ring every time your door would open and close?

25   A.  Yes.

E9BAADEL2                          Adams - Cross

1    Q.  And when I say "door" I mean the front of the apartment?

2    A.  The front door and the back door.

3    Q.  And well, because you were blindfolded I take it you don't

4    know how many people were in the apartment at any given time

5    while you were blindfolded?

6    A.  No, just the two guys that I saw on the step.

7    Q.  But you are certain that when you came in in the beginning

8    you were going into the apartment there were two men?

9    A.  It was only two men.

10   Q.  Two men that first confronted you?

11   A.  Yes.

12   Q.  And then after those men brought you into the apartment

13   then you were blindfolded?

14   A.  Not at that point.

15   Q.  And now I believe you had indicated on direct-examination

16   that there was some talk about someone going to Rite Aid to get

17   some duct tape?

18   A.  Yes.

19   Q.  You heard that?

20   A.  The Jamaican guy, the one that is corresponding with me, he

21   is the one that tell somebody to go get the duct tape.  I don't

22   know who it was.

23   Q.  And then at some point you were duct taped?

24   A.  Yes.

25   Q.  And you had told us that your wrists were duct taped?

1    A.  Yes.

2    Q.  I'm sorry?

3    A.  Yes.

4    Q.  And your eyes were duct taped?

5    A.  Yes.

6    Q.  And then you indicated that you were certain -- we went

7    over this a little bit yesterday on cross-examination -- that

8    it was after you were duct tape that it was three men who raped

9    you?

10   A.  Yes.

11   Q.  So you were raped by three men after someone got the duct

12   tape from Rite Aid?

13   A.  Yes.

14   Q.  You also indicated they were smoking marijuana in the

15   apartment?

16   A.  Yes.

17   Q.  And were you able to tell that because after you were duct

18   taped you could smell the marijuana?

19   A.  They didn't duct tape my nose, so I could smell it.

20   Q.  Right.  So you didn't see them smoking marijuana?

21   A.  But I could smell it.

22   Q.  But you could smell it?

23   A.  Yes.

24   Q.  So the marijuana smoking occurred while you were duct taped

25   while the duct tape was on your eyes?

1   A.  Yes.

2   Q.  Ms. Adams, when we stopped yesterday I was asking questions

3   about other times that you had been robbed?

4   A.  Yes.

5   Q.  I just want to briefly go back over that with you.  You had

6   said that there's been four prior robberies?

7   A.  Yes.

8   Q.  So four robberies not counting the September robbery?

9   A.  September robbery make it four robbery.

10  Q.  All right.  So let's just briefly go through the first

11  three.  So on the night of the robbery you were playing bingo

12  with your sister, Violet; is that correct?

13  A.  Yes.

14  Q.  You were also laying bingo with Princess who is the mother

15  of Lisa Hylton?

16  A.  Grace.

17  Q.  Princess Grace?

18  A.  Grace.

19  Q.  Is "Princess" her nickname?

20  A.  No.

21  Q.  All right.  And Grace is the mother of Lisa Hylton?

22  A.  Yes.

23  Q.  And so you had told us that there was one robbery that

24  involved Lisa Hylton, your daughter, Crystal, and two other

25  people while you were living on Magenta Street?

E9BAADEL2                        Adams - Cross

1   A.  On Neil Avenue.

2   Q.  Was there one on Magenta Street involving Lisa Hylton?

3   A.  Yes.

4   Q.  That was the one we were talking about yesterday before the

5   break where you were held at gun and knife point?

6   A.  Yes.

7   Q.  And money and drugs were stolen from the apartment on

8   Magenta Street?

9   A.  Neil Avenue.

10  Q.  Were you ever robbed?

11  A.  Duryea Avenue that's where the gun and -- Duryea.

12  Q.  So the gun and knife occurred on Neil Avenue?

13  A.  "Duryea".

14  Q.  I am sorry.  I couldn't hear your last word?

15  A.  Duryea Avenue.

16  Q.  That one occurred while you were living on Duryea Avenue?

17  A.  Yeah.

18  Q.  And then there was another time when you were robbed was

19  very similar to this one where you came home on a Sunday night

20  after playing bingo and you were ambushed by two men who forced

21  you into your apartment?

22  A.  On Magenta, yes.

23  Q.  And those men were looking for Patrick's drugs and money?

24  A.  Yes.

25  Q.  And they stole his safe from the apartment?

1    A.   Yes.

2    Q.   And you just said that one occurred on Magenta Avenue?

3    A.   Yes.

4    Q.   So is that why he started stashing his drugs and money at

5    Neil Avenue?

6              MS. GERACI:  Objection, your Honor.

7              THE COURT:  Sustained.

8    Q.   So we have one robbery where you were living on Magenta two

9    men came and took Patrick's safe.  The second robbery occurred

10   while you were living on Duryea Avenue?

11   A.   The first robbery at Duryea with Lisa and the other two is

12   on Magenta.

13   Q.   So then let's go to the third one on Magenta.  That was

14   by -- that was when it was, the apartment was robbed by

15   Violet's son?

16   A.   Violet's son robbed the apartment when we were living on

17   Duryea.  Two robberies on Duryea and two is on Magenta.  That's

18   four robberies all together.

19   Q.   Let's just take them one at a time is what we're trying to

20   do so we can get through this, Ms. Adams.  What's the name of

21   Violet's son?

22   A.   Darren.

23   Q.   And a Violet is your sister?

24   A.   Yes.

25   Q.   Darren is your nephew?

E9BAADEL2                    Adams - Cross

1    A.  Yes.

2    Q.  So Darren robbed Magenta and took a show box full of money?

3    A.  Yes.

4    Q.  So that was the third time that you'd been robbed?

5    A.  That is the first time.

6    Q.  Well, it's one of the three times prior to the September 12

7    robbery?

8    A.  Yes.

9    Q.  But in all four times the robbers were seeking either

10   Patrick's drugs or money; is that correct?

11   A.  Yes.

12   Q.  And two of the robberies involved Lisa Hylton?

13   A.  Yes.

14   Q.  And one of them involved your nephew?

15   A.  Yes.

16   Q.  And one of them involved your own daughter?

17   A.  Yes.

18   Q.  Ms. Adams, you stated on direct-examination that the police

19   showed you some photographs?

20   A.  Yes.

21   Q.  And that you looked at these photographs and you identified

22   someone as one of the perpetrators of the robbery?

23   A.  Yes.

24   Q.  When I say "robbery" I mean the September robbery.

25   A.  Yes.

E9BAADEL2                          Adams - Cross

 1   Q.  And when you looked at it did they show you a display, a

 2   piece of paper which displayed six photographs?

 3   A.  I can't remember how many photographs it was.

 4   Q.  But there was a group of photographs?

 5   A.  Yes.

 6   Q.  And you identified one of the persons, drew a circle around

 7   a person and signed your name underneath?

 8   A.  Yes.

 9          MR. PITTELL:  May I approach the witness and show the

10   witness an exhibit?

11          THE COURT:  You may.  Is this -- are you showing it

12   for purposes of refreshing your recollection or are you going

13   to move it in?

14          MR. PITTELL:  I am going to put it in.

15          THE COURT:  Yes.

16          MR. PITTELL:  It's -- actually, because there's

17   several markings, perhaps, we should mark this as Defense A.

18          THE COURT:  All right.

19          (Pause)

20          MR. PITTELL:  Approach the witness, your Honor?

21          THE COURT:  Yes.

22   Q.  Ms. Adams, I am showing you a document.  It's marked as

23   Defense Exhibit A.  Do you recognize that document?

24   A.  Yes.

25   Q.  Do you see your signature on that document?

1   A.  Yes.

2   Q.  Is that the group of photos that the police showed you that

3   I just asked you some questions about?

4   A.  Yes.

5           MR. PITTELL:  Judge, I offer Defense A into evidence.

6           THE COURT:  Any objections?

7           MS. GERACI:  No, your Honor.

8           THE COURT:  Received.

9           (Defendant's Exhibit A received in evidence)

10  Q.  Ms. Adams, you said on the night of the incident you were

11  wearing a dress?

12  A.  I was wearing a tights and a top.

13  Q.  When I say "the incident" I mean the September 12 robbery.

14  A.  Yeah.  I was wearing a white shirt, button down shirt and a

15  black tights.

16  Q.  When I say September 2 robbery.

17  A.  Yeah.

18          MR. PITTELL:  Thank you.  I have no further questions

19  of this witness, judge.

20          THE COURT:  All right.  Thank you.

21          Ms. Geraci, do you have any redirect?

22          MS. GERACI:  Yes, your Honor.  One moment?

23          THE COURT:  All right.

24          (Pause)

25          MS. GERACI:  Actually, nothing, your Honor.

1          THE COURT:  Thank you.  Ms. Adams, you may step down.

2          All right.  Would the government like to call its next

3    witness, please.

4          MR. POSCABLO:  Your Honor, the government calls

5    Patrick James.

6          THE COURT:  All right.  Mr. James to the stand,

7    please.

8     PATRICK ANTHONY JAMES,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. POSCABLO:

13   Q.  Good morning, Mr. James.

14   A.  Good morning.

15   Q.  Mr. James, based upon conversations that you had with your

16   counsel is it your intention to assert your Fifth Amendment

17   right against self incrimination in answering certain questions

18   today?

19   A.  Yes.

20   Q.  And have you been informed through your counsel that the

21   government intends to seek an order of immunity which would

22   allow you to testify about any questions that are posed to you

23   today?

24   A.  Yes.

25   Q.  Just to be clear, if you are asked certain questions on the

E9BAADEL2                    James - Direct

1   stand today about your background and your conduct without

2   being given immunity, would you assert your Fifth Amendment

3   right not to testify?

4   A.  Yes, I would.

5           MR. POSCABLO:  Your Honor, the government asserts for

6   reasons stated in its application that the testimony of this

7   witness is important and that this witness contains, possesses

8   information that is important to the matters at issue before

9   the Court and would ask your Honor to grant the witness

10  immunity to testify today.

11          THE COURT:  That motion is granted.

12          MR. POSCABLO:  Thank you, your Honor.

13          Your Honor, would this be an appropriate time for your

14  admonition to the witness?  That admonition being that he

15  understands his grant of immunity in regards to questions and

16  answers to questions posed to him that may incriminate him that

17  they can't be used at any trial against hims unless he doesn't

18  tell the truth or he fails to answer.

19          THE COURT:  With if he commits perjury he's got a

20  series of issues.  He is sworn to tell the truth, the whole

21  truth and nothing but the truth.  Your immunity covers you so

22  long as you tell the truth.

23          All right.  I didn't know what admonition you were

24  talking about.

25          MR. POSCABLO:  Thank you, your Honor.

```
1    Q.  Mr. James, how old you, sir?

2    A.  47 years old.

3    Q.  What borough do you currently live in?

4    A.  I currently live in Manhattan.

5    Q.  You go by any other mates?

6    A.  Yes, I do.

7    Q.  What names?

8    A.  Eugene Brown.

9    Q.  And you've just answered some questions regarding an

10   immunity that you've received, correct?

11   A.  Yes.

12   Q.  So you are testifying today pursuant to an immunity order?

13   A.  Yes.

14   Q.  And what is your understanding of what that immunity order

15   protects you from?

16   A.  Protects me from being prosecuted from anything I speak

17   about in court except if I lie.

18   Q.  How long have you lived in your current residence?

19   A.  About eight months.

20   Q.  Where did you live prior to that?

21   A.  I lived in the Bronx.

22   Q.  Do you remember the address?

23   A.  801 Neil Avenue and 830 Magenta.

24   Q.  Any other addresses?

25   A.  No.
```

E9BAADEL2                        James - Direct

1    Q.  How long were you living in the Magenta apartment, the 830

2    Magenta Avenue apartment?

3    A.  Approximately, two years.

4    Q.  When did you move out?

5    A.  I moved out after the robbery.

6    Q.  How about the Neil Avenue apartment?

7    A.  Approximately, three years.

8    Q.  And when did you move out of that one?

9    A.  I moved out of that one, approximately, two months after

10   the robbery.

11            MR. POSCABLO:  OK.  Ms. Chen, Government Exhibit 401

12   which is in evidence, please.

13            (Pause)

14   Q.  Mr. James, do you recognize this map?

15   A.  Yes, I do.

16   Q.  And did you have an opportunity to review it prior to your

17   testimony today?

18   A.  Yes I did.

19   Q.  Does this map fairly and accurately show where 830 Magenta

20   Street, where your residence is?

21   A.  Yes, it is.

22   Q.  Is it Magenta Street or Avenue?

23   A.  Street.  I think it's a street.  It says "street".

24   Q.  Is that what your recollection about where that apartment

25   was?

1   A.  Yes.

2            MR. POSCABLO:  May I approach, your Honor?

3            THE COURT:  You may.

4   Q.  I am handing you what's been marked for identification as

5   Government Exhibit 40.  Take a quick look at it and look up at

6   me when you're done.  Do you recognize it?

7   A.  Yes, I do.

8   Q.  What do you recognize it to be?

9   A.  It's a map of the Bronx with Neil Avenue and Magenta

10  Street.

11  Q.  Does that fairly and accurately depict that portion of the

12  Bronx which has Magenta Street and Neil Avenue?

13  A.  Yes, it does.

14           MR. POSCABLO:  Your Honor, the government offers

15  Government Exhibit 40.

16           THE COURT:  Any objection?

17           MR. PITTELL:  No objection.

18           THE COURT:  Received.

19           (Government's Exhibit 40 received in evidence)

20  Q.  Mr. James, what did you primarily do for a living in

21  September of 2012?

22  A.  I sold marijuana.

23  Q.  Do you still sell marijuana?

24  A.  No, I don't.

25  Q.  When was the last time that you sold marijuana?

E9BAADEL2                         James - Direct

1    A.  It's been over a year.

2    Q.  Were you a victim of a robbery in September of 2012?

3    A.  Yes.

4    Q.  Where did that robbery take place?

5    A.  The robbery took place at 830 Magenta and 801 Neil Avenue.

6    Q.  Did you live with anyone at either residence at the time?

7    A.  Yes, I did.

8    Q.  With whom?

9    A.  My live-in girlfriend, Jeanette Adams.

10           MR. POSCABLO:  Ms. Chen, Government Exhibit 15,

11   please, which is in evidence.

12           (Pause)

13   Q.  Do you recognize that person?

14   A.  Yes.

15   Q.  Who is that?

16   A.  That's Ms. Adams.

17           MR. POSCABLO:  And Government Exhibit 14 which is also

18   evidence.

19           (Pause)

20   Q.  Who is that?

21   A.  It's me.

22   Q.  Did anyone live with you at the Neil Avenue apartment?

23   A.  No.

24   Q.  During this robbery -- when did the robbery occur?

25   A.  The robbery occurred September 4.

1   Q.  Of 2012?

2   A.  Yes.

3   Q.  And were you assaulted during that robbery?

4   A.  Yes, I was.

5   Q.  Can you tell the jury what types of injuries you suffered?

6   A.  I received a cut to my elbow and a bunch of gashes to my

7   head.

8   Q.  What was taken during the robbery?

9   A.  $45,000 in cash from my Neil Avenue apartment, $5,500 from

10  Magenta apartment and $800 which was in my pockets, assorted

11  jewelry and electronics.

12  Q.  Was any marijuana or drugs taken?

13  A.  Yes, there was.

14  Q.  How much?

15  A.  Six pounds.

16  Q.  Of what?

17  A.  High grade Sour Diesel.

18  Q.  Sour diesel is a type of marijuana?

19  A.  Yes.

20  Q.  In thinking back to 2012, what was the value of a pound of

21  high grade Diesel marijuana?

22  A.  About four thousand.

23  Q.  Focusing on the $45,000 that was taken from Neil Avenue,

24  the $5,500 that was taken from the Magenta apartment and the

25  $800 in your pocket, what was the source of that money?

1    A.   It was proceeds from sales of marijuana.

2    Q.   Was the marijuana that was stolen yours?

3    A.   Yes, it was.

4    Q.   Was the money that was stolen yours?

5    A.   Yes, it was.

6    Q.   Tell me how many people were involved in the robbery?

7    A.   Approximately, four or five.

8    Q.   I want to shift gears a little bit and talk a little bit

9    about your background, OK?

10   A.   Yes.

11   Q.   Then we'll go back to the robbery.  When did you begin to

12   sell marijuana?

13   A.   I started selling marijuana back in 1987.

14   Q.   And have you been convicted of any felonies or selling

15   marijuana?

16   A.   Yes, I have.

17   Q.   How many?

18   A.   Three.

19   Q.   I turn your attention to 1987 or 1988?

20   A.   Yes.

21   Q.   Did you have a felony for selling marijuana then?

22   A.   Yes, I did.

23   Q.   Where was that?

24   A.   This was in New Jersey.

25   Q.   OK.  In federal or state court?

 1   A.  This was in -- I think was in -- no, it was -- it was in --

 2   I think it was in -- no, it wasn't federal.  It was in state

 3   court.

 4   Q.  Passaic County?

 5   A.  Yes.

 6   Q.  Did you have another felony in New Jersey?

 7   A.  I had two in New Jersey.

 8   Q.  Did you have a felony conviction?

 9   A.  Yes, I did.

10   Q.  And when was that?

11   A.  This was 1989 in Phoenix, Arizona.

12   Q.  Is it 1989 or 1999?

13   A.  No.  It was -- yeah.  I am sorry.  Correct, it was 1998.

14   Q.  That was in Phoenix, Arizona?

15   A.  Yes.

16   Q.  And what did you plead -- did you plead guilty in that

17   case?

18   A.  Yes, I did.

19   Q.  What did you plead guilty to?

20   A.  One count of conspiracy to distribute cocaine and

21   marijuana.

22   Q.  What sentence did you receive in 1998 for your felony

23   conviction?

24   A.  I served 38 months.

25   Q.  Were you deported after your federal arrest after your

1    conviction?

2    A.   Yes, I was.

3    Q.   Where were you deported to?

4    A.   I was deported back home to Jamaica.

5    Q.   Is that where you were born?

6    A.   Yes.

7    Q.   And did you return to the United States?

8    A.   Yes, I did.

9    Q.   When, approximately?

10   A.   2006.

11   Q.   Did you do that illegally or legally?

12   A.   I did it illegal.

13   Q.   Illegally?

14   A.   Illegally.

15   Q.   Did use your own personal identification when you entered

16   the United States back in 2006 illegally?

17   A.   No, I didn't.

18   Q.   Whose identification did you use?

19   A.   I used a friend of mine.

20   Q.   What was that person's name?

21   A.   James Brown.

22   Q.   That's not the Godfather of Soul, right?

23   A.   No, it's not.

24   Q.   A whole other person?

25   A.   Whole other person.

E9BAADEL2                     James - Direct

1    Q.  Did Mr. Brown have a relative?

2    A.  Yes, he did.

3    Q.  What's the relative's name?

4    A.  Eugene Brown.

5    Q.  Is that the name that you use now?

6    A.  Yes.

7    Q.  Well, your real name "Patrick James"?

8    A.  Yes.

9    Q.  OK.  Why do you use those names, Eugene Brown?

10   A.  Well, I cannot use my real name because I'll be deported,

11   so I needed a name so I can use it to travel and just live in

12   New York.

13   Q.  Now, Mr. James, has the government promised you anything

14   with regards to your immigration status?

15   A.  No, they have not.

16   Q.  At some point after your return to United States in 2006

17   did you begin to sell marijuana again?

18   A.  Yes, I did.

19   Q.  When was that?

20   A.  Approximately, a year later in 2007.

21   Q.  When was the last time -- again, you testified that the

22   last time you participated in a marijuana transaction was about

23   a year ago?

24   A.  Yes.

25   Q.  So from 2008 up until your most recent transaction how much

1   marijuana did you sell per week?

2   A.   Approximately, 20 pounds.

3   Q.   20 pounds?

4   A.   Yes.

5   Q.   And where did you get that marijuana from?

6   A.   The marijuana was shipped from the state of California.

7   Q.   And where was it shipped to?

8   A.   It was shipped to different homes all over New York.

9   Q.   In the Bronx?

10  A.   Bronx, Manhattan, yeah.

11  Q.   How was it packaged when you received it?

12  A.   It's vacuum sealed.  It is wrapped in a blue shop towel,

13  it's doused with alcohol, then vacuum sealed and then placed

14  inside of a box.

15  Q.   Let's talk about the shop towel.  Is that akin to the

16  towels used to wash cars?

17  A.   Yes.

18  Q.   Why is it wrapped in that?

19  A.   We used to use like Bounty regular paper towels but they

20  proved to be too thin.  So we use shop towels because they were

21  more absorbent.

22  Q.   What was the point of dousing them in alcohol?

23  A.   To prevent them being smelled by dogs.

24  Q.   What type of marijuana did you sell?

25  A.   Kush, Sour Diesel, premium grade marijuana.

E9BAADEL2                    James – Direct

1   Q.  OK.  And in your experience as a marijuana dealer do you

2   know where that type of marijuana is typically grown?

3   A.  It's grown typically in the Golden Triangle in the state of

4   California.

5   Q.  What's the Golden Triangle?

6   A.  It's an area from San Francisco to Humboldt County to

7   Eureka, back to San Francisco.

8   Q.  You testified that is where your marijuana came from?

9   A.  Yes.

10  Q.  Once you get it to the Bronx what did you do with the

11  marijuana?

12  A.  I had about five people that I distributed to.

13  Q.  Where did that occur, those deals?

14  A.  Some occurred in my apartment on Neil Avenue and some was

15  on the streets.

16  Q.  And how did you receive payment for the marijuana you

17  provided them?

18  A.  Some people paid cash and some was on consignment.

19  Q.  Can you explain what you mean by "consignment".

20  A.  I will give it to them and they pay me at a later date.

21  Q.  Like credit?

22  A.  Yeah, credit.

23  Q.  And where were these drug dealers that you would provide

24  the marijuana to, where were they located in general?

25  A.  The Bronx and New Jersey.

1    Q.  What would you do with the proceeds, with the money that

2    you received?

3    A.  I sent some home and purchased property and some I kept

4    here.

5    Q.  And did you pay taxes on proceeds you received for your

6    marijuana business?

7    A.  No, I did not.

8    Q.  Where did you keep the money that you didn't send to

9    Jamaica?

10   A.  It was kept in my safe at the Neil Avenue apartment.

11   Q.  Did you typically keep a gun in this house, as well?

12   A.  Yes, I did.

13   Q.  For what reason?

14   A.  For protection.

15   Q.  What type of gun?

16   A.  It was a Ruger 9-millimeter.

17   Q.  You still have it?

18   A.  No, I don't.

19   Q.  What did you do with it?

20   A.  I turned it over to the FBI.

21   Q.  Anybody in particular?

22   A.  Yes.

23   Q.  Who?

24   A.  Special Agent John Reynolds.

25   Q.  The individual sitting at counsel table?

E9BAADEL2                        James - Direct

1   A.  Yes.

2   Q.  When did you turn it over to him?

3   A.  Summer of 2013.

4   Q.  So, a little over a year ago?

5   A.  Yeah.

6   Q.  And you testified that you were a victim of robbery in

7   September of 2012, right?

8   A.  Yes.

9   Q.  Do you remember the specific dates that the robberies,

10  robbery occurred?

11  A.  Started September 2 and ended September 4.

12  Q.  And from your own memory do you remember the particular

13  days of the week that the robbery happened?

14  A.  Sunday to Tuesday.

15  Q.  You testified that you were living in Neil Avenue and

16  Magenta?

17  A.  Yes.

18  Q.  At the time in September of 2012 did you store marijuana in

19  either one of those locations?

20  A.  Yes, I did.

21  Q.  Which locations?

22  A.  Both.

23  Q.  How about money?

24  A.  Yes, I did.

25  Q.  In which locations?

1    A.  Both.

2    Q.  You testified that Ms. Adams at the time of the robbery was

3    your live-in girlfriend; is that correct?

4    A.  Yes, she was.

5    Q.  Prior to the robbery, how long had you been dating up until

6    the robbery?

7    A.  Approximately, four years.

8    Q.  How long had you been living together?

9    A.  Approximately, four years.

10   Q.  Are you still dating?

11   A.  No, we're not.

12   Q.  What is your relationship, if any, now?

13   A.  We're friends.

14   Q.  When was the last time you spoke with her?

15   A.  I spoke to her yesterday.

16   Q.  Did you speak to her about the facts of this case

17   yesterday?

18   A.  No, we didn't.

19   Q.  Now turning your attention to September 2, 2012 --

20   A.  Yes.

21   Q.  -- that's the Sunday.  Do you recall where you were?

22   A.  I was in Atlanta.

23   Q.  What were you doing there?

24   A.  I went to watch a football game with my son.

25   Q.  Now prior to traveling to Atlanta, had you previously

E9BAADEL2                      James - Direct

1    gotten into a fighting with Ms. Adams?

2    A.  Yes, I did.

3    Q.  When did that occur?

4    A.  I think it was August 31.

5    Q.  When did you return from Atlanta?

6    A.  September 2nd, a Sunday.

7    Q.  Do you remember what time?

8    A.  I flew into LaGuardia and got in like around seven.

9    Q.  What did you do when you got in?

10   A.  I took a cab to Magenta and I went upstairs and I got some

11   clothes.  I went downstairs in the garage and I got my car and

12   I went to see a friend of mine.

13   Q.  Why did you get clothes?

14   A.  Because me and her got into an argument, so I didn't want

15   to fight with her.  I wanted to say at Neil Avenue for a while.

16   Q.  You were going to go somewhere else?

17   A.  Yeah.

18   Q.  Did you go back to the Magenta apartment at some point?

19   A.  Yes, I did, around nine o'clock.

20   Q.  What did you do?

21   A.  I went and got more clothes.

22   Q.  How did you do that?

23   A.  I drove my car.

24   Q.  When you got there at 7:30 was Jeanette there?

25   A.  No, she wasn't.

E9BAADEL2                    James - Direct

1   Q.  When you got there at nine o'clock was Jeanette there?

2   A.  No, she wasn't.

3   Q.  Did you know where she was?

4   A.  I figured that she was at bingo.

5   Q.  Why is that?

6   A.  Because that's her routine.  She goes to bingo Friday,

7   Saturday, Sunday nights.

8   Q.  And after you got your clothes that last time at nine

9   o'clock where did you go?

10  A.  I went to my Neil Avenue apartment.

11  Q.  Did you remain there the entire night?

12  A.  Yes, I did.

13  Q.  Did you have any contact with Ms. Adams that night?

14  A.  No, I did not.

15  Q.  Now the next day is September 3, 2012; is that correct?

16  A.  Yes.

17  Q.  Did she attempt to contact you on that day?

18  A.  Yes, she did.

19  Q.  How?

20  A.  She called me on my cellphone.

21  Q.  Do you remember your cellular telephone at the time?

22  A.  (201)916-0824.

23  Q.  Did you actually talk to her on that day?

24  A.  Yes, I did.

25  Q.  That's September 3rd?

1   A.  Yes.

2   Q.  Do you recall what she said to you?

3   A.  She said she needed some money.  So I told her I would

4   bring it by later.  I was in New Jersey taking care of some

5   business.

6   Q.  Sitting here now -- no.  At the time that she called you --

7   A.  Yes.

8   Q.  -- did you pick up on anything in her voice?

9   A.  Not immediately.

10  Q.  OK.  And even after the conversation did you -- that

11  conversation?

12  A.  No.

13  Q.  Was there anything unusual about her calling you and asking

14  you for money?

15  A.  Yeah.  I could remember we get into an argument she never

16  calls me.  She always texted me.

