E9GAADEL1                        Jury Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          12 CR 802 (KBF)

5    DAVID DELVA,

6                   Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         September 16 , 2014
9                                        9:00 a.m.

10
     Before:
11
                     HON. KATHERINE B. FORREST,
12
                                         District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     JUSTINA GERACI
17   RYAN POSCABLO
          Assistant United States Attorney
18
     JEFFREY PITTELL
19        Attorney for Defendant Delva

20

21   ALSO PRESENT:  JOHN REYNOLDS, Special Agent FBI
     ANNIE CHEN, Paralegal Specialist, U.S. Attorney's Office
22

23

24

25

E9GAADEL1                          Jury Trial

1        Good morning everyone.  Please be seated.

2        (Trial resumed; jury not present)

3        MS. GERACI:  Good morning, your Honor.

4        Ryan Poscablo, Justina Geraci, Annie Chen and Special

5   Agent John Reynolds for the government

6        THE COURT:  Good morning, all.

7        MR. PITTELL:  Good morning, your Honor.

8        Jeffery Pittell, for Mr. Delva.

9        THE COURT:  Good morning, Mr. Pittell.

10       Good morning, Mr. Delva.

11       THE DEFENDANT:  Good morning.

12       THE COURT:  All right.  We have got a couple of

13  minutes before the jury will come out.  Are there any issues

14  which you folks would like to raise this morning?

15       MR. POSCABLO:  Judge, I think there are three issues

16  that the parties need to raise with your Honor.  First, with

17  regards to the stipulation of the various co-conspirators

18  guilty pleas, I think we've come to a resolution.  Mr. Pittell

19  has drafted a stipulation and the government is willing to sign

20  it.

21       THE COURT:  I take it the government then is not going

22  to object if Mr. Pittell proceeds with the argument in the

23  manner that he proffered yesterday which is four to five

24  people, four of them have been convicted etc., however he is

25  going to potentially do that if he chooses to do so.

E9GAADEL1                    Jury Trial

1           MR. POSCABLO:  If it's right up to that line, we will

2     not object.

3           THE COURT:  Where is the objection in your view?

4           MR. POSCABLO:  If he says anything about -- it's what

5     we discussed yesterday, anything about the sentence.

6           THE COURT:  Well, he's proffered he doesn't expect to

7     have to go there.  All right.  So that issue is done.  Thank

8     you all for resolving that.

9           MR. POSCABLO:  The second issue is that last night on

10    review of the Court's jury instructions and it's total our

11    fault, judge, I realized that the 924(C) Aiding and Abetting

12    didn't take into account the new Supreme Court case Rosemond.

13          THE COURT:  I went back to the case after you folks

14    had indicated that change and reread the case, read your

15    change.  I think that your change is in fact an appropriate

16    change.

17          Mr. Pittell, that draft has been circulated with the

18    change in it.  Have you had an opportunity to review that?

19          MR. PITTELL:  No, I haven't.

20          THE COURT:  All right. I'm going to hand to

21    Mr. Pittell Count Five -- and show it to Mr. Poscablo on way to

22    Mr. Pittell -- pages 63 and 64 of the black line version of the

23    instructions which as the additional language suggested by the

24    government.  Having reviewed the Rosemond case with you which

25    let me just for your ease of reference, Mr. Pittell, also hand

E9GAADEL1                        Jury Trial

1    you I think that the change is appropriate.

2             All right.  So my intention was to make that change

3    but I'll hear from Mr. Pittell on that in just a few minutes

4    after we have had a chance to review.

5             What else?

6             MR. POSCABLO:  The government does intend to put on a

7    rebuttal case.  It's a very short witness.  He is tall but it's

8    a very not lengthy testimony from Special Agent Reynolds with

9    regards to the records of, three different records involving a

10   home telephone record and cellphone record of Fay Noisette

11   during the relevant time period and also the phone records for

12   a cellphone that we believe is used by her son Ryheme Bell.

13            There's no issue other than we've provided Mr. Pittell

14   with a stipulation that the phone records are in fact true and

15   correct copies of business records of both Cablevision and

16   T-Mobile.  And I am not sure whether Mr. Pittell is willing to

17   sign that stipulation at this point.  And I don't know what to

18   do with that.

19            THE COURT:  All right.  Let's first find out if

20   there's an issue.  One of the questions I'll have for you folks

21   is whether or not these records were received at the same time

22   as other records from those same providers which as to which

23   there has been a stipulation.  If so then there would be no

24   reason to separate out the two groups one from the other.  But

25   let's go and find out if Mr. Pittell has an issue first.

1          MR. PITTELL:  Judge, I don't have an issue regarding

2     the authenticity of the records.  My objection is on a couple

3     grounds.  One, the records were -- to me yesterday morning.  By

4     then I was over here, so I had no way of actually really

5     viewing them because I don't have internet access and I

6     couldn't download them on my computer.  And so I haven't had a

7     chance to review them with the witnesses to see if there was

8     anything I may have wanted to inquire about them with the

9     witnesses since it's their phone records.

10          The subpoenas look like or the certifications on the

11     records look like the government requested them back in June.

12          THE COURT:  Is it your view that as a matter of law

13     the government was required to provide you with those records

14     in advance of its rebuttal case?

15          MR. PITTELL:  Well, depends if your No Surprise Rule

16     is considered a matter of law.  No, they are not required to

17     give them to me under any statute or rule but the government

18     wants to now use them to rebut my witnesses.  I haven't had a

19     fair time to review them or to discuss them with my clients.  I

20     may want to call them back for surrebuttal and I just think

21     that in light of the timing the Court should not allow it.

22          Also, I don't know if it's proper rebuttal.  There was

23     questions about their phone numbers and they acknowledged some

24     phone numbers.  I think maybe they said they didn't recall

25     other phone numbers.  It may have been proper to perhaps show

E9GAADEL1                    Jury Trial

them to refresh their recollection but there's nothing to

rebut.  I mean it would be akin to me maybe I should be now

permitted to put in Mr. Accilien's medical records.  There's

plenty of things that he didn't recall or are in conflict with

his medical records.

          THE COURT:  Well, there's a variety of -- I don't know

what the government's rebuttal testimony is going to be but

what you are suggesting are a couple of different things.  One

is, of course, it may or may not relate to the absence of

recollection as to a particular phone number although, it

might.  But it's different I think for Mr. Accilien because

there was no absence of recollection about his medical

condition.  He was quite forthcoming about his medical

condition unless you've got a particular instance that you are

thinking of that a medical record would fill in a hole, in

which case proffer that to me.

          But if there is a Fay or F-A-2 that Ms. Noisette did

not recall and it shows that there was an incoming call to the

305 line -- it may or may not be the same Fay and that's

something as to which Mr. Reynolds could be cross-examined.  If

it's the case that the phone number that she did recall, made a

phone call or received a phone call from the 305 phone at a

certain time or didn't receive a phone call at a certain time,

that would be probative of the alibi testimony.  So it could o

in a couple of different ways and some of the ways in which it

1    could go, all of it are subject to cross-examination and I

2    think depending upon what the issue is, certainly, could be

3    effective cross-examination.

4             In terms of timing this was I think an issue which the

5    government flagged last night.  I think it was crystal clear

6    from the way the testimony came in with the cellphones and the

7    absence of using it that they were planning on going back and

8    comparing the phone numbers to their records and, certainly,

9    the witnesses were here and you could have asked them to show

10   up this morning.  I don't know.  Are they here this morning?

11            MR. PITTELL:  No.

12            THE COURT:  So that is something that I'm not

13   particularly concerned about because you certainly could have

14   had them here if you'd wanted them here.  This was something

15   that was known and it was known to address the specific issues

16   raised in the rebuttal case, so it was the very same people who

17   were on yesterday afternoon.

18            In terms of looking at the records, you at least have

19   had them overnight even if you didn't have them during the day

20   yesterday and you'll have an opportunity to look at them right

21   now with Mr. Reynolds.  I understand that you're suggesting

22   that you might have addressed certain things on direct but you

23   know, I don't know what to do with that since the government

24   didn't flag its rebuttal until it was time for the rebuttal.

25            So, I am going to allow the government to put on a

1   short rebuttal case and, of course, you can cross-examination

2   Mr. Reynolds.  If you want to try to get your witness here

3   immediately, if there is anybody, then you should try and do

4   so.  And if there's a medical record for Mr. Accilien that you

5   think fills in a gap of memory that is similar to what the

6   government's intending to do that, of course, would be part of

7   your direct case and you would need to grapple with that right

8   now.

9        While you are thinking about that let me just tell you

10  folks that Juror No. Six indicated yesterday to my deputy that

11  the school where she works is in a partnership with the school

12  that Mr. Bell attends.  She only recognizes the name of the

13  school.  She has not ever seen Mr. Bell.  She does not

14  recognize Mr. Bell.  She has not never interacted with Bell.

15  But she in an excess of caution wanted to notify us of that

16  fact.  I don't see any reason that we would need to inquire of

17  her individually about that fact but I wanted to raise it with

18  you folks.

19       Anybody disagree?

20       MR. POSCABLO:  Judge, the government doesn't.  And if

21  there was any inquiry it would only be into whether that at all

22  affects her ability to be fair.  But I don't think she

23  indicated to the Court there would be anything that would sway

24  one way or the other and.  She just says she recognizes the

25  name.

E9GAADEL1                    Jury Trial

1             THE COURT:  That's the kind of thing that wouldn't

2       have raised any issue at all in voir dire.  This is really a

3       nonissue in my view.  I am just saying because I hate to be the

4       possessor of information from jurors that I haven't put on

5       record.

6             Mr. Pittell.

7             MR. PITTELL:  I agree.  I have no objection.

8             THE COURT:  All right.  As to the authenticity of the

9       records for the rebuttal case those then can just be offered

10      and then I will receive them without need for formal

11      stipulation.  As there's no objection to the authenticity is

12      the way that they would come in if that's the way in fact after

13      their foundation is laid or however they're reviewed if

14      Mr. Pittell does not object.

15            Mr. Pittell, a 924(C) on that charge on the Aiding and

16      Abetting piece.

17            MR. PITTELL:  Let me just take a minute?

18            THE COURT:  Yes.

19            (Pause)

20            MR. PITTELL:  I would agree that.

21            THE COURT:  That's the government's original language

22      from what they gave me last night.  I don't think there's a

23      need for me to change it, frankly.

24            MR. PITTELL:  I am familiar with Rosemond and I think

25      it's a fair comment.  I actually thought I had put in a request

E9GAADEL1                    Jury Trial

1   in one of my submissions regarding language regarding Rosemond.

2   But either way I think it fairly covers --

3          THE COURT:  All right.  So with that being said, you

4   folks saw what I did with the word "possess".  I just want to

5   make sure that was on page 66 of the draft changes that was in

6   the version that was sent to you last night.

7          MR. POSCABLO:  Judge, the government did and we're OK

8   with that.

9          THE COURT:  Mr. Pittell, you all right with that?

10         MR. PITTELL:  Yes.

11         THE COURT:  All right.  So the Court will then

12  finalize these and hand and a copy to the parties that will be

13  labeled in the header and upper right "Final As Delivered" and

14  "Final" as well as drafts three, two and one will all be put

15  once the charge is delivered onto the docket.

16         The verdict sheet is in the Court's view as the

17  government had suggested it is fine with one exception which is

18  6B of the verdict sheet in the government's draft.  I don't

19  know if it was a joint draft or not.  But 6B refers to powder

20  cocaine, and that just so that the record is clear comes in

21  Count Six, narcotics distribution conspiracy, how do you find

22  the defendant?  Guilty/not guilty.  Then you would say, if you

23  answered guilty as to crack cocaine unanimously, yes/no, as to

24  powder cocaine, unanimously, yes/no, as to marijuana,

25  unanimously, yes or no?  The question is do we need to have all

E9GAADEL1                    Jury Trial

1   three of those in there?  Should we take cocaine powder out at

2   this point?  What's your view.

3          MS. GERACI:  Your Honor, there was some testimony

4   about powder cocaine in this case.  So it's the government's

5   position that all three should remain at this point.

6          THE COURT:  Mr. Pittell.

7          MR. PITTELL:  Actually, on the lab report it was only

8   crack cocaine.

9          THE COURT:  The lab report was changed to crack

10  cocaine.  I think it was only that Mr. Accilien had dealt in

11  powder.  But was there any testimony that Mr. Delva had been

12  part of a conspiracy involving powder cocaine?

13         MS. GERACI:  Just a moment.

14         (Pause)

15         MS. GERACI:  Your Honor, that's fine.  I think the

16  testimony was that Mr. Accilien dealt the powder cocaine with

17  Dominique Jean-Philippe and I think your Honor's instinct is

18  correct that we should just leave it as crack cocaine and

19  marijuana.

20         THE COURT:  All right.  So 6B will come out and then

21  the verdict form 6A crack cocaine shall remain and marijuana

22  shall become 6B.  Other than that the Court's intention is to

23  accept the language in the verdict form which is relatively

24  straightforward.

25         We hadn't discussed this.  Is there any objection to

E9GAADEL1                    Jury Trial

1   the Court's doing so with that modification?

2           MS. GERACI:  No, your Honor.

3           THE COURT:  Mr. Pittell, I have a version of it here.

4   Do you want to see my version?

5           MR. PITTELL:  Sure.

6           (Pause)

7           MR. POSCABLO:  Judge, can I raise an issue while

8   Mr. Pittell is looking at the verdict sheet?

9           THE COURT:  As long he can do two things at once, yes.

10          MR. POSCABLO:  After we, I checked the jury charge and

11  I think the jury charge refers to powder cocaine and if that is

12  the case then if we're going to take it out then we need to

13  take it out from the jury charge.

14          THE COURT:  What page does it appear on?

15          MR. POSCABLO:  The first time I found it was on page

16  72, second full paragraph but I have a suspicion that's not the

17  only place it appears.

18          THE COURT:  72.

19          MR. POSCABLO:  Judge, I am looking at a red line.

20          (Pause)

21          MR. PITTELL:  That's fine.

22          THE COURT:  All right.  Thank you.  We will then

23  finalize the verdict form.  My practice is to give to each of

24  the jurors a copy of the verdict form so that they can see it

25  as well as one extra.  The extra is so that we don't get asked

E9GAADEL1                     Jury Trial

1    for a clean verdict form cause they often write all over them

2    during the deliberations.

3              MR. POSCABLO:  Judge, can I just give the court a

4    re-estimation of our time?

5              THE COURT:  Yes.

6              MR. POSCABLO:  So I believe after working with

7    Ms. Geraci last night her closing arguments are probably closer

8    to about an hour, not two hours and the rebuttal will be very

9    short, a lot shorter than an hour, probably closer to between

10   15 minutes and 30 minutes.  30 minutes if I want to please the

11   court reporters, 15 if I don't want to draw their ire.

12             THE COURT:  All right.  Well, we don't want to draw

13   anyone's ire.

14             MR. POSCABLO:  So we're down to about an hour.

15             THE COURT:  All right.  Mr. Pittell, do you have the

16   same estimation as yesterday, about an hour or more less?

17             MR. PITTELL:  Yes.

18             THE COURT:  All right.  So that's helpful because it

19   means that we've got more flexibility with how today can play

20   out.

21             So which jurors are missing, Joe?  We have everybody.

22             The first place that powder cocaine appears is on page

23   30.  I would take that out.  The second place that it appears

24   is page 71.  I would take it out on page 71.  That's in the

25   paragraph starting with the word "first".  It appears on page

E9GAADEL1                    Jury Trial

1    74 in the paragraph starting with the word "cocaine base".  And

2    I would take it out there.  And it appears for the last time on

3    page 78 and it's actually a full bullet there that would need

4    to come out on page 78.

5              All right.  Let's bring out the jury.

6              (Jury present)

7              MR. PITTELL:  Just in terms of logistics, you have

8    seen the stipulation, judge, actually.

9              THE COURT:  I haven't seen it but it's fine with me so

10   long as you folks --

11             MR. PITTELL:  I am going to read language when we get

12   to the table of the charges because it's with three defendants.

13   I am going to summarize it a little bit.  I think it'll get

14   kind of tedious if I say Count One offense, read the legal

15   language, date and place, read terms.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

E9gQdel2

```
 1              THE COURT:  I'm sure you'll be careful not to go
 2    beyond what the stipulation is.  That's fine.
 3              MR. PITTELL:  Yes.  I mean, it's in evidence, so they
 4    will be able to see it.
 5              THE COURT:  All right.  Is there anything apart from
 6    that which you intend to do?
 7              MR. PITTELL:  No.
 8              THE COURT:  Now, Mr. Delva has chosen not to testify.
 9    Is that right?
10              THE DEFENDANT:  Yes.
11              THE COURT:  And you know that's your decision and your
12    decision ultimately alone?
13              THE DEFENDANT:  Yes.
14              THE COURT:  All right.  Thank you.
15              Is it the defendant's then intention to rest after
16    that?
17              MR. PITTELL:  After the stipulation?
18              THE COURT:  Yes.
19              MR. PITTELL:  Yes.
20              THE COURT:  All right.  Mr. Poscablo, you will have
21    your brief rebuttal at that point.
22              MR. POSCABLO:  Yes, your Honor.
23              THE COURT:  That will go on about five ten minutes.
24              MR. POSCABLO:  That's right, Judge.
25              THE COURT:  We will go directly into the opening right
```

E9gQdel2

1    then.  I'm sorry, the closing.  Do you folks in light of that

2    fact want to take a very brief break?  We'll take a break after

3    the government's closing before Mr. Pittell, Mr. -- you go.

4    I'm sorry, the other way around.

5              MR. POSCABLO:  You're right.

6              THE COURT:  I am actually having, you know, a civil

7    case brain moment.  After Ms. Geraci's hour, we will take a

8    break.  Then Mr. Pittell will go.  We will have a break between

9    Mr. Pittell and Ms. Geraci.  Do you want to take a quick break

10   right now?  The jury is ready for us.

11             MR. PITTELL:  Yes, but is my summation going to get

12   broken up?  Let's say it's 12:30 or 12:15.

13             THE COURT:  I think it's going to be more like 11:30.

14             MR. PITTELL:  OK.  I would just, if possible, prefer

15   not to have mine cut in half during the lunch break.

16             THE COURT:  We will not cut it in half.  If Ms. Geraci

17   goes over, and it looks like we're going to run into a problem,

18   we'll take an earlier lunch.

19             MR. PITTELL:  Thank you.

20             THE COURT:  I won't cut you in half.  All right?  You

21   folks want to take a very quick break in light of that timing

22   or not?  I'm fine.  Let's go ahead and bring out the jury.

23             MR. POSCABLO:  Judge, what we will ask is for is like

24   a two minute break after the rebuttal case so we can set up our

25   podium and other evidence so we're not doing it in front of the

E9gQdel2

1   jury.

2                THE COURT:  That's fine.  We will do that.  It will be

3   a break anyway.  All right.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E9gQdel2

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, let's all be seated.

3          Mr. Pittell, you may proceed, sir.

4          MR. PITTELL:  Good morning, ladies and gentlemen.  I

5     am going to read a stipulation between the parties.  The

6     stipulation is Defendant's Exhibit I, and it states as follows:

7          It is hereby stipulated and agreed, by and among David

8     Delva, the defendant, by and with the consent of his attorney,

9     Jeffrey Pittell, and the United States of America by Preet

10    Bharara, United States Attorney for the Southern District of

11    New York, Ryan Poscablo and Justina Geraci, Assistant United

12    States Attorneys, of counsel, and the stipulation states as

13    follows:

14         (1) On September 5, 2013, pursuant to the cooperation

15    agreement which is in evidence in this trial as Exhibit 3514-L,

16    Gregory Accilien pleaded guilty to the following charges:

17         I am just going to show you the charges because this

18    document will be in evidence.  They're in a chart.  I am just

19    going to briefly summarize them.

20         Count One:  Conspiracy to commit robbery of drug and

21    drug proceeds.

22         Count Two:  Robbery of drug and drug proceeds.

23         Count Three:  Conspiracy to commit kidnapping.

24         Count Four:  Kidnapping.

25         Count Five:  Possession of a firearm in relation to

E9gQdel2

1    the offenses in Counts One through Four.

2              The date and place of all these offenses is

3    September 2012 Magenta Avenue in the Bronx.

4              Paragraph number two in the stipulation states:

5              On July 11, 2014, pursuant to the cooperation

6    agreement, which is in evidence in this trial as 3514-JJ,

7    Gregory Accilien pleaded guilty to the following charges:

8              The first five charges you see on the chart are the

9    same as the first five charges that I just read to you, so I am

10   going to just read the last two.

11             There are two additional ones.

12             Count Six:  Conspiracy to distribute and possess with

13   intent to distribute the following controlled substances:  Five

14   kilograms and more of cocaine; (2) crack cocaine; and (3)

15   marijuana.

16             The date and place of this offense was at least in or

17   about 2006 up to and including June 4, 2013.

18             Count Seven states:  The offense is making false

19   statements to the FBI and U.S. Attorney's office which falsely

20   stated and concealed the scope and extent of his narcotics

21   distribution activities, and the date and places of those

22   offenses was in or about July and August 2013 and in or about

23   July of 2014.

24             Paragraph three of the stipulation states the

25   following:  On September -- I'm sorry, I apologize -- on

E9gQdel2

September 9, 2013, Trevor Cole pleaded guilty to the following

charges:  (1) conspiracy to commit robbery of drugs and drug

proceeds;  (2)  Robbery of drugs and drug proceeds; (3)

conspiracy to commit kidnapping; (4) kidnapping; (5) possession

of a firearm in relation to Counts One through Four.  And the

date and place of those offenses was September 2012 on Magenta

Avenue in the Bronx for all five of those offenses.

          Paragraph four states that on September 9, 2013,

Dominique Jean-Philippe pleaded guilty to the following

charges:  I'm just going to show you the stipulation.  The

charges that he pleaded guilty to on that date are the same

exact charges that Trevor Cole pleaded guilty to, so I am not

going to read them again, but they are in the document.

          Paragraph five states:  On January 14, 2014, Lisa

Hylton pleaded guilty to the following charges:  Count One

conspiracy to commit robbery of drugs and drug proceeds.  The

place and date of the offense is September 2012 Magenta Avenue

in the Bronx.

          And the stipulation closes by saying:  It is further

stipulated and agreed that this stipulation may be received as

Defendant's Exhibit I at trial and signed by the parties.

          THE COURT:  All right.

          MR. PITTELL:  I offer this as Defendant's I, your

Honor.

          THE COURT:  Mr. Poscablo, is that the stipulation?

E9gQdel2

1          MR. POSCABLO:  It is indeed, your Honor.

2          THE COURT:  So that is received.

3          (Defendant's Exhibit I received in evidence)

4          MR. PITTELL:  Your Honor, at this point, the defense

5     rests.

6          THE COURT:  Thank you, Mr. Pittell.

7          Mr. Poscablo?

8          MR. POSCABLO:  Your Honor, the government does intend

9     to put on one witness in a rebuttal case.

10         THE COURT:  Please call your witness, Mr. Poscablo.

11         MR. POSCABLO:  Your Honor the government calls Special

12    Agent John Reynolds:

13     JOHN REYNOLDS,

14         called as a witness by the Government, in rebuttal

15         having been previously sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MR. POSCABLO:

18         THE COURT:  Special Agent Reynolds, you have been

19    sworn already in this proceeding.  Do you understand that you

20    remain under oath and you must testify truthfully and honestly

21    to the questions posed?

22         THE WITNESS:  Yes, ma'am.

23         THE COURT:  Please be seated, sir.

24         MR. POSCABLO:  May I proceed, your Honor?

25         THE COURT:  You may.

E9gQdel2                          Reynolds - direct

1              MR. POSCABLO:  Permission to approach?

2              THE COURT:  Yes.

3   Q.  Special Agent Reynolds, I've handed you a file that

4   contains what have been marked for identification as Government

5   Exhibits 751, 752, 752-A, 753.  Take a look at those.  Do you

6   recognize them?

7   A.  Yes, I do.

8   Q.  Speaking first about Government Exhibit 751, what do you

9   recognize that to be?

10  A.  These are records from Cablevision for the telephone number

11  (347) 715-6546.

12  Q.  How did you get those?

13  A.  They were -- through a subpoena.

14  Q.  Who issued that subpoena?

15  A.  The U.S. Attorney's office.

16  Q.  From whom did you receive those records?

17  A.  Like I said before, these records are from Cablevision.

18  Q.  Government Exhibit 752, do you recognize those?

19  A.  Yes, I do.

20  Q.  What do you recognize those to be?

21  A.  Again 752 and 752-A are T-Mobile records for the telephone

22  number (718) 407-9162, and, again, they are records that I

23  got -- obtained through a subpoena issued by the U.S.

24  Attorney's office.

25  Q.  Going back to 751, what's the telephone number for 751?

E9gQdel2                          Reynolds - direct

1   A.  For 751 and 751-A, the telephone number is (347) 715-6546.

2   Q.  Now let's turn your attention to 753.  What is 753?

3   A.  753 and 753-A are, again, records from T-Mobile that I

4   obtained through a subpoena issued by the U.S. Attorney's

5   office for a telephone number (347) 393-9649.

6          MR. POSCABLO:  Your Honor, at this time the government

7   offers Government Exhibits 751, 751-A, 752, 752-A, 753, and

8   753-A.

9          THE COURT:  Mr. Pittell?

10          MR. PITTELL:  Just subject to my prior objections,

11  your Honor.

12          THE COURT:  Those are received.

13          (Government's Exhibits 751, 751-A, 752, 752-A, 753,

14  and 753-A received in evidence)

15  Q.  Ms. Chen, can we please put up Government Exhibit 751-A?

16          Government Exhibit 751 which is in evidence, Special

17  Agent Reynolds.  What is that a record for you?  Testified it's

18  a Cablevision record, correct?

19  A.  Yes.

20  Q.  What are we looking at here?  What is 751-A?

21  A.  When I issued the -- when I gave the subpoena to

22  Cablevision, I asked for two things:  Both relating to

23  telephone number (347) 715-6546, I asked for the subscriber

24  information and for the telephone call records for incoming and

25  outgoing calls.

E9gQdel2                         Reynolds - direct

1   Q.   Who is the subscriber listed for this?

2   A.   Shirley Morris, with an address of 1159 Eastern Parkway,

3   Apartment 8A in Brooklyn, New York.

4   Q.   What is the date that Ms. Morris has been a subscriber to

5   Cablevision for this telephone number?

6   A.   She's been a Cablevision subscriber since October of 2008,

7   and it indicates here that during that time period there were

8   three telephone numbers listed right below the address.

9   Q.   Is 1159 Eastern Parkway, is that the address we heard about

10  yesterday from some of the defense witnesses?

11  A.   Yes, sir.

12  Q.   Let's turn to Government 752-A.  Actually, Ms. Chen, one

13  second.  Could you please put up Government Exhibit 2002?

14          MR. POSCABLO:  One moment, Judge?

15          THE COURT:  Yes.

16          MR. POSCABLO:  2000-Z, sorry.  Specifically referring

17  to page 6 for Fa, F-A.

18  Q.   Special Agent Reynolds, do you recognize what's on your

19  screen number 56?

20  A.   Yes, I do.  This contact is an excerpt from the report of

21  the 305 cell phone, and it's -- the contact is for Fa, and it's

22  for that Cablevision number I just talked about again

23  (347) 715-6546.

24  Q.   Government Exhibit 752-A now, Ms. Chen.  What is this

25  document?

E9gQdel2                          Reynolds - direct

1   A.   Again, when I subpoenaed T-Mobile for the telephone number

2   (718) 407-9162, again, I asked for two things just like I did

3   for the Cablevision.  I asked for the subscriber information

4   and also for the incoming and outgoing calls.  This page here

5   is the subscriber information that T-Mobile provided.

6   Q.   What is the name, the billing account name or the mobile

7   number name listed?

8   A.   The billing account name is under Fabienne none Noisette.

9   Same thing for the mobile number name.  And right above the

10   mobile number name, you'll see the actual telephone number, and

11   the account was established, meaning turned on, on August 8 --

12   excuse me -- August 16, 2012.

