E9h1del1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          12 CR 802 (KBF)

5   DAVID DELVA,

6              Defendant.                  Jury Trial

7   ------------------------------x

8                                          New York, N.Y.
                                           September 17, 2014
9                                          9:18 a.m.

10
    Before:
11
                     HON. KATHERINE B. FORREST,
12
                                           District Judge
13

14                        APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    JUSTINA GERACI
17  RYAN POSCABLO
         Assistant United States Attorney
18
    JEFFREY PITTELL
19       Attorney for Defendant Delva

20

21  ALSO PRESENT:  JOHN REYNOLDS, Special Agent FBI
    ANNIE CHEN, Paralegal Specialist, U.S. Attorney's Office
22

23

24

25
```

E9h1del1

1        (Trial resumed)

2        (Case called)

3        THE DEPUTY CLERK:  Counsel, please state your name for

4    the record.

5        MR. POSCABLO:  Good morning, your Honor.  Ryan

6    Poscablo, Justina Geraci, Annie Chen, and John Reynolds.

7        THE COURT:  Good morning, all of you.

8        MR. PITTELL:  Good morning, your Honor.  Jeffrey

9    Pittell for Mr. Delva, who's present.

10       THE COURT:  Good morning to each of you.

11           We're here at the moment because an issue developed

12   overnight relating to juror no. 7.  It appears that the

13   government has run a background check and determined that

14   there's a possibility that juror no. 7 is the same individual

15   as a Barbara Kearse who has been convicted of a felony relating

16   to drug possession and also been arrested on a number of

17   occasions for drug sales *inter alia*.

18           The court itself pulled the juror questionnaire that's

19   filled out downstairs, and I've got copies for you folks of the

20   relevant pages, and I'll have Joe hand you each one.  It does

21   appear that the date of birth and the address match that which

22   is set forth in the police reports and the information attached

23   by the government to their submission.  It does indicate on the

24   juror form that this juror indicated that she, under

25   questions 5 and 6, had not been convicted of a felony.  She

E9h1del1

checked no.  She in fact, if it's the same person, has been

convicted of a felony.  We'll determine, obviously, whether

we've got the same person or not.  Question 7 says:  "Were your

civil rights restored?"  And that question is answered yes.

Now that can mean a variety of things.  Obviously we all think

of it as the formal process for the restoration of civil

rights, which, under New York law, requires an application for

the restoration of rights and the issuance of a certificate

that would then provide the restoration of rights, and it's

possible that she applied for and received that.  It's also

obtainable through a pardon from the government.  There may be

other ways, but those are the ways which come to mind.

Nevertheless, it does appear that questions 5 and 6 were

answered inaccurately.  It's possible there was some confusion

as to whether or not, if there was a restoration of rights,

that somehow eliminated the need to answer 5 and 6 with an

answer that would be yes.  So that's one issue is whether or

not there has been an issue with respect to the form filled out

under penalty of perjury downstairs.  You'll note that at the

bottom it has an "under penalty of perjury" line.

          The other issue relates to the voir dire process which

the court conducted where the court asked a broader question,

which was not about a felony conviction but instead was about

whether or not anyone in the group had a criminal arrest.  The

language is I think accurately cited and quoted in the

1371

E9h1del1

1   government's letter.  And she did not indicate that she had.

2   In fact, there's an open warrant for her at this time as well

3   as a number of arrests.

4        So that is the information which we have and so we

5   don't know, I think, number one, while we seem to have an

6   indication, it seems fairly clear to me, based upon the juror

7   questionnaire filled out downstairs -- it's crystal clear,

8   frankly, but we don't know what her view will be as to whether

9   or not she's the same person and whether she will concede that

10  she's the same person.

11       She does not have an open warrant anymore.  That has

12  been cleared, but there are the arrests.  I was just so

13  informed of that by my deputy.

14       So I think the place to start would be to ask her to

15  come in.  I would propose to seat her in the first seat in the

16  jury box and ask her a series of questions, including what is

17  her date of birth, what's her address, etc.  I'll do it very

18  lightly because if we somehow made a mistake, it's important

19  that she not feel that she's in the middle of an inquisition

20  that's accusatory, and then I'll ask her if she's ever been

21  arrested and ever been convicted of a felony, and then after

22  that I'd ask her if her civil rights have been restored and

23  through what kind of process, and depending upon the answers to

24  the questions, I don't think it would take a very long period

25  of time to figure out what her answers are going to be.  We

E9h1del1

don't need to do a searching inquiry.  And lastly, whether or

not she has shared any information, if her answers are yes,

that she has been arrested, with any of the other jurors.  If

her answers are as the court expects them to be -- I would hope

that she would be truthful and honest with the court under

direct questioning -- then she would be dismissed and that

would be my intention.  What I would do would say, at the end

of that questioning, "Thank you very much, you can step

outside," confirm with you folks that you agree that dismissal

is appropriate.  If you don't agree that dismissal is

appropriate, we'll deal with that.  And then, if she is

dismissed, then have her leave and have alternate no. 1 take

her place.  We would then discuss the process, but the process

would be essentially calling all the 11 out, having alternate

no. 1 take the place of 7, giving them the very light

instruction, if you will, that, as I had said happens from time

to time, alternates are called upon to serve, that has occurred

here, the jury should not speculate as to why alternate 1 has

been called upon, but they should now go and deliberate with

alternate no. 1, who's now juror no. 7, on each and every count

together.  And so that would be the process.  Because they do

need to deliberate for each count.  They can't just say, okay,

we've already determined X, Y, or Z.  They need to commence the

deliberations again with them.

       How does that process sound to you and do the

E9h1del1

questions that I am proposing to ask juror no. 7 sound like the

appropriate questions?

            MR. POSCABLO:  They do for the government, your Honor.

            THE COURT:  Mr. Pittell?

            MR. PITTELL:  Judge, I object to the process and in no

uncertain terms and as strong as possible.

            THE COURT:  Do you have any reason to believe that

juror no. 7 is not the individual who has been convicted of a

felony and served a year, which would disqualify her as a

matter of law under 28 U.S.C. 1865(b)(5), unless her civil

rights have been restored?

            MR. PITTELL:  Yes, I do.  The rap sheet that the

government gave me indicates that a certificate of relief was

granted to her on April 9, 2012.

            THE COURT:  Okay.  So then --

            MR. PITTELL:  So her civil rights were restored, so I

think under the statute, she's not disqualified under the

statute.

            THE COURT:  Now do you agree with me that on her juror

form, under questions 5 and 6, she did answer those questions

inaccurately?  Though as I previewed, it's possible that if her

civil rights were in fact restored, that that could be a

confusion, because she did answer then question 7 indicating

she believed she'd gotten a certificate.  However, those

questions are inaccurate and nonetheless doesn't address the

E9h1del1

second question, which was the voir dire that the court

conducted asking the broader question of, "Has any juror been

arrested?"  And of course there are a number of arrests, so in

that regard she was sworn to tell the truth.  Frankly, if we'd

known she had drug convictions for sales of cocaine, if that's

in fact her and the issue here is in part those drug sales, we

would have taken a hard look at whether or not there was a

cause challenge, and I would suspect that had that been known,

a peremptory would have been used, if there hadn't been an

immediate cause dismissal.

MR. PITTELL:  Well, responding to all that, regarding

question 5, I don't think that there's a pending felony against

her so I think question 5 is actually correct.

Question 7 is correct because she did get a

certificate of relief.

Question 6 could be no because she thought that the

issuance of the certificate of relief would have nullified that

conviction.

Regarding her failure to answer the question to the

court's questioning of the panel, sometimes jurors are

intimidated, sometimes jurors are embarrassed, sometimes jurors

don't want to speak up.  I mean, look, I can speak from

personal experience.  I was in a jury pool and I was in the

box, and the judge looked at the jury and said to all the

jurors, "I'm the arbiter of the law and can you follow the

E9h1del1

1      instructions on the law as I give it to you?"  And nobody

2      raised their hand, and then I honestly raised my hand because

3      I've read plenty of cases where, you know, civil or criminal

4      verdicts were reversed because of instructional error.  I've

5      been personally involved in cases where that has occurred.  And

6      I must say, it was a little embarrassing and I even felt a

7      little intimidated on sort of, you know, rubbing it in the face

8      of the judge, so to speak, even though I didn't know that

9      judge, I knew nothing about him.  And so it very well could be

10     that her silence, especially because it's put to the panel as a

11     whole, other people are sitting there, they're strangers, it's

12     in the trappings of a courtroom setting, that her silence could

13     have been just out of embarrassment.  It's possible she was, on

14     that question, not paying attention.  I think the key inquiry

15     here is whether or not she deliberately lied to get on this

16     panel to somehow affect the trial, and I think that that is the

17     standard.  I think that's the standard set forth in the two

18     apparently controlling Supreme Court cases of *McDonough* and

19     *Phillips*, and that seems to be the inquiry, actual bias by the

20     juror.

21             THE COURT:  Well, certainly actual bias by the juror

22     is disqualifying.  There's no doubt about that.  It is also the

23     case that juror misconduct can also be a grounds for

24     disqualification with or without evidence of bias, if there is

25     in fact true misconduct.  I think that your point is that we

E9h1del1

1    need to determine whether there's been juror misconduct and

2    whether or not, in addition, there's bias.  As you know, the

3    court has previously expressed concerns regarding bias, given

4    the body language of that particular juror prior to even

5    commencing the deliberations, and so there was a question as to

6    that issue.  It just so happens that that same juror is the one

7    that we're now talking about.  So I hear your point.  I think

8    we need to do the inquiry.  I'd like to do that now so that the

9    rest of the jury panel isn't concerned.  I should say they're

10   being told we're having a conference, they should wait to begin

11   deliberations until our conference has ended.  They've been

12   told nothing more.

13        MR. PITTELL:  My concern about even having the inquiry

14   process is that --

15        THE COURT:  It would be error as a matter of law if I

16   did not inquire into a possible assertion of jury misconduct.

17   That I think is clear from both Second Circuit and Supreme

18   Court precedent.  I should not, however, and will not inquire

19   into deliberations, thoughts about the evidence in any way,

20   shape, or form.  This is a very narrow issue.

21        MR. PITTELL:  I understand, and I agree it's a narrow

22   issue.  My concern is, it's one of perception really from two

23   perspectives.  One, when the juror was doing the body language,

24   I think we're all talking about when she was nodding in what we

25   commonly interpret as a yes or an affirmative response, and it

E9h1del1

1    occurred frequently during my summation.

2            THE COURT:  And just to be clear about what the body

3    language was, there were lots of times that jurors as human

4    beings nod their heads in agreement with points even during

5    instructions that the court gives because they sometimes feel

6    that they want to interact in a human way.  The concern of the

7    court in terms of the body language, as I stated it yesterday,

8    was it was an unusual amount.  She was, frankly, on the edge of

9    her seat during much of the body language exhibition, leaning

10   forward in what I considered a jittery way, exhibiting the body

11   language.  Frankly, you know, I had sufficient concern about

12   that to state it on the record.  I normally don't state every

13   movement of a juror sitting in the box on the record.

14           MR. PITTELL:  I would agree.  During my summation, I

15   mean, I looked up and down the panel, back and forth, and I saw

16   that she was nodding in what I would infer as agreement with

17   some of the points that I was making, and that is unusual.  I

18   think any lawyer will tell you, on either side, it's unusual

19   that a juror would be expressive like that.  They're usually

20   stoic.  But my concern is that, so here we have a situation

21   where a juror is expressing a position which one can interpret

22   as being favorable to the defense --

23           THE COURT:  Prior to deliberations, however, which, as

24   I raised it yesterday, my concern is not that the jurors have,

25   you know, thoughts; it's that it seems to be that she had a

E9h1del1

1    particular attachment.  Now that's not the issue right now.

2    And I haven't gotten a statement from the jury saying that

3    they're unable to reach agreement.  I have no idea.  For all I

4    know, they could all be in favor of the defendant right now, or

5    they could all be in favor, including juror no. 7, with the

6    government.  I have received no information one way or the

7    other, nor will I inquire.  The issue for the court is solely

8    that we do have I think relatively clear evidence of potential

9    misconduct and I need to inquire.  I will do it lightly.

10             MR. PITTELL:  Well --

11             THE COURT:  I understand you object.

12             MR. PITTELL:  Right.  I object.  I just want to --

13             THE COURT:  Okay.  But I need you to do it really

14    quickly because we're going to get these people out here.

15             MR. PITTELL:  From my perspective, because she's

16    affirmatively agreeing to what is on my summation, she ends up

17    being singled out to have her criminal background checked.

18    None of the other jurors are checked.  So by her expressing

19    what would be interpreted as an agreement, her background is

20    checked.  So I'm concerned about the due process aspect of it,

21    that there's a juror who appears to be in my court, or in my

22    favor, is singled out for investigation.  That's one thing.

23             The other concern I have is that, let's say it is

24    right now 11 to 1 and she's the only holdout back there.

25    There's a potential that she's brought out, she's questioned.

E9h1del1

1    I know the court's going to question her lightly.  I have no

2    doubt about that, okay, but she's still going to be brought

3    out, she's going to be questioned.  She may feel intimidated

4    and then go back and change her vote, or the other jurors --

5    let's say it's, you know, 9 to 3 and there's two others with

6    her.  She's brought out, she's brought back in.  The other two

7    that are in favor might feel, wow, if we're siding for the

8    defense, look what's going to happen.

9              THE COURT:  This comes up whenever there are

10   indications of juror misconduct.  Number one, the court is

