UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

UNITED STATES OF AMERICA


-against-


                                                    Ind. No.
                                                    12 Cr. 802 (KBF)


DAVID DELVA,

                    Defendant.
---------------------------------------------------------x




**SENTENCING MEMORANDUM**






Jeffrey G. Pittell
MAHER & PITTELL, LLP
*Attorneys for Defendant*
299 East Shore Rd.
Great Neck, New York 11023
516- 829-2299

# TABLE OF CONTENTS

**Item**                                                                                      **Page**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

PERSONAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

    Mr. Delva's Childhood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
    Mr. Delva's Secondary and College Education . . . . . . . . . . . . . . . . . . . . .   3
    Mr. Delva Becomes Homeless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
    Mr. Delva Returns to His Family. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
    Family Tragedies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
    Mr. Delva Moves to New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

MR. DELVA'S CHARACTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

THE OFFENSE CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

ISSUES REGARDING THE PRESENTENCE INVESTIGATION
REPORT'S ("PSR") CALCULATION OF THE ADVISORY
SENTENCING GUIDELINES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

    The PSR's Calculation of the Guidelines. . . . . . . . . . . . . . . . . . . . . . . . .   18
    Our Objections to the PSR's Calculation of the Guidelines. . . . . . . . . . . .   20
    Our Calculation of the Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

OTHER ISSUES REGARDING THE PSR. . . . . . . . . . . . . . . . . . . . . . . . . . .   37

FACTORS FOR CONSIDERATION IN DETERMINING MR.
DELVA'S SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

## INTRODUCTION

We acknowledge -- due to his being convicted of Kidnaping Conspiracy and other offenses -- Mr. Delva faces the prospect of spending the rest of his life in jail. We further acknowledge that his co-defendants (Trevor Cole and Dominique Jean Philippe) were sentenced to life imprisonment. As such, at Mr. Delva's sentencing proceeding, the metaphorical "elephant in the room" will be whether he suffers the same fate. Through this *Sentencing Memorandum*, we urge the Court to separately consider the totality of Mr. Delva's personal background, as set forth herein, and not impose the same sentence upon him.

## PERSONAL BACKGROUND

### Mr. Delva's Childhood

Although he was born in Mt. Vernon, New York -- and grew up in New York and Florida -- David Delva was raised with a keen awareness of his Haitian roots.[1] His family always lived in areas where there was a vibrant Haitian community. He was taught how to speak Haitian Creole. His family frequented events -- such as New York City's West Indian Day Parade -- which fostered "Haitian Pride." They attended a church where many of its members were Haitian. At home, they cooked meals using Haitian family recipes. At times, during school vacations, he traveled to Haiti and

---

[1] Both of his parents, Violata Noisette and Raymond Delva, are originally from in Haiti.

visited family who lived there.  All told, David was brought up with a strong sense of his Haitian identity.

David's mother, Violata, was a college student when she became pregnant with him.  At that time, she was engaged to Raymond Delva.  However, when Violata became pregnant, Raymond did not want them to have children at this stage in their lives.  He wanted her to get an abortion.  Violata did not want to terminate her pregnancy.  This difficult and emotional conflict strained their relationship past the breaking point.  They called off their engagement.

Violata and Raymond were never able to reconcile their personal relationship.  Eventually, they moved onto separate marriages.  However, they remained civil and cordial to each other.  Both of them (as well as members of their families) were actively engaged in raising David.

Initially, David lived with Violata in Mount Vernon.  When David was born, Violata was a single mother who was working and attending school.  In order to lend her a hand, Rose Thomas (David's aunt, the sister of Raymond) moved in with Violata.  For several months, she helped Violata take care for David.

When David was approximately one year old, Violata met, and subsequently married, Antonio Noisette.  Thereafter, Antonio (and his children from a prior marriage)  became additional family figures in David's life.

When David was six years old, Antonio and Violata moved to Haiti. However, in order to permit David to continue attending school in the United States, the family decided he should live with Raymond in the Bronx, New York. Thereafter, until David was eleven years old, he lived with his Raymond, Raymond's wife and their children, Ray and Nicky.

## Mr. Delva's Secondary and College Education

When David was approximately eleven years old, his mother and Antonio -- who now had two sons of their own, Claudel and Matthew -- moved back to the United States. However, instead of returning to New York, they moved to Miami, Florida. They decided to reside in South Florida because it is home to the largest Haitian community in the United States. Shortly thereafter, David moved to Miami in order to live with them.

While there, David completed Middle School, and began attending *North Miami High School*. When he was in the ninth grade, David stopped attending High School and enrolled in the Job Corps Program. While in the Job Corps, David earned his GED.

After the Job Corps, Mr. Delva matriculated at *Miami Dade Community College* ("MDCC") where he planned to major in Business Management.  He took classes in Business, English, Math and Music.

### Mr. Delva Becomes Homeless

While attending MDCC, Mr. Delva was arrested and incarcerated for a couple months.  Due to his incarceration, he missed classes and his semester grades were marked as "incomplete."  This caused him to lose his financial aid.  Upon his release from jail, Mr. Delva reports he felt "lost."  He did not return home to live with his mother and family.

Instead, for approximately one year, Mr. Delva lived, homeless, throughout the environs of Miami.  He slept on the park benches, under bridges and in partially constructed buildings.  For food, he often ate table scraps handed out from restaurants.  When he needed money, he worked, off the books, as a day laborer at condominium construction sites (doing painting, tiling and wiring).  This period of homelessness, in Mr. Delva's life, is reflected in the PSR (at ¶¶ 86-105) which (over our objection, *infra*) reports a series of arrests -- primarily for trespassing -- on matters which were dismissed or never prosecuted.

4

During late 2008 or early 2009, Mr. Delva was "rescued" by his grandfather (Violata's father).  His grandfather tracked down Mr. Delva and found him hanging out in a public park.  His grandfather urged him to return home and reside with Violata, Antonio, Matthew and Claudel.  At that point, Mr. Delva had become acclimated to this state of existence and was hesitant to change.  However, he ultimately agreed to move back home with his family.

### Mr. Delva Returns to His Family

Once he resumed living with his Mother, Antonio and his stepbrothers, Mr. Delva got his life back on track.

He began working in a *VPX* manufacturing and assembly plant, in Broward County (north of Miami).  *VPX* is a popular brand of nutritional and sports supplements.  It is sold in numerous retail stores -- ranging from *GNC* (General Nutrition Center) to *Walmart* -- throughout the United States.  At the plant Mr. Delva worked in a sterile environment where he was responsible for packaging products.



Screenshot of *VPX* Website



David Delva at work *VPX* plant

In addition, Mr. Delva attended *American International University* where he studied Media Production.



Mr. Delva's Student Id from
*American International University*

### Family Tragedies

After Mr. Delva moved back into his mother's home, two tragedies, struck their family.

During the Summer of 2009, Antonio was murdered while in the parking lot of the hospital where he worked. Violata and Antonio's two young sons, Matthew and Claudel, ages nine and fifteen at the time, were devastated by the loss of their father. However, Mr. Delva stepped in and became the paternal figure in their lives. Mr. Delva's compassion for his younger stepbrothers is expressed in the letters they submitted on his behalf.[2]

---

[2] Copies of these letters, as well as others submitted on behalf of Mr. Delva, are included in the Exhibits to this *Sentencing Memorandum*.

In his letter, *Matthew Noisette*, describes the support, provided to him by Mr.

Delva, as follows:

> Over the years I've shared with him I've learn to realize that David has a huge heart and truly loves his family. Always giving me support not only as a brother but as a father figure. My father was murdered in the year of 2009. After my father death as a young boy growing up I've lust that need to have someone to talk to and get advice from, just to help guide me down the right road. My brother David was there as my support. He was there for my high school graduation and any little event that meant something me. David not only had such a big impact in my life but also everyone he came to encounter. David is considered to be a family man he played a role that even he himself did not realized. He is the back bone to our family and with our back bone missing, we can't stand as the family we once had.

Similarly, in his letter, *Claudel Noisette*, describes how Mr. Delva became a

father figure in his life:

> My brother David is a very sympathetic and courageous man. He is the only person I have to look up to as my father figure. Since my father died back in 2009, I really didn't have anyone to show me how to do this right, to become the young man I am today. My mother isn't really the teacher I would desire for my father figure, so David had a very important role in my life. Some things I love doing today is because of him. My passion is music. This love of music would have never came about if it wasn't for my brother David. I use to watch him play piano and one day he said "Come, let me show you how to play this". I do what he tells me to, not only because he is my older brother, but because I respect and love him so much to trust that he is only doing me good and preparing me for the future.