17  Q.  That was her way of showing she was mad at you?

18  A.  Yes.

19  Q.  Did she call you again on your cellphone that day,

20  September 3rd?

21  A.  She called, approximately, two or three more times.

22  Q.  Did you speak with her?

23  A.  Yes, I did.

24  Q.  What was the general gist of the conversation?

25  A.  I told her I was in New Jersey and seems like she really

E9BAADEL2                          James - Direct

```
 1  needs money.  So I said, you know I am taking some stuff to my
 2  daughter.  Call me later.  She was like, well, hurry up.
 3  Q.  How much money did she ask you for?
 4  A.  $110.
 5  Q.  Was that unusual?
 6  A.  Yeah.
 7  Q.  Why?
 8  A.  It's an odd amount of money.  I don't know why she would
 9  ask for $110.
10  Q.  Did you come to learn why she would ask for $110?
11           MR. PITTELL:  Objection.
12           THE COURT:  I'll allow it.
13  Q.  Did you come to learn why she asked you for $110?
14  A.  Yeah.  She was sending me a clue call 911.
15  Q.  Did you get that clue?
16  A.  No, I didn't.
17  Q.  And, approximately, what time did that call occur?
18  A.  Probably about six in the evening.
19  Q.  On Monday the 3rd?
20  A.  On the third, yeah.
21  Q.  And did Ms. Adams call you on your cellphone that night --
22  what did you do?
23  A.  When we came back to the Bronx I went to Magenta and I put
24  the $110 in her side mirror.  There's a slot between the glass
25  and the side mirror and I closed it.
```

1   Q.  And did you talk to her again after that?

2   A.  She called me.  After l left there she called me like 15

3   minutes later and I said, Jeanette, I left the money

4   downstairs.  I don't want to come upstairs.  I don't wan to

5   argue.  And she was begging me to come upstairs.  So I was like

6   I'm already halfway to Neil.  I'm not coming back up there.

7   She said, please, come up here.  I need to talk to you.  I

8   said, no, I am not coming.

9   Q.  What time did that conversation happen?

10  A.  Probably, nine o'clock.

11          THE COURT:  This is on what day?

12          THE WITNESS:  This the 3rd of September.

13  Q.  Monday, right?

14  A.  Yeah, Monday.

15  Q.  When was the next time that Ms. Adams called you?

16  A.  She called me the following day, the 4th.

17  Q.  On Tuesday?

18  A.  Yes.

19  Q.  This is by cellphone?

20  A.  Yes.

21  Q.  And did you actually speak with her?

22  A.  Yes, I did.

23  Q.  What did you speak about during this conversation?

24  A.  I told her I was going to come by and she said, well, bring

25  me some food.

E9BAADEL2                    James - Direct

1   Q.  OK.  And how did she sound on the phone?

2   A.  She sounded a little distraught.

3   Q.  So what did you do?

4   A.  I went to a restaurant.  I ate and I called her and asked

5   her what did she want.  And I was telling her that they don't

6   have any fried chicken, the rice and peas.  This what she

7   always orders.  And she was like, just bring me some stew

8   chicken and white rice.  I asked her, are you sure?  Cause you

9   never eat this at a restaurant.  She said, no, it's fine.  I

10  can go somewhere else and buy you fried chicken and rice and

11  peas.  And she's like, no, just bring that and bring me a soda.

12  Q.  Is that unusual?

13  A.  Yeah, because she doesn't drink sodas.

14  Q.  Still at this point did you -- did you sense anything at

15  this point?

16  A.  No.

17  Q.  Did you eventually go to the apartment at 830 Magenta?

18  A.  Yes, I did.

19  Q.  What time did you arrive there?

20  A.  Approximately, 3:30.

21  Q.  What, if anything, did you have with you in addition to the

22  food?

23  A.  I had a box containing six pounds of marijuana.

24  Q.  For what reason?

25  A.  It was shipped to me and I collected it that day.

1    Q.  What were you going to do with it?

2    A.  I was going to break it down, reseal it and distribute it.

3    Q.  And again, where did that marijuana come from?

4    A.  The marijuana came from the state of California.

5    Q.  So lead the jury through what happens next, OK.  You go to

6    Magenta, you go to the door.

7    A.  I go to Magenta.  I parked my car in the garage.  I always

8    do.  I went upstairs.  I opened -- I used the key to open the

9    door and stepped in.  I noticed it was dark.  Which was not

10   unusual.  Jeanette always kept the house kind of dark.  As I

11   stepped in there is, to my left is the kitchen and the living

12   room and around the corner is the bedroom and the bathroom.  I

13   saw, approximately, four or five guys jump out at me, one

14   waving a gun and the rest of them with knives and they grabbed

15   me.

16   Q.  What did they do?

17   A.  I started wrestling with them and then I ended up right

18   by -- I ended up right by the bathroom door and when I looked

19   in I saw Jeanette laying in the tub, her entire head covered in

20   duct tape.  Her arms bound in front of her.  Her legs bounded

21   too.

22   Q.  What did you think?

23   A.  I thought she was dead.

24   Q.  Did you notice whether the men -- was it men who attacked

25   you?

1    A.  Yeah.

2    Q.  Did you notice what the men were wearing on their head?

3    A.  A couple of them had their shirts pulled up over their

4    face.  I think one them had like a shirt tied around his face.

5    Q.  What about on their hands?

6    A.  They had latex gloves.

7    Q.  So what happened next when you saw Jeanette?

8    A.  When I saw Jeanette laying there I start to panic and I

9    started fighting back.  Then one stabbed me in the elbow with a

10   knife.  Then they picked me up literally picked me up and

11   brought me into the bedroom.  They put me on floor, tied my

12   legs, tied my arms and hogtied my legs and my arms together.

13   Q.  Behind?

14   A.  Behind.  Then they put a sock in my mouth and taped my

15   face.

16   Q.  Now, at this time you said that you saw at least one of

17   them with a gun, right?

18   A.  Yeah.

19   Q.  What type of gun was it?

20   A.  It was a chrome resolve.

21   Q.  You testified that you saw several of them with knives?

22   A.  Yes.

23   Q.  Did you recognize the knives that they had?

24   A.  They looked like knives from outside the kitchen.

25   Q.  From the block in the kitchen?

E9BAADEL2                    James - Direct

1   A.  Yes.

2   Q.  At that point had they taken anything from you yet?

3   A.  They took the marijuana.

4   Q.  Did they take anything from your person?

5   A.  Yeah.  They took the money out of my pockets.  There were

6   people all around me.  They took the money.  They took my

7   watch.  They took my wallet.

8   Q.  What kind of watch was it?

9   A.  A G-Shock.

10  Q.  What money did they take from your pocket?

11  A.  They took about, I think it's about eight or nine hundred

12  dollars.

13          MR. POSCABLO:  May I approach, your Honor?

14          THE COURT:  Yes.

15  Q.  I am handing you what's been marked for identification as

16  Government Exhibit 20.  Do you recognize it?

17  A.  Yes, I do.

18  Q.  What do you recognize that to be?

19  A.  That's a picture of me.

20          MR. POSCABLO:  OK.  Your Honor, the government offers

21  Government Exhibit 20.

22          THE COURT:  Any objections?

23          MR. PITTELL:  No.

24          THE COURT:  Received.

25          (Government's Exhibit 20 received in evidence)

1              MR. POSCABLO:  May we publish it, your Honor?

2              THE COURT:  You may.

3              (Pause)

4    Q.  Who is this a photograph of?

5    A.  It's me.

6    Q.  What, if anything, is on your left wrist?

7    A.  It's my G-Shock watch.

8    Q.  The one that they took?

9    A.  Yes.

10   Q.  When was that photograph taken?

11   A.  It was taken September 1 in Atlanta.

12             MR. POSCABLO:  All right.  You could take it down

13   Ms. Chen.

14             (Pause)

15             MR. PITTELL:  Judge, I didn't hear the last part --

16   was taken September 1 and --

17             THE WITNESS:  In Atlanta.

18   Q.  That was 2012, right?

19   A.  Yes.

20   Q.  That was taken right before you came home?

21   A.  Yes.

22   Q.  You testified that you saw Ms. Adams, Jeanette, in the

23   bathroom, right?

24   A.  Huh?

25   Q.  You saw Ms. Adams in the bathroom?
     A.  Yes.

E9bQdel3                         James - direct

 1   BY MR. POSCABLO:  (CONTINUED)

 2   Q.  Do you remember where she was?

 3   A.  She was in the bathroom in the bathtub.

 4   Q.  Was she talking or making any noise?

 5   A.  No.

 6   Q.  Did anyone do anything to stop the bleeding?  Were you

 7   bleeding from your arm?

 8   A.  Yes, I was.  I was bleeding.

 9   Q.  What, if anything, did they do?

10   A.  One of them, he was -- I think it's a scarf or a tie and

11   tied -- tied a tourniquet around my arm.

12   Q.  What, if anything, did anyone say to you -- did anyone say

13   anything to you at this point?

14   A.  They said that they were doing that because they didn't

15   want me to bleed to death before they got the money.

16   Q.  Who said that to you?

17   A.  He was one of the robbers.  We called him The Talker,

18   Trevor Cole.

19   Q.  The Talker.

20   A.  Yeah.

21   Q.  OK.  Let's take what your testimony was in pieces.

22   A.  Yes.

23   Q.  You said he was The Talker?

24   A.  Yes.

25   Q.  Why did you call him that?

1   A.  Because he did all the talking.

2   Q.  Was there anything about distinctive about this voice?

3   A.  Yes, he had a distinct Jamaican accent.

4   Q.  You testified that The Talker is Trevor Cole, right?

5   A.  Yeah.

6   Q.  Ms. Chen, can you put up Government Exhibit 10 which is in

7   evidence.  Do you recognize that person?

8   A.  Yes, that is Trevor Cole.

9   Q.  OK.  Sitting here today, you know that's Trevor Cole.  Is

10  that correct?

11  A.  Yes.

12  Q.  At the time of the robbery, did you know his name?

13  A.  No, I didn't.

14  Q.  And right after the robbery, were you able to identify that

15  person?

16  A.  No, I wasn't.

17  Q.  Ms. Chen, you can leave that up for a minute.

18          When was the first time that you identified this

19  person as the individual who was The Talker inside 830 Magenta?

20  A.  When I saw him in court.

21  Q.  How did you learn that his name was Trevor Cole?

22  A.  From the prosecutor.

23  Q.  But you now identified him as the person who was The Talker

24  in the robbery?

25  A.  Yes.

1   Q.  Do you recall being shown photographs of him?

2   A.  Yes, I did.

3   Q.  And at the time that you were shown a photograph, were you

4   able to identify him?

5   A.  No, I wasn't.

6   Q.  How were you able to identify him in court and not identify

7   him in the photograph?

8   A.  Well, he was distinctly tall and slender.  So, seeing the

9   silhouette and seeing the face, I kinda put the two together.

10  Q.  What else did Mr. Cole say to you at the time?

11  A.  He said, "We need some money."  So I said, "I have money in

12  my safe on Neill Avenue."  He asked me how much.  I said

13  "$45,000."  So, he said, "What's the combination to the safe?"

14  So I gave him the combination of the safe to him.  He took my

15  keys.

16  Q.  Now, you said that they had duct taped your mouth and put a

17  sock in your mouth.  How were you able to talk to him?

18  A.  He took the duck tape off so I could talk to him.

19  Q.  Did you have a money counter or cash counter in your

20  apartment?

21  A.  Yes, I did.

22  Q.  Did he say anything about that?

23  A.  Yeah.  He's like, "We found the money counter, so you got

24  some money.  We want some money."

25  Q.  You testified that -- how many people again were in the

1   apartment?

2   A.  Approximately four or five.

3   Q.  Did you hear voices in the apartment?

4   A.  Yes, I did.

5   Q.  Sitting here today, approximately how many voices did you

6   hear?

7   A.  Probably two or three voices.

8   Q.  And were they male or female?

9   A.  They were male.

10  Q.  The voices, I mean.

11  A.  Yes, they were male.

12  Q.  And the people who attacked you, you testified earlier that

13  they were men, right?

14  A.  Yes, they were.

15  Q.  Now, were you able to see anyone when you were attacked

16  coming into your apartment?

17  A.  Yes, I was.

18  Q.  What about during the entire episode during the entire time

19  you were there, were you able to see people?

20  A.  Yeah, I was.

21  Q.  And you testified earlier did they also put duct tape

22  around your eyes?

23  A.  Yes, they did.

24  Q.  Were you able to see even though they put duct tape around

25  your eyes?

E9bQdel3                          James - direct

1   A.  Yeah, I got the duct tape loose after awhile.

2   Q.  How were you able to do that?

3   A.  I -- there's vent inside the bedroom, so I crawled over and

4   I rubbed my head against it and got the duct tape up over my

5   eyes a little bit.

6   Q.  You testified earlier that some of the people -- some of

7   the men, the robbers that were in your apartment, may have had

8   things over their face.  Is that correct?

9   A.  Yes.

10            MR. POSCABLO:  One moment, your Honor?

11  Q.  Ms. Chen, Government Exhibit 11, which is in evidence,

12  please.

13            Do you recognize that person?

14  A.  That's Jean-Pierre (ph).

15  Q.  How do you recognize that individual?

16  A.  I identified him.

17  Q.  As what?

18  A.  As one of the robbers.

19  Q.  At the time you identified him as one of the -- let me step

20  back.  Did you know him prior to the robbery?

21  A.  No, I did not.

22  Q.  Did you know his name prior to the robbery?

23  A.  No, I did not.

24  Q.  After the robbery, you're saying you were able to identify

25  the photograph?

E9bQdel3                          James - direct

1    A.  Yes.

2    Q.  And the person?

3    A.  Yes.

4    Q.  And how did you learn the name of this individual?

5    A.  In court.

6    Q.  Government Exhibit 13, do you recognize that person?

7    A.  Yes.

8    Q.  Who is that?

9    A.  That's one of the robbers too.

10   Q.  When did you --

11            MR. PITTELL:  I'm sorry.  Could I have that answer

12   read back.

13            THE COURT:  Yes.  The court reporter can read that

14   back.

15            (Read back)

16   Q.  Were you shown a photograph of this prior to your testimony

17   today?

18   A.  Yes.

19   Q.  Do you know when the first time you saw this photograph?

20   A.  When I identified him.

21   Q.  Did you know this person prior to the robbery?

22   A.  No, I did not.

23   Q.  Did you learn this individual's name?

24   A.  No, I don't know him.

25   Q.  Do you think you could recognize others who were involved

1    in the robbery?

2    A.  It's possible.

3    Q.  Do you recognize anyone in the courtroom who was involved

4    in the robbery?

5    A.  No, I don't.

6    Q.  OK.  What happened after they brought you into the bedroom

7    and they asked you about your drugs and the money?

8    A.  They went silent for awhile, and I start calling for

9    Jeanette.  Then a guy came back in the room and was like, "Shut

10   the fuck up.  We're still here.  This ain't the police, mother

11   fucker."

12   Q.  And what happened next?

13   A.  Then while I was there, I couldn't -- for some reason I

14   couldn't stay still.  I kept moving and I kept making noises.

15   So, then the guy was on the phone.  I heard him on the phone,

16   he was like, "This mother fucker won't shut up, man.  What do

17   you want me to do?  Then he came over and he hit me in the head

18   like three times with a gun.  Then he picked up -- in the

19   bedroom we had one of the small tables.  He picked it up and

20   dropped it on me.  Then he started beating me with a broom or

21   mop stick.  And that's why he's like, "That's why mother

22   fuckers like you end up dead because you don't know when to

23   shut the fuck up.  You make more noise than your bitch."

24   Q.  Do you know who that person was?

25   A.  No, I don't.

E9bQde13                         James - direct

```
1    Q.  Could you see that person?

2    A.  I could see like faint -- I had duct tape on my eyes.  I

3    could see him but not clearly.

4    Q.  What happened next?

5    A.  I think I -- I think I passed out.  I think I was

6    unconscious for awhile because there was a big gap of time

7    where I didn't know what was going on.

8    Q.  At that point while you were there, you were still tied up,

9    right?

10   A.  Yes.

11   Q.  Did you notice whether -- how many individuals could you

12   perceive were in the apartment?

13   A.  About four or five.  You know, it was kind of crowded.

14   Q.  Did you see what, if anything, the individual who hit you

15   was doing?

16   A.  Umm, he was sitting in the bed watching TV like he was in

17   his own bedroom, not a worry in the world.

18   Q.  Now, after you were asked about your stash apartment, you

19   provided your keys to Trevor Cole.  Is that correct?

20   A.  Yes.

21   Q.  Did you hear anyone leaving your apartment?

22   A.  Yeah, because we have an alarm on the door.  When the door

23   opens, we hear the alarm.

24   Q.  At some point, did you hear people return?

25   A.  Yes, I did.
```

E9bQdel3                          James - direct

1   Q.  Sitting here today, do you recall the amount of time

2   between the time you heard people leave and the time you heard

3   people return?

4   A.  I would say hour and a half maybe.

5   Q.  Did any of them talk to you after they returned?

6   A.  Yeah.  When he returned, The Talker, Trevor Cole, I heard

7   him saying, "Can he see me?" because I guess he realized that

8   some of the duct tape was kind of shifted, and then he

9   proceeded to duct tape my entire face this time, duct tape my

10  arms again and duct tape my legs again.

11  Q.  Before they duct taped you, what, if anything, did they do?

12  A.  He said that, "This is not enough money.  We need more

13  money."

14  Q.  Did you have pants on at that point?

15  A.  I had shorts on.

16  Q.  Were you wearing anything in addition to your shorts?

17  A.  A belt.

18  Q.  What, if anything, did they do to that?

19  A.  He said, "This ain't enough money.  We want some more

20  money," and he proceeded to cut the shorts off me, including

21  the belt, and he said, "Pass me the iron.  We're going to burn

22  this mother fucker.  He going to give us some money."

23  Q.  What iron was he talking about?

24  A.  I guess it was the iron we had in the apartment.

25          MR. POSCABLO:  May I approach, your Honor?

E9bQdel3                          James - direct

1           THE COURT:  You may.

2    Q.  I'm handing you what's been marked for identification as

3    Government Exhibit 28.  Do you recognize this?

4    A.  Yes, this is my belt.

5    Q.  Which belt?

6    A.  This is the Louis Vuitton belt.

7    Q.  Were you wearing this at the time of the robbery?

8    A.  Yes, I was.

9    Q.  Is this the belt that they cut off of you?

10   A.  Yes, it was.

11          MR. POSCABLO:  Your Honor, the government offers

12   Government Exhibit 28.

13          THE COURT:  Mr. Pittell?

14          MR. PITTELL:  Can I just take a quick look at it.

15          MR. POSCABLO:  Sure.

16          MR. PITTELL:  No objection.

17          THE COURT:  Received.

18          MR. POSCABLO:  May we publish it, your Honor?  You

19   may.

20          (Government's Exhibit 28 received in evidence)

21   Q.  What, if anything, did Trevor Cole say at this point after

22   he cut that belt?

23   A.  He said, "We want some more money.  Can you get us

24   $250,000?"  So I said yes.

25   Q.  What did you say to him?

E9bQdel3                         James - direct

1   A.  I said, "Yeah, I can get somebody to bring you 250,000."

2   Q.  Did you identify someone who could do that?

3   A.  Yeah, I said my brother.

4   Q.  Do you have a brother?

5   A.  Yeah, I do.

6   Q.  Is that who you were thinking of?

7   A.  No.

8   Q.  Who were you thinking about?

9   A.  I was thinking about a cop who worked in the 47 precinct.

10  I had his number in my phone.

11  Q.  A police officer who worked in the 47 precinct?

12  A.  Yeah.

13  Q.  How did you have his number in your phone?

14  A.  He arrested me like a year earlier for a small amount of

15  marijuana, and he said, so he said, "You got to meet police.

16  You know anybody who got guns, give me a call." So I figured

17  it was the right time to call him.

18  Q.  Because you met some people with some guns.

19  A.  Right.

20  Q.  And what did you do with that number?

21  A.  He was in my phone. So I said, "You could call my brother,

22  and he'll probably bring the money over." So he said, "You

23  think 250 might be too suspicious, might raise some alarm?" I

24  said, "Yeah, maybe." He said, "OK. How about 150?" I said,

25  "OK. 150 we can do."

E9bQdel3                        James - direct

1    Q.  What was that detective's name, do you remember?

2    A.  It was A-B-R-I-A-N.  Abrian.

3    Q.  Abrian?

4    A.  Yes.

5    Q.  Do you know if they tried to call him?

6    A.  Yes, they did.

7    Q.  How do you know that?

8    A.  They put the phone on speaker and they said, "Mother

9    fucker, if you make a noise, we're going to kill you."  One guy

10   had a knife to this ear pressed firmly against my ear right

11   here.  One guy had another knife pressed firmly here.  Another

12   guy had a gun directly on my skull.  He said, "If you make a

13   noise, mother fucker, we are going to kill you.  We're going to

14   call him now."  So he put the phone on speaker and called him.

15   Q.  What happened?

16   A.  He didn't answer.

17   Q.  What happened next?

18   A.  He called him again.  He didn't answer.  Then he said, "Is

19   there anybody else you can call?"  I said, "Well, call my mom."

20   Q.  Did you call your mom?

21   A.  We called her.

22   Q.  What happened?

23   A.  She didn't answer.

24   Q.  What happened after that?

25   A.  My phone went dead.

1    Q.  And then?

2    A.  He was like, "Do you have a charger in here?"  I said, "No"

3    because I took it down to my Neill Avenue apartment.  I said,

4    "I have a car charger."  He's like, "Where's the car?"  I say,

5    "My car's in the garage."  He took my keys again.  I guess he

6    went down to the garage.

7    Q.  What happened next?

8    A.  Then I heard him coming back in the apartment again and

9    then I smelled alcohol.  They were spraying alcohol all over

10   the apartment, some kind of alcohol-based solution.

11   Q.  And what happened?

12   A.  They sprayed all over me.  They even sprayed it in my

13   mouth.  They were sprayed all -- I was doused in it.  They

14   sprayed it all over me.

15   Q.  Where were you at this point?

16   A.  I was on the floor in the bedroom.

17   Q.  Still tied up?

18   A.  Still tied up.

19   Q.  And you didn't have pants on; they had ripped them off?

20   A.  Yeah.

21            MR. POSCABLO:  Permission to approach, your Honor?

22            THE COURT:  Yes.

23   Q.  I'm handing you what's been marked for identification as

24   Government Exhibits 23 and 24.  Do you recognize these?

25   A.  Yes, I do.  They're two of my shirts.

E9bQdel3                          James - direct

```
 1   Q.  Let's talk about 23.  What color is 23?
 2   A.  Black.
 3   Q.  This is your shirt?
 4   A.  Yeah.
 5   Q.  24, what color?
 6   A.  Green.
 7   Q.  Is this your shirt?
 8   A.  Yes.
 9           MR. POSCABLO:  Your Honor, the government offers
10   Government Exhibits 23 and 24.
11           MR. PITTELL:  No objection.
12           THE COURT:  Received.
13           (Government's Exhibits 23 and 24 received in evidence)
14   Q.  Turning your attention to 23, which is the black shirt, I'm
15   turning your attention to the back of it.  What do you notice
16   here?
17   A.  It look like bleach had gotten on it.
18   Q.  Was the shirt like that prior to the robbery?
19   A.  No, it was not.
20           MR. POSCABLO:  Your Honor, may I publish it?
21           THE COURT:  You may.
22   Q.  What about 24?
23   A.  That's one of my shirts too.
24   Q.  Is there a bleach stain on this as well?
25   A.  Yes, there is.
```

1    Q.  Where is it?

2    A.  Right here.

3            MR. POSCABLO:  Indicating the top right portion of the

4    shirt, your Honor, by the shoulder?

5            THE COURT:  All right.

6            MR. POSCABLO:  May I publish, your Honor?

7            THE COURT:  Yes.  In just a couple of minutes, we are

8    going to take a short break.  Because we started late, we

9    should take a break, then we'll go to 12:45.

10           MR. POSCABLO:  This is actually a good time, your

11   Honor.

12           THE COURT:  Ladies and gentlemen, let's take a short

13   break.  We'll continue in a few minutes, and then we'll go

14   until 12:45.

15               (Jury recessed)

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

E9bQdel3                        James - direct

1              (Jury not present)

2              THE COURT:  Mr. James, you can step down.  Take a

3    short break as well.  We'll continue in about ten minutes or

4    so.

5              (Witness recessed)

6              THE COURT:  Let's be seated and see if there is

7    anything you folks need to go through.

8              MR. POSCABLO:  Nothing from the government.

9              THE COURT:  Mr. Pittell?

10             MR. PITTELL:  Nothing, your Honor.

11             THE COURT:  Let's take a ten minute break, and we will

12   continue.  Let's not make it as long as we've been having.  If

13   we can get the jury back, I want to continue because we started

14   late.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present).

2              THE COURT:  Mr. Poscablo, you may proceed.

3              MR. POSCABLO:  Thank you, your Honor.  Permission to

4    approach?

5              THE COURT:  Yes.

6    Q.  Mr. James, I'm handing you what's been marked for

7    identification as Government 29-A.  Do you recognize that?

8    A.  Yes, that is Abrian's cell phone number.

9    Q.  But the photograph overall, what is the photograph of?

10   A.  It's a photograph of my phone with contacts in there.

11             MR. POSCABLO:  Your Honor, the government offers

12   Government Exhibit 29-A.

13             THE COURT:  Mr. Pittell.

14             MR. PITTELL:  Can I just take a look at it?

15             MR. POSCABLO:  Sure.

16             MR. PITTELL:  No objection.

17             THE COURT:  Received.

18             (Government's Exhibit 29-A received in evidence)

19             MR. POSCABLO:  May we publish it, your Honor?

20             THE COURT:  You may.

21   Q.  Mr. James, this is the Abrian that was a police officer

22   that had stopped you or arrested you?

23   A.  Yes.

24   Q.  This is the person that you identified to the robbers as

25   your brother?

E9bQdel3                         James - direct

1    A.  Yes.

2    Q.  By the way, the cell phone that you have, can you make

3    out-of-state calls with it?

4    A.  Yes, I can.

5    Q.  You can also make international calls?

6    A.  Yes, I can.

7    Q.  Before the break, I had shown you the two bleached shirts,

8    correct?

9    A.  Yes, correct.

10   Q.  And prior to me showing them to you, you said that they

11   were showing alcohol-based something?

12   A.  They were spraying.  They were spraying.

13   Q.  Spraying.  What happened next?

14   A.  They went silent for awhile, and then I heard Jeanette

15   moving around in the apartment.  She was saying, "They have me

16   tied up in here for two days."  So I started calling for her to

17   come and untie me.  And eventually she did.

18   Q.  What happened next?

19   A.  She got into the shower.  She was reeking of urine and

20   looked horrible.  She got out of the shower, she got dressed.

21   I got dressed.  And she was like, "We got to take you to the

22   hospital because your arm is bleeding pretty bad."  So they

23   took all the phones.  So we went downstairs.  We went

24   downstairs and our car was missing.  So she borrowed somebody's

25   phone and called her sister.  Her sister took a cab over.  It

1   took her like maybe ten minutes, and she was like, "You all got

2   to call the police.  You all can't go to the hospital.  You got

3   to call the police first."  So she called the police.

4   Q.  Did the police come?

5   A.  Yes, the police came.

6   Q.  Let me stop you there right.  Before the police came, you

7   said that she helped you get free?

8   A.  Yes.

9   Q.  Do you recall how she did that?

10  A.  She used a knife to cut me free.

11  Q.  What was binding you?

12  A.  It was duct tape and I think one of my ties.

13          MR. POSCABLO:  Your Honor, may we publish Government

14  Exhibit 113 which is in evidence?

15  A.  Yes.

16  Q.  Do you recognize that?

17  A.  Yeah.  That looks like what I was tied up with.

18  Q.  Now, you testified just now that at some point the police

19  came?

20  A.  Yes, they did.

21  Q.  Did an ambulance come as well?

22  A.  Yes, they did.

23  Q.  Who came first?

24  A.  Umm, the regular cops came first, then the ambulance.

25  Q.  What happened when the regular cops came?

1   A.  They called -- the guy looked at my arm.  He was like,

2   "That looks terrible.  We got to get you an ambulance."  So

3   they called the ambulance and the ambulance came.