13   Q.   And the "none" just refers to no middle name, correct?

14   A.   Yes, sir.

15   Q.   Ms. Chen, 2000-D, please, which is in evidence.

16        What are we looking at here, Special Agent?

17   A.   This is a contact, again, from the 305 Huawei cell phone.

18   It's a contact for Fay, and it lists the telephone number of

19   (718) 407-9162.

20   Q.   That's a cell phone you attributed to Mr. Delva?

21   A.   Yes, sir.

22   Q.   And, lastly, Ms. Chen, Government Exhibit 753-A.  What are

23   we looking at here?

24   A.   This is the subscriber information that T-Mobile provided

25   for telephone number (347) 393-9649, again, the address

E9gQdel2                          Reynolds - direct

1   associated with this account is 1159 Eastern Parkway, Apartment

2   8.  It is under the account name of Shirley Morris.

3   Q.  When was this account established?

4   A.  This account was established on May 7, 2011.

5   Q.  Ms. Chen, 2000-Z, again, I believe page 15.  Number 151,

6   the record Ryheme.  Do you see that?

7   A.  Yes, sir.

8   Q.  Are you familiar with that number?

9   A.  Yes, sir.

10  Q.  Is that the same number we just looked at from the T-Mobile

11  record --

12  A.  Yes, sir.

13  Q.  -- shown in 753-A?

14  A.  Sorry.  Yes, sir.

15  Q.  OK.  You could take it down.  Did you review these records?

16  A.  Yes, I did.

17  Q.  Prior to your testimony today?

18  A.  Yes, I did.

19  Q.  Did you prepare charts similar to the other ones that you

20  prepared during your direct testimony in the main case?

21  A.  Yes.

22            MR. POSCABLO:  Permission to approach, your Honor?

23            THE COURT:  Yes.

24  Q.  Actually, I've already placed before you Government

25  Exhibits 751-B for boy, 752-B for boy, 753-B for boy, and 752-C

E9gQdel2                        Reynolds - direct

1    for Charlie.  Do you recognize these?

2    A.  Yes, I do.

3    Q.  Did you prepare these charts or assist in the preparation

4    of these charts?

5    A.  I assisted in the preparation of these charts.

6    Q.  Where did the information contained in these charts

7    generally come from?

8    A.  The information in these charts came from the telephone

9    records that I just talked about.

10            MR. POSCABLO:  Your Honor, the government offers

11   751-B, 752-B, 753-B and 752-C for Charlie.

12            THE COURT:  All right.  Mr. Pittell?

13            MR. PITTELL:  Subject to my same objections, Judge.

14            THE COURT:  All right.  Those are received.

15            (Government's Exhibits 751-B, 752-B, 753-B and 752-C

16   received in evidence)

17   Q.  Let's quickly go over each of these charts.  Government

18   Exhibit 751-B, which is in evidence, Ms. Chen.

19            Special Agent Reynolds, what does this chart show?

20   A.  This chart is -- shows the contact between the 305 Huawei

21   phone that I attribute to Dave Delva and between the home, the

22   landline at 1159 Eastern Parkway, Apartment 8A that I attribute

23   to Fabienne Noisette.

24   Q.  That's the one that was in the subscriber name of Shirley

25   Morris, right?

1    A.  Yes, sir.

2    Q.  Who Ms. Noisette testified was the grandmother of her child

3    Ryheme?

4    A.  Yes.

5    Q.  So, Ms. Chen, directing your attention to the period

6    between 8/28 and 9/6.

7            Special Agent Reynolds, there are no calls between

8    August 28 to September 6.  Is that because you left them out?

9    A.  No, sir.  The -- as indicated on top, the time frame from

10   these charts are August 1, 2012 to October 1, 2012.  So if

11   there are dates you don't see phone calls for between these two

12   individuals, they don't exist.  It's not left out.  This just

13   indicates between that time period all the telephone calls

14   between those two numbers.

15   Q.  To be fair, all this chart is saying is from August 28

16   until September 6, there are no calls either to or from the 305

17   number we attribute to Mr. Delva and the home number attributed

18   to 1159 Eastern Parkway.  Is that right?

19   A.  Yes, sir.

20   Q.  Ms. Chen, Government Exhibit 752-B.

21            What does this chart reflect?

22   A.  This chart reflects, again, contact between that 305 phone

23   and the Fabienne Noisette cell phone between August 16 and

24   October 1, 2012.

25   Q.  Again, let's look at the period between 8/30/2012 and

E9gQdel2                          Reynolds - direct

1   September 7, 2012.  What does this show?

2   A.  Again, it shows that there was no telephone contact between

3   August 30 of 2012 and November 7 -- September 7, 2012.

4   Q.  Ms. Chen, Government Exhibit 753-B.  What does this chart

5   show?

6   A.  This chart shows the contact between the 305 David Delva

7   phone and the cell phone for Ryheme Bell.  And it shows, again,

8   the records are between August 1 and October 1, 2012 and you

9   will notice there is no telephone contact between the dates of

10  August 20 and September 29.

11  Q.  Let's turn to Government Exhibit 752-C for Charlie.

12  Generally speaking, what is this chart about?

13  A.  This chart shows the contact between Fabienne Noisette's

14  cell phone and Ryheme's cell phone for the time period of

15  August 16 to October 1, 2012.

16  Q.  Now, sitting here today, do you recall what day Labor Day

17  was in 2012?

18  A.  Yes, sir.  It was September 3, 2012.

19  Q.  Let's turn to September 3, 2012, Ms. Chen, which I believe

20  starts on page 4.  Looking at this page and then on the next

21  page, approximately how many calls do you see between the phone

22  we attributed to Fabienne Noisette, her cell phone and the cell

23  phone we attribute to Ryheme Bell?

24  A.  What these phone records indicate on September 3 on that

25  Labor Day is there was, four instances of calls or attempts to

E9gQdel2                          Reynolds - direct

1    call between Noisette and Bell.  However, following that, you

2    will notice it says MMS in that column underneath where it says

3    voice.  That stands for multimedia message.  You will see that

4    there are approximately 34 -- 33 multimedia messages which are

5    picture messages, so sending pictures.

6              MR. POSCABLO:  One moment, your Honor?

7              THE COURT:  All right.

8    Q.  Government Exhibit 753, Ms. Chen.  Page 21, please.  Do you

9    recognize this?

10   A.  Yes, I do.

11   Q.  What is this?

12   A.  When T-Mobile provided these records, they were actually

13   provided in the form of like an old billing statement that you

14   or I would for our cell phone to your house.  These are for

15   Ryheme Bell's telephone number.

16   Q.  What does it show?

17   A.  It shows just like I was referencing before, about the

18   multimedia message here.  These records clearly state that it's

19   a picture.  So that every time you saw the MMS, it's a picture.

20   Again, it's with telephone number (718) 407-9162, which was

21   Fabienne's Noisette's.

22             MR. POSCABLO:  One moment, your Honor?

23             THE COURT:  All right.

24             MR. POSCABLO:  No further questions, your Honor.

25             THE COURT:  Thank you.  Mr. Pittell.

E9gQdel2                          Reynolds - direct

1    CROSS-EXAMINATION

2    BY MR. PITTELL:

3    Q.   Good morning, Agent Reynolds.

4    A.   Good morning.

5    Q.   Agent Reynolds, you were here yesterday for the testimony

6    of Fabienne Noisette.  Is that correct?

7    A.   Yes, sir.

8    Q.   Do you recall on cross-examination she was asked whether or

9    not David Delva called her on the Sunday before Labor Day when

10   he got to her apartment?

11   A.   Yes, sir.

12   Q.   And she said that he had called her on or she said she was

13   at work and received a call on her cell phone?

14   A.   Yes, sir.

15   Q.   Just so we're clear on the dates, that would have been

16   September 2?

17   A.   Yes, sir.

18   Q.   And you said you subpoenaed and reviewed the records of

19   Ms. Noisette's cell phone.  Is that correct?

20   A.   Yes, sir.

21   Q.   And her cell phone was working on September 2.  Is that

22   correct?

23   A.   That's what the records indicate.

24   Q.   The records indicate that she was receiving calls in and

25   out on that date?

E9gQdel2                        Reynolds - cross

1    A.  Yes.  There's call activity on that date, yes.

2    Q.  And text messages on that date?

3    A.  On September 2?

4    Q.  September 2.

5    A.  Could I review the --

6    Q.  Sure.

7    A.  Yes, sir.

8    Q.  Since you have the records in front of you, and you've

9    looked at them, the amount of calls or messages for that date,

10   September 2, to and from her phone is several pages.  Is that

11   correct?

12   A.  I'm seeing multiple pages, yes.

13   Q.  And probably like about 30, 40 calls or messages per page?

14   A.  There is -- it's numerous, yes.

15   Q.  So you would estimate that there is, give or take, at least

16   a hundred contacts calls and messages from her phone?

17   A.  Actually, no, I can't give you a number right now unless

18   you wanted me to sit here and count because you will notice in

19   a lot of the records, it's unknown, unknown, unknown, and it's

20   date of usage.  So it's indicating that you're like, you know,

21   on the internet or submitting something to Facebook, whatever

22   the case is, but there's numerous calls.

23   Q.  Numerous calls?

24   A.  Sure.

25   Q.  If we could take a look at Government Exhibit 752-B.  Now,

E9gQdel2                      Reynolds - cross

1    you've called this -- you prepared this.  Is that correct?

2    A.  Working with others, yes.

3    Q.  With the assistance of other people, you helped prepare

4    this?

5    A.  Yes, sir.

6    Q.  And this is entitled phone contact between David Delva and

7    Fabienne Noisette?

8    A.  Yes, sir.

9    Q.  But what it really means is phone contact between the 305

10   phone and Fabienne Noisette's cell phone?

11   A.  Yes, sir.

12   Q.  So this does not represent the entire universe of phone

13   contact between David Delva and Fabienne Noisette during those

14   dates.  Is that correct?

15   A.  What the chart represents is the contact between that 305

16   cell phone and Fabienne's Noisette's 715 cell phone.

17   Q.  If David Delva on September 2 called Fabienne Noisette from

18   her home phone, from her landline, it would not be on this

19   chart?

20   A.  Correct.

21   Q.  If you called him with Ryheme Bell's telephone, it would

22   not be on this chart?

23   A.  Correct.

24   Q.  If you called her from a pay phone in Kings Plaza, it would

25   not be in this chart?

1214

E9gQdel2                          Reynolds - cross

1    A.   Correct.

2    Q.   Can we highlight the August 30 to September 7th portion of

3    that?  So you indicated -- so this means that there is no phone

4    contact between the 305 phone and Fabienne Noisette from

5    October 30 to September 2.  Is that correct?

6    A.   Yes, sir.

7    Q.   That includes the entire period of the Magenta Street

8    robbery.  Is that correct?

9    A.   Yes, sir.

10   Q.   So, if Gregory Accilien had the 305 phone and was using it

11   during that entire weekend and David Delva did not have the

12   phone with him and was at Fabienne Noisette's apartment, that

13   would explain why there's no phone contact there.  Is that

14   correct?

15   A.   Would that explain it?

16   Q.   Yes, that would be one reason why there is no phone contact

17   between that period?

18   A.   One possibility, yes.

19             MR. PITTELL:  I have no other questions.

20             THE COURT:  Thank you.

21             Mr. Poscablo?

22             MR. POSCABLO:  Just two questions on redirect, your

23   Honor.

24   REDIRECT EXAMINATION

25   BY MR. POSCABLO:

E9gQdel2                          Reynolds - redirect

1    Q.  Special Agent, do you know Gregory Accilien's phone number?

2    A.  Yes, sir.

3    Q.  What is it?

4    A.  (347) 346-8013.

5    Q.  In your review of all of these records we just discussed,

6    did you see any contacts between those three numbers, the

7    Eastern Parkway apartment, Fabienne Noisette's cell phone or

8    Ryheme Bell's telephone, any contact between them and Gregory

9    Accilien numbers you just testified to?

10   A.  For that two-month period which I've reviewed for those

11   three numbers which we've gone over today, there was no contact

12   at all between the landline at 832 South Oak Drive.

13           MR. POSCABLO:  Your Honor, no further questions.

14           THE COURT:  Thank you.

15           MR. PITTELL:  I actually have a recross.

16           THE COURT:  All right.  All right.

17   RECROSS EXAMINATION

18   BY MR. PITTELL:

19   Q.  Agent, you heard Gregory Accilien testify that during the

20   period you reviewed these phone records, his cell phone had

21   been stolen months before.  Is that correct?

22   A.  Yes, sir.

23   Q.  That's obviously why you didn't see anything in those

24   records.  Is that correct?

25   A.  No, sir.  We were just talking about the landline at the

E9gQdel2                         Reynolds - recross

1   residence.

2              MR. PITTELL:  Nothing further.

3              THE COURT:  Thank you.  You may step down, Special

4   Agent.

5              (Witness excused)

6              THE COURT:  Mr. Poscablo.

7              MR. POSCABLO:  Judge, the government rests.

8              THE COURT:  Mr. Pittell, are we all set?

9              MR. PITTELL:  I don't have any surrebuttal case, your

10  Honor.  Defense rests.

11             THE COURT:  Thank you.

12             Ladies and gentlemen the evidentiary record in this

13  case is now concluded.  What we are going to do is take a short

14  break and come back, a very short break, just so that people

15  can get set up to do closing arguments.  I want to remind you,

16  as I said at the very beginning, that closing arguments are --

17  it's the opportunity for both sides to put the evidence

18  together in the manner that sort of marshals the evidence in a

19  manner that they believe supports either their claims or

20  defenses.

21             What the lawyers say in and of itself is not evidence.

22  The evidence is what you have heard in the case.  The arguments

23  are the opportunity for each side to tell you what inferences

24  they believe are appropriate from the evidence, but ultimately

25  what inference you draw will be up to you.

E9gQdel2                          Reynolds - recross

1              With that said, we are going to take a short break.  I

2      want to remind you that you are not yet able to talk to each

3      other or anybody else about this case.  That is coming shortly,

4      but it is not yet.  You still have to hear the closings, I have

5      to give you the charge, and then you'll be allowed to talk to

6      each other.  Let's take a short break.  Thank you.

7              (Jury recessed)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Ladies and gentlemen, as you folks are

3    getting yourselves settled, can one of you forward, the

4    government forward the verdict form to us in Word form, and we

5    can take out that B section that we talked about?

6           MR. POSCABLO:  Do you want us to take it out first,

7    Judge, and then send it?

8           THE COURT:  That would be helpful.

9           MR. POSCABLO:  We'll do that.

10          THE COURT:  Is there anything we should go over before

11   we take our own break and go into closings?

12          MR. PITTELL:  Procedurally, I need to renew my Rule 29

13   motion at the close of the government's case.

14          THE COURT:  People can all be seated.  Do you want to

15   -- apart from saying that, do you want to highlight anything in

16   particular?

17          MR. PITTELL:  I mean, other than I would ask the Court

18   to take into consideration the alibi witnesses and grant the

19   Rule 29 motion based upon your assessment of the testimony of

20   those witnesses.

21          THE COURT:  All right.  Mr. Poscablo?  Ms. Geraci?

22          MR. POSCABLO:  Judge, we believe that there are issues

23   that should go to the jury here.  We believe that the

24   government's rebuttal case showed competing facts from the

25   testimony of the alibi witnesses, and we believe that its met

E9gQdel2                       Reynolds - recross

1    its burden in proving all of the counts in this indictment.

2              THE COURT:  Thank you.

3              The Court does deny the motions.  I believe that there

4    is enough evidence to convict the defendant on each and every

5    count beyond a reasonable doubt, which is sufficient certainly

6    to go to the jury.  I've taken into consideration the rebuttal

7    case, and would note that Wilem Noisette really couldn't have

8    seen anything at all because he was inside the apartment,

9    because he was asleep for almost the entirety of the day on

10   Tuesday, and, therefore, his testimony that Mr. Delva was

11   present, at best, did not cover a sufficient period of time.

12             As to Ms. Noisette and her son, having seen their

13   demeanor, and particularly Ms. Noisette on cross-examination, I

14   found she lacked credibility on cross-examination, and the

15   biggest takeaway I had was how could she put her son up on the

16   stand and have him testify like he testified and take that kind

17   of legal risk because I don't believe the sneaker phone call

18   ever occurred based upon the testimony, and I think it's just

19   made up.  So I don't credit the alibi testimony, frankly, at

20   all.

21             Whether Mr. Delva could have gone to the West Indian

22   parade for an hour, I have no idea, but was he there for the

23   period of time that the Noisettes were trying to cover for him?

24   I think there is no doubt he was not.  So on that basis, the

25   Court does deny the motions.  The jury will ultimately decide

E9gQdel2                        Reynolds - recross

 1      the fact issues in this case as to each count.

 2              Let's take a short break and come back and have our

 3      closings.

 4              (Recess)

 5              (Jury present)

 6              THE COURT:  Ladies and gentlemen, let's all be seated.

 7              All right, Ms. Geraci.

 8              MS. GERACI:  Thank you, your Honor.

 9              Ladies and gentlemen, in the last week, you've seen

10      and heard all of the evidence that proves that David Delva, the

11      defendant, participated in the brutal armed robbery, kidnapping

12      and torture of Jeanette Adams and Patrick James over Labor Day

13      weekend 2012.  And you also saw and heard the evidence that

14      proves that the defendant is himself a drug dealer who sold

15      crack cocaine and marijuana and who had a gun to protect his

16      business.  And, ladies and gentlemen, there is no question that

17      the government has proven its case to you beyond a reasonable

18      doubt.

19              Let's start here.  There is no dispute that this

20      robbery and kidnapping took place.  And, frankly, there is no

21      significant dispute that it happened exactly the way you heard

22      it happened.  I'm sure you remember the testimony of Jeanette

23      Adams and Patrick James, about what happened to them that

24      weekend.  You saw the crime scene photographs and physical

25      evidence like the duct tape that was used to bind them.  You

E9gQdel2                      Summation - Ms. Geraci

1   saw the things that were stolen from them, including Patrick

2   James marijuana, his jewelry, and items of clothing like his

3   belt.  You saw their ransacked apartment, and you were told how

4   it looked and how it smelled.  And you heard about the injuries

5   they suffered at the hands of these violent robbers.  There is

6   no doubt that this robbery and kidnapping took place and that

7   its participants included Trevor Cole, Dominique Jean-Philippe,

8   Gregory Accilien and Lisa Hylton.

9          Earlier this morning you heard the defense tell you in

10  a stipulation that every single one of those people pled guilty

11  to these very crimes, and I expect the defense will later argue

12  to you that the defendant, David Delva, did not plead guilty

13  and went to trial because he, unlike the others, did not commit

14  these crimes.  But the testimony you heard and the evidence

15  you've seen clearly tell you the defendant also participated in

16  this heinous robbery and kidnapping and your common sense tells

17  you this too.

18         So, what are some of the things you've seen and heard?

19  Well, for one, the DNA evidence tells you that the defendant

20  participated in this crime.  Ladies and gentlemen, the

21  defendant's DNA was found on a latex glove at the crime scene.

22  This is simply devastating evidence.  This is why you heard

23  from two different experts about the DNA.  Do you recall the

24  testimony of the two experts?  Think about whether they were

25  really in dispute regarding the most significant issue.  I

E9gQdel2                    Summation - Ms. Geraci

1   submit they were not.  The defense expert said in no uncertain

2   terms that the defendant's DNA was associated with a mixture,

3   and that she could not exclude the defendant from the DNA

4   mixture found on the latex glove.

5           Put aside for the moment the likelihood ratio and the

6   presence of family members and the possibility of four

7   contributors.  It's undisputed that the defendant's DNA was

8   found on the latex glove and that the glove was found at the

9   crime scene.  And this makes perfect sense, right?  It makes

10  sense because Gregory Accilien told you that they all wore

11  latex gloves in the apartment.  And Patrick James told you that

12  he saw the same thing.  Keep in mind too that it is undisputed

13  that Trevor Cole and Lisa Hylton's DNA were also both found on

14  the scene, which supports what Accilien told you happened

15  there.

16          But you don't have to rely on the DNA proof alone; and

17  that is because you heard the testimony of Gregory Accilien,

18  Dominique Jean-Philippe's brother and David Delva's uncle.

19  Jeanette and Patrick were blindfolded with duct tape so they

20  were not able to see much or anything of what was happening to

21  them.  But Accilien gave you an insider's perspective on this

22  crime by telling you how the kidnapping and robbery unfolded in

23  realtime.  He told you what everyone did, when they did it, and

24  what they said throughout.

25          Let me offer you a premise, which I expect defense

E9gQdel2                    Summation - Ms. Geraci

1   counsel will agree with.  If you believe Gregory Accilien, the

2   defendant is guilty on all counts, without a doubt.  First,

3   Accilien testified about the defendant's participation in the

4   robbery and kidnapping.  He detailed for you how the defendant

5   got involved, what the defendant did, and how he was paid for

6   his crime, in marijuana and cash.

7          Second, he testified about the defendant's use and

8   possession of a gun to protect his drug business and about the

9   defendant's distribution of crack cocaine and marijuana.

10         When you go back into the jury room, think about

11  Accilien's demeanor on the stand and how it never changed for

12  direct and cross-examination.  Think also about how his

13  testimony is corroborated and supported by other evidence here

14  including the DNA evidence, the phone records, the physical

15  evidence, and the testimony you heard from other witnesses like

16  Patrick and Jeanette.

17         Lastly, think about his complete candor concerning his

18  mental health and how he spent a full day explaining symptoms

19  and treatment during cross-examination to you.

20         Ladies and gentlemen, if you believe Accilien, then

21  the defendant is guilty as charged; no doubt about it.  And

22  this is why so much time was spent by the defense trying to

23  discredit him because of his schizophrenia.  But, remember,

24  that he testified clearly before you that he can tell the

25  difference between reality and hallucination, whether it is

E9gQdel2                    Summation - Ms. Geraci

1    auditory or visual, and that he has no doubt about what

2    happened and about the defendant's participation in these

3    crimes.

4            I also expect that the defense will tell you that

5    Accilien needed to give up someone new to law enforcement and

6    that that person happened to be his nephew.  But your common

7    sense tells you differently, doesn't it?  FBI Special Agent

8    John Reynolds told you yesterday that when Accilien was

9    arrested and began to cooperate, Trevor Cole and Dominique

10   Jean-Philippe had not yet pled guilty.  And you heard testimony

11   from both Agent Reynolds and Accilien himself that Accilien

12   gave the government information about all of the participants

13   in this robbery and kidnapping.  He didn't just single out

14   David Delva.

15           I expect that the defense will point out

16   Mr. Accilien's various lies and omissions when he first started

17   speaking to law enforcement and in proffers.  The defense will

18   argue to you, I expect, that Accilien needed to get his story

19   straight.  But I respectfully submit, ladies and gentlemen,

20   that what Accilien meant was that he realized that he needed to

21   tell the whole truth about the crimes that he and others,

22   including his family members, committed; and you learned that

23   after he lied about the extent of his drug dealing with his

24   brother and with the defendant, he pleaded guilty to additional

25   crimes, including drug dealing and lying to federal officers

E9gQdel2                    Summation - Ms. Geraci

1    and that in his own worlds, he suffered the consequences.

2            Ladies and gentlemen, Gregory Accilien certainly has

3    his issues.  That much is very clear.  But your common sense,

4    your gut tells you that he wasn't lying to you during his

5    testimony.  He withstood hours of cross-examination questions

6    by the defense, and his answers were thoughtful and they were

7    candid.  When he didn't know the answer to something, he told

8    you so, and he didn't overreach or make things up to try to

9    account for the defendant's actions at every minute the whole

10   Labor Day weekend.

11           Let's talk about another piece of evidence.  Agent

12   Reynolds testified about several charts he created that were

13   based on phone records he obtained.  I just want to go over

14   some parts of them with you right now.  Let's take a look at

15   Government Exhibit 703 which lists for you the various cell

16   phone numbers that were introduced throughout this trial.  I

17   expect that the defense will argue that the 305 number that is

18   attributed here to David Delva is a shared number.  But in

19   reality, your common sense tells you that this is the

20   defendant's phone.  Remember the testimony you heard from the

21   alibi witnesses about not speaking much or at all with Gregory

22   Accilien.  Remember the phone between the defendant and those

23   witnesses from the 305 phone, between the defendant and his

24   sister.

25           Let's look at a chart that was marked as Government's

E9gQdel2                        Summation - Ms. Geraci

 1   Exhibit 701-A.  If you look at this, you can see the first

 2   calls that Jeanette Adams makes to Patrick James real cell

 3   phone number on September 3.  These are the calls she makes

 4   after she is brutalized by the robbers.  If we look further

 5   down at the last calls between Patrick and Jeanette, these are

 6   on September 4, the following day, at around 2:30 p.m. when

 7   Patrick and Jeanette are talking about Patrick coming home and

 8   bringing her stewed chicken and soda.  And you know from

 9   Patrick James' testimony that he got to the Magenta Street

10   apartment shortly thereafter, around 3:30 p.m. and there are no

11   calls between them after this point.

12           Let's go over the phone contacts among all of the

13   co-conspirators, which should be Exhibit 708.  Take a look at

14   the calls between Dominique Jean-Philippe and Trevor Cole on

15   September 2.  Look at the volume and the frequency, ladies and

16   gentlemen.  This is when they are planning the robbery.

17           Let's go further down and look at the break-in call

18   activity from around 9:24 p.m. until 12:02 a.m. on September 3.

19   You know what's happening here because Jeanette told you.  They

20   abducted her sometime after she got home around 10:00 p.m. and

21   they tied her up, and they searched her apartment for money and

22   drugs.

23           Let's take a look at Accilien's calls with his brother

24   Dominique after Jeanette was abducted.  Remember Accilien told

25   you that Dominique asked him to come over to an apartment which

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E9gQdel2                    Summation - Ms. Geraci

1    he remembered was near the Evander Child's school, but first to

2    go to Rite Aid and buy duct tape and latex gloves.  Jeanette

3    remembered hearing the conversation about going to Rite Aid for

4    duct tape, but, of course, she didn't know who was talking to

5    whom.

6         Then look what happened:  Dominique Jean-Philippe and

7    David Delva call each other back and forth for the next half

8    hour.  You can infer, ladies and gentlemen, that Mr. Accilien

9    is getting the latex gloves and the duct tape and is also back

10   and forth from the Magenta Street apartment, and that Dominique

11   Jean-Philippe is telling David Delva about the robbery and the

12   kidnapping that's in progress at this point.

13        On September 3 at 3:05 a.m. the calls stop.  They

14   don't pick up again until 8:16 a.m. when Trevor Cole and Lisa

15   Hylton start talking.  And you know why, don't you?  Accilien

16   told you that he and David Delva decided to leave after sunrise

17   and that Cole called Lisa for backup.

18        Let's look at flurry of calls among Dominique

19   Jean-Philippe, Trevor Cole, Gregory Accilien and David Delva on

20   September 3.  What can you infer is going on?  Well, let's look

21   at the calls between Patrick and Jeanette on that day.

22   Jeanette finally gave up Patrick's real phone number, and there

23   are calls back and forth trying to get him to come over to the

24   apartment.  Now, these calls are interspersed with the calls

25   among the robbers who are trying their best to get Accilien and

1    David Delva back over there to help them.

2              Now, remember that Accilien told you that the next

3    day, September 4, David Delva went back over to the Magenta

4    Street apartment, and at some point Gregory Accilien became

5    concerned and tried calling David Delva, Dominique

6    Jean-Philippe, and Trevor Cole.  Well, here are those calls.

7              Now, remember that Patrick told you that he got home

8    around 3:30 on the 4th and that he was jumped by four or five

9    men.  If you look at Exhibit 708, you can see the break in the

10   call activity among the robbers for over an hour, right at

11   about the time that Patrick got home.  You were also told by

12   Gregory Accilien that Dominique Jean-Philippe and Trevor Cole

13   left to go to the Neill Avenue stash house, and that Accilien

14   and Delva who were back at Magenta Street became concerned

15   because Patrick's customers were calling him.