11   required to investigate those, and there are cases where the

12   court has declined to do so and that has been held to be

13   reversible error.  The manner of the investigation, I agree, is

14   very important.

15             In addition to that, however, this does come up where

16   people have to be questioned, and one just tries to do it as

17   carefully as possible.  We don't know and will not know what

18   the split of the vote is, so hypotheticals about what it could

19   be or might be and how it might impact that I think can't get

20   us anywhere at this point.  I hear your view, which is you

21   would rather we don't proceed.  We have to proceed, and we will

22   proceed.  And we'll take it from there.

23             I will tell you I'm strongly concerned about this

24   juror because of the number of arrests for, among other things,

25   narcotics, and it is certainly an area of inquiry.  It's

E9h1del1

1  certainly something which you folks should have known about in

2  selecting the jurors, in deciding how you were going to use

3  peremptories, as well as the cause challenges, which of course

4  would have been posed.  But let's find out if we've got the

5  right person first, and before she is formally dismissed from

6  the panel, we'll talk again.

7       So what we need to do is to get her I think out here

8  and into the box.  If you think it would be lighter, we can do

9  it over at sidebar.  I'm happy to do it either way,

10  Mr. Pittell.  If you think that there is some way in which

11  having her sit in the seat no. 1 is too intimidating, which is

12  the way I would normally do it, in open court in particular so

13  that the defendant can hear what's going on, then, you know, I

14  would be happy to do it the other way.

15       MR. PITTELL:  I think since the courtroom is empty and

16  there's no other jurors, actually, she could sit maybe in her

17  own seat.  That would be fine.

18       THE COURT:  All right.  Well, let's do it that way.

19       MR. PITTELL:  Can I just suggest one other issue that

20  we should at least give some consideration?

21       THE COURT:  Yes.

22       MR. PITTELL:  I mean, this is the first time I saw the

23  questionnaire.

24       THE COURT:  Yes.  I only pulled it this morning after

25  receiving the government's letter.

E9h1del1

| | |
|---|---|
| 1 | MR. PITTELL:  The question is, you know, if signing |
| 2 | this is a criminal offense and there's potential that she made |
| 3 | a false statement on it, should she have counsel?  As well as |
| 4 | if her silence to your question posited to the panel, "Has |
| 5 | anybody been arrested," while she was under oath, if her |
| 6 | silence to that potentially subjects her to criminal exposure, |
| 7 | I question whether she should have counsel.  I mean, I say that |
| 8 | almost because -- I say it as my obligation as an attorney and, |
| 9 | you know, obviously she's not my client, I have a client here, |
| 10 | but, you know, when I see somebody who could potentially be |
| 11 | placed in jeopardy, we should at least talk about it. |
| 12 | THE COURT:  All right.  Mr. Poscablo? |
| 13 | MR. POSCABLO:  Judge, rather than going back to the |
| 14 | ranch, I brought part of the ranch over here.  My supervisor is |
| 15 | in the audience.  And I think it's the government's position |
| 16 | that we would not use any part of her answers to your Honor |
| 17 | against her today. |
| 18 | THE COURT:  All right. |
| 19 | MR. POSCABLO:  And we can affirmatively say that. |
| 20 | THE COURT:  All right.  Thank you. |
| 21 | Let's go ahead and bring out juror no. 7.  We'll sit |
| 22 | her in her normal place. |
| 23 | (Pause) |
| 24 | THE COURT:  My deputy was asking about her belongings, |
| 25 | and I said she could leave them in the room. |

E9h1del1

1        (Pause)

2        (Juror no. 7 present in the courtroom)

3        THE COURT:  Good morning, Ms. Kearse.

4        JUROR:  Good morning.

5        THE COURT:  All right.  We've got --

6        JUROR:  Should I sit down?

7        THE COURT:  Please sit down, yes.  Thank you.

8        We've got juror no. 7 here, which is Ms. Barbara

9    Kearse, is that right?

10        JUROR:  Mm-hmm.

11        THE COURT:  Is that K-E-A-R-S-E?

12        JUROR:  Yes.

13        THE COURT:  Thank you.  From time to time the court

14    has to ask individual jurors questions, and so I need to ask

15    you a few questions.  I'm sorry.  I know you're sitting out

16    here and you're in the box and you're all alone there in the

17    box.  We thought we'd put you in your seat so at least you had

18    the familiarity of your seat.

19        JUROR:  All right.  Thank you.

20        THE COURT:  All right.  What's your birthdate?

21        JUROR:  10/30/59.

22        THE COURT:  And what is your current home address and

23    then the home address just before that?

24        JUROR:  1314 Seneca Avenue, Bronx, New York.  And the

25    other one was 2280 Bathgate, Bronx, New York.

E9h1del1

1        THE COURT:  All right.  Now have you ever been

2   arrested before?

3        JUROR:  Yeah.

4        THE COURT:  All right.  And how many times have you

5   been arrested, approximately?

6        JUROR:  Once.

7        THE COURT:  Just once?

8        JUROR:  Yes.

9        THE COURT:  And have you ever been convicted of a

10  felony?

11       JUROR:  Yes.

12       THE COURT:  And did you serve time in jail for that?

13       JUROR:  Yes.

14       THE COURT:  And were your civil rights restored?

15       JUROR:  Yes.

16       THE COURT:  And did you go through a process to have

17  that occur?

18       JUROR:  Yes.

19       THE COURT:  And what did you do?  Did you get a

20  certificate of some sort?

21       JUROR:  I did, but at this point I wouldn't know where

22  it is if you asked me to go and find it.

23       THE COURT:  But your best recollection is that you got

24  your --

25       JUROR:  Yes, yeah.

E9h1del1

| | |
|---|---|
| 1 | THE COURT:  -- civil rights restored. |
| 2 | JUROR:  Yes, and I got my records sealed. |
| 3 | THE COURT:  All right.  And now on your juror |
| 4 | questionnaire that you filled out downstairs on the very first |
| 5 | day that you came -- |
| 6 | JUROR:  Yes. |
| 7 | THE COURT:  -- in question no. 6, it asked whether |
| 8 | you'd ever been convicted of a felony, and you checked no. |
| 9 | JUROR:  I did that because when they sealed my case, |
| 10 | she said that it's so old and outdated, just put no because |
| 11 | that's how old it is. |
| 12 | THE COURT:  Who told you that? |
| 13 | JUROR:  The lady in the district attorney's office |
| 14 | where I went to get my records sealed. |
| 15 | THE COURT:  All right.  So that was not somebody in |
| 16 | our jury office. |
| 17 | JUROR:  Oh, no, no. |
| 18 | THE COURT:  So they told you that if in the future |
| 19 | you're asked about whether you'd been convicted of a felony, |
| 20 | you would just say no? |
| 21 | JUROR:  Yes. |
| 22 | THE COURT:  All right.  Now are you sure you've only |
| 23 | ever been arrested once? |
| 24 | JUROR:  Yes.  I went to jail once. |
| 25 | THE COURT:  Well, putting aside being in jail, have |

E9h1del1

 1    you been arrested on other occasions?

 2            JUROR:  Twice.  I got in trouble, I got arrested, they

 3    let me come home, and then when I came home, I left New York,

 4    and I came back and they caught me.

 5            THE COURT:  All right.  And what was that conviction

 6    for?

 7            JUROR:  A drug case.

 8            THE COURT:  What kind of drugs?

 9            JUROR:  Crack cocaine.

10            THE COURT:  All right.  And putting aside the

11    questionnaire that you filled out, during the voir dire

12    process, do you remember when I was asking some questions of

13    the group of 12 sitting there?

14            JUROR:  Yes.

15            THE COURT:  And one of the questions I asked was,

16    "Have you ever been charged with a crime?"

17            JUROR:  Okay.

18            THE COURT:  And you didn't raise your hand.

19            JUROR:  No, I didn't.

20            THE COURT:  Was there any particular reason that you

21    didn't raise your hand?

22            JUROR:  Because the case is so old, it doesn't make a

23    difference.

24            THE COURT:  Okay.  All right.  So you heard the

25    question, is that right?

E9h1del1

 1              JUROR:  Yeah, I heard the question.

 2              THE COURT:  All right.  You just thought that you

 3      didn't need to answer it yes?

 4              JUROR:  Yes.

 5              THE COURT:  All right.  Have you spoken with any of

 6      the members of the jury, the other 11, about your --

 7              JUROR:  No.

 8              THE COURT:  -- criminal history?

 9              JUROR:  No.

10              THE COURT:  And have you spoken with either of the

11      alternates about your criminal history?

12              JUROR:  No.

13              THE COURT:  All right.  Thank you, Ms. Kearse.  You

14      may step down.  Thank you very much.

15              JUROR:  All right.  Thank you.

16              THE COURT:  Oh, Ms. Kearse, I'm going to have you just

17      wait over there, outside the room, while I talk to counsel just

18      for a moment before you go back in and join everybody.

19              JUROR:  All right.

20              (Juror no. 7 excused from the courtroom)

21              THE COURT:  All right.  Let me hear from counsel on

22      your views as to how to proceed.  I have my belief, but let me

23      hear from you folks.

24              MR. POSCABLO:  Judge, I think the government's

25      position, as outlined in its letter, now that we've learned

E9h1del1

that it's the same Ms. Kearse, that she should be dismissed and
that alternate juror no. 1 should be called back to replace
her.  Whether she willingly or unknowingly lied to the court on
two occasions, based on representations made by some other
representative in another agency or courthouse is irrelevant.
The point is that unfortunately she did lie, and it's clear
from her statements to your Honor and also her indications on
the juror form and also in answer to your Honor's questions in
voir dire.

THE COURT:  Mr. Poscablo, how many arrests do you
believe the information you have provided to the court
indicates?

MR. POSCABLO:  Judge, I counted ten, and of the ten,
seven were sealed, and my understanding is things are sealed if
someone's stopped, taken in handcuffs, and there's some sort of
declination to prosecute.  Sometimes that happens that cases
are sealed because of the age of the person who's placed under
arrest; sometimes it's because it's an unlawful arrest;
sometimes it's because, you know, the prosecuting agency
decides not to go through with it.

THE COURT:  And what dates do you have for those
arrests?

MR. POSCABLO:  Judge, unfortunately, I don't think I
have a copy of it right now, but give me one second.

(Pause)

E9h1del1

| | |
|---|---|
| 1 | MR. POSCABLO:  Sorry, your Honor. |
| 2 | (Pause) |
| 3 | MR. POSCABLO:  Okay.  Your Honor, I have arrests dated |
| 4 | May 1, 2010; April 24, 2010; March 17, 2000; February 16, 1999; |
| 5 | October 20, 1998; March 6, 1998; October 30, 1994; July 4, |
| 6 | 1994; June 17, 1991; and there's a final arrest, your Honor -- |
| 7 | one moment -- June 17, 1986. |
| 8 | THE COURT:  All right.  Mr. Pittell. |
| 9 | MR. PITTELL:  We don't know if it's her on all those |
| 10 | arrests the government read.  I mean, we've been provided with |
| 11 | two reports.  One is just an NYPD arrest report which lists her |
| 12 | name, it lists different addresses.  The criminal history |
| 13 | report, the one that's often given in discovery of a |
| 14 | defendant's criminal history, that one only indicates one |
| 15 | arrest, the one she spoke about.  Her answers to the questions, |
| 16 | in my opinion, clearly show there is no juror misconduct and -- |
| 17 | THE COURT:  Well, Mr. Pittell, you would agree I |
| 18 | think -- well, let me ask you.  Would you agree that, assuming |
| 19 | that these arrests are of the same individual, that she has |
| 20 | just lied to the court and indicated that she'd only been |
| 21 | arrested for the felony?  I mean, just now, under my |
| 22 | questioning just now. |
| 23 | MR. PITTELL:  Yes, if it can be verified that she is |
| 24 | the same person who was arrested on all of these, but unless -- |
| 25 | THE COURT:  Let me ask Mr. Poscablo for a proffer on |

E9h1del1

1   why he believes it's the same person.

2                 MR. POSCABLO:  Your Honor, first, this is a NYSID

3   report.  My understanding, from speaking with Special Agent

4   Reynolds, who used to be an officer of the NYPD, is that every

5   time a person is arrested, they're fingerprinted, and that's

6   how they come up with the fact that this is the same

7   individual.  So I think our understanding is that the same

8   Barbara Kearse was fingerprinted every time, and that would

9   make her this person.

10                Another indication that this is the same Barbara

11  Kearse who is juror no. 7 is, it's the same date of birth that

12  Ms. Kearse indicated, and every single one of the addresses are

13  in the Bronx, and at least as to the two most recent arrests

14  that I noted for your Honor, which are the arrests in May of

15  2010 and April 2010, although the defendant's address is

16  different, I would note that they're both at Bathgate Avenue in

17  the Bronx, and her address that she listed at the time of those

18  arrests was 2280 Bathgate, and she indicated to your Honor both

19  on her form and also during your Honor's questioning this

20  morning that her address now or used to be 2305 or 2280

21  Bathgate Avenue.

22                THE COURT:  All right.  Thank you.  I just wanted to

23  know why you thought it was the same person.

24                So based upon that information, Mr. Pittell?

25                MR. PITTELL:  It doesn't convince me it's necessarily

E9h1del1

1    the same person.  It could have been somebody --

2             THE COURT:  Well, let me just tell you it's enough for

3    me to be convinced that it's the same person.  So I think we

4    ought to go with the view that the court believes that there is

5    a sufficient indication that it's the same person, that the

6    court is basing its thinking on that fact.

7             MR. PITTELL:  I think we should bring her back here,

8    ask her if she was arrested in 2010.

9             THE COURT:  Let me just ask you, is there anything

10   else you want to say?

11            MR. PITTELL:  Yes.  I think she should be

12   fingerprinted because --

13            THE COURT:  You think she should be fingerprinted?

14            MR. PITTELL:  I think she should be printed and a rap

15   sheet should be run then.

16            THE COURT:  Well, do you think that that would be

17   something where, after that had occurred, you'd want that juror

18   back in the room?  I don't think so, not based upon the fact

19   that you wanted her to sit in seat no. 7.  I mean --

20            MR. PITTELL:  Well, Judge, this report does not

21   confirm, conclusively confirm that it's her.  The NYSID rap

22   sheets are often in error, people often have the same NYSID

23   number, people use other people's IDs when they're arrested.

24            THE COURT:  All right.  Let's bring her out and ask

25   her if she admits to these other arrests.  Let me have the

E9h1del1

1    marshal bring in juror no. 7 again.

2               (Juror no. 7 present in the courtroom)

3               THE COURT:  Hi, Ms. Kearse.  I'm going to ask you

4    about some other dates and ask you if you were arrested on

5    those dates.  Putting aside whether there were convictions.

6               JUROR:  Okay.

7               THE COURT:  How about May 1, 2010?

8               JUROR:  Yeah.

9               THE COURT:  Okay.  April 24, 2010?

10              JUROR:  I don't remember that one.

11              THE COURT:  Okay.  Then there's a May 2000?

12              JUROR:  No.

13              THE COURT:  February 16, 1999.

14              JUROR:  That was the last time I got in trouble

15   besides that.

16              THE COURT:  October 20, 1998?

17              JUROR:  That was the first time I got in trouble.

18              THE COURT:  Okay.  March 6, 1998?

19              JUROR:  I don't remember that.

20              THE COURT:  Okay.

21              JUROR:  I was getting ready to say, that's the only

22   case I know about.

23              THE COURT:  All right.  October 30, 1994?

24              JUROR:  No.

25              THE COURT:  How about July 4th holiday, 1994, does

E9h1del1