8



Photo of David Delva at grave of Antonio Noisette. (Extracted from Mr. Delva's cell phone and produced in the discovery)

The second tragedy occurred approximately six months later. On January 12, 2010, Haiti was hit by a catastrophic earthquake. It was the worst natural disaster to ever afflict the country. It measured 7.0 (Major) on the Richter Scale. Its epicenter was close to Port-au-Price, Haiti's capital and most populous city (est. 1.0 million residents). The earthquake killed well more than one hundred thousand people. It destroyed hundreds of thousands of homes and buildings. It rendered millions of people homeless.

9

Upon hearing the news about the earthquake, Mr. Delva "dropped everything" and headed for Haiti in order to help his fellow Haitians including members of his family who were reported missing and possibly trapped in the rubble.

It was a difficult journey for him to get there. Due to damage from the quake, the airport in Port-au-Prince was closed. Not to be deterred, Mr. Delva took a flight to the Dominican Republic (which is adjacent to Haiti on the island of Hispaniola). After he arrived in the Dominican Republic, he took a bus to Port-au-Prince.

Upon his arrival, Mr. Delva was confronted by utter devastation caused by the earthquake. Their family home, which they had owned for generations, was destroyed. Although Mr. Delva located some of his missing family, ten of his relatives -- including his great-grandmother, aunts and uncles -- were killed. After finding his family, Mr. Delva stayed on, helping with the clean up and recovery effort.



Mr. Delva in Haiti after the earthquake

## Mr. Delva Moves to New York

After Mr. Delva returned home from Haiti, he began searching for a job. However, he was involved in a car accident and disabled for many months. After he recovered from his injuries, he still could not find a job.

During the Summer of 2012, Mr. Delva's father, Raymond -- through a colleague who worked at *Iona College* -- secured a custodial job for him. Mr. Delva readily accepted the job because, in addition to finally being employed, it offered an opportunity for him to continue taking college classes. As such, during August 2012, he moved to New York and moved in with his uncle, Gregory Accilien, in the Bronx. One year later, at the time of his arrest in the matter at bar, during August 2013, he was still working at *Iona College*.


## MR. DELVA'S CHARACTER

As referenced above, many of Mr. Delva's family members have submitted character letters on his behalf. (A full set of these letters is included in the Exhibits to this *Sentencing Memorandum*). These letters are from:

| Name | Relationship |
|---|---|
| Ray Delva | Stepbrother |
| Raymond Delva | Father |
| Rose Thomas | Aunt |
| Pauline Altine | Grandmother |
| Samuel Thomas | Cousin |
| Ebony Olivier | Cousin |
| Kanya Olivier | Cousin |
| Rev. Wilfrid Saint Jean | Pastor |
| Nichola Dawson | Family Friend |
| Pascale Point-Du-Jour | Aunt |
| Claudel Noisette | Stepbrother |
| Violata Noisette | Mother |
| Matthew Noisette | Sister |
| Marie Excellent | Aunt |

These letters are well written.  They provide compelling insight into Mr. Delva's character and family.

Among other information, the letters show Mr. Delva comes from a family which places a high value on the importance of higher education.  Many of Mr. Delva's family members are proud to have undergraduate and postgraduate degrees. (For example:  Raymond Delva has a Master of Science; Samuel Thomas (cousin) has

12

an MBA; Ebony and Kanya Oliver (cousins) have undergraduate degrees from Florida State University; and, Rose Thomas (Aunt) has a Master of Arts).

The letters confirm Mr. Delva is extremely bright.  His mother's letter reports, at age six, David placed second in a national spelling bee and, by age sixteen, he earned his GED.  His father's letter reports, when David was a child, he consistently scored very high (upper 90th percentile) on standardized tests.

Collectively, the letters indicate Mr. Delva is unconditionally devoted to his family.  Regarding his commitment to family, Mr. Delva's Aunt, *Marie Excellent*, writes:

> David is a young man who loves his family.  Family means the world to him.  He always it a point to attend all my family functions, whether they were dinners Christmas parties, picnics, sickness, trauma, he was there.  When my twin daughter (his cousins) went away to college, he was constantly calling / texting them to let them know how proud he was of them and to give them words of support and encouragement.

Similarly, the letter of Mr. Delva's mother, *Violata Noisette*, confirms, following the passing of Antonio Noisette, Mr. Delva became the father figure for his younger siblings, Claudel and Matthew.  In pertinent part, she writes:

> My other two sons really look up to David for my Husband past away back in 2009, leaving them in need of a father figure. David stepped up and immediately became the man of the house. He would clean the house, cook food to make sure we eat, and insure his two little brothers handled their homework and understood what they were learning. With me being a single mother and the only person working in the household, David was a huge help and took lots of stress off my back.

Although not referenced in the letters, the life sentence currently being served by Mr. Delva's uncle -- co-defendant Dominique Jean Phillipe -- is on the mind of many of his family members.  They recognize the reality that Mr. Delva is going to be sentenced to a substantial term of incarceration.  However, in their letters, their underlying plea is for the Court to impose a sentence which provides both them, and Mr. Delva, a ray of hope so that, one day, they can share their lives away from the confines of prison.

One letter -- from *Rose Thomas* (Mr. Delva's Aunt) -- is especially candid about Mr. Delva's family, childhood and character.  As noted above, she is the sister of Raymond Delva and helped raise David when he was an infant.  She has always been a part of his life.  The matter at bar has been emotionally difficult for her as she is also the sister of Gregory Accilien and Dominique Jean Phillip (and she submitted letters on behalf of them as well).  The full text of her letter is on the following pages:

14

United States v. David Delva, 12 Cr. 802 (KBF)

The Honorable Katherine B. Forrest
U.S. District Court
500 Pearl Street
New York, NY 10007-1312

Re: Letter on behalf of David Delva

United States v. David Delva, 12 Cr. 802 (KBF)

To: Judge Forrest,

I was born the second child in a family of five children. Our home had no books and no dads. Mom tried her best but growing up in an impoverished, illiterate, and illegitimate environment is always a gamble. No one is certain how the children would fare. With no viable role model, we tried to figure out life. Some of us learned more useful lessons and used better resources than the others.

In 1988, my older brother had not learned how to be a father. He'd never had a dad but here he was about to become a young, unmarried one. His son David was to be born in the month of May. My brother had a trip planned for that month so I flew from Florida to New York to await the arrival of my nephew. I was first to hold him. He captivated my heart.

David was the first grandchild in the family. He was a brilliant, bright-eyed boy who placed in the $95^{th} - 98^{th}$ percentile on standardized tests in the early years of school. He was full of passion, promise, and possibilities yet he was saddled by family problems.

His father went on to marry, not his mom but someone else who ignored and neglected David. His parents had left New York and David bounced from his father's home in Georgia to his mom's home in Miami. The man who later married his mom was kind, but he would be murdered in the parking lot of his job before David became a young adult.

David's life was unstable and inconsistent and he tried desperately to stay connected to family members including my two younger brothers in New York - the uncles who are associated with the crimes for which David was charged and convicted.

Your Honor, I sat in the courtroom for the beginning of the trial and as the demands of school administration summoned me to Florida, my sister came to support our nephew. We, along with the other relatives who were there, stood behind a completely different young man than the charges described.

I know David as a selfless, compassionate, and attentive young man who phoned me for birthdays and holidays and attended family reunions and events. He's always been responsive to the hurt of others.

United States v. David Delva, 12 Cr. 802 (KBF)

When the disastrous earthquake hit Haiti in January 2010, David quickly boarded a plane to go and assist. Upon his return, the plane that carried American helpers from Haiti dropped him off in Sanford, near my Florida home. I picked him up from the airport. He was exhausted but thankful that he had lent a hand to those in needs. I still see him, pulling the snacks that he was given in the airplane out of his bag to give to my daughter- his younger cousin.

I remember him -using monetary gifts from his grandma- taking me to buy my favorite Caribbean soda and patties, a gracious gesture from a young man to an aunt he's always called "his angel."

I go back to the texts he'd sent me when he needed money. He was working but after he'd paid the bills, he'd text or call to ask to borrow money until his next paycheck. He was faithful to pay the money back though it would be alright if he didn't, but he'd always kept his words to me.

I hear his voice. I see his boyish smile and I know that his sentencing is coming and life for him - and for me- will never be the same. I'm so sorry for all that has happened and for the repercussions.