4   Q.  Did you go in the ambulance?

5   A.  Yes, I did.

6   Q.  Did you go by yourself or did you go with someone?

7   A.  No, it was me and Jeanette.

8   Q.  You both were went in an ambulance?

9   A.  Yes.

10  Q.  Before you went in the ambulance, did the police ask you

11  any questions?

12  A.  They was basically asking me what happened, and I wasn't

13  giving my -- you know, I was told him I was robbed, I was tied

14  up in my house about six and a half hours.

15  Q.  Did you tell him that you had marijuana?

16  A.  No, I did not.

17  Q.  Why not?

18  A.  I figured I'd probably get in trouble.

19  Q.  Do you know what hospital you went to?

20  A.  I think it was Jacobi.

21  Q.  Do you recall sitting here today what treatment they gave

22  you?

23  A.  I received about 12 stitches to my elbow, five staples to

24  gashes on my arms.  My hand was swollen.  They took an x-ray of

25  my hand.

```
 1              THE COURT:  When you said staples, you touched your
 2     head.  Did you mean your arm or your head?
 3              THE WITNESS:  No, I had 12 stitches to my elbow, and
 4     five staples to my head.  And my hands was swollen, so they
 5     just took some x-rays of my hands.
 6     Q.  Do you still have a scar on your left elbow?
 7     A.  Yes, I do.
 8              MR. POSCABLO:  With the Court's permission, may he
 9     show the scar on his elbow?
10              THE COURT:  Yes.
11              THE WITNESS:  May I step down?
12              MR. POSCABLO:  Yes, with the Court's permission?
13              THE COURT:  Yes.
14              (Pause)
15     Q.  Thank you, Mr. James.
16              When you went to the hospital, what name did you give
17     them?
18     A.  Eugene Brown.
19     Q.  How long did you stay in the hospital?
20     A.  I was there for about maybe six, seven hours.
21     Q.  So you didn't stay -- did you stay overnight?
22     A.  No.
23     Q.  Where did you go after you left the hospital?
24     A.  Me and Jeanette booked a hotel room.
25     Q.  You didn't want to go back to the apartment?
```

1    A.  No.

2    Q.  At some point did you go back to the apartment?

3    A.  Yes, I did.

4    Q.  When?

5    A.  Approximately maybe three days later.

6    Q.  Which apartment did you go back to?

7    A.  I went back to Magenta first.

8    Q.  Did you eventually go back to Neill?

9    A.  Yes, I did.

10   Q.  What did the Magenta apartment look like?

11   A.  It was totally trashed.  It looked like a tornado hit it or

12   something.

13   Q.  What about the Neill Avenue apartment?

14   A.  It was equally trashed too.

15   Q.  After you went back to the Neill Avenue apartment, did you

16   notice if anything was missing?

17   A.  Yeah, my money was missing, the safe was open, my money was

18   missing, my laptop, my jewelry.  They even took the liquor out

19   of my refrigerator.

20           MR. POSCABLO:  Permission to approach, your Honor?

21           THE COURT:  Yes.

22   Q.  I'm handing you what's been marked for identification as

23   Government Exhibit 508, 509, 512 and 532.  Do you recognize the

24   items depicted in these photographs?

25   A.  Yes, I do.

1   Q.  How do you recognize them?  What do you recognize them to

2   be?

3   A.  This is my necklace.

4   Q.  Pointing to 509?

5   A.  Yes.  This is my G-Shock watch.

6   Q.  That's 512?

7   A.  Yes.  This is my Gucci belt.  This is a custom Gucci belt.

8   Q.  That's Government Exhibit 532?

9   A.  Yes.

10  Q.  Government Exhibit 508, is that also your necklace?

11  A.  Yes, it is.

12          MR. POSCABLO:  Your Honor, the government offers 508,

13  509, 512 and 532.

14          THE COURT:  Any objection?

15          MR. PITTELL:  May I just quickly take a look at them?

16          THE COURT:  Certainly.

17          MR. PITTELL:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibits 508, 509, 512 and 532 received

20  in evidence)

21  Q.  Ms. Chen, can you please publish 509?

22          Do you recognize the individual in this?

23  A.  Yeah.  That is Trevor Cole wearing my necklace.

24  Q.  508, Ms. Chen.

25          Same thing?

1   A.  That is Trevor Cole again, yeah.

2   Q.  512?

3   A.  That is my G-Shock watch.

4   Q.  And 532?

5   A.  Yeah, that is my belt.

6   Q.  In addition to your G-Shock watch, did they take any other

7   watches from you?

8   A.  Yeah, they took a Gucci watch.

9           MR. POSCABLO:  Permission to approach?

10          THE COURT:  Yes.

11  Q.  I'm handing you what's been marked for identification as

12  Government 27.  Do you recognize that?

13  A.  Yeah, that's me wearing my Gucci watch.

14          MR. POSCABLO:  Your Honor, the government offers

15  Government Exhibit 27.

16          THE COURT:  Any objection?

17          MR. PITTELL:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 27 received in evidence)

20          MR. POSCABLO:  Your Honor, may we publish it on the

21  big screen?

22          THE COURT:  You may.

23  Q.  Who is in the photograph?

24  A.  That is me.

25  Q.  What is on your left wrist?

E9bQdel3                    James – direct

1   A.  That is my Gucci watch.

2   Q.  I'm handing you what's been marked for identification as

3   Government Exhibit 417.  Do you recognize those?

4   A.  Yes, that is my Gucci watch.

5   Q.  Is there something else in there?

6   A.  That's my ring.

7   Q.  And were these items, your Gucci watch and your ring, in

8   your Neill Avenue apartment prior to the robbery?

9   A.  Yes, they were.

10  Q.  And were they not in the Neill Avenue apartment after the

11  robbery?

12  A.  They were not.

13          MR. POSCABLO:  Your Honor, the government offers

14  Government Exhibit 417.

15          THE COURT:  Any objection?

16          MR. PITTELL:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 417 received in evidence)

19          MR. POSCABLO:  Your Honor, may we publish it?

20          THE COURT:  You may.

21  Q.  You testified that the Magenta Avenue apartment was also

22  ransacked?

23  A.  Yes, it was.

24  Q.  I'm just going to show you a couple of the photographs of

25  that apartment, OK?

E9bQdel3                           James – direct

1    A.  Yeah.

2    Q.  Government Exhibit 101, please.  What do you see in here?

3    A.  That's a picture of the living room.

4    Q.  Let's go Government 109.  What is that?

5    A.  That's the bedroom.

6    Q.  110?

7    A.  That is also the bedroom with the iron.

8    Q.  Where is the iron?

9    A.  It's on the front of the dresser.

10           MR. POSCABLO:  Your Honor, indicating the right middle

11   portion of Government Exhibit 110?

12           THE COURT:  Yes.

13   Q.  Was anything missing from the Magenta Street apartment?

14   A.  My money counter, a bag.

15   Q.  A bag?

16   A.  Yes.

17   Q.  Any other items?

18   A.  Yes.

19           MR. POSCABLO:  Permission to approach, your Honor?

20           THE COURT:  Yes.

21   Q.  I'm handing you what's been marked for identification as

22   Government Exhibit 415.  Do you recognize it?

23   A.  Yes.

24   Q.  What is that?

25   A.  This is a one piece of a three-piece set I purchased for my

1    son when he was going to college.

2    Q.  What is it?

3    A.  It is a cheap bag I bought at Wal-Mart.  It's three pieces.

4    He took the bigger piece, the carry-on.  And this was left back

5    I kept this because he couldn't -- only had one carry-on.

6            MR. POSCABLO:  The government offers Government

7    Exhibit 415.

8            MR. PITTELL:  No objection.  I can see it.

9            THE COURT:  Received.

10           (Government's Exhibit 415 received in evidence)

11           MR. POSCABLO:  May we just quickly publish it, your

12   Honor?

13           THE COURT:  Yes.

14   Q.  You testified that they also took marijuana from you from

15   the apartment?

16   A.  Yes, they did.

17           MR. POSCABLO:  536.  May I approach, your Honor?

18           THE COURT:  Yes.

19   Q.  Mr. James, I'm handing you what's been marked for

20   identification as Government Exhibit 536, 537, 538, 539, 540,

21   541 and 542.  Do you recognize these photographs?

22   A.  Yes, I do.

23   Q.  Did you have occasion to review these photographs prior to

24   your testimony today?

25   A.  Yes, I was.

E9bQdel3                          James - direct

1   Q.  What are these photographs of?

2   A.  This is consistent with the way we packaged marijuana.

3              MR. POSCABLO:  Your Honor, the government offers

4   Government Exhibit 536 to 542.

5              THE COURT:  Mr. Pittell?

6              MR. PITTELL:  If I could just take a quick peak at

7   what the witness has.

8              THE COURT:  Yes.

9              MR. PITTELL:  No objection.

10             THE COURT:  Received.

11             (Government's Exhibits 536 to 542 received in

12   evidence)

13             MR. POSCABLO:  Your Honor, may we publish just a few

14   photographs?

15             THE COURT:  Yes.

16  Q.  536, Ms. Chen.

17             What is that a picture of there, Mr. James?  What are

18  we looking at?

19  A.  That's a pound of marijuana.

20  Q.  How do you know?

21  A.  That's the way we package it.  It's vacuum sealed, wrapped

22  in a blue shop towel, doused in alcohol and vacuum sealed

23  again.

24             THE COURT:  It's vacuum sealed twice?

25             THE WITNESS:  Yes, it is.

1              THE COURT:  Vacuum sealed once.

2              THE WITNESS:  Wrapped in a blue shop towel, doused in

3    alcohol, then put into another bag and vacuum sealed again.

4              THE COURT:  I see.  Proceed.

5    Q.   537?

6    A.   That seems to be the pound of marijuana with the vacuum

7    seal bag removed.

8    Q.   The first bag?

9    A.   The first bag, right.

10   Q.   538.  Is that a photograph of the same thing?

11   A.   Yes, the same thing.

12   Q.   539?

13   A.   That's the marijuana with the blue shop towel removed.

14   Q.   540?  541?  And that's the marijuana?

15   A.   That's actual marijuana, yeah.

16             THE COURT:  How big the pound?  Is it -- I'm holding

17   up a box of tissues.

18             THE WITNESS:  It's bigger than that.

19             THE COURT:  It's bigger than that?

20             THE WITNESS:  It's more like the binder there.

21             THE COURT:  More like the binder?

22             THE WITNESS:  Yeah.

23             THE COURT:  All right.  Thank you.

24   Q.   Mr. Chen, can you please put up Government Exhibit 201:  Do

25   you recognize that photograph?

1   A.  Yeah, that is the entrance to my Neill Avenue apartment.

2   Q.  Do you recognize the individuals in that photograph?

3   A.  I don't know who they are.

4            THE WITNESS:  OK.  One moment, your Honor?

5            THE COURT:  All right.

6            MR. POSCABLO:  No further questions, your Honor.

7            THE COURT:  All right.  Thank you.

8            Mr. Pittell.

9            MR. PITTELL:  Thank you.

10   CROSS-EXAMINATION

11   BY MR. PITTELL:

12   Q.  Good afternoon, Mr. James.

13   A.  Good afternoon.

14   Q.  Mr. James, my name is Jeffrey Pittell.  I take it before

15   today, you've never seen me.  Is that correct?

16   A.  No, I've never seen you.

17   Q.  And we've never spoken on the phone before?

18   A.  No.

19   Q.  Never discussed this case before?

20   A.  No.

21   Q.  Mr. James, I represent Mr. Delva seated to my left.

22   A.  OK.

23   Q.  I just want to ask you some follow-up questions in response

24   to your testimony.  You had indicated that you had been selling

25   marijuana since 1987.  Is that correct?

1    A.  Yes.

2    Q.  In addition to marijuana, have you also sold cocaine?

3    A.  Yes, I have.

4    Q.  Isn't it true that at some point you indicated that you

5    were in some large-scale cocaine deals?

6    A.  Yes, I was.

7    Q.  What did you mean by large scale?

8    A.  I didn't say large scale.  I don't know where you got that

9    from.

10   Q.  Well, have you been involved in any cocaine deals?

11   A.  Yes, I have.

12   Q.  And what is the range of quantity of cocaine involved in

13   those deals?

14   A.  Kilos.

15   Q.  How much does a kilo of cocaine -- how much of a kilo --

16   Withdrawn.  What is the approximate cost of a kilo of cocaine?

17   A.  I wouldn't know that.

18   Q.  In those deals that you were involved in, what was the

19   price per kilo?

20   A.  Back in 1998?

21   Q.  Yes.

22   A.  In Arizona, it was about 16,500.

23   Q.  When you were involved in these kilo weight cocaine deals,

24   was it one kilo in the deal or multiple kilos?

25   A.  Sometimes there were one; sometimes there were multiple

1   kilos.

2   Q.  So those cocaine deals were involved in your dealings in

3   Arizona?

4   A.  Yes, it was.

5   Q.  You had indicated that you were arrested at some point, I

6   think it was, in 1998?

7   A.  Yes.

8   Q.  In Arizona?

9   A.  Yes.

10  Q.  And you were prosecuted in federal court in Arizona?

11  A.  Yes, I was.

12  Q.  I believe you had indicated that you have two or three

13  felonies from New Jersey?

14  A.  Yes.

15  Q.  Is it two or three?

16  A.  It's two felonies from New Jersey.

17  Q.  And those were in New Jersey state court?

18  A.  Yes.

19  Q.  What were those felonies for?

20  A.  Marijuana.

21  Q.  Marijuana dealing?

22  A.  Yes.

23  Q.  So going back to the Arizona case, that was in the federal

24  court similar to this court but in Arizona?

25  A.  Right.

E9bQdel3                    James - cross

1   Q.  And you were charged with being part of a large-scale

2   drug-trafficking organization?

3   A.  Yes.

4   Q.  And you were one of the leaders or higher-ups in that

5   organization?

6   A.  Yes.

7   Q.  That organization, I take it, they sold cocaine?

8   A.  Yes.

9   Q.  And they sold marijuana?

10  A.  Yes.

11  Q.  Were any other drugs involved?

12  A.  No, there wasn't.

13  Q.  Now, you were convicted in federal court.  Is that correct?

14  A.  That's correct.

15  Q.  And you pleaded guilty in that case?

16  A.  Yes, I did.

17  Q.  You had indicated that you received a sentence of 38

18  months.  Is that correct?

19  A.  That's correct.

20  Q.  But actually at the time of sentencing, it was a sentence

21  of time served.  Is that correct?

22  A.  That is correct.

23  Q.  So you had been in jail for 38 months, and then on your

24  sentencing, you got time served?

25  A.  That is correct.

E9bQdel3                          James - cross

1    Q.  You pleaded guilty to being a part of a drug conspiracy?

2    A.  Yes, I did.

3    Q.  And you pleaded guilty to money laundering?

4    A.  I don't recall money laundering.

5    Q.  But even the drug conspiracy charge, you were facing a

6    possible life sentence in that case.  Is that correct?

7    A.  No, I was not.

8    Q.  What was the maximum you were facing?

9    A.  I think 25 years.

10          MR. PITTELL:  Judge, I hate to break it up, but I

11   would prefer to bring this up at a side bar.

12          THE COURT:  All right.  Let's make it very quick.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (At the side bar)

2          THE COURT:  What's the application?

3          MR. PITTELL:  Originally you precluded my inquiry into

4    his prior federal case, but then you indicated I could go into

5    it very briefly, but I wasn't quite sure about whether or not I

6    could bring up cooperation because I'd like to at least elicit

7    the fact he cooperated, got a 5K and got a reduced sentence.

8          THE COURT:  I don't know how it's relevant to the

9    issue I raised, which is immigration.  The issue that I was

10   focused on, which was the reason why we're going into these

11   prior acts, but otherwise I certainly would have precluded it

12   is because the question is whether or not the hole that he dug

13   for himself is sufficiently deep that he is particularly biased

14   to try to get a letter of helpfulness that doesn't require

15   inquiry into the cooperation agreement.  Indeed, it doesn't

16   require the duration of the sentence because it's the facts of

17   the immigration that's the issue.  So I actually myself want

18   you to move along here because we've already covered it on

19   direct, so cover it very quickly and move on to other things.

20         MR. PITTELL:  I am going to move on.

21         That's all I have.

22         (Continued on next page)

23

24

25

1  BY MR. PITTELL:

2  Q.  So, Mr. James, after you got sentenced you were deported

3  from the United States?

4  A.  Yes, I was.

5  Q.  And you were deported because of the conviction we just

6  spoke about?

7  A.  Right.

8  Q.  The drug trafficking conviction?

9  A.  Yes, it was.

10 Q.  But at that time your lawyer actually tried to make an

11 application so that you could stay in the United States; is

12 that correct?

13 A.  Yes, that's correct.

14 Q.  And your lawyer tried to get you a visa so you could stay

15 in the United States?

16 A.  Yes.

17 Q.  And he made an application to the court and a judge denied

18 that application?

19 A.  No, he didn't.

20 Q.  But you never got the visa?

21 A.  No, I never got the visa, no.  It was not denied by the

22 court though.

23 Q.  But after you were deported in 2006?

24 A.  2001.

25 Q.  In 2001?

1   A.  Yes.

2   Q.  But you returned to the United States in 2006?

3   A.  Yes, I did.

4   Q.  And you came here illegally?

5   A.  Yes, I did.

6   Q.  And you had to come here illegally because of the

7   deportation?

8   A.  Correct.

9   Q.  Because of you were deported back to Jamaica you were not

10  permitted to legally travel to the United States?

11  A.  No, I was not.

12  Q.  If you had went to the American Consulate in Jamaica you

13  would not have been able to obtain a visa to come back?

14  A.  Correct.

15  Q.  So that's why you used the well, the name of James Brown or

16  Eugene Brown in order to come into the United States?

17  A.  Yes.

18  Q.  And you obtained a whole series of false documents

19  indicating that you were Eugene Brown; is that correct?

20  A.  Yes, I did.

21  Q.  You got a fake birth certificate?

22  A.  It's a real birth certificate.

23  Q.  Oh, so you actually you used Eugene Brown's birth

24  certificate?

25  A.  Correct.

1    Q.  Used his birth certificate, his Social Security number?

2    A.  Correct.

3    Q.  Possibly other documents?

4    A.  Correct.

5    Q.  In order to create a Eugene Brown identity for yourself?

6    A.  Correct.

7    Q.  And using that identity you were able to create a fake

8    California driver's license?

9    A.  No.

10   Q.  You got a fake California driver's license?

11   A.  No.  You got it all wrong.  The fake California driver's

12   license actually in James Brown.

13   Q.  OK.  But you paid six thousand dollars for that fake

14   license?

15   A.  No, I didn't.

16   Q.  How much did you pay for it?

17   A.  Probably about six hundred.

18   Q.  And you in addition to the California driver's license, you

19   got other fake driver's license; is that correct?

20   A.  Yes.

21   Q.  You got a fake driver's license from the U.S. Virgin

22   Islands?

23   A.  No.

24   Q.  Where else did you get a fake driver's license from?

25   A.  Jamaica.

```
 1   Q.  And did you get any other fake United States driver's
 2   license?
 3   A.  No, I did not.
 4   Q.  Well, the one from Jamaica had the Brown last name on it?
 5   A.  No.
 6   Q.  It had a different name?
 7   A.  Yes.
 8   Q.  What name did that have?
 9   A.  Jeffrey Anthony James.
10   Q.  But using these fake documents you were able to get a visa?
11   A.  No, I was not.
12   Q.  Well, using these -- why don't you tell us how came into
13   the United States illegally?
14   A.  I flew to the British Virgin Islands on my real name,
15   Patrick James.  I had some contacts over there.  They took me
16   on a boat from the British Virgin Islands into the U.S. Virgin
17   Island, St. Thomas.  Two weeks later I booked a flight in the
18   name of James Brown and I flew to Newark Airport.
19   Q.  So because you were then on U.S. territory and you had the
20   James Brown California driver's license, that was enough
21   identification for to you get a domestic flight to come to the
22   mainland?
23   A.  Correct.
24   Q.  And so as you sit here now you are actually here in the
25   United States illegally?
```

1   A.  Correct.

2   Q.  But I take it you're hoping to stay in the United States?

3   A.  I would hope so.

4   Q.  And are you hoping that your cooperation in this case will

5   somehow benefit you so that you can stay?

6   A.  I didn't really say that.

7   Q.  Well, have you requested that the prosecutors write a

8   letter to any U.S. immigration authorities describing the

9   cooperation you've provided in this case?

10  A.  Now, I haven't.

11  Q.  Has a lawyer or anyone else on your behalf asked that that

12  be done for you?

13  A.  I have an immigration lawyer.

14  Q.  And do you know if your lawyer has done that?

15  A.  I don't think he has done that.

16  Q.  Now, you said that at some point after you came here in

17  2006 you started again selling marijuana?

18  A.  Yes, I did.

19  Q.  And that's the marijuana that -- how much did you say it

20  cost a pound?

21  A.  In New York about four thousand.

22  Q.  And you had indicated that at the time -- well, at and

23  around the time of the September robbery you were selling --

24  well, actually, how many pounds a week were you selling?

25  A.  About 20 pounds.

```
1   Q.  And so at three or four thousand a pound, that's 60 to

2   $80,000 a week?

3   A.  Yeah, probably.

4   Q.  Now, before the September 12 robbery have you been robbed

5   before of either drugs, more specifically, marijuana?

6   A.  Yes.

7   Q.  And have you been robbed of money which is the proceeds

8   from selling the marijuana?

9   A.  Yes.

10  Q.  How many times?

11  A.  I think twice.

12  Q.  And did both of them involve either friends or family

13  members of Ms. Adams?

14  A.  I think so, yeah.

15  Q.  Did one of them involve an incident in 2008 where her

16  nephew stole, approximately, $50,000 from your apartment?

17  A.  Yes.

18  Q.  And did another one involve Ms. Adams' daughter who took,

19  approximately, $25,000 cash and, approximately, two pounds of

20  marijuana from you?

21  A.  Correct.

22  Q.  And was there another incident where, approximately,

23  $60,000 cash, $12,000 in money orders was taken from your

24  apartment?

25  A.  Yes.
```

E9BAADEL4                        James - Cross

1    Q.  And was that from the apartment on Magenta street?

2    A.  Yes, it was.

3    Q.  The one that you shared with Ms. Adams?

4    A.  Yes, it was.

5    Q.  Now, is it a reality that just suffering these losses is

6    cost of doing business?

7    A.  You could say that.

8    Q.  You had told Mr. Poscablo that at some point you had a gun.

9    A.  Yes, I did.

10   Q.  And when did you get a gun?

11   A.  I got it after the robbery on Magenta when they took the

12   $60,000 and the $12,000 of money order.

13   Q.  Is it fair to say that your purchasing the gun was in

14   response to all these robberies happening?

15   A.  Correct.

16   Q.  You bought it for protection?

17   A.  Correct.

18   Q.  And would it be fair to say that that's part of the

19   business getting a gun to protect yourself from these

20   robberies?

21   A.  Correct.

22   Q.  And the gun I take it was an illegal gun?

23   A.  Correct.

24   Q.  And you know that it's a federal crime to possess a gun if

25   you have a felony conviction?

E9BAADEL4                          James - Cross

```
1    A.  Yes, I do.

2    Q.  You said that at some point you gave this gun to FBI Agent

3    Reynolds sitting over there to my left?

4    A.  Yes, I did.

5    Q.  And you've never been prosecuted for the federal crime of

6    possessing a gun while having a felony conviction; is that

7    correct?

8    A.  That's correct.

9    Q.  So that's also covered by your immunity?

10   A.  I don't know.

11   Q.  When -- I think you may have said this on direct.  If I am

12   repeating myself, I apologize.  But I believe you had indicated

13   that people who buy marijuana from you, they pay in cash?

14   A.  Some of them, yeah.

15   Q.  And some of them pay in money orders?

16   A.  No.

17   Q.  How else do they pay?

18   A.  It's all cash.

19   Q.  But it's like ultimately when you get paid it is in cash?

20   A.  Correct.

21   Q.  And you had indicated that you sometimes give it to people

22   on consignment?

23   A.  Correct.

24   Q.  But when they do pay you that's in cash?

25   A.  Correct.
```

1    Q.   But when I was asking you about some of these prior

2    robberies you had indicated that some money orders were taken?

3    A.   Correct.

4    Q.   So do you take some of this cash and use it to buy money

5    orders?

6    A.   Correct.

7    Q.   And is the purpose of buying those money orders to then

8    send money to Jamaica?

9    A.   Correct.

10   Q.   And the money orders are purchased with money which is the

11   proceeds from selling drugs; is that correct?

12   A.   Correct.

13   Q.   And so by sending the money orders to Jamaica you are

14   sending the drug proceeds to Jamaica?

15   A.   Correct.

16   Q.   And have you ever been charged with the crime of money

17   laundering?

18   A.   I was charged in the 1998 federal case but I think that's

19   where I plea bargained that got dropped.

20   Q.   Since the 1998 case or since you came back to the United

21   States have you ever been charged with a crime of money

22   laundering?

23   A.   No, I've not.

24   Q.   Prior to testifying today you met with the FBI agent; is

25   that correct?

1   A.  Correct.

2   Q.  And you actually met with him more than once; is that

3   correct?

4   A.  That's correct.

5   Q.  And during at least one of these meetings you told him

6   about using your cash to buy money orders and sending the money

7   orders to Jamaica?

8   A.  Correct.

9   Q.  And to date have you not been prosecuted for money

10   laundering; is that correct?

11   A.  No, I've not.

12   Q.  But since you were charged with money laundering I take it

13   you know a little bit about what money laundering is?

14   A.  Yes, I do.

15   Q.  Would you agree with me taking cash, using it to buy money

16   orders, sending it to Jamaica, that's money laundering?

17   A.  Conceivably.

18   Q.  And I think you said this on direct-examination, you

19   haven't paid any taxes on any of the proceeds from selling

20   drugs; is that correct?

21   A.  No, I've not.

22   Q.  Would you agree that in the past 25 years that you have

23   been selling drugs you've earned tens of thousands of dollars?

24   A.  Correct.

25   Q.  Hundreds of thousands dollars?

E9BAADEL4                          James - Cross

```
1    A.  Correct.

2    Q.  In fact, you've grossed over a million dollars?

3    A.  Correct.

4    Q.  In fact, you've grossed millions of dollars?

5    A.  I wouldn't say "millions".

6    Q.  And some of this money that was sent to Jamaica was used to

7    purchase things in Jamaica?

8    A.  Yes, it was.

9    Q.  It was used to purchase real estate in Jamaica?

10   A.  Yes, it was.

11   Q.  It was used to purchase homes in Jamaica?

12   A.  Yes, it was.

13   Q.  And in fact, you currently own -- how many homes in Jamaica

14   do you own?

15   A.  Three.

16   Q.  And what is the value of each home?

17           THE COURT:  Sustained.  Let's move to the robbery.

18           MR. PITTELL:  I'll move on.

19           THE COURT:  Move to September of 2012.

20   Q.  And so in addition to buying homes you've used the money to

21   buy other things for yourself, cars?

22   A.  Car, a car.

23   Q.  A car.  Pay your rent?

24   A.  Right.

25   Q.  Travel?
```

1    A.  Right.

2    Q.  Because if you -- for the most part since you came back

3    here in 2006 has your occupation been, the way you've been

4    supporting yourself is by selling marijuana?

5    A.  Correct.

6    Q.  So the money that you earn from that you would use to pay

7    your day-to-day expenses?

8    A.  Correct.

9    Q.  And you were living with Ms. Adams, is that correct, or at

10   least a portion of this period?

11   A.  Yes.

12   Q.  And to a certain extent were you using some of this money

13   to help support her, as well?