16             Look at the only call activity from 4:00:00 p.m. until

17   4:32 p.m., the next half hour; it is exclusively between

18   Dominique Jean-Philippe and David Delva.  Look how many calls

19   or attempted calls are made in that period.  And you can see

20   for yourself where Dominique Jean-Philippe was headed during

21   this time.  Look at the man in white, who Accilien told you is

22   Dominique Jean-Philippe.  You can actually see him using his

23   cell phone in this picture.  This is him going into the stash

24   house, and again using his cell phone in the elevator of the

25   stash house going up to Patrick's apartment.

1         After this whole ordeal, look finally at all of the

2    calls made among the robbers on September 5.  You will see

3    David Delva persistently reaching out to Trevor Cole.  The

4    inference here is he is looking for his cut of the robbery, the

5    proceeds which Accilien told you Delva got at a later time.

6         I'm going to talk more about that later, but let's

7    talk about one thing these calls do not show.  They do not show

8    David Delva hanging out in Brooklyn with the Noisettes at the

9    West Indian Day parade.

10        Let's talk about something other evidence that proves

11   the defendant is guilty of this robbery and kidnapping.  Let's

12   talk about some pieces of evidence that come after the robbery

13   and kidnapping are over.  Accilien told you about how he

14   visited his brother, Dominique, in jail after Dominique was

15   arrested for these crimes.  He told you about the conversation

16   he had with Dominique which he then relayed to the defendant

17   about how Dominique told Accilien that nobody knew anything

18   about his and Delva's involvement in these crimes, and that he

19   and Delva had nothing to worry about.

20        Accilien showed you about the letters he received from

21   his brother in jail, which talk about how Accilien and David

22   have to stand tall to show family loyalty.  Accilien told you

23   what this means.  You can read these letters for yourself in

24   their entirety, ladies and gentlemen.  Here are the excerpts.

25        At some point, months later, Accilien also got

1    arrested for these crimes.  The defendant got arrested on the

2    same day for the drugs and the gun we'll talk about in just a

3    moment.  Accilien remained in custody after his arrest.  The

4    defendant was out on state bail.  You heard a prison call

5    between the defendant and Dominique Jean-Philippe shortly after

6    Accilien's arrest.  We're going to hear it now.

7            (Audio played)

8            MS. GERACI:  Ladies and gentlemen, did you notice how

9    careful they are on this call because they know it's recorded.

10   They say "these jacks are hot" and how surprised they are

11   Accilien got arrested.  "They got Dreko."  The defendant tells

12   Dominique Jean-Philippe that he told Accilien not to sign

13   anything and not to say anything.

14           Finally, Accilien told you about the conversation he

15   had with fellow inmates this summer who passed along a message

16   from the defendant, and the message was:  Don't take the stand

17   on me.

18           Let's go over what the defendant has been charged

19   with.  Here is your list of charges.  Let's take two of the

20   conspiracy counts together first -- Count One and Count Three.

21           Count One charges the defendant with conspiring with

22   others to rob Patrick James of his drugs and his drug money.

23           Count Three charges the defendant with conspiring to

24   kidnap Jeanette Adams and Patrick James in September of 2012.

25   Ladies and gentlemen, as we've already discussed, there is no

E9gQdel2                          Summation - Ms. Geraci

1   doubt that Dominique Jean-Philippe, Trevor Cole, Gregory
2   Accilien, and Lisa Hylton conspired or agreed to rob Patrick of
3   his drugs and money and to kidnap Patrick and Jeanette in order
4   to do so.  We submit that there is also no doubt that the
5   defendant knowingly joined in these conspiracies.  And Accilien
6   even told you why the defendant was brought in:  Cole and
7   Jean-Philippe needed help, and Accilien was uncomfortable and
8   he was acting paranoid.  So Jean-Philippe asked Accilien to
9   bring over the defendant, who is their nephew, because he had
10  more experience doing robberies and would be more comfortable
11  than Accilien.
12          Now, Count Two charges the defendant with robbing
13  Patrick James of his drugs and drug money in September 2012.
14  Accilien told you about the defendant's role in this robbery
15  and what the defendant's cut was.  The defendant got a quarter
16  pound of Patrick's marijuana and hundreds of dollars after he
17  violently beat Patrick with a mop stick because Patrick
18  wouldn't stay still.  You know where this marijuana comes from,
19  don't you?  Patrick told you; he gets it from California.
20          Count Four charges the defendant with kidnapping
21  Jeanette Adams and Patrick James in September of 2012.  Think
22  about the testimony of Patrick and Jeanette.  They were held
23  hostage in their own apartment.  After she was assaulted,
24  Jeanette was forced to use her cell phone to call Patrick.
25  Patrick then was forced to use his cell phone to call for more

E9gQdel2                      Summation - Ms. Geraci

 1    money.  The defendant and his co-conspirators, they used their

 2    own phones during this robbery.  Accilien told you that one of

 3    the things that he and Delva were asked to do was to watch over

 4    the bound victims and make sure they don't get free.

 5          Let's talk about Count Five.  The defendant is charged

 6    with using firearms or aiding and abetting the use of firearms

 7    which were brandished, or shown, in furtherance of the

 8    kidnapping and the robbery of Patrick James and Jeanette Adams.

 9          How do you know this happened?  Well, Accilien told

10    you that when he got to the Magenta Street apartment, he saw a

11    woman tied up in the bedroom, and that he also saw Dominique

12    Jean-Philippe's silver .38 pistol out on the table.  He told

13    you further that this gun was left for him and for David Delva

14    after Jean-Philippe and Cole left to raid the stash house.

15    Now, Jeanette remembered seeing silver guns too.  He testified

16    that the two men who forced her into the apartment each had

17    one.  Patrick told you that he was pistol whipped with a chrome

18    gun and that it was pointed at his head to get him to make the

19    call for more money.  Finally, Accilien told you that David

20    Delva came home from the robbery and kidnapping with

21    Jean-Philippe's .38 caliber pistol, and that Jean-Philippe came

22    to get it from the defendant the following day.

23          Count Six, ladies and gentlemen -- actually, as we go

24    through Counts Six and Seven, I want you to keep in mind that

25    what the purpose of kidnapping and robbery was was to rob

1   Patrick of pounds and pounds of high-grade marijuana.  So Count

2   Six charges the defendant with conspiring to sell drugs; and

3   Count Seven charges the defendant with using a firearm or

4   aiding and abetting the use of a firearm in furtherance of this

5   drug deal.

6           So let's talk about these counts, the drugs and the

7   guns.  Ladies and gentlemen, you have seen both in this case.

8   Remember what NYPD Detective Ellis Deloren told you about what

9   he found in Jean-Philippe's apartment?  He found marijuana

10  packaged in small clear bottles with pink and blue caps.

11  Detective Deloren found crack cocaine packaged in small baggies

12  and hidden in a sock.  He found razor blades, clear plastic

13  baggies and a scale, things that are used to cut up, weigh and

14  package drugs for re-sale.  He also found a number of things

15  belonging to Patrick James.  He found a pound of marijuana

16  packaged in a vacuum-sealed bag just like Patrick told you his

17  was packaged when it was shipped to him from California.  He

18  found some black luggage, which is right here.  Have we seen

19  this before?  (Indicating).   He found Patrick's Gucci watch

20  and his ring.

21          Now, what happened to Jean-Philippe's drug customers

22  after he got arrested?  Accilien told you, he steered them to

23  David Delva.  You saw their contacts in David Delva's cell

24  phone.  Accilien told you about contacting Ed and a person

25  named Harris, and you saw text messages between the defendant

E9gQdel2                    Summation - Ms. Geraci

1    and his drug customers, and you saw the crack that was found on

2    the defendant at the time of his arrest.

3            FBI Special Agent Andrew Brandt testified, and he told

4    you that when he took the defendant into custody, he found bags

5    of crack cocaine in the defendant's pocket.  And here they are.

6            Now, remember, Special Agent Reynolds told you that

7    they re-packaged the crack cocaine after the laboratory tested

8    it.  So, the crack cocaine is in here, and here are the baggies

9    in which it was packaged for resale.  You also heard Detective

10   Deloren tell you that he found a bag of crack cocaine and a

11   loaded gun in the defendant's room by his closet.

12           Accilien described that gun to you.  He told you what

13   it looked like, it was black.  He told you where the defendant

14   kept it, in his closet, exactly where it was found, and he told

15   you why the defendant had it.  He was selling drugs and he

16   needed it for protection.  So it seems, ladies and gentlemen,

17   that the defendant knows something about the occupational

18   hazards of drug dealing too.  And you saw this gun for

19   yourself.  Here it is.  The gun was loaded and the ammunition

20   is here.

21           So this brings us to Count Eight.  Count Eight charges

22   the defendant with the unlawful possession of a firearm or

23   ammunition by a convicted felon.  Remember the testimony of ATF

24   Special Agent Matthew Fleming.  He told you that the gun I just

25   showed you is a .9 millimeter SCCY semi-automatic pistol that

E9gQdel2                    Summation - Ms. Geraci

was manufactured in Florida, and he told you that the bullets I

just showed you that were found in that gun are GFL or Fiocchi

ammunition which is manufactured in Italy.  These were not

counterfeit, as you remember.

     It is against the law for someone like the defendant

to possess a gun or ammunition because the defendant was

previously convicted of a felony.  This makes him a person who

is not allowed to have a gun.

     So, what shows you that he possessed this gun?

Several things.  First, this gun was found in his room, in his

closet at 832 South Oak Drive in the Bronx, and that's exactly

where Accilien told you it would be.

     Second, look at the pictures of this gun on the

defendant's phone.

     Third, you heard the testimony of both Special Agent

Reynolds and Detective Deloren that after the defendant's

arrest, he told them that the gun was inoperable and that he

had tried to fix it unsuccessfully.  Special Agent Reynolds

told you that the defendant was arguing with him about getting

arrested for an inoperable gun.  Well, the defendant got the

law wrong here.  Ladies and gentlemen, I expect Judge Forrest

will tell you that whether the gun is operable or not is

completely irrelevant.  That is not something you should

consider here.  The only reason you should think about this

statement is because it shows you who the gun belongs to -- the

E9gQdel2                         Summation - Ms. Geraci

1    defendant.

2             And why did he get it?  Because he's a drug dealer,

3    and he needed protection so that the horrors that he inflicted

4    on Patrick and Jeanette would not be inflicted on him.  In

5    fact, defense counsel told you at the start of this trial that

6    this kind of thing is simply an occupational hazard for any

7    drug dealer like Patrick James and even sometimes for non-drug

8    dealers like Jeanette Adams.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E9GAADEL3                    Closing Statement - Geraci

1           MS. GERACI:  There should be no doubt in your mind

2    that this robbery and kidnapping happened and that it happened

3    in the way you heard.

4           Let's talk about the defendant's alibi witnesses who

5    you saw yesterday, people who love and care about the defendant

6    and who don't want to see him go to prison for any amount of

7    time.  His sister Fabian Noisette, she testified here before

8    you.  She told you details about the defendant's whereabouts

9    during Labor Day weekend 2012 and even what the defendant was

10   wearing.  But first think about the dates she gave you.  Those

11   were actually not the dates of Labor Day weekend 2012.  Think

12   about how she could remember what someone wearing on a

13   particular date two years ago but she could forget both her own

14   cellphone number and her own landline number.  We have it here,

15   ladies and gentlemen.  Here's her cellphone number.

16          And ladies and gentlemen, it's unfortunate but she

17   lied during her testimony.  She testified that she couldn't

18   remember her cellphone number that she had from August 2012

19   through December of 2013, more than a year.  She told you that

20   she was certain that she spoke with David Delva on her

21   cellphone the day before the parade because he was looking to

22   buy sneakers.  Well, you saw her phone records just a few

23   moment moments ago.  Where is that call, ladies and gentlemen?

24   As you saw, there is a call between Fabian Noisette and the

25   defendant on August 30, 2012 and then they don't talk again

E9GAADEL3                      Closing Statement - Geraci

1    until September 7.  Look at her landline.  She also couldn't

2    remember.  Well, here it is.  Her landline in 2012, she

3    couldn't remember it because if you look at the phone records,

4    there are no calls with the defendant on her landline number.

5         But who is calling Fabian Noisette during this time in

6    2012?  It's her son.  It's Ryheme Bell.  The witness who

7    testified that he was home the whole time that weekend and not

8    out enjoying the parade and that he did not have a cellphone at

9    that time.  Here is his cellphone number right here in the

10   defendant's contacts.  And check out his call activity in 2012.

11   In fact, not only is Ryheme calling his mother's cellphone,

12   he's also texting her phone and text messaging pictures to her

13   phone from his own cellphone on the day of the parade.  Think

14   about that.  Would he do that if he's also home that whole

15   weekend and she's there too?

16        Lastly, you remember Jean Wilem Noisette, the person

17   who showed up for the parade on Monday and got drunk the whole

18   day and saw the defendant run off in the crowd and then woke up

19   almost 24 hours later on Wednesday?  Not surprisingly, ladies

20   and gentlemen, he did not have much to tell you about the

21   defendant's whereabouts that weekend.

22        I am going to sit down in a minute but before I do I

23   want to make something very clear.  The government agrees with

24   the defense counsel that to put it mildly Gregory Accilien is

25   hardly an admirable man.  He's commit and pled guilty to

E9GAADEL3                    Closing Statement - Geraci

numerous acts of violence and that's why I told you in my

opening remarks to you to listen to his testimony very

carefully.  He is a criminal.  That's why he's been arrested,

prosecuted and convicted for his crimes.

        But keep in mind it's because he is a criminal that he

has important testimony to offer, testimony about the criminal

activity by this defendant and their crew of robbers.  To

really learn about these things you have to get the information

from the source, the criminals themselves.

        You heard about Accilien's cooperation agreements and

I expect you are about to hear a lot more from defense counsel

on that topic.  As you have heard from Mr. Accilien himself

there's no deal on the prison sentence he'll receive.  Here's

the only deal that the government made with him.  Plead guilty

to all of your crimes, cooperate and testify against all of

your co-conspirators and if you tell the truth and you don't

otherwise violate the terms of your agreement, let your

sentencing judge know what you have done, both good and bad and

maybe, just maybe the judge will give you something less than

the prison time you're otherwise facing.  That is the deal.

And you can read those agreements for yourselves if you'd like.

        Accilien told you what happens if he lies, right?  He

goes to jail for a very long time.  I submit to you that that

is a big incentive to tell you the truth.  Because he lied once

before to the government and he knows the price he pays for

1  this.  Remember, he told you that he suffered the consequences.

2  What were those?  His mandatory minimum sentence shot up by ten

3  years.  Of course, as you know the defendant does not have to

4  say a thing at this trial.  But in a way he has.  His

5  attorney --

6              MR. PITTELL:  Objection.

7              THE COURT:  Sustained.

8              MS. GERACI:  His attorney has questioned the witnesses

9  and through that questioning defense counsel has tried to

10  imply --

11             MR. PITTELL:  Objection.

12             THE COURT:  Sustained.

13             MS. GERACI:  The defense has argued that the

14  cooperating witness would say anything about the defendant to

15  get out of jail earlier.  But, ladies and gentlemen, that is

16  simply not true.  Mr. Accilien told you he will get no benefit

17  if the defendant is convicted here.  He only gets a benefit if

18  he tells you the truth.  Accilien has absolutely zero incentive

19  to lie about the defendant's role in this kidnapping and

20  robbery.  There are plenty of people that Accilien provided

21  information about that would have been of substantial

22  assistance to the government and the defendant is just one of

23  them.  There's simply no incentive for him to single out the

24  defendant for a lie.  There is no upside to lying and there is

25  every incentive to tell the truth.

1     Based on everything you've seen and heard, all the

2  evidence and the testimony taken together you can believe that

3  the defendant participated in the armed robbery and kidnapping

4  over Labor Day weekend 2012, used guns during those violent

5  acts and then agreed to sell the marijuana he stole as well as

6  other drugs.

7     Ladies and gentlemen, the evidence against David Delva

8  is overwhelming.  This not a close case.  The testimony given

9  by all of our witnesses coupled with the physical and the

10 scientific evidence before you, support the government's

11 contention that the defendant agreed with others to commit a

12 robbery and kidnapping over Labor Day weekend 2012, that he

13 committed this robbery and kidnapping, that he used guns during

14 this crime, that he agreed to sell drugs, some of the same

15 drugs that were stolen during the robbery and kidnapping, that

16 he had a gun to protect his drug business and had gun and

17 ammunition unlawfully because he is a felon.

18     At the start of this trial I asked you to use your

19 common sense as you listen to the evidence.  Now I am going to

20 ask you to keep using your common sense, to go back into the

21 jury room to deliberate.  Throughout this case the defense put

22 forth for you to consider nearly every possibility no matter

23 how remote or how farfetched that shows that there may be some

24 other explanation as to why the defendant may not have

25 committed the crimes he's charged with.  Well, that's not the

E9GAADEL3                    Closing Statement - Geraci

1    standard.  The standard is beyond a reasonable doubt.

2              And when you consider the testimony of all the

3    witnesses and all the evidence that you heard and that you've

4    seen, the only just and fair view, the only view that actually

5    makes sense here is that the defendant is guilty as charged.

6              THE COURT:  All right.  Thank you.

7              Ladies and gentlemen, we'll take just a very short

8    break and then we will hear from Mr. Pittell.  So I am going to

9    remind you not to talk to each other.  We'll take just a very

10   quick break and come on back out.  Thank you.

11             (Jury not present)

12             THE COURT:  Let's all be seated.  Can I have counsel

13   all over here for just one moment.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

E9GAADEL3                    Closing Statement – Geraci

1          (Sidebar)

2          THE COURT:  Who is the guy sitting right directly in

3     front of me against the wall?

4          MS. GERACI:  Maybe a U.S. marshal?

5          THE COURT:  I have to say it's distracting when you

6     see somebody with his head back and his tongue hanging out

7     because you wonder how long can this guy sleep, OK.  So I don't

8     think it's a useful thing to have somebody who's asleep in the

9     courtroom and I don't want to draw attention to it but it's

10    distracting to the jury.  So if somebody could kindly tell him

11    to get a cup of coffee.  He needs to wake himself up.  Does

12    anybody know him?

13         MR. POSCABLO:  No.  I'll speak to him.

14         THE COURT:  Thank you.  That's all.  Does anybody have

15    anything else?

16         MR. PITTELL:  No.

17         (Continued on next page)

18

19

20

21

22

23

24

25

```
 1            (Recess)

 2            (In Open Court)

 3            THE COURT:  All right.  Let's bring out the jury.

 4   Depending on how long Mr. Pittell actually goes and if you

 5   could give me sort of a two or a three or have somebody give me

 6   a sign, Ms. Geraci, of how long you think you are going to go

 7   20 or 30 minutes and I'll try to then judge whether or not

 8   we're going to take break.  I'd rather have you go all the way

 9   through.  I don't want to keep the jury after 1:00.

10            MR. POSCABLO:  If Mr. Pittell is anywhere close to

11   12:30 I think we can --

12            THE COURT:  We'll see how it goes.

13            All right.  Mr. Pecorino.

14            (Jury present)

15            THE COURT:  All right.  Ladies and gentlemen, let's

16   all be seated.

17            Mr. Pittell, you may proceed, sir.

18            MR. PITTELL:  Thank you.  Good morning, ladies and

19   gentlemen.

20            Labor Day 2012 as it does every year, the West Indian

21   Day parade rolled down Eastern Parkway in Brooklyn.  David

22   Delva got there early.  He got there on a Sunday afternoon.  He

23   got there early so he could buy some sneakers.  You heard

24   Ryheme tell you he bought a pair of Nike Ken Griffey sneakers.

25   The reason why he bought that specific pairs was because he
```

1    wanted to wear the Haitian colors with pride.  He stayed at his

2    sister's apartment that night.  He was there all day during the

3    parade.  He stayed there Monday night.  He is there all day on

4    Tuesday, a little bit hungover but they were all there.  He

5    stayed there Tuesday night.  And Wednesday morning he left to

6    go to work at his job as a janitor.  Those are facts.  He's

7    innocent.  David Delva was with his honest hardworking family

8    in Brooklyn, people who follow the honest version of the

9    American dream, his sister, a home health worker, his nephew

10   Ryheme Bell, a high school student, his stepbrother, Wilem

11   Noisette, a cook in the hospital.  While David Delva was with

12   these people, his two uncles, Gregory Accilien, Dominique

13   Jean-Philippe were with Trevor Cole.  They were in the Bronx,

14   not David.  They were in the Bronx gang raping Jeanette Adams.

15   They were in the Bronx pistol whipping Patrick James.  And they

16   did it with Lisa Hylton and Jeremy Acevedo.  But they did not

17   do it with David Delva.

18          During my opening statement last week I told you I

19   don't have to do anything in this case.  It's not my burden as

20   an attorney representing a defendant in a criminal trial in a

21   court in the United States.  I could simply just sit in my

22   chair and say to the prosecution, prove it.  And then come up

23   and say they haven't proven it beyond a reasonable doubt.  He's

24   not guilty.  But today is the most important day in the life of

25   David Delva and it should be pretty obvious.  So I am not just

E9GAADEL3                    Closing Statement - Pittell

1    going to kickback, go to sleep, do nothing.  That's why I

2    called witnesses.  That's why I called witnesses who proved

3    that on September 3rd, 2nd, 3rd, 4th and 5th, the Sunday before

4    Labor Day, the Labor Day and the Tuesday and that Wednesday

5    morning David was in Brooklyn.  He was no where near what was

6    going on on Magenta Street in the Bronx.

7            Now, Gregory Accilien got up on the witness stand and

8    you all heard him say that David was there, but quite frankly,

9    there's no diplomatic way to put this.  His testimony is

10   complete BS.  He's trying to put the blame on an innocent man.

11   His cooperation agreements are in evidence and we had them up

12   on the screen.  You could take them back in the jury room.

13   You'll see on both these cooperation agreements the first

14   version and the second version he's facing a maximum of life in

15   prison.  His testimony is nothing more than a desperate attempt

16   by him to avoid that from happening.

17           You heard some of the witnesses talk about living in

18   Miami in Florida was coincidental because I myself grew up in

19   south Florida.  And the best friend of my grandfather, someone

20   who I called my uncle used to have a commercial fishing boat

21   that worked out of Key West and went out into the ocean.  And

22   this wasn't a boat that just caught fish on a line.  It was a

23   commercial boat.  It had these two cranes.  They called them

24   outriggers that stretched out on both sides.  And a giant net

25   is attached behind them.  And while it's certainly not the most

E9GAADEL3                    Closing Statement – Pittell

environmentally sustainable way to go fishing, it drags a net

through the ocean and it scoops up whatever is there.

Sometimes it goes in the middle of the ocean.  Sometimes it

drags along the bottom.  And when the nets are full they get

dumped onto the boat.

         And so what I would do from time to time is work on

the boat and there would be this huge pile of fish dumped on

there.  And what I did with other people was we'd go through

the pile of fish.  Sometimes it would be dragging along the

bottom and it would pull up fish or turtles or other types of

fish which are not edible and we'd have to go through them,

throw away whatever was still alive back in the ocean and sort

through whatever could be kept.  And sometimes you'd go through

a pile and it would be filled with lots of fish that people

would eat and that the boat would save.  Sometimes we'd go

through the pile and there would be nothing left at the end of

the day.

         Now, the reason why I am telling you this is that is

the way I view this case.  Actually, I view it as three

different piles here.  One pile that you are going to have to

go through is the Magenta Street robbery and the charges

associated with that.  The next pile is the drug conspiracy/gun

possession charge.  And then the last pile is the felon in

possession trial.  Even though it is one trial, one indictment,

there are three separate sets of accusations here.

E9GAADEL3                     Closing Statement - Pittell

1            So I want to take a look at the first pile.  I am just

2    going to call it the robbery but it's Counts One through Five.

3    It's the robbery charge, the robbery conspiracy, the kidnapping

4    charge, kidnapping conspiracy, and the gun charge.  So I want

5    to talk about the evidence relating to that.  And I want to

6    tell you why there is overwhelming reasonable doubt about David

7    Delva not being a participant.  The first statement is there is

8    no ID of David Delva by any of the victims in this case.  They

9    were shown this photo awry with Mr. Delva's photo and they

10   could not ID him.  Mr. James was even asked to look around the

11   courtroom to see if he saw Mr. Delva and Mr. Delva was sitting

12   there right next to me the whole time.  He did not ID him.

13           That is certainly reasonable doubt.  That alone is a

14   reasonable doubt.  But there's more.  There's lots more.  First

15   of all, you may recall during the government's opening

16   statement the government told you there were four perpetrators

17   in the case.  Well, all four perpetrators have been arrested --

18   let me take that back.  There have been four people who have

19   been convicted in this case.  We have Trevor Cole.  We have

20   Gregory Accilien.  We have Dominique Jean-Philippe.  We have

21   Lisa Hylton.

22           You've heard as well from the testimony of Gregory

23   Accilien and the stipulation that I read to you earlier this

24   morning all four of those people have been convicted of

25   participation in the robbery.  Now you may recall when Patrick

1    James testified he said he thought there may have been four or

2    five people.  He wasn't sure of the number but when he viewed

3    the photo array he identified a fifth person, Jeremy Acevedo,

4    circled and indicated that was one of the perpetrators.

5           And you've heard the testimony of Detective Deloren, a

6    seasoned New York City police detective, one who's made

7    thousands of arrests and he's told you that the way he prepares

8    these photo arrays he tries to put similar photos so that when

9    he shows it to a suspect it's fair and that it's not screaming

10   out point me, point me, pick me.  Does it so when people look

11   at it if they identify someone it's reliable.  Likewise, if

12   they don't identify some one, that too is reliable.

13          So in addition to the no identification of Mr. Delva

14   the identification and conviction of all the real perpetrators,

15   let's talk about the DNA evidence.  The government wants you to

16   think that, well, since it is this tiny bit of DNA on that

17   glove matches or cannot be excluded for David Delva that he was

18   there.  That's it.  That's the end of the story.  In reality

19   what the government wants you to think is maybe you've seen

20   something like this on one of the bazillion crime shows on TV

21   where that's all it takes to identify someone.  But in this

22   particular case the DNA cannot be relied upon for several

23   reasons.

24          One, you heard both witnesses, Ms. Cooke and Ms. Ryan,

25   say it's a small amount under anybody's count, that mixture of

E9GAADEL3                Closing Statement - Pittell

1    DNA.  Sure there's a dispute as to whether it's three or four

2    but it's still a mixture.  Plus, the fact that there were at

3    least two people related to David Delva, two people who have

4    the same DNA were at the crime scene.

5            Now, talking about each one of these in a little bit

6    more specifics, a small amount of DNA, both Ms. Cooke and

7    Ms. Ryan agree the amount of the DNA in the mixture on the

8    glove is about a hundred cells.  They told you that sure this

9    is an amount above the minimum threshold needed to do testing

10   but it's way below the ideal amount.  And when you have a

11   miniscule amount like this it certainly leaves open the

12   possibility for error.  Just think about it.  Ms. Ryan told you

13   that in a drop of saliva there's thousands and thousands of

14   cells.  So just imagine how much a hundred cells is.  It's

15   beyond being a speck.  OK.  It's a speck of a speck.  And on

16   top of it it's a mixture, OK.  These hundred cells are not from

17   one person.  They are not from a single source.  They come from

18   a combination of three or four people.  So we're talking about

19   25 or 30 cells, assuming the portions are the same, that is an

20   incredibly small amount.  If it was only 25 cells, if it was

21   only 30 cells and it was a single source that would be below

22   the thresholds of the New York City Medical Examiner's Office.

23   It's only because there's a mixture and it's bunched up with

24   other people that they were even to analyze it.

25           Then you have the fact that there were people that

E9GAADEL3                   Closing Statement - Pittell

1    were related to each other at the scene and this is in

2    evidence.  This is the table that I had Ms. Ryan prepare which

3    shows that Jean-Philippe and David Delva, they share similar

4    DNA which, of course, they would.  They're related by blood.

5    And there are correlations between Mr. Jean-Philippe and the

6    glove recovered at the scene.  Now, there was a disagreement as

7    to whether or not he should have been included or excluded.