```
1    that ring any bells?

2              JUROR:  No.

3              THE COURT:  Okay.  How about June 17, 1991?

4              JUROR:  I don't remember that one.

5              THE COURT:  How about June 17, 1986 case?

6              JUROR:  No.

7              THE COURT:  You can't remember any of those?

8              JUROR:  No, that's going too far back.

9              THE COURT:  What's that?

10             JUROR:  You're going too far back.

11             THE COURT:  Okay.  How old were you the first time you

12   were arrested?  We will put aside dates for a moment and try

13   to --

14             JUROR:  Let's see.  The first time I really got in

15   trouble, I was like 12.  I had a fight.  Then after that, I

16   don't know.  I remember something in the '90s.  That's what I

17   remember.

18             THE COURT:  And then how many times in the '90s,

19   approximately?

20             JUROR:  Well, I got arrested once.  Whether it was

21   twice for the same charge --

22             THE COURT:  And that was in the '90s?

23             JUROR:  Yeah.

24             THE COURT:  And then you remember something in April

25   of 2010 or May of 2010?
```

E9h1del1

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | JUROR:  Yes, ma'am.  Me and my stepdaughter got into         |
| 2  | an argument.                                                 |
| 3  | THE COURT:  Okay.  And you said you remembered one in        |
| 4  | 1998.  You said June 1998 was the first time you got in      |
| 5  | trouble?                                                     |
| 6  | JUROR:  Yeah.                                                |
| 7  | THE COURT:  And that was different than the felony you       |
| 8  | were convicted of?                                           |
| 9  | JUROR:  Yeah.                                                |
| 10 | THE COURT:  What was that for; do you remember?             |
| 11 | JUROR:  Dealing.                                            |
| 12 | THE COURT:  Okay.  And you don't recall any of the          |
| 13 | 1994, the 1991, 1986?                                       |
| 14 | JUROR:  No.                                                  |
| 15 | THE COURT:  All right.  So there's the October 1998,        |
| 16 | the April 24, 2010, and then the one that you do recall in  |
| 17 | 1999, approximately?  That's the felony.                    |
| 18 | JUROR:  Yeah.                                                |
| 19 | THE COURT:  All right.  Okay.  Thank you very much.         |
| 20 | JUROR:  So am I going home now?                             |
| 21 | THE COURT:  No.  We've just got to get to the bottom        |
| 22 | of it.  Thank you very much.                                |
| 23 | JUROR:  Well, if you all want to excuse me, I can go        |
| 24 | home.                                                        |
| 25 | (Juror no. 7 excused from the courtroom)                    |

E9h1del1

1           THE COURT:  All right.  Well, we've gone from one to

2    three arrests, and we're getting I think varying and shifting

3    stories about the arrests each time.  I don't think we have a

4    clear answer on whether or not she recalls or doesn't recall

5    earlier arrests.  So I have heard I believe quite enough in

6    terms of the juror's demeanor.  I think that she's embarrassed

7    about some of the convictions, I think that she's not wanted to

8    talk about them because she finds them embarrassing, but I

9    believe that they occurred and I think, based upon how she was

10   responding when I was going through the other dates, I would

11   bet that if we fingerprinted her as Mr. Pittell suggests, that

12   we would find that the others occurred as well.  I certainly

13   believe that the three are sufficient.  We've gotten several

14   different answers now on these arrests, and that concerns me.

15           I also will say that had I known that she'd had a

16   crack conviction back in 1999 for a felony, irrespective of the

17   reinstatement of her civil rights, I would have struck her for

18   cause because of the possibility, the very strong possibility

19   of bias.  It's also possible that either of you might have used

20   a peremptory with her, but the court itself, not having had

21   that information, was prevented from heading off possible bias

22   at the pass.

23           The court believes it's appropriate to dismiss this

24   juror and to replace her with alternate no. 1.

25           Apart from what you folks have already argued, do you

E9h1del1

1    have additional positions that you would like to put down on

2    the record?

3            MR. POSCABLO:  No, your Honor, but one thing that just

4    came to mind is, given sort of the way this juror expresses

5    herself, you know, it may make sense not to allow her to go

6    back into the jury room.  Maybe we can give her her belongings.

7    I'm just worried that she would mumble something like, "They're

8    sending me home," "They're sending me home because they found

9    out about my record," or something.  I just wouldn't want that

10   to happen.

11           THE COURT:  We can take care of that, Mr. Poscablo.

12           Mr. Pittell, is there anything else you would like to

13   add to the record at this point?

14           MR. PITTELL:  Judge, I was hoping you would ask her

15   one other question, simply that now that she's acknowledged

16   that she remembers being arrested two other times, why, when

17   you asked her the first time, "Have you ever been arrested,"

18   she said no.

19           THE COURT:  Well, then I would have gotten only the

20   reason for lying to the court but I would have nonetheless been

21   left with a lie.  I hear your point.  I don't think that was

22   necessary to a determination as to whether she was being

23   truthful or not.  I think she was being decidedly untruthful,

24   and, to state the obvious, she also did say in response, in the

25   first questioning that I did of her this morning, that she had

E9h1del1

1    heard my question during voir dire about whether she'd ever

2    been arrested before but she hadn't thought she needed to

3    answer it because it was so old.  Now of course 2010 is not so

4    very old.  2010 is relatively recently.  She was even limiting

5    that answer simply to the one arrest and not the multiple

6    arrests.  So it's just too much.  It's too shifting.  If you

7    were on the other side of this, there's no doubt that this

8    would be enough.  And I purposely did not inquire as to whether

9    she could be biased or unbiased because at this point, given

10   that they're in deliberations, that would be inappropriate to

11   go there.

12           Anything else you'd like to say on the record?

13           MR. PITTELL:  No, I understand.  The reason why I

14   mentioned it was I thought it would at least complete the

15   record if we had her explanation for why, a few minutes before,

16   she answered no to the question and then she answered it yes.

17   Again, whether it was under embarrassment or whether or not she

18   felt it was not important or whatever the reason was, she

19   obviously had a reason.

20           THE COURT:  All right.  I do have one other question.

21   I just want to ask the government, or Mr. Reynolds, if he can

22   answer directly, whether or not the report that Mr. Poscablo

23   referenced, the NYSID report, is one which is relied upon in

24   the performance of the normal duties and responsibilities of

25   the FBI.

E9h1del1

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | MR. REYNOLDS:  Yes, ma'am.                                            |
| 2  | THE COURT:  Thank you, sir.                                           |

The court is going to dismiss juror no. 7, based upon juror misconduct, based upon the court's determination that there are a number of instances where the juror has been untruthful with the court, starting potentially with the questionnaire, though there's a possible explanation for that, but certainly in the voir dire process and then most recently during the questioning this morning before the court.  The court is very concerned about that.  In addition, the court believes that the information the court now has relating to the felony conviction indicates a possible area of concern that the court would have inquired into further had it been aware of it at the time.  So if there had been a positive answer to question no. 6, the court very likely, if the court had become aware of that, would have inquired at the time.

With that said, I will have my deputy tell the marshal that the juror can go home -- she herself has previewed that as a possibility -- and ask the marshal to collect her belongings. And when alternate no. 1 arrives, we will then call all the jurors in and I will proceed as I had indicated.

Is there any objection to that process?

MR. POSCABLO:  None from the government, your Honor.

MR. PITTELL:  I think my objection is clearly stated on the record.

E9h1del1

1      THE COURT:  Yes.  You have your objection to the

2   dismissal of juror no. 7.  Do you have any objection to the

3   manner of proceeding now?

4      MR. PITTELL:  No.

5      THE COURT:  All right.  Thank you.

6      We can go ahead and proceed in that manner.  Perhaps

7   we need one more thing, which is, as the other 11 won't really

8   know what to do right now, I do suggest that in the meantime

9   what I do is we call out the 11 and just say, you know, we're

10   waiting for alternate no. 1 to arrive, as soon as he does,

11   we'll call you folks out here and you can recommence, but don't

12   deliberate until you've got a full group of 12.

13      MR. POSCABLO:  That makes sense, Judge.

14      MR. PITTELL:  I agree.

15      THE COURT:  All right.  So when Joe comes back in,

16   I'll ask him, after no. 7's possessions are removed, to have

17   the other 11 come in.  We'll take a break until then.

18      MR. POSCABLO:  Thank you, Judge.

19      THE COURT:  Thank you.

20      (Recess)

21      (In open court)

22      THE COURT:  All right.  Let's bring out the 11.

23      (Jury present)

24      THE COURT:  All right.  Ladies and gentlemen, let's

25   all be seated for just a moment.

E9h1del1

```
 1          We have called upon alternate no. 1, who was en route,
 2     who will be taking the spot there of juror no. 7.  As I said
 3     yesterday during instructions, it sometimes occurs that we need
 4     to call upon the alternates, and we have done so here.  I
 5     instruct you that you should not speculate as to the reasons
 6     for that.  There could be a variety of reasons for that, and
 7     you just shouldn't speculate about it one way or the other.
 8          Now I don't want you to deliberate, in fact, I
 9     instruct you not to deliberate until you've got alternate 1
10     here.  He's on his way.  I hope he's here in 20 minutes or
11     thereabouts.  It could be half an hour.  But he's on his way.
12     And so when he arrives, we'll see you folks for another minute,
13     I'll have you folks come out, we'll have a full complement, and
14     we'll send you into the room to start deliberating.  All right?
15     I apologize for this delay.  Thank you.
16          We'll see you in a few minutes as soon as this fellow
17     gets here.  Thank you.
18          THE DEPUTY CLERK:  All rise as the jury leaves.
19          (Jury excused)
20          THE COURT:  All right.  Ladies and gentlemen, as soon
21     as alternate no. 1, the new juror no. 7, arrives, we will
22     reconvene and then give the instructions that they should
23     commence their deliberations as a group of 12.  In fact, he's
24     right here right now.  He just arrived.
25          Can you bring them on out again?
```

E9h1del1

<pre>
 1              MR. POSCABLO:  Judge, one thing.  I think your Honor
 2     was already going to go there.  I think the court has to
 3     instruct the jury that they need to start from the beginning.
 4              THE COURT:  Oh, yes.  I mean, I think I used the word
 5     "commence," and I've also suggested to you folks that they need
 6     to deliberate on each count.  They need to effectively start
 7     over again --
 8              MR. POSCABLO:  Right.
 9              THE COURT:  -- from the beginning.  Yes.
10              MR. POSCABLO:  Thank you.
11              THE COURT:  All right.  Why don't we see if we can
12     bring them all in.
13              (Jury present)
14              THE COURT:  All right.  Ladies and gentlemen, let's
15     all be seated.
16              Alternate no. 1, I want to thank you for joining us.
17     As I had indicated yesterday, it is from time to time the case
18     that we call upon the alternates to deliberate.  When that
19     occurs, the jury is not to speculate on why.  And also, it's
20     important that you all now understand that you should treat the
21     deliberations as beginning.  You should treat the deliberations
22     as starting from the beginning so that alternate no. 1, now
23     juror no. 7, will have a full opportunity to deliberate with
24     you on each of the counts that are charged in the indictment,
25     so that, alternate no. 1, you're not coming into something in
</pre>

E9h1del1

1      the middle.  You will essentially all be starting from scratch.

2             With that said, you are now free to go deliberate in

3      the jury room.  And you all remember my instructions from

4      yesterday.  We'll see you only when you have questions.

5      Otherwise, it will be at the end of the day.  Thank you.

6             THE DEPUTY CLERK:  All rise as the jury leaves.

7             (The jury retired to deliberate, 10:24 a.m.)

8             THE COURT:  All right.  Ladies and gentlemen, are

9      there any other issues you'd like to raise with me?

10             MR. POSCABLO:  Judge, one thing that Ms. Chen pointed

11     out to me, one piece of evidence that we didn't send back that

12     isn't drugs or ammunition or a firearm is the demonstrative

13     that your Honor accepted into evidence as Government

14     Exhibit 1003-A, and also the revisions on it based on the

15     handwriting of the DNA expert Ms. Cooke which we offered as

16     1003-R.  With the court's permission, I'd like to send it back.

17             THE COURT:  Mr. Pittell?

18             MR. PITTELL:  No objection.

19             THE COURT:  Then that may be given to the marshal to

20     be put into the jury room.

21             MR. POSCABLO:  And nothing further.

22             THE COURT:  Before alternate no. 1 came out, he just

23     asked Joe if he could speak to him, and Joe I instructed not to

24     speak to him.  He is now a juror who is deliberating and he can

25     only can communicate in writing in the same process as everyone

E9h1del1

1    else.  If he has paperwork issues, we'll deal with those in due

2    course.

3           All right.  Was there anything else we needed to deal

4    with?

5           MR. POSCABLO:  No, your Honor.

6           THE COURT:  All right.  Mr. Pittell?

7           MR. PITTELL:  No.

8           THE COURT:  So you folks know the process.  Stay

9    within close touch and let Joe know where you're going to be,

10    and I'll see you when we have a question or note from the jury.

11    Otherwise I won't see you until we're ready to adjourn at the

12    end of the day.  Thank you.

13           ALL COUNSEL:  Thank you.

14           (Recess pending verdict, 10:26 a.m.)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

E9hQdel2

```
 1              (At 12:05 p.m., a note was received from the jury)

 2              (Jury not present)

 3          THE COURT:  Ladies and gentlemen, let's all be seated.

 4     The Court has received a note from the jury.  It was received

 5     at 12:05 today, and it is dated today 12:02.  It is signed by

 6     Deirdre Moy.

 7          It states the following:  Question 1:  Please point us

 8     to the evidence that shows the existence of David's iPhone or

 9     phone on September 2012.

10          And then it doesn't have a number two but here is the

11     second question:

12          Please point us to the evidence that shows the

13     existence of any phone owned by David other than the iPhone or

14     phone with number (305)709-8402.  So this would be, I would

15     think direct, cross and any testimony relating to documentary

16     exhibits or documentary exhibits themselves.  I am assuming

17     that you folks don't off the top of your head have that.

18          We've marked this Court Exhibit 1.  Why don't you

19     folks take this, confer, come up with what the right universe

20     is, tell Joe as soon as you've got it, I'll come out, we'll

21     look at it, and we'll give it to the jury.