Your Honor, as you sentence my nephew, I ask one thing that is uncommon among people of the same group and very rare across peoples, tongues, and nations: I ask that you look at David as your own. If you can see him as yours, then it would be clear how devastating it would be for his family to lose him to a lifetime in prison and Your Honor would grant him a second chance because he's her own.

I had great hopes for David. I believe that a family is firm and its legacy lasting when its children succeed and serve. My family and I are as broken as we will ever be and all I can do is beg for mercy, grace, and empathy on behalf of my nephew David.

Thank you, Your Honor.

Rose Thomas, MA

## THE OFFENSE CONDUCT

The Court presided over the trial of Mr. Delva.  As the Court is well aware, Mr. Delva contends he did not participate in the Magenta Street Robbery which occurred, in the Bronx, during Labor Day Weekend of 2012.

During the course of the defense case, we called three alibi witnesses who attested to the fact that -- while the Magenta Street Robbery was occurring -- Mr. Delva was in Brooklyn, with family, at his sister's apartment located on Eastern Parkway in Brooklyn.

The three witnesses were able to specifically recall Mr. Delva being present, with them, during the course of that Labor Day weekend from Sunday through Wednesday.  They were able to recall being there because there were not together for a "run of the mill" weekend.  They were there to partake in the festivities associated with the annual West Indian Day Parade -- a major event within the Haitian community -- which travels along Eastern Parkway (in Brooklyn) during the Labor Day Weekend.

## ISSUES REGARDING THE PRESENTENCE INVESTIGATION REPORT'S ("PSR") CALCULATION OF THE ADVISORY SENTENCING GUIDELINES

### The PSR's Calculation of the Guidelines

A summary of the PSR's calculation to Mr. Delva's advisory sentencing guidelines is as follows:

*Group 1 Kidnaping  Adams  (¶¶48 55)*

| | |
|---|---|
| Base offense level[3] | 36 |
| Enhancement:  Ransom Demand | +6 |
| Enhancement:  Serious Bodily Injury to victim | +2 |
| Enhancement:  Sexual Exploitation of victim | +6 |
| Adjusted Offense Level | 46 |

*Group 2 Kidnaping  James  (¶¶56 62)*

| | |
|---|---|
| Base offense level | 36 |
| Enhancement:  Ransom Demand | +6 |
| Enhancement:  Serious Bodily Injury to victim | +2 |
| Adjusted Offense Level | 40 |

---

[3] Citations to the corresponding U.S.S.G. sections are in the PSR.

*Group 3 Drug Conspiracy   (¶¶63 68)*

| Base offense level | 20 |
|---|---|
| Adjusted Offense Level | 20 |

*Multiple Count Analysis   (¶¶69 74)*

Based upon the foregoing, Mr. Delva's highest adjusted offense level is 46 (from Group 1).  The PSR determines he has 1½ Units (1 for Group 1 and ½ for Group 2).  Due to him having 1½ units, the PSR adds 1 level to Mr. Delva's highest adjusted offense level of 46 resulting in a Total Offense Level ("TOL") of 47.  However, per Chapter 5, Part A of the Sentencing Guidelines, Mr. Delva's TOL is capped at 43.

*Criminal History Category   (¶¶75 84)*

The PSR alleges Mr. Delva has 8 Criminal History Points which correspond to Criminal History Category ("CHC") IV.

*Sentencing Range   (¶135)*

The PSR alleges under TOL 43, and CHC IV, the corresponding advisory Sentencing Guideline Range is life.

19

## Our Objections to the PSR's Calculation of the Guidelines

In response to this calculation, we submitted objections to the PSR's calculation of the advisory Sentencing Guidelines.[4]   We contend that the following calculations are in dispute:

1.    Ransom Demand Enhancement (Groups 1 & 2)

2.    Sexual Exploitation Enhancement (Group 1)

3.    Serious Physical Injury Enhancement (Group 1)

4.    Drug Quantity (Group 3)

5.    Role in the Offense (All Groups)

6.    Calculation of the Criminal History Category

Our discussion regarding each of these issues is as follows:


*Ransom Demand Enhancement (Groups 1 & 2)*

In response to the first draft of the PSR, we objected to the imposition of the 6 level Ransom Demand Enhancement to both the James and Adams group.  The authority for the Ransom Demand Enhancement is in U.S.S.G. §2A4.1(b)(1) which states, "if a ransom demand or a demand upon government was made, increase by 6 levels."

---

[4]

In his *pro se* post trial motions, Mr. Delva also raised objections to some of these calculations.

However, the term "ransom demand" -- for purposes of applying the Ransom Demand Enhancement -- is not expressly defined in the Sentencing Guidelines nor in the commentary to §2A4.1.

The application of the Ransom Demand Enhancement was squarely addressed in *U.S. v. Reynolds*, 714 F.3d 1039 (7th Cir. 2013).  In *Reynolds*, a group of robbers ambushed a drug dealer outside his home.  The drug dealer was taken inside and tied up with duct tape.  He was beaten up by the robbers who he disclosure of the location of his  drug and money stash.  At sentencing, the District Court applied the 6 level Ransom Demand Enhancement.  However, on appeal, the Circuit Court reversed.  In pertinent part, the Court stated:

> This issue is difficult because "ransom" is not defined in the guidelines, and the commentary to U.S.S.G. § 2A4.1 gives no insight into what conduct the Sentencing Commission intends § 2A4.1(b)(1) to punish
>
> . . .
>
> § 2A4.1(b)(1) may be applied only if kidnappers' demands for "money or other consideration" reach someone other than the captured person. In reaching this conclusion we look first to the language of the guideline, which presupposes the existence of a third party.  The adjustment applies if "a ransom demand or a demand upon government was made." U.S.S.G. § 2A4.1(b)(1) (emphasis added). Those are distinct actions, and yet the Sentencing Commission has chosen to group them together and treat them as equally culpable offenses.   Since a "demand upon government" cannot be made during a kidnaping without the communication of demands to people other than those held captive, we think that "ransom demand" is fairly read to also include this third-party element. Section 2A4.1(b)(1) is a substantial adjustment, and additional punishment is warranted when demands reach third parties because those

21

who are contacted will experience great stress and may attempt a rescue, escalating the threat of violence. Moreover, kidnaping someone in order to compel others to act, as a substitute for confronting or attempting to rob those others in person, can be a very effective way to accomplish crime that merits heightened deterrence. But when a kidnaping is conducted without the knowledge of anyone except for the victim, the scope of the crime and risk of harm to others, while undoubtedly extensive, is nonetheless not as great. *Id.* at 1044.

Applying this holding to the matter at bar, we objected to PSR's application of the Ransom Demand Enhancement. We contended the demand for "money or other consideration" was not conveyed to, and did not reach, someone other than James or Adams who were the captured persons. As such, the demands placed upon James and Adams were not "ransom" demands for Guideline purposes. They were only intended to cause James and Adams, and not third persons, to act in response to the demands placed upon them. More specifically: 1) Regarding Adams, the demands were intended to causing her to call James in order to lure him over to her Apartment; and, 2) Regarding James, the demands were intended to cause him to disclose the location of his stash). The matter at bar is not a case where, by threat of harm to the kidnaped person, a third person was coerced into doing an act.

In response, in the Addendum to the PSR, the Probation Department took the position that -- since there is no guideline definition of the term "ransom demand" -- the controlling definition should be the one found in *Merriam Webster's Dictionary.*

22

According to the PSR, this definition states "to be free from captivity or punishment by paying a price."

We submit there is no valid basis for the PSR to claim a dictionary provides a better, and preferable definition, for a Guideline enhancement, instead of one promulgated by a Circuit Court of Appeals.  In fact, the *Reynolds* Court expressly admonished against the use of dictionaries to define Guideline enhancements.  In *Reynolds*, both sides apparently advocated the term "ransom" should be defined in accordance with *Black's Law Dictionary*.  However, the Court found this was improper and stated:

> The definition proposed by [the parties] is overinclusive: under the Black's Law definition, even a simple mugging would include a "ransom" demand if at some point during the attack the assailant offered to let the victim go in exchange for her valuables or some other benefit. Dictionaries should be used as sources of statutory meaning only with great caution, *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir.2012), and here we think that the Black's entry does not comport with an ordinary understanding of what a "ransom" demand is. *Id.*

In the matter at bar, the definition of "ransom demand" as advocated by the PSR would apply to any robbery where a person is threatened with "punishment" unless they "pay a price" by handing over their money or property.  This is in direct conflict with *Reynolds*.   Under the PSR's definition, as warned in *Reynolds*, a mine run robbery -- where a person is ordered to hand over the money in their pocket under a threat of being beaten, stabbed or shot -- could be construed as a ransom demand.