14           MR. POSCABLO:  Objection, your Honor.

15   A.  Yes, I was.

16           MR. POSCABLO:  I'll withdraw it, judge.  He already

17   answered.

18           MR. PITTELL:  May I approach the witness, judge?

19           THE COURT:  You may.

20           MR. PITTELL:  Actually, you know what?  I want to show

21   him an exhibit but I think maybe I need to put it up on the

22   projector.

23           THE COURT:  All right.  You may proceed.

24   Q.  Can you see the screen, Mr. James?

25   A.  Yes, I can.

1   Q.  Is it on the screen in front of you?

2   A.  Yes, it is.

3   Q.  I want to show you a document.  This is a document in

4   evidence as Defendant's Exhibit A.  I am going to, just cause

5   it's only half on the screen, I am going to slide it up so you

6   can see the bottom portion and then I am going to pull down and

7   show you the middle.  Take a look at that and I will just

8   direct your attention to where I am pointing my pen.  You

9   recognize that photograph; is that correct?

10  A.  Yes.  That's Trevor Cole.

11  Q.  That is the same photograph of Trevor Cole that you've

12  looked at earlier during your direct-examination?

13  A.  It seems to be.

14  Q.  Now, after the robbery occurred, at some point you met with

15  a detective from the New York City Police Department; is that

16  correct?

17  A.  Yes, I did.

18  Q.  And the detective showed you photo groupings similar to

19  this one but containing different photographs; is that correct?

20  A.  That's correct.

21  Q.  And there were at least three instances where you looked at

22  a photo grouping and you identified people, one person within

23  those group somethings; is that collect?

24  A.  That's correct.

25  Q.  And in each of those instances where you identified someone

1  you told the detective that was somebody who you recognized as

2  being one of the perpetrators of the September robbery at

3  Magenta Street?

4  A.  That's correct.

5          MR. PITTELL:  May I approach the witness, judge?

6          THE COURT:  Yes.

7          MR. PITTELL:  I guess I'll mark this as Defendant's B.

8          THE COURT:  All right.

9          (Pause)

10  Q.  Mr. James, I am showing you a document.  It's not on the

11  screen.  It's Defendant's Exhibit B.  I'd ask you to take a

12  look at it.

13  A.  I did.

14  Q.  Do you recognize this document?

15  A.  Yes, do.

16  Q.  Have you seen it before?

17  A.  Yes, I have.

18  Q.  Is your signature on that document?

19  A.  Yes it is.

20          MR. PITTELL:  Judge, I would offer this in evidence as

21  Defendant's B.

22          MR. POSCABLO:  No objection, judge.

23          THE COURT:  Received.

24          (Defendant's Exhibit B received in evidence)

25          MR. PITTELL:  I guess can we publish it?

1              (Pause)

2    Q.  Can you see the screen there, Mr. James?

3    A.  Yes, I can.

4    Q.  I don't know if you can see it on the screen but do you see

5    where I am pointing my pen?

6    A.  Yes, I saw it.

7    Q.  That's your signature?

8    A.  That is my signature.

9    Q.  Do you see a circle around the photograph?

10   A.  Yes.

11   Q.  Did you draw that circle?

12   A.  Yes, I did.

13   Q.  Was this shown to you by a police detective?

14   A.  Yes, it was.

15   Q.  And when it was shown to you, I take it your signature and

16   the circle was not there?

17   A.  No, it was not.

18   Q.  And police detective asked you if you recognized anybody in

19   this photo array?

20   A.  Yes, they did.

21   Q.  You indicated that you had recognized the man in the lower

22   left corner?

23   A.  Yes, I did.

24   Q.  And you indicated that you recognize him as one of the

25   perpetrators of the September 12 robbery?

1    A.  Correct.

2    Q.  And it's circled and signed by you, correct?

3    A.  Correct.

4            MR. PITTELL:  I have another document.  I just ask

5    that it be marked as Defendant's C.

6    Q.  Mr. James, I am showing you a document marked as

7    Defendant's Exhibit C.  I'd ask you to just to take a look at

8    it?

9    A.  I have.

10   Q.  And do you recognize this document?

11   A.  Yes, I do.

12   Q.  Have you seen it before?

13   A.  Yes, I have.

14   Q.  And does your signature appear on it?

15   A.  Yes, it is.

16           MR. PITTELL:  I would offer this Defendant's C.

17           MR. POSCABLO:  No objection, judge.

18           THE COURT:  Received.

19           (Defendant's Exhibit C received in evidence)

20           MR. PITTELL:  Judge, may I publish it?

21           THE COURT:  You may.

22           (Pause)

23   Q.  Can you see that on your screen there, sir?

24   A.  Yes, I can.

25   Q.  I am going to point with my pen; is that your signature

1    there?

2    A.  Correct.

3    Q.  And did you draw a circle around there?

4    A.  Yes, I did.

5    Q.  Similar to the questions I asked you regarding the first

6    document I showed you, the prior document I showed you, was

7    this shown to you by a police detective?

8    A.  Yes, it was.

9    Q.  And at the time it was shown to you did it have your

10   signature on, that circle on it?

11   A.  No, it did not.

12   Q.  When the detective showed it to you the detective asked you

13   to take a look at it and tell him whether or not you recognize

14   anybody in that photograph?

15   A.  Correct.

16   Q.  And you told him that you did recognize somebody and you

17   told him that you recognized somebody as one of the

18   perpetrators of the September 12 robbery; is that correct?

19   A.  That's correct.

20   Q.  And then the detective -- and then you actually showed him

21   which photograph was the one that you recognized?

22   A.  Correct.

23   Q.  And then he asked you to circle it and sign it?

24   A.  Correct.

25   Q.  And that's what you did?

1   A.  Yes.

2   Q.  Thank you.  And -- oh, one more thing.  Do you know who

3   that's a photograph of?

4   A.  That's Jean Pierre.

5   Q.  You also know him as "Dominique Jean-Philippe"?

6   A.  Yeah, Dom Philippe.

7           MR. PITTELL:  Judge, this one will be Defendant's D.

8           THE COURT:  All right.

9   Q.  Mr. James, I am showing you a document marked as

10  Defendant's D.  I'd ask you to take a look at it and tell us if

11  you recognize it?

12  A.  Yes, I did do.

13  Q.  And is that your signature on the portion of the document?

14  A.  Correct.

15          MR. PITTELL:  And I'd offer Defendant's Exhibit D into

16  evidence.

17          MR. POSCABLO:  No objection, judge.

18          THE COURT:  Received.

19          (Defendant's Exhibit D received in evidence)

20          MR. PITTELL:  May I publish it, judge?

21          THE COURT:  You may.

22          (Pause)

23  Q.  Similar to my prior questions, Mr. James, there was a, at

24  one time when a police detective showed you this photo array;

25  is that correct?

E9BAADEL4                        James – Cross

1   A.  That's correct.

2   Q.  And when the detective showed you the photo array it did

3   not have your signature on it; is that correct?

4   A.  No, it did not.

5   Q.  I know it's hard to see on the screen but it's a photograph

6   on the upper right hand corner, there's a circle around it?

7   A.  Yes, correct.

8   Q.  When the detective showed it to you that circle was not

9   there?

10  A.  No, it was not.

11  Q.  And when the detective showed it to you the detective asked

12  you to take a look at it and tell him whether or not you

13  recognize anybody; is that correct?

14  A.  That's correct.

15  Q.  And you told him that you did recognize somebody?

16  A.  Yes, I did.

17  Q.  And you told him the person who you recognize was one of

18  the perpetrators of September robbery; is that correct?

19  A.  Correct.

20  Q.  And then after you told the detective he asked you to draw

21  a circle around the picture?

22  A.  Correct.

23  Q.  And sign it as well?

24  A.  Correct.

25  Q.  And that's what you did?

1    A.  Correct.

2    Q.  That's what you did on this one.

3    A.  Correct.

4    Q.  Going back to the -- withdrawn.

5           In addition to the four photo arrays that I've shown

6    you, there were other photo arrays that were shown to you; is

7    that correct?

8    A.  Correct.

9           THE COURT:  Is this DXE?

10          MR. PITTELL:  Yes.

11   Q.  Mr. James, I am showing you a photo array marked as

12   Defendant's Exhibit E.

13   A.  Yes.

14   Q.  I'd ask you to take a look at that.

15   A.  I have.

16   Q.  And was this ever shown to you before?

17   A.  Yes, it was.

18   Q.  And was this shown to you by the same detective who showed

19   you the other photo arrays?

20   A.  Correct.

21   Q.  And when the detective showed this one to you did the

22   detective ask you if you recognized anybody from the

23   September 12 robbery?

24   A.  Correct.

25   Q.  And you told him that after looking at this you did not

1   recognize anybody; is that correct?

2   A.  That's correct.

3           MR. PITTELL:  Judge, I would offer it in evidence as

4   Defendant's Exhibit E.

5           MR. POSCABLO:  No objection, judge.

6           THE COURT:  Received.

7           (Defendant's Exhibit E received in evidence)

8           MR. PITTELL:  May I publish it, judge?

9           THE COURT:  You may.

10          (Pause)

11  Q.  Just looking at this one, Mr. James, your name is not

12  anywhere on this; is that correct?

13  A.  Correct.

14  Q.  And none of the photographs are circled?

15  A.  Correct.

16  Q.  Mr. James, you said that on the, I guess it's September 4

17  that was the first time that you went into the apartment on

18  Magenta Street and people were there; is that correct?

19  A.  That's correct.

20  Q.  And when you went into the apartment, am I correct, you did

21  say that it was dark in the apartment?

22  A.  Yeah.

23  Q.  The lights were out?

24  A.  Correct.

25  Q.  And you saw four to five guys?

1    A.  Correct.

2    Q.  And you say four to five guys because I take it you are

3    estimating whether it was four or five?

4    A.  Correct.

5    Q.  You are not a hundred percent sure if it was four or a

6    hundred percent if was five?

7    A.  No.

8    Q.  I take it you didn't sit there and count them?

9    A.  No, I did not.

10   Q.  Because as soon as you came in probably one of first things

11   you saw was the gun?

12   A.  Yeah.

13   Q.  And I take it your attention was focused on the gun?

14   A.  Yeah.

15   Q.  As well as the knives that the other ones held?

16   A.  Correct.

17   Q.  And so that's why as you sit here now you can't be specific

18   as to whether it was four or five?

19   A.  No, I can't.

20   Q.  And you indicated that some of them had their faces

21   covered?

22   A.  Um-hmm.

23   Q.  And some of them had their faces covered by like their

24   shirts being pulled up like -- was it a T-shirt being pulled

25   up?

1    A.  Yeah, a T-shirt.

2    Q.  I think you had said also some of them had things on their

3    heads?

4    A.  Yes.

5    Q.  What did they have on their heads?

6    A.  I don't know.  It might have been a shirt or like a scarf

7    or something.

8    Q.  Sort of like a disguise?

9    A.  Correct.

10   Q.  Like someone would wear, let's say they were robbing a bank

11   and they wanted to like disguise themselves, they would put

12   that on?

13   A.  Correct.

14   Q.  And they were all black skinned?

15   A.  Correct.

16   Q.  Now you said that they were all guys but isn't it possible

17   that one of them could have been a woman?

18   A.  I guess it's possible.

19   Q.  Because I take it that when you came in and you saw the

20   guns and knives that was your focus of attention?

21   A.  Correct.

22   Q.  Not really determining the sex of each of the perpetrators;

23   is that correct?

24   A.  That's correct.

25             MR. PITTELL:  Judge, if I could just have a moment?

 1            THE COURT:  All right.

 2            (Pause)

 3            MR. PITTELL:  There one thing I wanted to go back to.

 4            THE COURT:  All right.

 5   Q.   Earlier, Mr. James, you indicated that there was no order

 6   issued by a judge which denied your application for a visa; is

 7   that correct?

 8   A.   That is correct.

 9            MR. PITTELL:  May I approach the witness, judge?

10            THE COURT:  You may.

11            MR. PITTELL:  I guess this will be Defendant's F.

12            (Pause)

13   Q.   Mr. James, I am showing you a document.  It's marked as

14   Defendant's Exhibit F.  I would actually just ask you to take a

15   moment to take a look at the document and read it?

16   A.   I know what the document is.

17   Q.   All right.  And you had earlier indicated that a judge did

18   not issue an order?

19   A.   I meant initially the judge did not.  When I was deported

20   the judge did not.

21   Q.   But then subsequently the judge did, correct?

22   A.   That is after I was in Jamaica and I filed a motion.

23   Q.   And that motion was denied?

24   A.   The motion was denied as being untimely.  I took too long

25   to file the motion.

1   Q.  So it was a motion you filed yourself?

2   A.  Yes, I did.

3   Q.  And it was a motion for a visa so you could travel or stay

4   in the United States?

5   A.  It's a motion for visa and --

6   Q.  The document is not in evidence yet, so I prefer that you

7   don't read it.  I just want to ask you some questions.

8   A.  OK.

9   Q.  So you filed a motion for what's called an S Visa; is that

10  correct?

11  A.  Yes, I did.

12  Q.  And an S Visa would have allowed you to come back legally

13  to the United States?

14  A.  Correct.

15  Q.  But the judge did issue an order denying that application?

16  A.  Yes, the judge did being untimely timely.  I took too long

17  to file the motion.

18  Q.  Regardless of the reason it was denied?

19  A.  Yes, it was.

20          MR. PITTELL:  I have no other questions, judge.

21          THE COURT:  All right.  Thank you.

22          Mr. Poscablo, do you have any redirect?

23          MR. POSCABLO:  Very brief, your Honor.

24  REDIRECT EXAMINATION

25  BY MR. POSCABLO:

E9BAADEL4                     James - Redirect

1   Q.  Mr. James, you've testified that you were shown a six pack.
2   You know what a six pack is, right?
3   A.  Yes.
4   Q.  It's the photographs with six photographs?
5   A.  Correct.
6   Q.  A six pack containing a photograph of Trevor Cole?
7   A.  Correct.
8   Q.  When you were shown that you didn't identify them?
9   A.  No, I did not.
10  Q.  You later testified that you saw him in court and were able
11  to identify him?
12  A.  Correct.
13  Q.  And you were shown this six pack?
14          MR. POSCABLO:  May I approach, your Honor?
15          THE COURT:  Yes.
16  Q.  Defense Exhibit E, you were shown this, right?
17  A.  Yes, I was.
18  Q.  And at the time that you were shown that six pack you
19  didn't identify anyone there?
20  A.  No, I did not.
21  Q.  Take a look at that six pack.  Is there anyone on that six
22  pack that is familiar to you as you sit here today?
23  A.  Yes, there is.
24  Q.  Who?
25  A.  The defendant.

 1    Q.  That's the defendant, right?

 2    A.  Right.

 3    Q.  And you know that because you looked at the photo and you

 4    looked at the defendant that's here in the courtroom?

 5    A.  Right.

 6    Q.  Sitting here today do you recognize the defendant as the

 7    person who was at the robbery?

 8    A.  No, I don't recognize him.

 9    Q.  You don't recognize him, right?

10    A.  No.

11    Q.  Can you explain?

12            MR. PITTELL:  Objection.

13            THE COURT:  I think you need to rephrase that.

14    Sustained.

15            MR. POSCABLO:  OK.

16    Q.  Your testimony is that you don't recognize the person who

17    is sitting here?

18    A.  Correct.

19    Q.  Did there come a time that you gave a description about

20    some of the individuals who were in the robbery?

21    A.  Correct.

22    Q.  Tell the jury what some of those descriptions were that you

23    gave?

24    A.  I described an individual beating me as having not a big

25    build but a very kind of husky physique.

1   Q.  Could you see that person's face, the one who was beating

2   you?

3   A.  Finally, I could see more his physique, his height and

4   everything.

5   Q.  You were shown photographs of two other people that you

6   identified, right?

7   A.  Correct.

8   Q.  One you identified as Dominique Jean-Philippe?

9   A.  Correct.

10  Q.  The person beating you did you identify that person as

11  Dominique Jean-Philippe?

12  A.  No, I did not.

13  Q.  Then there was a third person whose name you didn't

14  identify but you identified the photograph, right?

15  A.  Yes, correct.

16  Q.  Let's just call that person "Person X".  Sitting here today

17  did you think it was Person X?

18  A.  I couldn't tell.

19  Q.  Could it have possibly been someone else?

20  A.  It's very possible.

21  Q.  Did you give a description to law enforcement or to the

22  government about the hair that the person who was beating you

23  had?

24  A.  Yeah.

25  Q.  What was it like?

1    A.  Low hair.

2    Q.  Low hair?

3    A.  Low crop air.

4    Q.  Not braids or twists?

5    A.  No.

6           MR. POSCABLO:  No further questions, your Honor.

7           THE COURT:  All right.  Thank you.

8           You may step down.

9           MR. PITTELL:  Judge, actually, I just have very brief,

10   very brief.

11          THE COURT:  All right.

12          (Pause)

13          MR. PITTELL:  Actually, judge, I have no questions.

14          THE COURT:  All right.  Thank you.  Mr. James, you may

15   step down.

16          All right.  Ladies and gentlemen it's 12:38.  It's

17   only seven minutes early but let's take your lunch break and

18   we'll resume right at two o'clock.  If I can corral everybody

19   and I hope to do so and we'll go to the next witness after

20   that.  So I'll see you folks at 2:00 and the usual instructions

21   that I give you about not talking about the case.  Thanks.

22          (Jury not present)

23          THE COURT:  Ladies and gentlemen, I have a matter

24   courtroom at 1:30.  Do you folks have any additional matters

25   that you would like to raise with me?

1           MR. POSCABLO:  No, your Honor.

2           MR. PITTELL:  One thing I want to clarify.

3           THE COURT:  I'll be seated.

4           MR. PITTELL:  It's not a point but in the discussion

5    about Mr. James and a photograph and so on I indicated that I

6    didn't have the photograph with me.  I just want the record to

7    reflect I do have the photograph with me to clarify that.

8           THE COURT:  All right.  Is that the photograph you

9    marked?

10          MR. PITTELL:  No.  But it was the one that was

11   attached to the 3500 and I had indicated I didn't have it.  I

12   just wanted to correct the record.

13          THE COURT:  All right.  Thank you.  As long as we are

14   sitting, who is up next?

15          MS. GERACI:  Your Honor, the government expects to

16   call Special Agent Matthew Fleming of the ATF followed by

17   Special Agent Andrew Brandt of the FBI.

18          THE COURT:  How long are these folks?

19          MS. GERACI:  Not very long, your Honor.  Short

20   witnesses.

21          THE COURT:  15 minutes?

22          MS. GERACI:  Probably, yes.

23          THE COURT:  All right.  So we'll probably get to one

24   more today beyond that?

25          MS. GERACI:  Yes, your Honor.  We expect to call then

1    Detective Ellis Deloren.

2              THE COURT:  All right.  So we'll get to -- I am sure

3    we get to those folks all this afternoon unless something

4    unusual comes up.  And then after that you'd only have Special

5    Agent Reynolds after that.

6              MS. GERACI:  That's correct, judge.

7              THE COURT:  Because NYPD Officer Ford is still -- it

8    is not your intention to call him.

9              MR. POSCABLO:  That's right.

10             THE COURT:  I think we have got enough certainly for

11   the afternoon.

12             Let's also just have you folks prepare draft changes

13   with your comment because today is Thursday, I don't want to

14   have you folks come back in tomorrow only for a charging

15   conference.  You may want to be doing other things.  Let's talk

16   later today about the possibility of when closings would be

17   which would be after defense's case, if any.  And I assume

18   there is going to be a defense case cause we have been talking

19   about a defense case all along.  But we'll talk about the

20   timing and ways that can play out.  We'll do that before the

21   day is finished.  Thank you.

22             (Luncheon Recess)

23             (Continued on next page)

24

25

E9bQdel5

                              AFTERNOON SESSION

                                 2:00 p.m.

         (In open court; jury not present)

         MR. PITTELL:  Judge, there is one matter I want to

flag.  It may need more discussion before Detective Deloren

testifies.  One of the last questions I asked Mr. Accilien on

cross was whether or not he gave consent to search the house,

whether or not he gave consent to search the room, and he said,

no, he did not.

         THE COURT:  But the search that was incident to the

arrest, right?

         MR. PITTELL:  Yes.

         THE COURT:  The search was incident to the arrest, and

the search of the bedroom was incident to a protective sweep.

So I don't think consent was necessary.  It's actually sort of

irrelevant.

         MR. PITTELL:  The opening up of a drawer and the

recovery of ammunition from the drawer I don't think was a part

of the protective sweep.

         THE COURT:  I hadn't focused on the ammunition, but

the fact of the search itself, for instance, doesn't change.

The drugs in the closet, that's all the same.

         MR. PITTELL:  The drugs in the closet, the gun in the

closet, that doesn't change.

         THE COURT:  Right.

1          MR. PITTELL:  Just, chronologically, by the time I

2     came into this case, there had already been a suppression

3     hearing, and within the transcript of Detective Deloren, he

4     testified that Mr. Accilien had given him verbal and later

5     written consent to search the house.  So while I may have had

6     standing to file the motion, there would be no basis which I

7     could argue.

8          THE COURT:  I see on the ammunition.  Let's take up

9     the ammunition point later.

10          MR. PITTELL:  It also applies to the scale because the

11     scale was recovered from a cabinet in the kitchen, I believe.

12          THE COURT:  I thought it was the kitchen counter.

13     There's a photograph of it on the kitchen counter, if it's the

14     same scale.  Is it a different scale?

15          MR. PITTELL:  That's a different scale.

16          THE COURT:  I see.  So we need to think about the

17     scale.

18          Why do you even need the scale and the ammunition?

19     You've got testimony about the scale and you've got testimony

20     about the ammunition.  Why do you need to put in photographs

21     and/or physical items?  That just begs an issue, right?

22          MR. POSCABLO:  Yes, your Honor, I think that's

23     correct.  I guess --

24          MR. PITTELL:  I would agree even if I get everything

25     in my favor, I'm not Rule 29 on those issues because there's

1    still a gun, still ammunition inside the gun.

2           THE COURT:  And Accilien also testified he had

3    ammunition in his room.  Whether or not Accilien gave time for

4    a consensual search, that doesn't matter because he testified

5    there was ammunition in the room.  Whether or not the recovered

6    ammunition recovered from a search as to which there wasn't

7    consent is admissible different testimony as to such

8    ammunition.

9           What would be the purpose -- you want to cross Deloren

10   on "Didn't you say at the Fatico that you got consent?  Did you

11   get consent?  Didn't you tell us at the Fatico that you got

12   consent?"

13          He says no.

14          You then say, "At the Fatico you said you got

15   consent."  That's your cross.

16          Or you say so if Accilien said he didn't give you

17   consent, he lied?

18          MR. PITTELL:  I wasn't even anticipating crossing him

19   on that issue and inviting the jury as to who to believe.  I

20   think ultimately verbally I'm making a motion now for

21   suppression of those items based upon those grounds based upon

22   information that came to my attention after --

23          THE COURT:  The items are the ammunition and the scale

24   in the cabinet.

25          MR. PITTELL:  Right.

1           THE COURT:  I personally think that you've got

2     testimony on those.  The government, I think we can moot the

3     motion by the government not offering those items, the physical

4     items.  Think about it.  Let's take it up at the mid-afternoon

5     break.

6           MR. POSCABLO:  Maybe what we can do is we won't offer

7     them until after the break, Judge.  Meaning, if we're going to

8     offer other evidence, we'll hold off on offering those.

9           THE COURT:  I see.  You've got a witness who is about

10    to offer those?

11          MR. POSCABLO:  Yes.

12          THE COURT:  Why do you need to have the scale and the

13    ammunition when you've got testimony about it?

14          MR. POSCABLO:  I just -- the answer is I don't think

15    we do, Judge.  I just haven't had a minute to think about it.

16    I just heard about it just now when your Honor did.  We have a

17    nexus expert who is supposed to testify next.  The nexus expert

18    was going to testify about the ammunition as well.  In fact,

19    just one --

20          THE COURT:  The nexus, you're saying a connection

21    expert?

22          MR. POSCABLO:  Correct, about the gun and the

23    ammunition.  If I could have one minute to confer with

24    Ms. Geraci, I think we can --

25          THE COURT:  Is it ammunition from inside the gun or

1    ammunition that was outside the gun?

2              MS. GERACI:  Outside the gun, your Honor.

3              THE COURT:  And it was the ammunition that was seized.

4              MS. GERACI:  Yes, your Honor.

5              THE COURT:  I see what your issue is.

6              (Pause)

7              MR. POSCABLO:  Judge, our next witness is going to be

8    the nexus expert.  He will only testify about the ammunition in

9    the gun and the gun itself and not the ammunition in the

10   drawer.

11             THE COURT:  How about the scale?

12             MR. POSCABLO:  He will not be testifying about the

13   scale.

14             THE COURT:  So, that motion is denied as moot in light

15   of the proffer from the government.  If the government changes

16   its mind and it is going to offer those two pieces of physical

17   evidence, the government will notify the Court, and the Court

18   will entertain the motion again, and I will have to make a

19   decision one way or the other about it.  But otherwise it's

20   denied as moot in light of that proffer that you're not going

21   to offer it.

22             Mr. Pecorino, can you bring out the jury, please?

23             (Continued on next page)

24

25

1                (Jury present)

2                THE COURT:  Would the government like to call its next

3      witness, please?

4                MS. GERACI:  Your Honor, with the Court's permission,

5      the government would like to read a stipulation between the

6      parties.

7                THE COURT:  All right.  You can be seated, folks.

8      Thank you.

9                MS. GERACI:  This is Government 3001, a stipulation

10     between the parties with the same caption at the front.

11               (1) If called to testify, a representative of Jacobi

12     Medical Center (Jacobi) located in the Bronx, New York, would

13     testify that:  On or about September 4, 2012, Eugene Brown was

14     brought to the emergency room of Jacobi at approximately

15     10:58 p.m. and was admitted into Jacobi to be treated for two

16     one-inch lacerations to his head and a six-inch laceration to

17     his arm.  The lacerations on his head were treated with staples

18     and his arm laceration was closed with stitches.  Brown was

19     discharged on September 5, 2012.

20               On or about September 4, 2012, Jeanette Adams was

21     brought to the emergency room at Jacobi at approximately

22     10:56 p.m. and was admitted into Jacobi to be treated for pain

23     and swelling to her left eye and left cheek bone as well as

24     pain, swelling and abrasions to her wrists.  The wounds on her

25     wrists were dressed with bandages, and the pain on the left

E9bQdel5

1   side of her face was treated.  Adams was discharged on

2   September 5, 2012.

3          It is further stipulated and agreed that this

4   stipulation may be received in evidence as a Government Exhibit

5   at trial and is dated September 11, 2014 and signed by both

6   parties.  Your Honor, the government offers exhibit 3001.

7          THE COURT:  Would you please just read the first

8   paragraph above the numbered paragraph?

9          MS. GERACI:  Certainly, your Honor.

10         It is hereby stipulated and agreed, by and among the

11  United States of America, by Preet Bharara, United States

12  Attorney for the Southern District of New York, Ryan P.

13  Poscablo and Justina L. Geraci, Assistant United States

14  Attorneys of counsel, David Delva, the defendant, by and with

15  the consent of the attorney Jeffrey G. Pittell, Esquire.  And

16  then it goes into the numbered paragraphs.

17         THE COURT:  Thank you.

18         Mr. Pittell, that is a stipulation into which you've

19  entered on behalf of your client?

20         MR. PITTELL:  Yes.

21         THE COURT:  That is received.

22         (Government's Exhibit 3001 received in evidence)

23         MS. GERACI:  Thank you, your Honor.

24         At this time, the government calls Special Agent

25  Matthew Fleming.

1            THE COURT:  Special Agent Fleming, please.

2      MATTHEW A. FLEMING,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5      DIRECT EXAMINATION

6      BY MS. GERACI:

7            THE COURT:  Special Agent Fleming, please be seated.

8      It will be important for you to speak clearly and audibly into

9      the mike.