8    But the fact remains they were related and it's certainly

9    possible that Jean-Philippe contributed to the mixture as well

10   as Gregory Accilien who was never tested could have contributed

11   to the mixture.  And when you mix up two relatives,

12   Jean-Philippe and Gregory Accilien, when you mix up all their

13   DNA you are going to get both of their DNA here and so it would

14   make sense that David Delva would have similarities because

15   there's actually twice the opportunity for him to have

16   similarities.

17           But in the end even if the DNA on the glove, the 20 to

18   30 odd cells from that mixture belonged to David Delva that

19   doesn't mean he was there.  You heard the testimony yesterday

20   from Ms. Ryan how DNA can easily be transferred, how Gregory

21   Accilien walking into that apartment and reaching into the box

22   or touching the pile of gloves could very easily put David

23   Delva's skin DNA, his saliva DNA onto those gloves.  He was

24   using David Delva's cellphone.  There's certainly a dispute as

25   to how long or how often he was using this but he admitted that

1    he was touching the screen sending a text message during while

2    he was there.

3            And you've seen the phone records.  I am not going to

4    stand here and tell that you David Delva never used this phone.

5    Sure, he used it but so did Gregory being Accilien.  David

6    Delva's DNA was on this phone.  And when Gregory Accilien

7    touched it he very easily do could have put on his fingers and

8    then put it on a glove when he touched the gloves.

9            And besides the phone there was tons of opportunity

10   for Accilien to bring Delva's DNA to the crime scene.  He went

11   back and forth depending upon which version he tells you, three

12   or four times.  Trevor Cole went from Mr. Delva's resident to

13   the crime scene.  Dominique Jean-Philippe went there from the

14   Delva residence to the crime scene.  It's certainly entirely

15   possible that during all these trips that that speck of a speck

16   of DNA could have been brought over from Oak Drive to Magenta.

17           Now, you saw the phone records and all the charts and

18   even you saw some during the prosecutor's summation I submit to

19   you they don't prove anything.  OK.  All those charts show is

20   that there were calls between this phone and Trevor Cole and

21   Dominique Jean-Philippe.  And I submit it's a little misleading

22   for those charts to say calls between Delva and Jean-Philippe

23   or Delva and Cole because whoever made those charts wasn't

24   standing there when this phone was being used.  And you've

25   heard, you've seen that Gregory Accilien used this phone.  This

E9GAADEL3                    Closing Statement - Pittell

1    is a cellphone.  OK.  Someone could pick it up, use it.  If

2    someone could put it down, someone else could use it.  It's not

3    tied to somebody.  Gregory Accilien did not have a cellphone.

4    He had lost his cellphone months earlier.

5          He actually said it was stolen and never replaced it.

6    And so what did his nephew do?  His nephew, David, he would let

7    him use his phone from time to time.  And why was he OK with

8    that?  Because he had another phone.  He had an iPhone.  So it

9    was OK that he let his uncle use that phone or so he thought

10   but those records, those phone records which say David Delva is

11   talking to Trevor Cole, David Delva talking to Dominique

12   Jean-Philippe, they do not show that David Delva was involved

13   in the robbery.

14         And in fact, if anything, the ones that you saw this

15   morning when Agent Reynolds testified about the phone call or

16   the lack of phone call activity that weekend between David and

17   Fabian shows that he wasn't in fact in Brooklyn and left his

18   phone behind because if he had taken the phone and been in

19   Brooklyn he would have called her.  She said he called her.  So

20   if he had the 305 phone that would have shown up on her phone

21   records but he didn't have it and he left it behind with

22   Gregory Accilien.  That's why you have all those calls between

23   this phone and Trevor Cole and Dominique Jean-Philippe because

24   it's Gregory Accilien using the phone.

25         Now I want to talk about the testimony of Gregory

Accilien.  The government is trying to suggest that he has no

motive to lie and he's just here to tell the truth, to finally

tell the truth after spending months and months of getting his

story straight, after lying over and over again he's finally

passed that.  He's now here to tell the truth and he has no

motive to lie.  Well, I submit to you that's not true.  He has

a tremendous motive to lie.  He doesn't want to spend the rest

of his life in jail.  Is there really a bigger motive than

that?  He's been in jail.  He knows what it's like that jail.

Even if you've never been in jail no one wants to go to jail

and certainly if someone's been there, they don't want to go

back.  He's been locked up in hospitals.  He knows what it's

like to be trapped inside an institution and surely he does not

want to go back there.  In fact he's been convicted of the

crime of lying.  He was convicted on July 14, OK, just a few

months ago of making false statements to the U.S. Attorney of

lying to them, of lying to the FBI and this wasn't just oh, at

the beginning of case he lied but we've straightened that story

out and we have gotten past it.  These lies were on July 2014.

          And of course the lies he told them are not the only

lies that he told.  He lied when got arrested.  The first thing

he said when he got arrested, I wasn't there.  I had nothing to

do with it.  Then he told Agent Reynolds, you know what?  I

want to keep it real.  I am going to tell you what happened.

And he still lied.  He still said he was not involved.

1          And then even if you look at his testimony now when he

2     finally came clean, so to speak, and told you about his

3     involvement, just think about it he told you the bare minimum.

4     All he basically said was he brought the gloves and the tape

5     and hung around.  He was around there but that's basically it.

6     But he didn't admit to being the one who beat up Mr. James.

7     And you know Mr. James identified Mr. Gregory Accilien as being

8     one of the perpetrators and he said the beater, the person who

9     beat him was stocky.  Mr. Accilien's stocky.  He said he had a

10    low haircut.  Mr. Accilien had a low air cut.  Has a low cut in

11    this picture.  And you've already heard that Mr. Gregory

12    Accilien as a history of violence.  He's beaten up his own

13    nephew before, David Delva.  Beaten him up over cigarettes.

14    he's attacked innocent people in the subway.  He's attacked

15    police officers who have tried to subdue and arrest him.  He's

16    attacked patients in a hospital. he's attacked workers in a

17    hospital.

18         Of course Mr. Accilien's violence brings us to the

19    question of whether or not he was one of the people who raped

20    Ms. Adams.  Now I brought that up in the opening before you

21    heard any evidence and I submit to you that there is certainly

22    evidence that he was one of the three men who raped here and

23    that he lied about that by not telling you about that on the

24    stand.  And the reason why I tell you this is she was pretty

25    clear she was raped by three men.  She was raped by three

E9GAADEL3                    Closing Statement - Pittell

 1    different men.  And regardless of what Gregory Accilien told

 2    you, regardless of what version he told you, there was a point

 3    in time when there were three men in that apartment in his own

 4    words.  There was a point in time when it was him, Trevor Cole

 5    and Dominique Jean-Philippe, the three men were in the

 6    apartment together at a point in time where she was tied up.

 7         Then you really can't overlook the fact that at that

 8    time he was being prescribed medication to enhance his sexual

 9    performance.  So look at the facts as he even put them to you.

10    He goes to the apartment, sees her tied up, at some point he

11    goes back home and he's later at the apartment.  He certainly

12    has an opportunity to go back home, to grab one of those Viagra

13    or Lavitra pills, take it and go back to the apartment and rape

14    Ms. Adams.

15         You also heard that while they were there they were

16    all smoking marijuana and he said he was smoking marijuana but

17    he also told you that with his condition his schizophrenia,

18    he's been told for years by doctors that he has to stop smoking

19    marijuana, that he can't smoke marijuana because it affects his

20    schizophrenia.  I submit to you that if smoking marijuana

21    affects his ability to think rational and to behave rational.

22         Now, at the time that Mr. Accilien was arrested

23    everybody else, Trevor Cole, Dominique Jean-Philippe, Lisa

24    Hylton, Jeremy Acevedo had been arrested.  He needed to blame

25    someone new.  And so as you've seen, as I've argued, he stuck

E9GAADEL3                    Closing Statement - Pittell

1    it on David.  And look, even though they're related as you

2    heard there was no great love between the two of them.  They

3    got in fights overing cigarettes.  Gregory Accilien said that

4    he beat up David because David was drunk and mouthed off to

5    him.  I submit to you that he figured on that day when he was

6    getting arrested he saw David cuffed and hauled away, he

7    figured what's the difference?  You heard him say, well, David

8    was involved in other robberies which the judges told you that

9    statement can't affect your decision in this case.  But you

10   know what that is very important because he figured, you know

11   what, maybe he won't feel so bad dumping on David.

12       And then you heard a lot about his mental illness and

13   his brain injury and I'm not going to go through it line by

14   line with you again.  But this man was hit in the head with a

15   crowbar.  He was knocked unconscious.  He had a brain tumor.

16   He had to have brain surgery, have it removed.  For years and

17   years he has suffered from severe schizophrenia.  He hears

18   voices.  He sees things that aren't there.  He sees the color

19   yellow and goes crazy.  This is not just a mild form of mental

20   illness.  This is severe mental illness.

21       Now, I could probably go on and on and on about

22   Gregory Accilien but this wasn't a very long trial.  You sat

23   through the cross-examination.  You have the transcripts.  You

24   can you have it all read back to you but I submit to you he is

25   just simply someone who in a criminal case where competent

1    evidence means to convince a jury beyond a reasonable doubt

2    that person is guilty that that's not there.  That's not proof

3    beyond a reasonable doubt.

4         And speaking of reasonable doubt, that turns me to the

5    testimony yesterday afternoon of Fabian Noisette, Ryheme Bell

6    and Wilem Noisette.  That testimony alone is reasonable doubt.

7    I could have not even talked about everything that I have just

8    said in the 20 minutes or so that I have been speaking to you

9    and just simply said, that testimony alone is a reasonable

10   doubt and sit down.  They confirmed that David was in Brooklyn

11   the entire time from Sunday afternoon from before the robbery

12   started because Ms. Adams said it happened around ten, 10:30

13   Sunday night.  He is there until Wednesday morning and the

14   robbery as over on Tuesday night.

15        Now, I want to talk about the next pile of fish, so to

16   speak.  And when I say by that I mean the second what I call

17   the second set of charges in this case, the drug and the gun

18   charges in Count Six and Seven.

19        Now, within this group there are two charges.  One is

20   conspiracy to distribute drugs.  Second is possession of a gun

21   in furtherance of this conspiracy.  Now, later today Judge

22   Forrest is going to give you an instruction on what the crime

23   of conspiracy means.  And even so on the government's summation

24   they showed you some charts where crimes have elements.  And

25   one of the elements that Judge Forrest is going to tell you is

E9GAADEL3                    Closing Statement - Pittell

1    that in a conspiracy, first of all, a conspiracy is not -- a

2    conspiracy is separate from the crime that people are trying to

3    commit.

4          For example, if you have two people selling drugs

5    they're arguably committing two crimes.  One, conspiracy to

6    sell the drugs and the actual sale of the drugs.  Now, let's

7    say the two people try to sell the drugs but don't, they still

8    committed the conspiracy but they didn't commit the actual

9    crime, the sale of the drugs.  So what you have here is the

10   charge of conspiracy, the agreement by Mr. Delva with another

11   person to sell drugs.  That's where what he's accused of.  And

12   in order for the government to prove that he's guilty of that

13   they have to prove that there was an agreement between David

14   Delva and somebody else to sell drugs.

15         Now keep in mind it must be an agreement between two

16   people.  If David Delva is only shown to be selling drugs by

17   himself he's not agreeing with anybody to sell the drugs.  He's

18   not conspiring with anybody. he's not working with a partner.

19   That's what you needs to prove a conspiracy, a partnership.

20         Now, I submit to you that Gregory Accilien who claims

21   he was the one who was conspiring with David Delva was lying to

22   you about that.  He told you that he at some point after his

23   brother got locked up was steering customers to David.  But

24   think about it.  Does that really make sense?  If you look at

25   the stipulation that I read to you, Defendant's Exhibit I,

1    where it has the charges that Gregory Accilien pleaded guilty,

2    if you look at Count Six where he has pleaded guilty to

3    conspiracy to possess and distribute drugs it goes from 2006 up

4    to June 4, 2013.

5              Now he told you and Fabian Noisette told you that

6    David moved up here in August of 2012.  So Gregory Accilien had

7    been selling drugs for years and years before David moved up

8    here and not just little amounts.  He's been selling big

9    amounts, five kilograms or more of cocaine.  So he is a

10   relatively -- well, I don't want to use the term "big time" but

11   he was well established in selling drugs before David got here

12   and before his brother got arrested.  So there was no need for

13   him to all of a sudden steer customers to David.  He could

14   certainly handle that on his own.  But I submit to you that

15   this whole business about him claiming he's sending customers

16   to David Delva is just a fabrication so that he can dump

17   another crime on his nephew.  That is part of him getting his

18   story straight.  That's a part as during the meetings, perhaps,

19   he looked at the cellphone that they shared saw these messages

20   which if you look at some them --

21             MR. POSCABLO:  Objection.

22             MR. PITTELL:  -- appear to be --

23             THE COURT:  Sustained.

24             MR. PITTELL:  I submit to you that Gregory Accilien --

25   Well, we know Gregory Accilien used this phone.  He said he

 1    used it.  There's text messages on this phone.  He used this

 2    phone to send text messages.  I submit to you that a lot of

 3    these text messages, they're him.  It's him using the phone to

 4    do the drug deals.  And him getting up here saying he is

 5    steering customers to David is basically him trying to say all

 6    those messages are David.

 7           Now, there was when David was arrested a small

 8    quantity of drugs that was recovered from him.  It was a little

 9    bit in these little packages, OK.  I submit to you that these

10    tiny packages, these are personal use amounts, OK.  This very

11    easily is enough for one person to just simply get high with a

12    friend overnight.  This is not necessarily drug dealing weight.

13    This is not kilogram quantity.  And there's no testimony that

14    this really is even David Delva's drugs.  Gregory Accilien

15    didn't even get up there and ID the drugs.

16           And I would like to suggest one thing to you that it

17    very well could be Gregory Accilien's drugs and those were

18    Gregory Accilien's pants that David Delva was wearing.  You

19    might think where is that coming from OK.  You might think

20    maybe I am just reaching or making up things but if you look at

21    the phone, the photographs on the phones, you'll see there's a

22    picture of David Delva and Gregory Accilien wearing the same

23    shirt.  They shared the same bedroom, OK.  Accilien wouldn't

24    even admit that.  He wouldn't even admit that he was sharing

25    the same bedroom with David.  They shared the same bedroom.  It

E9GAADEL3                    Closing Statement - Pittell

 1    was one closet.

 2              The police came there at six in the morning and a

 3    police raid to arrest somebody like Gregory Accilien who is a

 4    suspect in a violent robbery is not going to be a knock, knock,

 5    hello.  We're the police.  We'd like you to come out and arrest

 6    you.  They are going come in like gangbusters.  They are going

 7    to come in with a show of force.  They are going to be coming

 8    in screaming, shouting, guns drawn, a dozen officers.  They are

 9    going to be running up on the place.  So is it really that

10    farfetched that at six in the morning David's asleep in bed.

11    He hears what's going on and he puts Gregory's pants on and the

12    pants have the drugs?

13              Now in the second pile that I've told you about

14    there's two crimes.  One is the drug conspiracy which I just

15    spoke about and the second is the possession of firearm in

16    furtherance of that drug tracking crime.  Now, in order for a

17    person to be convicted of possession of a firearm in

18    furtherance of a drug tracking crime one of two things must be

19    proven.  One is that the person used or carried the firearm

20    during a drug tracking crime.

21              (Continued on next page)

22

23

24

25

1          MR. PITTELL:  (Continued) But here, there is no

2     testimony that David was using a gun; that he used a gun during

3     a drug crime; that he carried a gun during the drug crime.

4     There is not even any testimony that he actually committed a

5     drug crime.  All there is is testimony by Accilien that he sent

6     customers his way.  But there is no proof whatsoever, even a

7     line to support that used or carried a firearm.

8          However, there is another way that a person can be

9     convicted of possession of a firearm in furtherance of a

10    drug-trafficking crime, is that they just simply possessed it,

11    if they possessed it in furtherance of a crime as opposed to

12    using it or carrying it.  But the Judge is going to tell you

13    that the possession of a gun must be incident and an essential

14    part of the crime.  It must have played some part in furthering

15    the crime.  OK?

16         Here, the only evidence you have is that there was a

17    gun found by Detective Deloren in a closet shared by David

18    Delva and Gregory Accilien.  Now, Gregory Accilien got up there

19    and claimed David had it there for protection, but I submit to

20    you that was a lie.  I submit to you that was Gregory

21    Accilien's gun.  I submit to you that Gregory Accilien took

22    this photo of the gun when he was using this phone.

23         Gregory Accilien is the one who's done gunpoint

24    robberies in the past.  He told you that him, his brother,

25    Dominique Jean-Philippe, and Trevor Cole robbed an ice cream

E9gQdel4                    Summation - Mr. Pittell

truck, an ice cream truck.  If there is ever a place which is

sacred to children in this city, it's an ice cream truck; and

Gregory Accilien robbed one at gunpoint, and he was the one who

had the gun.

So, we know that he owned a gun.  And one way we know

that this gun -- it's somewhere over there.  That's OK, you

don't have to bring it over.  One way we know that this gun was

not used in furtherance of a drug-trafficking crime was because

the gun didn't work.  Both Detective Deloren and Agent Reynolds

said that when David Delva was arrested, he said the gun didn't

work.  He was even specific about it.  It had a busted spring.

He tried to fix it.  Ladies and gentlemen, if a broken gun is

sitting in a closet, it's not being used in furtherance of a

drug-trafficking crime.

Patrick James told you he got a gun.  OK.  I submit to

you that that was a working gun because he needed that for

protection.  OK.  A broken gun doesn't protect anybody from

anything.

Now, I want to go on to the third group of charges.

This action is actually only one charge in this group.  Count

Eight in the indictment.  This is sometimes called a felon in

possession of a firearm.  The government even showed you on the

PowerPoint that there are three elements of that crime.  One, a

person must have a prior felony conviction.  It said that they

knowingly possessed a gun, and the gun was used in interstate

E9gQdel4                    Summation - Mr. Pittell

1    commerce.

2            Well, two of the three you don't even have to think

3    about.  You heard the stipulation that Mr. Delva has a prior

4    felony conviction.  You heard the agent testify about the gun

5    being in interstate commerce.  I didn't even ask him a single

6    question about the gun.  There is no dispute that the gun was

7    in interstate commerce.  So there is only one element that

8    really needs to be discussed in the felon in possession charge.

9            Now, when the government showed you their little

10   chart, it just said knowingly possessed a gun.  However,

11   there's a little bit more to it.  They have to prove that David

12   possessed the gun, knowingly possessed the gun, on June 2013.

13   Now, if he possessed the gun in January of 2013, but not June

14   of 2013 -- yes, he committed the crime in January of 2013, but

15   he did not commit the crime in June of 2013.  So maybe you're

16   thinking, oh, that's a technicality.  That's a minor detail,

17   but that's the law.  OK?  That is the law, and the Judge is

18   going to tell you that it must be proven that on June of 2013,

19   or, I should say, the government has to prove that David

20   knowingly possessed a gun on June of 2013.  And I submit to you

21   that in the evidence in this case, there is not proof beyond a

22   reasonable doubt that he knowingly possessed the gun on June of

23   2013.

24           Did David Delva know that Gregory Accilien owned a

25   gun?  Of course he did.  Did he try and fix it?  Of course he

E9gQdel4                        Summation - Mr. Pittell

1    did.  You heard what the agents and police told you.  Was he

2    able to fix it?  No, he wasn't.

3           When he was trying to fix it, was that knowing

4    possession of the gun on June of 2013?  No, because there's no

5    testimony that that occurred on June in 2013.  All we know is

6    that the gun was recovered from somewhere in a closet during

7    June of 2013.  But even Gregory Accilien didn't tell you David

8    knew the gun was there at that time.  I submit to you that the

9    evidence -- and it's not my burden; it's the government's

10   burden -- there is not proof beyond a reasonable doubt to show

11   that he committed this crime.

12          Probably towards the end of -- well, at some point

13   today, you are going to be asked to make a decision in this

14   case.  You are going to have to deliberate, and you are going

15   to be asked to reach a verdict.  I think you all probably know,

16   for David Delva, this is a life-affecting decision.  When you

17   go back there, I ask you to discuss with yourselves, was the

18   evidence sufficient?  Is it proof beyond a reasonable doubt?

19          When you look at this case, really, a lot of the

20   government's case rests upon the testimony of Gregory Accilien.

21   And when you are deciding whether or not his testimony can be

22   relied upon, I urge you to use the decision-making process that

23   you would use in your everyday affairs.

24          Let's take a situation where hopefully none of you

25   will have to, but let's say you have to make a serious medical

E9gQdel4                    Summation - Mr. Pittell

1    decision about yourself or someone that you love or a friend --

2    a serious one -- cancer, heart disease.  What's going to happen

3    to make that decision?  You're going to go speak with the

4    doctor, and the doctor is going to give you an opinion.  If

5    it's a serious condition, maybe you'll want to go to a doctor

6    and get a second opinion and see if they agree.  If they

7    disagree, maybe you'll want to go to another doctor and get a

8    third opinion.

9              Here, there's only one person -- Gregory Accilien.

10   Ask yourself:  If you only had one opinion from the doctor and

11   that doctor suffered from schizophrenia, severe schizophrenia,

12   is that someone who you would want to rely upon to make that

13   kind of decision?  Let's say that doctor was someone who heard

14   voices, someone who hallucinated.  Is that someone who you

15   would want to operate on yourself or someone you know?  Let's

16   say this was a doctor who was involved in gunpoint robberies,

17   who sold drugs, who assaulted people for no reason.  Is that

18   someone you would feel comfortable taking care of you or your

19   family?  Let's say you knew this doctor just lied over and over

20   again.  Is that someone who you would want to make a decision?

21   But that's what you're being asked to do.  You're basically

22   being asked to find him guilty on the word of Gregory Accilien

23   because if you take it away, there really is nothing left in

24   this case.

25             Now, I had told you before about these times that I

1    had to go work on my uncle's fishing boat.  It was kind of a

2    depressing job.  A lot of the times when we'd sort through the

3    pile of fish, a lot of the fish were dead, and you'd have to

4    throw them back in the ocean.  You know, one time I -- I was a

5    kid.  I said to my uncle, it doesn't seem fair that all of

6    these creatures in the ocean are doing nothing, they're caught

7    in a net, they get pulled up and they get killed so that people

8    can eat."  And my uncle said, "Look, you know, it's the law of

9    the sea.  You know, this is the sacrifice that we make so that

10   other people can get their fish in a restaurant."

11          And you know what?  That may be the law of the sea,

12   and I'm sure Greenpeace doesn't agree with it, but it's not the

13   law of this country.  It's not the law of this courtroom.  And

14   I urge you not to sacrifice someone in this case just simply

15   because a crime has been committed.

16          Thank you very much.

17          Thank you, your Honor.

18          THE COURT:  Thank you, Mr. Pittell.  We are going to

19   hear now from Mr. Poscablo.  Mr. Poscablo.

20          MR. POSCABLO:  Thank you, your Honor.

21          Good afternoon.  I'm not going to attempt to respond

22   to all of the points that Mr. Pittell raised.  You folks have

23   paid a lot of attention during this trial, and I know you're

24   ready to get the case and start deliberating, but I did want to

25   take the time today to respond to just a few of the points that

E9gQdel4                         Rebuttal - Mr. Poscablo

1    I think are at issue here in this case.  Then I am going to

2    rely on each of you and the close attention that you paid to

3    the evidence when you go back to deliberate.

4            As you know, the defendant has no obligation to do

5    anything in this trial.  None.  As Judge Forrest told you at

6    the beginning, the government has the ultimate burden of proof.

7    The defendant doesn't have to do anything or prove a thing.  He

8    doesn't have to call witnesses.  He doesn't have to make any

9    arguments.  And the burden is the government's, it's our

10   obligation.  But if they do, if they do make arguments, if they

11   do cross-examine the government's witnesses and if they call

12   their own witnesses, like his lawyer did in this case, it's

13   perfectly appropriate for the government to address those

14   arguments, and it's perfectly appropriate for you to scrutinize

15   their arguments to see if they hold up, to see if they match up

16   with the evidence that you've seen over the last week, and to

17   see if they match up with your common sense.

18           I submit to you that in this case the defense's

19   arguments are not based on the undisputed evidence before you.

20   Instead, the defense is inviting you to speculate and to ignore

21   what your common sense tells you happened during the Labor Day

22   weekend during 2012.

23           THE COURT:  Mr. Poscablo, would you hold on for a

24   second?  I'm going to ask Joe.

25           MR. POSCABLO:  You could leave it up, your Honor.

1          Ladies and gentlemen, it is almost offensive that

2     Mr. Pittell gets up here and tells you that when Patrick James

3     was attacked in his house by five armed men and they wrapped

4     duct tape around his eyes, around his face and hogtied him;

5     that when they did that, it's his fault that he can't ID the

6     defendant.  It is almost offensive.  OK.

7          You heard Ms. Geraci tell you, there was one set of

8     eyes that saw everything that happened.  It wasn't Jeanette

9     Adams.  Her face was duct taped.  It wasn't Patrick James.  His

10    face and his eyes were duct taped.  It was Gregory Accilien.

11    So who did he ID?  Well, that's Gregory Accilien.  You know he

12    pled guilty, right?  He saw everything that happened.  He

13    talked to you about Lisa Hylton.  You heard she pled guilty,

14    right?  He told you about Trevor Cole.  He told you about

15    Dominique Jean-Philippe.  There is no evidence from

16    Mr. Accilien regarding this man:  None.  Who else did you hear

17    him talk about?  One set of eyes that saw everything.  He

18    talked about this man, David Delva.  It is almost offensive.

19         And one other thing with regard to the ID.  Do you

20    remember Special Agent Andrew Brandt, clean-cut FBI agent who

21    sat there and answered questions about the arrest and how he

22    found the crack cocaine?  Do you remember the last question

23    Ms. Geraci asked him?  First let me back up.  His testimony was

24    that he spent hours with this man processing him for his

25    arrest, hours with him; transporting him from the arrest point

E9gQdel4                        Rebuttal - Mr. Poscablo

1  to the FBI office.  Ms. Geraci asked him, a highly trained

2  special agent.  Do you see that person in the courtroom?  No.

3  Can't ID him.  Makes sense, right?  And this man didn't have

4  his eyes duct taped.

5          Now, ladies and gentlemen, the defendant and his

6  counsel, they want it both ways.  What I mean by that is they

7  want you to believe Gregory Accilien when he says he committed

8  this crime.  They want you to believe him when he tells you

9  that he lied and he left things out with his during his

10  proffers with the government.  They want you to believe him

11  when he talks about his illness and his schizophrenia.  And

12  they want you to believe him when he implicates Trevor Cole,

13  Dominique Jean-Philippe and Lisa Hylton.  And he wants you to

14  believe him when he says that he went to the Rite Aid and

15  bought duct tape and latex gloves.  They even want you to

16  believe him when he says he went to the Magenta Street

17  apartment and that he sold drugs.  All of that they want you to

18  believe.

19          But when Gregory Accilien talks about David Delva, his

20  nephew's participation in this robbery and kidnapping, woa.

21  Out of nowhere, he's a liar.  Now he's lying.  When he tells

22  you that David Delva took over Dominique Jean-Philippe's crack

23  and marijuana customers, woa.  He's lying there.  When he

24  testified about Delva's role in the robbery and the kidnapping,

25  what he received and how he beat Patrick James, well, there,

E9gQdel4                          Rebuttal - Mr. Poscablo

1    he's a liar, he's a schizophrenic and he has hallucinations.

2              Use your common sense, ladies and gentlemen.  You know

3    that Gregory Accilien didn't lie to you on that stand.  You

4    know that he did the best he could to recollect the events of

5    that weekend, and all of the other evidence and testimony

6    support what he told you about David Delva's participation in

7    this robbery and kidnapping.  They can't have it both ways.