22          MR. POSCABLO:  OK your Honor.

23          THE COURT:  Sound all right?

24          MR. POSCABLO:  Yes, Judge.

25          THE COURT:  Joe is going to mark it as Court Exhibit
```

E9hQdel2

1    1, and you both can inspect it.  It is my practice at the

2    conclusion of a trial to post to the docket all juror

3    questions, so don't take it with you.  We can make a copy of it

4    if you'd like, but here it is if you would like to look at it

5    for now.

6            MR. POSCABLO:  Thanks.

7            (Recess)

8            (Jury not present)

9            THE COURT:  Now, during the time between the last

10   session on the record and right now, this session on the

11   record, I got a knock on my robing room door from Mr. Poscablo.

12   I put my head into the courtroom so that I could see the

13   defendant as well as defense counsel, and Mr. Poscablo

14   indicated that the parties had conferred on the testimony but

15   had a disagreement as to five lines.

16            I stated that we would get a court reporter up here,

17   but that they should indicate on the transcript where they

18   agreed and disagreed, and then I would come out here make this

19   statement that I'm making right now, and we would then talk

20   about the disagreement.

21            Now, I have reviewed the testimony that you folks have

22   flagged, which is page 314/lines 23, and you've agreed on

23   everything up to 316/line 17.  Then there is a disagreement at

24   page 316/line 18 through 25.

25            The first question I have is the jury's obviously

1      going to wonder about where is the testimony on the iPhone.  So

2      when was the iPhone referred to?  I know that when Mr. Delva

3      was arrested, he referred to the iPhone.  I don't recall

4      Mr. Accilien, whose testimony I have before me, having referred

5      to the iPhone, so I'm not surprised there is nothing in him,

6      but where is the iPhone referenced?

7                  MR. POSCABLO:  Judge, I think the agreed upon response

8      to question number one from the jury is there is no evidence of

9      the existence of Mr. Delva's iPhone.

10                 THE COURT:  Wasn't there testimony from Mr. Reynolds

11     that when he was arrested, there was an iPhone recovered at the

12     time?

13                 MR. POSCABLO:  Yes, your Honor.

14                 THE COURT:  So that is the evidence of existence of.

15                 MR. POSCABLO:  But not in September -- I was reading

16     it literally.  It says in September of 2012.  When Special

17     Agent Reynolds arrested Mr. Delva and found the iPhone, it was

18     in August of 2013.  So I think the literal, our literal reading

19     of that is --

20                 THE COURT:  I hear you.  I understand your point.  Was

21     there any other place before the jury where the iPhone was

22     mentioned?  Have you folks done any search in the transcript?

23                 MR. POSCABLO:  We have, your Honor, and we can double

24     check again, but I believe the only time it was discussed was

25     during Special Agent Reynolds' testimony.

E9hQdel2

1    THE COURT:  I do recall that we had a number of

2    sessions outside of the presence of the jury where it was

3    raised.

4         Mr. Pittell, are you in agreement that that was the

5    only time it was raised?

6         MR. PITTELL:  Yes.

7         THE COURT:  All right.  Then the only other phone that

8    was mentioned on the record in front of the jury was the HTC

9    phone, and that testimony was exclusively by Mr. Accilien.

10   That appears to me to be what you folks have handed me.

11        MR. POSCABLO:  That's correct.

12        THE COURT:  Is that agreed?

13        MR. PITTELL:  Yes.

14        MR. POSCABLO:  That's correct.

15        THE COURT:  All right.  Then we turn to the next.

16        MR. PITTELL:  Regarding the other phone, there is

17   another disagreement that come up while you were coming out.

18        THE COURT:  Let me finish this point.  If it is not

19   related to identifying the testimony, we will certainly take it

20   up, but let's get this resolved.

21        Now, the five lines that you folks disagree on, as I

22   said, lines 20 through 25 of page 316 are not responsive to the

23   jury's question, though I certainly understand why the

24   defendant would want to include them, because it refers to

25   Mr. Accilien's use of the 305 phone.  And that is a theme, a

E9hQdel2

1  defense theme.

2          The jurors know how to ask for all of the testimony

3  relating to Mr. Accilien yen's use of the 305 phone, and they

4  can certainly ask for that.  If that were the question, there's

5  a lot more that we would have to put in than just those five

6  lines.  So, I am not going to include the five lines because

7  they are not directly responsive to the question.

8          MR. POSCABLO:  Judge, we're talking about -- Judge, I

9  think I might have said five lines, but it's actually more.

10         THE COURT:  It's lines 20 -- I'm sorry, it's 18

11  through 25.  It's actually seven lines.

12         MR. POSCABLO:  Right.

13         THE COURT:  So that is my ruling on those seven lines.

14         Now, before we leave this and go to the issue

15  Mr. Pittell would like to raise, let me just state that I would

16  intend, if I don't have any disagreement, to say to the jury

17  that at the time of Mr. Delva's arrest in August of 2014, he

18  was arrested with an iPhone -- 2013 -- and that's where they

19  heard the word iPhone, but there is no testimony or evidence --

20  and the parties are in agreement on this fact -- as to an

21  iPhone in 2012

22         MR. POSCABLO:  That's correct.

23         THE COURT:  Mr. Pittell?

24         MR. PITTELL:  Yes.

25         THE COURT:  Mr. Poscablo?

E9hQdel2

1          MR. POSCABLO:  That's correct, your Honor.

2          THE COURT:  That way they're not confused as to why

3    they heard the word iPhone and don't have it in what I am going

4    to be providing to them.

5          Now, the other issue that, Mr. Pittell, you would like

6    to raise, does it relate to the testimony that we are about to

7    give to the jury or something else?  Otherwise, we can call the

8    jury out, deal with this, send them back, and then deal with

9    your other issue

10         MR. PITTELL:  It relates to the testimony.

11         THE COURT:  What is the application?

12         MR. PITTELL:  The testimony is Mr. Accilien referenced

13   that Mr. Delva had an HTC phone.  Government Exhibit 2000-K,

14   which the government has referred to as a selfie, was put in

15   pursuant to the stipulation which put the phone and the memory

16   card into evidence, and the stipulation said that 2000-K along

17   with other images were on the memory card.

18         The memory card is in evidence.  I have the report of

19   the memory card.  The data on the memory card indicates that

20   the photo 2000-K was taken with an HTC camera.  And it has the

21   date that it was taken.  And that information is on the memory

22   card.  So that information is in evidence.  So I think the

23   excerpt from the report should be given to the jury or the jury

24   could be told that Government Exhibit 2000-K is on the memory

25   card, which is actually on the stipulation, was taken with an

E9hQdel2

1    HTC camera, on April 6, 2012 at 12:17:36 seconds p.m.

2              THE COURT:  This goes to the second question, would be

3    your point.

4              MR. PITTELL:  I'm trying to print out the report, but

5    the report is 150 pages, and for some reason the program I

6    have, I can't print out an individual page.  I can show you on

7    my laptop.

8              THE COURT:  No.  Just repeat to me, if you would,

9    Mr. Pittell, it's Exhibit 2000-K.

10             MR. PITTELL:  Right.

11             THE COURT:  2000-K, which is -- first of all, let me

12   back up.  There is an HTC phone, and that HTC phone is the 305

13   phone.  Is that right?

14             MR. PITTELL:  No.  The 305 phone is the Huawei phone.

15             THE COURT:  The Huawei phone.

16             MR. PITTELL:  The HTC phone is referenced by

17   Mr. Accilien in his testimony.

18             THE COURT:  All right.  So, the 305 phone is the

19   Huawei phone.  The HTC phone, and it had, I take it, a

20   different number than 305?

21             MR. POSCABLO:  No.  The HTC phone, your Honor -- if I

22   may interrupt, the HTC phone is the phone that the defense has

23   been arguing about as being the second phone that was in

24   Mr. Delva's possession that Special Agent Reynolds and the

25   government informed your Honor in a proffer that we never found

E9hQdel2

1     that phone; we didn't take that phone.

2              And the only piece of evidence testimony-wise

3     regarding the HTC phone is in what we provided to the Court in

4     pages 314 to 316.  So I think the issue here, if I may, Judge--

5              THE COURT:  Yes, translate for me.

6              MR. POSCABLO:  Yes.  Mr. Pittell is referring to what

7     was referred to in the court as a selfie.  It's a photograph of

8     Mr. Delva.  The report that was provided to the defense

9     regarding the metadata regarding that photograph shows that it

10    was taken by an HTC phone.  I think it might even say the time

11    and date that it was taken.

12             THE COURT:  I think I get the point.

13             MR. POSCABLO:  Right.  Well, so I think what

14    Mr. Pittell wants is he wants to offer not this photograph, but

15    the report showing that the photograph was taken by an HTC

16    phone.

17             Here is the government's position on it, Judge.

18    First, the only evidence or informant testimony regarding the

19    HTC phone is what we provided to the Court, and it's clear from

20    the testimony of Mr. Accilien that Mr. Delva didn't own that

21    phone until well after the robbery.  I think he said it's

22    months after the robbery.  Let me double-check.

23             The line is 11 to 13:

24    "Q.  OK.  But at some point, did he have a phone which was an

25    HTC brand phone?

E9hQdel2

1    "A.  Yes, this was like months after the robbery."

2              So that's one issue.

3              The second issue, your Honor, is that Mr. Pittell is

4    incorrect.  The memory card attached to the 305 phone is not in

5    evidence.  The stipulation between the parties -- and we could

6    put it up on the screen -- offers Government Exhibit 2000 --

7    200 -- 2000, which is the cell phone and only the cell phone.

8              The stipulation makes reference to another memory

9    card, right?  A memory card file inside the phone, but it

10   doesn't offer the memory card as part of Government Exhibit

11   2000.

12             THE COURT:  All right.  But the 2000-K, which is the

13   selfie apparently is associated with a report which has

14   metadata associated with that report which indicates that that

15   2000-K selfie was taken in June of 2012, and that it was taken

16   with an HTC camera.

17             MR. POSCABLO:  Camera.

18             THE COURT:  Now, is there any debate that an HTC

19   camera is the same thing as a camera resident inside an HTC

20   phone.  Is it a point without a difference?

21             MR. POSCABLO:  I actually can tell you I don't know,

22   Judge.  I think Special Agent Reynolds is saying that he

23   believes you're right, but I don't know for a fact that it's

24   true.

25             MR. PITTELL:  I don't think there's any difficulty.

E9hQdel2

1    Below it, there's a model number.  If we looked at the model

2    number, we would see it corresponds to a telephone.