23

*Reynolds* clearly indicated U.S.S.G. §2A4.1(b)(1) should only be applied in limited circumstances when a kidnapper issues demands intended to compel a third party (either the government or private citizen) to act. *Id.* at 1045. Here the demands were only intended to compel the victims, first Adams, and, thereafter James, to act. There were no demands which were intended to compel a third party to act. Accordingly, the Ransom Demand Enhancement should not be included in the calculation of Mr. Delva's advisory Sentencing Guidelines.

### *Sexual Exploitation Enhancement (Group 1)*

We contend the Sexual Exploitation Enhancement should not apply because Adams' claim -- that she was raped (as alleged during the trial and the Cole/Phillipe *Fatico* hearing) -- is in inherently incredible. During both proceedings, she claimed, during the course of the Magenta Street Robbery, she was raped by three men, none of whom wore a condom, and all of whom ejaculated. For several reasons, her testimony is beyond the pale of belief.

First, during the *Fatico* hearing she testified the three rapes occurred with her legs being bound tightly together with duct tape. In pertinent part, the following colloquy occurred:

Q.     Did there come a time when you were sexually assaulted by the robbers?

24

A.    Yes
Q.    Where were you?
A.    In the bedroom.
Q.    Were you on the floor?
A.    Yes.
Q.    Were your arms and legs still bound and your eyes taped?
A.    Yeah
      (Cole/Phillipe *Fatico* Hearing pp.27-28 )

Under these circumstances, one must question, if Adams legs were tightly bound in this manner (so tightly that she complained of pain due to being bound) then how could three men have possibly raped her.

Second, there is no logical reason why Adams failed to report the rape until several months after the incident.  During this period, she was repeatedly interviewed by the case detective and agent.  She readily reported the other heinous acts inflicted upon her during the course of the Magenta Robbery.

Third, at the hospital, Adams did not tell any of the medical professionals that she had been raped.  Adams worked in a hospital as a medical assistant.  As such, she certainly knew that, if she had been raped (without a condom by three men who ejaculated), there would have been DNA evidence which would have invaluable in helping apprehend her assailants.  Yet, according to her medical records, when asked if she had been sexually assaulted, Ms. Adams she replied "no."

Fourth, it is noted in police reports that, prior to being raped, Adams had the presence of mind to request the perpetrators use condoms.  However, she did not do

25

this out of concern about getting pregnant.  At the *Fatico* hearing, she testified she could not get pregnant (p.80).  As such, it is axiomatic, her request -- for use of a condom -- was to ensure HIV or an STD were not transmitted to her.  Yet, while at the hospital, she never privately requested any of these tests be administered to her.  As someone who worked in a hospital, she obviously knew the administration, and results of these tests, would be kept confidential.

Fifth, the only evidence of Adams' allegedly being raped is her own uncorroborated testimony.  As indicated above, it is not corroborated by any medical evidence. At the *Fatico* hearing, the Government did not call any of the family members as witnesses to her alleged outcry of rape.

Sixth, the circumstances of this incident suggest it was a robbery, set up by Adams, which "went bad."  Adams certainly had motive to set up James to be robbed. Prior to the robbery, they had a violent dispute which culminated in James firing a gun at her.  Moreover, there were numerous prior instances where members of Adams' family -- including her daughter -- set up robberies of James' stash.  Adams' willingness to rob James is confirmed by James' initial comment -- upon entering the Magenta Street Apartment -- as stating "Jeanette, you set me up."

26

Seventh, it is reasonable to infer that Adams belated allegation of rape was an afterthought, or embellishment of her story, in order to get back at the men who tied her up and beat her during the course of the Magenta Street Robbery.

We acknowledge Adams was tied up, beaten and brutalized.  However, we contend there is insufficient evidence to establish, by a preponderance of evidence, that she was raped and therefore, the 6 level Sexual Exploitation Enhancement is not applicable.

In addition, even if Adams had been raped, it is unequivocal that Mr. Delva was not one of rapists nor was he even present when the rapes occurred.

During the rapes, Adams was blindfolded.  As such, she did not identify Mr. Delva as one of the alleged rapists.

In addition, following the *Fatico* Hearing, the Government filed a stipulation which was entirely based upon statements of Accilien (ECF81-1) who was cooperating with the Government by that point.  According to the stipulation, Accilien denied participating in, or being present, during the rapes.  (Stip. ¶6).  According to the time line of events, as asserted by the Government in the stipulation and during the trial, the rapes occurred on Monday.  (*See* Government Letter, ECF Doc. 81, p.3). According to the stipulation, and Accilien's testimony, Mr. Delva was only in the

27

Magenta Street Apartment on two accessions.  The first time he was there was early Monday morning.  He was brought there by, stayed there with, and left with, Accilien.  According to the stipulation, during this visit, they were only there for 30 minutes.  (Stip. ¶3).  As such, since Accilien claims the rapes did not occur while he was present in the Magenta Apartment, Mr. Delva cannot be alleged to have participated in the rape during this 30 minute period while he was in the Apartment with Accilien.

The second time Mr. Delva was in the Magenta Apartment, according to the stipulation (Stip. ¶4), was when he went there on Tuesday (the day after the rapes had already taken place).

Based upon the foregoing, there is no basis to allege Mr. Delva participated in the rape of Adams.

*Serious Physical Injury Enhancement (Group 1)*

In our response to the first draft of the PSR, we objected to imposition of the Serious Physical Injury Enhancement contending it cannot be applied if the Sexual Exploitation Enchantment is applied.  Application Note 1, to U.S.S.G. §2A4.1, expressly states this enhancement cannot be double counted with the Sexual Exploitation Enhancement.  In pertinent part, it states, "for purposes of this guideline,

"Serious Bodily Injury" means conduct other than criminal sexual abuse, which is taken into account in the specific offense characteristic under subsection (b)(5)." *Id*.

The PSR contends this enhancement is still applicable because, in addition to being sexually exploited, Ms. Adams had pain in her wrists and "burn" like skin injuries caused by the duct tape being applied to her wrists. However, these injuries do not constitute serious physical injuries for purposes of applying the Serious Physical Injury Enhancement.

The Guidelines define "Serious Physical Injury" in U.S.S.G. §1B1.1, Application Note 1(L), which states:

> "Serious bodily injury" means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.

Here, the injury to Ms. Adams does not even come close to fitting within this definition. She did not suffer from extreme physical pain, protracted impairment or medical intervention. As shown by her medical records, her "burns" were superficial skin abrasions. Mr. Adams was not admitted to the hospital for burn treatment. Her abrasions were treated in the emergency room and she released. There is not even any evidence of follow up medical care being administered.

29

*Drug Quantity (Group 3)*

The first draft of the PSR alleged the base offense level, for the Drug Conspiracy, was level 10 based upon the six pounds of marijuana. During the trial, James alleged six pounds of marijuana (which is approximately 2.7 kilograms) was taken from him. As such, we agreed base offense level of 10 was appropriate [per U.S.S.G. 2D1.1(c)(15)] since this based offense level corresponds to a quantity of 2.5 to 5 kilograms of marijuana.

The Government responded to the first draft of the PSR by alleging, in addition to the marijuana, 20 grams of crack should be added to the drug quantity. The Probation Department simply accepted this representation at face value and incorporated it into the PSR. Thus, for Group 3, the PSR increased Mr. Delva's base offense (and adjusted offense) level from 10 to 20. Other than simply taking the Government at its word, the PSR does not provide any justification for this revision.

The PSR minimizes the aspect of this adjustment by indicating it does not affect the overall guideline calculation. However, we contend this Guideline calculation is a §3553(a) factor which is relevant toward determining the applicable sentence the Drug Conspiracy Count.

*Role in the Offense (All Groups)*

In response to the first draft of the PSR, we contended Mr. Delva is entitled to a reduction for having a minimal role in the offense.

At trial, Mr. Delva was found not guilty of all substantive counts relating to the Magenta Street Robbery/Kidnaping of Adams and James.  At trial, the only evidence that Mr. Delva actually, and directly, participated in actual incident came from the testimony of Accilien.  Among other allegations, Accilien claimed Mr. Delva was present in the apartment and, while there, guarded the victims, pistol-whipped James and helped cleaned up the crime scene.  However, the jury apparently did not believe this testimony of Accilien as it acquitted Mr. Delva of the substantive counts. Notably, it acquitted him of Count 5 which charged him with possession and brandishing a firearm during the course of the Robbery and Kidnaping.  This Count correlated to Accilien's testimony alleging Mr.  Delva pistol-whipped James.  As such, by reaching this verdict, it is readily apparent the jury rejected all of Accilien's testimony which claimed Mr. Delva directly participated in the Robbery.  We contend, by acquitting on the substantive Counts, the jury determined Mr. Delva was not present during any portion of the Magenta Robbery.