10            You may proceed, Ms. Geraci.

11            MS. GERACI:  Thank you, your Honor.

12     Q.  Agent Fleming, where do you work?

13     A.  I'm a special agent with the Bureau of Alcohol, Tobacco,

14     Firearms and Explosives.

15     Q.  What is your title?

16     A.  I'm a special agent on the Joint Firearms Task Force.

17     Q.  How long have you been a special agent with ATF?

18     A.  I've been a special agent approximately five years and

19     seven months.

20     Q.  Are you assigned to any particular group at ATF?

21     A.  Yes.

22     Q.  What group that?

23     A.  That group is the joint firearms trafficking group.

24     Q.  What are your general duties and responsibilities?

25     A.  We investigate trafficking into the New York area, both

1    proactive cases and reactive cases.

2    Q.  By trafficking, do you mean ammunition and guns?

3    A.  Yes.

4    Q.  Do you also make interstate nexus determinations?

5    A.  Yes.

6    Q.  Can you describe what an interstate nexus determination is?

7    A.  It is basically a determination that a particular firearm

8    was manufactured in a particular state.

9    Q.  Have you received any specialized training in making those

10   kinds of determinations?

11   A.  Yes, I have.

12   Q.  What type of training?

13   A.  I attended the criminal investigator training program at

14   FLETC in Glynco, Georgia where I learned the basic nomenclature

15   of firearms.  I also attended special agent basic training

16   where they went in more depth at the ATF school.  I attended

17   the firearms trafficking course and also attended the

18   interstate nexus school at the firearms technology branch in

19   Martinsburg, West Virginia.

20   Q.  In the course of your employment with ATF, approximately

21   how many firearms and rounds of ammunition have you examined

22   for the purpose of making interstate nexus determinations?

23   A.  Approximately hundreds of guns and thousands of rounds of

24   ammunition.

25            MS. GERACI:  Your Honor, at this time we offer ATF

1   Special Agent Matthew Fleming as an expert in the interstate

2   nexus firearms and ammunition.

3           THE COURT:  Mr. Pittell?

4           MR. PITTELL:  No objection.

5           THE COURT:  The Court does find Special Agent Fleming

6   is qualified to testify in the area of the interstate nexus

7   area of firearms, and he will be allowed to so testify.

8           You may proceed.

9           MS. GERACI:  Thank you, Judge.

10  BY MS. GERACI:

11  Q.  Agent Fleming, have you reviewed a firearm and ammunition

12  in connection with this case?

13  A.  Yes, I have.

14  Q.  Do you know anything about the defendant who is on trial in

15  this case?

16  A.  No, I do not.

17  Q.  What kind of analysis did you conduct on the firearm in

18  this case?

19  A.  I analyzed the report with the firearm from the NYPD lab,

20  and then I performed a physical examination of the firearm and

21  the ammunition.

22  Q.  Did you come to any determinations?

23  A.  Yes, I did.

24  Q.  What steps did you take to come to your determinations?

25  A.  I referenced ATF's list of manufacturers for firearms and

1    ammunition.  I also reviewed the commonly sourced material,

2    including the *Standard Catalog of Firearms,* the blue book of

3    guns, the *Ammo Encyclopedia* and *Gun Digest* for further

4    information.

5            MS. GERACI:  Your Honor, may I approach?

6            THE COURT:  Yes.

7    Q.  Special Agent Fleming, I've handed you what's marked as

8    Government Exhibit 54.  Do you recognize this?

9    A.  Yes, I do.

10   Q.  Have you seen this before your testimony today?

11   A.  Yes, I have.

12   Q.  How do you recognize the items in Government Exhibit 54?

13   A.  I recognize it because my initials are on the evidence tape

14   on the bag.

15   Q.  What is Exhibit 54?

16   A.  Exhibit 54 is a firearm.

17           MS. GERACI:  Your Honor, at this time the government

18   offers Exhibit 54 into evidence.

19           MR. PITTELL:  Subject to my prior objection on that,

20   Judge.

21           THE COURT:  That is received.

22           (Government's Exhibit 54 received in evidence)

23   Q.  Agent Fleming, can you tell us the make and model of that

24   firearm?

25   A.  It is an SCCY Industries firearm 9-millimeter Parabellum

1   semi-automatic pistol.

2   Q.  Did you come to any conclusions about this firearm?

3   A.  Yes, I did.

4   Q.  What were your conclusions?

5   A.  That the firearm is manufactured outside the State of New

6   York.

7   Q.  Did you come to any conclusions as to where it was

8   manufactured?

9   A.  Yes, I did.

10  Q.  Where?

11  A.  It was manufactured in Florida.

12          MS. GERACI:  Permission to publish to the jury, your

13  Honor?

14          THE COURT:  Yes.  Ms. Geraci, you are just going to

15  show it to the jury and walk it down.

16          MS. GERACI:  Yes, your Honor, and I'll do that at the

17  end.  I believe there are some things attached.

18          THE COURT:  All right.

19  BY MS. GERACI:

20  Q.  Agent Fleming, what kind of analysis did you conduct on

21  ammunition in this case?

22  A.  I did an analysis of the NYPD lab report, and then I also

23  did a physical examination of the ammunition.

24  Q.  Did you come to any determinations?

25  A.  Yes, I did.

E9bQdel5                          Fleming - direct

1   Q.  What steps did you take to make those determinations?

2   A.  Again, I sourced some of the commonly cited material

3   including the *Ammo Encyclopedia* and the International

4   Ammunition Association website for further information

5   regarding the manufacturer.

6   Q.  I believe you have up with you what's marked as Government

7   Exhibit 55.  Could you take a look at that, please?

8   A.  Yes.

9   Q.  Have you seen that before your testimony today?

10  A.  Yes, I have.

11  Q.  Do you recognize it?

12  A.  Yes, I do.

13  Q.  How do you recognize it?

14  A.  I recognize it because my initials are on the evidence tape

15  located on the bag.

16  Q.  Can you tell us what it is?

17  A.  It is 9-millimeter Luger ammunition.

18          MS. GERACI:  Your Honor, at this time the government

19  offers Exhibit 55.

20          MR. PITTELL:  Judge, just subject to my prior

21  objection and potential connection issue.

22          THE COURT:  All right.  Government Exhibit 55 is

23  received subject to connection.

24          MS. GERACI:  Yes, your Honor.

25          (Government's Exhibit 55 received in evidence)

1    Q.  Have you been able to determine what the make and model of

2    that ammunition is?

3    A.  Yes, I have.

4    Q.  What is it?

5    A.  It's a Fiocchi and it's made in Italy.

6            THE COURT:  When you said it was 9-millimeter Luger

7    ammunition, what did you mean by the word Luger?

8            THE WITNESS:  Luger is the type of round.  It denotes

9    a 9-millimeter round.

10           THE COURT:  I see.

11   Q.  Special Agent Fleming, has the firearm been rendered safe?

12   A.  Yes, it has.

13           MS. GERACI:  One moment, your Honor.

14           THE COURT:  What do you mean by that?

15           THE WITNESS:  I mean that it's zip tied.  The source

16   of ammunition has been removed, and there is no ammunition in

17   the chamber.

18           MS. GERACI:  Permission to publish to the jury now,

19   your Honor?

20           THE COURT:  Yes, now that we've determined it's safe.

21           MS. GERACI:  Thank you, your Honor.

22           (Pause)

23           MS. GERACI:  No further questions.

24           THE COURT:  Thank you.

25           Mr. Pittell.

1   CROSS-EXAMINATION

2   BY MR. PITTELL:

3   Q.  Good afternoon, Agent.

4   A.  Good afternoon.

5   Q.  Special Agent.  Sorry about that.

6           I actually want to put one of the items of ammunition

7   up on the projector and up on the screen, and I want to ask you

8   some questions about it.

9           Detective, can you see on your screen these items in

10  the plastic bag that I'm pointing at with my pen?

11  A.  Yes, I do.

12  Q.  That's the ammunition that you told us about.  Is that

13  correct?

14  A.  Yes, it is.

15  Q.  Is ammunition also sometimes called cartridges or a

16  cartridge?

17  A.  Cartridge case, yes.

18  Q.  So the term ammunition and cartridge case are more or less

19  synonymous?

20  A.  No.  Ammunition is the whole unit.  The cartridge case can

21  be the outside casing without the propellant, the primer and

22  the bullet.

23  Q.  So which term would be the one for the whole unit?

24  A.  Ammunition.

25  Q.  OK.  So would you agree that ammunition basically has four

1    parts:  The bullet which is projected, the cartridge case,

2    powder inside the cartridge case and a primer which is built

3    into the cartridge case?

4    A.  Yes.

5    Q.  And the way that ammunition is manufactured is a cartridge

6    case has the primer billets into it.  Is that correct?

7    A.  It can be built into it.

8    Q.  And just so that we can clarify a little bit.  The

9    cartridge case is the long cylindrical portion of ammunition.

10   Is that correct?

11   A.  Yes.

12   Q.  And the bullet is the tip, often a different color, a

13   grayish color, attached to the top of the cartridge case?

14   A.  Yes.

15   Q.  And the powder that I asked you about would be inside the

16   cartridge case?

17   A.  Yes.

18   Q.  And the primer is at the bottom of the cartridge case.

19   It's a small explosive cap.  Is that correct?

20   A.  Yes, it's a cap that will detonate the propellant powder.

21   Q.  Now, in your experience as an expert and as an ATF agent --

22            THE COURT:  Hold on.  Let's come over here a second.

23        (Continued on next page)

24

25

1          (At the side bar)

2          THE COURT:  My concern is that he is not an expert in

3     firearms generally.  He was qualified as an interstate nexus

4     expert for just where things are manufactured.  So it looks

5     like you're about to launch into -- having laid a foundation, I

6     was waiting for a relevance objection, but the government

7     didn't make one.  I encourage you to now do it.

8          But, in any event, where are we going with this?

9          MR. PITTELL:  Where I'm going is I want to inquire

10    about whether or not he knows whether or not the gun and the

11    ammunition is authentic.

12         THE COURT:  Oh, that's not -- his job is to figure out

13    whether or not -- you can ask him whether or not -- test him on

14    where the gun was manufactured, what basis he has to believe

15    that the gun was the right gun and therefore that it was

16    manufactured in the state of Florida.  That's what he testified

17    to.  As much as you want.  But whether or not it is an operable

18    firearm --

19         MR. PITTELL:  No, not whether or not it's operable.

20    Whether or not it's authentic.  Whether or not the bullets were

21    really made by a manufacturer or whether or not these were made

22    by a gun hobbyist who took a primer and put it in there.  How

23    does he know the markings are authentic?  How does he know the

24    markings are authentic on the gun?

25         THE COURT:  All right.  All right.  All right.  That's

E9bQdel5                    Fleming — cross

1    fine.  Got it.

2              (In open court)

3         (Continued on next page)

1    BY MS. GERACI:

2    Q.  Agent, in the course of your duties and trainings as a

3    special agent, have you had training in the manufacture of or

4    at least how ammunition is manufactured?

5    A.  I've had some training in that, but mainly the training

6    centers around determining the manufacturer of ammunition.

7    Q.  And are you aware that gun hobbyists at times manufacture

8    their own ammunition?

9    A.  Yes.

10   Q.  And the way they do it is they'll take a cartridge that

11   either has a primer already in it or insert a primer cap, put

12   some powder in and then cap it with a bullet.  Is that correct?

13   A.  Yes.

14   Q.  And one reason why gun hobbyists might do it is it saves

15   money.  Is that correct?

16   A.  Yes.

17   Q.  Because it's cheaper to make your own ammunition as opposed

18   to going to a gun store and buying brand ammunition?

19             MS. GERACI:  Objection, your Honor.

20             THE COURT:  Sustained.

21   Q.  Are you familiar with this process that I'm talking about

22   how someone manufactures their own ammunition?

23   A.  Yes, I'm familiar.

24   Q.  I take it it's a relatively easy process, a cartridge?

25   A.  I do not know how easy the process is.

```
 1    Q.   Now, you've been employed by the ATF since approximately,

 2    is it, 2009?

 3    A.   Yes.

 4    Q.   And you've told us about some of your training.  In the

 5    course of your experience as a special agent for the ATF, have

 6    you ever had any general training in the identification of

 7    counterfeit goods?

 8    A.   Yes, I have.

 9    Q.   What kind of goods?  Have you been trained in the

10    identification of counterfeit goods?

11    A.   Primarily tobacco products and some firearm stuff.

12    Q.   What training -- what about ammunition?  Have you had

13    training in counterfeit ammunition?

14    A.   I do not recall.

15    Q.   And you believe that you've had some training in

16    counterfeit firearms?

17    A.   Yes.

18    Q.   Can you tell us what that training is?

19    A.   Through the course of my training as interstate nexus

20    determination agent, I reference the ATF firearms technology

21    branch reference collection which has over 30,000 guns, and so

22    I was able to see all different types of firearms that are

23    manufactured across the world, and I have -- on several

24    occasions.

25    Q.   So you have seen that there are counterfeit firearms
```

1   manufactured out there?

2   A.  Yes.

3   Q.  Would you believe that there is -- or do you know whether

4   or not there's counterfeit ammunition manufactured out there?

5   A.  I do not know.

6   Q.  But would you agree that based upon your knowledge of how

7   ammunition is manufactured, that it would be relatively easy to

8   manufacture counterfeit ammunition?

9           MS. GERACI:  Objection, your Honor.

10          THE COURT:  Sustained.

11  Q.  You gave an opinion about this ammunition that's in an

12  exhibit that it was manufactured outside of New York.  Is that

13  correct?

14  A.  Yes, I did.

15  Q.  And that was based upon your observation of the ammunition.

16  Is that correct?

17  A.  Yes, my physical examination of the headstamp that's on the

18  ammunition.

19  Q.  So physical examination would be that you've actually had

20  it out of the bag and looked at it either with your eye or

21  maybe with a magnifying glass?

22  A.  Yes, and we also took pictures of it.

23          THE COURT:  What's the headstamp you mentioned?

24          THE WITNESS:  The headstamp is the back of the

25  cartridge case.  That's going to have all the identifying

1   information, and it's where the actual firing pin will strike

2   the back of the ammunition.

3   Q.  So that would be -- I'm going to point to the screen up

4   here.  So the headstamp would be on this one down at the bottom

5   here?

6   A.  Yes, that's where the headstamp is located.

7   Q.  And the headstamp has some markings which are imprinted in

8   there.  Is that correct?

9   A.  Yes.

10  Q.  And those markings are the trademarks or headstamp of a

11  manufacturer.  Is that correct?

12  A.  Yes, usually the manufacturer is on the headstamp.

13  Q.  Now, in these particular items, other than the headstamp,

14  are there any other identifying markings?

15  A.  Yes, 9-millimeter Luger is at the 6:00 position on the

16  headstamp.

17  Q.  Other than those markings, are there any other markings?

18  A.  I do not recall.

19  Q.  Is there any kind of serial number on the ammunition?

20  A.  No, there is not.

21  Q.  Is there any type of unique numbering on it to indicate the

22  date or the place of manufacture?

23  A.  Sometimes there is, but on this particular ammunition there

24  is no other information other than the GFL at the 12:00

25  position and the 9-millimeter Luger at the 6:00 position.

1    Q.  So other than those markings on the headstamp, there are no

2    other identifying features of this ammunition?

3    A.  Well, there are other identifying features but nothing on

4    the headstamp.

5    Q.  Are there any other identifying features regarding the

6    manufacturer?

7    A.  No.

8    Q.  So, would you agree that if this ammunition did not have a

9    headstamp or the marking, the Luger marking on it, that you

10   would not be able to tell who the manufacturer was?

11              MS. GERACI:  Objection, your Honor.

12              THE COURT:  Overruled.

13   A.  Typically, the headstamp is what we source to determine

14   where the ammunition is manufactured.

15   Q.  I am asking specifically for these specific items that are

16   up on the screen.  If they did not have a headstamp on them,

17   wouldn't you agree that you would not be able to tell us where

18   it was manufactured?

19   A.  Yes.

20   Q.  Prior to working for the ATF, have you ever been employed

21   by a manufacturer of ammunition?

22   A.  No, I have not.

23   Q.  Have you ever worked in any type of ammunition factory?

24   A.  No.

25   Q.  So you would agree that since you've never worked in an

1   ammunition factory or never worked for an ammunition

2   manufacturer and since you do not have any training or

3   experience in the identification of counterfeit ammunition,

4   that you cannot give us an opinion as to whether or not the

5   markings on the headstamp here are real or counterfeit?

6          MS. GERACI:  Objection, Judge.

7          THE COURT:  Overruled.  He can answer.

8   A.  Based on in my level of expertise on what I'm looking at, I

9   can determine that that ammunition was made by Fiocchi.  Other

10  than that, I can't answer the question.

11  Q.  But you're assuming that because the headstamps have

12  information relating to Fiocchi that it was made by Fiocchi.

13  Is that correct?

14  A.  Yes, the headstamp is what's commonly cited by industry

15  experts as well as civilians on how to determine where

16  ammunition is manufactured.

17  Q.  But would you agree that based upon your experience in

18  working with counterfeit items such as cigarettes that there

19  are times when counterfeit copies can almost be exact replicas

20  of the original?

21          MS. GERACI:  Objection, your Honor.

22          THE COURT:  Well, why don't you make it not in terms

23  of cigarettes.  Why don't you make it more specific to the

24  issues here.

25  Q.  Well, you do not have any experience in the identification

1   of counterfeit headstamps.  Is that correct?

2   A.  I am unaware that counterfeit headstamps exist, yes.

3   Q.  Well, if they did exist, you would not have any experience

4   in identifying them.  Is that correct?

5            MS. GERACI:  Objection, Judge.

6            THE COURT:  Sustained.  You can try it differently.

7   Q.  As you sit here now, you do not know whether or not the

8   headstamps on this ammunition are real or counterfeit?

9            MS. GERACI:  Objection.

10           THE COURT:  No.  Overruled.

11  A.  I'm just reporting what's on those headstamps.  In my

12  opinion, they're made by Fiocchi in Lecco, Italy.

13  Q.  But your opinion is based on an assumption that the

14  headstamps are real?

15  A.  Yes.

16  Q.  If they were counterfeit, they could have been made

17  anywhere?

18  A.  I would assume they could be if they were counterfeit.

19  Q.  And if they were counterfeit, they could even be made in

20  New York State?

21  A.  In my experience, these pieces of ammunition are made by

22  Fiocchi in Lecco, Italy, and that's my opinion on that.

23  Q.  But based on your experience as a ATF agent, if they were

24  to be manufactured by highly qualified counterfeiters, there is

25  no reason why they couldn't be manufactured in New York as

E9bQdel5                          Fleming - cross

1    opposed to anywhere else in the world?

2              MS. GERACI:  Objection, your Honor.

3              THE COURT:  Yes, let's have -- I'm sorry.  I

4    apologize, ladies and gentlemen.  I need to see you folks back

5    over here.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E9bQdel5                        Fleming – cross

1              (At the side bar)

2              THE COURT:  Do you have a reasonable good faith basis

3    to believe that either the firearm or the ammunition is

4    counterfeit?  Because if you don't, I'm not going to allow any

5    more of this.

6              MR. PITTELL:  No, I don't.

7              THE COURT:  You're done.  Thank you.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. PITTELL:  I have no further questions for this

3     witness.

4          THE COURT:  Thank you.

5          Ms. Geraci.

6          MS. GERACI:  Very briefly, your Honor.

7          THE COURT:  All right.

8     REDIRECT EXAMINATION

9     BY MS. GERACI:

10    Q.  Special Agent Fleming, in your five years, five plus years

11    as an ATF agent, have you ever heard of Fiocchi ammunition,

12    counterfeit ammunition manufactured in New York?

13    A.  I have never heard of counterfeit ammunition, period.

14         MS. GERACI:  No further questions, your Honor.

15         THE COURT:  Thank you.  You may step down.

16         (Witness excused)

17         THE COURT:  Would the government like to call its next

18    witness, please?

19         MS. GERACI:  The government calls Special Agent Andrew

20    Brandt of the FBI.

21         THE COURT:  Special Agent Brandt, please.

22

23

24

25

1    ANDREW BRANDT,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. GERACI:

6              THE COURT:  Special Agent Brandt, please be seated.

7    It will be important for you to adjust the mike so we can get a

8    clear and audible sound.  You may proceed, Ms. Geraci.

9              MS. GERACI:  Thank you, your Honor.

10   Q.  Agent Brandt, where do you work?

11   A.  I work for the Federal Bureau of Investigation in Lower

12   Manhattan.

13   Q.  What is your title?

14   A.  Special agent.

15   Q.  How long have you been a special agent with the FBI?

16   A.  Approximately five years and seven months.

17   Q.  Are you assigned to any particular squad in the FBI?

18   A.  Yes, I'm assigned to a squad called C11, and it is a squad

19   that specializes in narcotics trafficking investigations.

20   Q.  What are your general duties and responsibilities?

21   A.  My general duty as part of this squad is to investigate

22   allegations of narcotics trafficking within the five boroughs

23   of New York City.

24   Q.  Do you participate in arrests?

25   A.  I do.

1   Q.  I'm going to direct your attention to June 4 of 2013.  Were

2   you working that day?

3   A.  I was.

4   Q.  Where were you working?

5   A.  I was a member of a team of FBI special agents in New York

6   City Police Department Detectives in Bronx, New York on that

7   date.

8   Q.  Who else was working with you on that date?

9   A.  I was a member of a team.  There were other FBI special

10  agents as part of a team, and the team also contained or --

11  excuse me -- consisted of members of New York City Police

12  Department.

13  Q.  Who was directing the team that day?

14  A.  The team was being directed by a fellow FBI agent I work

15  with by the name of John Reynolds.

16  Q.  Is that the FBI agent sitting at counsel table in front?

17  A.  Yes, it is.

18  Q.  What was your assignment that day?

19  A.  My assignment that day was to assist the team in the arrest

20  of an individual by the name of Gregory Accilien.

21  Q.  Where did you go to assist with that arrest?

22  A.  We went to an address in the Bronx, which I don't recall

23  the exact address at this time.

24  Q.  Do you know what period of the day you arrived at the

25  address?

1    A.  This would have been in the morning time frame, early

2    morning.

3    Q.  What did you do when you first got there?

4    A.  All of us on the team when we first arrived at that street

5    where that address is located first parked our cars, got out of

6    our vehicles, and then formed a line or what we call in law

7    enforcement a stack beginning at the front door of the

8    residence and then a line snaking back from the front door.  I

9    myself was located toward the back of the stack or toward the

10   end of that line.

11   Q.  At some point did you go into the residence?

12   A.  I did.

13   Q.  And then at some point were you directed to transport

14   anyone from that residence?

15   A.  I was.

16   Q.  Who was that?

17   A.  I was directed to take into custody and therefore transport

18   an individual by the name of David Delva.

19   Q.  What, if anything, did you do with respect to David Delva

20   before you left the residence?

21   A.  After I was directed to take control of Mr. Delva and

22   transport him, before departing the residence, I performed a

23   search of his person.

24   Q.  What, if anything, did you find?

25   A.  In one of his pants pockets, I found a small baggie that

1   contained a white-colored substance inside of the baggie.

2   Q.  What did you believe that to be?

3   A.  I believed it to be a drug.

4   Q.  What did you do with the item after you found it in his

5   pocket?

6   A.  After I found that item in his pocket, I gave it to another

7   special agent on the team so that I would be able to better

8   control Mr. Delva and transport him.

9   Q.  Sitting here today, do you remember what Mr. Delva looked

10  like?

11  A.  I -- I don't specifically recall.

12  Q.  What happened next?

13  A.  What happened next was I took Mr. Delva outside, along with

14  New York City Police Department Detective Angelo Tessitore.  We

15  put him in a law enforcement vehicle, and we drove him to an

16  NYPD precinct for further processing.

17          MS. GERACI:  Thank you, your Honor.  No further

18  questions.

19          THE COURT:  Thank you.

20          Mr. Pittell.

21  CROSS-EXAMINATION

22  BY MR. PITTELL:

23  Q.  Good afternoon, Special Agent.

24  A.  Good afternoon, sir.

25  Q.  You said that you were part of a team of FBI and New York

1   City police officers that day?

2   A.  Yes.

3   Q.  Do you remember approximately how many people were in the

4   team in total?

5   A.  I would say approximately ten or so law enforcement

6   officers, and that's, again, an approximation.

7           THE COURT:  You're going to stay within the scope of

8   the direct, right?  We're not going to wander farther?

9           MR. PITTELL:  Yes.

10          THE COURT:  Thank you.

11  Q.  What time was it that you arrived there?

12  A.  I do not recall the exact time, sir.  It was an early

13  morning operation because typically when we do arrest warrant

14  service, we do it in the early morning, so I would be guessing

15  if I said a time.

16  Q.  By early morning, you mean after sunrise?

17  A.  Yes, sir.

18  Q.  But like before 8:00, 9:00-type early morning?

19  A.  That would be fair to say, yes.

20  Q.  So, it's sort of the early morning after people wake up as

21  opposed to the early morning after midnight?

22  A.  That's correct, yes.  It would definitely be after -- well,

23  while the sun is rising so there is sunlight outside, but I

24  think before 8:00 would also be fair to say.

25          MR. PITTELL:  That's all I have, your Honor.

841

1            THE COURT:  All right.  Thank you.

2            MR. PITTELL:  Thank you, Agent.

3            (Witness excused)

4            THE COURT:  Would the government like to call its next

5    witness?

6            MS. GERACI:  Yes, your Honor, just one minute.

7            MR. POSCABLO:  Judge, can we have a quick side bar?

8    It's with regard to the evidence we had discussed earlier.

9            THE COURT:  This is like a new record for me, the

10   number of side bars all in a row.  I apologize in advance.

11   We'll do it quickly.  We are going to take our afternoon break

12   at 3:15.  That is why I don't want to break right now.  I have

13   to do something else at 3:15 for like ten minutes.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

E9bQdel5                          Brandt - cross

1                 (At the side bar)

2                 MR. POSCABLO:  Your Honor, just for the record, we are

3        going to agree with your Honor, and we are not going to offer

4        the scale or the ammunition that were recovered from the drawer

5        in the bedroom.

6                 I just wanted to raise a related issue which is that

7        Mr. Pittell signed a stipulation we all agreed that the

8        Government Exhibit 70 would be admitted into evidence.  What

9        was tested on here is the scale, so we will offer it, but we

10       will redact this before it goes back to the jury.  I just

11       wanted to flag that issue now, that's all.

12                MR. PITTELL:  OK.  That's fine.

13                THE COURT:  Thank you.

14                (In open court)

15        ELLIS DELOREN,

16            called as a witness by the Government,

17            having been duly sworn, testified as follows:

18       DIRECT EXAMINATION

19       BY MS. GERACI:

20                THE COURT:  Be seated and adjust the microphone.

21                Ms. Geraci, you may proceed.

22                MS. GERACI:  Thank you, your Honor.

23       Q.  Detective Deloren, where do you work?

24       A.  I currently work in the joint federal robbery task force.

25       Q.  Are you also a member of the New York Police Department?

E9bQdel5                          Deloren - direct

1    A.  Yes, I am.

2    Q.  What is your title?

3    A.  Detective.

4    Q.  How long have you been a detective with the NYPD?

5    A.  I've been a detective since 2008, so a little over six

6    years.

7    Q.  Prior to your assignment with the robbery task force, where

8    did you work?

9    A.  I worked in the Bronx robbery squad.

10   Q.  How long were you with the Bronx robbery squad?

11   A.  About six years.

12   Q.  What area of New York City does that cover?

13   A.  Mostly the Bronx, but sometimes our cases take us

14   city-wide.

15   Q.  What are your duties and responsibilities or what were they

16   as a member of the Bronx robbery squad?