8              Now Mr. Pittell also argued one other thing about

9    Mr. Accilien, right?  He argued that he's being framed.  How

10   did that play out?  Gregory Accilien before the robbery is even

11   committed thinks to himself, I have to vigorously shake David

12   Delva's hand and I'm going to put it in this glove.  Somehow

13   I'm going to get some DNA off of him, maybe at night when he's

14   sleeping.  Maybe he gives him noogies, right as a fake fight,

15   starts rubbing him really hard so he has some DNA on his hands.

16   Then he's going to take that DNA and he's going to plant it on

17   the crime scene.

18             That's just ridiculous, isn't it?  You guys saw

19   Gregory Accilien.  He's no crime master mind.  He's an Army

20   veteran.  He had a tumor in his head.  He got hit in the head

21   with a crowbar.  And he testified before you.  You can judge

22   his testimony.  He told you about his mental illness, but he's

23   not a criminal master mind.  That defies all reason, logic and

24   common sense.

25             Now, ladies and gentlemen, let me start by saying

E9gQdel4                        Rebuttal - Mr. Poscablo

1   there's really no dispute about the DNA evidence.  I just want

2   to talk about that really quickly.  The defendant's own DNA

3   expert testified that despite all the arguments about family,

4   about the possibility that Dominique Jean-Philippe or Gregory

5   Accilien touched that glove, Suzanne Ryan, the defendant's own

6   expert, flatly stated that the defendant, David Delva, could

7   not be excluded from the sample.  She clearly and convincingly

8   said he cannot be excluded.  And that corroborates what Diana

9   Cooke says, and it corroborates Gregory Accilien's testimony

10  that Delva was there.

11          Now, if we leave the world of crazy and we go to the

12  world -- and the world of crazy of what's possible and come

13  back to the world of what's likely and what's reasonable, you

14  know that David Delva put those gloves on inside that

15  apartment, and you know that he had them on when he helped

16  Trevor Cole and Dominique Jean-Philippe tackle and beat Patrick

17  James, and you know that this wasn't the result of Accilien and

18  Delva sleeping in the same bed of unwiped globs of spit on

19  Accilien's face or of some crazy transfer of DNA from some

20  vigorous hand-holding or face-shaking.

21          You may recall that I mentioned Occam's razor, I asked

22  Suzanna Ryan about it.  This is what it basically says if

23  applied to this case.  The simplest explanation is usually the

24  right explanation.  And the simplest explanation, ladies and

25  gentlemen, is that David Delva was there and he put that glove

E9gQdel4                        Rebuttal - Mr. Poscablo

1    on.

2              I want to talk about the phone evidence because

3    Mr. Pittell has argued two things to you.  First, he argued

4    that it's not David Delva's cell phone.  Now, that's just

5    ludicrous.  I think that's just ludicrous.  You saw the selfie

6    that he took with that phone or that he had on that phone.  You

7    saw the numerous phone contacts between that phone and his

8    family; not Gregory Accilien's family, and all the contacts he

9    had with every participant in this case.  Of course it's his

10   phone.  But then he says, well, even if it was his phone, he

11   left it in Brooklyn during the robbery.  There's no evidence of

12   that.  None.  That's just preposterous.

13             Let's talk about the alibi witnesses.  His sister, his

14   nephew and a relative who didn't talk to him that much, they

15   testified before you and they told you that they didn't want to

16   see him go to jail.  And during their testimony, at first they

17   did seem believable, didn't they, when they talked about David

18   Delva being at the West Indian parade wearing his new Ken

19   Griffey Nikes, sporting the colors of his homeland.  They

20   seemed to be telling you the truth.  But on cross-examination

21   their testimony didn't hold up, did it?  Then when you saw the

22   evidence, the phone evidence in the government's rebuttal case,

23   it's unfortunate, but I got to tell you that they lied to you.

24   They got on that stand and they lied.  And it's understandable.

25   It's understandable.  They love him.  They don't want to see

E9gQdel4                          Rebuttal - Mr. Poscablo

1   him go to jail.  But they did lie, and you can look at those

2   phone records to show you.  I mean just to point it out, how

3   impossible it is that you don't know your own home telephone

4   number that you've had for years when you're asked on the

5   stand.

6            I want to talk a little bit about the drugs that

7   Mr. Pittell talked about.  Now, he argued to you that 12

8   packets of crack are for personal use.  I mean, it's a lot of

9   crack.  Next I guess he's going to argue like this is a good

10  Saturday night, this marijuana; but it's clear, this marijuana,

11  this crack cocaine, they're packaged for distribution, not

12  personal use.  It's a lot of crack.

13           Now, I want to talk about the testimony that showed

14  that Dave Delva used the gun for his protection.

15           Ms. Chen, transcript pages 197 and 198, please.

16           Folks, Gregory Accilien was asked about the gun.

17  Let's start with line 8.  It says:

18  "Q.  What did David show you?

19  "A.  He showed me the gun.

20  "Q.  Can you describe the gun he showed you?

21  "A.  It was a black, smaller gun.

22  "Q.  Whose gun was it?

23  A.  It was Dave's gun.

24  Q.  Do you know where he kept it?

25  "A.  Umm, I did.  It was on the closet.

E9gQdel4                         Rebuttal - Mr. Poscablo

1     "Q.  Did you ever speak with him about this gun?

2     "A.  Yes.

3           Line 21 starts:  "You mentioned, did he ever tell you

4     why he had the gun?

5     "A.  He said he was selling drugs; he needed protection."

6           It makes sense, doesn't it?  Patrick James told you

7     about the gun he had to protect himself.  He didn't have it

8     that day, and he told you about how he gave it to the Federal

9     Bureau of Investigation as soon as he started dealing with

10    them.

11          Now, there was a little bit question about the

12    operability of the gun.  I submit to you that there is no

13    testimony, no evidence that the gun was in fact inoperable.

14    The only thing you heard was the defendant's statement to the

15    FBI saying that that gun doesn't work, but I expect Judge

16    Forrest will tell you that operability doesn't matter.

17          Now, in order to believe the defendant's story, he'd

18    have to be the unluckiest guy in the world; if not the world,

19    definitely in New York City because here is what he wants you

20    to believe.  He went to Fay Noisette's house on Sunday night

21    and he slept there until Wednesday.  But on Monday morning, he

22    got up and partied like a rock star in the West Indian Day

23    parade.  He slept there Monday night, he slept there all day

24    Tuesday and then he left on Wednesday.  That covers the entire

25    span of this robbery and kidnapping, by the way.  That's

E9gQdel4                     Rebuttal - Mr. Poscablo

1    convenient.

2          But how does he explain that his DNA showed up at the

3    crime scene?  He argues secondary touch or secondary transfer.

4    So, the unluckiest man in New York City, David Delva, he either

5    spit on or he vigorously rubbed something on Gregory Accilien,

6    and when Accilien went and bought those latex gloves and put

7    one on, he transferred Delva's DNA on to the glove.  Man,

8    that's unlucky.  And his phone records show an inordinate

9    amount of activity during that weekend; the phone that he

10   supposedly left in Brooklyn.  Man, that's unlucky too.  But,

11   you know what?  Those phone records don't show any calls

12   between him and his family at the West Indian Day parade.  They

13   show phone records between him and every single person who

14   participated in this conspiracy.  Man, that's unlucky.  Then

15   when the police go to arrest his uncle because they don't know

16   anything about his participation yet.  They find drugs and guns

17   in his room, and they find crack in the pants pocket.  Man,

18   that's unlucky.  But you know what's even more unlucky?  The

19   fact that he wore his uncle's pants when the police came in.

20   That's unlucky.  Ladies and gentlemen, the defendant isn't

21   unlucky.  He's guilty.

22          Now, during the summation, Mr. Pittell suggested to

23   you that the consequences of Mr. Delva's crime are now your

24   responsibility; that because of your jury service, you're now

25   responsibility for the defendant's fate.  That is just wrong.

E9gQdel4                    Rebuttal – Mr. Poscablo

1    OK? Let me emphasize that that is just wrong. The defendant

2    alone is responsible for the consequences of his actions. He

3    is the one that went to the Magenta Street apartment. He's the

4    one that stayed there with Gregory Accilien. He's the one who

5    beat Patrick James with a mop handle. He's the one that had

6    marijuana, money and jewelry as a result of that robbery and

7    kidnapping. He's the one who sold marijuana and crack cocaine

8    with his uncles, and he's the one who owned that gun and that

9    crack. He alone, and not you, he alone is responsible for his

10   actions.

11        Now, in our opening statement, you learned that this

12   wasn't a complicated case; and it's not. Many of the facts

13   indeed are undisputed. The fact of this kidnapping, the fact

14   of this robbery, what happened to Mr. James and Ms. Adams, none

15   of that is in dispute. And the trial wasn't going to be

16   lengthy and it hasn't been. It has been quick and efficient,

17   and we appreciate the attention you've brought to it because

18   every case is important no matter how long it lasts.

19        On behalf of the United States Attorney's office and

20   my colleagues at this table, I'd like to thank you for your

21   willingness to serve on this jury, for the obvious seriousness

22   with which you've taken this deed, for your close and careful

23   attention that you paid throughout this case. And because of

24   the careful attention that you've paid over the last few days,

25   the defendant David Delva had a fair trial. He had his day in

E9gQdel4                        Rebuttal - Mr. Poscablo

1    court.

2              Now it's time for you to do your duty.  Go back to

3    that jury room and decide this case based on the principles

4    that Judge Forrest explained to you at the start of this trial.

5    Decide this case without fear, without prejudice, and without

6    sympathy.  Decide this case based on the evidence you've seen

7    and you've heard.  But now that you've seen and heard all of

8    this evidence, it's clear that this isn't a close case.  Use

9    your common sense.  The evidence of guilt is overwhelming, and

10   as Ms. Geraci pointed out to you, much of it is undisputed.

11             At the end of the day, all of this evidence points to

12   only one outcome, that David Delva, the defendant, is guilty

13   beyond a reasonable doubt of all of the counts in the

14   indictment.

15             Thank you.

16             THE COURT:  Thank you, Mr. Poscablo.

17             Ladies and gentlemen, we are now at point where I am

18   going to start giving you the jury instructions.  Are you OK to

19   sit here 20 minutes while I start or do you need a break?

20   You're OK.

21             So what we will do is I am going to start.  I will

22   give you the first instructions before you get your copy.  What

23   we're going to do is you'll get a copy when we get to the

24   actual counts.  So you saw in the closings that the attorneys

25   went through some of the charges.  Those are the counts.  First

1     I'm going to give you some preliminary instructions, and we

2     will hand you a copy of the instructions before I get to the

3     next section which will be right after lunch.

4              Then after that, you will have a chance to start your

5     deliberations today.  While these instructions are long, they

6     are not going to take up the entire afternoon, I can assure

7     you.

8              Now, the instructions themselves, this document I'm

9     holding up, you're each going to get a copy of it, as I said.

10    There is a handy table of contents in the front, which is a

11    couple pages, and it lists everything I'm going through so you

12    can turn to it.  So if you want to know about how to think

13    about credibility of witnesses, it will be there.  We are going

14    to go through it, but you can turn to it and turn back to it

15    later on if you want.  If you are trying to remember the

16    elements of a felon in possession, you will be able to turn

17    back to it if you would like.

18             While I am going to go through these instructions, and

19    you're going to have a copy, it's my statement, it's what I

20    tell you orally that controls.  Every once in awhile while I'm

21    going through the instructions, there will be a difference

22    between what I say and what's written on the page.  It's

23    usually relatively minor, but it's what I say that controls.

24    So, I want you to listen and hear what I'm saying.  All right?

25    We're going to go through these one by one.

1              Now, you've heard all of the evidence in this case, as

2     well as the final arguments of the lawyers for the parties.  My

3     duty at this point is to instruct you on the law.  It is your

4     duty to accept these instructions of law and to apply them to

5     the facts as you determine the facts.  On these legal matters,

6     you must take the law as I give it to you, regardless of any

7     opinion that you may have as to what the law may be or ought to

8     be.  It would violate your sworn duty to base a verdict upon

9     any other view of the law than that which I give to you.  If an

10    attorney has stated a legal principle different from any that I

11    state to you in my instructions, it's my instructions that

12    control.

13             You should not single out any instruction alone as

14    stating the law, but you should consider my instructions as a

15    whole when you retire to deliberate in the jury room.  And

16    you're going to be able to take a copy of these in there with

17    you.

18             Now, your role, ladies and gentlemen of the jury, is

19    to pass upon and decide the issues of fact in this case.  You,

20    the members of the jury, are the sole and the exclusive judges

21    of the facts.  You pass upon the weight of the evidence.  You

22    determine the credibility of witnesses.  You resolve such

23    conflicts as there may be in testimony, and you draw whatever

24    reasonable inferences you decide to draw from the facts as you

25    have determined them.

1          The evidence before you consists of the answers given

2     by witnesses and the exhibits and stipulations that were

3     received into evidence.  In determining the facts, you must

4     rely upon your own recollection of the facts.  I will instruct

5     you at the end of the charge about your ability to have

6     testimony read back, and as I mentioned before, you will have

7     access to all of the exhibits whether they're in the jury room

8     with you or things that you can request from out here.

9          Now, what the lawyers have said their opening

10    statements, in objections, and in their questions, and what

11    they may have said in their closing arguments is not evidence.

12    You should bear in mind particularly that a question put to a

13    witness is never evidence.  Only the answer is evidence.  If a

14    witness affirms a particular fact in a question by answering

15    yes, you may consider that fact as agreed upon by the witness.

16    The weight that you give to that fact is up to you.

17          Nor are you to substitute anything that I may have

18    said during the trial or during these instructions with respect

19    to the facts for your own independent recollection.  What I say

20    is not evidence.  If I have sustained an objection to a

21    question or stricken testimony, any stricken answers given by a

22    witness are no longer part of the evidence in this case, and

23    you may not consider them.

24          You should draw no inference or conclusion for or

25    against any party because of lawyers' objections.  Counsel have

1   not only the right, but the duty, to make legal objections when

2   they think that such objections are appropriate.

3          Also, do not draw any inference from any of my

4   rulings.  The rulings I have made during a trial are not any

5   indication of my views of what your decision should be as to

6   whether or not the government has proven the defendant guilty

7   beyond a reasonable doubt of the crimes charged.  You should

8   draw no inference or conclusion of any kind, favorable or

9   unfavorable, with respect to any witness or any party of the

10  case because of any comment, question or instruction of mine.

11         Now, your verdict must be based solely upon the

12  evidence or the lack of evidence in this case.  It would be

13  improper for you to consider any personal feelings you may have

14  about the defendant's race, ethnicity or national origin.  It

15  would be equally improper for you to allow any feelings that

16  you have about the nature of the crimes charged to interfere

17  with your decision-making process.

18         I also want to remind you that before each of you was

19  accepted and sworn to act as a juror, you were asked questions

20  regarding competency, qualifications, fairness and freedom from

21  prejudice or bias.  On the faith of those answers, you were

22  accepted as jurors by the parties.  Therefore, those answers

23  are as binding on each of you now as they were then, and they

24  will remain so until the jury is discharged from consideration

25  of this case.

E9gQdel4                              Charge

1          Now, the fact that a prosecution is brought in the

2    name of the United States of America entitles the government to

3    no greater consideration than that given to any other party to

4    a litigation.  By the same token, the government is entitled to

5    no less consideration.

6          Now, as you've heard, the defendant has pled not

7    guilty to each of the charges in the indictment.  As a result,

8    the burden is on the defendant to prove the defendant's guilt

9    beyond a reasonable doubt as to each charge.  This burden never

10   shifts to the defendant for the simple reason that the law

11   never imposes upon a defendant in a criminal case the burden or

12   duty in testifying or calling any witness or locating or

13   producing any evidence.

14         The law presumes a defendant to be innocent of the

15   charges.  This presumption was with the defendant when the

16   trial began and remains with the defendant unless and until you

17   are convinced that the government has proven the defendant's

18   guilt beyond a reasonable doubt.

19         The question naturally arises:  What is reasonable

20   doubt?  What does that phrase mean?  The words almost define

21   themselves.  A reasonable doubt is a doubt based in reason and

22   arising out of the evidence in this case, or the lack of

23   evidence.  It is a doubt that a reasonable person has after

24   carefully weighing all of the evidence in the case.

25         Reasonable doubt is a doubt that appeals to your

E9gQdel4                      Charge

1    reason, your judgment, your experience, and common sense.  If,

2    after a fair and impartial consideration of all of the

3    evidence, you can candidly and honestly say that you are not

4    satisfied with the guilt of the defendant you are considering,

5    that you do not have an abiding and firm belief of that

6    defendant's guilt; in other words, if you have such a doubt as

7    would reasonably cause a prudent person to hesitate in acting

8    in matters of importance in his or her own affairs, then you

9    have a reasonable doubt, and in that circumstance, it is your

10   duty to find the defendant not guilty.

11            On the other hand, if, after a fair and impartial

12   consideration of all of the evidence, you can candidly and

13   honestly say that you do have an abiding belief of the

14   defendant's guilt, such a belief as a prudent person would not

15   hesitate to rely upon in important matters in the personal

16   affairs of his or her own life, then you have no reasonable

17   doubt, and under such circumstances, it is your duty to find

18   the defendant guilty.

19            One final word on this subject:  Reasonable doubt is

20   not whim and it is not speculation.  It is not an excuse to

21   avoid the performance of an unpleasant duty.  Nor is it

22   sympathy for the defendant you are considering.  Beyond a

23   reasonable doubt does not mean a positive certainty.  It does

24   not mean beyond all possible doubt.  After all, it is virtually

25   impossible for a person to be absolutely and completely

1   convinced of any contested fact that by its nature is not

2   subject to mathematical proof and certainty.  As a result, the

3   law in a criminal case is that it is sufficient if the guilt of

4   the defendant is established beyond a reasonable doubt, not

5   beyond all possible doubt.

6          Now, the defendant here, David Delva, had been

7   formally charged in what you have heard referred to as an

8   indictment.  As I instructed you at the outset of trial, the

9   indictment is simply an accusation.  It is no more than the

10  means by which a criminal case is started.  It is not evidence.

11  It is not proof of the defendant's guilt.  It creates no

12  presumption and it permits no inference that the defendant is

13  guilty of the crimes charged.

14         You are to give no weight to the fact that an

15  indictment had been returned against the defendant.

16         I will not read the entire indictment to you at this

17  time.  You are going to have a copy of the indictment with you

18  in the jury room, and you will have the opportunity to read it

19  in its entirety if you choose to do so.  In a moment, I am

20  going to summarize the indictment for you, and then I am going

21  to go in detail through each of the elements of the crime

22  charged.

23         First, I want to talk to you about direct and

24  circumstantial evidence.  As I said to you at the very outset

25  of the case, there are two types of evidence that you may use

1   in reaching your verdict.  One type is direct evidence.  One

2   kind of direct evidence is a witness's testimony about

3   something that he or she knows by virtue of his or her own

4   senses -- something that the witness has seen, touched,

5   smelled, heard.  Direct may also be in the form of an exhibit.

6           The other type of evidence is circumstantial evidence.

7   Circumstantial evidence is evidence that tends to prove one

8   fact by proof of other facts.  By way of example, if you wake

9   up in the morning and see that the sidewalk is wet, you may

10   find from that fact that it rained during the night.  However,

11   other evidence, such as a turned on garden hose may also

12   explain the water on the sidewalk.  Therefore, before you

13   decide that a fact has been proven by circumstantial evidence,

14   you must consider all the evidence in the light of reason,

15   experience, and common sense.

16           That is all there is to circumstantial evidence.  You

17   infer based on your reason, experience and common sense from an

18   established fact the existence or the nonexistence of some

19   other fact.

20           Let me give you another example.  Let's imagine that

21   you're on a deserted island, and you've been alone there for

22   five years.  One day, you see footprints in the sand, human

23   footprints, of a size that is bigger than your own.  You

24   haven't seen a person, but based on the footprints, you are

25   able to put two and two together and determine that you are no

1    longer alone.  Someone else is now on the island with you.

2    That deduction on your part is based on circumstantial

3    evidence, and it constitutes your determination of a fact.

4         Many facts, such as a person's state of mind, can

5    rarely be proven by direct evidence.  Circumstantial evidence

6    is of no less value than direct evidence.  It is a general rule

7    that the law makes no distinction between direct and

8    circumstantial evidence but simply requires that before

9    convicting the defendant, you, the jury, must be satisfied of

10   the defendant's guilt beyond a reasonable doubt from all of the

11   evidence in the case.

12        Now, let's talk about inferences.  You've heard people

13   use the word inference.  You should draw this inference or draw

14   that inference.  For instance, in closing arguments, the

15   attorneys ask you to infer based on your reason, experience,

16   and common sense from one or more established fact the

17   existence of another fact.  Now, I've instructed you on

18   circumstantial evidence, and that involves inferring a fact

19   based on other facts, your reason, and common sense.

20        So, what is an inference?  What is the mean to infer

21   something?  An inference is not a suspicion or a guess.  It is

22   a reasoned, logical decision to conclude that a disputed fact

23   exists based on another fact that you know exists.

24        There are times when different inferences may be drawn

25   from facts, whether proven by direct or circumstantial

 1   evidence.  The government asks you to draw one set of

 2   inferences, while the defense asks you to draw another.  It is

 3   for you, and you alone, to decide what inferences you will

 4   draw.

 5         The process of drawing inferences from facts in

 6   evidence is not a matter of guesswork or speculation.  An

 7   inference is a deduction or conclusion that you, the jury, are

 8   permitted, but not required, to draw from the facts that have

 9   been established by either direct or circumstantial evidence.

10   In drawing inferences, you should exercise your common sense.

11         Therefore, while you are considering the evidence

12   presented to you, you may draw from the facts that you find to

13   be proven such reasonable inferences as you would be justified

14   in light of your experience.  Let me repeat that sentence.  I

15   put in the word "you."  It doesn't belong there.

16         Therefore, while your considering the evidence

17   presented to you, you may draw, from the facts that you find to

18   be proven, such reasonable inferences as would be justified in

19   light of your experience.

20         Some inferences, however, are not permissible.  You

21   may not infer the defendant is guilty of participating in

22   criminal conduct merely from the fact that he was present at

23   the time the crime was being committed and had knowledge that

24   it was being committed.  Nor may you use evidence that I

25   instructed you was admitted for a limited purpose for any

1    inference beyond that limited purpose.

2              In addition, you may not infer that the defendant is

3    guilty in participating in criminal conduct merely from the

4    fact that he associated with people who were guilty of

5    wrongdoing or merely because he has or had knowledge of the

6    wrongdoing of others.

7              Here again, let me remind you that whether based upon

8    direct or circumstantial evidence, or upon the logical,

9    reasonable inferences drawn from such evidence, you must be

10   satisfied of the guilt of the defendant beyond a reasonable

11   doubt before you may convict the defendant of any of the crimes

12   charged.

13             Now, let's talk about credibility of witnesses.  It's

14   an important subject that relates to the evaluation, your

15   evaluation of testimony.  How do you evaluate the credibility

16   or believability of witnesses?  The answer, as I told you at

17   the very beginning of this case, is that you use your common

18   sense.  Common sense is your greatest asset as a juror.  You

19   should ask yourselves did the witness impress you as honest,

20   open or candid?  Or did the witness appear to be evasive or as

21   though the witness were trying to hide something.  How

22   responsive was the witness to the questions asked on direct

23   examination and on cross-examination?

24             If you find that a witness is intentionally telling a

25   falsehood, that is always a matter of importance that you

1    should weigh carefully.  If you find that any witness has lied

2    under oath at this trial, you should view the testimony of such

3    a witness cautiously and weigh it with great care.  It is,

4    however, for you to decide how much of the witness's testimony

5    if any, you wish to believe.  Few people recall every detail of

6    every event precisely the same way.  A witness may be

7    inaccurate, contradictory or even untruthful in some respects

8    and yet be entirely believable and truthful in other respects.

9    It is for you to determine whether such inconsistencies are

10   significant or inconsequential and whether to accept or reject

11   all or to accept some and reject the balance of any witness.

12           Hold on one second.  Let me finish this instruction.

13           On some occasions during the trial, witnesses were

14   asked to explain an apparent inconsistency between testimony

15   offered at this trial and previous statements made by the

16   witness.  It is for you to determine whether a prior statement

17   was inconsistent, and, if so, how much, if any, weight to give

18   to an inconsistent statement in assessing that witness's

19   credibility at trial.  You may consider evidence of a witness's

20   prior inconsistent statement only insofar as it relates to that

21   witness's credibility.

22           In evaluating the credibility of the witnesses, you

23   should take into account any evidence that the witness would

24   testify may benefit in some way from the outcome of this case.

25   Such an interest if the outcome creates a motive to testify

1    falsely and may sway the witness to testify in a way that

2    advances his own interests.  Therefore, if you find that any

3    witness whose testimony you are considering may have an

4    interest in the outcome of this trial, then you should bear

5    that factor in mind when evaluating credibility of his or her

6    own testimony and accept it with great care.  This is not to

7    suggest that any witness who has an interest in the outcome of

8    the case would testify falsely.  It is for you to decide to

9    what extent, if at all, the witness's interests had affected or

10   colored his or her testimony.

11          You are not required to accept testimony even though

12   the testimony is uncontradicted and the witnesses's testimony

13   is not challenged.  You may decide that because of the

14   witness's bearing or demeanor or because of the inherent

15   improbability of the testimony, or for other reasons sufficient

16   to yourselves, that the testimony is not worthy of belief.  On

17   the other hand, you may find that because of a witness's

18   bearing or demeanor and based upon your consideration of all

19   the other evidence in the case that the witness is being

20   truthful.

21          Thus, there is no magic formula by which you can

22   evaluate testimony.  You bring into this courtroom all your

23   experience.  You determine for yourselves in many circumstances

24   the reliability of statements that are made by others to you

25   and upon which you are asked to rely and act.  You may use the

E9gQdel4                        Charge

 1    same tests here that you use in your everyday lives.  You may

 2    consider the interest of any witness in the outcome of this

 3    case and any bias or prejudice of any witness, and this is true

 4    regardless of who called or questioned the witness.

 5            I am going to do a few more.  Then we are going to

 6    take lunch, all right?  I will now give you a copy of these

 7    instructions.  I am going to ask you to leave them under your

 8    chair until the conclusion of lunch because I haven't gone

 9    through all of them with you.

10            If you'll turn to page 18.

11            Again, you don't have to look at these at all.  They

12    are really just for you, if you want to, to follow along and

13    for you to have in the jury room, but I want you to make sure

14    you listen to me.  So if you've got them in front of you and

15    you're looking at them, make sure you've also got ear on me.

16            Page 18, that's where we are.  We are talking about a

17    defendant's testimony.

18            Now, a defendant in a criminal case does not have a

19    duty to testify or come forward with any evidence.  Under our

20    Constitution, a defendant has no obligation to testify or to

21    present any evidence because it's the government's burden to

22    prove that the defendant is guilty beyond a reasonable doubt.

23    That burden remains with the government throughout the entire

24    trial and never shifts to the defendant.  The defendant is

25    never required to prove that he is innocent.

1          In this case, the defendant, David Delva, chose not to

2     testify.  You must not attach any significance to the fact that

3     the defendant did not testify.  I instruct you that no adverse

4     inference against the defendant may be drawn by you because he

5     did not take the witness stand, and you may not consider it in

6     any way in your deliberations in the jury room.

7          You've heard testimony from law enforcement officials.

8     The fact that a witness may be employed as a law enforcement

9     official does not mean that his or her testimony is necessarily

10    deserving of more or less consideration or greater or lesser

11    weight than that of an ordinary witness.

12         At the same time, it is legitimate for defense counsel

13    to try to attack the credibility of a law enforcement witness.

14    As I have said, it is for you, the fact finders in this case,

15    to determine issues relating to credibility.

16         It is your decision, after reviewing all of the

17    evidence, whether to accept the testimony of the law

18    enforcement witness and to give to that testimony whatever

19    weight, if any, you find that the deserves.

20         Now, you've heard from a witness who testified that he

21    committed crimes.  Let me stay a few things that you may want

22    to consider during your deliberations on the subject of what we

23    call a cooperating witness.