3                THE COURT:  There was a point in time when there was a

4    selfie taken of the defendant with an HTC phone?

5                MR. PITTELL:  Right.

6                THE COURT:  I think that's what we're saying, right?

7    In June of 2012, the defendant took a selfie with an HTC phone.

8                MR. POSCABLO:  It was April of 2012.

9                THE COURT:  April of 2012.

10               I think to be fair, since you folks have focused on

11   the selfie as indicative of the possession and control of the

12   305 phone and the jury has asked for evidence -- not just

13   testimony, but evidence -- that shows the existence of any

14   phone owned by David other than the iPhone or the 305.  Now,

15   the only issue there is owned by David.  But this is

16   circumstantial evidence similar to that which you've put

17   forward for ownership of the 305 phone, ownership of the HTC

18   phone.

19               So, what I would suggest is that we do the following:

20   I handle question one in the manner that we have suggested,

21   which is, I will point out that the iPhone didn't exist.  There

22   is no evidence in the record that there was an iPhone in

23   September of 2012.

24               As to the second question, there is the testimony that

25   we are going to give them, and that the jury should be aware

E9hQdel2

1    that there is a photograph that was on a memory card in the 305

2    phone that had indicated on it in the report associated with

3    that which is in evidence as 2000-K, an indication that there

4    was a selfie taken by the defendant on an HTC phone in June of

5    2012 -- April 2012.

6              MR. POSCABLO:  I think your statement is accurate,

7    your Honor.  I just want to be clear that we do not believe

8    that either the memory card or the report are in evidence.

9              THE COURT:  The report's not in evidence?

10             MR. POSCABLO:  No.  The report is not in evidence.

11             THE COURT:  Hold on.  I'm relying upon the fact that

12   the report is in evidence.

13             MS. GERACI:  It is not in evidence.  It was not

14   offered by the government or the defense.

15             THE COURT:  So there is no evidence as to the metadata

16   in evidence.

17             MR. POSCABLO:  That's right.

18             THE COURT:  The only thing that is in evidence is the

19   actual selfie, but the metadata is not in evidence?

20             MR. POSCABLO:  Correct.

21             MR. PITTELL:  The memory card is in evidence.

22             THE COURT:  It is apparently not, according to the

23   government it was not.

24             MR. PITTELL:  I saw the phone, and the phone was put

25   into evidence.  That was the whole point of the dispute as to

E9hQdel2

1    whether or not it was in the phone or not in the phone.   The

2    phone is in evidence.   The memory card was in the phone.   To

3    now sit and here we had this whole discussion about the memory

4    card being taken out of the HTC phone and put into the Huawei

5    phone.   And to say now it's not really in the Huawei phone

6    that's a little disingenuous.

7               MR. POSCABLO:   Judge, it's actually the opposite.   In

8    fact, Mr. Pittell has strenuously argued that that memory card

9    to his client, his argument to the client is that that's not

10   the memory card; that that memory card that's actually in the

11   phone is not the memory card that belonged in that phone.   He's

12   argued and moved to have that entire thing suppressed because

13   his argument is Special Agent Reynolds or some other member

14   from law enforcement took that memory card from some other

15   phone and put it in this phone.   I think the language is very

16   specific about what is being offered by the government because

17   I think there was a dispute about this memory card and whether

18   it was the memory card attached to this phone.

19              THE COURT:   Here is the issue I have.   The issue I

20   have is if the report is not in evidence, I don't have any way

21   of rendering the phone operable, having the jury then go into

22   the phone to get the metadata out.   I can't then recite for the

23   jury a proffer on that data that's not in evidence.   I think

24   that would be inappropriate.

25              So I can't make the statement that I was suggesting

E9hQdel2

1    that I would make about the selfie.  So the only evidence that

2    we are left with is the evidence in the record which is that

3    which is contained within the testimony of Mr. Accilien.

4             Was there any other issue we had to raise?

5             MR. POSCABLO:  Judge, can I just have a moment to talk

6    to my team a second?

7             (Pause)

8             MR. POSCABLO:  What I had asked my team, your Honor,

9    so the record is clear, is whether there was any other evidence

10   from other cell phones or from the investigation that was

11   offered to the jury reflecting a phone number associated with

12   David that could have been found, let's say, in Trevor Cole's

13   phone.  And the response I got is no.  The only numbers

14   associated with David were the 305 number and then the later

15   number which was in the iPhone unless Mr. Pittell can think of

16   another number.

17            MR. PITTELL:  No, but getting back to that point, I

18   think the memory card needs to be rendered operable then to the

19   jury, and the jury needs to view the photos and the data that

20   is on memory card on the phone.

21            THE COURT:  You're asking to reopen the record.  The

22   application prior to trial was to ensure that the phones were

23   not operable when they were given to the jury, and the Court

24   did ensure that.  The phones went into evidence in a

25   non-operable form at the defense request.  So I am not going to

E9hQdel2

1    re-open the record at this point to change that.

2            So the application is denied.

3            Let's bring out the jury so that we can deal with the

4    issue of the note.

5            The jury has taken a short break.  As soon as they

6    reassemble, we'll gather them together and have the marshal

7    bring them out.  Let's continue as soon as they are gathered.

8    Then I go true the response with them.

9            (Recess)

10           THE COURT:  Let's all be seated.  The jury is ready

11   for us, but I understand that there is another issue that one

12   of you would like to raise.

13           Mr. Pittell.

14           MR. PITTELL:  Judge, I also think in response to the

15   note, it said 2005, paragraph 1C should be read to the jury.

16           THE COURT:  2005 paragraph 1C should be read?  Can

17   someone please hand it up to me?

18           MR. POSCABLO:  We have it up on your screen.

19           MR. PITTELL:  It's actually paragraph one and

20   paragraph C.

21           THE COURT:  Now, the memory card found in government

22   2000 is the memory card found in the 305 phone, correct?

23           MR. POSCABLO:  Correct.

24           THE COURT:  And were taken by other cameras.  Now that

25   paragraph references 2000-I through L, S, S1 and V.  Can I see

E9hQdel2

1     those exhibits?  Do we have them?

2              MR. POSCABLO:  We could pull them up Judge, if you

3     want?

4              THE COURT:  All I have that in my binder is 2000-H.  I

5     have that now.  So 2000 I, let me just turn to -- through L.

6     Can you go back to the stip?  Sorry.  I just want to make sure.

7     Those are the selfies.  Then let me look at S, S1 and V.  I

8     think that I would like you folks to address the phrase "owned

9     by David."

10             What I would like to do is, I think, my preference,

11    but I am still thinking about this; is to read this portion of

12    the stip or, you know refer the jury to this portion of the

13    stip as suggested by Mr. Pittell but suggest to the jury that

14    we are doing that, but -- and the but -- what follows that word

15    "but" would be some phrase that does not indicate that it

16    refers to any phone owned by David.  It could be any phone.  It

17    could be another phone.

18             MR. POSCABLO:  That's right.

19             THE COURT:  But the "owned by David," I think, and

20    referencing it "owned by David" is not necessarily the case.

21    As you yourself argued, it could have been attached to an

22    image -- I'm looking at Mr. Pittell when I said "you" there --

23    that was then taken into a memory of a phone.

24             So, referencing simply the existence of the

25    photographs that are taken by other cameras, the jury can then,

E9hQdel2

1    I think, look at them and determine for themselves whether the

2    selfies are indicative of ownership or not.  Let them draw

3    their own conclusion.  But, for instance, the picture of the

4    scale may have been taken into the memory, and it may or may

5    not have been taken on a phone owned by David, etc.

6           So what I will do is refer to them to:  Here is some

7    other evidence of phones -- some other evidence of

8    photographs -- I guess what I would say is, in excess.  I

9    wouldn't say that.  Strike that phrase.

10          In addition, the Court one point to you paragraph 1-C

11   of 3005 with the following caveat:  Those indicate that there

12   were photographs taken with other cameras.  Whether or not

13   those cameras were telephones owned by Mr. Delva or is not

14   something that is referenced in that stipulation.

15          MR. PITTELL:  I would just say it is a conclusion that

16   you can draw from.  You will have to draw from what is in

17   evidence at the trial.

18          THE COURT:  So here is what I would propose to do

19   then.  Were you standing up, Mr. Poscablo?

20          MR. POSCABLO:  I would like to hear what you are going

21   to propose.

22          THE COURT:  What I propose to do is I to say to the

23   jury:  We discussed question number one on the iPhone.

24          Question number two:  Refer the jury to transcript

25   portions which we've already all discussed here.  Then I will

E9hQdel2

1    say:  In addition, the Court refers the jury to the stipulation

2    at Government Exhibit 3005, in particular paragraph C, but with

3    the following caveat:  Your question was worded:  Evidence that

4    shows the existence of any other phone owned by David, and

5    whether or not the cameras that took these photographs were on

6    a phone owned by David is not referenced in the stip.

7         MS. GERACI:  And there is no evidence of that, Judge.

8    I think our position was that this stipulation should not be

9    read, so that your Honor knows what our position is.

10        THE COURT:  I understand.  What I am trying to figure

11   out is:  One, why the government wouldn't want the photographs

12   to have been on a camera owned by David since they are the

13   selfies, and so why the government is sort of fighting that I

14   am a little bit unclear of because if you are citing to the

15   selfies, as Mr. Pittell has requested, in paragraph 1-C and the

16   selfies, Mr. Pittell wants to indicate, were on a phone owned

17   by David, that strikes me as something that you would think the

18   government wouldn't be fighting; the government would be

19   embracing because it is suggesting that he prior phones, he

20   somehow managed to get them onto the 305 phone.  The jury can

21   draw a reasonable -- they can draw a number of different

22   inferences, one of which is he took the memory from his prior

23   phones and put it on the 305 phone.

24        You sure you want to do this, Mr. Pittell?

25        MR. POSCABLO:  Judge, you taught me to sit down, so

E9hQdel2