However, the jury did find Mr. Delva guilty of being a member of the Robbery and Kidnaping conspiracy. We believe the jury must have (albeit erroneously) based

its finding solely upon the telephone call between Mr. Delva and his uncle Dominique

Jean Phillipe.   This conclusion is supported by a jury note, sent out during

deliberations, which stated the following:

```
First, . . . can we have a playback or transcript of
number 800 prison call between Dominique Jean-Philippe
and David Delva. And then number two: Explain what
"progress" means as used on pages Count One, second
element . . . i.e., if a person learns of unlawful
activity and a conspiracy surrounding it after the
unlawful act, are they a co-conspirator? [Trial Transcript p.
1423].
```

Based upon this note, it seems the jury found Mr. Delva's culpability, for his

involvement in the conspiracy, was based upon to his conduct referenced during the

telephone call between him and Jean Phillipe.   During this phone call -- which

occurred nine months after the Magenta Robbery (and after the arrest of Accilien for

participating in the Magenta Robbery) -- Mr. Delva and Jean Phillipe discuss the

arrest of Accilien.   During the call, Mr. Delva informed Jean Phillipe he advised

Accilien not to say or sign anything. We infer the jury found Mr. Delva was liable for

conspiracy based upon his providing this advice to Accilien.

In light of this finding, coupled with his acquittal on substantive counts, it

appears the jury found Mr. Delva was not a direct participant in the Magenta Robbery.

Since his involvement in the conspiracy was limited to providing after-the-incident

advice to Accilien, we contend he is entitled to a four level adjustment for having a minimal role in the offense pursuant to U.S.S.G. §3B1.2(a).

*Criminal History Category*

Our objections to the calculation of Mr. Delva's criminal history category are as follows:

| ¶ | Comment | # Criminal History Pts. |
|---|---------|-------------------------|
| 76 | This paragraph reports the sentence is "unknown." We have not seen a judgment of conviction for this offense. Since there is no verification of:  the conviction; imposition of sentence; and issuance of a judgment for this offense, it should not be included in the calculation of Mr. Delva's Criminal History Category. | 1 |
| 78 | The information reported in the PSR is insufficient for this offense to be included in the calculation of Mr. Delva's Criminal History Category. We note the PSR does not a report of a docket number for this offense. Since there is no verification of:  the conviction; imposition of sentence; and issuance of a judgment for this offense, it should not be included in the calculation of Mr. Delva's Criminal History Category. | 2 |

| ¶ | Comment | # Criminal History Pts. |
|---|---------|-------------------------|
| 79 | This paragraph charges the same offense and reports the same sentence as the offense referenced in paragraph 78. We note the offense reported in this paragraph reports a docket number and indicate a different arrest date (9/27/07) as compared to the one reported in paragraph 78 (which states he was arrested on 7/7/07). However, if Mr. Delva was serving a 4 month and 26 day sentence for the offense in paragraph 78 (for which he was arrested on July 7, 2007), then he still could have been in custody when he was purportedly "arrested" on September 27, 2007 for the offense reported in paragraph 78. Due to this unverified inconsistency, and since we have not been provided with confirmation of the conviction (such as a copy of a judgment of conviction) we object to it being included in the calculation of Mr. Delva's Criminal History Category. | 2 |
| 81 | The information reported in the PSR is insufficient for this offense to be included in the calculation of Mr. Delva's Criminal History Category. We note the PSR does not report a docket number for this offense. Since there is no verification of: the conviction; imposition of sentence; and issuance of a judgment for this offense, it should not be included in the calculation of Mr. Delva's Criminal History Category. | 1 |
| 82 | This paragraph charges the same offense and reports the same sentence as paragraph 81. Due to this inconsistency, and apparent duplicate reporting, and since we have not been provided with verification of the conviction (such as a copy of a judgment of conviction) we object to it being included in the calculation of Mr. Delva's Criminal History Category. | 1 |

The PSR indicates Mr. Delva has a total of 9 criminal history points. However, based upon the foregoing, we object to 7 of these points. As such, until our objections

are resolved, we contend he only has 2 criminal history points which place him in Criminal History Category II.

### Our Calculation of the Guidelines

Based upon the foregoing, we contend Mr. Delva's advisory Sentencing Guidelines should be calculated as follows:

| **Group 1**<br>**Kidnaping Group (Adams)** | |
|---|---|
| Base Offense Level | 32 |
| Adjusted Offense Level | 32 |
| | |
| **Group 2**<br>**Kidnaping Group (James)** | |
| Base Offense Level | 32 |
| Enhancement:  Serious Bodily Injury | +2 |
| Adjusted Offense Level | 34 |
| | |
| **Group 3**<br>**Drug Conspiracy** | |
| Base Offense Level | 10 |
| Adjusted Offense Level | 10 |
| | |
| **Multiple Count Adjustment** | Units |
| Group 2 - Adjusted Offense Level = 34 | 1 |
| Group 1 - Adjusted Offense Level = 32 | 1 |
| Group 2 - Adjusted Offense Level = 10 | 0 |
| Total Units | 2 |
| | |
| **Greater of Adjusted Offense Level** | 34 |
| **Increase in offense level (based upon 2 units)** | +2 |
| **Reduction for a minimal role in the offense** | -4 |
| **Total Offense Level** | 32 |
| **Advisory Guideline Range (CHC)** | 135 to 168 months. |

## OTHER ISSUES REGARDING THE PSR

*The Applicable Sentence for Count 7 (PSR ¶135)*

The PSR, at ¶135, says the term of imprisonment on Count 7 "must be imposed consecutively to any other counts." This is erroneous. Mr. Delva's conviction, in Count 7, is for a violation of 18 U.S.C. §924(c), for use of a firearm during a drug trafficking offense (Count 6). Per the statute, the mandatory minimum sentence of five years is to be imposed consecutive to the punishment provided for "such" drug trafficking crime. As such, the sentence on Count 7 must only be consecutive to Count 6 not the other Counts of conviction as referenced in the PSR.

*Objection to Description of the Offense Conduct*: (PSR ¶¶26-36)

In response to the first draft of the PSR, we objected to, and requested a redaction of, all the allegations in the PSR which claimed Mr. Delva directly participated in the Magenta Street Robbery. As indicated above, during the trial, we contended Mr. Delva was not present during the commission of these offenses and offered alibi testimony supporting this contention. At trial, the alibi witnesses consistently attested to the fact that Mr. Delva was at his sister's residence during the period when the Magenta Street Robbery was taking place. We contend the jury accepted this testimony and found he did not participate in these offenses. That is

37

why he was acquitted of all substantive counts relating to these offenses.  Moreover, the fact Mr. Delva was convicted of conspiracy does not mean he participated in the underlying offenses.  Conspiracy is a separate crime.   A person can be convicted of conspiracy by agreeing to commit a crime without actually participating in it.

In light of the foregoing, we contend the following paragraphs, which allege specific offense conduct by Mr. Delva, must be removed from the PSR: ¶¶26,28,30,31,33,34,36

*Specific Objection:*  (PSR ¶26)

This paragraph claims Accilien was told to come back with Delva who had more experience with robberies.   Any claim that Delva is "experienced in robberies" is not true.  Notably, the Criminal History Section of the PSR (¶74-104) reports Mr. Delva has been arrested on 24 occasions.  Yet not one of these arrests is for robbery. We contend this demonstrates that any allegation, claiming Mr. Delva was "experienced" in robberies, is a fabrication.

In addition, this paragraph claims DNA from Delva was later found on one of the gloves found at the scene.  At trial, we offered testimony, by a DNA expert who testified there was insufficient evidence to allege the DNA on the glove belonged to

Mr. Delva.  In light of this dispute, it is error for the PSR to decide that Mr. Delva's DNA was recovered from the crime scene.

*Specific Objection:*  (*PSR* ¶31)

There was no credible testimony about this conversation between Phillipe and Delva.

There was no testimony that Delva was present when the male victim arrived and that he was rushed by Delva

*Specific Objection:*  (*PSR* ¶36)

There was no testimony from anyone who observed Delva clean the apartment with bleach.