17   A.  Bronx robbery squad is responsible for handling home

18   invasion robberies that occur in the Bronx as well as all the

19   pattern robberies.

20   Q.  Approximately how many robbery cases have you been involved

21   in the investigation of?

22   A.  Hundreds.

23   Q.  Do you also participate in arrests?

24   A.  Yes.

25   Q.  Approximately how many arrests have you participated as an

1  officer of the New York City Police Department?

2  A.  Thousands.

3  Q.  Do you ever investigate kidnappings?

4  A.  Yes.

5  Q.  Under what circumstances would you investigate a

6  kidnapping?

7  A.  Typically, if it was pertaining to a home invasion robbery.

8  Q.  Detective Deloren, how are cases typically assigned to you?

9  A.  When I was in the Bronx robbery squad, cases were assigned

10  to us on a rotating basis.

11  Q.  I'm going to turn your attention to the evening of

12  September 4 of 2012.  Did you become aware -- I'm sorry.  Did

13  you become involved in an investigation of a robbery and

14  kidnapping in the Bronx?

15  A.  Yes.

16  Q.  Did you arrest anyone in connection with that

17  investigation?

18  A.  Yes, several people.

19  Q.  Can you name some of the people you arrested?

20  A.  I arrested Trevor Cole, Dominique Jean-Philippe, Gregory

21  Accilien, the defendant, David Delva, Lisa Hylton.

22  Q.  Can I ask you to please look around the courtroom and let

23  me know if you see any of the individuals you just mentioned?

24  A.  Yes.  May I stand up?

25          MS. GERACI:  Yes, with the Court's permission.

1        THE COURT:  Yes.

2   A.  The defendant, David Delva, is in what looks like a black

3   suit sitting at the table.

4   Q.  Can you describe a facial features to his hair?

5   A.  Male black with short braids.

6        MS. GERACI:  With the Court's permission, may I ask

7   Ms. Chen to put up already in evidence Exhibit 10?

8        THE COURT:  All right.

9   Q.  Detective Deloren, do you recognize this person?

10  A.  Yes.

11  Q.  Who is that?

12  A.  That's Trevor Cole.

13  Q.  Exhibit 11, please.  Do you recognize that person?

14  A.  Yes.

15  Q.  Who is that?

16  A.  That's Dominique Jean-Philippe.

17  Q.  Exhibit 12 please, Ms. Chen.

18        Who is that?

19  A.  That's the defendant, David Delva.

20  Q.  Exhibit 13, please.

21        And who is that?

22  A.  That's Gregory Accilien.

23  Q.  Lastly, go to 16.

24        Do you recognize that person?

25  A.  That's Lisa Hylton.

E9bQdel5                          Deloren - direct

1   Q.  How did you first learn of this investigation?

2   A.  I was notified by the 47 detective squad of a home invasion

3   at the particular location on Magenta Street.

4   Q.  Do you recall the address?

5   A.  Yes.

6   Q.  What is it?

7   A.  830 Magenta Street.

8   Q.  Is that in the Bronx?

9   A.  Yes.

10  Q.  Did you go to that address?

11  A.  I did.

12  Q.  How did you get there?

13  A.  Police department vehicle.

14  Q.  Did you go alone or were you with other people?

15  A.  I was with my partner.

16  Q.  What's your partner's name?

17  A.  Detective Angelo Tessitore.

18  Q.  Approximately what time did you arrive at 830 Magenta

19  Street?

20  A.  It was approximately 10:00 or 10:30 p.m.

21  Q.  When you arrived, can you describe what was happening?

22  A.  When I got to the scene, there was an ambulance parked in

23  front of the building.  There were several people standing

24  around the ambulance including uniformed officers.  There was

25  two detectives and some civilians as well.

1   Q.  Was this outside the building or were you inside?

2   A.  No, this was outside in front of the building.

3   Q.  Did you speak with anyone when you got there?

4   A.  Yes.

5   Q.  Who did you speak with?

6   A.  The first person I spoke to was the detective from the 47

7   precinct, and then from there I went into the ambulance, and I

8   spoke with both the male and the female victims.

9   Q.  At some point did you go into the apartment?

10  A.  Yes.

11  Q.  Can you describe the physical condition -- I'm sorry, let's

12  back up.  Can you describe the physical condition of the

13  victims as you viewed them?

14  A.  They both obviously looked assaulted, bleeding and dried

15  blood, swelling, cuts.  The female victim had -- on one of her

16  wrist, she had a very deep abrasion, like skin was missing from

17  her wrist.

18          The male victim had a bandage on his head with blood

19  seeping through.  He also had a bandage on his arm.  They were

20  both disheveled and beaten up.

21  Q.  Were you able to observe their demeanor?

22  A.  Yes.

23  Q.  Can you describe it?

24  A.  Their demeanor, they were -- they were shaken.  They were

25  definitely afraid at that particular moment, but at the same

 1    time they were also -- they were calm.  They weren't excited.

 2    Q.  Did you ever come to learn their names?

 3    A.  Yes.

 4    Q.  What are their names?

 5    A.  Jeanette Adams and the male victim initially identified

 6    himself to me as Eugene Brown, who I have come to learn his

 7    real name is Patrick James.

 8    Q.  After you spoke with the victims, what did you do?

 9    A.  I went upstairs to the apartment.

10    Q.  Do you know what apartment you went to?

11    A.  5E.

12    Q.  What did you do when you went into the apartment?

13    A.  Well, the first thing I did is I observed the scene to see

14    what was left behind of any kind of evidentiary nature.  I

15    observed the place was completely ransacked.  Bedroom was

16    flipped upside down is the best way to describe it -- drawers

17    pulled out, clothes strewn about.  There was blood on the

18    floor.  There was blood on some clothes or a shirt.  There was

19    duct tape on the floor that looked like it had been ripped off

20    somebody's body.  There was discarded food items.  There was --

21    the place was a complete mess.

22    Q.  Did you notice any smell?

23    A.  Yes.

24    Q.  What did you notice?

25    A.  It was a combination of urine, marijuana and there was also

1   a strong smell of cleaning fluids.

2   Q.  Was ECT there when you arrived?

3   A.  Yes.

4   Q.  And what, if any, direction did you give to ECT?

5           THE COURT:  What's ECT again?

6   Q.  I'm sorry, your Honor.  Detective Deloren, what is ECT?

7   A.  ECT is the NYPD's evidence collection team is what it

8   stands for.  They're called to the scene whenever we need

9   fingerprints lifted or items that maybe perpetrators or

10  suspects would leave at the scene that we need vouchered.  They

11  would come and typically collect those items.

12  Q.  In this case, what, if any, direction did you give to ECT?

13  A.  I walked through the house with one of the officers, and I

14  directed him as to what articles that I wanted to recover and

15  sent to the lab for analysis.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1    BY MS. GERACI:

2    Q.  Were the victims in the apartment with you when you were

3    there or were they somewhere else?

4    A.  I left them in the ambulance.  So I can only assume they

5    were still downstairs or on their way to the hospital.

6    Q.  At some point later did you go to another location?

7    A.  Yes.

8    Q.  Where did you go?

9    A.  I went to 801 Neil Avenue also in the Bronx.

10   Q.  And, approximately, how long did it take you to get from

11   Magenta Street to Neil Avenue?

12   A.  Five minutes, ten minutes tops.

13   Q.  Approximately, what time did you arrive at Neil Avenue?

14   A.  Maybe 11:30, midnight, somewhere around there.

15   Q.  How did you get there?

16   A.  Same department vehicle.

17   Q.  Did you go alone or with your partner?

18   A.  No.  With my partner.

19   Q.  What did you do when you got there?

20   A.  We went up to the male victim's floor, 7th floor.  And when

21   I got there there were several uniformed officers already there

22   on the floor trying to gain entry to the apartment.

23   Q.  As far as you could tell had anyone opened the door yet?

24   A.  Not yet.

25   Q.  At some point did you go in?

1    A.   Yes.

2    Q.   Was anyone there?

3    A.   No.

4    Q.   Can you describe the conditions of this apartment?

5    A.   It was also ransacked, not quite as bad as the original

6    apartment but furniture was definitely flipped over.  Closets

7    were searched.  There was an empty safe that looked like it had

8    been ripped out of the closet or pulled out closet that was on

9    floor.

10   Q.   Did it smell like anything?

11   A.   Yes.

12   Q.   What did it smell like?

13   A.   There was a strong smell of fresh marijuana.

14   Q.   At some point did you leave the Neil Avenue location?

15   A.   Yes.

16   Q.   Where did you go after that?

17   A.   I went to Jacobi Hospital.

18   Q.   Why did you do that?

19   A.   To go talk to the victims again.

20   Q.   Did you speak with them there?

21   A.   Yes.

22   Q.   What did you do after you left the hospital?

23   A.   I went back to my office.

24          MS. GERACI:  Your Honor, may I approach?

25          THE COURT:  You may.

 1              (Pause)

 2     Q.   Detective Deloren, I've handed you what's been entered into

 3     evidence as Government Exhibits 200 which is the disk and 201

 4     through 205.  Have you had an opportunity to review these

 5     things before your testimony today?

 6     A.   Yes.

 7     Q.   What have I handed you?

 8     A.   Well, Government Exhibit 201 a CD, a disk which contains

 9     the video from 805 Neil Avenue.  There are surveillance cameras

10     throughout the lobby of the building.

11     Q.   Did you recover that initially?

12     A.   Yes.

13     Q.   And what are the other exhibits I've handed you?

14     A.   These are still photographs, Government Exhibits 201

15     through 205.  And they are still photographs that are captured

16     from the video.

17              MS. GERACI:  With the Court's permission may we play

18     some portions of this video?

19              THE COURT:  Yes.

20              MS. GERACI:  May I direct Ms. Chen to play Exhibit 200

21     starting at one minute, eight seconds.

22              (Videotape played)

23              MS. GERACI:  May I now direct Ms. Chen to play the

24     second surveillance video at two minutes, 57 seconds.

25              (Videotape played)

1            MS. GERACI:  OK.  I'll now ask Ms. Chen to play the

2     third surveillance video at three minutes and four seconds.

3            (Videotape played)

4            MS. GERACI:  I am going to ask Ms. Chen to play the

5     fourth surveillance video at one minute and 47 seconds.

6            (Videotape played)

7            MS. GERACI:  Can we skip to the fifth surveillance

8     video at one minute, 26 seconds.

9            (Videotape played)

10           MS. GERACI:  And may I ask Ms. Chen to just now jump

11    to the sixth video, the last one at one minute, 50 seconds.

12           (Videotape played)

13    BY MS. GERACI:

14    Q.   While we're doing that, Detective Deloren, can you see the

15    time reflected?

16    A.   Yes.

17    Q.   What is it?

18    A.   It says 1719 hours which is 5:19 p.m.

19    Q.   What is the date?

20    A.   9/4/2012.

21           MS. GERACI:  Thank you.

22           (Videotape played)

23           MS. GERACI:  Thank you, Ms. Chen.

24    Q.   Detective Deloren, did you there come a time when you

25    recovered a vehicle associated with this investigation?

1    A.  Yes.

2    Q.  How did that come about?

3    A.  The vehicle was reported stolen from the original home

4    invasion.  It belonged to the female victim.  I had put out an

5    alert on the car to be notified any time the car passes through

6    any of the city's license plate readers.  Some time after the

7    robbery occurred I was notified that the car was ticketed a

8    parking summons was issued to that car on Barnes Avenue in the

9    Bronx about two blocks from the victim's house.

10   Q.  And at some point did you recover the vehicle?

11   A.  Yes.

12   Q.  Can you describe how you did that?

13   A.  I drove up.  I saw the car on the block.  We decided to

14   conduct surveillance on the car for 24 hours to see if anybody

15   came back to it, got back in it and tried to drive it.  After

16   the 24 hours was up Agent Reynolds and I decided that we were

17   going to impound the car for evidence.

18   Q.  And you came to understand whose car it was?

19   A.  Yes.

20   Q.  Whose car is it?

21   A.  Jeanette Adams.

22          MS. GERACI:  With the Court's permission may we

23   publish Government Exhibit 300 already in evidence?

24          THE COURT:  Yes.

25          (Pause)

1   Q.   Detective Deloren, is this the car you recovered?

2   A.   Yes.

3   Q.   Did there come a time in your investigation where you

4   learned about additional evidence?

5   A.   Yes.

6           THE COURT:  How much more do you have?  I am going to

7   have to have you end in about three minutes.

8           MS. GERACI:  Your Honor, I have a bit more but this is

9   a fine time to stop.

10          THE COURT:  Let's do that.  Let's take our break right

11  now.

12          Ladies and gentlemen, we'll take our afternoon break

13  and I can assure you that this break will be at least until

14  3:30.  It will be at least a 20 minute break.  It might even be

15  done in 15 minutes but I know it's not going to be ten.

16          All right.  Thank you.

17          (Jury not present)

18          THE COURT:  You can step down and take a break as

19  well.

20          (Witness not present)

21          THE COURT:  Let's all be seated for a moment.

22          Is there anything you folks would like to raise with

23  me?

24          MS. GERACI:  No, your Honor.

25          THE COURT:  All right.  One thing I just want to make

1      sure of is I don't know what evidence you are going to go

2      through but are you going to go through things that were

3      recovered at the house?

4              MS. GERACI:  I'm sorry.  We're going to be going

5      through evidence recovered at Dominique Jean-Philippe's

6      apartment and at David Delva's apartment.

7              THE COURT:  All right.  And what I am trying to figure

8      out is I don't want to have sidebars about the scope of the

9      examination and so if the scope of the examination is not as

10     broad as I had thought it might be, then I just want to surface

11     if there are going to be any scope issues right now so we don't

12     have to have another sidebar.

13             Mr. Pittell, you know where you are going.  I don't

14     want to have you proffer your cross right now but is there

15     anything you think we should reasonably address that's likely

16     to be a beyond the scope?  In other words, are you going to ask

17     him whether or not he opened up a draw and took out ammunition?

18     Because that in my view which if the ammunition is offered

19     would be beyond the scope.

20             Similarly, unless the government goes into, did you

21     ask Accilien for consent, I don't think that that issue is

22     within the scope either

23             MR. PITTELL:  Just in terms of the ammunition, what

24     may or may not be an issue is that it's my recollection from

25     the suppression hearing he recovered the gun which was loaded,

1   made it safe, disassembled it and it went somewhere.  Later on

2   then it was taken back to the scene for photographing and a

3   kind of recreation of how he observed it.  Two clips were

4   recovered one from the gun.  I think another one from a drawer.

5   I just want to make sure that there's no mix up of that.

6          THE COURT:  I thought it was a box of ammunition from

7   the drawer, not a clip.  Was there also a clip?

8          MR. PITTELL:  I think there was a second clip.

9          MS. GERACI:  Judge, it's my understanding that there

10  was a box of ammunition recovered as well as a clip.

11         THE COURT:  All right.

12         MR. PITTELL:  The only issue is that --

13         THE COURT:  Is it chain of custody?

14         MR. PITTELL:  Typically when a police officer recovers

15  an object they make -- they put some type of identifying

16  marking on it or immediately voucher so the chain of custody

17  begins and is preserved.

18         THE COURT:  So you want to go after whether or not the

19  gun he identifies on direct is in fact the gun obtained at the

20  scene?

21         MR. PITTELL:  Not the gun.

22         THE COURT:  Or the ammunition you want to find out if

23  the ammunition he is going to identify on direct is, in fact,

24  the ammunition recovered?  That would be the only reason to go

25  into it.

 1          MR. PITTELL:  If there's identifying markings that can

 2     be satisfied then I don't want to go into it.

 3          THE COURT:  All right.  I just want to get a feel for

 4     it.  I don't want that preclude you.  That sounds like a

 5     reasonable inquiry if there's a reason to suggest that there

 6     may be a reason why it's not the stuff that he recovered at the

 7     scene.

 8          All right.  I'm going to do my call in the other room

 9     with these parties in this civil case and we'll come back out.

10     I expect it'll be about 3:30.  So, it'll be about a 15 minute

11     break.

12          (Recess)

13          MS. GERACI:  What the government will do is not read

14     that section and submit to the jury a redacted version.

15          THE COURT:  Can you just read the first paragraph when

16     do you that?  Otherwise, I feel like I need to do something to

17     indicate --

18          MS. GERACI:  Of course, your Honor.

19          THE COURT:  I know that you say "stipulation" but the

20     word isn't necessarily as meaningful as "by and between".

21          MS. GERACI:  That makes sense, judge.

22          (Jury present)

23          THE COURT:  All right.  Ladies and gentlemen, let's

24     all be seated.

25          All right.  Ms. Geraci, you may proceed.

1          MS. GERACI:  Thank you, judge.

2    Q.   Detective Deloren, I'd like to just go back very briefly to

3    Government Exhibit 200 and ask you two very quick questions

4    that I neglected to ask you earlier.

5          MS. GERACI:  Can I ask Ms. Chen to publish Exhibit 200

6    first video at the time stamp 1:08.

7          THE COURT:  Yes.

8    Q.   Detective Deloren, what time is indicated on this video at

9    this point?

10   A.   1654 hours which is 4:54 p.m.

11         MS. GERACI:  And with the Court's permission may I ask

12   Ms. Chen to go to Exhibit 200, video number six at,

13   approximately, 1 minute, 50 seconds?

14         THE COURT:  Yes.

15         (Pause)

16   Q.   What are we seeing in this video here?

17   A.   We're seeing the two suspects leaving with the victim's

18   belongings.

19   Q.   What's the timestamp on this at this point?

20   A.   1719 hours which is 5:19 p.m.

21   Q.   Now could you tell it's his belongings?

22   A.   Well, when they first came in they weren't carrying that

23   suitcase and now they have it.  So they must have taken it from

24   the apartment.  And the suitcase I know belongs to Patrick

25   James.

1    Q.  And at some point did you come to learn the identity of the

2    two people in video?

3    A.  Yes.

4    Q.  Who are they?

5    A.  The individual in the white T-shirt is Dominique

6    Jean-Philippe and in the dark T-shirt, that's Trevor Cole.

7    Q.  Detective Deloren, did there come a time when you learned

8    about additional evidence?

9    A.  Yes.

10   Q.  Approximately, how long after the robbery occurred did you

11   learn about this additional evidence?

12   A.  I'm not sure of the exact date.  It was on the same day

13   that we recovered the car on Barnes Avenue, approximately, a

14   week or so, five days.  Again, I don't remember exactly how

15   many days after the robbery.

16   Q.  How did you come to learn about this evidence?

17   A.  I received a phone call from Jeanette adamants.

18   Q.  And what did you do after you spoke with Ms. Adams?

19   A.  I went to her apartment.

20   Q.  Is this the Magenta Street apartment?

21   A.  Yes.

22   Q.  Who else was there, if you recall?

23   A.  I remember her daughter was there.  And while I was there

24   her son arrived.

25   Q.  And what, if anything, did you obtain at the Magenta Street

1    apartment?

2    A.   She showed me a bag containing gloves and cigarette butts.

3    Q.   Did you look in the bag?

4    A.   Yeah.

5    Q.   And what did you do with the bag after you obtained it?

6    A.   I secured it there at the location and I called our

7    evidence collection team to the scene.

8    Q.   And do you know if the evidence collection team collected

9    the bag?

10   A.   Yes.

11   Q.   At some point you arrested Dominique Jean-Philippe?

12   A.   That's correct.

13   Q.   Do you recall when you did that?

14   A.   November 4, 2013.

15   Q.   And where did you arrest him?

16   A.   At his residence in Mount Vernon, 227 Fifth Street.

17   Q.   What, if anything, did you recover during this arrest?

18   What were some of things?

19   A.   Some of things I recovered, narcotics, crack cocaine,

20   marijuana, pills, paraphernalia indicative of drug sales, drug

21   packaging, bullets, as well as personal belongings that we came

22   to learn belonged to Patrick James.

23           MS. GERACI:  May I approach, your Honor?

24           THE COURT:  Yes.

25   Q.   Detective Deloren, I am going to show you what's been

1   marked as Government Exhibit 401.  First of all, can you take a

2   look at these items which should be marked Exhibits 401 through

3   425 and tell me generally if you've seen these items before?

4   A.  I've seen all these items before.

5   Q.  Do you recognize these items?

6   A.  Yes.

7   Q.  Have you had a chance to review them before your testimony

8   today?

9   A.  Yes, I have.

10  Q.  What do you recognize them generally to be?

11  A.  Generally, they are the items that were recovered at

12  Dominique Jean-Philippe's apartment or his bedroom.

13  Q.  So let's go through them as they sort of appear here.  I am

14  showing you what's been marked as Government Exhibit 421.  Do

15  you recognize that?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's a sock in a clear plastic bag or Saran wrap of a sort

19  that we recovered bullets in.

20          MS. GERACI:  Your Honor, would you prefer I offer them

21  one at a time or collectively in a group at the end?

22          THE COURT:  You can offer them one at a time, however

23  you would like to do it.

24          MS. GERACI:  At this time the government would offer

25  Exhibit 421.

1               THE COURT:  Mr. Pittell?

2               MR. PITTELL:  This is it?

3               MS. GERACI:  Yes.

4               MR. PITTELL:  No objection.

5               THE COURT:  One by one do you want to just look

6     through the pile or is the whole box going in?

7               MS. GERACI:  Yes.

8               MR. PITTELL:  So let me just take my look.

9               (Pause)

10              MR. PITTELL:  I don't think I'll have any objection.

11              THE COURT:  Why don't you move them in as a group,

12    then you can have the witness go through them and you don't

13    have to go through a belabored identification.  Move them is as

14    a group.

15              MS. GERACI:  Your Honor, there are going to be

16    Government Exhibits 401 through 425.

17              THE COURT:  All right as in the --

18              MS. GERACI:  That's everything in the box.  Although,

19    your Honor, if I could probably move to admit each one and then

20    ones that are not drug evidence I could perhaps publish to the

21    jury.

22              THE COURT:  You'll be able to have the detective go

23    through each and every one of them.  I am just trying to do the

24    paperwork.

25              MS. GERACI:  Understood, your Honor.

```
 1              THE COURT:  All right.  So you are not going to have
 2    any objections, Mr. Pittell, to these?
 3              MR. PITTELL:  No.
 4              THE COURT:  So 401 to 425 will be received.  You may
 5    proceed to work with the witness on them.
 6              (Government's Exhibits 401-425 received in evidence)
 7              MS. GERACI:  Thank you, your Honor.
 8    Q.   Detective Deloren, do you recognize this item marked as
 9    Government Exhibit 415 and has been entered into evidence?
10    A.   Yes.
11    Q.   What is in Government Exhibit 415?
12    A.   No, 418.
13    Q.   Could you, please, tell the jury what is in Government
14    Exhibit 418.  You may have to actually open it?
15    A.   I don't need to.  I could tell you what it is.  It's two
16    envelopes that I put the bullets in that I recovered that were
17    in the sock and the plastic.
18    Q.   Do you know what kind of bullets were recovered?
19    A.   .38 caliber.
20              MS. GERACI:  Government Exhibit 420, what are we
21    looking at here?
22    A.   This is crack cocaine that was recovered from the bedroom.
23              (Continued on next page)
24
25
```

BY MS. GERACI:  (CONTINUED)

Q.  Detective Deloren, can I trouble you to hold it up to the jury?

A.  Oh, sure.  I can show it to the jury.

            MS. GERACI:  With the Court's permission, can we publish it that way?

            THE COURT:  You can publish it however you think best to see it, but I don't know if they will see it from the witness stand.

Q.  Detective Deloren, I'm told to keep my voice up.  If you don't mind, could you reach for the next Government Exhibit in the box and let me know what you are looking at.  Which Exhibit is that?

A.  This is Government Exhibit 423.

Q.  What is that?

A.  This is narcotics and paraphernalia that were recovered from a bag that Jean-Philippe was carrying at the time of his arrest.

Q.  Can you describe exactly what is in that as far as the various items can you still see it?

A.  I can still see it.  There are some jars in there that are used for, I guess, the packaging of marijuana, and there are also some pills as well as some small bags of crack.

Q.  What is the next government exhibit you can reach?

A.  Government Exhibit 412.

E9bQdel7                         Deloren - direct

1    Q.   What is that?

2    A.   I'm sorry?

3    Q.   What are you looking at?

4    A.   This is a larger bag of marijuana that is vacuum sealed or

5    at least was vacuum sealed at one point, as well as those

6    similar -- this is a different exhibit.  I'm sorry.  So 412 is

7    just a vacuum-sealed marijuana.  That was recovered in the

8    bedroom of Dominique Jean-Philippe.

9    Q.   What is the next exhibit in your reach?

10   A.   413.

11   Q.   What is that?

12   A.   This is also additional marijuana.  You can see the jars

13   and the larger bag off to the side here, also recovered in the

14   bedroom.

15   Q.   Detective Deloren, what is the next exhibit you can reach?

16   A.   Government Exhibit 422.

17   Q.   What is that?

18   A.   Just a pair of plastic bags that -- the items that

19   Dominique Jean-Philippe was carrying, the items that he had the

20   drugs and the paraphernalia were in these bags.

21   Q.   What is the next one in your reach?

22   A.   414.

23   Q.   What is that?

24   A.   It's a bag of marijuana that was recovered from the

25   bedroom.

E9bQdel7                          Deloren - direct

1    Q.  What's the next item?

2    A.  Government Exhibit 417.

3    Q.  What is that?

4    A.  A watch and a ring that were recovered Dominique

5    Jean-Philippe's bedroom.

6    Q.  What's the next item in the box?

7              THE COURT:  Mr. Poscablo, can I see that exhibit?

8    Thank you.

9    A.  Government Exhibit 424.

10   Q.  What is that?

11   A.  It's a small envelope containing cash that was also

12   recovered in Dominique Jean-Philippe's bedroom.

13   Q.  Do you know how much cash is in there?

14   A.  Not off the top of my head, no.  I don't remember.  Open

15   it?

16             MR. POSCABLO:  Located on the front.

17   A.  I'm sorry.  $1,550.

18   Q.  The next item?

19   A.  Government Exhibit 406, which is small clear plastic bags

20   used for the packaging of narcotics.

21   Q.  What's the next item?

22   A.  Government Exhibit 410, which is the same thing, more small

23   plastic bags.

24   Q.  What's the next item?

25   A.  Government Exhibit 409, which is a scale.

E9bQdel7                          Deloren - direct

1    Q.   The next item?

2    A.   Government Exhibit 411, small plastic bags used for

3    packaging crack cocaine.

4              Exhibit 407?

5    Q.   Mmm-hmm.

6    A.   Also, small plastic bags used for packaging marijuana, and

7    Exhibit 408 which is the same thing.

8    Q.   The next item, Detective?

9    A.   405, similar jars that were used for packaging marijuana.

10   These ones are empty.

11   Q.   The next item, Detective?

12   A.   Government Exhibit 404, jars again, just a different color

13   top.

14   Q.   The next item?

15   A.   Government Exhibit 403.  This contains razor blades and

16   assorted small Ziploc bags used for cutting up drugs and

17   packaging drugs.

18   Q.   The next one?

19   A.   Government Exhibit 401 is just a cookie tin recovered in

20   the bedroom, but it also contains some of the paraphernalia

21   that you've seen before.

22   Q.   The next item?

23   A.   Government Exhibit 402, which is just a plate, but it had

24   also razor blades on it and drug residue when we recovered it.

25   Q.   There seems to be an item right on the floor, Mr. Poscablo.

1    A.  I don't see a Government Exhibit on here.

2    Q.  415?

3    A.  415?  OK.

4    Q.  What is it?

5    A.  It's a piece of luggage.

6              THE COURT:  A roller bag?

7              THE WITNESS:  Yes.  Well, it has wheels.  I don't see

8    the -- oh, there it is, the extender handle is there.