24         Cooperating witness testimony should be given such

25    weight as it deserves in light of the facts and the

circumstances before you, taking into account the witness's

demeanor, candor, the strength and accuracy of the witness's

recollection, the witness's background, and the extent to which

the testimony is or is not corroborated by other evidence in

the case.  You may consider whether the cooperating witness,

like any other witness called in this case, had an interest in

the outcome of the case; and, if so, whether it had affected

his or other testimony.

You've also heard testimony about cooperation

agreements between the government and cooperating witness.  I

must caution you that it is no concern of yours why the

government made an agreement with a witness.  However, the

existence of agreement itself and its effect on the witness may

be considered by you in determining credibility.  Your sole

concern is whether a witness has given truthful testimony here

in this courtroom before you.

In evaluating the testimony of cooperating witnesses,

you should ask yourself whether the cooperating witness would

benefit more by lying or by telling truth.  Was his testimony

made up in any way because he believed or hoped that he would

somehow receive favorable treatment by testifying falsely?  Or

did he believe that his interest would be best served by

testifying truthfully?  If you believe that the witness was

motivated by hopes of personal gain, was the motivation one

which would cause him to lie, or was it one which would cause

1  him to tell the truth?  Did this motivation color his

2  testimony?

3          If you find that the testimony was false, you should

4  reject it.  However, if, after a cautious and careful

5  examination of the cooperating witness's testimony and demeanor

6  upon the witness stand, you are satisfied that the witness told

7  the truth, you should accept it as credible and act upon it

8  accordingly.

9          As with any witness, let me emphasize that the issue

10 of credibility need not be decided in an all-or-nothing

11 fashion.  Even if you find that a witness testified falsely in

12 one part, you may still accept his or her testimony in other

13 parts or may disregard all of it.  That is a determination

14 entirely for you, the jury.

15         You have also heard testimony that the cooperating

16 witness pled guilty to charges arising out of the same facts

17 that are at issue in this case .  You are instructed that you

18 are to draw no conclusions or inferences of any kind about the

19 guilt of the defendant on trial from the fact that a government

20 witness pled guilty to similar charges.  The decision of that

21 witness to plead guilty was a personal decision that witness

22 made about his own guilt.  It may not be used by you in any way

23 as evidence against or unfavorable to the defendant here on

24 trial.

25         We have a couple more pages.  Is that OK?  Are you all

E9gQdel4                          Charge

1    right?

2              Persons not on trial.  Page 22 if you are following

3    along.

4              You may not draw any inference, favorable or

5    unfavorable, towards the government or the defendant on trial

6    from the fact that certain persons were not named as a

7    defendant in the indictment.  The fact that these persons are

8    not on trial here must play no part in your deliberations.

9              Whether a person should be named as a co-conspirator

10   or indicted as a defendant in this matter is within the sole

11   discretion of the U.S. Attorney's office and the grand jury.

12   Therefore, you may not consider it in any way in reaching your

13   verdict as to the defendant here on trial.

14             You have also heard evidence during the trial that

15   witnesses have discussed the facts of the case and their

16   testimony with the government lawyers or with his own lawyer

17   before the witness appeared in court.

18             Although you may consider that fact when you are

19   evaluating a witness's credibility, I instruct you that there

20   is nothing unusual or inherently improper about a witness

21   meeting with his lawyers or the government lawyers before

22   testifying so that the witness can be aware of the subject he

23   or she will be questioned about, focus on those subjects and

24   have the opportunity to review relevant exhibits before being

25   questioned about them.  Such consultation helps conserve your

E9gQdel4                         Charge

1    time and the Court's time.  In fact, it would be unusual for a

2    lawyer to call a witness without such constitutions.

3            The weight you give to the fact or the nature of the

4    witness's preparation for his or her testimony and what

5    inferences you draw from such preparation are matters

6    completely within your, the jury's, discretion.

7            Now, you have heard reference through the questioning

8    to the fact that certain investigative techniques were used by

9    the government.  There is no legal requirement, however, that

10   the government prove its case through any particular means.

11   While you are to carefully consider the evidence adduced by the

12   government, you are not to speculate as to why law enforcement

13   authorities used the techniques that they did.

14           Your concern is whether or not, on the evidence or

15   lack of evidence, the defendant's guilt has been proven beyond

16   a reasonable doubt.

17           You have heard tape-recordings and telephone

18   conversations.  There is nothing illegal about the government's

19   use of recordings in this case, and you may consider the

20   conversations contained on tape-recording along with all the

21   other evidence in this case.  Whether you approve or disapprove

22   of the interception and recording of these conversations may

23   not enter into your deliberations.

24           You must, therefore, regardless of any personal

25   opinion, give this evidence full consideration along with all

1    the other evidence in the case in determining whether the

2    government has proven beyond a reasonable doubt the guilt of

3    the defendant.

4           The parties have shown you a typed transcript of the

5    audio recording.  The recordings themselves, that's what's

6    evidence, as we talked about when it was played.  The

7    transcript is not evidence.  It was provided to you as an aid

8    to assist you in listening to the recordings.  As you may

9    recall, as the recordings were played, I advised you to listen

10   carefully to the recording themselves.  You alone will make

11   your own interpretation of what you heard on those recordings.

12   If you think you heard something different than what was typed

13   on the transcript, then what you heard is controlling.

14          We are going to go through page 28.

15          Now, expert testimony.  You heard testimony from what

16   we call expert witnesses.  Such a witness is permitted to

17   express his or her opinions on matters about which he or she

18   has specialized knowledge or training.  The parties present

19   expert testimony to you on the theory that someone who is

20   experienced in the field can assist you in understanding the

21   evidence or in reaching an independent decision on the facts.

22          In weighing an expert's testimony, you may consider

23   the expert's qualifications, his or her opinions, and his or

24   her reasons for testifying, as well as all the other

25   considerations that ordinarily apply, including all the

1    evidence in the case.  You may give expert testimony whatever

2    weight, if any, that you find that it deserves in light of all

3    of the evidence in the case.  However, you should not accept

4    witness testimony simply because the witness is an expert.  Nor

5    should you substitute such testimony for your own reason,

6    judgment, and common sense.  The determination of the facts in

7    this case rests solely with you.

8              Now, you heard evidence in the form of what are called

9    stipulations.  A stipulation of fact is an agreement among the

10   parties that a certain fact is true.  You should regard such

11   agreed facts as true.

12             A stipulation of testimony is an agreement among the

13   parties that if called as a witness, a witness may give certain

14   testimony.  You must accept as true the fact the witness would

15   have given the testimony.  However, it is for you to determine

16   the effect or weight given to that testimony.

17             You have heard the names of several people during the

18   course of the trial who did not appear here to testify, and one

19   or more of the attorneys may have referred to their absence.  I

20   instruct you that each party had an opportunity, or lack of

21   opportunity, to call any of these witnesses.  However, the

22   government bears the burden of proof.  The defendant does not

23   bear the burden of proof.  Therefore, you should not draw any

24   inference or reach any conclusion as to what these persons

25   would have testified to had they been called.  Their absence

E9gQdel4                          Charge

1    should not affect your judgment in any way.

2              You should, however, remember my instruction that the

3    law does not impose on the defendant in a criminal case the

4    burden or duty of calling any witnesses or producing any

5    evidence.

6              We are going to go into the charges next.  While it is

7    still a big chunk of pages here, several of them refer back to

8    charges we are going to go through.  So we actually only go

9    through them once and then there are a couple places where I

10   "as I told you."  So, it will go faster, I hope, than it looks.

11             So I am going to ask you to take lunch now.  We will

12   come back right at 2:00, and we will continue.  You can't talk

13   to each other about this case yet.  You are not yet fully

14   charged, and I haven't yet sent you into the room and said,

15   "now you can talk."  It will be so clear to you when it is time

16   for you to talk.  Until then, you must not talk to each other

17   or anybody else about the case.  Thank you.  We'll see you

18   right at 2:00.  Please leave your instructions here under your

19   chair.

20             (Jury recessed)

21             (Continued on next page)

22

23

24

25

1          (Jury not present)

2          Ladies and gentlemen, let's all be seated.

3          Counsel, is there anything up to where I am now in the

4    jury instruction that you would like to raise me with me?

5          MR. POSCABLO:  Judge, I didn't hear it, but colleagues

6    at my table did.  On page 7, your Honor might have said in the

7    second line, "As a result, the burden is on the defendant to

8    prove the defendant's guilt."  If the transcript says that you

9    didn't, then --

10         THE COURT:  I am happy to go back to that.  I think

11   that they have heard this instruction that a defendant does not

12   bear the burden of proof I think numerous, numerous times, but

13   I will go back and ensure that that wording is accurate.

14         MR. POSCABLO:  And nothing else from the government,

15   your Honor.

16         THE COURT:  Mr. Pittell, from your aside?

17         MR. PITTELL:  Your Honor, if you want to hear an

18   aside, I actually heard you talk about credibility of law

19   enforcement witnesses.  I think this may be the first case

20   where I didn't attack the credibility of law enforcement

21   witnesses.  I'm just making it as a comment.  There is no

22   objection.  I don't think we need to have an instruction.

23         THE COURT:  Is there anything else that we need to go

24   over right now before we take our own break?

25         MR. POSCABLO:  Judge, we have prepared a new revised

E9gQdel4                         Charge

1    indictment which takes out language "powder cocaine" from Count

2    Six.  We will forward that to your Honor's chambers as soon as

3    we get downstairs.

4              THE COURT:  Let me remind you folks that as soon as

5    the jury is charged, which will be about 3:30, I would think is

6    when we will be done, the exhibits will go at that moment

7    rolled into the room.  So make sure you folks have agreed on

8    what belongs in that cart, including both Defense Exhibits and

9    Government Exhibits and what does not belong in that cart, if

10   things were not introduced.  Of course, certain physical

11   exhibits can stay out here and certain physical exhibits can go

12   back.

13             If there are any issues, you can raise them with me.

14   Does anybody participate any issues on any of that?

15             MR. PITTELL:  No.  I think we know what doesn't go in.

16             THE COURT:  Terrific.  So you guys will get the cart

17   ready is my point.  I know I am belaboring this, but I've told

18   you, I had my experience where it was like an hour and a half

19   before it went in there.  And it wasn't a case where I was

20   convinced the jury would take more than an hour and a half, so

21   I really wanted the exhibits back there because I had promised

22   them the cart.  It did get back there.  I just want to make

23   sure you use your time during lunch to do that.

24             (Lunch recess)

25             (Continued on next page)

                          AFTERNOON SESSION

                            2:00 p.m.


             THE COURT:  All right.  Let's bring out the jury.

             (Jury present)

             THE COURT:  All right.  Ladies and gentlemen, let's
all be seated.

             All right.  We're picking up on page 29.  Before I get
there, I just also wanted to make sure I had read a particular
part of the instructions correctly.  On page seven where we
have gone over this about the presumption of innocence and
burden of proof that the burden is always on the government to
prove the defendant's guilt beyond a reasonable doubt.  I may
have used the word "defendant" inadvertently there but, of
course, as you have heard it's the government's burden
throughout the case.

             All right.  We're on page 29 and we are going through
the indictment in a summary of the indictment first.  The
defendant, as we've said that David Delva has been formally
charged in an indictment and as instructed at the outset the
indictment is just an accusation.  It's not in evidence and
there are eight counts here and you will deliberate
individually as a group.  You'll look at each of the eight
counts individually.  And you are going to have a copy of the
indictment with you in the jury room.  I am just going to give

1    you a brief summary now.

2            Count One charges Mr. Delva with conspiring with

3    others it to commit a robbery.  And the conspiracy that he is

4    charged with is alleged to have  existed in September of 2012.

5            Count Two charges the defendant with committing a

6    robbery in September of 2012.

7            Count Three charges the defendant with conspiring to

8    commit a kidnapping in September of 2012.

9            Count Four charged the defendant with committing a

10   kidnapping in September of 2012.

11           Count Five charges the defendant with during and in

12   relation to the September 2012 robbery offenses and the

13   September 2012 kidnapping offenses.  The use, carrying and

14   possession of firearms or having aided and abetted the use,

15   carrying and possession of firearms which were brandished.

16           Count Six charges the defendant with conspiracy to

17   distribute or possess with the intent to distribute narcotics,

18   specifically, crack cocaine and marijuana.  So crack cocaine

19   when that's used together just means what we commonly refer to

20   as crack.

21           Count seven charges that the defendant during an

22   relation to the drug tracking offense used, carried and

23   possessed a firearm or aided and abetted the use, carrying and

24   possession of a firearm.

25           Count Eight charges the defendant with the unlawful

1    possession of a firearm and ammunition which has moved in

2    interstate commerce by someone who has been convicted of a

3    felony offense.

4          Now I just indicated the indictment contains eight

5    counts.  Each count constitutes a separate offense and crime

6    and you must consider each count of the indictment separately

7    and you must return a separate verdict on each count.  And the

8    verdict form will list each of the individual counts

9    separately.

10         Count One is a conspiracy to commit robbery.  And I am

11   going to go through an overview of the elements.  It charges

12   the defendant with participating in a conspiracy to commit

13   robbery.  You are going to have a copy of indictment as I told

14   you.  There are three conspiracies charged in the indictment.

15   Counts One, Three and Four all charge conspiracies.  The

16   Court's general instructions regarding how you determine if a

17   conspiracy existed and the defendant's role in it, if any, are

18   the same for all three counts and I'm going to refer back to

19   these instructions in the other counts as well.

20         Count One.  In order to find the defendant guilty of

21   this count you must find that the government has proven beyond

22   a reasonable doubt the following three elements:

23         First, that the conspiracy charged in the indictment

24   existed.  That is, an agreement or understanding between two or

25   more persons existed in or about September 2012, to achieve

1    some unlawful end.  That is to do something.  The unlawful end

2    is called the object of the conspiracy.  Every conspiracy must

3    have one or more objects or goals.  In Count One the object

4    charged is that the defendant and others intentionally and

5    knowingly agreed to rob an individual they believed to be in

6    possession of the drugs and drug proceeds.

7         Therefore, the first question for you at first is did

8    the conspiracy alleged in the indictment exist?  Was there such

9    a conspiracy?

10        Second, the government must prove beyond a reasonable

11   doubt that the defendant intentionally and knowingly became a

12   member of the conspiracy charged.  That is, that he knowingly

13   participated in the conspiracy to commit robbery with knowledge

14   of its object and with an intent to further the aims of

15   conspiracy.

16        Third, that interstate or international commerce or

17   any item moving in interstate or international commerce was or

18   could have been delayed, obstructed or affected in any way or

19   degree if the robbery had been completed.

20        Before I explain the elements of conspiracy in greater

21   detail, let me make one point.  In considering a conspiracy

22   charge you do not have to find that the actual substantive

23   crimes that the object of the conspiracy has been committed.

24   Here, an actual robbery.  It is the agreement itself in a

25   conspiracy charge the agreement with others to commit the crime

 1    along with the other elements of the conspiracy that the law

 2    forbids and defines as a crime.

 3          How do you determine whether a conspiracy existed?

 4    Simply defined, a conspiracy is an agreement by two or more

 5    people to violate the law.  A conspiracy has sometimes been

 6    called a partnership for criminal purposes in which each

 7    partner becomes the agent of every other partner.

 8          To establish the existence of a conspiracy however,

 9    the government is not required to show that two or more people

10    sat around a table an entered into a formal contract.  Indeed,

11    it would be extraordinary if there was such a formal document

12    or a specific agreement.  From its very nature a conspiracy is

13    also almost characterized by secrecy and concealment.  It is

14    sufficient if two or more persons in any manner, whether they

15    say so directly or not, come to a common understanding to

16    violate the law.  Express language or specific words or are not

17    required to indicate agreement to or membership in a

18    conspiracy.

19          It is not necessary that a conspiracy actually succeed

20    in its purpose for you to conclude that it existed.  If a

21    conspiracy exists, even if should fail in its purpose it is

22    still a crime.  In determining whether there has been an

23    unlawful agreement, you may judge the acts and conduct of the

24    allege members of the conspiracy that are done to carry out an

25    apparent criminal purpose.  The adage "actions speak louder

1    than words" is applicable here.

2          If upon consideration of all the evidence, directed

3    and circumstantial, you find beyond a reasonable doubt that the

4    minds of two or more of the conspirators met, we sometimes call

5    it a meeting of the minds, that is if they agreed and as I

6    explained, a conspiratorial agreement to you to work together

7    in furtherance of the unlawful scheme alleged in the indictment

8    then proof of the existence of the conspiracy is established.

9          Let's talk about the object of the conspiracy.  As I

10   said in order to find the defendant guilty of the conspiracy

11   charged in the indictment you must find that the government has

12   also met its burden of proof with respect to what it has

13   charged or asserted was the object or goal of the conspiracy.

14   Put another way, what did the conspirators want to achieve?

15   What was their unlawful end?

16         In Count One the defendant is charged with conspiring

17   with others in or about September 2012 to commit a robbery.

18   Robbery is then alleged to be the object.  So you need to

19   determine whether the defendant conspired to commit a robbery.

20   Later, you will hear me refer back to this same instruction

21   when I refer to the substantive robbery count.

22         We have all heard the word "robbery".  But how is a

23   robbery actually defined under the law?  A robbery is the

24   unlawful taking of personal property from another against his

25   or her will.  This is done by threatening or actually using

1   force, violence or fear of injury, immediately or in the future

2   to person or property.

3           In order to find that the defendant conspired to

4   commit a robbery, you must find that the government proved

5   beyond a reasonable doubt that the defendant participated in a

6   conspiracy to obtain or take the personal property of another,

7   or from the presence of another or attempted to do so.

8           Two, against the intended victim's will by actual or

9   threatened force, violence or fear of injuries, whether

10  immediate or in the future.

11          Three, that had the robbery occurred the defendant's

12  action would have in any way or degree obstructed, delayed or

13  affected interstate commerce.

14          I will explain these elements of robbery to you in

15  greater detail a moment in connection with Count Two, the

16  specific offense of robbery as charged in the indictment.

17          Let's talk about participating in a conspiracy.

18          If you find beyond a reasonable doubt that the

19  conspiracy charged in Count One of the indictment existed you

20  must then determine whether the defendant intentionally and

21  knowingly became a member of the conspiracy.

22          You must determine not only whether the defendant

23  participated in the conspiracy but also whether he did so

24  intentionally and knowingly.  That is, did he participate in

25  the conspiracy with knowledge of its unlawful purpose and with

1   the specific intention of furthering the objective of that

2   conspiracy?

3           Knowledge is a matter of inference from facts proved.

4   A person acts intentionally and knowingly if he acts purposely

5   and deliberately and not because of mistake or accident or mere

6   negligence or other innocent reason.  That is, the acts must be

7   the product of a defendant's conscious objective.

8           If you find that the conspiracy existed, that is the

9   element we discussed a few moment ago and the defendant

10  participated intentionally and knowingly in it, the extent of

11  the defendant's participation has no bearing on whether or not

12  he is guilty.  The fact that a defendant's participation in a

13  conspiracy was more limited than that of another co-conspirator

14  should not affect your verdict.

15          Ultimately, the question is this, has the government

16  proven beyond a reasonable doubt that the defendant joined the

17  conspiracy charged in the count you are considering that he

18  intentionally and knowingly participated in it with the

19  awareness of its purpose as something he wished to bring about?

20          As I have said, the extent of the defendant's

21  participation in the conspiracy charged in the indictment has

22  no bearing on the issue of the defendant's guilt.  He need not

23  have joined the conspiracy at the outset.  But he must at some

24  point during its progress have joined the conspiracy with

25  knowledge as to its general scope and purpose.

1      If he did join with such knowledge at any time while

2  it was in progress he may still be held responsible for all

3  that was done before he joined and all that was done during the

4  conspiracy's existence while he was a member.  Indeed, each

5  member of the conspiracy may perform separate and distinct acts

6  and may perform them at different times.  Some conspirators

7  play major roles while others play minor parts in the scheme.

8  An equal role not what the law requires.  In fact, even a

9  single act may be sufficient to draw the defendant within the

10  ambit of the conspiracy.

11      I want to caution you however, that the defendant's

12  mere presence at the scene of an alleged crime does not by

13  itself make him a member of the conspiracy.  Similarly, peer

14  association with or one or more members of a conspiracy even

15  coupled with knowledge that such other person is acting

16  unlawfully does not automatically make the defendant a member.

17  A person may know be related to or be friendly with a

18  conspirator without being a conspirator himself.  Mere

19  similarity of conduct or the fact that the defendant may have

20  assemble together with others and discussed common aims and

21  interests does not necessarily establish proof of the existence

22  of a conspiracy.

23      I also want to caution you that mere knowledge or

24  acquiescence without participation in the unlawful plan is not

25  sufficient.  Moreover, the fact that the acts of the defendant

1    without knowledge merely happen to further the purposes or

2    objectives of the conspiracy does not make the defendant a

3    member.  More is required under the law.  What is necessary is

4    that the defendant must have participated with knowledge of at

5    least some of the purposes or objectives of the conspiracy and

6    with the intention of aiding in the accomplishment of those

7    unlawful ends.

8         In sum, you must decide that with an understanding of

9    the unlawful character of the conspiracy the defendant

10   intentionally engaged, advised or assisted in the conspiracy

11   for the purpose of furthering the illegal undertaking.  If you

12   make this determine, the defendant thereby became a knowing and

13   willing participate in the unlawful agreement, that is to say a

14   conspirator.

15        Now I want to talk with you about liability for acts

16   and declarations of co-conspirators.  The Counts One, Three and

17   Six involve conspiracy charges so these instructions apply to

18   all those counts.  When people enter into a conspiracy to

19   accomplish an unlawful end each and every member becomes an

20   agent for the other conspirators in carrying out the

21   conspiracy.  Accordingly, the reasonably foreseeable acts,

22   declarations, statements and omissions of any member of the

23   conspiracy and in furtherance of the common purpose of the

24   conspiracy are deemed under the law to be the acts of all the

25   members and all of the members are responsible for such acts

1    declarations, statements and omissions.

2              If you find beyond a reasonable doubt that the

3    defendant was a member of the conspiracy charged in the

4    indictment, then any acts done or statements made in

5    furtherance of the conspiracy by persons also found by you to

6    have been members of that conspiracy may be considered against

7    the defendant.  This is so even if such acts were done and

8    statements were made in the defendant's absence and without his

9    knowledge.

10             However, before you may consider the statements or

11   acts of a co-conspirator in deciding the issue of the

12   defendant's guilt you must first determine that the acts and

13   statements were made during the existence and in furtherance of

14   the unlawful scheme.  If the acts were done or the statements

15   made by someone whom you do not find to have been a member of

16   the conspiracy or if they were not done or said in furtherance

17   of the conspiracy, they may be considered by you as evidence

18   only against the member who said or did them.

19             The third element the government must prove beyond a

20   reasonable doubt is that if the conspiracy to commit robbery

21   was or had been completed interstate or international commerce

22   was or would have been affected in some way, even if the effect

23   is or would have been slight.  In this regard, I want to

24   instruct you that the statutory language specifically forbids a

25   robbery that in any way or degree obstructs, delays or effects

1    commerce or the movement of any article or commodity in

2    commerce.  Such a robbery need only effect interstate or

3    international commerce in some way or degree even if the effect

4    is minimal.

5         The requirement of showing an effect on interstate

6    commerce involves only a minimal burden of proving a connection

7    to interstate or foreign commerce and is satisfied by conduct

8    that affects commerce in any way or degree.  For example, if

9    the object of a robbery was items which traveled in or went

10   through interstate commerce that would be a sufficient effect

11   on interstate commerce.  Even a potential or subtle affect on

12   commerce will suffice.

13        Let me give you some real world examples of affecting

14   interstate commerce.  If I order a book on Amazon.com and that

15   book is made in Washington state, shipped to Amazon's warehouse

16   in Minnesota, then shipped to me in New York.  That would be

17   affecting interstate commerce.  The book is traveling through

18   various states in commerce.

19        If two people conspire to steal bananas shipped into

20   New York from the Caribbean they're conspiring to affect

21   interstate commerce because the bananas travel in interstate

22   commerce.

23        The statute is not limited to conduct that directly

24   and immediately obstructs the movement of goods nor is it

25   necessary that commerce actually be affected by the defendant's

1   conduct.  It is sufficient if the robbery or the conspiracy to

2   commit a robbery possibly or potentially affected interstate

3   commerce.  It is not necessary for you to find that the

4   defendant intended or anticipated or even knew that his own

5   acts or the act of his co-conspirators would affect interstate

6   commerce.  All that is necessary is that the natural

7   consequence of the acts they conspired to commit would either

8   actually or potentially affect interstate commerce.  Nor do you

9   have to decide whether the affect on interstate commerce was or

10  would have been harmful or beneficial to a particular business

11  or to commerce in general.  The government satisfies its burden

12  of proving an effect on commerce if it proves beyond a

13  reasonable doubt any effect whether harmful or not.

14          Also, the commerce affected or potentially affected

15  need not be lawful.  Activities affecting or potentially

16  affecting unlawful interstate commerce such as trafficking in

17  drugs fall within the purview of this statute.  If you find

18  beyond a reasonable doubt that the target of a robbery

19  purchased or sold goods that flowed in interstate commerce and

20  that the money and items that the defendant con spired to rob

21  were those goods or the proceeds of the target's business, then

22  this element will have been met.  By way of example, interstate

23  commerce is affected if the target of a robbery engages in the

24  purchase or sale of either this interstate commerce however

25  minimally.

1          As I stated, Count Two charges the defendant with

2    committing a robbery.  The allegation contained in Count Two is

3    brought not only under the law that prohibits robbery but also

4    under a provision of the federal criminal case code that makes

5    it a crime for anyone to aid, abet, counsel, commend, induce or

6    procure the commission of another crime.

7          To find the defendant guilty of this count you must

8    find that the government has proven beyond a reasonable doubt

9    the following four elements:

10          First, that the defendant obtained or took the

11    property of another.

12          Second, that the defendant took the property against

13    the victim's will by actual or threatened force, violence or

14    fear of injury, whether immediate or in the future.

15          Third, that such actions actually or potentially in

16    any way or degree obstructed, delayed or affected interstate or

17    foreign commerce.

18          Fourth, that the defendant acted unlawfully, willfully

19    and knowingly.

20          Again, the first element that the government must

21    prove beyond a reasonable doubt to establish a robbery is the

22    defendant obtained the personal property of another or from the

23    presence of another.  The term "property" includes tangible or

24    intangible things of value including drugs and money.

25          The second element the government must prove beyond a

1    reasonable doubt is that the defendant took person's property

2    against the victim's will by actual threat, force, violence or

3    fear of injury, whether immediate or in the future.  There must

4    be some nexus between the threat or use of force and the taking

5    of the property.

6             In considering whether there was use or threatened use

7    of force, violence or fear you should give those words their

8    common and ordinary meaning and understand them as you normally

9    would.  The violence would not have to be directed at the

10   person whose property was taken.  The use of a threat or force

11   or violence might be aimed at a third person or at causing

12   economic rather than physical injury.  Fear exists if at least

13   one victim would experience anxiety, concern or worry over

14   expected personal harm or business loss.  The potential

15   existence of fear must be determined by the facts existing at

16   the time of the conspiracy.

17            Your decision whether there was a conspiracy to use

18   force or threatened fear of injury involved a decision about

19   what the victim's state of mind would have been at the time of

20   the agreed upon actions.  It is obviously impossible to

21   ascertain or prove directly what a person's subjective feeling

22   would be.  You can't look into a person's mind to see what his

23   or state of mind would be.  But a careful consideration of the

24   circumstances and evidence should enable you to decide whether

25   fear would reasonably have been the victim's state of mind.  It

1    is not necessary that the fear would be a consequence of direct

2    threat.  It is sufficient that the surrounding circumstances

3    would have rendered the victim's fear reasonable.  You must

4    find that a reasonable person would have been fearful under the

5    circumstances.

6          The third element the government must prove beyond a

7    reasonable doubt is that the defendant's action would affect or

8    personally affect interstate or international commerce in any

9    way or degree.  I previously instructed you on what it means to

10   affect commerce and you should follow those instructions here.