1    I'm going to sit down.

2            THE COURT:  As I'm thinking it through, it strikes

3    me--

4            MR. PITTELL:  I'm satisfied with you just reading the

5    stipulation and giving the caveat.  I think that reading the

6    stipulation is reasonable within answering the question.

7            THE COURT:  But the "by other cameras" you're

8    suggesting is responsive to the question -- is evidence of the

9    existence of any phone owned by David because that's why we're

10   reading it, right?

11           MR. PITTELL:  Right, because there's selfies in

12   evidence.  Selfies are taken with a phone.  You can call it a

13   camera, whatever you want.  It's taken with a camera in a

14   phone.  So I think that it is certainly circumstantial evidence

15   that it's his phone because it's a selfie.  People do take

16   selfies on other people's phones, but people also take selfies

17   on their own phone.  So, I think the best way to approach it is

18   just read the stipulation.

19           THE COURT:  I am not going to read the stipulation.  I

20   will refer them to the stipulation because they got the

21   stipulation in the back there.

22           MR. PITTELL:  Mr. Poscablo, you sat down.  Do you

23   understand how the Court is intending to proceed?

24           MS. GERACI:  Yes, Judge.

25           THE COURT:  All right.  Let's bring out the jury.  And

E9hQdel2

1      the Court has received two copies of the testimony of

2      Mr. Accilien's cross-examination.  I take it that these have

3      been reviewed by both parties and are an accurate reflection of

4      the testimony the Court referred to?

5              MS. GERACI:

6              MR. POSCABLO:  Yes, your Honor.

7              MR. PITTELL:  Yes.

8              (Jury present)

9              THE COURT:  All right, ladies and gentlemen.  The

10     Court has received a note from the jury that reads as follows:

11             First, it was signed by Deirdre Moy dated today's

12     date, dated 12:02 p.m. received at 12:05 and has been marked as

13     Court Exhibit 1.

14             There are two questions on this note.  The first

15     reads:  Question 1:  Please point us to the evidence that shows

16     the existence of David's iPhone on September 2012.  There is

17     another question underneath that:  Please point us to the

18     evidence that shows the existence of any phone owned by David

19     other than the iPhone or phone with number (305) 709-8402.

20             Now, of course, it is for you to determine what the

21     facts are, but let me give you some guidance.  In terms of the

22     first question which point us to the evidence that shows the

23     existence of David iPhone on September 2012, there is no such

24     evidence.  The only evidence of an iPhone was at the time of

25     arrest in August of 2013, and that came in through Special

1422

E9hQdel2

1      Agent Reynolds.  So there will be nothing to provide you in

2      response to that question.

3              In terms of the second question, we have a one-page --

4      it's portions of two pages -- actually almost two pages of

5      testimony that we'll give you from the cross-examination of

6      Mr. Accilien.

7              In addition, I would refer you to Government Exhibit

8      3005, paragraph C.  That's a stipulation that related to an

9      agreement.  It was an agreement of stipulated facts between the

10     parties.  So you can take a look at that as well.

11             All right.  That was for the question:  The evidence

12     that shows the existence of any phone owned by David other than

13     the 305 phone or the iPhone.  Those are the answers.

14             I will have Mr. Pecorino hand this to the foreperson.

15     Ms. Moy, you are Juror No. 1.  He will hand you two copies of

16     it, they're identical, and you can go on back into the room.

17             Thank you.

18             (Jury continued deliberations resumed)

19             THE COURT:  Ladies and gentlemen, is there anything

20     else that we should go over until we get our next note?

21             MR. POSCABLO:  Not from the government.

22             MR. PITTELL:  Not from us.  Thank you.  We will

23     adjourn until we get our next note.

24             (Recess)

25             (At 3:15 p.m., a note was received from the jury)

E92Qdel2

1           (Jury not present)

2           THE COURT:  I received a note from the jury from

3    Deirdre Moy dated today's date at 3:15 p.m.  I received it at

4    3:22.  I've marked it as Court Exhibit 2.

5           It asks two things:  First, can we have playback, a --

6    strike that.  Start over again.

7           Can we have a playback or transcript of number 800

8    prison call between Dominique Jean-Philippe and David Delva.

9           And then number two:  Explain what "progress" means as

10   used on pages 39 Count One, second element -- which I take to

11   be a reference to the page in the jury instructions, and then

12   it continues -- i.e., if a person learns of unlawful activity

13   and a conspiracy surrounding it after the unlawful act, are

14   they a co-conspirator?

15          That's the end of the message.  I will let you folks

16   inspect in a moment.

17          As to the playback of number 800, which I think is

18   pretty clearly a reference to Government Exhibit 800, I would

19   have them -- unless you folks object -- come out here and

20   listen to that call again, and the transcript can be played.  I

21   think that is fairly straightforward.

22          Is there any objection to that?

23          MR. POSCABLO:  None from the government, your Honor.

24          MR. PITTELL:  None from us.

25          THE COURT:  In terms of the second question, again,

E92Qdel2

1    let me read it to you again:  Explain what progress means as

2    used on pages 39, Count One, second element; i.e., if a person

3    learns of unlawful activity and a conspiracy surrounding it --

4    then there is an arrow down, after the unlawful act, back to

5    text -- are they a co-conspirator?

6            Having looked at the instructions, I think that the

7    way progress is best defined and the way the question is asked

8    are they a co-conspirator requires joining two pieces, from

9    pages 38 to 39.  38 I would propose to re-read -- because

10   sometimes it actually does make a difference when the Court

11   re-reads it and re-reads it slowly -- to re-read either the

12   whole first paragraph on page 39 and half of the second

13   paragraph or just starting with the word "but" in the first

14   paragraph down to, but not including, the "some conspirators

15   play major roles" in the second paragraph.

16           In any event, the word "progress" I think is

17   relatively clearly defined here.  The issue is also a joining

18   issue based upon their question, which is are they a

19   co-conspirator?  So that requires not only the concept of

20   progress, but the concept of knowingly and intentionally

21   joining.  And they need to find that because even if the

22   defendant was found to have been present as we know, even if he

23   was present during the progress of the conspiracy, he has to

24   have been found to have knowingly and intentionally joined it.

25   So I would propose to also read the fourth paragraph on page

E92Qdel2

1    38.

2           Lastly, the last thing that I would propose is that we

3    define for them when the progress has occurred, the progress is

4    the time frame he had to have knowingly and intentionally

5    joined the conspiracy while it was in progress.  The time frame

6    while it was in progress as alleged by the government is from

7    the time Ms. Adams was initially detained until the individuals

8    left the apartment on Tuesday late afternoon, early evening.

9           MR. PITTELL:  Judge, can you just -- I was having a

10    little difficulty trying to follow you in terms of portions of

11    the charge that you were going to read.

12           THE COURT:  Let me go through it as I would go through

13    it with them.  That may be the easiest thing instead of walking

14    you through my rationale.

15           I will preface how I am going to go through it with

16    them with you with the initial sentence that I think their

17    question really asks two things:  I think, one, it asks for

18    progress, but they also want to know whether or not if somebody

19    happens to join it while it's in progress, can they be a

20    co-conspirator.  That requires that they also find that he has

21    met the element of joining a conspiracy.

22           So what I would propose to do is say:  Ladies and

23    gentlemen, here's the question.  I'm going to answer it for you

24    this way:  As you know, on page 39 of the jury instructions,

25    the instructions state that:  A defendant need not have joined

E92Qdel2

the conspiracy at the outset, but he must at some point during

his progress have joined the conspiracy with knowledge as to

its general scope and purpose.  If he did join with such

knowledge at any time while it was in progress, he may still be

held responsible for all that was done before he joined and all

that was done during the conspiracy's existence while he was a

member.  Indeed, each member of the conspiracy may perform

separate and distinct acts and may perform them at different

times.

Now, in addition to that, ladies and gentlemen, in

terms of a defendant being part of a conspiracy in terms of

whether or not he would become a co-conspirator, you also would

need to find that he joined the conspiracy.  I refer to you

page 38, which is the instruction as to participation in the

conspiracy.  You should read the entirety of the instruction,

but in particular you need to turn to paragraph four.

If you find that the conspiracy existed, and that the

defendant participated intentionally and knowingly in it, the

extent of the defendant's participation has no bearing on

whether or not he is guilty.  The fact that the defendant's

participation was more limited than of that a co-conspirator

should not affect your verdict.

Lastly, ladies and gentlemen, in terms of your

question what does progress mean, the government has alleged

that the robbery conspiracy, the kidnapping conspiracy and the

E92Qdel2

1    substantive crimes occurred between the period when

2    Ms. Jeanette Adams was first detained on September 2 through

3    September 4.

4            MS. GERACI:  Your Honor, just with respect to the

5    timing issue, the allegations -- the time allegations of the

6    conspiracy are just September 2012.  Frankly, I think the

7    conspiracy predates the moment that they sort of jumped the

8    bounds.  I think there are calls that suggest they were

9    planning it earlier.  And then certainly after they left, part

10   of the conspiracy was to divvy up the goods that were stolen,

11   and they were calls to suggest that as happening too.

12           And then pursuant to the law the government cited with

13   respect to the two letters in the case, Exhibit 50 and 51,

14   there is evidence to suggest the conspiracy continued any

15   attempts to cover it up.  I don't know if we want to put a time

16   frame around that whole period or if we just want to say

17   September 2012 or however your Honor feels comfortable.

18           THE COURT:  I take that point.  I hear that.

19           Mr. Pittell.

20           MR. PITTELL:  I think that is going to confuse and

21   mislead the jurors.

22           THE COURT:  Which part?

23           MR. PITTELL:  About saying that the progress means the

24   period when the letters were sent.

25           THE COURT:  Well, I think that the suggestion is that

E92Qdel2