*Reporting of Arrests for Dismissed Cases*:  (*PSR* ¶¶ 86-105)

In response to the first draft of the PSR, we objected to inclusion of arrests, in ¶¶86-105, where Mr. Delva was arrested and the cases were either:  dismissed; subjected to withheld adjudication; or, have an unknown disposition.   The presumption of innocence should still govern here.  An arrest is not an indication that a person committed a crime.  As such, arrests which were later dismissed should not

be included in the "CRIMINAL HISTORY" section of a PSR as they imply the person committed the offenses simply because he was arrested.

Sadly, at times, police have arrested people -- especially homeless ones which was Mr. Delva's circumstance during the period of many of these arrests -- on specious or even false grounds. The inclusion of this information only serves to prejudice Mr. Delva as it unduly taints his personal background before the Sentencing Court and, while he is in jail, the information will adversely affect the Bureau of Prisons' calculation of his security classification.

### *Recommended Sentence of Count 6 (PSR - Recommendation)*

The PSR recommends a term of twenty years, the statutory maximum, be imposed for Count 6. As indicated above, there is a dispute regarding the calculation of the Adjusted Offense Level, and corresponding advisory range of imprisonment, for this Count. This dispute is as follows:

- **Per the PSR's Calculation** - With an Adjusted Offense Level of 20 and CHC IV, the advisory Guideline range is 51 to 63 months

- **Per our Calculation** - With an Adjusted Offense Level of 10 and CHC II, the advisory Guideline range is 8 to 14 months.

Under either calculation, we contend a recommendation which advocates a sentence of twenty years on Count 6 is substantively unreasonable. This recommendation which advises imposition of a sentence which is 177 months above

40

the high end of the highest guideline calculation. We submit this recommendation utterly fails to take any of the factors, as set forth in 18 U.S.C. §3453(a), into consideration.

## FACTORS FOR CONSIDERATION IN DETERMINING MR. DELVA'S SENTENCE

We respectfully request the Court consider the following factors when imposing sentence in this matter.

*First,* although the co-defendants Cole and Phillipe were sentenced to life in prison, unlike the allegations against Mr. Delva, they planned, commenced and carried out the Magenta Robbery. They tied up and beat Adams. They tied up and beat James. They have lengthy histories of engaging in violent criminal acts. Their criminal records bespeak of a lifetime of violence and committing crimes far greater than Mr. Delva's prior history. Against this backdrop, in light of Mr. Delva's lesser role (as compared to Cole and Phillipe) and the much more violent criminal histories of Cole and Phillipe, we contend a sentence -- below a life term -- will take §3553(a)(6) into consideration and (in comparison with Cole and Phillipe) will not result in an unfair sentencing disparity.

*Second,* under 18 U.S.C. §3553(a)(1), prior to imposition of a sentence, a court shall consider the "history and characteristics of the defendant." Accordingly, we

respectfully request the Court to consider Mr. Delva' personal background information contained in this *Sentencing Memorandum*.

**Third,** under even under our Sentencing Guideline calculation, the advisory calculation represents a significant term of incarceration be imposed upon Mr. Delva. We submit a sentence, which is not a life sentence, will still be one in consideration of 18 U.S.C. §3553(a)(2)(B) & (C), as it will satisfy the goals of specific and general deterrence and will alleviate concern about protecting the public from further crimes.

**Fourth,** in consideration of 18 U.S.C. §3553(a)(2)(A), we submit a term of imprisonment, a term of supervision, coupled with the collateral consequences of a felony conviction, adequately reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense.

## CONCLUSION

In his letter to the Court, Mr. Delva's cousin, Samuel Thomas closes with the following words which -- quite eloquently -- plead for a fair and just sentence.  They are worth repeating and adopting as our conclusion to this *Sentencing Memorandum*:

> **My cousin David has been found guilty of some severe crimes. While I do not condone nor am I proud of what has been done. I believe there is hope for change. I am very aware that prison is meant to be a place of reform for citizens who do not value the law. I plead that you allow David to serve his time and be reformed, but allow him to enter our society once again to become the productive man I know he can be. He is a brilliant, helpful soul who has made poor choices and has followed the wrong influences around him. I know that he must pay for his actions; I just ask that the punishment he pays is not with his life. I pray that he is able to come out of the system reformed, able to live a life that we would be proud of and that God will be happy with. I am not writing you with excuses, nor am I saying what was done was right in the eyes of the law and ultimately, the Lord. I just ask that you look deep inside yourself and make a decision that could allow David a second chance to start over. He's a 26-year-old man who has barely started to live. Please judge, I beg of you. I pray my words are able to make an impact.**

Dated:      February 13, 2015
            Great Neck, New York

                                        Respectfully submitted,
                                        /s/
                                        Jeffrey G. Pittell

TO:   AUSA Justina Geraci
      David Delva

# EXHIBITS
## (Character Letters)

United States v. David Delva, 12 Cr. 802 (KBF)


The Honorable Katherine B. Forrest

U.S. District Court

500 Pearl Street

New York, NY 10007-1312


Re: Letter on behalf of David Delva

United States v. David Delva, 12 Cr. 802 (KBF)


Dear Honorable Judge Forrest

I am writing to you about David Delva, a defendant in one of your recent court cases. David has been convicted and will be sentenced in your court. I am reaching out to you because David is my brother, but even beyond that, David is a remarkable person.

It has been horrifying for me to reconcile the charges with David my brother who has always supported my schooling and intellectual development. Our family has gone through many hardships in the past decade and when tensions were high and everyone seemed to be going in opposite directions, it was David who always made a call for unity. When we had family gatherings, he was always gregarious and his voice was always heard somewhere in the house, laughing with the smaller cousins or having a more serious discussion with the elders. It was through David that I understood the true value of family and community. He has always been one of the warmest people that I have had the privilege of growing up with and just the thought that he may never see his family or be a part of society as a free man has caused me many sleepless nights.

His involvement in this case is especially tragic considering that he had been making plans to pursue an education again, but a life sentence would eliminate any prospect for rehabilitation or reform, something which I am confident David is capable of. I hope you take into account all of this information when you consider David's sentencing. I know David as a wonderful brother and if he gets a second chance he would use it wisely. Thank you for taking the time to hear my thoughts on this matter.

Sincerely,

Ray Delva

United States v. David Delva, 12 Cr. 802 (KBF)


The Honorable Katherine B. Forrest
U.S. District Court
500 Pearl Street
New York, NY 10007-1312


Re: Letter on behalf of David Delva

United States v. David Delva, 12 Cr. 802 (KBF)

October 14, 2014

Dear Judge Forrest:

This writing is on behalf of my first born son David Delva.  He is a good man who has been trying to improve himself and just before this occurrence he was very conscious and active in bettering his life through serious and legal work at Iona College.  His plan was to attain enough time for eligibility to start his college education in that same institution.  David is very smart and his ability to capture, retain, and apply information has been amazing to me.  He loves his family, both close and extended, and maybe this is partly one of the reasons he is in that predicament today.  He was at his uncle's house to maintain family tie but the result has not been positive for him.  He had great plans for his future, and he had shown many signs of commitment to their fulfillment such as leaving a previous bad environment to rent his own place, and his dedication to his job at Iona College for his livelihood.

While the current charges and conviction do not show it, your decision is going to impact in the most significant way a young man who is full of potential. And this is why I am pleading for your leniency on his behalf.  All David needs now is a second opportunity to remedy his life forever, and you have the power to make it happen.

As humans travel through life, we realize that we need each other in more than one ways.  Today it is my turn to plead for your mercy.  Today it is my turn to beg for a second chance for my son.  Today it is my turn to bow down to your will with the hope and prayer that the court's view on humanity will supersede all else.

May your decision give my son another chance at life, another opportunity to excel, another beginning to the deployment of his greatest potential.  May your evaluation and final decision reflect charity at its best and I thank you for giving my son this most momentous chance of his entire life.


Sincerely,
Raymond Delva, MS

United States v. David Delva, 12 Cr. 802 (KBF)

The Honorable Katherine B. Forrest
U.S. District Court
500 Pearl Street
New York, NY 10007-1312

Re: Letter on behalf of David Delva

United States v. David Delva, 12 Cr. 802 (KBF)

To: Judge Forrest,

I was born the second child in a family of five children. Our home had no books and no dads. Mom tried her best but growing up in an impoverished, illiterate, and illegitimate environment is always a gamble. No one is certain how the children would fare. With no viable role model, we tried to figure out life. Some of us learned more useful lessons and used better resources than the others.
In 1988, my older brother had not learned how to be a father. He'd never had a dad but here he was about to become a young, unmarried one. His son David was to be born in the month of May. My brother had a trip planned for that month so I flew from Florida to New York to await the arrival of my nephew. I was first to hold him. He captivated my heart.