9    Q.  I am handing you Government Exhibit 416.

10   A.  This is a purse that was recovered in Dominique

11   Jean-Philippe's bedroom, and that's where the cash was.

12             MS. GERACI:  Your Honor, with the Court's permission,

13   the government would like to read a stipulation between the

14   parties.

15             THE COURT:  Yes.

16             MS. GERACI:  This is Government Exhibit 3007.

17             It is hereby stipulated and agreed, by and among the

18   United States of America, by Preet Bharara, United States

19   Attorney for the Southern District of New York, Timothy D. Sini

20   and Justina L. Geraci, Assistant United States Attorneys of

21   counsel, David Delva, the defendant, by and with consent of his

22   attorney, Jeffrey G. Pittell, Esquire, that:

23             (1) Government Exhibit 412 marked as item number 27 is

24   a plastic bag containing vegetative matter with a weight of

25   313 grams and was submitted to the New York City Police

1    Department police laboratory controlled substance analysis

2    section or the laboratory for testing for the presence of a

3    controlled substance.

4              Government Exhibit 412 was found to contain marijuana.

5    The results of this analysis are found in a laboratory report

6    marked as Government Exhibit 475.

7              (2) Government Exhibit 413 consists of four items

8    marked as item numbers 29, 30-A, 30-B and 31, and was submitted

9    to the laboratory for testing for the presence of a controlled

10   substance.

11             Item number 29 is a plastic bag containing vegetative

12   matter with a weight of 15.732 grams and was found containing

13   marijuana.

14             Items number 30-A and 30-B consist of 13 glass jars

15   containing vegetative matter with a weight of 144.799 grams.

16   Item 30-A, which is one of these last jars --

17             THE COURT:  I'm sorry, could you just tell me again?

18   What was 15.732?

19             MS. GERACI:  15.732 grams.  And the second item was

20   144.799 grams.

21             THE COURT:  That's 414, Exhibit 414?

22             MS. GERACI:  This is all for 413.  It just contains

23   different items.

24             THE COURT:  All right.  Thank you.

25             MS. GERACI:  Item 30-A, which is one of these glass

1    jars was found to contain marijuana.  Item number 31 is a

2    Ziploc bag containing vegetative matter with a weight of

3    .524 grams.  The results of the analysis of Government Exhibit

4    413 are found in a laboratory report marked as Government

5    Exhibit 475.

6              Government Exhibit 414 marked as item number 28 is a

7    Ziploc bag containing vegetative matter with a weight of

8    70.977 grams and was submitted to the laboratory for testing

9    for the presence of a controlled substance.  Government Exhibit

10   414 was found to contain marijuana.  The results of this

11   analysis are found in a laboratory report marked as Government

12   Exhibit 475.

13             Government Exhibit 420 consists of seven items marked

14   as item numbers 1-A, 1-B, 2, and 3-B and was submitted to the

15   laboratory for testing for the presence of controlled

16   substance.  Item numbers 1-A and 1-B consist of 30 Ziploc bags

17   containing solid material with a weight of 2.37 grams.  Item

18   number 1-A, which is one of these Ziploc bags, was found to

19   contain cocaine.  Item number 2 was found to contain cocaine

20   with a weight of 18.125 grams.  Item numbers 3-A and 3-B

21   consist of nine capsules containing solid material with a

22   weight of 4.221 grams.  The results of the analysis of

23   Government Exhibit 420 are found in a laboratory report marked

24   as Government Exhibit 476.

25             Government Exhibit 423 consists of eleven items marked

1   as item numbers 32, 33-A, 33-B, 34-A, 34-B, 35-A, 35-B, 36 and

2   37, and was submitted to the laboratory for testing for the

3   presence of a controlled substance.  Item number 32 contains

4   marijuana with a weight of 11.906 grams.  Item numbers 33-A and

5   33-B consist of nine bottles containing vegetative matter with

6   a weight of 97.604 grams.  Item number 33-A, which is one of

7   the bottles, was found to contain marijuana.  Item numbers 34-A

8   and 34-B consist of two bottles containing vegetative matter

9   with a weight of 13.375 grams.  Item number 34-A, which is one

10  of these bottles, was found to contain marijuana.  Item numbers

11  35-A and 35-B consist of three Ziploc bags containing

12  vegetative matter with a weight of 2.36 grams.  Item number

13  35-A, which is one of these bags, was found to contain

14  marijuana.  Item number 36 consists of five Ziploc bags

15  containing cocaine.  Item number 37 consists of four Ziploc

16  bags containing cocaine.  The results of the analysis of

17  Government Exhibit 423 are found in a laboratory report marked

18  as Government Exhibit 477.

19          It is further stipulated and agreed that this

20  stipulation and Government Exhibits 475, 476 and 477 may be

21  received in evidence as Government Exhibits at trial.  This is

22  dated July 10, 2014 and signed by both parties.

23          Your Honor, at this time the government offers Exhibit

24  3007, which is this stipulation as well as Exhibits 475, 476

25  and 477.

1           THE COURT:  All right.

2           Mr. Pittell?

3           MR. PITTELL:  I stipulated to that, your Honor.

4           THE COURT:  All right.  Thank you.  Those are

5    received.

6           (Government's Exhibits 3007, 475, 476 and 477 received

7    in evidence)

8    Q.  Detective Deloren, did you voucher all of this material

9    that we just saw?

10   A.  Yes.

11   Q.  That day, did you seize any cellular telephone?

12   A.  No.

13   Q.  Did any of the material we saw a moment ago contain rice?

14   A.  Yes.

15   Q.  Why would it contain rice?

16   A.  Rice is used to keep narcotics dry.

17   Q.  Detective Deloren, did there come a time when you arrested

18   an individual named Gregory Accilien?

19   A.  Yes.

20   Q.  Do you recall when that was?

21   A.  June 4, 2013.

22   Q.  Where did you arrest Mr. Accilien?

23   A.  At his residence at 832 South Oak Drive in Bronx, New York.

24   Q.  Did you recover any documents from his home?

25   A.  Yes.

1           MS. GERACI:  May I approach, your Honor?

2           THE COURT:  Yes.

3    Q.  I'm showing you what's in evidence as Government Exhibit 50

4    and 51.  Do you recognize those?

5    A.  Yes.

6    Q.  What are they?

7    A.  Those are the two documents that I recovered from Gregory

8    Accilien's house, apartment.

9    Q.  Can we just go back to when you arrested Dominique

10   Jean-Philippe, and I asked you if you had recovered any

11   cellular phones.  Do you know if anyone else on your team

12   recovered any cellular telephones?

13   A.  Yes.

14   Q.  Do you recall how many?

15   A.  I don't remember.  I don't know.

16   Q.  At some point did you arrest David Delva?

17   A.  Yes.

18   Q.  Do you recall when?

19   A.  Initially on the same day as we arrested Gregory Accilien.

20   Q.  On what charges did you arrest David Delva?

21   A.  David Delva had an open warrant, and he was also charged

22   with gun possession and narcotics possession.

23   Q.  Did you arrest him at the same location that you arrested

24   Gregory Accilien?

25   A.  Yes.

E9bQdel7                        Deloren - direct

1   Q.  Did you recover anything during this arrest?

2   A.  I did.

3   Q.  What were some of the things that you recovered?

4   A.  I recovered a loaded gun and a quantity of cocaine.

5           MS. GERACI:  May I approach, your Honor?

6           THE COURT:  Yes.

7   Q.  I'm showing you what's marked as Government Exhibit 54, 55

8   and 57.  Do you recognize these items?

9   A.  54 is the gun that I recovered.  55 are the bullets that

10  were in the gun, including the magazine.  And Government

11  Exhibit 57 are the narcotics that were recovered in the house

12  as well, and there's also additional narcotics here that were

13  recovered from the pocket of David Delva.

14  Q.  Let's look at Government Exhibit 54 for a moment.  How do

15  you recognize that gun?

16  A.  I know it's the gun I recovered because my initials are

17  scratched into it, and I remember it from that day.

18  Q.  Let's look at Government Exhibit 55.  How do you remember

19  those?

20  A.  These are the bullets that were recovered from the magazine

21  and the chamber of that gun.

22          MS. GERACI:  The government offers Exhibit 54, 55 --

23          THE COURT:  54 and 55 came in through your ATF agent.

24          MS. GERACI:  And the bullets were subject to

25  connection and the government offers them now.

1           THE COURT:  Mr. Pittell?

2           MR. PITTELL:  Just subject to my same objections.

3           THE COURT:  They are received without limitation.

4           (Government's Exhibits 54, 55 and 57 received in

5     evidence)

6           MS. GERACI:  May I publish to the jury, your Honor?

7           THE COURT:  Yes.

8           MS. GERACI:  Your Honor, with the Court's permission,

9     I will read a brief stipulation between the parties.

10          THE COURT:  All right.

11          MS. GERACI:  This is marked as Government Exhibit

12    3008.

13          It is hereby stipulated and agreed, by and among the

14    United States of America, by Preet Bharara, United States

15    Attorney for the Southern District of New York, Ryan P.

16    Poscablo and Justina L. Geraci, Assistant United States

17    Attorneys of counsel, David Delva, the defendant, by and with

18    the consent of his attorney, Jeffrey G. Pittell, Esquire, that

19    Government Exhibit 58 consists of 12 Ziploc bags containing

20    solid material marked as items number 2-A and 2-B and was

21    submitted to the laboratory for testing for the presence of a

22    controlled substance.  Item number 2-A consists of eleven of

23    those Ziploc bags with an aggregate weight including narcotics

24    and packaging of 1.353 grams and was found to contain cocaine.

25    The results of the analysis of Government Exhibit 58 is found

1    in a laboratory report marked as Government Exhibit 70.

2            Government Exhibit 59 marked as item number 3 -- one

3    moment.  Your Honor, I apologize.  We have a small typo in the

4    exhibit, I believe.  What was once marked as 58 is now just 57.

5    So that is the exhibit I was referring to with the stipulation,

6    and we will make that change for the Court.

7            So, Government Exhibit 57 marked as item number 3 is a

8    Ziploc bag containing solid materials with an aggregate weight

9    including narcotics and packaging of .144 grams and was

10   submitted to the laboratory for testing for the presence of a

11   controlled substance.  Government Exhibit 57 was found to

12   contain cocaine base.  The results of this analysis are found

13   in the laboratory report marked as Government Exhibit 70.

14           It is further stipulated and agreed that this

15   stipulation and Government Exhibit 70 may be received in

16   evidence as Government Exhibits at trial and is dated

17   September 5, 2014 and signed by both parties.

18           Your Honor, at this time, the government moves to

19   admit Government Exhibit 3008 and Government Exhibit 70 subject

20   to the small change I just mentioned of the exhibit number

21           MR. PITTELL:  So stipulated.

22           THE COURT:  All right.  And those are received.  Thank

23   you.

24           (Government's Exhibits 3008 and 70 received in

25   evidence)

1    Q.  Detective Deloren, at some point did you obtain phone

2    numbers in connection with this investigation?

3    A.  Yes.

4    Q.  Did you get a phone number -- did you obtain a phone number

5    for Lisa Hylton in November of 2012?

6    A.  I did.

7    Q.  How did you obtain this phone number?

8    A.  I asked her, and she actually gave me two phone numbers.

9    Q.  Do you recall either of the phone numbers?

10   A.  I do.

11   Q.  What number do you recall or numbers?

12   A.  (718) 799-6813.

13           MS. GERACI:  Permission to approach, Judge?

14           THE COURT:  Yes.

15   Q.  Detective Deloren, I've shown you what's marked as

16   Government Exhibit 42.  Do you know what this is?

17   A.  Yes.

18   Q.  What is it?

19   A.  It's a partial map of the Bronx.

20   Q.  Do you recognize any of the locations on the map?

21   A.  I recognize all three.

22   Q.  What locations do you recognize?

23   A.  830 Magenta Street, which is where the home invasion

24   occurred, where the original crime occurred.  801 Neill Avenue,

25   which is where we saw a video of the two defendants -- two

1    suspects enter the building and then leave with the luggage.

2    And 832 South Oak Drive, which is Gregory Accilien's address.

3            MS. GERACI:  Your Honor, the government offers Exhibit

4    42.

5            MR. PITTELL:  I just want to take a look at it.

6            No objection.

7            THE COURT:  Received.

8            (Government's Exhibit 42 received in evidence)

9            MS. GERACI:  Permission to publish, your Honor?

10           THE COURT:  Yes.

11   Q.  Detective Deloren, do you know the street name for cocaine

12   base?

13   A.  It escapes me right now, I apologize.  No, I don't.

14   Q.  That's OK.  Let's look at the map for a moment, the address

15   at 830 Magenta Street at the top, what do you understand --

16   what does that address mean to you?

17   A.  I'm sorry, repeat the question.

18   Q.  The address at 830 Magenta Street at the top, what does

19   that mean to you?

20   A.  That's Jeanette Adams' home address.  That's where the

21   original crime occurred.

22   Q.  And the next address is 832 South Oak Drive.  Does that

23   address mean anything to you?

24   A.  (Indicating)

25   Q.  What is it?

1   A.   That is Gregory Accilien's home address.   That is where he

2   was arrested.   That is also where David Delva was also

3   arrested.

4   Q.   Lastly, the one at the bottom, 801 Neill Avenue, does that

5   address mean something to you?

6   A.   Yes.

7   Q.   What does that mean to you?

8   A.   That's Patrick James' apartment.

9   Q.   That last address, 801 Neill Avenue, is that the address

10  from which you obtained the surveillance video that we saw

11  earlier as Government Exhibit 200?

12  A.   Yes, it is.

13  Q.   Detective Deloren, at some later point did you arrest David

14  Delva?

15  A.   Yes.

16  Q.   When was that?

17  A.   August 19, 2013.

18  Q.   On what charges?

19  A.   Those were federal charges including Hobbs Act robbery,

20  possession of a weapon, kidnapping.

21  Q.   Did he speak with you?

22  A.   No, not initially.   No.

23  Q.   At some point did he speak with you?

24  A.   Yes.

25  Q.   What, if anything, did he say?

1   A.  He stated basically that our case was nonsense and that the

2   gun that we recovered wasn't even operable, and he used the

3   word operable.  In fact, he said it was inoperable.

4   Q.  Did he tell you anything else about the gun?

5   A.  He said something specifically about what was wrong with

6   it.  I don't remember exactly what he said, something about a

7   spring.  I don't recall.

8   Q.  On or about June 19 of 2014, what, if anything, did you do

9   with respect to the defendant?

10  A.  I'm sorry, repeat -- I'm sorry.

11  Q.  Did you do anything with respect to the defendant on or

12  about June 19 of 2014?

13  A.  Yes.

14  Q.  And what was that?

15  A.  I swabbed him for DNA.

16  Q.  Why did you do that?

17  A.  To aid the investigation.

18  Q.  Did you have a search warrant?

19  A.  Yes.

20  Q.  And what did you do with the -- how did you swab him?

21  A.  We have a kit that we use.  It's like a larger Q-Tip kind

22  of device.  I handed it to the defendant.  He rubbed it on the

23  inside of his mouth on his cheek and gums.  He put it back into

24  the plastic tube that I had, and then I put that back into the

25  plastic bag that it came in.

1    Q.  What did you do with that swab in the plastic bag after you

2    took it?

3    A.  I vouchered it and sent it to the lab.

4    Q.  Were there any issues with the voucher?

5    A.  Yes.

6    Q.  What were the issue?

7    A.  The vouchering system with the NYPD has a few pull-down

8    menus where you're supposed to click what kind of category the

9    evidence that you're vouchering is, and I mistakenly clicked on

10   the wrong category when I initially vouchered it.  It was

11   kicked back to me the next day, and I had to re-voucher it.

12   Q.  Do you remember the category you first categorized this as?

13   A.  It was silly.  It was -- I originally vouchered it as

14   suspect consent sample when it should have been court ordered

15   sample.

16   Q.  Detective Deloren, do you know what the proper name for

17   crack cocaine is?

18   A.  The proper name?  Base.

19            THE COURT:  Is crack cocaine base?

20            THE WITNESS:  Yes.

21            MS. GERACI:  Thank you, your Honor.  No further

22   questions.

23            THE COURT:  Thank you.  Mr. Pittell.

24            MR. PITTELL:  May I inquire?

25            THE COURT:  Yes.  You may proceed.

E9bQdel7                        Deloren - direct

1    CROSS-EXAMINATION

2    BY MR. PITTELL:

3    Q.  Good afternoon, Detective.

4    A.  Good afternoon.

5    Q.  Detective, my name is Jeffrey Pittell.  As you probably

6    imagine, I'm the attorney for David Delva.

7    A.  Yes.

8    Q.  Prior to today, have we ever met before?

9    A.  No, sir.

10   Q.  I've never spoken to you about this case?

11   A.  No.

12   Q.  Detective, on direct examination, you said that in

13   connection with the Magenta Street robbery, you arrested Trevor

14   Cole?

15   A.  Yes.

16   Q.  Dominique Jean-Philippe?

17   A.  That's correct.

18   Q.  Gregory Accilien?

19   A.  Yes.

20   Q.  David Delva?

21   A.  Yes.

22   Q.  Lisa Hylton?

23   A.  Yes.

24   Q.  And you also arrested someone else.  Isn't that correct?

25   A.  Yes.

1   Q.  And that's Jeremey Acevedo?

2   A.  Yes.

3         MR. PITTELL:  May I approach the witness, your Honor?

4         THE COURT:  You may.

5         MR. PITTELL:  Judge, I'll put it up on the projector

6   so the jury can see it.

7         THE COURT:  All right.

8   Q.  Detective, I'm showing you a document marked as --

9   actually, it's in evidence.  It's Defendant's Exhibit E.  Can

10  you take a look at that, please.  Is that Jeremey Acevedo in

11  the upper right-hand corner?

12  A.  Yes.

13  Q.  And did you prepare the original version of this document?

14  A.  Yes.

15  Q.  This is called a photo array.  Is that correct?

16  A.  Yes.

17  Q.  Photo arrays are used in the course of police

18  investigations.  Is that correct?

19  A.  Yes.

20  Q.  And typically the way a photo array is prepared is a police

21  officer or detective will have a photograph of a suspect, and

22  they want to show it to a witness.  Is that correct?

23  A.  Yes.

24  Q.  And what a police officer or detective will do is then will

25  find five other photographs of people that look similar to the

1    suspect.  Is that correct?

2    A.  Yes.

3    Q.  And then they're all assembled on one page similar to the

4    way that this document is assembled.  Is that correct?

5    A.  That is correct.

6    Q.  And the other five people are not suspects in the crime.

7    Is that correct?

8    A.  That is also correct.

9    Q.  So, they're, for lack of a better term, innocent people?

10   A.  Yes, we call them fillers.

11   Q.  OK, even better.  And the idea is so that when this is

12   shown to a witness, that the fillers look very similar to the

13   suspect.  Is that correct?

14   A.  Yes.

15   Q.  I take it that when you prepare these, you try and make it

16   fair so that it's not suggestive in any way to suggest to the

17   person that's viewing it to pick out the suspect?

18   A.  That is correct.

19   Q.  And that is what you did when you prepared this one.  Is

20   that correct?

21   A.  Yes.

22   Q.  And after you prepared this -- when you prepared this, the

23   suspect photo was Jeremey Acevedo.  Is that correct?

24   A.  Yes.

25   Q.  The one that has the circle around it?

1   A.  Yes.

2   Q.  And after you prepared this, you showed this to Patrick

3   James?

4   A.  I did.

5   Q.  And Patrick James identified the photograph of Jeremey

6   Acevedo?

7   A.  Yes.

8   Q.  And after he identified -- well, when you showed it to him,

9   did you first ask him "Do you recognize anybody in this photo

10  array"?

11  A.  Yes.

12  Q.  And Patrick James told you, yes, he did?

13  A.  (Indicating)

14  Q.  Then did you ask him to point to the photograph he

15  recognized?

16  A.  I asked him to circle.

17  Q.  And he circled it?

18  A.  Yes.

19  Q.  And did you then ask him how did he recognize that person?

20  A.  Yes.

21  Q.  And he told you that that person was one of the

22  perpetrators of the Magenta Street robbery?

23  A.  Yes.

24  Q.  And then at some point after he circled it, you had him

25  sign his name?

1   A.  Correct.

2   Q.  And after you showed this to -- at some point after this

3   identification was made by Patrick James, Jeremey Acevedo was

4   arrested?

5   A.  Yes, he was.

6          MR. PITTELL:  I'm going to first show this to the

7   witness, and then I will put it up on the screen.

8          THE COURT:  All right.

9          MR. PITTELL:  I will just stand here and ask a couple

10  questions.

11  Q.  Detective, I'm showing you Defendant's Exhibit A.

12  A.  Mmm-hmm.

13  Q.  Do you recognize this photo array?

14  A.  Yes.

15  Q.  Did you prepare it as well?

16  A.  I did.

17  Q.  I am now going to put it up on the screen.

18          Detective, is this Trevor Cole in the bottom

19  right-hand corner?

20  A.  Yes, it is.

21  Q.  When you prepared this array, he was the suspect.  Is that

22  correct?

23  A.  Yes.

24  Q.  And the other five people were the fillers?

25  A.  Yes.

1   Q.  Did you prepare this in the same way as the Acevedo array

2   where when you looked for fillers, you tried to find people who

3   were similar in appearance to Mr. Cole?

4   A.  Yes, of course.

5   Q.  And, again, the purpose was that so that it would not be

6   suggestive to whoever you showed suggesting that they pick

7   Mr. Cole?

8   A.  Correct.

9   Q.  And you showed this to Jeanette Adams?

10  A.  Yes.

11  Q.  And when she looked at it, did she draw a circle around

12  Mr. Cole's picture?

13  A.  Yes, she did.

14  Q.  When you showed it to her, did you ask her if she

15  recognized anybody?

16  A.  Yes.

17  Q.  And did she tell you that she recognized the photo of

18  Trevor Cole?

19  A.  Yes.

20  Q.  And she indicated that he was one of the perpetrators of

21  the Magenta Street robbery?

22  A.  Yes.

23  Q.  At some point after she made this identification, you

24  arrested Trevor Cole?

25  A.  Yes.

|   |   |
|---|---|
| 1 | MR. PITTELL:  May I approach, your Honor? |
| 2 | THE COURT:  Yes. |
| 3 | Q.  Detective, I'm showing you Defendant's Exhibit D.  Do you |
| 4 | recognize that Exhibit? |
| 5 | A.  I do. |
| 6 | Q.  Did you prepare it? |
| 7 | A.  I did. |
| 8 | Q.  Same thing.  I'm going to put it up on the screen. |
| 9 | A.  OK. |
| 10 | Q.  Detective, the same series of questions.  Who is the |
| 11 | suspect in this photo array? |
| 12 | A.  Gregory Accilien, number four bottom left. |
| 13 | Q.  Right where my finger is? |
| 14 | A.  Yes. |
| 15 | Q.  And the other five people are fillers? |
| 16 | A.  Correct. |
| 17 | Q.  When you picked out those fillers to put in the photo |
| 18 | array, you tried to find people who were similar in facial |
| 19 | appearance to Mr. Accilien? |
| 20 | A.  Yes. |
| 21 | Q.  And the purpose was to make it fair and not suggestive? |
| 22 | A.  Correct. |
| 23 | Q.  After you assembled this photo array, did you show it to |
| 24 | anybody? |
| 25 | A.  Yes. |

1   Q.  Did you show it to Patrick James?

2   A.  Yes.

3   Q.  And you asked him if he recognized anybody?

4   A.  Yes.

5   Q.  And he told you that he recognized the person in number 4?

6   A.  Yes.

7   Q.  And he indicated that that person was one of the

8   perpetrators of the Magenta Street robbery?

9   A.  Yes.

10  Q.  And then at some point he circled Mr. Accilien's picture

11  and wrote his name?

12  A.  Yes.

13  Q.  Then at some point thereafter, you arrested Mr. Accilien?

14  A.  Yes.

15          MR. PITTELL:  May I approach, your Honor?

16          THE COURT:  Yes.

17  Q.  Detective, I'm showing you Defendant's Exhibit C.  Do you

18  recognize this photo array?

19  A.  Yes.

20  Q.  Did you prepare it as well?

21  A.  I did.

22  Q.  Same thing.  I'm going to put it up on the screen.

23  Detective, can you see it on the screen?

24  A.  Yes.

25  Q.  Who is the suspect in this array?

1    A.   Dominique Jean-Philippe.  He is situated in position number

2    one, which is the top left.

3    Q.   Right where my pen is?

4    A.   Yes.

5    Q.   Same as with all the other arrays.  I take it that the

6    other five people are fillers?

7    A.   Correct.

8    Q.   And when you were looking for filler photographs, you used

9    people whose facial appearance was in your opinion similar to

10   Dominique Jean-Philippe?

11   A.   Yes.

12   Q.   And the purpose was so that the array would not be

13   suggestive to whoever you showed it to?

14   A.   That's correct.

15   Q.   And then at some point did you show this array to Patrick

16   James?

17   A.   Yes.

18   Q.   Did you ask him if he recognized anybody in the array?

19   A.   Yes.

20   Q.   And he told you that he recognized Dominique Jean-Philippe?

21   A.   That's correct.

22   Q.   And he told you that he recognized Dominique Jean-Philippe

23   as one of the perpetrators of the Magenta Street robbery?

24   A.   Yes.

25   Q.   And then he circled it and wrote his name on it?

1    A.  Yes.

2            MR. PITTELL:  May I approach, your Honor?

3            THE COURT:  Yes.

4    Q.  Detective, I'm showing you a document in evidence,

5    Defendant's Exhibit E.  Did you prepare this photo array?

6    A.  I did.

7    Q.  I'm going to put that up on the screen.  Detective, who is

8    the suspect -- which photo is the suspect in this array?

9    A.  Number three, that's David Delva.

10   Q.  Right where my pen is?

11   A.  Yes.

12   Q.  As with the other arrays, when you prepared this, the other

13   five people are fillers.  Is that correct?

14   A.  Correct.

15   Q.  And you selected fillers that in your opinion had similar

16   facial appearances to Mr. Delva?

17   A.  Yes.

18   Q.  After you prepared this array, you showed it to Patrick

19   James.  Is that correct?

20   A.  That is correct.

21   Q.  After Patrick James looked at it, he told you he did not

22   recognize anybody in the photo array as being present at the

23   Magenta Street property?

24   A.  That's correct.

25   Q.  And then you also showed this to Ms. Adams?

1    A.  No, that's not correct.

2    Q.  You did not show it to her?

3    A.  No.

4    Q.  Do you know if another detective or officer showed it to

5    her?

6    A.  No, they did not.

7    Q.  With the three other arrays, Dominique Jean-Philippe,

8    Trevor Cole, Jeremey Acevedo, at some point after a positive

9    identification was made, you arrested each one of those

10   persons?

11   A.  Yes, the investigation continues even after an ID or no ID

12   is made.

13   Q.  I understand that.  I'm just clarifying that after that

14   identification was made, at some point thereafter each one was

15   arrested?

16   A.  Yes.

17           MR. PITTELL:  Judge, I'm about ready to move on to

18   another topic.

19           THE COURT:  Move ahead.  We have 15 minutes.

20           MR. PITTELL:  OK.

21   Q.  That box, is that Exhibit 401 through 425?  Detective, this

22   box was -- I know you went through it.  I'm not going to go

23   through everything with you again.

24   A.  OK.

25   Q.  These are all the items that you recovered from Dominique

1    Jean-Philippe's apartment?

2    A.  His room.  He was renting a room.

3    Q.  OK.  From his residence?

4    A.  Yes.

5    Q.  And you indicated that it included marijuana, narcotics?

6    A.  Yes.  Yes.

7    Q.  When I say narcotics, I mean drugs other than marijuana.

8    A.  Yes, I know that.

9    Q.  And it included a plate?

10   A.  Yes.

11   Q.  And many containers containing either marijuana or drugs?

12   A.  Yes.

13   Q.  And you heard the stipulation that Ms. Geraci read to the

14   jury during your testimony?