11         The fourth element the government must establish

12   beyond a reasonable doubt is that the defendant acted

13   unlawfully, willfully and knowingly.  I've already explained

14   these concepts to you in regard to the charge contained in

15   Count One and you have follow my previous instructions on this

16   point.

17         Before I move to Count Three I want to talk about

18   aiding and abetting.

19         With respect to the robbery offense charged in Count

20   Two the indictment charges the defendant under a provision of

21   the federal criminal code that makes it a crime for anyone to

22   aid or abet a robbery.  And you'll hear later the indictment

23   also charges a defendant with aiding and abetting with respect

24   to kidnapping with regard to the charge in Count Four and the

25   firearm offenses charged in Counts Five and Seven.

1          Under this law, under the aiding and abetting law it's

2   not necessary for the government to show that a defendant

3   himself physically committed a crime with which he is charged

4   in order for you to find him guilty.  Thus, if you do not find

5   beyond a reasonable doubt that the defendant himself committed

6   a crime charged you may under certain circumstances still find

7   the defendant guilty of that crime as an aider and abettor.  A

8   person who aids or abets another to commit an offense is just

9   as guilty of that offense as if he committed the crime itself.

10         As you can see the first requirement is that another

11  person has committed the crime charged.  That is, another

12  person committed every element of the count for which aiding

13  and abetting applies.  However here, the Count Two as I have

14  just described them.  Obviously no one can be convicted of

15  aiding and abetting criminal acts of another if no crime was

16  committed by the other person in the first place.  But if you

17  find that a crime was committed, then you must consider whether

18  the defendant aided or abetted the commission of the crime.

19         In order to aid or abet another to commit a crime it

20  is necessary that a defendant willfully and knowingly

21  associated himself in some way with the crime and that he

22  willfully and knowingly seek by some act to help make the crime

23  succeed.  Participation in a crime is willful if the act is

24  taken voluntarily and intentionally, that is to say with a bad

25  purpose either to disobey or to disregard the law.  I have

1    already defined the term "knowingly" for you and should apply

2    that definition here as well.

3         The mere presence of a defendant where a crime is

4    being committed even coupled with knowledge by the defendant

5    that a crime is being committed or the mere acquiescence by a

6    defendant in the criminal conduct of others even with guilty

7    knowledge, is not sufficient to establish aiding and abetting.

8    An aider and abettor must have some interest in the criminal

9    venture.

10        In order to convict the defendant of aiding and

11   abetting a robbery you must find that the defendant actively

12   participated in the underlying crime with advance knowledge

13   that a co-conspirator would commit a robbery.  You must find

14   that the defendant performed some act that facilitated or

15   encouraged the underlying crime of robbery.

16        Count Three charges the defendant with conspiracy to

17   commit kidnapping.  You will have a copy of the indictment in

18   the jury room and you can read that if you would like.

19        The conspiracy as we talked about is a kind of

20   criminal partnership, an agreement of two or more persons to

21   join together to accomplish some unlawful purpose.  It is an

22   entirely separate offense.  And a different offense from the

23   substantive crime that may be the objective of the conspiracy.

24   To find defendant guilty of this count you must find that the

25   government has proven beyond a reasonable doubt the following

1    three elements:

2         First, that the conspiracy as charged in the

3    indictment existed.  That is, that there was an agreement or

4    understanding to kidnap.

5         Second, that the defendant intentionally and knowingly

6    became a member of that conspiracy.

7         Third, that any one of the co-conspirators, not

8    necessarily the defendant but any one of the parties involved

9    in the conspiracy, knowingly committed at least one overt act

10   in furtherance of the conspiracy during the life of the

11   conspiracy in the Southern District of New York.

12        Now let's consider those three elements.  Existence of

13   the conspiracy.

14        Again, as to the first element the government must

15   prove beyond a reasonable doubt, they have to, again, the first

16   element the government must prove beyond a reasonable doubt to

17   establish the offense of the conspiracy is that two or more

18   people entered into an unlawful agreement charged in the

19   indictment.  In other words, with respect to Count Three that

20   there was, in fact, an agreement or understanding to violate

21   those provisions of law which make it illegal to kidnap an

22   individual or individuals using a means, facility, an

23   instrumentality of interstate or international commerce.

24        I've also instructed you that an object of a

25   conspiracy is an illegal goal or object that the

 1    co-conspirators agreed to achieve.  In Count Three the

 2    government has alleged that the defendant joined a conspiracy,

 3    the goal of which was to commit a kidnapping.  In order to find

 4    a defendant conspired to commit kidnapping you must find that

 5    the government has proven beyond a reasonable doubt the

 6    elements of kidnapping.  Later when I explain Count Four which

 7    is the substantive crime corresponding to the objective of the

 8    conspiracy charged in Count Three meaning kidnapping, I will

 9    explain the element of kidnapping in more detail.

10          If you conclude that the government has proven beyond

11    a reasonable doubt that the kidnapping conspiracy charged in

12    Count Three existed you must determine whether the defendant

13    join that conspiracy knowing of its unlawful purpose and

14    further its unlawful objective.  Here, the alleged purpose of

15    the conspiracy was to commit a kidnapping.  I've already

16    instructed you about how one joins or participates in a

17    conspiracy and you should apply those instructions here as

18    well.

19          Now you heard me use the word "overt act" and I'm

20    going to explain that to you now.  The third element that's a

21    requirement of an overt act, to sustain its burden of proof the

22    government must show beyond a reasonable doubt that at least

23    one overt act was committed in furtherance of the kidnapping

24    conspiracy by at least one of the co-conspirators but not

25    necessarily the defendant in the Southern District of New York.

1    I instruct you as a matter of law, the Southern

2    District of New York includes the Bronx, Manhattan and

3    Westchester.  An overt act is any act that tends to carry out

4    the conspiracy.  The act need not be unlawful.  It can be any

5    act, innocent or illegal, as long as it is done in furtherance

6    of the object or purpose of the conspiracy.  The agreement to

7    engage in or cause the performance of a crime is not itself an

8    overt act.  Let me put it in everyday language.  The overt act

9    element is a requirement that the agreement went beyond the

10   mere talking stage, the mere agreement stage.  The requirement

11   of an overt act is a requirement that some action is to be

12   taken during the life of the conspiracy by one of the

13   co-conspirators to further the conspiracy.

14   In order for the government to satisfy the overt act

15   requirement it is not necessary for the government to prove any

16   particular overt acts or even that the defendant himself

17   committed an overt act.  It is sufficient for the government to

18   show that the defendant or one of his alleged co-conspirators

19   knowingly committed an overt act in furtherance of the

20   conspiracy.

21   The overt act need not have been committed at

22   precisely the time or in precisely the place alleged in the

23   indictment.  In fact, the overt act need not even be the one

24   alleged in the indictment.  It can be any overt act whether

25   alleged in the indictment or not.  If you are convinced beyond

1    a reasonable doubt that the it occurred while the conspiracy

2    was still in existence.

3          Lastly, I want inform of the distinction between the

4    elements that the government is required to prove with respect

5    to the charged robbery and kidnapping conspiracies.  The

6    government is not required to prove overt acts with respect to

7    the robbery conspiracy in order to satisfy its burden.  By

8    contrast, the government must prove at least one overt act with

9    respect to the kidnapping conspiracy in order to satisfy its

10   burden.

11         So let's talk about Count Four which is the

12   substantive crime of kidnapping.  Count Four charges the

13   defendant with others known and unknown to having engaged in

14   kidnapping in or about September of 2012.  In order to sustain

15   its burden of proof with respect to the allegation of

16   kidnapping charged in Count Four, the government must prove

17   beyond a reasonable doubt the following three elements:

18         First, that the defendant knowingly and lawfully

19   seized or confined or kidnapped or abducted or carried away at

20   least one person.

21         Second, that the defendant held an individual for

22   ransom reward or for any other reason.

23         Third, that the defendant was transported in

24   interstate or foreign commerce or that the defendant traveled

25   in interstate or foreign commerce or used any means, facility

1  or instrumentality of interstate or foreign commerce in

2  committing or in furtherance of the offense.

3        The defendant is also charged with aiding and abetting

4  in the kidnapping.  Accordingly, it will would be sufficient

5  for this element if he aided and abetted another person in the

6  kidnapping.

7        So the word "the" there is a typo.  It should be "he".

8        I've previously instructed you on what it means to aid

9  and abet and you should follow those instruction here.

10       The first element the government must prove beyond a

11  reasonable doubt is that the defendant willfully and knowingly

12  seized, confined, kidnapped, abducted or carried away a victim.

13  "Kidnap" means to take and carry away a person by force against

14  his or her will.  "Seize", "confine", "abduct" and "carry away"

15  all mean the physical or bodily taking and carrying away of a

16  person or holding or restriction of someone by force or without

17  that person's consent.

18       In order to satisfy this element the government must

19  show that the defendant knew that the victim was not with them

20  voluntarily but was rather forced or coerced.

21       The second element the government must prove beyond a

22  reasonable doubt was that the defendant held a victim for

23  ransom, reward or for some other reason.  In order to satisfy

24  the element the government need not prove the reason the

25  defendant took the individual was for reward for pecuniary

1   gain.  It is sufficient to satisfy this element if the

2   government proves that at the time the defendant kidnapped the

3   individual he did so to derive some benefit.

4        The third element the government must prove beyond a

5   reasonable doubt is that the victim was transported in

6   interstate commerce or that the defendant traveled in

7   interstate commerce or used the mail or any other means,

8   facility or instrumentality of interstate commerce in

9   committing or in furtherance of the commission of offense.

10       The term "facility" or "instrumentality" of interstate

11  or foreign commerce includes the use of a telephone in

12  furtherance of the commission of the offense.

13       Count Five.  He 924(c)(1)(A) at top there just refers

14  to the statute that is this count.  It charges an offense

15  connected to either the robbery conspiracy charged in Count

16  One, the robbery charge in Count Two, the kidnapping conspiracy

17  charged in Count Three or the kidnapping charged in Count Four.

18  This means that you cannot consider Count Five unless you first

19  determine that the defendant, David Delva, is guilty of any one

20  or more of the robbery, robbery conspiracy, kidnapping

21  conspiracy or kidnapping charges in Counts One, Two, Three and

22  Four, right?  You've got to have found one of those, the

23  defendant had been guilty of one of those before you can get to

24  five, all right, otherwise, you don't get to five.

25       Count Five also charges the defendant with aiding and

1    abetting the carrying or possession of a firearm, as well as

2    the brandishing in connection with Counts One, Two, Three or

3    Four.  I've briefly instructed you on what it means to aid and

4    abet.

5         The defendant's also charged with aiding and abetting

6    here in count Five.  Accordingly, it would be sufficient for

7    this element if the defendant aided and abetted another person

8    in the use, carrying and possession of a firearm.  I've already

9    instructed you on aiding and abetting liability and you should

10   apply those instructions here.

11        I do however want to give you an additional

12   instruction that applies to aiding and abetting the use,

13   carrying, possession of or the possession of a firearm.

14        In order to convict the defendant of aiding and

15   abetting another's use or carrying of a firearm or possession

16   of a firearm in furtherance of a crime of violence or drug

17   trafficking offense, the government must establish, one, that

18   the defendant activity participated in at least one of the

19   underlying crimes, here, the robbery conspiracy and robbery

20   charges in Count One and Two, the kidnapping conspiracy and

21   kidnapping charge in Counts Three and Four or the narcotics

22   distribution conspiracy charged in Count Six of the indictment.

23   And that the defendant did so with advanced knowledge that a

24   participate in that crime would use or carry a firearm or

25   possess a firearm in furtherance of a crime.

1        As to the first part, active participation does not
2   require the defendant participated in each and every element of
3   the underlying crime.  Rather, the defendant's participation
4   may be limited to only one or some of the elements of the
5   underlying crime.  It is sufficient for the defendant to
6   facilitate any part even though not every part of the criminal
7   venture.
8        As to the second part, in order for a defendant to
9   have had advanced knowledge of another participant's use or
10  carrying firearm or possession of a firearm in furtherance of a
11  crime, the defendant needs to have had that knowledge at a
12  point before or even during the commission of the crime when
13  the defendant still had the opportunity to walk away from
14  participating in the offense if he chose to do so.
15       If a defendant who has the opportunity to walk away
16  from participating in an offense chooses to continue to
17  participate in the offense after learning that another
18  participant will use or carry a firearm or possess a firearm in
19  furtherance of the offense or is currently using or carrying a
20  firearm or possessing a firearm in furtherance of the offense,
21  that defendant has the requisite advanced knowledge to make him
22  an aider and abettor of the other participants use or carrying
23  of a firearm or possession of a firearm in furtherance of a
24  crime.
25       To prove count five the government has to prove beyond

1    a reasonable doubt the following three elements:

2              First, that on or about the dates alleged in the

3    alleged in the indictment the defendant either used, carried or

4    possessed a firearm or aided and abetted the use, carrying or

5    possession of a firearm by someone else.

6              Second, that the defendant used or carried the firearm

7    or aided and abetted another's use or carrying of a firearm --

8    and it should also say "possessed".  I'll have the government

9    look at that and Mr. Pittell look at that.  It should say the

10   government used carried or possessed a firearm or used, carried

11   or possessed or aided an abetted the use, carrying and

12   possession of a firearm during and in relation to the specified

13   crimes charged in Counts One, Two, Three and Four or that he

14   possessed a firearm -- here we go.  You know what?  What let me

15   start that one over.

16             Second element is that the defendant used or carried

17   the firearm or aided and abetted another's use during and in

18   relation to the specified crimes in Counts One through Four or

19   that the defendant possessed a firearm or aided and abetted

20   another in the possession of a firearm in furtherance of those

21   same crimes.

22             Third, the third element that he had to have acted

23   knowingly.

24             So we'll talk about all of those.  So we have talked

25   about use, carried, possessed or aided and abetted the same.

1          "Firearm" is commonly known as a gun.  It is defined

2    as any weapon which will or is designed to or to make readily

3    be converted to expel a projectile by eh action of an

4    explosive.  That would be the bullet.

5          In considering the specific element of whether the

6    defendant used or carried or possessed a firearm, it does not

7    matter whether the firearm was loaded or operable at the time

8    of the crime.  Operability is not relevant to your

9    determination of whether a weapon qualifies as a firearm.

10         In order to prove the defendant used a firearm the

11   government must prove beyond a reasonable doubt an active

12   employment of a firearm by defendant during and in relation to

13   the commission of a crime of violence.  This does not mean that

14   the defendant must actually fire or attempt to fire the weapon.

15   Although, those would obviously constitute uses of the weapon.

16   Brandishing, displaying or even referring to the weapon so that

17   others present knew that the defendant had the firearm

18   available if needed, all constitute use of the firearm.  The

19   mere possession of a firearm at or near the site of the crime

20   without active employment as I've just described is not

21   sufficient to constitute use.

22         To show that the defendant carried a firearm the

23   government must prove beyond a reasonable doubt that the

24   defendant had the weapon within his control so that it was

25   available in such a way that it furthered the commission of the

```
 1   crime.  The defendant need not have held the firearm
 2   physically, that is, have had actual possession of it on his
 3   person.  If you find that the defendant had dominion and
 4   control over the place where the firearm was located and had
 5   the power and intention to exercise control over the firearm
 6   and that the firearm was immediately available to him in such a
 7   way that it furthered the commission of the crime of violence
 8   or drug trafficking crime, you may find that the government has
 9   proven that the defendant carried the weapon.
10           I'd like to describe possession in a bit more detail
11   right now.
12           A person need not have actual physical possession,
13   that is, physical custody of an object in order to have legal
14   possession of it.  If a person has the ability to exercise
15   substantial control over an object even if he or she does not
16   have the object in his or her physical custody and that person
17   has the intent to exercise such control, then the person is in
18   possession of the article.  So let me give you a few examples.
19           Say my grandmother left me some jewelry when she died
20   and it's now sitting in a safety deposit box at the bank.  My
21   siblings and I are the only people who can get into that box.
22   Do we have possession of jewelry?  Absolutely, we have
23   possession of it, even though it's in a safety deposit box
24   inside a bank and not in our hands or even in our homes.
25           Possession a firearm in further of a crime of violence
```

1    requires the defendant possessed a firearm and that the

2    possession advanced or moved forward the crime, the mere

3    presence of a firearm is not enough.  Possession in furtherance

4    requires the possession be incident to and an essential part of

5    crime.  The firearm must have played some part in furthering

6    the crime for this element to be satisfied.

7        The second element the government must prove beyond a

8    reasonable doubt is that the defendant carried a firearm during

9    and in relation to a crime of violence or possessed a firearm

10   in furtherance o such a crime or aided and abetted the same.

11   Possession in furtherance requires that possession be instant

12   to and an essential part of the crime.  The firearm must have

13   played some part in furthering a crime in order for the element

14   to be satisfied.

15       I instruct you that the robbery conspiracy allege in

16   Count One qualifies under the law as a crime of violence.  I

17   further instruct you that the robbery in Count Two qualifies

18   under the law as a crime of violence.

19       I further instruct you that the kidnapping conspiracy

20   alleged in Count Three qualifies under the law as a crime of

21   violence.

22       And I further instruct you that the kidnapping alleged

23   in Count Four qualifies under the law as a crime of violence.

24       I also instruct that in order to find the defendant

25   guilty of Count Five the jury must be unanimous as to whether

1    it was the robbery conspiracy charged in Count One, the robbery

2    in Count Two the kidnapping conspiracy in Count Three or the

3    kidnapping in Count Four or some combination of those four

4    counts that the defendant used or carried a firearm during an

5    in relation to or possessed a firearm in furtherance of or

6    aided and abetted the same.

7              Final element the government has to prove beyond a

8    reasonable doubt in Count Five is that the defendant knew he

9    was carrying or possessing a firearm or knew that he was

10   carrying and abetting another's carrying or possessing a

11   firearm.

12             To satisfy this element you must find that the

13   defendant had knowledge that he or another whom he was aiding

14   and abetting was carrying or using or possessing a firearm.  I

15   have previously defined "knowingly" for you and you should

16   apply that definition here.

17             In order for the government to satisfy that element it

18   must proved beyond reasonable doubt that the defendant knew

19   what he was doing, that is, that he knew that he was carrying

20   or using or aiding and abetting another's carrying and use of a

21   firearm in the commission of a crime of violence.

22             If and only if you find the defendant guilty of Count

23   Five as I just explained to you, then you must make a special

24   find on that count.  Specifically, you must determine whether

25   or not during a defendant's use, carrying or possession of a

1    firearm he brandished the firearm or aided an abetted another

2    to brandish the firearm .

3              To brandish a firearm means that or part of the weapon

4    was displayed or the presence of the weapon was otherwise mad

5    known to another person to intimidate that person regardless of

6    whether the weapon was directly visible to that person.  Your

7    finding as to brandishing must be beyond a reasonable doubt.

8    In addition, it must be unanimous in that all of you must agree

9    that a firearm was brandished.

10             Count Six charge the defendant with participating in a

11   conspiracy to violate the narcotics laws of the United States.

12   Again, you are going to have a copy of the indictment.  You

13   have to find two elements for this charge.  The agreement

14   existed.  That is, that there is an agreement or understanding

15   between two or more persons from in or about September of 2012

16   through on or about June 4, 2013 to do something and that there

17   is something called the object of the conspiracy.  Every

18   conspiracy has to have an object.  Count Six the object is that

19   certain individuals intentionally and knowingly agreed to

20   distribute or to possess with intent to distribute controlled

21   substances.  Here, cocaine base and in a form commonly as crack

22   and marijuana.  Therefore, the first question is did the

23   agreement alleged in the indictment exists?  Was there such an

24   agreement?

25             Second, the government must prove beyond a reasonable

1    doubt that the defendant intentionally and knowingly became a

2    member of the charged conspiracy.  That is, that he knowingly

3    participated in the conspiracy to distribute or possessed with

4    intent to distribute narcotics with knowledge of its objects

5    and with the intent to further the aims of the conspiracy.

6         Before I tell you these elements in great he detail

7    let me make one point.  As I said before, to find a conspiracy

8    charge the defendant is guilty beyond a reasonable doubt on a

9    conspiracy charge does not mean that you have to find the

10   defendant guilty of the substantive crime.  Conspiracy and the

11   substantive crime are two different crimes.

12        We've talk about the existence already of the

13   conspiracy and you should apply those definitions here.

14        we've talked about object of the conspiracy and the

15   object here is to distribute or possess with intent to

16   distribute controlled substances.  And as we've said, every

17   conspiracy has an object.  You've got to find that the object

18   charge here has been met by the government that they have

19   proven it beyond a reasonable doubt.  The object is to

20   distribute or possess with intent to distribute controlled

21   substances.  Cocaine base in the form of crack and marijuana

22   are call controlled substances.

23        Thus, to find that the government has met its burden

24   of proof with respect to Count Six the government has to prove

25   that the goal or object of the conspiracy whether it succeeded

1    or not was a goal of distributing or possessing with intent to

2    distribute crack and/or marijuana.  "To distribute" means just

3    that, to distribute.  When one has the object or goal to

4    distribute something to someone else one has the object or goal

5    of transferring it.

6        I have defined the term "possession" above.

7    Possession means just that, to have possession to possess.  Now

8    to have object to possess or to have custody or control of

9    something such as a controlled substance does not mean it has

10   to be physically on someone's person.  And more than one person

11   can possess the same thing, the key is that to possess means

12   that a person must have the object of exercising some control

13   over it.

14       If you determine that the object of the conspiracy was

15   to possess a controlled substance then you must make a

16   determination as to the drug type.  On the verdict form

17   there'll be a special question about drug type.  And it will

18   have a, if you found the defendant has met certain other

19   elements then you'll look at and you'll check whether or not

20   you have found that there was crack involved or you'll find

21   whether or not there was marijuana.

22       If you find that an object of the conspiracy charged

23   in this count was to possess a controlled substance, then you

24   must decide whether an object of the conspiracy also included

25   an intent to distribute it.  In order to establish this element

1    the government must prove beyond a reasonable doubt that an

2    object of the conspiracy was to control the controlled

3    substance with the purpose or intention of transferring it to

4    another person.

5            Here again, you must determine that the government has

6    demonstrated that the defendant intended to distribute a

7    controlled substance.

8            Now, let me be clear.  The government need only prove

9    that the object of the conspiracy was to distribute the

10   controlled substance or to possess the controlled substance

11   with the intent to distribute it.  The government can but need

12   not prove both.  You have to be unanimous however as to which

13   object was proven beyond a reasonable doubt.

14           Page 79.  Page 78 is blank.

15           Count Six, participation.  If you conclude that the

16   government has proven beyond a reasonable doubt that the

17   narcotics conspiracy charged in Count Six existed you have to

18   determine whether or not the defendant joined that conspiracy

19   knowing its unlawful purpose and to further its unlawful

20   objective.  Here, the alleged purpose of the conspiracy was to

21   distribute or possess with intent to distribute narcotics.

22   I've also already instructed you on how one joins or

23   participates in a conspiracy and you'll have to apply those

24   instructions here.

25           As I said, you are going to have to decide if there

1   was a controlled substance involved what kind of controlled

2   substance.  And it should say two questions.  You have to

3   answer the following two questions.

4        Did the government prove beyond a reasonable doubt

5   that the defendant conspired to distribute cocaine base in a

6   form commonly known as crack?  So if you have found the

7   narcotics conspiracy it will say, has the government proven

8   beyond a reasonable doubt that crack was involved?  It'll say,

9   "yes or no".  You'll check one or the other if you have found

10  the other element.

11       The second question is, did the government prove

12  beyond a reasonable doubt that the defendant conspired to

13  distribute marijuana?  And you'll check again "yes or no".

14       You will be provided a verdict form that will include

15  separate spaces for this.

16       Count Seven, the firearm offense.

17       Count Seven alleges the violation of a statue that we

18  referred to by its number 924(C) in the Federal Criminal Code.

19  That provision makes it a crime for any person during and in

20  relation to any drug trafficking crime to use or carry a

21  firearm or in furtherance of any such crime to possess a

22  firearm.

23       Count Seven is a firearms count connected to the

24  narcotics tracking offense charged in Count Six.  This means

25  that you cannot consider Count Seven unless you've first

1    determined that the defendant is guilty of the narcotics

2    conspiracy charged in Count Six.

3              Let's talk about the elements of Count Seven.

4              To sustain its burden of proof with respect to the

5    Count Seven the government had to prove beyond a reasonable

6    doubt the following elements:

7              First, that on or about the dates alleged the

8    defendant either used, carried or possessed a firearm or aided

9    and abetted the use, carrying or possession of a firearm by

10   another.

11             Second, that the defendant used or carried a firearm

12   or aided an abetted the use or carrying of a firearm during and

13   in relation to the specified -- it should say "drug trafficking

14   crime" or possessed a firearm or aided the possession of a

15   firearm in furtherance of that crime.

16             Third, that the defendant act knowingly.

17             And I have briefly instructed you on what aiding and

18   abetting means and you should apply those here.  I've also

19   instructed you on the terms "using", "carrying" an "possessing"

20   and you should use those instruction here.

21             We are not now on page 84.

22             The second element that the government has to prove

23   beyond a reasonable doubt is that the defendant used or carried

24   a firearm in relation to a drug trafficking crime or possessed

25   a firearm in furtherance of such a crime or aided abetted the

 1  same.  Possession in furtherance requires possession be instant

 2  to and an essential part of the crime.  The firearm must have

 3  played some part in furthering the crime for this element to be

 4  satisfied.

 5        I instruct you that the narcotics distribution

 6  conspiracy alleged in Count Six of the indictment qualifies

 7  under the law as a drug trafficking crime for which the

 8  defendant may be prosecuted in a court of the United States.

 9        We've also talked about knowingly in Count Seven and

10  I've also instructed you on what knowingly means.

11        I am turning to Count eight page 86.

12        Count Eight charges the defendant with a violation of

13  the Federal Firearms statute.  Specifically Count Eight charges

14  that in or about June 2013 in the Southern District of New York

15  after having been convicted of crimes punishable by

16  imprisonment for a term exceeding one year, the defendant

17  knowingly did possess and affecting commerce a firearm and

18  ammunition, to wit, a .9 millimeter SCCY pistol and Fiocchi

19  bullets, which previously ha been shipped and transported in

20  interstate and foreign commerce.

21        You will have a copy of the indictment in the jury

22  room.

23        The, relevant statute reads in part, that if a crime

24  or a person who has been convicted in any court of a crime

25  punishable by imprisonment for a term exceeding one year to

E9GAADELV5                    Jury Charge

1    possess in or affecting commerce any firearm or ammunition.
2              (Continued on next page)

1          THE COURT:  (Continued) In order to sustain its burden

2     of proof on Count Eight, the government must prove each of the

3     following three elements beyond a reasonable doubt:

4          (1) That the defendant was previously convicted of a

5     crime punishable by imprisonment for a term exceeding one year.

6     In other words, a felony;

7          (2)  That in or about June 2013, defendant knowingly

8     possessed a firearm or ammunition;

9          (3)  That the defendant's possession of the firearm or

10    ammunition was in or affecting interstate or foreign commerce.

11         The first element is the prior conviction.  That has

12    to be a prior felony conviction.  To satisfy this element, you

13    need only find beyond a reasonable doubt that the defendant

14    was, in fact, convicted of such a crime and that the conviction

15    was prior to the possession of a firearm as charged in the

16    indictment.

17         The government need not prove that the defendant knew

18    that his prior conviction was punishable by a term of

19    imprisonment for a term exceeding one year.  Nor is it

20    necessary for the defendant to have been sentenced to

21    imprisonment for more than one year.  A plea of guilty has the

22    same consequence as a conviction after trial.

23         In this regard, you've heard evidence in the form of a

24    stipulation or agreement by both sides that the defendant was

25    convicted in a court of a felony punishable by imprisonment for

1  a term exceeding one year.  The parties have also agreed by

2  stipulation that this conviction occurred prior to the time

3  that the defendant is alleged to have possessed a firearm and

4  ammunition as charged in the indictment.  As I instructed you

5  earlier, a stipulation is an agreement among the parties that

6  certain facts are true.  In such cases, you have to accept

7  those facts as true.