```
 1   the Court simply say the time frame is September 2012.

 2              MS. GERACI:  In or about.

 3              THE COURT:  As opposed to -- I don't think Ms. Geraci,

 4   I'm not taking it as she would ask, and I certainly wouldn't,

 5   go into individual events.

 6              Another way of doing it is to say:  There were events

 7   before the Labor Day weekend, certainly the Labor Day weekend,

 8   and then there were certain events after the Labor Day weekend.

 9   That would be, I think, another way of doing it.  That, I

10   think, covers the same point.  I think the jury's question is

11   fairly read as wanting to understand about somebody coming in

12   while something is already going on and what the impact of that

13   is.

14              Now, it's important that -- that's why I said, you,

15   know he's got to have joined.  He can't just have come in and

16   been around.  He's got to have joined.  And I think it is

17   useful to give them a time frame, but I am fine with going with

18   September 2012 if that is the view.  Tell me about the rest of

19   it.

20              MR. PITTELL:  Let me just tell you what my concern is,

21   and then we can discuss it.  My concern is let's say the jury

22   believes that he was not at Magenta Street during the time

23   period from the abduction of Ms. Adams to the time they were

24   released but the jury believes it's him on that phone call with

25   Dominique Jean-Philippe.  The phone call is talking about
```

```
 1    Accilien being arrested and not saying things.  The phone call

 2    is not -- there is no admissions to him being there, but he's

 3    discussing criminal activity.  I'm concerned that the jury

 4    might feel that that is joining the conspiracy in progress,

 5    that phone call.

 6             THE COURT:  Then perhaps what we should do if that is

 7    your concern I actually -- I hear the possibility of that,

 8    though I actually interpret it a little bit differently, but I

 9    hear that possibility.  What I would suggest is that I give

10    them perhaps the entire participation in the conspiracy

11    instruction again because what you want to do is, I think,

12    focus on what they have to find in order to find that he

13    participated.  So, therefore, it is really the entirety of that

14    instruction.

15             So, I am happy to give that instruction, but I would

16    do it starting with "extent of participation," go back to he's

17    got to have joined, and give a time frame.  So how about:

18    "You've heard evidence or there was evidence put in at trial

19    regarding events before the Labor Day weekend, at the time

20    Ms. Adams was detained until she was released, or until the

21    victims were released, and in September thereafter."  And I

22    think that is all we need to do.