David was the first grandchild in the family. He was a brilliant, bright-eyed boy who placed in the $95^{th} - 98^{th}$ percentile on standardized tests in the early years of school. He was full of passion, promise, and possibilities yet he was saddled by family problems.
His father went on to marry, not his mom but someone else who ignored and neglected David. His parents had left New York and David bounced from his father's home in Georgia to his mom's home in Miami. The man who later married his mom was kind, but he would be murdered in the parking lot of his job before David became a young adult.
David's life was unstable and inconsistent and he tried desperately to stay connected to family members including my two younger brothers in New York - the uncles who are associated with the crimes for which David was charged and convicted.

Your Honor, I sat in the courtroom for the beginning of the trial and as the demands of school administration summoned me to Florida, my sister came to support our nephew. We, along with the other relatives who were there, stood behind a completely different young man than the charges described.
I know David as a selfless, compassionate, and attentive young man who phoned me for birthdays and holidays and attended family reunions and events. He's always been responsive to the hurt of others.

United States v. David Delva, 12 Cr. 802 (KBF)

When the disastrous earthquake hit Haiti in January 2010, David quickly boarded a plane to go and assist. Upon his return, the plane that carried American helpers from Haiti dropped him off in Sanford, near my Florida home. I picked him up from the airport. He was exhausted but thankful that he had lent a hand to those in needs. I still see him, pulling the snacks that he was given in the airplane out of his bag to give to my daughter- his younger cousin.

I remember him -using monetary gifts from his grandma- taking me to buy my favorite Caribbean soda and patties, a gracious gesture from a young man to an aunt he's always called "his angel."

I go back to the texts he'd sent me when he needed money. He was working but after he'd paid the bills, he'd text or call to ask to borrow money until his next paycheck. He was faithful to pay the money back though it would be alright if he didn't, but he'd always kept his words to me.

I hear his voice. I see his boyish smile and I know that his sentencing is coming and life for him - and for me- will never be the same. I'm so sorry for all that has happened and for the repercussions.

Your Honor, as you sentence my nephew, I ask one thing that is uncommon among people of the same group and very rare across peoples, tongues, and nations: I ask that you look at David as your own. If you can see him as yours, then it would be clear how devastating it would be for his family to lose him to a lifetime in prison and Your Honor would grant him a second chance because he's her own.

I had great hopes for David. I believe that a family is firm and its legacy lasting when its children succeed and serve. My family and I are as broken as we will ever be and all I can do is beg for mercy, grace, and empathy on behalf of my nephew David.

Thank you, Your Honor.

Rose Thomas, MA

United States v. David Delva, 12 Cr. 802 (KBF)

The Honorable Katherine B. Forrest
U.S. District Court
500 Pearl Street
New York, NY 10007-1312

Re: Letter on behalf of David Delva

United States v. David Delva, 12 Cr. 802 (KBF)

Dear Judge Forrest,

I am David Delva's grandmother and I am writing to ask you to have mercy on my grandson. There are no words to tell how everything has affected my family and me. I am very sorry that David was involved in crimes and that your Honor has to decide how long to send him to jail. Besides praying to God, all I must do is to beg Your Honor for grace. It's not the court's fault but we are at its mercy.

This is not the life I thought David would have. He is a smart and kind boy. He's my first grandchild. I just pray that he'll have a chance to make a better life in the future. Please judge, have mercy on David.

Sincerely,

Paulene Altine
David's Grandma

United States v. David Delva, 12 Cr. 802 (KBF)

The Honorable Katherine B. Forrest
U.S. District Court
500 Pearl Street
New York, NY 10007-1312

Re: Letter on behalf of David Delva

United States v. David Delva, 12 Cr. 802 (KBF)

Dear Judge Forrest:

Judge, I am writing this letter to you with sorrow in my heart. My family has had a cloud that will not fade over our heads for the past 2 years. I would first like to apologize for the trouble that has been brought to your courtroom and to our society by the poor choices that have been made and the actions conducted. My cousin David has been found guilty of some severe crimes. While I do not condone nor am I proud of what has been done I believe there is hope for change. I am very aware that prison is meant to be a place of reform for citizens who do not value the law. I plead that you allow David to serve his time and be reformed, but allow him to enter our society once again to become the productive man I know he can be. He is a brilliant, helpful soul who has made poor choices and has followed the wrong influences around him. I know that he must pay for his actions; I just ask that the punishment he pays is not with his life. I pray that he is able to come out of the system reformed, able to live a life that we would be proud of and that God will be happy with. I am not writing you with excuses, nor am I saying what was done was right in the eyes of the law and ultimately, the Lord. I just ask that you look deep inside yourself and make a decision that could allow David a second chance to start over. He's a 26-year-old man who has barely started to live. Please judge, I beg of you. I pray my words are able to make an impact.

Sincerely,

Samuel Thomas, MBA

Dear Judge,

When I think of David, I think of him as the heart of our family.

The year 2007 was when my family and I found out that my dad, David's uncle will not be coming back to the United States. As my older cousin David took on the roll of father figure. As a 16 year old kid, having a father figure was very important. He not only stepped up as a father figure for me but also for my twin sister.

David was always there for birthdays, holidays, and other special events and occasions. David sent my sister and I off to college and always checked in on us to see how we were doing academically and to give us encouragement and motivation when we missed home.

In the summer of 2009, David's step father passed and quickly became the man of his household and father to his 2 younger siblings. Since the passing of his step father, he was immediately looked upon as the heart that kept our family beating. He often grieved and mourned his father behind closed doors and in public he kept an optimistic and positive attitude that kept the family going day by day.

David inherited 4 kids, including myself. He was always a family man and in taking on that fatherly role, came naturally. David is the heat of our family and I ask that you allow him to keep are family's heart beating.

Thank you,

Ebony Olivier

Dear To whom it may concern,

When I think of my cousin, many words come to mind; Inspirational. Brotherly, caring, human and eclectic.

During my days in college, David would call me and talk to me about school, my work load and current events that pertains to the economy. Economics was my scholastic study so our bond is very strong. After every phone conversation it use to end with a question, "What do you want to become?" As a college student my inspired occupation would always change, ranging from a financial analyst to a business development associate. After proclaiming my career path, David would lecture to me how proud he was of me, assuming that I am currently in the chosen career field.

David inspires his whole family to live out their dreams and seek for higher learning and reach heights not proclaimed. David's younger brother Mathew is excelling in aviation school while his youngest brother is an honor student preparing to take his standardized test.  While I am currently working at Darden as an accountant.

David really encouraged me and the rest of his family to dream big and live up to our potential. I ask that you give him the chance to live up to his potential and to live out his dreams.

Kanya Olivier

*World Mission Of Jesus-Christ, Inc*



**13850 NW 26 Ave.  A 2nd Floor**
**OPA-LOCKA FL. 33054**
**TEL.(786)4887951/ TEL./FAX # (786)401-6765**
**Rev. Wilfrid Saint-Jean, Sr. Pastor & Founder**

From : Rev. Wilfrid Saint-Jean

13850 NE 26 Ave.

Opa-Locka Fl. 33054

To :    Whom it may concern:

Date:   10/30/2014

Greeting in the name of our Lord of Jesus Christ . My name is Rev. Wilfrid Saint-Jean, I am the President
of World Mission Of Jesus Christ Inc., and the Sr. Pastor of the Church. As a Pastor of a church since
1997, I have always remembered my church's members like I have known David Delva since 2007 and
his entire family . They have been constantly in church and they were always needed Pastor's
counseling and advising in anything they are doing such as Spiritually , Socially and Financially.
Therefore, I believe this family is a great example for other family and if you want to award David a
second chance he will deserve it and I believe he will improve himself for the time to come. Please, I
would like you to give David Delva a special opportunity to pursuing his life in continuing his education,
as well as to live his life as a Christian. For more details concerning this family call me at (786)488-7951.
Thank You and God bless you and your entire family.

Sincerely

Rev. Wilfrid Saint-Jean

President & Sr. Pastor/ School 's Administrator

TO WHOM IT MAY CONCERN

RE: Mr. David Delva

Mr. David Delva is a wonderful, inspiring young man. He deserves to enjoy life to the fullest. He is inspiring because he plays a very positive role in the lives of his younger siblings. Upon the death of his step father he has stood by his brothers' side and has stared them in to the right direction. There was never a day when he was not persistent with his brothers to make sure home work was done and house chores were taken care of in the absence of his mother being at work. When you speak of the "man of the house" that's what David is and was.