15   A.  Yes.

16   Q.  Which indicated that these items were sent to a laboratory

17   for testing and tested positive for marijuana and cocaine base?

18   A.  Yes.

19   Q.  Isn't it true that none of these items were sent off for

20   DNA or fingerprint or any of that type of testing.  Is that

21   correct?

22   A.  These particular items, no, mmm-mmm.

23   Q.  So there's no DNA evidence which indicates Mr. Delva's DNA

24   is on any of these items.  Is that correct?

25   A.  For crack or marijuana, is that what you're asking me?

1   Q.  On the plate, on the tin, on the suitcase?

2   A.  No.

3   Q.  On the jars which contain the marijuana?

4   A.  They weren't tested, so I wouldn't know.

5   Q.  And, likewise, because they weren't tested, Mr. Delva's

6   fingerprints -- there is no evidence that Mr. Delva's

7   fingerprints are on any of these items?

8   A.  Correct.

9   Q.  You say they weren't tested, there is no reason why they

10  couldn't have been tested.  Is that correct?

11  A.  To show possession?  We --

12  Q.  Like the plate.  The plate could have been sent for DNA

13  testing.  Is that correct?

14          MS. GERACI:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Well, Detective, you indicated that at some point you

17  returned to Magenta Avenue and you saw a black plastic bag with

18  some gloves and cigarette butts?

19  A.  That's correct.

20  Q.  And you arranged to have those items vouchered and sent off

21  to a laboratory.  Is that correct?

22  A.  Yes.

23  Q.  Did you look inside the bag?

24  A.  I did.

25  Q.  And there were -- it was a pair of gloves.  Is that

 1  correct?

 2  A.  Yes.

 3  Q.  There were two latex gloves in there?  And that was sent to

 4  a laboratory for DNA testing.  Is that correct?

 5  A.  Yes.

 6  Q.  And that was your determination?

 7  A.  Yes.

 8  Q.  But none of these items in that box were sent to any

 9  laboratory for DNA testing?

10  A.  That's because the --

11  Q.  I'm just asking whether it was.

12  A.  Because the gloves were found in the location where the

13  crime occurred.

14  Q.  So, is that a no?

15  A.  You have to repeat the question.

16  Q.  Were any of the items in the box sent for DNA testing?

17  A.  No.

18  Q.  You indicated that David Delva was arrested on June 4,

19  2013.  Were you a part of a team of FBI agents and New York

20  City Police Officers who were at South Oak Drive on that

21  morning for the purpose of arresting Gregory Accilien?

22  A.  Yes, I was.

23  Q.  At that time when David Delva was arrested, he was not a

24  suspect in the Magenta robbery.  Is that correct?

25  A.  That's correct.

1   Q.  So the reason why you arrested him on that date had nothing
2   to do with the Magenta robbery?
3   A.  No, it was the gun and the drugs and the warrant.
4   Q.  He was arrested on charges of gun possession and on drug
5   possession?
6   A.  And the warrant.
7   Q.  And the warrant.  And the warrant was for an open case?
8   A.  I don't know what the warrant was for.  I don't remember.
9   Q.  So even if a gun or drugs hadn't been found, he would have
10  been arrested anyway based upon the warrant?
11  A.  That's correct.
12  Q.  And the gun and drug possession charges, that case was sent
13  over to the Bronx district attorney's office?
14  A.  Originally, yes.
15  Q.  And then you indicated at some point -- when you arrested
16  David Delva, he was in the house at South Oak Drive.  Is that
17  correct?
18  A.  Yes.
19  Q.  Then you subsequently arrested him two and a half months
20  later in August of -- August 19, 2013, and at that time, you
21  were arresting him on this case.  Is that correct?
22  A.  Correct.
23  Q.  And he was not in jail on the Bronx case at that point?
24  A.  No, he was not.
25  Q.  He was out at liberty, so to speak?

1   A.  So to speak.

2   Q.  Now, before you arrested him -- did you attend any meetings

3   at the U.S. Attorney's office with Gregory Accilien?

4   A.  Yes.

5   Q.  And those meetings are called proffer meetings?

6   A.  Yes.

7   Q.  Before you arrested David Delva, you had attended two or

8   three proffer meetings with Gregory Accilien?

9   A.  Something like that.  I don't remember exactly how many.

10  Q.  It was more than one?

11  A.  Yes.

12  Q.  The reason why you took the swabs of DNA from David Delva,

13  was that to compare his DNA with gloves that were in that bag?

14  A.  Yes -- I don't know if it was specifically to the gloves

15  but to maybe the cigarette butts and the gloves.  I don't

16  remember exactly.

17  Q.  So, it was to potentially any item that was recovered in

18  this case?

19  A.  Correct.

20  Q.  I want to ask you some questions about the residence of

21  Mr. Accilien on South Oak Drive.  It's a one-bedroom apartment?

22  A.  I would classify it as a one bedroom.  It was being used,

23  it seemed at the time, as a two bedroom.

24  Q.  The reason why it was being used as a two bedroom is

25  because the living room had been converted into a bedroom?

1   A.  Yes.

2   Q.  So, it had a kitchen.  No -- if you want to call it a

3   kitchen.  No -- no living room; just two bedrooms?

4   A.  Yeah, the living room was being used as a bedroom.

5   Correct.

6   Q.  OK.  And do you recall a time that the arrest team entered

7   the building?

8   A.  The time of day?

9   Q.  Yes.

10  A.  Not exactly.  It was about 7:00 a.m., 6:30 a.m., somewhere

11  around there.

12  Q.  When you arrived there, there were other people in the

13  residence besides Mr. Delva.  Is that correct?

14  A.  Yes.

15  Q.  There was Mr. Accilien?

16  A.  Yes.

17  Q.  And there was another male?

18  A.  Yes.

19  Q.  There was a woman?

20  A.  Yes.

21  Q.  And two children?

22  A.  I remember one child.

23  Q.  You indicated that you recovered a gun and some ammunition

24  from somewhere within the apartment?

25  A.  Yes.

1   Q.  And you recovered it from one of the bedrooms.  Is that

2   correct?

3   A.  The actual bedroom.  I recovered it inside the closet.

4   Q.  Just so we're clear, it's the real bedroom; not the living

5   room that's the bedroom?

6   A.  That's right.

7   Q.  Do you recall how many beds were in that bedroom?

8   A.  In the actual bedroom?

9   Q.  Yes.

10   A.  Just one.

11   Q.  Just one bed?

12   A.  Mmm-hmm.

13   Q.  And there was only one closet?

14   A.  Correct.

15   Q.  There was a small plastic dresser?

16   A.  Yes.

17   Q.  You also indicated that you recovered some envelopes?

18   A.  Yes, two of them.

19   Q.  Are those in front of you, sir?

20   A.  They are.

21   Q.  These envelopes were also in the bedroom?

22   A.  Yes.

23   Q.  And these envelopes, you saw that they were addressed to

24   Mr. Accilien?

25   A.  Yes.

1   Q.  You recovered -- did you also recover any other piece of

2   mail addressed to Mr. Accilien?

3   A.  Just those two items.

4   Q.  Do you recall recovering a bill from a bank or from --

5   A.  Yes.  Now I do, yes.

6   Q.  What was that?

7   A.  I don't remember, but I do remember it was maybe a -- I

8   don't know if it was a bill or a statement or something like

9   that.

10  Q.  And that was also addressed to Mr. Accilien?

11  A.  Yes.

12  Q.  So the reason why you took that was because that -- did you

13  take it because it would provide perhaps confirmation that

14  Mr. Accilien lived there?

15  A.  I took the letters first because they provided that

16  confirmation.  The letter or the bill or statement provided

17  additional confirmation.

18  Q.  Confirmation that Mr. Accilien was actually living in the

19  residence?

20  A.  Yes.

21          THE COURT:  Just for your purposes, we've got five

22  minutes.  You want to bear that in mind.

23          MR. PITTELL:  OK.

24  BY MR. PITTELL:

25  Q.  And the letters -- was that the only reason why you took

1   the letters?

2   A.  No, that's not the only reason why.

3   Q.  You also took them because you saw a return address on the

4   letters?

5   A.  Not necessarily return address.  The sendee's name.

6   Q.  And what name did you see on there?

7   A.  Diddy.

8   Q.  And at that time who did you know Diddy to be?

9   A.  That's Dominique Jean-Philippe.

10  Q.  At some point, you knew that was his nickname?

11  A.  Yes.

12  Q.  And those letters were also addressed to Dreko?

13  A.  Yes.

14  Q.  At that point, did you know that that was Gregory

15  Accilien's nickname?

16  A.  I did indeed.

17  Q.  When the team went in, Mr. Accilien was in the apartment.

18  Is that correct?

19  A.  Yes.

20  Q.  And Mr. Accilien was arrested?

21  A.  Yes.

22  Q.  And at some point, you asked Mr. Accilien for his consent

23  to search the apartment?

24  A.  Yes.

25  Q.  And he gave you -- and you actually asked him for consent

1   to search the bedroom?

2   A.  Yes.

3   Q.  And he gave you that consent?

4   A.  Yes.

5   Q.  And he told you that he used the bedroom?

6   A.  He said that he shared the bedroom with David Delva.

7   Q.  So by him saying that, he was telling you that he also used

8   the bedroom?

9   A.  Yes.

10  Q.  Or that's what you understood it to mean?

11  A.  Yes, he said that -- he told me that they both sleep in the

12  same bed.

13          THE COURT:  Are you going to keep it just on the scope

14  of the direct, and then we'll just tie it up?

15  Q.  And he -- I don't know if I asked you this.  I apologize

16  for asking it again.  Did he give you verbal consent to search

17  the apartment?

18  A.  Yes.

19  Q.  Did he give you verbal consent to search the bedroom?

20  A.  Yes.

21  Q.  Did he later give you written consent to search?

22  A.  No.

23          MR. PITTELL:  Judge, I'm going to go on another topic.

24          THE COURT:  How much more in general do you have with

25  this witness?

E9bQdel7                          Deloren - cross

1              MR. PITTELL:  It's more than a few minutes.

2              THE COURT:  How much?  Like ten minutes?  Like three

3    minutes?  Like five minutes?

4              MR. PITTELL:  Probably about 15.

5              THE COURT:  Really?  Come on over here.  15?

6         (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the side bar)

2        THE COURT:  It just seems like you're floating around.

3        MR. PITTELL:  I'm paring it down.

4        THE COURT:  I'm worried that what you're doing is

5   trying to hang on.  That's why I'm pushing you on the time.  It

6   seems to me that you're done but looking for what I would

7   call -- not to the use a word we've used all afternoon --

8   filler on certain things.  Not that I can't understand what

9   your questions are, but that's my only concern.  Tell me in

10  good faith that you aren't just going home to read your notes.

11       MR. PITTELL:  I looked at my notes, and it's 15

12  minutes, but as I'm going through, I'm crossing off things.  I

13  could take a minute to go through it, and --

14       THE COURT:  Now you're telling me in good faith you've

15  got more and you're not going home to read it over the weekend

16  to --

17       MR. PITTELL:  No, we're not done.  We still got

18  Reynolds to go.

19       THE COURT:  No.  No.  No.  It's not that purpose.

20  It's really I like to get witnesses off the stand so they don't

21  have come to come back and think about it all weekend.

22       (Continued on next page)

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, we are going to end

3    for this evening.  We won't quite finish.  So I don't want to

4    hold you here and have it go a little longer.  We will bring

5    the witness back on Monday because we are not going to sit

6    tomorrow.  We are going to pick up on Monday morning.

7          The expectation is still that we are on track.  OK?

8    The case is not going longer than expected.  To give you a

9    sense where we are, we are right where we expected to be.  You

10   are going to have a whole weekend.

11         I want to remind you on the weekend not to take any

12   temptation to talk to anybody about this case, but to just put

13   this case to the side until you come back on Monday morning.

14   We'll see you folks at 9:30 Monday morning.  Don't do any

15   research or try to become DNA experts or anything else.  No

16   research on any aspects of this case -- people, places, things,

17   concepts, none of that.  I'm sure you won't.  We'll see you

18   Monday.  Thank you very much.

19         (Jury recessed)

20         THE COURT:  All right, Detective.  We will have a few

21   more minutes with you on cross on Monday.

22         THE WITNESS:  That's fine.

23         THE COURT:  I don't know if the government has

24   anything else, we'll pick it up on Monday.  You may step down.

25         THE WITNESS:  Thank you.

1            (Witness recessed)

2            THE COURT:  Let's all be seated.

3            (Jury not present)

4            MR. PITTELL:  Judge, I thought I was going to pare

5     down my notes so I could finish with him.

6            THE COURT:  I thought you said 15 minutes.  I don't

7     want to unduly truncate your analysis.  What I wanted was a

8     good faith basis that you really did have things, and you

9     wanted to -- that you weren't just trying to take up the time

10    to get to the end of the day, which I'm not trying to accuse

11    you of anything, but it's a well-known lawyer technique.  And I

12    just perceived when you asked me 15 minutes before the break

13    whether or not we were done, that perhaps that's where we were

14    heading.  That was my -- I don't mean any disrespect, and I'm

15    not going to truncate your examination.  If you've got more

16    with the detective, we'll have more with the detective.  We are

17    going to have more of the detective because he is still on

18    cross.

19           MR. PITTELL:  Right.  No, when you asked me, I looked

20    down at my notes, I had four typewritten pages and based on how

21    we're going, I estimated 15 minutes, but I'm also --

22           THE COURT:  If he's on for five minutes on cross on

23    Monday, it matters not.  I'm sure he can be here and all of

24    that.  I just don't like these people to have to think about it

25    and worry about it all weekend when they've gotten geared up to

1    come in, but, you know, look, that's what they're here for.

2              MR. PITTELL:  I don't think Detective Deloren worries

3    about cross.

4              THE COURT:  It's my goal with all witnesses.  I try

5    not to have them hung over weekends if it is not necessary.

6    But here it is and so be it.

7              Now, you folks are going to send me track changes of

8    the jury instruction.  So I need to get them by Sunday, shall

9    we say.  If you can get them to me sooner and you have them

10   sooner, terrific; but if you can't, sometime on Sunday so I can

11   print them out and work with them and have you a returned draft

12   Monday morning.  Or if I don't turn the draft, I'll at least

13   have your input.

14             You should take this as potentially your last clear

15   chance.  When you've got -- you may have another chance, but

16   you may not, given where we are.  In light of that, if you want

17   to put comments down with the track changes, you can do so

18   particularly, for instance, if you have a case cite and you

19   believe that I've gotten something not quite right or there is

20   some better way of articulating something and you see my

21   footnote and you think I've garbled something.

22             Frankly, right now, I think there is an issue, from my

23   perspective, on page 76 where there is parts of page 76 that I

24   think may be internally contradictory, but I'll see if you guys

25   come up with it which you'll get to and maybe even offer some

E9bQdel7                          Deloren – cross

1    language.  Let's talk about the closings and also about the

2    duration of your case.

3              Mr. Pittell?

4         (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. POSCABLO:  Judge, before you do that can I just

2     ask a couple follow-up questions with regard to the jury charge

3     and what we should do?

4          THE COURT:  Yes.

5          MR. POSCABLO:  When we submit our tract changes should

6     we just start from page one as opposed to where we were?

7          THE COURT:  No, I would not ignore comments up to

8     where we were but we had gone through 45 or 50 pages.  So if

9     there's no need to go back through that, no need to go back

10    through that.

11         MR. POSCABLO:  Understood.  I just -- I'll look

12    through the transcript to make sure and then if there's no need

13    to go back to it.

14         THE COURT:  I understand that you were out during part

15    of that.

16         MR. POSCABLO:  I guess the last question is once we do

17    your tract changes we'll submit it to your Honor's chambers and

18    copy opposing counsel.

19         THE COURT:  You should file it on ECF when you submit

20    it.  It will be filed.  It's easier for you to file it than for

21    me but I will make sure that there's a clear record as to every

22    potential suggested change that either party has made at any

23    point in time.

24         MR. POSCABLO:  Thank you, your Honor.

25         THE COURT:  Mr. Pittell.

E9BAADEL8

 1              MR. PITTELL:  I only have about four more comments.
 2     If you want to take the time to do it now, I can do it now.  I
 3     don't think it's going to take too long.
 4              THE COURT:  You know what, let's talk about the
 5     closings and the length of your case first.  I won't want to
 6     keep people here.  I don't mind if you want to pull out your
 7     pages in light of those four comments and just hand them over
 8     and I put them on the docket if you just have them in your
 9     draft and just pull them out, I'll put them behind something
10     and say this was provided to us by defense counsel and this was
11     additional suggested changes.
12              MR. PITTELL:  My handwritten notes are not so
13     self-explanatory.
14              THE COURT:  All right.  Either you can confer with
15     Mr. Poscablo.  He can do the laboring work on putting it into
16     tract changes.  I was looking through the witnesses and timing
17     them out if they were sort of 20 minutes a piece.  They're
18     alibi witnesses, so I don't know how long they are going to be
19     but that I think 20 minutes is sort of a rough estimate.  One
20     guy who sort of lays the ground work, so that's an hour you
21     said but the other one if you -- so that means that -- are you
22     currently expecting to call Dr. Rosenbaum?
23              MR. PITTELL:  Yes.
24              THE COURT:  On what words?
25              MR. PITTELL:  I want to put Dr. Rosenbaum up there to

1    say what's schizophrenia.

2              THE COURT:  I don't think we are going allow that.

3    When we originally talked about this it was because the

4    assumption was that there were going to be a variety of words

5    which a layperson wouldn't have heard of or known about.  And

6    there were to be medical records.  They were going to

7    interpret, not just putting a doctor on the stand to say what's

8    schizophrenia.  That, I think is not the purpose.  It's to

9    provide the layperson with a definition.  That was the nature

10   of what I thought your original proffer was.  That was back

11   when you were going to be putting in a bunch of medical

12   records.

13             Now we've got the guy talking about schizophrenia.  I

14   asked about schizophrenia during the voir dire.  I think we all

15   conceded that that is correct that people would understand it

16   in their everyday life by having it as part of voir dire.

17   Indeed, what you suggested you asked they should be asked

18   whether or not they know anybody who's been diagnosed with

19   schizophrenia.  So in that case I don't think there's any

20   particular reason to go into that.

21             MR. PITTELL:  Well, I respectfully disagree.  I think

22   although schizophrenia is a term which is commonly used in

23   everyday language it has a lot of meanings.  My kids say oh,

24   she's schizo, he's schizo --

25             THE COURT:  Here is what you should do.  I need then a

1    very specific proffer on what she's going to say that fits

2    within what we talked about which was a definition.  I mean

3    what we talked about was very specific.  It was not to go into

4    something that wandered into what mental illness can be.  It

5    was here are these four words.  You, the jury, may not

6    understand them.  Here is what an auditory hallucination is but

7    now it's clear.  If that's not the purpose and it's to say,

8    look, schizophrenia can be a variety of conditions.  It can

9    have a variety of symptomology.  It can be the following.  That

10   was not the purpose.  It was, schizophrenia is a medical

11   condition which may have auditory and visual hallucinations,

12   period.  Next definition.  We've gotten that.

13            MR. PITTELL:  It's now my cross-examination.  I've

14   eliminated my witness.

15            THE COURT:  You have.  Between your voir dire where

16   you've conceded that the word was in and of itself

17   understandable to a panel and this.  So you can proffer

18   something else but people should think about this and see

19   whether there's something specific.  Look at the transcript.  I

20   encourage you to go back to the transcript to see whether or

21   not there is any lack of clarity as to what was going on.  I

22   mean, certainly, there was extensive testimony on his diagnosis

23   of schizophrenia saying it was it schizophrenia or paranoid

24   schizophrenia?  There were gradations here, so I didn't detect

25   any confusion.  So I am going to take her off for the moment.

1   How long is Suzanna Ryan?  But can you proffer to me as you

2   look through the transcript no, judge, it was really quite

3   unclear and the following and make a very specific proffer and

4   I will consider it.

5            Suzanna Ryan, how long is she?

6            MR. PITTELL:  It's hard to say.

7            THE COURT:  You've disclosed to the government what

8   her report is?

9            MR. PITTELL:  Right.

10           THE COURT:  Is she going to say that there's some peak

11  is there like a fourth allele?

12           MR. PITTELL:  A lot of her testimony -- first of all,

13  I don't need her to do the "what is DNA" because we already

14  have that.  I don't think she is going to be that long.

15           THE COURT:  But is she a, there was another peak?

16           MR. PITTELL:  I haven't decided yet how I am going to

17  approach it.

18           THE COURT:  I thought that the government knew.  I'm

19  not trying to get you to give away your secret sauce but I was

20  just wondering whether or not I picked up on what it was likely

21  to be.

22           MR. PITTELL:  In my notice I disclosed there's a two

23  prong approach.  One is questioning the findings of Ms. Cooke,

24  the peaks and the alleys or valleys on the reports, and then

25  the issue of secondary transfer.

1          THE COURT:  Right.  Well, that obviously --

2          MR. PITTELL:  And I have not yet deciders how I am go.

3    Ing to approach them but I do know.  I thought Ms. Cooke did a

4    fine job in explaining what is DNA, so I am not going to go

5    over what is DNA and I am assuming the jury knows that.  So I'm

6    going to kind of go into it once she' qualified

7          THE COURT:  She's no longer with the Office of the

8    Chief Medical Examiner; is that right?

9          MR. POSCABLO:  That's correct.

10          THE COURT:  She's not likely to be a government DNA

11    witness in the future?

12          MR. POSCABLO:  In this case?

13          THE COURT:  No.  In other cases.

14          MR. POSCABLO:  Depends on whether --

15          THE COURT:  Whether she had done work while she was

16    there.

17          MR. POSCABLO:  That's right.

18          MR. PITTELL:  Just so I know, let's say a half hour on

19    direct.  Let's say 45 minutes.

20          THE COURT:  All right.  So we could be finished on

21    Monday is my point.  Just so that we're -- I think the way I've

22    looked at it was we could be finished with testimony end of day

23    Monday with the witnesses that we currently know about.  So the

24    question becomes whether or not Mr. Delva is going to testify.

25    Have you folks discussed it?

1          MR. PITTELL:  At this point, no.  Now that I think we

2     can really see the end of the government's case.  I can

3     bring --

4          THE COURT:  Join issue on it so that at the beginning

5     of your case you tell us.  I mean, that's fair.  And in the

6     ordinary orderly case of case management I could make you tell

7     me now and I am within my right to do so in terms of the legal

8     standard for this.  I do understand your point and I know that

9     this is maybe not an easy call and so but at the end of the

10    government's case when they rest if there's a logical breaking

11    point and I don't go right in your first witness which we may

12    do, I am going to ask you so that we have a sense of timing.

13    You'll know.  And you should have, of course, your witnesses

14    here and stacked because if Deloren is off the stand -- how

15    long is Reynolds going to take?

16         MR. POSCABLO:  About the same amount of time as

17    Officer Deloren, your Honor.

18         THE COURT:  Basically, the entire afternoon,

19    Mr. Pittell, it seems like that you'll have to do your

20    witnesses.

21         MR. PITTELL:  OK.

22         THE COURT:  Maybe we'll be slopping over into Tuesday

23    ad if Mr. Delva testifies, then that's just all of Tuesday

24    could be taken up.  I don't know how long it would go on for.

25    Although, if it's an alibi defense and he's going to be -- I

E9BAADEL8

```
 1   don't know how long his testimony would go for.  So that raises
 2   the closings.  If we're done on Monday then you'll close on
 3   Tuesday, all right.  If we're done Tuesday at this time before
 4   lunch you'll close on Tuesday, all right.  If people are done
 5   with testimony and you rest at say three o'clock, you will not
 6   close on Tuesday.  I will do jury instructions for the
 7   remaining two hours, all right.  So that's how I'll play it.
 8   If Mr. Delva testifies and that takes up all of Tuesday then
 9   we'll do the same for Wednesday.  Basically you'll do closings
10   Wednesday morning.  But I would think it's likely unless
11   something comes up that we'll be closing on either Tuesday or
12   Wednesday.  You won't close Monday, all right.  If everything
13   ended on Monday I won't make you close on Monday because our
14   expectation and it's fair to have you folks be able to plan
15   your time is that you are not going to have to close on Monday.
16   So Tuesday will be the Earliest but Wednesday is probably the
17   latest.  Does that make sense?
18            MR. POSCABLO:  Yes, judge.
19            MS. GERACI:  Yes, judge.
20            MR. PITTELL:  Yes, judge.
21            THE COURT:  All right.  So I am going to assume that
22   you folks could each take an hour on your main closing.  I
23   would think likely to go through a bunch of this stuff, I can't
24   imagine it being a lot less than that.  And then I think that
25   it could be longer than that.  So we are going to have to
```

E9BAADEL8

1    figure out if we end up starting right at two o'clock, how much

2    time I'll want to get a sense of how much time people are

3    planning on taking because I prefer to not have the government

4    have its rebuttal on Wednesday morning standing alone.

5              MR. POSCABLO:  OK.  I don't want the extra night to

6    think about it too, judge.

7              THE COURT:  So, we are going to start closing.  I want

8    us to try to finish closing.

9              All right, do you folks have any questions for me?

10             MR. POSCABLO:  No, your Honor.  Good weekend, your

11   Honor.

12             THE COURT:  We are adjourned.

13             (Adjourned to Monday, September 15, 2014 at nine a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2      Examination of:                            Page

 3      JEANETTE ADAMS

 4      Cross By Mr. Pittell . . . . . .704

 5      PATRICK ANTHONY JAMES

 6      Direct By Mr. Poscablo . . . . .716

 7      Cross By Mr. Pittell . . . . . .771

 8      Redirect By Mr. Poscablo . . . .801

 9      MATTHEW A. FLEMING

10      Direct By Ms. Geraci . . . . . .815

11      Cross By Mr. Pittell . . . . . .822

12      Redirect By Ms. Geraci . . . . .835

13      ANDREW BRANDT

14      Direct By Ms. Geraci . . . . . .836

15      Cross By Mr. Pittell . . . . . .839

16      ELLIS DELOREN

17      Direct By Ms. Geraci . . . . . .842

18      Cross By Mr. Pittell . . . . . .883

19                        GOVERNMENT EXHIBITS

20      Exhibit No.                              Received

21       40   . . . . . . . . . . . . . . . . . 720

22       20   . . . . . . . . . . . . . . . . . 740

23       28   . . . . . . . . . . . . . . . . . 751

24       23 and 24  . . . . . . . . . . . . . . 755

25       29-A   . . . . . . . . . . . . . . . . 758
```

```
 1    508, 509, 512 and 532  . . . . . . . . . . . 764

 2    27   . . . . . . . . . . . . . . . . . . . . 765

 3    417  . . . . . . . . . . . . . . . . . . . . 766

 4    415  . . . . . . . . . . . . . . . . . . . . 768

 5    536 to 542 . . . . . . . . . . . . . . . . . 769

 6    3001   . . . . . . . . . . . . . . . . . . . 814

 7    54   . . . . . . . . . . . . . . . . . . . . 818

 8    55   . . . . . . . . . . . . . . . . . . . . 820

 9    401-425  . . . . . . . . . . . . . . . . . . 864

10    3007, 475, 476 and 477 . . . . . . . . . . . 873

11    54, 55 and 57  . . . . . . . . . . . . . . . 876

12    3008 and 70  . . . . . . . . . . . . . . . . 877

13    42   . . . . . . . . . . . . . . . . . . . . 879

14                        DEFENDANT EXHIBITS

15    Exhibit No.                            Received

16    A    . . . . . . . . . . . . . . . . . . . . 715

17    B    . . . . . . . . . . . . . . . . . . . . 790

18    C    . . . . . . . . . . . . . . . . . . . . 792

19    D    . . . . . . . . . . . . . . . . . . . . 794

20    E    . . . . . . . . . . . . . . . . . . . . 797

21

22

23

24

25
```