8          I instruct you that the prior conviction that is an

9  element of the offense is only to be considered by you for the

10  fact that it exists and nothing else.  You are not to consider

11  it for any other purpose.  You may not consider the prior

12  conviction in deciding whether the defendant was in knowing

13  possession of the firearm or ammunition as charged in the

14  indictment.

15          I have already instructed you on the second element,

16  which is knowingly possessed.  And ammunition I will define for

17  you as meaning bullets, cartridge cases, primers or propellant

18  powder designed for use in any firearm.

19          The third element is in or affecting interstate or

20  foreign commerce.  This means the government must prove that

21  some point prior to the defendant's possession, the firearm

22  and/or ammunition had traveled in interstate commerce or

23  foreign commerce.  In this regard, it is sufficient for the

24  government to satisfy this element by proving that at some

25  point prior to June 2013, the firearm and/or ammunition moved

1    over a state line or the United States border.

2              For example, if the firearm came from Connecticut to

3    New York or from Nevada to New York, then it was transported or

4    shipped in interstate commerce.  If the firearm came from

5    Brazil to New York, it was shipped in foreign commerce.  The

6    government need not prove that the defendant himself carried

7    the firearm or ammunition across a state line or the United

8    States border.  Nor must the government prove who carried it

9    across or how it was transported.

10             It is not necessary for the government to prove that

11   the defendant knew that the firearm or ammunition had

12   previously crossed a state or national border.  All the

13   government needs to prove is that the firearm and/or ammunition

14   did so at some point prior to the time that the defendant

15   possessed it.

16             I am going to give you a few final instructions.

17             The indictment alleges that certain events or

18   transactions occurred on or about various dates.  It is not

19   necessary, however, for the government to prove that these

20   events or transactions occurred on exactly those dates.  When

21   the crime charged is the crime of conspiracy, it is sufficient

22   if you find that the defendant was a member of the conspiracy

23   charged in the indictment for some time within that period.

24             Now, in addition to all the elements I described for

25   you with respect to Counts One through Eight of the indictment,

E9gQdel6                    Charge

1    you must also decide whether any acts in furtherance of the

2    charged offense occurred within the Southern District of New

3    York.  Venue is an element of each of the crimes charged.

4           So, for each of the crimes you have to figure out

5    whether or not an act occurred in the Southern District of New

6    York.

7           The Southern District of New York includes the

8    following counties:  Manhattan, the Bronx, Westchester,

9    Dutchess, Putnam, Rockland, Orange and Sullivan counties.  This

10   is called venue.  Venue simply means place or location.

11          In this regard, in regard to venue, the government

12   need not prove that any crime was committed in this district or

13   that the defendant was present here.  It is sufficient to

14   satisfy this element if any act in furtherance of the crime you

15   are considering occurred within the district.  I further

16   instruct you that any act in the Southern District of New York

17   or any communication into or out of the Southern District of

18   New York can establish venue so long as the action furthers the

19   conspiracy charged.  Actually, it should further the crime

20   charged.

21          On this issue of venue -- and this alone -- the

22   government need not prove venue beyond a reasonable doubt but

23   only has to prove venue by a preponderance of the evidence.  A

24   preponderance of the evidence means more likely than not.

25   Thus, the government has satisfied its burden of proof as to

1    venue if you conclude that it is more likely than not that some

2    act in furtherance of each charged offense -- each of the

3    eight -- occurred in this district.

4              If you find that the government has failed to prove

5    venue, then even if all of the other elements are satisfied for

6    a particular count, you would have to acquit the defendant on

7    that count.

8              Now, the defendant has raised the defense of alibi as

9    to Counts One through Six of the indictment.  The defendant has

10   presented evidence that he was not present at the time and

11   place where the alleged kidnapping and robbery was committed,

12   and he was not a participant in the conspiracy to distribute

13   drugs stolen from the victims.  It is for you, the jury, to

14   weigh and assess this evidence.

15             But I want to remind you that the government has the

16   burden to prove beyond a reasonable doubt each of the elements

17   of these offense, including that the defendant was present at

18   the time and place where these offenses are alleged to have

19   occurred.  The defendant does not have an affirmative burden to

20   prove any defenses, including an alibi defense.  The burden of

21   proving beyond a reasonable doubt that the defendant committed

22   the crimes charged always remains with the government.  The

23   burden of proof is not shifted to the defendant.

24             You have heard reference in the argument of counsel to

25   the fact that certain investigative techniques were not used by

1    law enforcement authorities.  There is no legal requirement

2    that the government prove its case through any particular

3    means.  While you are to carefully consider the evidence

4    presented by the government, you need not speculate as to why

5    they used certain techniques that they did, or why the did not

6    use other techniques.  The government is not on trial and law

7    enforcement techniques are not your concern.

8           Your concern is to determine whether or not, based on

9    the evidence or lack of evidence, the guilt of the defendant

10   had been proven beyond a reasonable doubt.

11          You've heard testimony about evidence seized in

12   connection with certain searches conducted by law enforcement

13   officials.  Evidence obtained from these searches was properly

14   admitted in this case and may be properly considered by you.

15   Such searches were entirely appropriate law enforcement

16   actions.  Whether you approve or disapprove of how the evidence

17   was obtained should not enter into your deliberations because I

18   instruct you that the government's use of the evidence is

19   entirely lawful.

20          You must, therefore, regardless of your personal

21   convictions or opinions, give this evidence full consideration

22   along with all the evidence in the case in determining whether

23   the government has proven the defendant's guilt beyond a

24   reasonable doubt as to each crime taken separately.

25          Your verdict must be based solely on the evidence

1   developed at trial or lack of evidence.  It would be improper

2   for you to consider -- and we've actually talked about this

3   earlier in the instructions -- any personal feelings you may

4   have about the defendant's race, religion, national origin, sex

5   or age.  The defendant is entitled to a trial free from

6   prejudice, and our judicial system cannot work unless you reach

7   a verdict through a fair and impartial consideration of the

8   evidence.

9            The government has offered evidence tending to show

10  that on a different occasion or occasions, the defendant

11  engaged in conduct similar or related to that charged in the

12  indictment.

13           In that connection, let me remind you that the

14  defendant is not on trial for committing acts not alleged in

15  the indictment.  Accordingly, you may not consider this

16  evidence of similar acts as a substitute for proof that the

17  defendant committed the crimes charged in the indictment.  Nor

18  may you consider this evidence as proof that the defendant has

19  a criminal personality or bad character.  The evidence of the

20  other similar acts was admitted for a much more limited

21  purpose, and you may consider it only for that limited purpose.

22           If you determine that the defendant committed the acts

23  charged in the indictment and these similar acts as well, then

24  you may, but need not, draw an inference that in doing the acts

25  charged in the indictment, the defendant acted knowingly and

1   intentionally and not because of some mistake, accident or

2   other innocent reasons.

3        Evidence of similar acts may not be considered by you

4   for any other purpose.  Specifically, you may not use this

5   evidence to conclude that because the defendant committed the

6   other act or acts, he must also have committed the acts charged

7   in the indictment.

8        Some of the exhibits were also charts.  These charts

9   were introduced as summaries.  They are not direct evidence,

10  really.  They are summaries of the evidence.  They are a visual

11  representation of information or data as set forth either in

12  the testimony of a witness or in the stipulation or in some

13  documents.  They are admitted as aids to you.  They are not in

14  and of themselves evidence.  They are attended to be of

15  assistance to you in your deliberations.

16       In presenting the evidence which you've heard, it is

17  often easier and more convenient to utilize summary charts than

18  to place all of the relevant documents in front of you.  It is

19  up to you to decide whether those charts fairly and correctly

20  present the information in the testimony and the documents.

21  The charts are not to be considered by you as direct proof of

22  anything.  They are merely graphic demonstrations of what the

23  underlying testimony in documents are.

24       To the extent the charts conform with what you

25  determine the underlying evidence to be, you may accept them.

E9gQdel6                          Charge

1   But one way or the other, realize the charts are not in and of

2   themselves direct evidence.  They are merely visual aids.  They

3   are nothing more.

4          Now, under your oath as jurors, you are not to be

5   swayed by sympathy.  You are to be guided solely by the

6   evidence in this case.  And the crucial question that you must

7   ask yourself as you sift through the evidence is:  Has the

8   government proven the guilt of the defendant beyond a

9   reasonable doubt?

10         It is for you alone to decide whether the government

11  has proven that the defendant is guilty of the crime for which

12  he is charged solely on the basis of the evidence, or lack of

13  evidence, and subject to the law as I charge you.  It must be

14  clear to you that once you let fear, prejudice, bias or

15  sympathy interfere with your thinking, there is a risk that you

16  will not arrive at a true and just verdict.

17         If you have a reasonable doubt as to the defendant's

18  guilt, you should not hesitate for any reason to find a verdict

19  of acquittal.

20         But, on the other hand, if you find that the

21  government has met its burden of proving the defendant's guilt

22  beyond a reasonable doubt, you should not hesitate because of

23  sympathy or for any other reason to render a verdict of guilty.

24         Now, the question of possible punishment of the

25  defendant is of no concern to you, ladies and gentlemen of the

1   jury, and should not in any sense enter into or influence your

2   deliberations.  The duty of imposing sentence rests exclusively

3   upon the Court.

4        Your function is to weigh the evidence in the case and

5   to determine whether or not the defendant is guilty beyond a

6   reasonable doubt solely upon the basis of the evidence.

7        Now, for those of you who took notes during the trial,

8   you should not show your notes to or discuss your notes with

9   any other juror during the deliberations.  Any note that you

10  have taken are for you and to assist you, and you alone.  The

11  fact that a particular juror has taken notes entitles that

12  juror's views to no greater weight than those of any other

13  juror.

14       Finally, your notes are not a substitute for your

15  recollection of evidence in this case.  If you have any doubt

16  as to any testimony, you may request that the official

17  transcript that has been made part of these proceedings be read

18  to you or otherwise provided.

19       Let me give you my concluding remarks, and then I am

20  going to let you folks go into the jury room.

21       Your function now is to weigh the evidence in this

22  case and to determine the guilt or non-guilt of the defendant,

23  David Delva, with respect to each one of the counts in the

24  indictment in which he is charged.  You are to consider his

25  guilt or non-guilt as to each count separately.

E9gQdel6                          Charge

1          You are about to begin your deliberations.  As I said

2     to you earlier, many, but not all, of the exhibits will be sent

3     with you into the jury room.  For instance, you are not going

4     to have the drugs, the firearms or the ammunition.

5          If you want to see any physical evidence that is not

6     sent into the jury room, then that could be arranged very

7     quickly.  We can have it out here for you.  Similarly, if you

8     want to ask particular portions of the transcripts read to you,

9     we can have that arranged as well or we can identify a

10    particular piece that you want and send it into the jury room.

11    But please appreciate that it is not always easy to locate

12    exactly what you are looking for, so you need to be as specific

13    as possible if you do want to see a particular piece of

14    testimony or a particular piece of evidence.

15         Now, any communications with the Court -- any at all

16    -- whether requesting evidence or testimony or otherwise or

17    asking any question at all have to be made in writing by you

18    folks to me, signed by your foreperson and given to the

19    marshal.  Very shortly, the marshal, the U.S. marshal, will be

20    sworn and will take over the role that Joe has served.  He will

21    be the one who will interact with you and will be the one who

22    if you have a note, you will give the note to the marshal; the

23    marshal will then find Joe; and we will proceed that way.  So

24    you won't be communicating directly with Joe any more until the

25    conclusion.  All right?

1        Now, I will respond to any questions that you have as

2   quickly as I can, but let me describe the process to you just

3   for a moment so you folks understand.

4        If you have a question, your foreperson, who you will

5   decide who it's going to be, as people decide in a variety of

6   different ways.  Sometimes it's Juror No. 1; sometimes somebody

7   volunteers; sometimes people draw straws; sometimes they throw

8   a number into the hat.  It's up to you.  There is no right way,

9   there is no wrong way to do it.  You decide who you want to

10   have.  That foreperson is going to have some paper that Joe has

11   that has on it sort of lines for the questions and a place for

12   the foreperson to sign and then the time.

13        We then take this -- you write your note.  The

14   foreperson signs it.  Anybody can write the note.  The

15   foreperson signs.  It gets put into an envelope which you folks

16   will have.  The envelope gets delivered to the marshal outside

17   your door.  The marshal will find Joe.  I'm telling you this so

18   you understand the process; it's not immediate.  Joe will find

19   me.  I have an office back there called my robing room where I

20   keep my robe, and I also have -- literally.  I also have a

21   chambers, an office that's downstairs.  There's an elevator in

22   there.  So Joe has to come get me.  If I'm not there, he has to

23   call me.  I then open the note.  I break the seal.  I open the

24   note.  I read the note.  I call up here.  I call up counsel.  I

25   get everybody in the room, with the court reporter.  I read the

 1   note.  We discuss the note.  We then decide how we're going to

 2   deal with the note.  We then call you folks in and tell you how

 3   we're going to deal with the note.  Thereafter, we give you the

 4   answer to the note.

 5          Just so you don't think it's like, hey, we're going to

 6   get the answer in like 37 seconds.  It takes a little while.

 7   So, be as specific as possible.  We want all of your questions

 8   to be answered, but we want you to understand the process so

 9   that you can help us to isolate as much as possible the

10   specific thing that you would like.

11          Now, never ever when you're sending a note tell us how

12   the jury is split.  Like, let's just say that you're at a 5-7

13   or you're at an 11-1 or you're at whatever it is, never give

14   the split of the vote, OK, on the note.  Never say:  "We're

15   split X to Y on the following question."  OK?  Nobody but you

16   will ever know the process of deliberations, OK, and how things

17   go.

18          Now, as I said, your first task is going to be to

19   choose a foreperson.  You will do that however you folks deem

20   appropriate.  The foreperson doesn't have any greater voice or

21   authority than any other juror.  But that is the person who

22   will then be the person who signs the notes and communicates

23   directly with the Court through notes.

24          By the way, the reason I read it to you folks, I have

25   you all come out here and read you the note is so there's no

E9gQdel6                        Charge

1   rogue juror.  There's no rogue juror sending notes.  I make

2   sure you all understand what the note is that I've received.

3           The most important part of this process is about to

4   begin, and that is the part that you folks are about to play to

5   deliberate and decide issues of the fact.  It is for you, and

6   you alone, to decide whether the government has proven its case

7   as to each count in the indictment beyond a reasonable doubt.

8   If the government has succeeded, your verdict should be guilty.

9   If it has failed, it should be not guilty.  And, again, you

10  must consider each count individually.  I know you will try the

11  issues that have been presented to you according to the oath

12  that you have taken as jurors.  In that oath, you promised that

13  you would well and truly try the issues joined in this case and

14  a true verdict render.  Your function is to weigh the evidence

15  in the case and to determine whether or not a defendant is

16  guilty solely upon the basis of such evidence.

17          As you deliberate, please listen to the opinions of

18  your fellow jurors.  Deliberations.  You listen to each other

19  and ask for an opportunity to express your own views.  Every

20  juror should be heard.  No one juror should hold the center

21  stage in the jury room, and no one juror should control or

22  monopolize deliberations.

23          If, after listening to your fellow jurors, and if

24  after stating your own view, you become convinced that your

25  view is wrong, do not hesitate because of stubbornness or pride

E9gQdel6                        Charge

1   to change your view.  On the other hand, do not surrender your

2   honest convictions and belief solely because of the opinions of

3   your fellow jurors or because you are outnumbered.  Your final

4   vote must reflect your conscientious belief as to how the issue

5   should be decided.  Your verdict has to be unanimous.  If at

6   any time you are not in agreement, you are instructed not to

7   reveal the position of the jurors.  That is the split of the

8   vote to anyone, including to the Court.

9          Finally -- and I say this not because I think it is

10  necessary, but because it is the custom of our courthouse to

11  say this -- you should treat each other with courtesy and

12  respect during your deliberations.  All litigants stand equal

13  in this courtroom.  All litigants stand equal before the bar of

14  justice.  All litigants stand equal before you.  Your duty is

15  to decide the issues before you fairly and impartially and to

16  see that justice is done.

17         Under your oath as jurors, you are not to be swayed by

18  sympathy.  You should be guided solely by the evidence

19  presented during the trial and the law as I have given it to

20  you without regard to the consequences of your decision.  You

21  have been chosen to try the issues of fact and to reach a

22  verdict on the basis of the evidence or the lack of evidence.

23  If you let sympathy interfere with your clear thinking, then

24  there is a risk that you will not arrive at a just verdict.

25  All parties are entitled to a fair trial.  You must make a fair

1    and impartial decision so that you will arrive at a just

2    verdict.

3         Now, I want to tell you folks a few more things very

4    quickly.

5         The alternates:  Alternate 1 and 2.  You will not be

6    deliberating with jurors 1 through 12, but you are not released

7    forever.  You are released to go home or wherever it is you

8    choose to go.  I ask that you stay in touch with Joe by cell

9    phone or whatever method of communication is quickest and

10   easiest.  If, for some reason -- and it does happen -- we have

11   to call upon you to come and join the deliberations, then we

12   would do so.  So, you are not relieved until this whole thing

13   is over.  Joe will call you.  You will be the first phone call

14   made after the verdict is in because that way you'll know

15   you're done.  All right?  Until then, I ask that you maintain

16   your oath of silence and not speak to anybody else about this

17   case because if you are called upon to deliberate, it's very

18   important that you not have spoken to friends, family, anybody

19   else about your thoughts.

20        As I said you're going to have -- can I have the

21   verdict sheet?  You are going to have a copy of this verdict

22   sheet.  It leads you through -- each one of you will have one.

23   It's easier to give you each one and there will be one extra

24   that you can have in the middle of the table.  It leads you

25   through each of the charges.  It just says guilty, not guilty

on each one; you take them one by one.  At the end, there is a

place for everybody to sign, OK?  You will be dismissed 5:00.

So you are going to have an hour and a half to deliberate

today.  You will be picking up again tomorrow morning at 9:30.

It just continues until you are done.

You can't deliberate until everybody is here in the

morning, and we'll talk again at 5:00.  You won't leave until I

call you out and then I will dismiss you at 5:00.  If at any

point you have a verdict -- today, tomorrow, whenever it is --

the verdict form does not go in the envelope, OK?  The

foreperson holds on to the verdict form.  In the envelope goes

something that says:  "We've reached a verdict."  The envelope

is handed to the marshal.  The marshal hands it to Joe.  Joe

hands it to me.  I read "We've reached a verdict."  I come up,

and then we come out.  The foreperson will then be asked to

hand the form to Joe, all right?  So that is the way the

process works.  Don't put the verdict form in the envelope.

All right?

That's it.  Ladies and gentlemen, I am going to have

Alternates 1 and 2 will go into the room and be able to gather

their belongings.  I am now going to release you folks to go

talk to each other.  We have to swear the marshal

As you see at bottom of my notes, I take one moment to

talk to counsel on my initiative over here.

(At the sidebar)

E9gQdel6

1    MR. PITTELL:  Judge, I thought when you were reading

2    Count Eight that you didn't read the first line; that you went

3    right into here.

4    THE COURT:  Let me see.  You want me to read that

5    line?

6    MR. PITTELL:  Just the first sentence.

7    THE COURT:  OK.

8    MR. POSCABLO:  And, Judge, we have looked at

9    Mr. Pittell's and our evidence is ready.  Mr. Pittell needs to

10   eyeball the evidence.

11   (In open court)

12   THE COURT:  Ladies and gentlemen, I have one little

13   thing that I may have not read entirely so I want to make sure

14   I read it.

15   On page 90, it says:  The second element that the

16   government must prove -- this is now in Count Eight -- beyond a

17   reasonable doubt is that in or about June 2013, the defendant

18   knowingly possessed a firearm or ammunition.  I have already

19   instructed you on all the terms except ammunition, and you

20   should use those definitions here.  Ammunition, as I've told

21   you -- and that part I did go through -- is cartridges, cases,

22   primers, bullets or propellant powder designed for use in any

23   firearm.

24   All right?  I am going to ask my deputy to please

25   swear the U.S. marshal.

E9gQdel6

1        (Marshal sworn)

2        THE COURT:  All right, ladies and gentlemen, I am now

3   going to have you go in and start talking to each other about

4   this case.  Thank you.

5        (At 3:32 p.m. the jury retired to deliberate)

6        THE COURT:  Ladies and gentlemen, let's all be seated.

7   First, is there anything any party would like to raise?  Then I

8   will talk about process in terms of who needs to be where when.

9        MR. POSCABLO:  Not from the government, your Honor.

10       THE COURT:  Mr. Pittell?

11       MR. PITTELL:  Not from us, Judge.

12       THE COURT:  So let me tell you my practice.  It is

13  3:30.  Typically, I'll stay close by in the robing room for

14  about an hour.  When the jury first starts, we often get a

15  quick question.  So it's just easier if I stick around.  So I

16  will be right next door for probably actually the remainder of

17  the afternoon.  It's only from now until 5:00.

18       I ask you folks to be nearby.  When I say nearby, I

19  don't mean heading back to the U.S. Attorney's office where you

20  have to then come over from next door, unless one of you is

21  content not to necessarily be present during the question.

22       Mr. Pittell, since there is only one of you, you will

23  need to be nearby in the building someplace.  Then if you just

24  leave Joe with your phone number if you have a cell phone in

25  the building, then Joe can get you on the eighth floor or

E9gQdel6

1    wherever you may be hanging out or wherever you are here.  I

2    don't have any other matters in here this afternoon.  I do at

3    lunchtime tomorrow.  No, I don't.  I have a meeting tomorrow at

4    lunchtime.  So I will dismiss the jurors at 5:00.  We will

5    assemble at 5:00 again with the court reporter.  We will

6    dismiss the jurors and tell them they can't start deliberating

7    until 9:30, but my practice is not to come in the courtroom at

8    9:30.  You folks should be nearby, but the jurors will be

9    instructed they can begin deliberating when all of them are

10   present and to notify the marshals if somebody is missing at

11   about quarter of 10:00, 10:00.  So that we are aware of it.  I

12   think that that is it.

13           Then the government, I take it, will have accessible,

14   and hopefully closely accessible, an electronic version of a

15   transcript in case we get questions so we can quickly make

16   transcript copies.

17           MR. POSCABLO:  I was going to ask your Honor what your

18   practice was with that.  If we should have the electronic

19   versions, and we will discuss amongst ourselves what will go

20   in.

21           THE COURT:  Yes.  If there is a question as to sort of

22   particular, can you give me all the testimony on X, you folks

23   will scramble around and try to agree on what that involves.

24   Then I have found that it is just easiest for the government to

25   extract those pieces from the electronic version rather than

E9gQdel6

1    having to redact it or anything else.  It is quite cumbersome

2    to do that.  Since you folks seem to be set up for that, that

3    will be helpful and then it would be sent back in.  Are those

4    exhibits all right?

5              MR. PITTELL:  There are actually some with drug

6    residue.

7              MR. POSCABLO:  Judge, we are going to put on the

8    record that we are going to keep the empty vials, the scale,

9    plate which may have some drug residue.

10             THE COURT:  They understand, and there was testimony

11   about drug residue on those.  So I think that is fine.  They

12   know they're not getting everything.  Do they have an index?

13             MR. POSCABLO:  They do.

14             THE COURT:  That will be sufficient.

15             Is there anything else anybody needs to say?

16             MR. POSCABLO:  No, your Honor.

17             THE COURT:  The one last thing I wanted to mention was

18   that there was one juror whose body language -- actually, it

19   was interesting -- alternated between being, seeming to be

20   quite -- to be agreeing strongly with one side at certain

21   points and indicating things by nodding the head in one

22   direction or nodding the head in another direction in sort of a

23   manner that is sort of a little on the unusual side in how

24   frequently it happened.  And that was Juror No. 7.  I say that

25   because I don't anticipate any issues.  This has happened

E9gQdel6

1    before, and, nonetheless, the jurors have all been able to talk

2    to each other and deliberate as the case law requires, but it

3    always concerns me when somebody appears to be oriented

4    strongly in one direction.  Sometimes it's just a personal

5    habit where they are making facial expressions and body

6    movements.  Sometimes it's more than that.

7          Sufficient unto the day, I did want to note it now

8    before we have any issues, if there are any, and there may be

9    none.  I have frequently made this comment and had none.  It is

10   just a safety precaution that I do notice something in terms of

11   demeanor.  All right.  I am going to leave it to you folks to

12   get this to Mr. Pecorino.  He will give it to the marshal in

13   just a couple of moments.  All right?

14          MR. POSCABLO:  Yes, your Honor.

15          THE COURT:  Thank you.  We will see you folks at 5:00.

16          (Recess pending verdict)

17                         (In open court; jury present)

18          THE COURT:  I am going to let you folks go this

19   evening, and we will pick up tomorrow morning at 9:30.  I want

20   to remind you folks that you all need to be present before you

21   start.  People can talk about the weather or whatever the

22   sports games are, whatever, you know, general things, topics,

23   but don't discuss the case until everybody is here.  We need

24   all 12 of you to start your deliberations in the morning.  OK?

25          You are not going to come out here first.  You are

1    just going to go into the jury room and start deliberating.  If

2    you don't have all 12 of you by quarter of 10:00, let the

3    marshal know, and then give us the juror number, and we'll try

4    to figure out where the juror is so you folks aren't waiting

5    around until noon and don't know where one person is.  We'll

6    see if there's a train delay or something like that.  If by

7    quarter of 10:00 someone is missing, let the marshal know so

8    you don't have to sit around.  But, otherwise, when you get in

9    and you've got all 12 of you, if you are there at 9:25, you can

10   start at 9:25, and we will have lunch for you tomorrow.

11          If there are any special dietary restrictions or

12   issues, let the marshal know.  Give him a piece of paper and,

13   you know, we will take care of arranging for that, but,

14   otherwise, it will be a regular assortment of sandwiches,

15   things like that, sort of run-of-the-mill cold cut sandwiches;

16   but if you have a special request, it's not a problem.  In

17   fact, if you want, we can do Chinese food tomorrow or something

18   like that, right?  We can't?  I get into trouble with these

19   things.  We are going to order from a restaurant, so it's not

20   going to be there, but there is a specific list that we have to

21   order from.

22          So Joe will leave a menu for you.  He can't chat with

23   you, but he can leave a menu for you, and you can fill it out

24   and give it to the marshal for lunch tomorrow.  Only start when

25   you are all here.  But you will start in the morning, and we

E9gQdel6                    Deliberations

1    will see you if you have any questions during the day.  Thank

2    you.

3              Even though you are deliberating, remember not to talk

4    to anybody in the rest of your life.  Only talking to each

5    other about the case is what's allowed right now.  You can't

6    talk to anybody else in your life right now about the case.

7    Thank you.

8              (Jury recessed)

9              THE COURT:  All right, ladies and gentlemen, as we had

10   said earlier, tomorrow morning you folks should be here right

11   around 9:30, not certainly later than 9:30, to be ready in case

12   there's a question of some sort that comes up.  And if you are

13   going to be out of the courtroom, let Joe know where you can be

14   reached so we can get a hold of you immediately if we need to.

15             Is there anything you folks would like to raise this

16   afternoon?

17             Mr. Pittell?

18             MR. PITTELL:  No, your Honor.

19             THE COURT:  We will see you folks tomorrow morning.  I

20   will only see you when there's a question.  I won't see you

21   before that.

22             MR. POSCABLO:  Thank you, Judge.

23             THE COURT:  Good night.

24             (Trial deliberations to continue Wednesday,

25   September 17, 2014 at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

JOHN REYNOLDS

Direct By Mr. Poscablo . . . . . . . . . . . .1201

Cross By Mr. Pittell . . . . . . . . . . . .1211

Redirect By Mr. Poscablo . . . . . . . . . .1214

Recross By Mr. Pittell . . . . . . . . . . .1215

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 751, 751-A, 752, 752-A, 753, and 753-A . . .1203

 751-B, 752-B, 753-B and 752-C   . . . . . . .1207

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 I   . . . . . . . . . . . . . . . . . . . . .1201