23             MR. PITTELL:  It's just there was nothing thereafter.

24    I mean, the letters were admitted as a co-conspirator's

25    statement, but they weren't addressed as sort of a separate
```

E92Qdel2

1    theory, a separate conspiracy to cover up.

2              THE COURT:  I don't think so.  It's in furtherance of

3    the underlying conspiracy.

4              MR. PITTELL:  I am just concerned that -- I mean, the

5    theory of this case, the government's theory of the case is

6    that he joined the conspiracy during the robbery, during the

7    kidnapping and participated in various discussions or letters

8    afterwards; not that it occurred and then he later joined in

9    the coverup phase of the conspiracy.  I'm just concerned

10   that -- I don't --

11             THE COURT:  How about --

12             MR. PITTELL:  I'm sorry, go ahead.

13             THE COURT:  How about we see whether or not the

14   government -- this may actually clarify this for the jury as

15   well as resolve your problem.

16             What if -- and I'm looking at the government now --

17   what if we said, ladies and gentlemen, here is the piece on

18   progress, here is the piece on joining, but please understand

19   that the government's theory is that the defendant joined while

20   the robbery and the kidnapping were in progress.  So their

21   theory that he joined during the period over the Labor Day

22   weekend.  I think that fairly characterizes what the government

23   is suggesting, and I think that then resolves your issue which

24   if they are only thinking of him joining later, they would be

25   disabused of that.

E92Qdel2

1       MS. GERACI:  That's fine, your Honor.

2       THE COURT:  Mr. Pittell, does that address your

3  concern?

4       MR. PITTELL:  Yes.

5       THE COURT:  The government's theory is that the

6  defendant joined the conspiracy over the Labor Day weekend

7  while the robbery and kidnapping were in progress.  OK?

8       MS. GERACI:  Yes, your Honor.

9       THE COURT:  I see you're nodding your head,

10  Mr. Pittell.  I take that as a yes.

11       MR. PITTELL:  I'm sorry, I --

12       THE COURT:  No, I was writing down the wording, and I

13  just wanted to re-read it so we were clear.

14       All right.  So that is the way we will do it.  So can

15  the government tee up Government Exhibit 800?

16       MS. GERACI:  Your Honor, just to be clear, we are just

17  going to be playing the portions that we played in court.

18       THE COURT:  Only the portions you played in Court.  It

19  says:  Can we have a playback for transcript of Government

20  Exhibit 800 of prison call between Dominique Jean-Philippe and

21  David Delva.

22       MS. GERACI:  Yes, your Honor.  We have that, and we

23  have the transcript ready as it plays.

24       THE COURT:  Mr. Pittell, is there any question as to

25  what that is exactly?  Do you want to see exactly what they are

E92Qdel2

1    going to play?

2              MR. PITTELL:  They're going to play what was admitted.

3    There's not like there was a portion admitted that wasn't

4    played.

5              THE COURT:  No, but there are two ways that was

6    played:  One way during direct in which case it was a little

7    bit longer and only a smaller clip was played during the

8    summation, as I recall.  My assumption is that the government

9    is going to play the longer of the two.

10             MS. GERACI:  Judge, we actually played exactly the

11   same thing during summation and during the course of the trial.

12             THE COURT:  It just took longer in my mind the first

13   time.

14             MR. POSCABLO:  But, Judge, it's in the English

15   language, so the transcript isn't in evidence.

16             THE COURT:  It's OK.  It's an aid for them to follow

17   along.  I will give them that instruction.  I always do that.

18   We are not going to send it back to them.  We're going to play

19   it out here.  Is there any objection to that?

20             MR. PITTELL:  No.

21             THE COURT:  Let's see if we can get the jury out here

22   and we'll see if we can do those two things with them.

23             (Jury present)

24             THE COURT:  The Court has received a note from the

25   jury signed by Deirdre Moy today's date at 3:15, and it was

E92Qdel2

handed to me at 3:22.  The note has been marked as Court

Exhibit 2.  It has been read to counsel and it has two

questions.

          First, can we have a playback or transcript of number

800 prison call between Dominique Jean-Philippe and David

Delva.  So I take that counsel agrees that's the Government

Exhibit 800, which is the recorded call, and we're going to

play that for you in just a moment.

          The second question is, is what "progress" in quotes

means as used on page 39, Count One, second element; i.e., if a

person learns of unlawful activity and a conspiracy surrounding

it after the unlawful act, are they a co-conspirator?

          In that regard, let me give you an addition will

reference to the instruction.  You have referred to page 39

Count One, second element.  In particular, I want to answer the

question by making sure that you look both at that instruction

as well as the prior page, which is the participation in the

conspiracy.

          And as you can see from the instruction which you

should review in its entirety, it states, in part:  The

defendant need not have joined the conspiracy at the outset;

but, he must have, at some point during its progress, joined

the conspiracy with knowledge as to its general scope and

purpose.  If he did join with such knowledge at any time while

it was in progress, he may still be held responsible for all

1    that was done before he joined and all that was done during the

2    conspiracy's existence while he was a member.  Indeed, each

3    member of a conspiracy may perform separate and distinct acts

4    and may perform them at different times.

5          Now I'm going to go over the joining of the

6    conspiracy, but I also just want to remind you that the

7    government's theory is that the defendant joined the conspiracy

8    over the Labor Day weekend, the conspiracy for kidnapping, the

9    robbery conspiracy, while the robbery and kidnapping

10   conspiracies -- while the robbery and kidnapping were going on.

11   So their theory is that he joined it over that weekend.

12         In terms of participation -- and I should note because

13   I don't want my words just now to have been confusing.  You

14   know from all of the counts now which ones are conspiracy

15   counts and which ones are not, right?  There is also a

16   narcotics distribution conspiracy.  Anyway, you'll go back and

17   look at all of those instructions as you deem appropriate.

18         But in terms of participation, I want to remind you

19   that if you find beyond a reasonable doubt that if the

20   conspiracy in Count One of the indictment existed, you must

21   then determine whether the defendant intentionally and

22   knowingly became a member that of conspiracy.  You must

23   determine not only whether defendant participated in the

24   conspiracy but also whether he did so intentionally and

25   knowingly; that is, did he participate in the conspiracy with

E92Qdel2

1    knowledge of its unlawful purpose and with a specific intention

2    further objective of furthering the objective of that

3    conspiracy.

4            Knowledge is a matter of inference from facts proved.

5    A person acts intentionally and knowingly if he acts

6    purposefully and deliberately and not because of mistake or

7    accident, mere negligent, or other innocent reason.  That is,

8    the acts must be the product of the defendant's conscious

9    objective.

10           If you find that the conspiracy existed, and the

11   defendant participated knowingly and intentionally in it, the

12   extent of a defendant's participation has no bearing on whether

13   or not he is guilty.  The fact that a defendant's participation

14   in a conspiracy is more limited of that as a co-conspirator,

15   should not affect your verdict.

16           Now we are going to play Government Exhibit 800.

17           (Audio played back)

18           THE COURT:  Ladies and gentlemen, that concludes our

19   answer to the questions.  You can go on back into the jury

20   room.  Thank you.

21           (Jury retires to deliberate at 3:54 p.m.)

22           (Jury not present)

23           THE COURT:  Ladies and gentlemen, is there anything

24   else we need to cover right now?

25           MR. POSCABLO:  No, Judge.

E92Qdel2

1        THE COURT:  Mr. Pittell?

2        MR. PITTELL:  No.

3        THE COURT:  So I will put the second juror note here

4   for inspection.  I will see you folks either at a few minutes

5   before 5:00 or another note, whichever comes first.

6        MR. POSCABLO:  Thank you, your Honor.

7        (Recess pending verdict)

8        (Jury present)

9        THE COURT:  We are going to bring out the jury.  I

10  just want to mention to you folks that I had agreed to speak to

11  a large group of people tomorrow in Washington D.C.  I have

12  told them I cannot go to Washington D.C.  It is the heads of

13  SEC enforcement from all over the country, and they are having

14  a conference just with those internal folks, with their own

15  folks.  So I told them that I can do it by video conference,

16  and I can be present for one hour as opposed to the two that

17  they had originally scheduled me for.

18        I have made arrangements -- we have been doing a

19  backup plan for the last couple of days.  We can't, it turns

20  out, do it here in the court because the equipment is not

21  compatible.  I have to go to the SEC office on Vesey Street.

22  My intention is to go there.  I will leave here at 9:30.  I

23  will be there at quarter of 10:00.  I will speak from 10:00 to

24  11:00 and be back by 11:15.

25        If the jury has a question during my absence, we're

E9hQdel2

1    going to have to have them wait.  So they can start

2    deliberating at 9:30, but if there is a question, I won't be

3    able to get back to it until 11:00.

4            For you folks, would you prefer that I mention this to

5    the jury or remain silent as to this?  It is unclear whether

6    they have a question or not.  I would probably go ahead and

7    tell them just so that they understand if there is an issue.

8    On the other hand, I understand if you folks don't want me to

9    do that because it may suggest they shouldn't deliberate as --

10   I don't know, if you had a view about that.  I don't know if

11   you would have a view about that.

12           Mr. Pittell?  Mr. Poscablo?

13           MR. POSCABLO:  Judge, the government defers to your

14   good judgment.

15           THE COURT:  I am sort of indifferent.

16           MR. POSCABLO:  So are we.

17           THE COURT:  But Mr. Pittell?

18           MR. PITTELL:  My view is I think you should probably

19   tell them because otherwise let's say they come here at 9:30

20   and they got a note and they're waiting around two, three

21   hours, it may be frustrating for them, which, actually, though,

22   if you tell them that, on the flip side, then they might think

23   well why don't we just get here at 11:00.

24           THE COURT:  The alternative is we could have them come

25   in and start at 10:30 and pick up at 10:30.  That way I'm

E9hQdel2

1    almost back by then.  I will be back by 11:15.  That way they

2    are not feeling like they start and don't have me available.

3    Would that be preferable for folks?

4              MR. POSCABLO:  Judge, you could also just ask them and

5    give them the option.  Let them know --

6              THE COURT:  It's always difficult with 12 people on

7    the fly at 5:00 p.m.

8              MR. POSCABLO:  We defer.

9              THE COURT:  Why don't we do this:  Why don't we start

10   them at 10:30 tomorrow morning, one hour later.  I will tell

11   them that the Court has to do something.  I want to make sure I

12   am available as quickly as I can be and, therefore, the start

13   would be 10:30.  Does that sound reasonable?  Is that

14   preferable for your folks?

15             MR. PITTELL:  Of course the important question is when

16   do we have to be here?

17             THE COURT:  I would say 10:30 as well if it turns out

18   that's when we're going to have the jury.  You just need to be

19   here when the jury is in, and, you know, for all of us,

20   including for the defendant, we only have to be here when the

21   jury is here.  Let's do that.  Let's bring the jury out.

22             (Jury present)

23             THE COURT:  Ladies and gentlemen, let's all be seated

24   as you reach your seats.  We are going to adjourn for the

25   evening and have you folks come back tomorrow morning.

E9hQdel2

1          However, there is one thing that I need to do first

2    thing in the morning, so I am going to have you folks start at

3    10:30 versus 9:30.  All right?  That way, if you have a

4    question or anything comes up, I can attend to it very quickly.

5    I don't want to have you waiting around at 9:30 if I am not

6    available.  I think that that makes the most sense.

7          So we will have you folks start at 10:30.  And we will

8    have lunch again, and Joe will have a menu left for you through

9    the marshals on the table.  I want to remind you not to talk to

10   anybody other than each other when you are altogether at the

11   same time about this case.  So still do not talk to anybody

12   else in your life about this case.  See you folks tomorrow.

13   Good night.

14          (Jury recessed)

15          THE COURT:  So we will all gather again or you folks

16   will gather again at 10:30 tomorrow morning.  I will be

17   available as close to that as I can be.  It will be about

18   11:15, I will be in place, I would think, in my robing room or

19   downstairs -- upstairs.  And anything else you folks want to

20   raise tonight.

21          MR. POSCABLO:  Not from the government, your Honor.

22   Good evening.

23          MR. PITTELL:  No, your Honor.

24          THE COURT:  Thank you.  We're adjourned.

25          (Trial deliberations to continue Thursday,
     September 18, 2014 at 10:30 a.m.)