 David has that big personality that can make an entire room smile with warmth. A person like him doesn't deserve the life that society has prepared him for but he should be given the opportunity of a second chance to make right with his life and make better choices as he has done in the past. His ambitious level is high and I am sure he has learned his lessons.

As a close friend of the family I have watched him grow into a strong young gentleman, true to himself and others around him. He is a positive being who needs to be free to shine in all aspects of his life.

We all love him and want him to come home and return to his rightful place in our lives. Believe me when I say that society, this nation would be at a loss of a great human being, if he remains incarcerated.

Friend to the Family





Nichola Dawson

Pascale Point-Du-Jour

October 31ˢᵗ 2014



Hon. Katherine B Forrest
U.S. District Court
500 Pearl St.
NY, NY 10001

Re:     US v. *Delva* 12 cr 802 (KBF)

Dear Judge Forrest:

Allow me to introduce myself; my name is Pascale Point-Du-Jour, and I am David Delva's maternal aunt. I am writing on his behalf because my nephew is currently awaiting judgement on his fate. At this point, I am humbly asking for your consideration for mercy on this struggling family. In recent years, my sister and nephew have suffered a lot of tragic losses, including the violent death of David's stepfather, the death of his grandmother through illness, as well as the death of his grandfather, a casualty of Hurricane Sandy.

David is the oldest of three brothers. At a very young age, he's had to struggle with the responsibility of being the adult figure in his mother's household. As such, David has had to help his mother raise his two younger siblings. He shared his love of music with his brothers and has encouraged them to pursue this interest in music through their schoolwork. He has demonstrated a sense of altruism by embarking on the rescue mission to Haiti to help victims of the 2010 earthquake. Subsequently, he came to New York in search of opportunities to work during a crumbling economy. Unfortunately, he met with the wrong crowd, and got into trouble.

Your honor, my sister's family has suffered through a lot, and cannot survive additional losses. Given a chance, David has some of the basic foundations/characteristics to be a fine young man. He has the desire to stand by his mother and to be present in the life of his siblings. Please your honor, consider him for mercy during this trial and sentencing.

Sincerely,

Pascale Point-Du-Jour

███████████
███████████
██████████████
███████████████

Hon. Katherine B. Forrest

U.S. District Court

500 Pearl Street

NY, NY 10001

Dear Judge Forrest,

This letter is on behalf of my brother, David Delva. David and I don't have the same father, but he does way too much to only consider him as a half-brother.

My brother David is a very sympathetic and courageous man. He is the only person I have to look up to as my father figure. Since my father died back in 2009, I really didn't have anyone to show me how to do this right, to become the young man I am today. My mother isn't really the teacher I would desire for my father figure, so David had a very important role in my life. Some things I love doing today is because of him. My passion is music. This love of music would have never came about if it wasn't for my brother David. I use to watch him play piano and one day he said "Come, let me show you how to play this". I do what he tells me to, not only because he is my older brother, but because I respect and love him so much to trust that he is only doing me good and preparing me for the future.

If David is gone from my life, who will I have to look up to as a father figure or who will I have to share my passion with. David is my only male role model and without a role model in life, I don't have any inspiration.

Please let my brother David have another chance and you will realize what a mistake you did not make.

Thank you for time.


Sincerely,

Claudel Noisette



Hon. Katherine B. Forrest

U.S. District Court

500 Pearl Street

NY, NY 10001

Dear Judge Katherine

According to the bible, David was brought forth because he was the youngest amount Jesse's sons. He was appointed to take on the role and receive the anointed oil from Samuel. Throughout the Bible David rose to fame due to his bravery, musical talents and his strength. David also displayed his faults.

My son is very knowledgeable, being ranked the 2nd best Speller in the U.S. by the age of six. He also received his high school diploma at the age of sixteen. My other two sons really look up to David for my Husband past away back in 2009, leaving them in need of a father figure. David stepped up and immediately became the man of the house. He would clean the house, cook food to make sure we eat, and insure his two little brothers handled their homework and understood what they were learning. With me being a single mother and the only person working in the household, David was a huge help and took lots of stress off my back.

David's motto in his life is family. Back when there was an earthquake in Haiti, David heard that there were people in his family that were hurt and others that were considered missing. Due to work, I

was unable to go to Haiti, so he took on the responsibility and went himself.  The moment he arrived to

the Dominican Republic, he immediately took a bus to Haiti, not stopping to eat or sleep. David made it

his priority to locate his family. He did find them made me gain in contact with them. He gave them a

phone so that we can keep contact and stay informed about the changes that were being made in Haiti.

When David returned from his trip, he has a terrible cold and was losing a lot of weight because of it. I

apologized and told him you didn't have to go up there for me. He said "I don't care I would do it again if

I had to".

Though David has been kept away from us for a long period of time, He still managed to keep a

huge smile on my face. For my birthday, I received a card from him. I wasn't happy because I got the

card, but because he sent it out weeks before just so I could receive it on time for my birthday. He called

me later that day and told me he didn't want to be left out on a day that means so much to him. David

always seems to find a way to make me happy and proud that I am his mother.

Please spare my son for he is the only man I have in my life. My husband and my father is gone,

please don't take away my last and only hope.  He is not criminal, and all he wants is a chance to prove

himself, not only to you but to the world and he can't do that if he is kept away.

Thank you for your time.

Sincerely,

Violaine Noisette



Hon. Katherine B. Forrest

U.S. District Court

500 Pearl Street

NY, NY 10001


Dear judge,

I am writing on the behalf of my brother David Delva. Let me start off by telling you the type of person David really is.

Over the years I've shared with him I've learn to realize that David has a huge heart and truly loves his family.  Always giving me support not only as a brother but as a father figure. My father was murdered in the year of 2009. After my father death as a young boy growing up I've lust that need to have  someone to talk to and get advice from, just to help guide me down the right road. My brother David was there as my support. He was there for my high school graduation and any little event that meant something me.

David not only had such a big impact in my life but also everyone he came to encounter. David is considered to be a family man he played a role that even he himself did not realized.

He is the back bone to our family and with our back bone missing, we can't stand as the family we once had.

No one is perfect. we all make mistakes that we all have to live with. All I asked that you give him a chance to prove his innocence. Hear him out and make a fair decision, I wouldn't like to live the rest of my life questioning rather or not if I incarcerated an innocent man for a crime he didn't commit. I wouldn't want to be the reason his loved ones are emotionally struck. I believe everyone is entitled to a second chance. I know my brother and if he received a final chance, he will better himself and return to the family that he truly loves.

Thank you for your valuable time.

Sincerely,

Matthew Noisette



October 30, 2014

Hon. Katherine B. Forrest
U.S. District Court
500 Pearl St
NY, NY 10001

Dear Judge Forrest,

This letter is on behalf of my Nephew, David Delva.  David is my nephew by marriage.  Even though I am no longer married to his uncle, I still consider him my nephew.  I love and adore him the same.

David is a young man who loves his Family.  Family means the world to him.  He always made it a point and made great efforts to attend all my family functions, whether they were dinners, Christmas parties, picnics, sickness, trauma, he was there.  When my twin daughters (his cousins) went away to college, he was constantly calling / texting them to let them know how proud he was of them and to give them words of support and encouragement.  When they graduated this past December, it broke my heart that he couldn't attend.  I know for a fact, if it wasn't for his situation, he would have purchased a plane ticket to Tallahassee, FL to attend their graduation.  His absence was definitely felt and his presence was surely missed.

David has faced a lot of challenges and adversities in his life.  There were a few members of his family who were affected by the earthquake in Haiti.  When he found out that some were hurt and a few missing, he made it his business to make a special trip down there by way of Dominican Republic then caught a bus to cross over to Haiti to find his family who were seriously injured by the earthquake.  He found and cared for them since his mother wasn't able to make the trip.  A few months prior to the earthquake, his step father was murdered on his way to work.  He was devastated and left to be head of household and look after his 2 younger brothers.  Then in 2012 his grandfather collapsed and died on the streets of NY during Hurricane Sandy.

I write this letter not to make excuses for my nephew, but to show the sweet, kind, loving and compassionate side of him that you may not know.  David has a heart of gold, adores his family

and would give the shirt of his back if he had to.  I had the opportunity to correspond with David several times while incarcerated.  He has expressed remorse regarding what happened. He is eager to get out, straighten his life and be a positive contributor to society. He also wants to pursue his love for music and be there for his mother and younger brothers since their father is no longer around.   I ask with much appreciation for leniency for David as he awaits his sentence.

Respectfully yours,

Marie A. Excellent